BETSY C. MANIFOLD (182450)
manifold@whafh.com
RACHELE R. RICKERT (190634)
rickert@whafh.com
BRITTANY N. DEJONG (258766)
dejong@whafh.com
**WOLF HALDENSTEIN ADLER**
   **FREEMAN & HERZ LLP**
750 B Street, Suite 2770
San Diego, CA 92101
Telephone:     619/239-4599
Facsimile: 619/234-4599

*Counsel for Plaintiff Victoria Shaev*

[Additional counsel on signature page]

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VICTORIA SHAEV, derivatively on behalf of WELLS FARGO & COMPANY, <br><br> Plaintiff, <br><br> v. <br><br> JOHN D. BAKER II, ELAINE L. CHAO, JOHN S. CHEN, LLOYD H. DEAN, ELIZABETH A. DUKE, ENRIQUE HERNANDEZ JR., DONALD M. JAMES, CYNTHIA M. MILLIGAN, FEDERICO F. PEÑA, JAMES H. QUIGLY, STEPHEN W. SANGER, JOHN G. STUMPF, SUSAN G. SWENSON, CARRIE L.  TOLSTEDT, and SUZANNE M. VAUTRINOT, <br><br> Defendants. <br><br> -and- <br><br> WELLS FARGO & COMPANY, <br><br> Nominal Defendant. | Case No. <br><br> **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT** <br><br> <u>**DEMAND FOR JURY TRIAL**</u> |

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Plaintiff Victoria Shaev, by and through her undersigned counsel, derivatively on behalf of Wells Fargo & Company, ("Wells Fargo" or the "Company") alleges upon personal knowledge as to herself and her own acts, and upon information and belief as to all other matters, based upon, among other things, her counsel's investigation, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings, news reports, press releases, congressional testimony, and other publicly available documents regarding Wells Fargo, as follows:

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought by the Funds on behalf of Nominal Defendant Wells Fargo against John D. Baker II, Elaine L. Chao, John S. Chen, Lloyd H. Dean, Elizabeth A. Duke, Enrique Hernandez Jr., Donald M. James, Cynthia M. Milligan, Federico F. Peña, James H. Quigley, Stephen W. Sanger, John G. Stumpf, Susan G. Swenson, Carrie L. Tolstedt, and Suzanne M. Vautrinot.  The Funds are, and were at all times relevant hereto, Wells Fargo shareholders.

## INTRODUCTION

2.      This action alleges that the Individual Defendants (defined below) breached their fiduciary duties of loyalty, good faith, candor, and trust owed to the Company and all of its stockholders under Delaware law and violated Sections 14(a) and 29(b) of the Securities Exchange Act of 1934 (the "Exchange Act").

3.      At all relevant times, Wells Fargo, its board of directors (the "Board"), and senior executive officers, in an effort to inflate and manipulate the market price for Wells Fargo stock and, therefore, keep their lofty positions and increase their own compensation, sanctioned the corporate policy of promoting and maintaining an aggressive sales culture that resulted in employees creating unauthorized phony deposit and credit card accounts, victimizing customers by unwittingly enrolling them in online banking services and ordering debit cards for consumers, all without the consumers' consent or knowledge.

4.      To achieve the goal of selling a high number of accounts to each customer each year, and thus to artificially inflate the Company's stock price and increase their own personal

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

wealth, Wells Fargo's senior executives imposed unrealistic sales quotas on its employees, and adopted policies that have, predictably and naturally, driven its employees to engage in fraudulent behavior to meet those unrealistic goals as the supine Board turned a blind eye to the massive wrongdoing.

5.     In 2016, the unlawful misconduct became front-page headline news, as federal and state regulators imposed $185 million in penalties and fines on Wells Fargo for the massive scandal.

6.     Defendant John G. Stumpf ("Stumpf"), the Company's Chairman of the Board and Chief Executive Officer ("CEO"), admitted in his testimony before the Senate Banking Committee on September 19, 2016 that he had knowledge of the widespread fraud as far back as 2011, when he discussed the problem of the fake accounts with Carrie L. Tolstedt ("Tolstedt"), the disgraced head of retail banking as part of an internal investigation. Despite that knowledge, the illegal activity was allowed to continue for another five years.

7.     Beginning in 2012, various regulators, including the Office of the Comptroller of the Currency (the "OCC"), commenced investigations into the Company's unlawful practices. As early as 2013, those regulators issued repeated warnings to Wells Fargo's Board and senior executive officers about the unlawful practices, but the Board and the senior executive officers took no action to stop them from continuing.

8.     Thus, Wells Fargo's Board and senior executive officers knew about and encouraged these nefarious practices for years. This culture was perpetuated throughout the entire Company until regulators forced Wells Fargo to own up to the problem.  Indeed, the pervasive nature of the scheme is evidenced by the Company's terminating at least 5,300 people thus far, including branch managers and managers of managers. Shockingly, some of these people were terminated for refusing to participate in the fraudulent practice and others were terminated for reporting the wrongdoing.

9.     Even with this corrective purge, the Board has ignored the systemic wrongdoing that Defendant Stumpf knew of as early as 2011 and the rest of the Board has known of at least as early as 2013 but failed to prevent, stop, or remedy until recently.  Indeed, even after being

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

fined $185 million by regulators for the massive wrongdoing, Wells Fargo's Board allowed Defendant Tolstedt, the executive who oversaw the bank's retail division where most of the malfeasance occurred until July 2016 to receive a stunning $124.6 million cash severance payment despite the fiasco.

10.     During a Senate hearing on the fiasco on September 21, 2016, Senator Elizabeth Warren delivered to Defendant Stumpf the following blunt and unvarnished assessment of the failure of senior management to prevent or remedy the harm to Wells Fargo: "***OK, so you haven't resigned, you haven't returned a single nickel of your personal earnings, you haven't fired a single senior executive***. Instead evidently your definition of 'accountable' is to push the blame to your low-level employees who don't have the money for a fancy PR firm to defend themselves. ***It's gutless leadership***."

11.     In this derivative action, Plaintiff, a longtime shareholder of Wells Fargo, seeks to hold accountable – finally – the directors and senior officers whose "gutless leadership" for years caused or permitted the massive wrongdoing that now plagues the Company.

## JURISDICTION AND VENUE

12.     The jurisdiction of this Court is founded upon: (a) federal question jurisdiction, pursuant to section 27 of the Exchange Act, as amended, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331; (b) diversity of citizenship, 28 U.S.C. § 1332, and (c) supplemental jurisdiction, 28 U.S.C. § 1367(a).  Plaintiff is a citizen of the State of New York.  The Defendants are all citizens of jurisdictions other than New York.  The matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

13.     Plaintiff brings this action as a derivative action to obtain specific equitable relief for the false and misleading Proxy Statement that failed to comply with the Exchange Act, the SEC Regulations, and Delaware law governing the contents of proxy statements and for the breaches of fiduciary duty under Delaware law.  The claims herein arise under the laws of the State of Delaware and under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), Section 29(b) of the Exchange Act, 15 U.S.C. § 78cc(b), Rule 14a-9, 17 C.F.R. § 240.14a-9, of the promulgated thereunder, and SEC Schedule 14A, 17 C.F.R. § 240.14a-101.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

14.     This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a).

15.     This Court has personal jurisdiction over the Defendants, and venue is proper in this judicial district because nominal defendant Wells Fargo is headquartered in San Francisco, California.  All Defendants have substantial and sufficient business contacts within the State of California because of their current or former roles within the Company.

16.     This action is not a collusive one to confer jurisdiction that the Court would otherwise lack.

## PARTIES

### A.     Plaintiff

17.     Plaintiff is a stockholder of the Company and acquired the common stock of First Interstate Bancorp, a Wells Fargo predecessor, in January 1990, which was later converted to shares of Wells Fargo after the Company acquired First Interstate, and have held her shares continuously since.

### B.     Nominal Defendant

18.     Wells Fargo is a Delaware incorporated company and a financial holding company and a bank holding company registered under the Bank Holding Company Act of 1956 with its principal executive offices located in San Francisco, California.  The Company has approximately $1.9 trillion in assets and serves one in three households in the United States.  The Company describes itself as "community-based" as it "strive[s] for the highest ethical standards with [its] team members, [its] customers, [its] communities and [its] shareholders."

19.     Wells Fargo provides retail, commercial, and corporate banking services to individuals, businesses, and institutions. Its Community Banking segment offers checking, savings, market rate, individual retirement, and health savings accounts, as well as time deposits and remittances; and lines of credit, auto floor plan lines, equity lines and loans, equipment and transportation loans, education and residential mortgage loans, and debit and credit cards. This segment also provides equipment leases, real estate and other commercial financing, small business administration financing, venture capital financing, cash management, payroll services,

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

retirement plans, and merchant payment processing and private label financing solutions, as well as purchases retail installment contracts.

### C.    Director Defendants

20.    Defendant Stumpf is Chairman of the Board and CEO of Wells Fargo and has served as Chairman since January 2010 and CEO since June 2007.  Stumpf has spent nearly 35 years at the Company and also served as President from August 1, 2005 until November 2015, and Chief Operating Officer from September 1, 2005 to June 2007.

21.    Defendant John D. Baker II ("Baker") is a Wells Fargo director and has been since January 2009.  Baker is a member of the Company's Audit and Examination (the "Audit Committee"), Corporate Responsibility, and Credit Committees.

22.    Defendant Elaine L. Chao ("Chao") is a Wells Fargo director and has been since July 2011.  Chao is a member of the Company's Credit and Finance Committees.

23.    Defendant John S. Chen ("Chen") is a Wells Fargo director and has been since June 2005.  Chen is a member of the Company's Human Resources Committee.

24.    Defendant Lloyd H. Dean ("Dean") is a Wells Fargo director and has been since June 2005.  Dean is a member of the Company's Corporate Responsibility, Governance and Nominating, and Risk Committees, and is the Chair of the Human Resources Committee.

25.    Defendant Elizabeth A. Duke ("Duke") is a Wells Fargo director and has been since January 2015.  Duke is a member of the Company's Credit, Finance, and Risk Committees.

26.    Defendant Enrique Hernandez, Jr. ("Hernandez") is a Wells Fargo director and has been since January 2003.  Hernandez is a member of the Company's Corporate Responsibility Committee and is the Chair of the Finance and Risk Committees.

27.    Defendant Donald M. James ("James") is a Wells Fargo director and has been since January 2009.  James is a member of the Company's Finance and Human Resources Committees.

28.    Defendant Cynthia Milligan ("Milligan") is a Wells Fargo director and has been since July 1992.  Milligan is a member of the Company's Corporate Responsibility, Governance and Nominating, and Risk Committees, and is the Chair of the Credit Committee.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

29.     Defendant Federico Peña ("Peña") is a Wells Fargo director and has been since November 2011.  Milligan is a member of the Company's Audit and Examination, Governance and Nominating, and Risk Committees, and is the Chair of the Corporate Responsibility Committee.

30.     Defendant James H. Quigley ("Quigley") is a Wells Fargo director and has been since October 2013.  Quigley is a member of the Company's Credit and Risk Committees, and is the Chair of the Audit and Examination Committee.

31.     Defendant Stephen M. Sanger ("Sanger") is a Wells Fargo director and has been since July 2003.  Sanger is a member of the Company's Human Resources Committee and is the Chair of the Governance and Nominating Committee.

32.     Defendant Susan G. Swenson ("Swenson") is a Wells Fargo director and has been since November 1998.  Swenson is a member of the Company's Audit and Examination Committee as well as the Company's Governance and Nominating Committee.

33.     Defendant Suzanne M. Vautrinot ("Vautrinot") is a Wells Fargo director and has been since February 2015.  Vautrinot is a member of the Company's Audit and Examination and Credit Committees.

34.     Defendants Stumpf, Baker, Chao, Chen, Dean, Duke, Hernandez, James, Milligan, Peña, Quigley, Sanger, Swenson, and Vautrinot are referred to collectively herein as the "Director Defendants" and collectively as the "Board."

**D.     Officer Defendants**

35.     In addition to being named as a Director Defendant above, Defendant Stumpf is also sued in his capacity as CEO of the Company.

36.     Defendant Tolstedt is the Company's former Senior Executive Vice President of Community Banking, and ran the unit at Wells Fargo that was responsible for fraudulently opening up the phony accounts. Tolstedt resigned from the Company in July 2016 with $124.6 million in stock and options, and received compensation which included a yearly incentive bonus of $5.5 million in stock along with a base salary and other bonuses, even during the years of confirmed fraudulent practices under her watch.  The Board allowed Tolstedt to resign with her

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

full compensation in order to try to conceal the massive wrongdoing she caused or permitted to take place under her watch.

37.     Defendants Stumpf and Tolstedt are referred to as the "Officer Defendants," and with the "Director Defendants," collectively referred to as the "Individual Defendants."

<u>**INDIVIDUAL DEFENDANTS' DUTIES**</u>

38.     By reason of their positions as directors and/or senior officers of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its stockholders the fiduciary obligations of loyalty, due care and good faith.

39.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

40.     The Individual Defendants were responsible for maintaining and establishing adequate internal controls for the Company, and to ensure that the Company's public statements were based on accurate research, financial and operational information, and were not presented in a misleading manner.

<u>**CORPORATE GOVERNANCE AND REPORTING SYSTEMS**</u>

41.     According to the Board's Corporate Governance Guidelines, "[t]he business of the Company is managed under the direction of its Board." The Board's oversight responsibilities include:

      a.     Reviewing, monitoring and, where appropriate, approving the Company's strategic plans and objectives, financial performance, risk management framework and risk appetite; and

      b.     Ensuring processes are in place for maintaining the integrity and reputation of the Company and reinforcing a culture of ethics, compliance and risk management.

42.     Under the heading "Code of Ethics," the Corporate Governance Guidelines highlights that:

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

> One of the Board's key responsibilities is to ensure that the Company, through its management, maintains high ethical standards and effective policies and practices designed to protect the Company's reputation, assets and business. The Board has adopted and promotes the Wells Fargo Code of Ethics and Business Conduct applicable to team members as well as directors. Directors shall be familiar with, and are expected to conduct their activities in accordance with, the Code of Ethics and Business Conduct.[1]

43. To discharge their duties, the Board of Wells Fargo was required to, *inter alia*, exercise reasonable and prudent supervision over the selection, oversight, performance, and performance monitoring of management and employees, as well as policies, standards, practices and controls of the Company as set forth in Wells Fargo's governing corporate documents, including its Code Of Ethics and Corporate Governance Guidelines.

44. In addition, by reason of their positions as members of the Audit Committee, Defendants Baker, Peña, Quigley, Swenson, and Vautrinot are subject to additional responsibilities to the public stockholders of Wells Fargo.  According to the Audit Committee Charter, the purpose of the Audit Committee is to assist the Board in fulfilling its responsibilities to oversee, *inter alia*:

a. the integrity of the Company's financial statements and the adequacy and reliability of disclosures to stockholders, including management activities related to accounting and financial reporting and internal controls;

b. operational risk, the Company's compliance with legal and regulatory requirements, financial crimes risk, information security risk, and technology risk; and

c. reputation risk related to the Committee's responsibilities described in this Charter.[2]

---

[1]     Wells Fargo & Company Corporate Governance Guidelines, *available at*: https://www08.wellsfargomedia.com/assets/pdf/about/corporate/governance-guidelines.pdf.

[2]     Wells Fargo & Company Audit and Examination Committee Charter, *available at* https://www08.wellsfargomedia.com/assets/pdf/about/corporate/audit-and-examination-committee-charter.pdf.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

45.     In addition, by reason of their positions as members of the Corporate Responsibility Committee, Defendants Peña, Baker, Dean, Hernandez, and Milligan are subject to additional responsibilities to the public stockholders of Wells Fargo.   According to the Corporate Responsibility Charter, one of the purposes of this Committee is to "monitor the Company's reputation generally, including with customers.[3] To this end, the Committee is to "review and approve, and recommend to the Risk Committee for its approval, the Company's reputation risk management framework, which outlines the Company's governance framework and approach for managing and monitoring reputation risk," and "shall monitor the Company's reputation generally, including with customers, and review and receive updates and reports from management on . . . customer service and complaint matters and other metrics relating to the Company's brand and reputation, including matters relating to the Company's culture and the focus of its team members on serving our customers." *Id.*

46.     In addition, by reason of their positions as members of the Governance and Nominating Committee, Defendants Peña, Baker, Dean, Hernandez, and Milligan are subject to additional responsibilities to the public stockholders of Wells Fargo.   According to the Governance and Nominating Committee Charter, the purpose of this Committee is to "assist the Board of Directors in fulfilling its responsibilities to oversee the composition of the Board and its committees and the Company's corporate governance practices," including by, *inter alia*:

> a.     recommending to the Board the corporate governance guidelines applicable to the Company; and
>
> b.     overseeing reputation risk related to the Committee's responsibilities described in this Charter.[4]

47.     In addition, by reason of their positions as members of the Human Resources

---

[3]     Wells Fargo & Company Corporate Responsibility Committee Charter, *available at* https://www08.wellsfargomedia.com/assets/pdf/about/corporate/corporate-responsibility-committee-charter.pdf

[4]     Wells Fargo & Company Governance and Nominating Committee Charter, *available at* https://www08.wellsfargomedia.com/assets/pdf/about/corporate/governance-and-nominating-committee-charter.pdf.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Committee, Defendants Dean, Chen, Engle, James, and Sanger are subject to additional responsibilities to the public stockholders of Wells Fargo. According to the Human Resources Committee Charter, the purpose of this Committee is to "assist the Board of Directors in fulfilling its responsibilities relating to the overall compensation strategy for the Company and the compensation of the Company's executive officers," including by, *inter alia*:

  a. conducting the annual Chief Executive Officer performance evaluation process;

  b. evaluating and approving compensation plans, policies and programs of the Company applicable to executive officers;

  c. overseeing the implementation of risk-balancing and risk management methodologies for incentive compensation plans and programs for senior executives and those identified employees in a position to expose the Company to material risk; and

  d. overseeing reputation risk related to the Human Resources Committee's responsibilities described in this Charter.[5]

48. For 2015, the Human Resources Committee approved $19.3 million for Defendant Stumpf, and $9,050,000 for Tolstedt, including $850,000 worth of annual incentive compensation based on "performance" goals inflated by improper sales practices.

49. As directors of the Company, the Director Defendants are in a fiduciary relationship with Wells Fargo and owe the Company and its shareholders the highest obligations of loyalty, good faith, and fair dealing.

50. As senior executives, the Officer Defendants owe the Company and its shareholders fiduciary duties that are identical to those owed by the Director Defendants. The Officer Defendants are therefore in a fiduciary relationship with Wells Fargo and owe the Company and its shareholders the highest obligations of loyalty, good faith, and fair dealing.

51. The Officer Defendants further owe fiduciary duties as executives who ran and/or

---

[5] Wells Fargo & Company Human Resources Committee Charter, *available at* https://www08.wellsfargomedia.com/assets/pdf/about/corporate/human-resources-committee-charter.pdf.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

oversaw the very division of the Company responsible for the fraudulent marketing scheme, supervised tiers of employees, participated in strategic planning and execution of Company objectives (including among others, the marketing of the Company's consumer banking services and related products), and/or participated in Company financial decisions. The Officer Defendants further owe duties pursuant to principles of agency law as agents of the Company privy to matters of interest and significance.

## RULE 23.1 ALLEGATIONS

52. This action is a stockholders' derivative action brought pursuant to the Federal Rules of Civil Procedure, rule 23.1.

53. Plaintiff is a current stockholder of the company and has continuously owned such shares of stock of the company at all times during defendants' continuous wrongdoing as alleged herein.

54. As alleged in detail in the section entitled Derivative and Demand Requirement Allegations, *infra*, making a demand on the Board would be futile, and Plaintiff has standing to proceed in this stockholder derivative action.

## SUBSTANTIVE ALLEGATIONS

**A.    The Coercive Sales Culture and Underlying Wrongdoing**

55. Wells Fargo maintained a pressure-cooker culture on its employees to make excessive sales quotas and to "cross-sell" financial products, such as checking and savings accounts, credit cards, mortgages, and wealth management.[6] The quotas imposed by Wells Fargo on its employees were not attainable because there were not enough customers who enter branches on a daily basis for employees to meet their quotas through traditional means.

56. Cross-selling forced Company employees to create bogus accounts and register existing customers for financial products they did not request and or authorize, often using

---

[6]      Wells Fargo, 2014 Annual Report to the SEC ("Important to our strategy to achieve [our] vision is to increase the number of our products our customers use and to offer them all of the financial products that fulfill their financial needs."). The Annual Report continues: "Our cross-sell strategy is to increase the number of products our customers use by offering them all of the financial products that satisfy their financial needs."

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

fictitious addresses so that the customer was unaware of the practice.

57.     Under Defendant Tolstedt's direction and control, Wells Fargo imposed daily quotas on its employees to "cross-sell" products to existing customers, with a goal of eight products per household. This target was called the "Gr-eight initiative," a term coined by former CEO Dick Kovacevich. The initiative was designed to maintain industry leadership in cross-selling. Employees who missed the target would have to work weekends or stay late to catch up, and threatened with termination.

58.     This pervasive culture of cross-selling and unethical marketing, under Defendant Tolstedt's direction and control, led many employees to engage in the illegal conduct and manifested itself through, among other things, quotas for financial products sold to customers passed to branch managers by regional bosses.  Branch managers were expected to commit to obtaining 120% of the daily quotas each morning, and if they failed to achieve that goal the branch manager would be "severely chastised and embarrassed in front of 60-plus managers in [their] area by the community banking president" on a nightly conference call.[7]  Managers therefore pressured their subordinates to meet these goals, who then fraudulently made the accounts and registered customers for non-requested services.

59.     The widespread practices even earned internal nicknames by Company employees, including "sandbagging," which refers to the practice of delaying of opening accounts until the next sales reporting period, "pinning," which refers to the practice of assigning, without customer authorization, Personal Identification Numbers ("PINs") to customer ATM card numbers with the intention of impersonating customers on Wells Fargo computers, and "bundling," which refers to the practice of knowingly and intentionally misinforming customers that certain products are available only in packages with other products such as additional accounts, insurance, annuities, and retirement plans even though they may be purchased separately.

60.     Other false or misleading sales tactics encouraged by the quota system and, thus

---

[7]      *See* http://www.latimes.com/business/la-fi-wells-fargo-sale-pressure-20131222-story.html.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

used by Wells Fargo employees include:

      a.     making misrepresentations to customers to get them to open additional accounts by falsely stating that they will incur monthly fees on your checking accounts until you add a savings account;

      b.     making misrepresentations that additional accounts do not have monthly fees, when they do incur such fees;

      c.     referring unauthorized, and therefore unfunded, accounts to collections because Wells Fargo's practices cause the accounts to have negative balances;

      d.     opening credit card accounts for those customers who stated that they do not wish to open such accounts, and telling them that they will be sent a credit card anyway, and to just discard when they receive them.

61.     Customers often learn about these practices purely by accident, such as opening a welcome letter in the mail for new accounts, receiving correspondence from Wells Fargo for accounts they do not recognize, or receiving calls from collection agencies stating that the customer is overdrawn on an account that the customer did not know existed.

62.     The harm to customers includes: (a) losing money to monthly service fees charged for unauthorized accounts; (b) having accounts being placed into collection, forcing them to defend them in enforcement actions; (c) having their credit reports affected, impacting job and credit applications; and (d) being compelled to open identity theft protection services to ensure that no further fraudulent activities would occur.

63.     Further exerting sales pressure on employees was that internal whistle-blowing on improper sales practices led directly to termination.  For example, as described on CNN Money, Bill Bado refused to open fake accounts that are not requested by customers.[8]  On September 19, 2013, Mr. Bado sent an email to a Wells Fargo Human Resources Representative and copied his regional manager detailing that a "branch manager on 'many occasions' asked him to send out a

---

[8]    http://money.cnn.com/2016/09/21/investing/wells-fargo-fired-workers-retaliation-fake-accounts/.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

debit card, 'pin it, and enroll customers in online banking – 'all without the customers (sic) request of knowledge.'"[9]  Wells Fargo fired Mr. Bado just eight days later.

64.    In stark contrast to the way the Company treated Mr. Bado, Wells Fargo continually touted and praised the performance of Defendant Tolstedt.  The Company continually cited her achievement of strategic objectives such as, "continued growth in primary checking customers and continued success in increasing online and mobile banking customers"[10] and "cross-selling products from other business lines to customers."[11]  These "achievements" facilitated Tolstedt's accumulation of $124.6 million in Company stock, options, and restricted shares[12] and are the result of a corrosive sales culture that forced employees to create fake accounts and register customers for unrequested products.

65.    Indeed, in July 2016, when the OCC sent the Board a final Supervisory Letter concluding that "the Bank's sales practices were unethical; the Bank's actions caused harm to consumers; and Bank management had not responded promptly to address these issues," and just before the burgeoning scandal erupted in front-page headlines across the country, the Company announced Defendant Tolstedt's retirement, with Defendant Stumpf calling her "a standard-bearer of our culture, a champion for customers, and a role model for responsible, principled, and inclusive leadership."[13]  Unfortunately for the Company and its shareholders, its "standard-bearer" oversaw and stood for a culture of selling at any cost, even by breaking the law.

66.    Indeed, Defendant Stumpf later admitted in his testimony before the Senate Banking Committee that Defendant Tolstedt's "retirement" was in part precipitated by communications regarding the findings of an internal investigation of the unauthorized opening of accounts.

---

[9]    *Id.*

[10]    Schedule 14A Proxy Statement filed with the Securities and Exchange Commission ("SEC") on March 16, 2016 at 52.  Hereafter referred to as the "2016 Proxy."

[11]    Schedule 14A Proxy Statement filed with the SEC on March 17, 2015 at 50.  Hereafter referred to as the "2015 Proxy."

[12]    http://fortune.com/2016/09/12/wells-fargo-cfpb-carrie-tolstedt/.

[13]    Exhibit 99.1 to Form 8-K filed with the SEC on July 12, 2016.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

67.     The high pressure sales practices were neither designed to meet customers' financial needs nor drive customer satisfaction. Instead, they were put in place so that the Company could report inflated fee income and to show apparent steady revenue growth to investors, which ultimately benefitted the Company executives, including the Individual Defendants, by artificially driving up the Company's stock price and allowing them to accumulate vast personal wealth.

68.     As alleged herein, the conduct warranting the investigations is not the work of a rogue employee or business division outside the direct purview of the Board and senior management. Rather, the conduct was the result of a toxic policy instituted by the Company at a senior level that was affirmatively adopted or ratified by the Board as the Company's business and marketing strategy, and was deeply embedded in the Company's practices and corporate culture.

69.     In large part because of the phony "cross-selling" program, the market price for Wells Fargo stock doubled from 2011 to mid-August 2015. Over that same time period, Defendant Stumpf received $155 million in stock options as the stock price soared, in large part based on the illegal cross-selling practice.

70.     As identified in the Company's 2013 Annual Report, the "cross-selling efforts to increase the number of products our customers buy from us . . . is a key part of our growth strategy." The 2013 Annual Report, however, did not disclose that the strategy was illegal.

71.     At the Company's Analyst Day conference on May 20, 2014, Defendant Tolstedt admitted that the financial performance of Wells Fargo's Community Banking segment was tied to growth resulting from its cross-selling efforts: "the density and cross-sell model[s] drive revenue."

72.     During a presentation at the Barclays Global Financial Services Conference on September 10, 2014, the Company said it had generated more fee income than its peers in large part due to the Company's focus on earning more customer business through its now-discredited culture of cross-selling.

73.     Despite the overwhelming "red flags" signaling continuing wrongful conduct,

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

1    certain Director Defendants knew but continued to ignore the failure of the Company executives

2    to enforce their own governance policies, as instances of noncompliance were uncovered by

3    internal investigations in 2011 and by outside government investigations and the Company's

4    public actions in 2013. As alleged in detail below, between January 2012 and July 2016, the

5    OCC conducted multiple supervisory activities related to the illegal sales practices through

6    which examiners assessed the Bank's governance and risk management practices.[14]

7         74.    Specifically, in February 2013, the OCC issued a Supervisory Letter[15] to Wells

8    Fargo requiring it to develop an operational risk compliance program, and in early 2014, the

9    OCC directed Wells Fargo to address weaknesses in compliance risk related to the unfair and

10   deceptive practices, including reassessing the Company's cross-selling and sales practices. The

11   OCC held meetings with Company management throughout 2014, as well as review of the

12   Company's management information systems, and other internal audit findings. The OCC's

13   ongoing review continued in 2015, with meetings with Company management, review of

14   extensive documents, including internal reports, board packages, and internal audit findings, and

15   identified the need for Wells Fargo to improve its risk management and corporate governance

16   related to operational and compliance risk.

17        75.    The OCC concluded that the Community Bank unit at Wells Fargo "lacked a

18   formalized governance framework to oversee sales practices and thus" required Wells Fargo to

19   "address the governance of sales practices within its Community Bank division."

20        76.    An additional Supervisory Letter was issued in June 2015 to Stumpf, the

21   Company's Chairman of the Board and CEO, identifying matters related to the widespread

22   illegal sales practices, and instructed the Bank to take corrective actions to address the fraudulent

23   practices. Notably, the June 2015 Supervisory Letter instructed the Company to re-evaluate

24   compensation and incentive plans to "***ensure they did not provide an incentive for***

---

[14]    Testimony of Thomas J. Curry, Comptroller of the Currency before Committee on Banking, Housing, and Urban Affairs of the United States Senate, Sept. 20, 2016, *available at* https://occ.gov/news-issuances/news-releases/2016/nr-occ-2016-115a.pdf ("Curry Testimony").

[15]    A Supervisory Letter is an official OCC communication that formally conveys supervisory findings and conclusions, including any supervisory concerns.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

*inappropriate behavior.*" Curry Testimony at 7.

77.     The OCC examination continued into 2016 and the OCC sent a letter to the Board with its findings, namely, concluding that "the Bank's sales practices were unethical; the Bank's actions caused harm to consumers; and Bank management had not responded promptly to address these issues." *Id.* at 8.

78.     Thus, from at least 2013, 13 out of 15 current Board members[16] and the Company executives were on notice that the Company was involved in highly material and flagrant violation of the law and the Company's own ethical and corporate governance guidelines.

79.     In light of the multiple investigations concerning the Company's improper practices, Wells Fargo's Board and senior executives knew or should have known that the Company's continued conduct could subject it and its stockholders to severe consequences, including fines and penalties, as well as untold legal fees that the Company would have to spend to defend itself from the allegations of wrongdoing.

80.     Despite the lawsuit commenced by the City of Los Angeles and various regulatory actions all relating to the misconduct described herein, the Board and the Company's senior executives allowed the behavior to continue and therefore breached their fiduciary duties causing significant harm to the Company and for which they must be held accountable.

81.     The Board has a duty to claw back the excessive and unjustified compensation from the Officer Defendants.  Defendant Tolstedt oversaw the Company's retail banking while the widespread and illegal practices occurred. Tolstedt's accumulated compensation therefore, over her 27 years tenure at the Company, amounts to approximately $90 million. Between 2011 and 2015, while the wrongdoing was taking place, Defendant Stumpf, who oversaw the Company's entire operation as Wells Fargo's CEO, received more than $100 million in total compensation (including cash, stock awards, stock options, and performance shares).

82.     As set forth in the 2016 Proxy (defined *infra*), "Wells Fargo has strong recoupment and clawback policies in place . . . The Company has multiple recoupment or

---

[16]        Dean and Vautrinot were appointed to the Board in 2015.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

clawback policies and provisions in place that are applicable to our executive officers." Pursuant to the Company's Long-Term Incentive Compensation Plan, the triggers for clawback or recoupment are as follows:

- misconduct which has or might reasonably be expected to have reputational or other harm to the Company or any conduct that constitutes "cause;"
- Misconduct or commission of a material error that causes or might be reasonably expected to cause significant financial or reputational harm to the Company or the executive's business group;
- Improper or grossly negligent failure, including in a supervisory capacity, to identify, escalate, monitor or manage, in a timely manner and as reasonably expected, risks material to the Company or the executive's business group; and/or
- The Company or the executive's business group suffers a material downturn in financial performance or suffers a material failure of risk management.

83.     The Board has failed to use its clawback authority and instead, has chosen to unjustifiably compensate the Officer Defendants for the very misconduct that has harmed the Company, all in violation of their fiduciary duties to the Company.

**B.     Regulatory Actions and Findings**

84.     Wells Fargo's aggressive sales practices drew the notice of the Los Angeles Times ("L.A. Times"), which conducted an extensive investigation of the Company in 2013 and published an article detailing the fraudulent sales tactics on December 21, 2013.[17] The investigation uncovered widespread complaints about fake accounts and high-pressure sales quotas mandated by Wells Fargo executives on Company employees.

85.     The L.A. Times article prompted an investigation by the Los Angeles City Attorney, and in 2015, the City of Los Angeles sued the Company, alleging that the bank's sales goals had encouraged "unfair, unlawful, and fraudulent conduct."

86.     Following the revelations of the toxic sales culture at Wells Fargo, governmental entities, including the OCC, the Los Angeles City Attorney, and the CFPB, launched investigations into Wells Fargo's sales practices.

---

[17]     *See* http://www.latimes.com/business/la-fi-wells-fargo-sale-pressure-20131222-story.html.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

- 18 -

87.    After launching a preliminary examination in 2012, the OCC initiated meetings with various levels of the Company's management in 2013, including the executive leadership, to evaluate among other things, the Company's sales practices.[18]

88.    The OCC's meetings and examinations resulted in a formal Supervisory Letter requiring the Company to develop its operational risk compliance program for consumer practices, which later became a directive to address weakness related to unfair and deceptive practices in 2014.  Among these practices, the OCC identified the need to assess cross-selling and sales practices as part of the OCC's upcoming examination of the Company's governance process.    Throughout 2014, OCC examiners continued their dialogue with Company management regarding these issues.

89.    At about the same time as the City of Los Angeles lawsuit, the Consumer Financial Protection Bureau ("CFPB") also commenced an investigation regarding the Company, and has since determined that Wells Fargo engaged in at least the following unlawful acts and practices: (1) opened unauthorized deposits accounts for existing customers and transferred funds to those accounts from their owners' other accounts, all without their customers' knowledge or consent; (2) submitted applications for credit cards in consumers' names using consumers' information without their knowledge or consent; (3) enrolled consumers in online-banking services that they did not request; and (4) ordered and activated debit cards using consumers' information without their knowledge or consent,  in violation of  sections 1031 and 1036(a)(1)(B) of the Consumer Financial Protection Act of 2010 ("CFPA"), 12 U.S.C. §§ 5531 and 5536(a)(1)(B).

90.    Prompted by complaints from consumers and Wells Fargo employees alleging improper sales practices at the Company, in March 2012, the OCC commenced an examination of the Company's sales practices, and concluded that the Company engaged in unsound and unsafe sales practices that included the unauthorized opening of deposit or credit card accounts and the transfer of funds from authorized, existing accounts to unauthorized accounts.

---

[18]    Testimony of Thomas J. Curry, Comptroller of the Currency, before the United States Senate Committee on Banking, Housing, and Urban Affairs (Sept. 20, 2016).

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

91.     In February 2015, the OCC conducted an examination of the Company's Community Bank Operational Risk Management and concluded that the Company lacked a formalized governance framework to oversee sale practices and issued a Supervisory Letter that included a Matter Requiring Attention ("MRA"),[19] requiring the bank to address the governance of sales practices within its Community Bank division.

92.     The OCC issued another Supervisory Letter to the Chairman and Chief Executive Office in June 2015, which included five MRAs that required the Company "*to take significant action to address the inappropriate tone at the top.*"[20]   The June 2015 letter also identified the lack of appropriate control or oversight structure given the corporate emphasis on product sales and cross-selling; the lack of an enterprise-wide sales practices program; the lack of an effective enterprise-wide customer complaint process; the lack of a formalized governance process to oversee sales practices and oversee and test branch sales practices; and the failure of the Company's audit services to identify the above issues.   The OCC also required the Company to hire two consultants, one to review the sales practices and one to assess consumer harm.   The consultants issued their findings to the OCC and the Company three times in October 2015, February 2016, and May 2016.

93.     Throughout 2015 and 2016, the OCC continued its review of the Company and held monthly meetings with Company management and issued a Report of Examination and a letter to the Board in July 2016.   The Report of Examination communicated the following findings and conclusions:

- the Company's sales practices were unethical;

- the Company's practices harmed consumers; and

- the Company's management had not responded promptly to these issues.

---

[19]     MRAs describe practices that deviate from sound governance, internal control, and risk management principles, and have the potential to adversely affect a bank's condition, including its financial performance or risk profile, if not addressed; or result in substantive noncompliance with law and regulations, enforcement actions, supervisory guidance, or conditions imposed in writing in connection with the approval of any application by a bank.

[20]     Testimony of Thomas J. Curry, Comptroller of the Currency, before the United States Senate Committee on Banking, Housing, and Urban Affairs (Sept. 20, 2016).

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

94.     On July 18, 2016, a Supervisory Letter was sent to Stumpf, the Company's Chairman, which stated that the Company engaged in unsafe or unsound banking practices. Shortly thereafter, the OCC approved the issuance of the Consent Order and the assessment of civil money penalties due to the Company's "reckless unsafe or unsound sales practices and the Bank's risk management and oversight of those practices."

95.     The OCC issued its Order on September 8, 2016.[21] The OCC Order identified, among other things, that "the incentive compensation program and plans within the Community Bank Group were not aligned properly with local branch traffic, staff turnover, or customer demand, and they fostered the unsafe or unsound sales practices . . . and pressured Bank employees to sell Bank products not authorized by the Customer."  The unsafe or unsound sales practices identified by the OCC included:

- the selling of unwanted deposit or credit card accounts;
- the unauthorized opening of deposit or credit card accounts;
- the transfer of funds from authorized, existing accounts to unauthorized accounts ("simulated funding"); and
- unauthorized credit inquires for the purposes of opening the unwanted and unauthorized accounts.

96.     As a result of these practices, on September 8, 2016, in coordination with the CFPB and the Los Angeles City Attorney, the OCC assessed a $35 million civil penalty against the Company that reflects a number of factors, including Wells Fargo's failure to develop and implement an effective enterprise risk management program to detect and prevent the unsafe or unsound sales practices, and the scope and duration of the practices (the "OCC Order"). The OCC Order also requires the Company to take corrective action to stop and prevent the unsafe or unsound sales practices, and to provide for restitution to those customers who were financially harmed as a result of these practices.

97.     On September 8, 2016, the CFPB also announced that it has fined Wells Fargo

---

[21]     https://occ.gov/news-issuances/news-releases/2016/nr-occ-2016-106a.pdf.   Hereafter, the "OCC Consent Order".

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

$100 million for the widespread illegal practice of secretly opening unauthorized deposit and credit card accounts and ordered the Company to pay full restitution to all victims of the illegal practice. As noted by the CFPB in its press release announcing the investigation and Consent Order, the wrongdoing was already known to the Company through an internal investigation that had uncovered the fraudulent practices, and not from results of an independent government investigation. The press release further explained that the illegal conduct was not caused by a small set of rogue employees, but was driven by the Company in a concerted effort to be the leader in the cross-selling market.

98.     As stated in the CFPB's press release, not only did the Company know about the wrongdoing, it incentivized the employees who participated in the fraudulent scheme:

> WASHINGTON, D.C. — Today the Consumer Financial Protection Bureau (CFPB) fined Wells Fargo Bank, N.A. $100 million for the widespread illegal practice of secretly opening unauthorized deposit and credit card accounts. Spurred by sales targets and compensation incentives, employees boosted sales figures by covertly opening accounts and funding them by transferring funds from consumers' authorized accounts without their knowledge or consent, often racking up fees or other charges. ***According to the bank's own analysis, employees opened more than two million deposit and credit card accounts that may not have been authorized by consumers.*** Wells Fargo will pay full restitution to all victims and a $100 million fine to the CFPB's Civil Penalty Fund. The bank will also pay an additional $35 million penalty to the Office of the Comptroller of the Currency, and another $50 million to the City and County of Los Angeles.
>
> \*   \*   \*
>
> ***In recent years, the bank has sought to distinguish itself in the marketplace as a leader in "cross selling" these products and services to existing customers who did not already have them.*** When cross selling is based on efforts to generate more business from existing customers based on strong customer satisfaction and excellent customer service, it is a common and accepted business practice. ***But here the bank had compensation incentive programs for its employees that encouraged them*** to sign up existing clients for deposit accounts, credit cards, debit cards, and online banking, and the bank failed to monitor the implementation of these programs with adequate care.

99.     Similarly, the CFPB issued a Consent Order on September 8, 2016.[22]  The CFBP

---

[22]     http://files.consumerfinance.gov/f/documents/092016_cfpb_WFBconsentorder.pdf. Hereafter, the

Consent Order highlights the magnitude of the Company's malfeasance, concluding that *Wells Fargo employees opened 1,534,280 deposit accounts* that may not have been authorized and that may have been funded through simulated funding or transferring funds from existing customer accounts without customer knowledge or consent.   Similarly, the CFBP Consent Order concluded that *Wells Fargo employees submitted applications for 565,445 credit-card accounts* that may not have been authorized by using customer information without their knowledge or consent.   In addition to the unsafe or unsound sales practices identified by the OCC, the CFPB highlighted that employees enrolled customers in online-banking services without their consent.

100.    Richard Cordray ("Cordray"), the Director of the CFBP, noted: "The gravity of the fraud that occurred at Wells Fargo cannot be pushed aside as the stray misconduct of just a few bad apples.  As one former federal prosecutor aptly noted, the stunning nature and scale of these practices reflects instead the consequences of a diseased orchard."[23]

101.    Cordray continued his blistering findings: "Wells Fargo built and refined an incentive-compensation program and implemented sales goals to boost the cross-selling of products, but did so in a way that made it possible for its employees to pursue unfair and abusive sales practices."  The cross-selling incentive program resulted in a culture that "[r]ather than put its customer first, Wells Fargo built and sustained a program where the bank and many of its employees served themselves instead, violating the basic ethics of a banking institution, including the key norm of trust." *Id.*

102.    The CFBP fined Wells Fargo $100 million for its practices and required the installation of independent consultants to monitor for future misconduct.  In conjunction with the CFPB's and the OCC's settlement, the Los Angeles City Attorney settled its investigation into Wells Fargo for $50 million after having spent 16-months investigating the Company and speaking to over 1000 former employees and customers.[24]

---

"CFBP Consent Order."

[23]    Testimony of Richard Cordray, Director of the Consumer Financial Protection Bureau, before the United States Senate Committee on Banking, Housing, and Urban Affairs (Sept. 20, 2016).

[24]    Testimony of Hon. Michael N. Feuer, Los Angeles City Attorney, before the United States Senate Committee on Banking, Housing, and Urban Affairs (Sept. 20, 2016).

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

103. Also on September 8, 2016, the City of Los Angeles announced that it had settled its lawsuit with Wells Fargo, whereby Wells Fargo will pay $50 million in penalties to the City of Los Angeles and restitution to customers.

104. The aggregate amount of penalties and fines levied against Wells Fargo, to date is $185 million, with no end in sight. For example, shortly after the announcement of the $185 million in penalties and fines, the United States Attorney's Offices for the Southern District of New York and the Northern District of California opened a civil and/or criminal investigation into the sales practices at Wells Fargo, and has subpoenaed documents and other materials from the Company. The scope of the investigation includes whether senior executives directed employees to falsify documents in conjunction with the opening of accounts and products without consumers' knowledge or authorization and whether there was willful blindness on the part of the senior executives concerning their practices.

105. As stated by CFBP Director Cordray, "All told, the bank will pay $185 million in fines for the illegal actions of these employees.  That is a dramatic amount as compared to the financial harm to consumers, but it is justified here by the outrageous and abusive nature of these fraudulent practices on such an enormous scale."

106. In an effort to scapegoat low-level employees and to avoid personal accountability and liability for the massive fraud, the Company disclosed that it had fired more than 5,300 employees. Some were fired for reporting the wrongdoing and others were fired for not participating in it. But not a single senior executive, however, has lost a job or (until recently) paid or promised to pay anything to compensate the Company for its massive losses. No member of the Board has accepted responsibility for the stunning oversight failure.

107. This revelation of widespread misconduct caused the Company stock to fall from a close of $49.90 per share on September 8, 2016 to $48.72 per share on September 9, 2016. As of September 16, 2016, the Company lost approximately $19 billion in market capitalization, and may lose additional value as the scandal unfolds and as official investigations and public scrutiny continue.

108. On September 21, 2016, Defendant Stumpf testified before the Senate Committee

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

on Banking, Housing, and Urban Affairs. When he was interrogated by Senator Warren, Defendant Stumpf admitted that not a single senior executive was fired for the misconduct:

> Warren:    Have you fired a single senior executive? And by that, I don't mean regional manager or branch manager. I'm asking about the people who actually led your community banking division or your compliance division.
>
> Stumpf:    We've made a change in our regional – to lead our regional banks –
>
> Warren:    I just said I'm not asking regional managers. I'm not asking about branch managers. I'm asking if you had fired senior management, the people who actually led community banking division, who oversaw this fraud or the compliance division that was in charge of making sure that the bank complied with the law.
>
> Stumpf:    Carrie Tolstedt –
>
> Warren:    ***Did you fire any of these people?***
>
> Stumpf:    ***No***.
>
> Warren:    ***No. OK, so you haven't resigned, you haven't returned a single nickel of your personal earnings, you haven't fired a single senior executive***. Instead evidently your definition of "accountable" is to push the blame to your low-level employees who don't have the money for a fancy PR firm to defend themselves. ***It's gutless leadership***.

109.    In his written testimony prepared for the hearing, Defendant Stumpf admitted that the Company was aware of the problem since as early as 2011, but at the Senate hearing he admitted he failed to stop it.

110.    Shamed by Senator Warren's harsh criticism of his failure to account to the Company for any of his wrongdoing, on September 27, 2016, Defendant Stumpf agreed to return $41 million in stock, plus some salary, for his role in the scandal.  However, in a gross failure of oversight and in breach of their fiduciary duty to the Company, Stumpf's confederates on the Board took no action to recover anything from him until after the scandal erupted, and the Board has failed to hold any other director or senior officer accountable in any way.

111.    The backlash against the Company continues to grow, as the California Treasurer John Chiang ("Chiang") announced on September 28, 2016 that he has severed the state's

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

business relationships with Wells Fargo. Chiang described the Company's behavior as "a culture which actively promotes wanton greed." The sanction will remain in place for at least a year, and the loss of the state's business is expected to be astronomical, as the California Treasurer oversees approximately $2 trillion in banking transactions a year and manages $75 billion in investments. Wells Fargo also served as the lead underwriter of five of the past thirteen bond offerings from the state in this year alone, and was the second-largest underwriter of municipal debt in the first half of the year

### C.    The Board Made False and Misleading Statements in the Company's Proxy Statement

112.    On or about March 16, 2016, the Director Defendants authorized the distribution of the proxy statement in connection with the 2016 Annual Shareholder meeting that was held on April 16, 2016 (the "2016 Proxy"), with which Wells Fargo's shareholders were asked to vote on the re-election of all 15 nominees for the Board listed in the 2016 Proxy, including all Director Defendants.

113.    In violation of Section 14(a) of Exchange Act, the 2016 Proxy contained false and misleading statements and omissions.

114.    All the Director Defendants permitted the use of their names in the Proxy Statement, and the Notice of Annual Meeting of Stockholders and the accompanying 2016 Proxy were issued "[b]y Order of the Board of Directors," therefore the Board participated in the soliciting of proxies in contravention of Rule 14a-9. *See* § 14(a), 15 U.S.C. § 78n(a); Notice of Annual Meeting of Stockholders.

115.    The 2016 Proxy misleadingly represented that the "[c]andidates for election to the Board] must be individuals of the highest character and integrity." 2016 Proxy at 12. This statement by the Company falsely implied that all 15 incumbent candidates who sought re-election to the Board met that standard; namely, that they were "individuals of the highest character and integrity." Plaintiff and all other shareholders whose votes or proxies were sought reasonably understood that endorsement to mean that all 15 candidates for re-election to the Board conducted themselves as directors in an ethical manner.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

116.    Those statements were false and misleading, especially in the absence of the disclosure that all of the nominees for the Board, *i.e.*, the Director Defendants, had exhibited a distinct lack of "highest character and integrity" by ignoring evidence of the Company's systematic misconduct.

117.    The 2016 Proxy misleadingly represented that Wells Fargo's Board was actively working to ensure the Company's compliance with applicable law, stating that the Audit Committee:

- assists the Board in fulfilling its responsibilities to oversee the integrity of our financial statements and the adequacy and reliability of disclosures to our stockholders, including our internal control over financial reporting;

- oversees operational risk, legal and regulatory compliance, financial crimes risk (Bank Secrecy Act and Anti-Money Laundering), information security risk (including cyber), and technology risk, approves significant supporting operational risk, compliance and financial crimes policies and programs, including our information security program, and reviews regulatory examination reports and communications; and

- reviews and discusses the implementation and effectiveness of our ethics, business conduct, and conflicts of interest program.

118.    Those statements were false and misleading, especially in the absence of a disclosure that Wells Fargo's Audit Committee and the Board consciously allowed the occurrence and continuation of widespread misconduct at the Company. Thus, an investor could not take comfort from the existence of the reporting structure described in the 2016 Proxy because Wells Fargo's management and directors did not care if Company employees broke the law as long as they kept Wells Fargo profitable.

119.    The 2016 Proxy misleadingly represented that Wells Fargo's Board was actively working to ensure the Company's compliance with applicable law, stating that the Corporate

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Responsibility Committee:

- monitors the Company's reputation generally, including with its customers; and

- receives reports and updates on customer service and complaints, including related to the Company's culture and its team members' focus on serving customers, and other matters relating to the Company's brand and reputation.

120.   Those statements were false and misleading, particularly in the absence of a disclosure that Wells Fargo's Corporate Responsibility Committee and the Board consciously ignored red flags concerning the existence of widespread misconduct at the Company and allowed the misconduct to continue. Thus, an investor could not take comfort from the existence of the reporting structure described in the 2016 Proxy because Wells Fargo's management and directors did not care if Company employees broke the law and damaging the Company's reputation as long as they kept Wells Fargo profitable.

121.   The 2016 Proxy misleadingly represented that Wells Fargo's Board was actively working to ensure the Company's compliance with applicable law, stating that the Governance and Nominating Committee:

- annually reviews and assesses the adequacy of [the Company's] Corporate Governance Guidelines and oversees a review of the Board's performance; and

- oversees the Company's engagement with stockholders and other interested parties concerning governance matters and works with the Board's other committees in connection with stockholder engagement on matters subject to the oversight of such other committees.

122.   Those statements were false and misleading, particularly in the absence of a disclosure that Wells Fargo's Governance and Nominating Committee and the Board consciously ignored red flags concerning the existence of widespread misconduct at the

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Company allowed the misconduct to continue. Thus, an investor could not take comfort from the existence of the reporting structure described in the 2016 Proxy because Wells Fargo's management and directors did not care if Company employees broke the law as long as they kept Wells Fargo profitable.

123.    The 2016 Proxy misleadingly represented that Wells Fargo's Board was actively working to ensure the Company's compliance with its compensation and risk oversight policies, stating that the Human Resources Committee:

- oversees the Company's incentive compensation practices so that they are consistent with the safety and soundness of the Company and do not encourage excessive risk-taking and reviews and approves benefit and compensation plans and arrangements applicable to executive officers of the Company; and

- evaluates the CEO's performance and approves and recommends the CEO's compensation to our Board for ratification and approval and approves compensation for our other executive officers and any other officers or employees as the Human Resources Committee determines appropriate.

124.    Those statements were false and misleading, particularly in the absence of a disclosure that Wells Fargo's Human Resources Committee and the Board consciously unjustly compensated Stumpf and Tolstedt by consciously permitted payments and refused to seek clawback of those payments. Thus, an investor could not take comfort from the existence of the mechanisms as described in the 2016 Proxy.

125.    The 2016 Proxy further misleadingly represented that Wells Fargo's Board operated pursuant to Wells Fargo's Code of Ethics, which "applies to [Wells Fargo's] team members and directors and continues to reflect [Wells Fargo's] core value of holding [the Company] to the highest standards of ethical behavior." 2016 Proxy at ii. The 2016 Proxy further states that each nominee for the Board "satisfies the applicable requirements of [the Company's] Corporate Governance Guidelines, Code of Ethics applicable to directors, and any other rules,

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

regulations, or policies applicable to members of the Board and its committees and for making any required disclosures in our proxy statement." 2016 Proxy at 12. These representations were false and misleading because the Board were flagrantly violating Wells Fargo's Code of Ethics and Corporate Governance Guidelines, both of which forbids unethical practices of any kind.

126.    These false and misleading statements and omissions were an essential link in the election of the Director Defendants to the Board of Wells Fargo. The 2016 Proxy harmed the Company by interfering with the proper governance on its behalf that follows the free and informed exercise of the stockholders' right to vote for directors. For example, as a result of their election to the Board, the Director Defendants continued to harm the Company by perpetuating the systematic and widespread misconduct alleged herein and failed to halt the illegal practices.

## DERIVATIVE AND DEMAND ALLEGATIONS

127.    Plaintiff brings this action derivatively in the right and for the benefit of nominal defendant Wells Fargo to redress injuries suffered, and to be suffered, by Wells Fargo as a direct result of the Individual Defendants' breaches of fiduciary duties, abuse of control, gross mismanagement, unjust enrichment and violations of federal securities laws.  Wells Fargo is named as a Nominal Defendant solely in a derivative capacity and no claims are asserted against it.

128.    Plaintiff owns Wells Fargo common stock and has owned Wells Fargo common stock at all times relevant hereto.

129.    Plaintiff will adequately and fairly represent the interests of Wells Fargo in enforcing and prosecuting its rights.

130.    On September 14, 2016, Plaintiff's counsel wrote to the Board pursuant to Section 220 of the Delaware General Corporation Law demanding an inspection of books and records relating to the scandal.

131.    On September 26, 2016, C. Vance Beck, Senior Vice President, Senior Company Counsel of the Company wrote to Plaintiff's counsel offering to produce certain books and records pursuant to a proposed confidentiality agreement that would preclude Plaintiff from disclosing any of the books and records, or the information contained therein. That proposed

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

confidentiality agreement would preclude Plaintiff from including the books and records, or any information derived therefrom, in this Complaint without following the Court's procedures for filing documents under seal.

132.   In light of the admissions that have been made since September 14, 2016, including in Defendant Stumpf's Senate testimony on September 20, 2016, the books and records inspection is unnecessary for Plaintiff to commence this action.  Accordingly, Plaintiff's counsel wrote to Mr. Beck on September 28, 2016 withdrawing the 220 demand without prejudice.

133.   Plaintiff did not make a pre-suit demand upon the Board to bring this action because a majority of the Board either: (a) engaged in conduct that is not a legitimate exercise of judgment and/or is *ultra vires* and, therefore, cannot enjoy the limited protection of the business judgment rule; and/or (b) would have been "interested" in (and therefore conflicted from and unable to fairly consider) a demand because they face a substantial likelihood of liability for their role in the unlawful and improper conduct alleged herein.

134.   As alleged below, at least thirteen of the fifteen Board members knew about the widespread and continuous misconduct alleged and refused to take corrective measures. As such, a demand on the Board would be futile as the Director Defendants to this day have refused to take responsibility for their actions.

### A.   Demand Is Excused Because The Director Defendants' Conduct Is Not a Valid Exercise Of Business Judgment

135.   The Director Defendants' challenged misconduct lies at the heart of this case and constitutes the direct facilitation of the wrongful activity alleged herein, including knowingly and consciously presiding over the Company's systematic and widespread illegal conduct.

136.   The Board affirmatively adopted, implemented, and condoned a business strategy based on deliberate, widespread, blatant violations of law. Breaking the law is not a legally protected business decision, and such conduct can in no way be considered a valid exercise of business judgment even if it resulted in the Company increasing its earnings or increasing its market value. Accordingly, demand on the Board is excused.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

137.   A derivative claim to recoup equitable damages for harm caused to the Company by unlawful activity represents a challenge to conduct that is outside the scope of the Board's business judgment – conduct for which the Director Defendants face personal liability.

138.   Allowing the Company to violate laws and regulations, or looking the other way while refusing to prevent others under the Board's control from committing these wrongful acts are all forms of misconduct that cannot under any circumstances be examples of legitimate business conduct. The protections of the "business judgment rule" do not extend to such malfeasance. Nor can such malfeasance ever constitute the "good faith" required of corporate fiduciaries.

139.   Moreover, this action does not arise from an anomalous incident of misconduct within the Company or from the acts of a rogue employee or division within the Company. Rather, as alleged herein, serious violations of the marketing laws occurred systematically and at every level of the Company as a direct result of the Board's decision to embrace a policy of committing calculated legal violations as the Company's deliberate business strategy. There is no legitimate "business judgment" involved in devising or carrying out such an unlawful policy. Accordingly, demand on the Board is futile and excused.

**B.    Demand Is Excused Because a Majority of The Board Members Are Conflicted Because There is a Substantial Likelihood Of Liability Arising From Their Misconduct**

140.   Even if knowingly presiding over wrongful conduct could somehow fall within the realm of the business judgment rule, which it does not, demand is also futile and excused because a majority of the members of the Board are personally responsible for the massive wrongdoing. As they are neither disinterested nor independent, the Board cannot, therefore, properly consider a demand.

141.   Specially, as alleged herein, pursuant to the Company's Corporate Governance Guidelines, Code of Business Conduct and Ethics, and Delaware law, the Director Defendants knew of or recklessly permitted the illegal sales practices described herein, approved the compensation which incentivized employees, including Stumpf and Tolstedt to engage in the illegal sales practices and refused to clawback the unjust compensation, and failed to implement

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

1    any meaningful reforms as instructed by the CFPB and OCC to halt the wrongdoing, even after

2    receiving notice of the rampant illegal conduct as uncovered internally by the Company's own

3    investigation and by the governmental investigations.

4        142.    As alleged herein, an overwhelming majority of the Board (including Defendants

5    Stumpf, Baker, Chao, Chen, Dean, Hernandez, James, Milligan, Peña, Quigley, Sanger, and

6    Swenson) were on notice since at least 2011 that Wells Fargo employees were committing highly

7    material and flagrant violation of the law as well as violating the Company's own ethical and

8    corporate governance guidelines, as determined by the CFPB and the OCC.

9        143.    Given their fiduciary duties as directors of the Company, to the extent any of the

10    Director Defendants did not have actual knowledge of the extensive fraudulent practices taking

11    place within Wells Fargo, such lack of knowledge could only be the product of willful blindness

12    that constitutes a bad faith breach of their fiduciary duty to the Company and its shareholders.

13        144.    Moreover, the Director Defendants were required to act upon this information to

14    protect the Company from continued legal violations being committed. Rather than doing so, the

15    Director Defendants, in violation of their legal obligations, consciously ignored the information

16    presented to them and about which they were otherwise made aware concerning the Company's

17    extensive legal violations. As a result, nearly all of the Director Defendants face a substantial

18    likelihood of personal liability for their conduct and demand is, therefore, excused.

19        145.    The Director Defendants are likewise conflicted from pursuing, and unable to

20    pursue, the Company's claims against the Officer Defendants. Any effort to directly prosecute

21    such claims against the Officer Defendants for their direct roles in the deceptive sales and

22    marketing practices carried out in Wells Fargo's name would necessarily expose the Director

23    Defendants' own culpability for the very same conduct. Given that the Board was required to be

24    regularly informed concerning the Company's compliance or non-compliance with the law, any

25    effort by the Director Defendants to hold Company employees liable would lead the Director

26    Defendants to defend on the ground that their own conduct was consistent with corporate policy

27    and practice, as established and by and known to the Board.

28        146.    In addition, thirteen of the Director Defendants (*i.e.*, all of the Director

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Defendants other than Chao), constituting an overwhelming majority of the Board, served on various Board committees directly implicated in the wrongdoing and thus face a heightened likelihood of liability arising from their conduct on the specific committees of the Board.

147.    Defendants Quigley, Baker, Peña, Swenson, and Vautrinot are conflicted from considering a demand because they each face a substantial likelihood of liability as a result of their conduct on the Audit Committee. As set forth herein, the Audit Committee's charter imposes specific duties on members of this committee to ensure compliance with laws, regulations, and internal procedures.

148.    Defendants Peña, Baker, Dean, Hernandez, and Milligan are conflicted from considering a demand because they each face a substantial likelihood of liability as a result of their conduct on the Corporate Responsibility Committee. As set forth herein, the Corporate Responsibility Committee's charter imposes specific duties on members of this committee to monitor the Company's reputational harm.

149.    Defendants Sanger, Dean, Milligan, Peña, and Swenson are conflicted from considering a demand because they each face a substantial likelihood of liability as a result of their conduct on the Governance and Nominating Committee. These defendants are specifically charged with reviewing matters of corporate governance and maintaining an informed status on Company issues related to corporate social responsibility. Defendants Sanger, Dean, Milligan, Peña, and Swenson therefore breached their fiduciary duty of due care, loyalty, and good faith, as they permitted a Company-wide scheme to repeatedly violate the laws and regulations, as discussed above, despite the fact that they were on notice of Company's wrongdoing and the consequences thereof to the Company. The repeated Company-wide conduct described above, which included the fraudulent sales practices that placed profits ahead of its customers' sensitive information and trust, ultimately resulting in millions of fines and untold legal fees and damage to the Company's reputation. Accordingly, Defendants Sanger, Dean, Milligan, Peña, and Swenson face a substantial likelihood of liability and cannot appropriately consider a demand, and therefore demand is excused with respect to these Defendants.

150.    Similarly, Defendants Dean, Chen, James, and Sanger are conflicted from

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

considering a demand because they each face a substantial likelihood of liability as a result of their conduct on the Human Resources Committee. These defendants are specifically charged with reviewing matters of executive compensation. Defendants Dean, Chen, James, and Sanger therefore breached their fiduciary duty of due care, loyalty, and good faith, as they approved unjust compensation for Stumpf and Tolstedt and failed to clawback said compensation, despite the fact that they were on notice of Stumpf's and Tolstedt's wrongdoing and the consequences thereof to the Company. Accordingly, Defendants Dean, Chen, James, and Sanger face a substantial likelihood of liability and cannot appropriately consider a demand, and therefore demand is excused with respect to these Defendants.

151. The Board has also conceded, in the Company's SEC filings, that Defendant Stumpf is not an independent director of the Company. Defendant Stumpf is Wells Fargo's CEO, and, as such, lacks independence from the numerous interested directors referenced herein, rendering him incapable of impartially considering a demand to commence and vigorously prosecute this action.

152. Demand is also futile as to Defendant Stumpf because he personally benefitted and will benefit from his breach of fiduciary duties and breaches by his fellow Board members. Specifically, Stumpf was given over $100 million in cash and equity between 2011 and 2015, compensation that was approved by members of the Board. In 2015, Defendant Stumpf received $19.3 million in compensation from the Company, which included a base salary of $2.8 million, an "Annual Incentive Award" of $4 million, and stock optioned valued at $12.5 million. The 2016 Proxy stated that the executive compensation is "tied to performance." However, Stumpf's performance was based on improper sales practices which have caused the Company financial and reputational harm. Stumpf is therefore conflicted and unable to consider a stockholder demand to investigate the wrongdoing that is the basis for the retention of his lucrative position and compensation.

///

///

///

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**Derivative Claim for Breach of Fiduciary Duty for Causing the Company to
Engage in Unlawful Conduct or Consciously Disregarding Widespread Violations of Law
(Against The Director Defendants)**

153.    Plaintiff incorporates by reference each and every paragraph above as if fully set forth herein.

154.    As directors, officers and high level employees of the Company, all of the Defendants owed Plaintiff, the stockholders – and each other – fiduciary duties of good faith, loyalty and care.

155.    The Director Defendants all owed and owe fiduciary duties to Wells Fargo and its stockholders. By reason of their fiduciary relationships, Defendants specifically owed and owe Wells Fargo the highest obligation of good faith and loyalty in the administration of the affairs of Wells Fargo, including the oversight of Wells Fargo's compliance with laws governing the sales and marketing of Wells Fargo's products. Moreover, the Board had specific fiduciary duties as defined by the Company's key corporate governance documents and principles that, had they been discharged in accordance with the Board's obligations, would have necessarily prevented the misconduct and consequent harm to the Company alleged herein.

156.    Defendants expressly agreed to abide by the Corporate Governance Guidelines and Code of Ethics and other state laws against improper sales and marketing practices.

157.    The Director Defendants consciously violated their corporate responsibilities in at least the following ways:

- Affirmatively and repeatedly declining to stop and prevent Wells Fargo's wrongful sales and marketing practices after receiving reports of such illegal activity and numerous red flags in the form of class action lawsuits and investigation notices from the various governmental agencies indicating widespread wrongdoing, and/or consciously disregarding such reports and activity.

- Approving and/or consciously disregarding Wells Fargo's business plan or

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

marketing its products through the widespread illegal promotion in order to maximize Wells Fargo's short-term profit but at the expense of stockholder's long-term interests and Wells Fargo's reputation and goodwill.

158.     As a direct and proximate result of the Director Defendants' conscious failure to perform their fiduciary obligations, Wells Fargo has sustained significant damages, not only monetarily, but also to its corporate image and goodwill. Such damage included, among other things, the substantial penalties, fines, liabilities and expenses described herein.

159.     As a result of the misconduct alleged herein, the Director Defendants are liable to the Company.

**SECOND CAUSE OF ACTION**
**Derivative Claims**
**(Against The Officer Defendants)**

160.     Plaintiff incorporates by reference paragraphs 1 through 152 above as if fully set forth herein.

161.     By reason of their positions as fiduciaries of the Company, the Officer/Employee Defendants owed duties of good faith, loyalty, and truthful disclosure. The Officer Defendants were all aware of and educated concerning the relevant laws and regulations concerning marketing of Wells Fargo's products, and were duty-bound to abide by the laws and regulations and to enforce compliance therewith.

162.     The Officer Defendants consciously violated and breached these duties by causing Wells Fargo to employ a deliberate and systematic business plan of artificially increasing sales by engaging in unlawful sales and promotion practices by numerous Wells Fargo employees for a prolonged period of time.

163.     The Officer Defendants authorized and implemented Wells Fargo's policies and practices of encouraging the widespread unlawful sales and marketing practices, and retaliation against employees who reported such unlawful practices to management.

164.     As a direct and proximate result of the Officer Defendants' breaches of fiduciary duty, the Company has sustained, and will continue to sustain, substantial harm, including the

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

damages set forth herein.

165.     The Officer Defendants are liable to the Company as a result of the acts alleged herein.

### THIRD CAUSE OF ACTION
### Derivative Claim for Unjust Enrichment
### (Against All Defendants)

166.     Plaintiff incorporates by reference paragraphs 1 through 165 above as if fully set forth herein.

167.     By their wrongful acts and omissions, Defendants were unjustly enriched at the expense of and to the detriment of Wells Fargo.

168.     Plaintiff, as a stockholder and representative of Wells Fargo, seek restitution, damages, an order of this Court disgorging all profits, benefits, and other compensation obtained by these Defendants from their wrongful conduct and fiduciary breaches, and other relief for the Company, in an amount to be proven at trial.

### FOURTH CAUSE OF ACTION
### Violation of Section 14(a) of the Exchange Act
### (Against The Director Defendants)

169.     Plaintiff incorporates by reference paragraphs 1 through 152 above as if fully set forth herein.

170.     SEC Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

171.     The Director Defendants exercised control over Wells Fargo and caused Wells Fargo to disseminate the false and misleading 2016 Proxy, which materially misrepresented the manner in which nominees for Wells Fargo's Board were selected, the effectiveness of the Board's oversight of compliance issues at the Company and the Board's compliance with the

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Company's Code of Ethics and Corporate Governance Guidelines.

172.   As alleged herein, the 2016 Proxy contained untrue statements of material facts and omitted to state material facts necessary to make the statements that were made not misleading in violation of section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder. These false statements and omissions were essential links in the election of the Director Defendants to Wells Fargo's Board and the continued illegal management of the Company.

173.   The written communications made by the Director Defendants described herein constitute violations of Rule 14a-9 and section 14(a) because such communications were materially false or misleading and were provided in a negligent manner.

174.   At all relevant times to the dissemination of the materially false or misleading 2016 Proxy, Director Defendants were aware of or had access to the true facts concerning Wells Fargo's operations.

175.   Wells Fargo has been severely injured by this conduct and is entitled to damages and equitable relief.

**FIFTH CAUSE OF ACTION**
**Violation of Section 29(b) of the Exchange Act**
**(Against The Director Defendants)**

176.   Plaintiff incorporates by reference paragraphs 1 through 152 and 169 through 175 above as if fully set forth herein.

177.   By their wrongful acts and omissions, the Director Defendants were unjustly enriched at the expense of and to the detriment of Wells Fargo.

178.   The Director Defendants each received incentive compensation and fees, including stock awards, while engaging in conduct that violates Section 14(a) of the Exchange Act. The Director Defendants' incentive compensation and fees should be rescinded under Section 29(b) of the Exchange Act because the Director Defendants violated Section 14(a) by issuing a false and misleading proxy statement to Wells Fargo shareholders regarding the nature of, and responsibility for the misconduct alleged herein. All of the payments the Director Defendants received are therefore voidable by Wells Fargo under Section 29(b) of the Exchange

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

1  Act.

2         179.    Wells Fargo is in privity with the Director Defendants with respect to the

3  incentive compensation and fees provided by Wells Fargo to the Director Defendants. The

4  Director Defendants have engaged in prohibited conduct in violation of the securities laws as

5  alleged herein.

6         180.    Wells Fargo has been severely injured by the misconduct of the Director

7  Defendants. According, Wells Fargo is entitled to recession of the incentive and compensation

8  and fees granted to Director Defendants.

9                                  **PRAYER FOR RELIEF**

10         WHEREFORE, Plaintiff demands judgment against the Defendants jointly, severally, or

11  individually, as follows:

12         1.     determining that this action is a proper derivative action maintainable under law

13  and that demand is excused;

14         2.     granting judgment in Plaintiff's favor on all claims;

15         3.     awarding the Company damages in an amount to be proven at trial;

16         4.     awarding appropriate equitable relief to remedy the Individual Defendants'

17  breaches of fiduciary duties;

18         5.     awarding the Plaintiff the costs and disbursements of this action, including its

19  reasonable attorneys' fees and expenses; and

20         6.     awarding such other relief as the Court deems just and proper.

21                                  **DEMAND FOR JURY TRIAL**

22         Plaintiff hereby demands a trial by jury on all issues so triable.

23  DATED:  September 29, 2016              **WOLF HALDENSTEIN ADLER**
                                           **FREEMAN & HERZ LLP**
24

25                                  By:    _/s/ Betsy C. Manifold_____
26                                         BETSY C. MANIFOLD

27                                         BETSY C. MANIFOLD
28                                         manifold@whafh.com

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

RACHELE R. RICKERT
rickert@whafh.com
BRITTANY N. DEJONG
dejong@whafh.com
750 B Street, Suite 2770
San Diego, CA 92101
Telephone:  619/239-4599
Facsimile:  619/234-4599

**WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLP**
GREGORY M. NESPOLE
nespole@whafh.com
MARK C. RIFKIN
rifkin@whafh.com
GLORIA KUI MELWANI
melwani@whafh.com
270 Madison Avenue
New York, New York 10016
Telephone:  212/545-4600
Facsimile:   212/545-4653

*Counsel for Plaintiff Victoria Shaev*

WELLSFARGO:23366

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

1
2

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

3
4

VICTORIA SHAEV,
derivatively on behalf of
WELLS FARGO & COMPANY,

    )
    )    Case No.
    )

5
6

        Plaintiff,

7

      v.

8
9
10
11
12
13
14
15

JOHN D. BAKER II, ELAINE L.
CHAO, JOHN S. CHEN, LLOYD H.
DEAN, ELIZABETH A. DUKE,
ENRIQUE HERNANDEZ JR.,
DONALD M. JAMES, CYNTHIA M.
MILLIGAN, FEDERICO F. PEÑA,
JAMES H. QUIGLY, STEPHEN W.
SANGER, JOHN G. STUMPF,
SUSAN G. SWENSON, CARRIE L.
TOLSTEDT, and SUZANNE M.
VAUTRINOT,

16

        Defendants.

17
18

      -and-

19

WELLS FARGO & COMPANY,

20

        Nominal Defendant.

21

22

**VERIFICATION OF VICTORIA SHAEV**

23      1.    I am the plaintiff in the above-entitled action, have read the foregoing

24 Verified Stockholder Derivative Complaint ("Complaint"), and believe it to be true

25 and correct, and the same is true as to my own knowledge, except as to the matters

26 therein stated to be alleged upon information and belief, and as to those matters I

27

28

1   believe them to be true.

2       2.    I have not received, been promised or offered and will not accept any

3   form of compensation, directly or indirectly, for prosecuting or serving as a

4   representative party in this stockholder derivative action except for (i) such

5   damages or other relief as the Court may award me, (ii) such fees, costs or other

6   payments as the Court expressly approves to be paid to me, or (iii) reimbursement,

7   paid by my attorneys, of actual and reasonable out-of-pocket expenditures incurred

8   directly in connection with the prosecution of this stockholder derivative action.

9       3.    I have been a Wells Fargo & Company ("Wells Fargo") stockholder

10   during relevant periods alleged in the Complaint and I continue to hold my shares.

11   I confirm that the action is not a collusive one and that I am capable and willing to

12   fairly and adequately represent the interests of stockholders who are similarly

13   situated in enforcing the rights of Wells Fargo.

14       4.    I hereby authorize the filing of the Complaint.

15

16       I declare under penalty of perjury that the foregoing is true and correct.

17       Executed this 28th day of September, 2016 in the County of Nassau, New

18   York.

19

20

21                                *Victoria Shaev*

22                                  Victoria Shaev

23

24

25

26

27

28                                  2