1    Richard M. Heimann (CA Bar No. 063607)
     *rheimann@lchb.com*
2    Joy A. Kruse (CA Bar No. 142799)
     *jakruse@lchb.com*
3    Katherine C. Lubin (CA Bar No. 259826)
     *kbenson@lchb.com*
4    LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
     275 Battery Street, 29th Floor
5    San Francisco, CA 94111-3339
     Telephone: (415) 956-1000
6    Facsimile:  (415) 956-1008

7    *Attorneys for Plaintiff Fire & Police Pension Association*
     *of Colorado and Co-Lead Counsel*
8

9    Maya Saxena (admitted *pro hac vice*)
     *msaxena@saxenawhite.com*
10   Joseph E. White, III (admitted *pro hac vice*)
     *jwhite@saxenawhite.com*
11   Lester R. Hooker (CA Bar No. 241590)
     *lhooker@saxenawhite.com*
12   Jorge A. Amador (CA Bar No. 237800)
     *jamador@saxenawhite.com*
     SAXENA WHITE P.A.
13   5200 Town Center Circle, Suite 601
     Boca Raton, FL 33486
14   Telephone:  (561) 394-3399
     Facsimile:  (561) 394-3382
15

16   *Attorneys for Plaintiff The City of Birmingham*
     *Retirement and Relief System and Co-Lead Counsel*

17   [Additional Counsel on Signature Page]

18

19                 UNITED STATES DISTRICT COURT

20                NORTHERN DISTRICT OF CALIFORNIA

21

22   |                                          | Lead Case No. 3:16-cv-05541-JST |
     |                                          |                                 |
23   |                                          | **CONSOLIDATED AMENDED**        |
     | IN RE WELLS FARGO & COMPANY              | **VERIFIED STOCKHOLDER**        |
24   | SHAREHOLDER DERIVATIVE                   | **DERIVATIVE COMPLAINT**        |
     | LITIGATION                               |                                 |
25   |                                          | **DEMAND FOR JURY TRIAL**       |

26

27

28

# TABLE OF CONTENTS

**Page**

I.     NATURE AND SUMMARY OF THE ACTION ............................................................. 1

II.    JURISDICTION AND VENUE ................................................................................ 17

III.   INTRADISTRICT ASSIGNMENT.......................................................................... 18

IV.    PARTIES ................................................................................................................ 18

     A.     Lead Plaintiffs..................................................................................... 18

     B.     Nominal Defendant .............................................................................. 19

     C.     Individual Defendants .......................................................................... 21

          1.     Officer Defendants ............................................................... 21

          2.     Director Defendants ............................................................. 22

V.     DEFENDANTS WERE OBLIGATED TO SAFEGUARD THE COMPANY'S
     INTERESTS AND COMPLY WITH APPLICABLE LAWS ......................................... 25

     A.     Duties of All Defendants...................................................................... 25

     B.     Fiduciary Duties of Directors of Federal Banking Institutions........................... 27

     C.     The Board's Committees Were Expressly Charged with Overseeing and
          Monitoring the Bank's Risk Exposure. ................................................... 28

          1.     Audit And Examination Committee ....................................... 30

          2.     Risk Committee.................................................................... 31

          3.     Human Resources Committee................................................ 33

          4.     Corporate Responsibility Committee ..................................... 35

          5.     Governance and Nominating Committee................................. 35

     D.     The Board Touted Wells Fargo's Corporate Governance Structures. .................. 36

          1.     The Board's Governance and Nominating Committee was
               responsible for reviewing Wells Fargo's Corporate Governance
               Guidelines. ......................................................................... 36

          2.     Wells Fargo relied on the purported strength of its corporate
               governance structures to urge shareholders to reject a resolution to
               adopt an independent Chairman................................................ 37

VI.    DEFENDANTS BOTH ENCOURAGED AND FAILED TO ADDRESS THE
     ILLICIT ACCOUNT-CREATION SCHEME................................................................ 39

     A.     Defendants Regarded Cross-Selling as Critical to Wells Fargo's Success,
          and Repeatedly Emphasized that to Investors. ............................................ 39

     B.     Defendants Had Access to Information Regarding Account Openings and
          Sales Quotas, as Well as Sales Misconduct Reports, Which Were Closely
          Tracked at the Company. ..................................................................... 44

          1.     Products per household, a metric for the number of accounts opened
               by Wells Fargo employees, were closely tracked and reported................ 44

          2.     Employee sales quotas were closely tracked. .......................... 45

# TABLE OF CONTENTS
### (continued)

Page

        3.   Wells Fargo also tracked problems with the cross-selling strategy, including "gaming" and "sales incentives" violations, and the Board was informed of these reports. .......... 48

C.   Defendants Learned of Specific Misconduct in Opening Fake Accounts. .......... 51

D.   Defendants Knew the Illicit Account-Creation Activities Were Subject to Regulatory Investigations and Civil Litigation. ..................... 53

E.   Defendants Learned of Improper Account-Creation Activities Through Reports by Current and Former Wells Fargo Employees and Through Litigation by Former Employees. ..................... 61

F.   The OCC's Investigation Expressly Alerted Defendants to Deficiencies in Wells Fargo's Compliance Structures. ..................... 67

G.   The Repeated Shareholder Proposal to Create an Independent Chairman Further Highlighted the Deficiencies in Corporate Governance at the Company. ..................... 71

H.   Defendants Maintained an Illusory System for "Auditing" Branches for Potential Wrongdoing. ..................... 72

I.   Defendants Knew or Consciously Disregarded that More than 5,300 Wells Fargo Employees Were Terminated for Conduct Relating to the Illicit Account-Creation Scheme. ..................... 73

J.   The Internal Investigation Begun in August 2015 Was Initiated Only After "Consultation" with Regulators and the L.A. City Attorney's Office. ................. 75

K.   Stumpf Has *Admitted* He and the Board Learned of the Illicit Account-Creation Scheme Long Before It Was Publicly Revealed. ..................... 76

L.   Numerous Defendants' Compensation Was Tied to Wells Fargo's Financial Performance, which in Turn Depended on Successful Cross-Selling. ..................... 77

VII.   THE DIRECTOR DEFENDANTS VIOLATED SECTION 14(a) OF THE EXCHANGE ACT AND SEC RULE 14a-9, AND BREACHED THEIR FIDUCIARY DUTIES, BY CAUSING THE COMPANY TO FILE MATERIALLY MISLEADING PROXY STATEMENTS ............ 80

A.   Numerous Director Defendants Caused Wells Fargo to Issue the Materially False or Misleading 2014 Proxy Statement. ..................... 80

B.   Numerous Director Defendants Caused Wells Fargo to Issue the Materially False or Misleading 2015 Proxy Statement. ..................... 86

C.   All of the Director Defendants Caused Wells Fargo to Issue the Materially False or Misleading 2016 Proxy Statement. ..................... 93

VIII.   DEFENDANTS VIOLATED SECTION 10(b) OF THE EXCHANGE ACT AND SEC RULE 10b-5, AND BREACHED THEIR FIDUCIARY DUTIES, BY KNOWINGLY OR RECKLESSLY ISSUING MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE RELEVANT PERIOD ............ 99

A.   Defendants Caused Wells Fargo to Conduct a Massive Stock Repurchase Program. ..................... 100

**TABLE OF CONTENTS**
(continued)

Page

B.   In Connection with the Share Repurchases, Defendants Issued False or Misleading Statements Regarding the Extent of Their Purported Success in Cross-Selling and Related Topics. ......... 103

   1.   Defendants made false or misleading statements regarding cross-selling efforts and specific cross-selling metrics reported by Wells Fargo. ......... 106

   2.   Defendants made false or misleading statements regarding risk controls. ......... 118

   3.   Defendants Stumpf, Sloan, and Shrewsberry made false or misleading statements regarding the accuracy of financial information contained in Wells Fargo's SEC filings, and regarding the Company's internal and disclosure controls. ......... 122

C.   The Insider Selling Defendants Unlawfully Profited at Wells Fargo's Expense by Selling Back Shares to the Company at Artificially Inflated Prices. ......... 124

D.   In Repurchasing Stock, Wells Fargo Relied on Defendants' False or Misleading Statements. ......... 131

E.   Neither the Statutory "Safe Harbor" Nor the "Bespeaks Caution" Doctrine Applies to Defendants' Misrepresentations. ......... 133

F.   The Group Pleading Doctrine Applies to Defendants' Misstatements and Omissions. ......... 134

G.   Defendants' Misstatements and Omissions Caused Damages to Wells Fargo. ......... 134

IX.   THE REVELATIONS BEGINNING IN SEPTEMBER 2016 SHED FURTHER LIGHT ON DEFENDANTS' KNOWLEDGE OR CONSCIOUS DISREGARD OF THE SCHEME, AS WELL AS THE SIGNIFICANT DAMAGES WELLS FARGO HAS SUFFERED AND WILL CONTINUE TO SUFFER. ......... 136

A.   Resolutions with the Los Angeles City Attorney, the CFPB, and the OCC Have Revealed Details Concerning the Illicit Account-Creation Scheme and Defendants' Knowledge or Conscious Disregard of It. ......... 136

   1.   Settlement with the L.A. City Attorney ......... 137

   2.   Settlement with the CFPB ......... 138

   3.   Settlement with the OCC ......... 139

B.   The Congressional Response to the Scandal Further Demonstrated Defendants' Knowledge or Conscious Disregard of the Illicit Account-Creation Scheme. ......... 140

   1.   During his testimony before the Senate Banking Committee, Stumpf confirmed Defendants' breaches of fiduciary duty. ......... 140

   2.   Additional testimony by Stumpf, as well as additional congressional actions, further confirmed the extent of Defendants' misconduct. ......... 143

X.   ADDITIONAL DAMAGES TO WELLS FARGO ......... 147

A.   Wells Fargo Has Lost Significant Business Due to the Scandal. ......... 147

1

**TABLE OF CONTENTS**
(continued)

2

Page

3       B.     The Clawback of a Portion of Stumpf's and Tolstedt's Ill-Gotten Gains Is
4            "a Dollar Short and a Day Late." ....................................................................... 153

XI.     DEMAND ON THE WELLS FARGO BOARD WOULD HAVE BEEN FUTILE...... 154

5       A.     Demand Is Excused Because the Director Defendants' Conduct Did Not
           Constitute a Valid Exercise of Business Judgment............................................ 154

6       B.     Demand Is Excused Because the Director Defendants Face a Substantial
7            Likelihood of Liability Due to Their Knowledge or Conscious Disregard of
           Facts Relating to the Illicit Account-Creation Scheme....................................... 156

8       C.     Demand Is Excused Because the Board Has Shown Its Lack of
9            Independence from Stumpf by Repeatedly Granting Him Excessive
           Compensation...................................................................................................... 163

10 XII.     PLAINTIFFS' CLAIMS ARE TIMELY ...................................................................... 165

XIII.     CLAIMS FOR RELIEF ............................................................................................... 166

11       COUNT I Breach of Fiduciary Duty (Against All Defendants) .................................... 166

12       COUNT II Unjust Enrichment (Against All Defendants)............................................... 170

13       COUNT III Breach of Fiduciary Duty for Insider Selling and Misappropriation of
           Information (Against the Insider Selling Defendants)........................................ 170

14       COUNT IV Violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9
15            (Against the Director Defendants) ..................................................................... 171

      COUNT V Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5
16            Promulgated Thereunder (Against All Defendants) .......................................... 173

      COUNT VI Violations of Section 20A of the Exchange Act (Against the Insider
17            Selling Defendants)............................................................................................ 175

18       COUNT VII Violations of Section 29(b) of the Exchange Act (Against All
19            Defendants) ........................................................................................................ 176

      COUNT VIII Violation of Section 25402 of the California Corporations Code
20            (Against the Insider Selling Defendants) ........................................................... 177

21       COUNT IX Violation of Section 25403 of the California Corporations Code
           (Against the Director Defendants) ..................................................................... 178

22       COUNT X Corporate Waste (Against the Director Defendants)................................... 179

      COUNT XI Contribution and Indemnification (Against Defendants Stumpf,
23            Shrewsberry, Sloan, and Tolstedt) .................................................................... 179

PRAYER FOR RELIEF............................................................................................................ 180

24 JURY DEMAND ...................................................................................................................... 181

25

26

27

28

1    Lead Plaintiffs Fire and Police Pension Association of Colorado ("Colorado Fire and

2  Police") and The City of Birmingham Retirement and Relief System ("Birmingham") (together,

3  "Plaintiffs"), shareholders of Wells Fargo & Company ("Wells Fargo," the "Company," or the

4  "Bank"),[1] bring this action on Wells Fargo's behalf seeking relief under federal and state law for

5  the misconduct perpetrated against the Company by the current and former officers and directors

6  identified below (collectively, "Defendants") arising from the long-running, systemic and

7  fraudulent practice of opening millions of accounts without customer knowledge or authorization

8  (the "illicit account-creation scheme").[2]  Lead Plaintiffs, through their counsel, have conducted an

9  investigation into the facts supporting the allegations in this Complaint and believe discovery will

10  elicit further evidentiary support for their allegations.[3]

11  **I.       NATURE AND SUMMARY OF THE ACTION**

12    1.    This shareholder derivative action arises from Defendants' remarkable and

13  disturbing breach of the trust reposed in them by Wells Fargo's banking customers.  From at least

14  January 1, 2011 to the present (the "Relevant Period"), Defendants knew or consciously

15  disregarded that Wells Fargo employees were illicitly creating millions of deposit and credit card

16  accounts for their customers, without those customers' knowledge or consent.  In effect, under

17  Defendants' watch, those employees defrauded their customers in an attempt to drive up "cross-

18  selling," i.e., selling complementary Wells Fargo banking products to prospective or existing

19  customers.

20    2.    To achieve their publicly touted goal of selling eight products per household—

21  referred to as the "Great Eight" or "Gr-eight" initiative—Defendants imposed strict quotas

---

[1] Wells Fargo Bank, N.A. is a wholly owned subsidiary of Wells Fargo & Company.
Accordingly, Plaintiffs refer to those entities interchangeably.

[2] While Wells Fargo is named as a nominal defendant, any reference to "Defendants" does not
encompass the Company.

[3] Plaintiffs' investigation included a review of (i) filings by Wells Fargo with the U.S. Securities
and Exchange Commission ("SEC"); (ii) findings or allegations by government entities in
connection with investigations into the illicit account-creation scheme; (iii) records of
congressional proceedings; (iv) news articles; (v) securities analysts' reports about Wells Fargo;
(vi) wire and press releases; (vii) documents received by the Los Angeles City Attorney ("L.A.
City Attorney") in connection with its case against Wells Fargo; and (viii) additional information
readily obtainable on the Internet.

regulating the number of products Wells Fargo bankers must sell.  Those quotas translated into unrelenting pressure on bankers to open numerous accounts per customer.  Bank employees were thus driven to engage in unlawful account-creation practices.  And because Wells Fargo's success in cross-selling was central to its financial results and market participants' assessment of the Company, Defendants were also highly motivated to foster, and perpetuate, those unlawful practices.  Indeed, the goal of Wells Fargo's high pressure cross-selling strategy was to show steady quarterly growth in the opening of customer accounts, maintain the Company's industry leadership in cross-selling, and, most importantly, drive up the Bank's share price.  The artificially inflated stock price resulted in enormous compensation for the Bank's executives.  To wit, for the last few years, CEO John Stumpf has been the banking industry's highest paid CEO, receiving tens of millions of dollars in salary and equity compensation every year.

3.      Throughout the Relevant Period, Defendants emphasized that cross-selling was central to Wells Fargo's financial condition and prospects.  Indeed, Defendants highlighted Wells Fargo's cross-selling rates as a metric that differentiated the Bank from its peers.  In Wells Fargo's 2010 Annual Report to shareholders, Defendant John G. Stumpf, then-CEO and Chairman of the Board, described the Company as the "king of cross-sell":

> To succeed at it, you have to do a thousand things right.  It requires long-term persistence, significant investment in systems and training, proper team member incentives and recognition, taking the time to understand your customers' financial objectives, then offering them products and solutions to satisfy their needs so they can succeed financially. . . . The bad news is it's hard to do.  The good news is it's hard to do, because once you build it, ***it's a competitive advantage*** that can't be copied.[4]

4.      Similarly, at the May 20, 2014 Analyst Day conference, Defendant Carrie L. Tolstedt, then-Senior Executive Vice President, Community Banking, stated "the cross-sell model . . . drive[s] revenue."

5.      During the same conference, Wells Fargo's Chief Financial Officer John R. Shrewsberry characterized the Company's cross-selling capability as "legendary," noting it had

---

[4] Unless otherwise indicated, all emphasis in this Complaint has been added.

1    been the Company's vision "for decades."  As detailed in this Complaint, Defendants' purported

2    cross-selling success was more myth than legend.

3          6.     While cross-selling is not inherently improper, Defendants knowingly perpetuated

4    or consciously disregarded the scheme by which millions of unauthorized accounts were created

5    in an effort to meet the targets set by Company management.  As Senator Pat Toomey (R-PA)

6    said during a hearing of the Senate Committee on Banking, Housing, and Urban Affairs ("Senate

7    Banking Committee") held in the wake of the scheme's revelation to the public in September

8    2016:  "Wells Fargo wasn't cross-selling. Failing to notify these customers about these sham

9    accounts, this isn't cross-selling, this is fraud."[5]

10          7.     Other government officials likewise condemned the illicit-account creation

11    activities that plagued the Company.  Senator Elizabeth Warren (D-MA) described it as a

12    "staggering fraud."[6]  Treasury Secretary Jack Lew stated:  "The pattern of behavior that we've

13    seen here is something that needs to stop.  It is not acceptable to do things that are designed to

14    increase either an individual or firm's bottom line by deceiving customers or passing on charges

15    that are either invisible or they don't know about."[7]  Comptroller of the Currency Thomas Curry

16    said the improper practices "undermine the fundamental trust that goes to the heart of the bank-

17    customer relationship" and "have no place in the federal banking system."[8]

18          8.     The recent revelations regarding the scheme and Defendants' knowledge or blatant

19    disregard of it have deeply damaged the Company's reputation and imposed significant costs on

20    it, including by way of regulatory fines, lost business, exposure to litigation, and damages due to

21    the loss in value of hundreds of millions of Wells Fargo shares Defendants caused the Company

---

[5] An Examination of Wells Fargo's Unauthorized Accounts and the Regulatory Response: Hearing Before the Senate Committee on Banking, Housing, and Urban Affairs, 114th Cong. (Sept. 20, 2016) ("Sept. 20, 2016 Senate Banking Committee Hr'g Tr.") at 15.

[6] *The Lead with Jake Tapper* (CNN television broadcast Sept. 9, 2016), available at http://money.cnn.com/video/news/2016/09/12/elizabeth-warren-wells-fargo.cnnmoney/.

[7] *E.g.*, Maggie McGrath, "*Treasury Secretary Jack Lew: What Wells Fargo did was 'unacceptable*,'" Maggi McGrath, FORBES, Sept. 13. 2016, available at http://www.forbes.com/sites/maggiemcgrath /2016/09/13/treasury-secretary-jack-lew-what-wells-fargo-did-was-unacceptable/#20971c6325c9.

[8] Sept. 20, 2016 Senate Banking Committee Hr'g Tr. at 52.

1    to repurchase during the Relevant Period.  Additional damage to Wells Fargo will continue to

2    mount in the coming months and years.

3         9.    Those revelations began on September 8, 2016, when the L.A. City Attorney, U.S.

4    Consumer Financial Protection Bureau ("CFPB"), and the Office of the Comptroller of the

5    Currency ("OCC") issued separate press releases and consent orders disclosing widespread

6    deficiencies and unsafe or unsound practices in Wells Fargo's risk management and oversight of

7    its sales practices.

8         10.    In connection with levying a $100 million civil penalty against Wells Fargo, the

9    CFPB stated in a consent order (issued with the consent of Wells Fargo's board of directors (the

10   "Board")) that from January 1, 2011 to September 8, 2016 thousands of Wells Fargo employees

11   engaged in improper sales practices "to satisfy sales goals and earn financial rewards under [the

12   Company's] incentive-compensation program," leading the Company to terminate approximately

13   5,300 employees for engaging in those practices.[9]

14        11.    Specifically, the CFPB found that Bank employees:

15          a)  "engaged in 'simulated funding,'" whereby "[t]o qualify for incentives
     that rewarded bankers for opening new accounts that were funded shortly after
16   opening, [the Bank]'s employees opened deposit accounts without consumers'
     knowledge or consent and then transferred funds from consumers' authorized
17   accounts to temporarily fund the unauthorized accounts in a manner sufficient for
     the employee to obtain credit under the incentive-compensation program;
18
19          b)  "submitted applications for and obtained credit cards for consumers
     without the consumers' knowledge or consent";
20
            c)  "used email addresses not belonging to consumers to enroll consumers
21   in online-banking services without their knowledge or consent"; and

22          d)  "requested debit cards and created personal identification numbers
     (PINs) to activate them without the consumer's knowledge or consent."[10]

23        12.    In all, the CFPB found that the Bank "opened hundreds of thousands of

24   unauthorized deposit accounts and applied for tens of thousands of credit cards for consumers"

25   without their knowledge or consent.[11]  The Bureau determined that as a result of the above

26   ──────────────
     [9] Wells Fargo Bank, N.A., 2016-CFPB-0015 (Consumer Financial Protection Bureau Sept. 8,
     2016) ("CFPB Consent Order") ¶ 9.

27   [10] Id. ¶¶ 10-13.

28   [11] Id. ¶ 14.

1   conduct, the Bank engaged in "unfair" and "abusive" acts or practices in violation of the

2   Consumer Financial Protection Act.

3        13.     Similarly, in connection with levying a $35 million civil penalty against Wells

4   Fargo, the OCC (with the Board's consent) issued a consent order stating that as a result of the

5   conduct noted above, the Bank "engaged in reckless unsafe or unsound banking practices that

6   were part of a pattern of misconduct."[12]

7        14.     Further, the final judgment Wells Fargo entered into with the L.A. City Attorney

8   requires that the Company provide restitution to any customer who suffered a direct monetary

9   loss in connection with an unauthorized account and pay $50 million in civil penalties, the largest

10  such payment in the history of the L.A. City Attorney's office.  The final judgment also directs

11  Wells Fargo to establish policies and procedures requiring that Wells Fargo Community Banking

12  employees provide customers with information about their accounts.[13]

13       15.     The illicit account-creation scheme also led to a congressional investigation, which

14  has shed further light on the misconduct and Defendants' role in it.  The Senate Banking

15  Committee's September 2016 hearing revealed that (i) Wells Fargo suffered a far-reaching,

16  systemic breakdown in corporate governance; (ii) the Board failed to implement basic systems of

17  internal controls over the Company's sales and risk management; (iii) the Board failed to

18  implement a meaningful reporting system to adequately address significant and pervasive illegal

19  practices; and (iv) even after the Board learned of the unlawful creation of accounts, the scheme

20  continued for years while Board members willfully ignored the widespread abuses and rewarded

21  culpable senior executives, including Stumpf, who has resigned in the wake of this scandal.

22       16.     Contrary to Stumpf's statement to Congress that he and other Company leaders

23  were "committed to getting it right 100 percent of the time," the facts, which continue to emerge,

24  show that he and the other Defendants repeatedly failed to address the serious problem of

25  employees improperly creating accounts, despite having been confronted with a series of red flags

---

[12] Wells Fargo Bank, N.A., AA-EC-2016-079 (Department of the Treasury Comptroller of the Currency Sept. 6, 2016) ("OCC Consent Order") ¶ 4.  The Consent Orders stated the Board neither admitted nor denied the regulators' findings.

[13] *See* http://freepdfhosting.com/29677883a9.pdf.

1  appearing as of 2007, if not earlier.  Indeed, Stumpf admitted during his Senate testimony that he

2  learned of the fraud in 2013 and that the Board learned of it "later [in] 2013 and then 2014 and

3  on."[14]  Stumpf later amended his timeline in testimony before the House Financial Services

4  Committee on September 29, 2016, during which he acknowledged the Board "was made aware,

5  generally, of issues by—in committees, at high levels, in the 2011, '12 time frame."

6        17.    Notwithstanding that knowledge—which, as detailed below, actually dates back to

7  2007—neither Stumpf nor the other Defendants disclosed the improper activities to the public,

8  and instead continued to tout their purported success in cross-selling, including repeatedly

9  reporting artificially inflated cross-selling metrics.  Indeed, in a September 28, 2016 joint letter

10  asking the SEC to commence a securities fraud investigation into the illicit account-creation

11  scheme, Senators Warren, Jeff Merkley (D-OR), and Bob Menendez (D-NJ) wrote:

12  
13      Mr. Stumpf admitted that he became aware of widespread fraud at the bank in
    2013, ***yet neither he nor the company disclosed that information to investors***
    until the CFPB Consent Order became public in September 2016.  In the interim,

14      during quarterly earnings calls, Mr. Stumpf personally touted Wells' cross-sell
    ratio . . . as well as Wells' success in opening new deposit accounts and credit card

15      accounts.  ***He did so apparently with knowledge that many of these retail***
    ***accounts were created without customer authorization***.

16        18.    During the Senate hearing, Senator Toomey highlighted that Wells Fargo "had far

17  too few common-sense controls in place to prevent the kind of abuse that customers were subject

18  to."[15]  He further challenged the failure of Stumpf and others at Wells Fargo to disclose the illicit

19  account-creation scheme to the SEC, and emphasized the materiality of the "reputational damage"

20  the Company has sustained due to the scandal.[16]

21        19.    Later in the hearings, OCC Comptroller Curry testified, "I would say from the

22  OCC's standpoint and the facts of this particular case, the fact that 5,300 employees were

23  terminated was material and that there were two million accounts involved that would be

24  material."[17]

25  _____

26  [14] Sept. 20, 2016 Senate Banking Committee Hr'g Tr. at 12.

    [15] *Id.* at 15.

27  [16] *Id.* at 16-17.

28  [17] *Id.* at 62.

20.     The illicit account-creation scheme was not the product of a few rogue Wells Fargo employees.  To the contrary, it was the natural and foreseeable outgrowth of a system, implemented by Wells Fargo leadership, to pressure employees to meet unrealistic sales targets and thereby obtain bonuses.  The relentless pressure from the top created a culture of lawlessness among employees in the Company's Community Banking segment, resulting in widespread misconduct.  Defendants nonetheless continued imposing relentless pressure on employees, while continually touting to investors and others the Company's "record" cross-selling, which allowed Stumpf and other Defendants to reap millions in compensation during the Relevant Period.  As CFPB Director Richard Cordray put it in announcing the Bureau's settlement with Wells Fargo in September 2016:  "The gravity and breadth of the fraud that occurred at Wells Fargo cannot be pushed aside as the stray misconduct of just a few bad apples"; rather, "the stunning nature and scale of these practices reflects instead the consequences of a diseased orchard."[18]

21.     The facts demonstrating Defendants' knowledge or conscious disregard of the illicit account-creation scheme, including those summarized in the immediately following paragraphs, are compelling.  Defendants turned a blind eye to numerous red flags that began appearing even before 2011, as far back as 2007—nearly a decade before the fraud was finally revealed in late 2016.

22.     In **September 2007**, the Board's Audit and Examination Committee and Stumpf received letters from an employee discussing how the Gr-Eight Initiative created a high-pressure sales culture that resulted in "unethical and illegal activity," including "routine deception and fraudulent exploitation of [Wells Fargo's] clients."  The letter warned, prophetically:  "Left unchecked, the inevitable outcome shall be one of professional and reputational damage, consumer fraud and shareholder lawsuits, coupled with regulator sanctions."

23.     By at least **2008**, Wells Fargo began tracking complaints, through its "EthicsLine" service, related to "gaming"—described in the Wells Fargo Store Manager Incentive Plan (dated January 1, 2008) as "the manipulation and/or misrepresentation of product solutions or product

---

[18] *Id.* at 53.

1  solutions reporting in order to receive or attempt to receive compensation, or to meet or attempt to

2  meet goals"—and "sales incentives."[19]

3      24.    **Both before and during the Relevant Period**, Defendants were informed by

4  current and former Wells Fargo employees about illicit account-creation activities, including

5  through direct contact with Stumpf and others and through litigation by former employees

6  alleging they were wrongfully terminated for attempting to report unlawful activity.  Among

7  other actions by former Wells Fargo employees, **in 2008** an employee won a federal

8  whistleblower case against Wells Fargo relating to the creation of fake brokerage accounts, which

9  violated SEC rules and thus triggered whistleblower protections under the Sarbanes-Oxley Act of

10  2002 ("SOX").  In the case, a division of the U.S. Department of Labor ("DOL") found there was

11  "reasonable cause to believe" Wells Fargo violated whistleblower protection laws by transferring

12  the employee after he flagged illegal activity.

13      25.    In **2009**, six former employees sued Wells Fargo in federal court in Montana

14  alleging wrongful termination.  They claimed they had been fired in mid-2008 for reordering

15  debit cards without authorization and had been instructed to do so by their manager, and had

16  reported the activity to EthicsLine.

17      26.    In **2010**, former Wells Fargo employees Yesenia Guitron and Judi Klosek filed a

18  discrimination lawsuit in the Northern District of California, in which they pointed to unethical

19  sales activities and unauthorized account openings at the Company.  Interviewed for a 2016 *New*

20  *York Times* article, Guitron said that before leaving the Company in 2008 and filing suit, she

21  reported the activity to her branch manager, the branch manager's boss, EthicsLine, and the

22  Company's Human Resources department.

23      27.    Stumpf testified to the Senate Banking Committee that in **2011**, one group (the

24  Sales and Service Conduct Oversight Team) "began to engage in proactive monitoring of data

25  analytics, specifically for the purpose of rooting out sales practice violations."[20]  According to

26  ---

27  [19] "EthicsLine" was a service for employees to report ethics and compliance concerns online or by phone to third-party interviewers, who then provided the information to Wells Fargo.

28  [20] Sept. 20, 2016 Senate Banking Committee Hr'g Tr. at 2.

CONSOLIDATED AMENDED VERIFIED
STOCKHOLDER DERIVATIVE COMPLAINT
LEAD CASE NO. 3:16-CV-05541-JST

Stumpf, in **2013** that team began an analysis of simulated funding across the retail banking business.  The Sales and Service Conduct Oversight Team identified simulated funding activity in the Los Angeles and Orange County markets, and terminated Wells Fargo employees for that conduct.[21]

28.    Also in **2011**:

  a.  New Jersey-based branch manager Rasheeda Kamar sent an email to Stumpf warning him that employees were creating fake accounts to reach the Company's sales quotas;

  b.  Nearly 1,000 employees in the Company's retail banking sector were terminated for improper sales practices; and

  c.  Arizona-based branch manager Ricky Hansen emailed Stumpf and several HR executives, describing practices related to creating fake accounts, which he reported to EthicsLine (he was subsequently fired).

29.    Stumpf testified to the House Financial Services Committee in September 2016 that "the Board, **from 2011 to 2013**, would get reports at a Committee level, at a high-level about ethics lines [EthicsLine], requests, or information at not a granular but maybe at the company level."

30.    According to Wells Fargo's written responses to questions posed by the Senate Banking Committee, **from at least 2011** the Board's Audit and Examination Committee received periodic reports from Wells Fargo's Internal Investigations group, as well as EthicsLine reports, showing "increase in sales integrity issues."[22]  Thereafter, the Company stated, the Risk Committee and the Human Resources Committee received reports relating to sales conduct (the Human Resources Committee in particular received "reports from management that it was monitoring sales integrity in Community Banking").  The Company further stated, "Sales integrity issues were also discussed periodically with the Board."

---

[21] *Id.*

[22] Wells Fargo's written response to Senate Banking Committee at 72.

31.     Beginning in **January 2012** (and continuing to July 2016), the OCC engaged in multiple supervisory activities concerning Wells Fargo, including targeted examinations of the Bank's governance and risk management practices related to compliance and operational risk. Among other things (as further detailed below), in **February 2013** the OCC issued a Supervisory Letter requiring Wells Fargo to develop its operational risk compliance program.[23]

32.     In **March 2012**, "the OCC received a small number of complaints from consumers and Bank employees alleging improper sales practices at Wells Fargo, which were forwarded to OCC supervision staff assigned to the Bank, consistent with agency practice at the time."[24]

33.     In **October 2012**, seven former Wells Fargo employees commenced a lawsuit against Wells Fargo, alleging conduct similar to that set forth in Guitron and Klosek's complaint, including the requirement that employees meet quotas or face the prospect of termination.

34.     CFPB Director Cordray testified to the Senate Banking Committee in September 2016 that in **mid-2013**, whistleblowers contacted the CFPB about sales activities at Wells Fargo.

35.     On **October 3, 2013**, a former employee brought suit against Wells Fargo in San Mateo Superior Court alleging wrongful termination and retaliation in connection with being forced to open accounts in family members' names.

36.     According to Wells Fargo's written response to the Senate Banking Committee, Stumpf recalled that in **late 2013** he learned of the increase in the number of reports of sales-practice issues.[25]

37.     Of particular significance, on **December 21, 2013**, the *Los Angeles Times* ran a detailed article describing the rampant pressure tactics at Wells Fargo to open accounts (the "December 2013 *L.A. Times* Article").[26]  The article reported on "[t]he relentless pressure to sell

---

[23] A Supervisory Letter is an official OCC communication that formally conveys supervisory findings and conclusions, including any supervisory concerns from the OCC's ongoing supervision of the subject institution.

[24] Thomas Curry written testimony to Senate Banking Committee at 3-4.

[25] Wells Fargo's written response to Senate Banking Committee at 72.

[26] E. Scott Reckard, *Wells Fargo's pressure-cooker sales culture comes at a cost*, LOS ANGELES TIMES (December 21, 2013), available at http://www.latimes.com/business/la-fi-wells-fargo-sale-pressure-20131222-story.html.

1  [that] has battered employee morale and led to ethical breaches."  The report, based on "a review

2  of internal bank documents and court records, and from interviews with 28 former and seven

3  current Wells Fargo employees who worked at bank branches in nine states, including

4  California," concluded:  "To meet quotas, employees have opened unneeded accounts for

5  customers, ordered credit cards without customers' permission and forged client signatures on

6  paperwork.  Some employees begged family members to open ghost accounts."

7         38.     Shortly after the December 2013 *L.A. Times* Article was published, i.e., **in late**

8  **December 2013 or early January 2014**, the OCC initiated a series of meetings with Wells Fargo

9  management, including executive leadership, to discuss oversight of sales practices.[27]

10        39.     In **February 2014**, Stumpf addressed the December 2013 *L.A Times* Article at a

11  town hall meeting with Wells Fargo employees in Hollywood, Florida.

12        40.     While the events before December 2013 should have caused Defendants to

13  seriously address what was a systemic problem of unlawful account-creation activities to meet

14  overly aggressive sales quotas, the December 2013 *L.A. Times* Article unquestionably alerted

15  Defendants that those activities were pervasive and stemmed from the culture—directed by

16  management and supported by the Board—of pressuring Bank employees to grow accounts by

17  any means necessary.  Notably, Stumpf admitted during his testimony before the House Financial

18  Services Committee that he discussed the December 2013 *L.A. Times* Article with the Board.[28]

19        41.     Further, during his testimony before the Senate Banking Committee in September

20  2016, Stumpf ***admitted*** that he learned of the fraud **in 2013** and that the Board learned of it "**later**

21  **[in] 2013 and then 2014 and on.**"[29]  He further stated the reports "got to the board level – it got

22  to the corporate level in 2013 because progress was not being made.  And the board level in '14,

23  as the corporate resources started to [sic]."[30]  Stumpf further testified the Board also learned

24  "sometime in 2013" that the Bank's regulators were informed of this growing problem.  He also

---

25  [27] Testimony of Thomas J. Curry, Comptroller of the Currency, before the Senate Banking Committee (Sept. 20, 2016) at 4.

26  [28] Sept. 29, 2016 House Financial Services Committee Hr'g Tr. at 26.

27  [29] Sept. 20, 2016 Senate Banking Committee Hr'g Tr. at 12.

28  [30] *Id.* at 13.

CONSOLIDATED AMENDED VERIFIED
STOCKHOLDER DERIVATIVE COMPLAINT
LEAD CASE NO. 3:16-CV-05541-JST

1    testified: "And I know in 2014, various committees of the Board were made aware of this.  The

2    risk committee, the audit and examination [committee], the corporate responsibility [committee]."

3    While (as detailed below) Stumpf and the other Defendants actually knew of or consciously

4    disregarded facts relating the illicit account-creation scheme long before 2013, Stumpf's

5    admissions to Congress were nonetheless striking.

6         42.    Additionally, the December 2013 *L.A. Times* Article prompted L.A. City Attorney

7    Michael Feuer to initiate what became a yearlong investigation into illicit account-creation

8    practices, which led to the filing on **May 4, 2015** of a civil enforcement action by the L.A. City

9    Attorney in the name of the People of the State of California seeking relief for consumers and an

10   end to the illicit account-creation practices.  The complaint describes the tactics Wells Fargo

11   employees used in perpetuating the illicit account-creation scheme.  A settlement was reached in

12   September 2016, under which Wells Fargo agreed to make restitution to affected customers and

13   pay $50 million in civil penalties.

14        43.    After the L.A. City Attorney's suit was filed, the CFPB requested information

15   from Wells Fargo.

16        44.    On **April 3, 2015**, a former Wells Fargo banker located in Chatsworth, California

17   mailed and emailed a letter to Stumpf and the Board advising them of "unethical practices in sales

18   due to the continuous management threat of negative consequences if they did not produce

19   'solutions.'"  During the next several months, the former employee repeatedly emailed Wells

20   Fargo representatives, copying the Board, asking for updates.  An email from August 2015

21   forwarded an internal Wells Fargo email from November 2014 with an example of a supervisor

22   pushing employees to meet their "mandatory" sales goal.

23        45.    On **May 14, 2015**, a consumer class action was filed against Wells Fargo in the

24   United States District Court for the Northern District of California for the same improper

25   practices noted in the December 2013 *L.A. Times* Article and in the L.A. City Attorney's

26   complaint.  The class complaint was supported in part by the testimony of a Wells Fargo

27   employee who confirmed the sales quota system at the Company "creates a culture of doing what

28

1    you have to do to meet numbers" and detailed some of the tactics involving opening sham

2    accounts.

3         46.     While the above events were unfolding, regulators were examining, among other

4    things, Wells Fargo's processes to monitor risk management and sales practices—which, as

5    detailed in this Complaint, were woefully deficient and both fostered the illicit account-creation

6    scheme and perpetuated it throughout the Relevant Period:

7
              a.    In **February 2015**, the OCC conducted an examination of the Bank's Community

8                   Bank Operational Risk Management, which led to the OCC's April 2015

9                   Supervisory Letter that included a Matter Requiring Attention ("MRA") requiring

10                  the Bank to address the governance of sales practices within its Community

11                  Banking division.  The OCC defines MRAs as practices that "[d]eviate from sound

12                  governance, internal control, and risk management principles, which may

13                  adversely impact the bank's earnings or capital, risk profile, or reputation, if not

14                  addressed"; or "[r]esult in substantive noncompliance with laws and regulations,

15                  internal policies or processes, OCC supervisory guidance, or conditions imposed

16                  in writing in connection with the approval of any application or other request by a

17                  bank."[31]

18
              b.    In **June 2015**, the OCC issued an additional Supervisory Letter to Stumpf

19                  identifying matters related to the Bank's enterprise-wide risk management and

20                  oversight of its sales practices that required corrective action by the Bank.

21
              c.    In **June and July 2015**, Wells Fargo provided information to the CFPB.

22

23
              d.    In **October 2015**, at the direction of the OCC, two independent consultants

24                  presented their first set of three quarterly findings to Wells Fargo following a

25

26

27    _____
      [31] *See* https://occ.gov/publications/publications-by-type/comptrollers-
28    handbook/_paginated/banksupervisionprocess/bank00200.htm.

thorough review of the Bank's approach to enterprise-wide sales practices and to assess consumer harm.

e.   In **November 2015**, the OCC required Wells Fargo to enter into a consent order due to "deficiencies in an internal control pillar of the Bank's program for Bank Secrecy Act/Anti-Money Laundering ["BSA/AML"] compliance covering the Wholesale Banking Group line of business"; the OCC noted Wells Fargo's "[g]overnance and oversight practices are not effective."[32]

f.   In **February and May 2016**, the two independent consultants engaged by the OCC presented their second and third set of findings to Wells Fargo following a thorough review of the Bank's approach to enterprise-wide sales practices and assessing consumer harm.

g.   **Throughout 2016**, the OCC held monthly meetings with Bank management to monitor and follow up on the Bank's progress in addressing the corrective actions the OCC had required.

h.   In **July 2016**, the OCC issued its Report of Examination concluding that the Bank's sales practices were unethical, the Bank's actions caused harm to consumers, and Bank management had not responded promptly to address those issues.

i.   On **July 18, 2016**, the OCC sent a Supervisory Letter to Stumpf stating the Bank engaged in unsafe or unsound banking practices.

47.   Accordingly, faced with direct evidence of fraudulent account-creation activities, Defendants were utterly derelict in their duties and did nothing to meaningfully address the indications of pervasive misconduct at the Company, in addition to the deficient internal controls

---

[32] OCC Consent Order, Nov. 17, 2015, *available at* https://occ.gov/static/enforcement-actions/ea2015-125.pdf.

1  that allowed the misconduct to occur and the overly aggressive sales-quota program that fostered
2  and perpetuated it.

3      48.     Even worse, Defendants implemented other policies that actually *enabled* the
4  fraudulent misconduct to flourish.  For instance, as detailed in a January 24, 2017 *Wall Street
5  Journal* article,[33] while it was standard procedure in the banking industry for banks to conduct
6  surprise annual audits of their branches to ensure they were following appropriate sales practices,
7  Defendants manipulated that practice.  The *Journal* detailed that Bank managers and executives
8  from across the country confirmed branches would be provided with 24-hour notice of what were
9  purportedly random audits of their branches' sales practices.  That notice allowed the branches
10  time to fabricate or mask evidence of the illicit account-creation scheme, including shredding
11  documents or forging missing signatures.  Thus, while other banks in the industry relied on
12  random audits to identify and correct any deficient sales practices, Defendants used them as
13  opportunities to reinforce and enable fraudulent practices.

14      49.     On February 1, 2017, six Senate Banking Committee members, led by Senator
15  Menendez, wrote to Sloan demanding answers after the *Journal*'s revelations that the Bank
16  reportedly tried to cover its tracks by shredding and forging documents to conceal the widespread
17  customer fraud.   The Senators stated "[t]hese latest allegations by Wells Fargo employees raise
18  yet another red flag indicating that *top management and the board of directors of Wells Fargo
19  knew or should have known about the extensive fraud occurring throughout the bank*."  The
20  Senators further stated, "Wells Fargo's internal review system was allowed to operate with
21  serious flaws for years, remains flawed, and lacks appropriate controls to prevent future harm to
22  the bank's customers."

23      50.     While individual employees were terminated during the Relevant Period for
24  engaging in improper activities related to creating accounts—and, indeed, the collective firing of
25  more than 5,300 employees during the Relevant Period was yet another red flag to Defendants—
26

27  [33] Emily Glazer, *At Wells Fargo, Bank Branches Were Tipped Off to Inspections*, THE WALL
    STREET JOURNAL (January 24, 2017), available at https://www.wsj.com/articles/at-wells-fargo-
28  bank-branches-were-tipped-off-to-inspections-1485253800.

1    Defendants failed to (i) disclose the misconduct to investors, including its impact on Wells

2    Fargo's financial results and cross-selling metrics reported in its SEC filings and other public

3    statements; (ii) take appropriate steps to bring the misconduct to an end.

4          51.    Additionally, Defendants made materially false or misleading statements

5    throughout the Relevant Period, which among other things caused the Company to repurchase

6    approximately 772 million shares of Wells Fargo stock at prices that were artificially inflated due

7    to those misstatements or omissions.

8          52.    Further, several Defendants reaped significant ill-gotten gains through dispositions

9    of Wells Fargo shares during the Relevant Period at prices artificially inflated due to the false or

10   misleading statements they and other Defendants made concerning the Company's cross-selling

11   efforts and corresponding financial metrics.

12         53.    Defendants' failure to address the illicit account-creation scheme, as well as the

13   culture that fostered it, is particularly striking given their prior knowledge of problems caused by

14   the sales-quota program.  Specifically, on **July 20, 2011**, Wells Fargo entered into a consent order

15   with the Federal Reserve and paid an $85 million penalty in connection with allegedly steering

16   prime borrowers into more costly subprime loans and falsifying income information on mortgage

17   applications. The Federal Reserve alleged "[t]hese practices were allegedly fostered by Wells

18   Fargo Financial[, Inc.]'s incentive compensation and sales quota programs and the lack of

19   adequate controls to manage the risks resulting from these programs."[34]  Rather than addressing

20   the underlying problem, Stumpf blamed "a relatively small group of team members [who] are not

21   what we stand for at Wells Fargo" and promised to "provide restitution to customers who may

22   have been harmed."[35]

23         54.    "[I]n consultation . . . with regulators and with the [L.A.] city attorney's office"[36]

24   and pursuant to confidential communications between those parties, in August 2015

25   _____
     [34] Federal Reserve Board Press Release (July 20, 2011), available at
26   https://www.federalreserve.gov/newsevents/press/enforcement/20110720a.htm.

     [35] Ben Rooney, *Fed hits Wells Fargo with $85 million fine*, CNN MONEY (July 20, 2011),
27   available at http://money.cnn.com/2011/07/20/news/companies/wells_fargo_fined/.

     [36] Sept. 20, 2016 Senate Banking Committee Hr'g Tr. at 11.
28

1  Pricewaterhouse Coopers ("PwC") was engaged to review Wells Fargo records for the purpose of

2  determining "who may have suffered financial harm as a result of an account that may not have

3  been authorized, and to quantify what that financial harm might have been."[37]  In other words, the

4  investigation was initiated only in response to regulators and amidst litigation, not as a decision in

5  the ordinary course of business to address the illicit account-creation scheme.

6      55.     Moreover, Defendants failed to timely disclose PwC's striking findings—

7  specifically, that 1.5 million deposit accounts and 565,000 consumer credit card accounts may

8  have been unauthorized, and approximately 115,000 of those accounts had incurred $2.6 million

9  in fees.  Those findings were not revealed to the public until September 2016.

10     56.     In short, Defendants failed—repeatedly, and brazenly—to serve the best interests

11 of Wells Fargo and its shareholders.  As a result of their misconduct, Defendants are liable to the

12 Company under Sections 10(b), 14(a), 20A, and/or 29(b) of the Securities Exchange Act of 1934

13 ("Exchange Act") as well as for breaches of their fiduciary duties and other violations of state

14 law.

15 **II.      JURISDICTION AND VENUE**

16     57.     This Court has jurisdiction over the subject matter of Plaintiffs' Exchange Act

17 claims in accordance with 28 U.S.C. §§ 1331 and 1337, as well as Section 27 of the Exchange

18 Act, 15 U.S.C. § 78aa, and has jurisdiction over Plaintiffs' state-law claims in accordance with

19 28 U.S.C. § 1367.

20     58.     This Court has jurisdiction over each of the Defendants because each Defendant is

21 either a resident of California or otherwise has sufficient minimum contacts with California (or, in

22 the case of Plaintiffs' Exchange Act claims, with the United States as a whole) to render the

23 exercise of jurisdiction by this Court permissible under California Code of Civil Procedure §

24 410.10 as well as the United States and California Constitutions.  Additionally, in connection

25 with the misconduct alleged in this Complaint, Defendants, directly or indirectly, used the means

26 and instrumentalities of interstate commerce, including the United States mails, interstate

27 telephone communications, and the facilities of the national securities markets.

28 _____
[37] *Id*. at 4.

59.     Venue is proper in this District in accordance with Section 27 of the Exchange Act.  Venue is also proper under 28 U.S.C. § 1391(b) because (i) Wells Fargo maintains its principal place of business in this District; (ii) one or more of the Defendants resides in this District; (iii) a substantial portion of the transactions and wrongs complained of in this Complaint occurred in this District; and (iv) Defendants received substantial compensation in this District by doing business here and engaging in numerous activities that had effects in this District.

## III.     INTRADISTRICT ASSIGNMENT

60.     A substantial portion of the transactions and conduct giving rise to the claims in this action occurred in the County of San Francisco; accordingly, this action has been properly assigned to the San Francisco division of this Court.

## IV.     PARTIES

### A.     Lead Plaintiffs

61.     Plaintiff Fire and Police Pension Association of Colorado, established on January 1, 1980, is the Trustee for the Fire and Police Members' Benefit Investment Fund, which contains assets of governmental defined benefit pension plans for the purpose of providing benefits for firefighters and police officers and beneficiaries upon retirement, disability, or death.  In the State of Colorado, affiliated employers and members contribute a percentage of the employees' wages to the trust fund.  Colorado Fire and Police has approximately 23,500 Colorado firefighters and policemen as members, and its net investible assets totaled $4.302 billion in market value as of December 31, 2016.  Colorado Fire and Police's principal place of business is located at 5290 DTC Parkway, Suite 100, Greenwood Village, Colorado 80111.

62.     The General Counsel for Colorado Fire and Police, Kevin Lindahl, is a nationally recognized, experienced pension fund attorney.  Mr. Lindahl has served in his capacity as General Counsel since 2000.  He is also an elected member of the Church Pension Fund Board of Trustees for the Episcopal Church; the board oversees over $11 billion in assets.  Mr. Lindahl is also the past President of the National Association of Public Pension Attorneys, the principal professional legal and educational organization consisting exclusively of public pension fund attorneys, and currently serves on its Executive Board.

63.     Plaintiff City of Birmingham Retirement and Relief System is a public pension system organized for the benefit of current and retired public employees of the city of Birmingham, Alabama.  Birmingham has approximately 4,000 active participants and approximately 3,400 retirees.  As of December 31, 2016, Birmingham had pension assets under management of over $1 billion.

64.     Plaintiffs bring this action derivatively on behalf and for the benefit of Wells Fargo to redress injuries Wells Fargo suffered, and will suffer, as a direct result of Defendants' misconduct.  Wells Fargo is named as a Nominal Defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.  Plaintiffs will adequately and fairly represent the interests of the Company and its shareholders in this litigation.

65.     Plaintiffs have owned Wells Fargo common stock throughout the Relevant Period and remain current stockholders of the Company.  Plaintiffs intend to retain shares in Wells Fargo throughout the duration of this litigation.

**B.     Nominal Defendant**

66.     Nominal Defendant Wells Fargo, founded in 1852, is a Delaware corporation with principal executive offices located at 420 Montgomery Street, San Francisco, California.  Accordingly, Wells Fargo is a citizen of Delaware and California.  Wells Fargo is a financial holding company and a bank holding company that provides retail, commercial, and corporate banking services through banking stores and offices, the Internet, and other distribution channels to individuals, businesses, and institutions in all 50 states, the District of Columbia, and other countries.  Wells Fargo provides other financial services through its subsidiaries engaged in various businesses, principally wholesale banking, mortgage banking, consumer finance, equipment leasing, agricultural finance, commercial finance, securities brokerage and investment banking, insurance agency and brokerage services, computer and data processing services, trust services, investment advisory services, mortgage-backed securities servicing, and venture capital investment.

1      67.     Wells Fargo was established to provide banking and express services to Gold Rush

2    California and the Pacific Coast.  In the early part of the 20th century the Company served as a

3    commercial bank in San Francisco, and beginning in the 1960s, it expanded into a northern

4    California regional bank with branch offices throughout the area.  In the 1980s, Wells Fargo

5    became a statewide bank and the seventh-largest bank in the nation.  The Company engaged in a

6    series of acquisitions and mergers in the late 1980s and 1990s, including a merger with Norwest

7    Corporation of Minneapolis in 1998.  That coincided with Wells Fargo's focus on the U.S. retail

8    customer market.  In 2008, Wells Fargo acquired Wachovia Corporation.

9      68.     Currently the world's second-largest bank by market capitalization and third-

10    largest bank in the United States by assets, Wells Fargo describes itself as a "diversified,

11    community-based financial services company with $1.9 trillion in assets."[38]  The Company had

12    total equity of $204.0 billion as of September 2016.[39]

13      69.     The Company has three reportable operating segments:  (i) Wholesale Banking,

14    which provides financial solutions to businesses with annual sales generally in excess of $5

15    million; (ii) Wealth and Investment Management, which provides personalized wealth

16    management, investment and retirement products and services, including financial planning,

17    private banking, credit, investment management and fiduciary services to high-net worth and

18    ultra-high-net worth individuals and families; and (iii) Community Banking—the most-relevant

19    to this case—which was the Company's largest segment during the Relevant Period, and focuses

20    on diversified financial products and services to customers and small businesses, including

21    checking and savings accounts, credit and debit cards, as well as auto, student, and small-business

22    lending.  Community Banking products also include investment, insurance, and trust services in

23    39 states and the District of Columbia, as well as mortgage and home equity loans in all 50 states.

24    During the Relevant Period, Community Banking earned approximately twice the annual revenue

25    of Wholesale Banking and more than three times the revenue of Wealth and Investment

26    Management.

---

27    [38] Wells Fargo & Company Q3 2016 Form 10-Q at 3.

28    [39] *Id*. at 4.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

C.    **Individual Defendants**

1.    **Officer Defendants**

70.    Defendant John G. Stumpf, a citizen of California, served as Wells Fargo's CEO from June 2007 until his resignation on October 12, 2016 amid the public outcry over the misconduct detailed in this Complaint.  He also served as Chairman of the Board between January 2010 and as a director since June 2006, prior to his October 2016 resignation.  Stumpf earlier served as the Company's President from August 2005 to November 2015, and as its Chief Operating Officer from August 2005 to June 2007.  He previously held various positions with the Company or its predecessors, since at least 1982, and has held a variety of management and senior management positions, including Group Executive Vice President of Community Banking. From 2011 to 2015, Wells Fargo paid Stumpf more than $100 million in salary, stock awards, and other compensation.

71.    Defendant Timothy J. Sloan, a citizen of California, has served as Wells Fargo's CEO since October 2016 (following Stumpf's resignation), and served as the Company's President and COO since November 2015.  Prior to that, he served as Senior Executive Vice President, Wholesale Banking from May 2014 to November 2015; as Senior Executive Vice President and CFO from February 2011 to May 2014; and as Senior Executive Vice President and Chief Administrative Officer from September 2010 to February 2011.  He previously held various positions with the Company or its predecessors beginning in 1988.  From 2011 to 2015, Wells Fargo paid Sloan more than $40 million in salary, stock awards, and other compensation.

72.    Defendant Carrie L. Tolstedt, a citizen of California, served as Wells Fargo's Senior Executive Vice President, Community Banking from June 2007 to July 2016, and then transitioned to retirement, leaving the Company in December 2016; she continued to report to Sloan from July to December 2016.  Prior to that, Tolstedt served as Group Executive Vice President, Community Banking from 2006 to June 2007; and as Group Executive Vice President, Regional Banking from 2002 to 2006.  She previously held various positions with the Company or its predecessors beginning in 1990.  From 2011 to 2015, Wells Fargo paid Tolstedt more than $45 million in salary, stock awards, and other compensation.

73.     Defendant John R. Shrewsberry, a citizen of California, has served as Wells Fargo's Senior Executive Vice President and CFO since May 2014.  Shrewsberry previously served as Head of Wells Fargo Securities from 2009 to May 2014 and held various other positions with the Company beginning in 2001.  From 2014 to 2015, Wells Fargo paid Shrewsberry more than $16 million in salary, stock awards, and other compensation.

74.     Defendant Michael J. Loughlin, a citizen of California, has been Senior Executive Vice President since July 2011 and Chief Risk Officer of Wells Fargo since 2006.  Loughlin oversees all risk-taking activities at Wells Fargo, including credit, market, operational, and compliance. Loughlin is the leader of the Corporate Risk group and is a member of Wells Fargo's Operating and Management Committees.

75.     Defendants Stumpf, Sloan, Tolstedt, Shrewsberry, and Loughlin are referenced collectively in this Complaint as the "Officer Defendants."  Additionally, Stumpf, Sloan, Tolstedt, and Loughlin comprise the "Insider Selling Defendants."

### 2.     Director Defendants

76.     Defendant John D. Baker II, a citizen of Florida, has been a Wells Fargo director since January 2009.  Baker has served on the Audit and Examination Committee and the Credit Committee since at least March 2010, and has served on the Corporate Responsibility Committee since January 2011.  From 2011 to 2015, Wells Fargo paid Baker more than $1.5 million in fees, stock awards, and other compensation.

77.     Defendant Elaine L. Chao, a citizen of Kentucky, was a Wells Fargo director from July 2011 until January 2017.  Chao served on the Credit Committee since at least March 2013 and served on the Corporate Responsibility Committee from July 2011 to at least March 2012.  From 2011 to 2015, Wells Fargo paid Chao more than $1.2 million in fees, stock awards, and other compensation.  On January 31, 2017, Chao was confirmed by the U.S. Senate to serve as Secretary of Transportation.

78.     Defendant John S. Chen, a citizen of California, has been a Wells Fargo director since September 2006.  Chen has served on the Human Resources Committee since at least

1   March 2010.  From 2011 to 2015, Wells Fargo paid Chen more than $1.3 million in fees, stock

2   awards, and other compensation.

3          79.     Defendant Lloyd H. Dean, a citizen of California, has been a Wells Fargo director

4   since June 2005.  Dean has served as Chairman of the Human Resources Committee since at least

5   March 2012 and has served on the Corporate Responsibility Committee, including as Chairman

6   from January 2011 to at least March 2011, and on the Risk Committee since January 2011.  He

7   also served on the Credit Committee from at least March 2010 to at least March 2012, on the

8   Audit and Examination Committee from at least March 2010 to at least March 2011, and on the

9   Governance and Nominating Committee from 2012 to the present.  From 2011 to 2015, Wells

10  Fargo paid Dean more than $1.5 million in fees and stock awards.

11         80.     Defendant Elizabeth A. Duke, a citizen of Virginia, has been a Wells Fargo

12  director since January 2015.  Duke has served on the Risk Committee since January 2015 and on

13  the Credit Committee and Finance Committee since January 2016.  In 2015, Wells Fargo paid

14  Duke more than $350,000 in fees and stock awards.

15         81.     Defendant Susan E. Engel, a citizen of New York, has been a Wells Fargo director

16  since May 1998.  Engel has served on the Credit Committee, the Finance Committee, and the

17  Human Resources Committee since at least March 2010.  From 2011 to 2015, Wells Fargo paid

18  Engel more than $1.5 million in fees, stock awards, and other compensation.

19         82.     Defendant Enrique Hernandez, Jr., a citizen of California, has been a Wells Fargo

20  director since January 2003.  Hernandez has served as Chairman of the Board's Risk Committee

21  since at least March 2012 and as a member of that Committee since January 2011, and has served

22  on the Corporate Responsibility Committee since January 2011.  He has served as Chairman of

23  the Finance Committee since at least January 2011.  He also served on the Audit and Examination

24  Committee from at least March 2010 to March 2016.  From 2011 to 2015, Wells Fargo paid

25  Hernandez more than $1.7 million in fees, stock awards, and other compensation.

26         83.     Defendant Donald M. James, a citizen of Alabama, has been a Wells Fargo

27  director since January 2009.  James has served on the Human Resources Committee since at least

28  March 2010.  James has served on the Finance Committee since at least 2011.  From 2011 to

2015, Wells Fargo paid James more than $1.3 million in fees, stock awards, and other compensation.

84.     Defendant Cynthia H. Milligan, a citizen of Nebraska, has been a Wells Fargo director since July 1992.  She has served as Chairman of the Credit Committee since at least March 2010; has served on the Corporate Responsibility Committee since January 2011; has served on the Risk Committee since January 2011, including as Chairman of that Committee from January 2011 to at least March 2011; and has served on the Governance and Nominating Committee since at least 2005.  She also served on the Audit and Examination Committee from at least March 2010 to at least March 2011.  From 2011 to 2015, Wells Fargo paid Milligan more than $1.5 million in fees, stock awards, and other compensation.

85.     Defendant Federico F. Peña, a citizen of Colorado, has been a Wells Fargo director since November 2011.  He has served as Chairman of Wells Fargo's Corporate Responsibility Committee since at least March 2016 and as a member that Committee since at least March 2014; has served on the Audit and Examination Committee since November 2011; has served on the Risk Committee since March 2016; and has served on the Governance and Nominating Committee since 2012.  From 2011 to 2015, Wells Fargo paid Peña more than $1.2 million in fees, stock awards, and other compensation.

86.     Defendant James H. Quigley, a citizen of Utah, has been a Wells Fargo director since October 2013.  He has served as Chairman of the Audit and Examination Committee since January 2014, has served on the Risk Committee since at least March 2014, and has served on the Credit Committee since at least March 2015.  From 2013 to 2015, Wells Fargo paid Quigley more than $800,000 in fees and stock awards.

87.     Defendant Judith M. Runstad, a citizen of Washington, was a Wells Fargo director from May 1998 to April 2016.  She served on the Corporate Responsibility Committee from January 2011 to April 2016, including as Chairman from at least March 2012 to at least March 2015; served on the Credit Committee from at least March 2010 to April 2016; served on the Risk Committee from at least March 2012 to at least March 2015; and served on the Finance

1   Committee since at least March 2012.  From 2011 to 2015, Wells Fargo paid Runstad more than

2   $1.6 million in fees, stock awards, and other compensation.

3        88.     Defendant Stephen W. Sanger, a citizen of Minnesota, has been Wells Fargo's

4   Chairman of the Board since October 2016 (following Stumpf's resignation), Lead Director since

5   January 2012 and a director since July 2003.  He has served on the Human Resources Committee

6   since at least March 2010, including as Chairman from at least March 2010 to March 2011; has

7   served on the Risk Committee since January 2011; and has served on the Governance and

8   Nominating Committee from 2011 to the present, including as Chairman since 2012.  From 2011

9   to 2015, Wells Fargo paid Sanger more than $1.5 million in fees, stock awards, and other

10  compensation.

11       89.     Defendant Susan G. Swenson, a citizen of California, has been a Wells Fargo

12  director since November 1998.  She has served on the Audit and Examination Committee since at

13  least March 2010, and has served on the Governance and Nominating Committee since at least

14  2006.  From 2011 to 2015, Wells Fargo paid Swenson more than $1.3 million in fees, stock

15  awards, and other compensation.

16       90.     Defendant Suzanne M. Vautrinot, a citizen of Colorado, has been a Wells Fargo

17  director since February 2015.  She has served on the Audit and Examination Committee since at

18  least March 2015, and has served on the Credit Committee since February 2016.  In 2015, Wells

19  Fargo paid Vautrinot more than $324,000 in fees and stock awards.

20       91.     The individuals identified in ¶¶ 76-90 above, in addition to Defendant Stumpf, are

21  referenced collectively in this Complaint as the "Director Defendants."

22  **V.   DEFENDANTS WERE OBLIGATED TO SAFEGUARD THE COMPANY'S**
        **INTERESTS AND COMPLY WITH APPLICABLE LAWS**
23

24       A.     <u>**Duties of All Defendants**</u>

25       92.     By reason of their positions as officers or directors of Wells Fargo and because of

26  their ability to control the business, corporate, and financial affairs of the Company, Defendants

27  owed Wells Fargo and its shareholders the duty to exercise due care and diligence in the

28  management and administration of the affairs of the Company, including ensuring that Wells

Fargo operated in compliance with all applicable federal and state laws, rules and regulations. Defendants were and are required to act in furtherance of the best interests of Wells Fargo and its shareholders so as to benefit all shareholders equally and not in furtherance of Defendants' personal interest or benefit.  Each director and officer owes to Wells Fargo and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

93.     Because of their positions of control and authority as directors or officers of Wells Fargo, Defendants were able to and did, directly or indirectly, exercise control over the wrongful acts detailed in this Complaint.  Due to their positions with Wells Fargo, Defendants had knowledge of material non-public information regarding the Company.

94.     To discharge their duties, Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, controls, and financial and corporate affairs of the Company.  By virtue of such duties, the officers and directors of Wells Fargo were required to, among other things:

a.     Manage, conduct, supervise, and direct the employees, businesses, and affairs of Wells Fargo in accordance with laws, rules, and regulations, as well as the charter and by-laws of Wells Fargo;

b.     Ensure that Wells Fargo did not engage in imprudent or unlawful practices and that the Company complied with all applicable laws and regulations;

c.     Remain informed as to how Wells Fargo was, in fact, operating, and, upon receiving notice or information of imprudent or unsound practices, to take reasonable corrective and preventative actions, including maintaining and implementing adequate financial and operational controls;

d.     Supervise the preparation, filing, or dissemination of any SEC filings, press releases, audits, reports, or other information disseminated by Wells Fargo, and to examine and

evaluate any reports of examinations or investigations concerning the practices, products, or conduct of officers of the Company;

e.      Preserve and enhance Wells Fargo's reputation as befits a public corporation;

f.      Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business; and

g.      Refrain from unduly benefiting themselves and other Wells Fargo insiders at the expense of the Company.

**B.      Fiduciary Duties of Directors of Federal Banking Institutions**

95.      The Board has a responsibility, as part of its fiduciary duties to Wells Fargo and its stockholders, to oversee the operations of the Company and to maintain sufficient systems or controls to be reasonably certain that misconduct at the operational level would be elevated to the Board and executive management for remediation.  The Board fails in that responsibility if it (i) fails to implement appropriate reporting systems or controls or (ii) consciously fails to monitor or oversee the systems and controls it put in place.

96.      While the boards of all Delaware corporations have this oversight duty, federal regulatory bodies place special emphasis on the oversight function of boards of banking institutions.  Following the mortgage crisis of the last decade that threw a spotlight on deceptive banking practices, the federal government enacted regulations and issued guidance on the duties of banks and, in particular, their boards of directors, to oversee operations at the customer level. Each of these regulatory schemes is meant to drive home the core principle that banks must employ systems and controls designed to detect suspicious activity at the customer level.

97.      The Federal Deposit Insurance Corporation ("FDIC") has enumerated the duties of bank directors as follows:

Th[e] [fiduciary duties of care and loyalty mean] that **_directors are responsible_** for selecting, monitoring, and evaluating competent management; establishing

business strategies and policies; monitoring and assessing the progress of business operations; ***establishing and monitoring adherence to policies and procedures required by statute, regulation, and principles of safety and soundness***; and for making business decisions on the basis of fully informed and meaningful deliberation.[40]

98.     Similarly, the OCC describes the primary fiduciary duties of bank directors as follows:

While holding companies of large banks are typically managed on a line of business basis, directors at the bank level are responsible for oversight of the bank's charter-al legal entity.  Such responsibility requires separate and focused governance.  ***We have reminded the boards of banks that their primary fiduciary duty is to ensure the safety and soundness of the national bank or federal savings association.  This responsibility involves focus on the risk and control infrastructure.***  Directors must be certain that appropriate personnel, strategic planning, risk tolerance, operating processes, delegations of authority, controls, and reports are in place to effectively oversee the performance of the bank.  The bank should not simply function as a booking entity for the holding company.  ***It is incumbent upon bank directors to be mindful of this primary fiduciary duty as they execute their responsibilities.***[41]

99.     To discharge their duties as Wells Fargo's officers and directors, and as further informed by OCC Bulletin 2014-52[42], Defendants were required to exercise reasonable and prudent supervision over Wells Fargo's management, policies, practices, and controls of the affairs of the Company.

## C.     The Board's Committees Were Expressly Charged with Overseeing and Monitoring the Bank's Risk Exposure.

100.     Among the Board's most-critical duties is overseeing the Company's risk management structure.[43]  Wells Fargo's 2013 Annual Report to shareholders, for example, states "[e]ach Board committee receives reports and information regarding risk issues directly from management and, in some cases, management committees have been established to inform the risk management framework and provide governance and advice regarding risk management

---

[40] Financial Institution Letter, FIL--87—92 (FDIC Dec. 3, 1992) available at https://www.fdic.gov/regulations/laws/rules/5000-3300.html.

[41] Testimony of Thomas J. Curry, Comptroller of the Currency, before the Financial Services Committee, U.S. House of Representatives (June 19, 2012), *available at* https://occ.gov/news-issuances/congressional-testimony/2012/pub-test-2012-91-written.pdf.

[42] OCC Bulletin 2014-52, Subject: Matters Requiring Attention (Oct. 30, 2014).

[43] *See* Wells Fargo & Company 2012 Annual Report at 50; Wells Fargo & Company 2013 Annual Report at 51; Wells Fargo & Company 2014 Annual Report at 54; Wells Fargo & Company 2015 Annual Report at 59.

functions."[44]  Other Annual Reports issued during the Relevant Period similarly represent that various Board committees have frequent interactions with the Company's risk officers:

> The Chief Risk Officer and the Chief Credit, Market and Operational Risk Officers, who report to the Chief Risk Officer, work closely with the Board's Risk, Credit and Audit and Examination Committees and frequently provide reports to these and other Board committees and update the committee chairs and other Board members on risk issues outside of regular committee meetings, as appropriate.[45]

101.    Further, the Board's several standing committees monitor other specific aspects of Wells Fargo's business.  Specifically among these are the Audit and Examination Committee, the Risk Committee, the Corporate Responsibility Committee, the Human Resource Committee, and the Governance and Nominating Committee.  These committees have their own, supplemental charters setting forth duties for their respective members, in addition to the duties of board members generally.

102.    The below chart illustrates the membership of Wells Fargo's principal standing Board committees during all or part of the Relevant Period:

| Director/ Defendant | Audit and Examination | Corporate Responsibility | Governance and Nominating | Human Resources | Risk |
|---|---|---|---|---|---|
| Baker | X | X | | | |
| Chao | | X | | | |
| Chen | | | | X | |
| Dean | | X | X | X | X |
| Duke | | | | | X |
| Engel | | | | X | |
| Hernandez | | X | | | X |

---

[44] Wells Fargo & Company Wells Fargo 2013 Annual Report at 53; *see also* Wells Fargo & Company 2012 Annual Report at 50; Wells Fargo & Company 2014 Annual Report at 56; Wells Fargo & Company 2015 Annual Report at 59, 61.

[45] Wells Fargo & Company 2012 Annual Report at 50; Wells Fargo & Company 2013 Annual Report at 53; Wells Fargo & Company 2014 Annual Report at 56; Wells Fargo & Company 2015 Annual Report at 61.

| | | | | | |
|---|---|---|---|---|---|
| James | | | | X | |
| Milligan | | X | X | | X |
| Peña | X | X | X | | X |
| Quigley | X | | | | X |
| Runstad | | X | | | X |
| Sanger | | | X | X | X |
| Swenson | X | | X | | |
| Vautrinot | X | | | | |

**1.    Audit And Examination Committee**

103.    The Board's Audit and Examination Committee is currently comprised of Quigley (Chair), Baker, Peña, Swenson, and Vautrinot.  According to the Audit and Examination Committee Charter, the Committee shall provide assistance to the Board with respect to its oversight of "the integrity of the Company's financial statements and the adequacy and reliability of disclosures to stockholders, including management activities related to accounting and financial reporting and internal controls."  Moreover, the Committee is charged with overseeing "the Company's compliance with legal and regulatory requirements, financial crimes risk (including Bank Secrecy Act/anti-money laundering risk) . . . and reputation risk related to the Committee's responsibilities described in this Charter."

104.    The Audit and Examination Committee is also tasked with the obligation to oversee and monitor the Company's compliance with laws and regulations.  Wells Fargo's applicable Charter in effect during the Relevant Period specifically provides that the job of the Committee is to periodically review and receive updates and reports from management on the state of, among other things:

- [T]he Company's internal control over financial reporting.  Review disclosures to the Committee by the CEO and CFO in connection with their certification of the Company's Forms 10-K and 10-Q regarding any significant deficiencies or material weaknesses in the design or operation of internal controls over financial reporting and any fraud involving any employees who have a significant role in the Company's internal controls over financial reporting.  Review with management and the independent auditor the basis for their

reports issued under 12 C.F.R. Part 363.

\* \* \*

- *[C]ompliance and general condition of compliance risk management in the Company, including significant pending laws and regulations, significant violations of statutes and regulations (including those relating to safety and soundness)* with corrective actions and schedules for resolution, adherence to compliance risk appetite metrics, and the reputation risks of significant compliance exposures[.]

\* \* \*

3. <u>Committee Report</u>. Review and approve the Committee report required to be included in the Company's annual proxy statement by the rules of the Securities and Exchange Commission.

4. <u>Regulatory Reporting and Risk Disclosure</u>.

*Approve and periodically review the Company's policy establishing its disclosure framework for financial and risk reports prepared for the Board, management and bank regulatory agencies and related risk, capital,* and liquidity disclosures made by the Company, including financial reporting or other required disclosures arising out of the Basel Capital Accords.

*Periodically review and receive updates from management regarding the Company's compliance with its regulatory reporting and risk governance and oversight framework and monitor the Company's progress in appropriately and promptly addressing, correcting, and resolving any matters reported to the Committee* in connection with such updates.

105.     The Audit and Examination Committee Charter also states the Committee must "[d]iscuss regulatory examination reports and letters addressed to the Committee or the Board, and receive at least quarterly summaries of significant examination reports and other significant communications from regulators, including areas of criticism or less-than-satisfactory ratings, and a corrective action program and timetable."

## 2.     Risk Committee

106.     The Board's Risk Committee is currently comprised of Hernandez (Chair), Dean, Duke, Milligan, Peña, Quigley, and Sanger.  The Company's Annual Reports during the Relevant Period stated the Committee "serves as a focal point for enterprise-wide risk issues, overseeing all key risks facing the Company."[46]  Wells Fargo's Risk Committee Charter states the Committee

_____

[46] *See* Wells Fargo & Company 2014 Annual Report at 54; Wells Fargo & Company 2015 Annual Report at 59; *see also* 2012 Annual Report at 50; 2013 Annual Report at 51.

will provide assistance to the Board by "serv[ing] as a resource to management by overseeing risk across the entire Company and across all risk types, and by enhancing management's and the Board's understanding of the Company's overall risk appetite and enterprise-wide risk management activities and effectiveness."[47]  The Charter also delineates other responsibilities of the Committee:

  1. <u>Risk Management Framework</u>.  The Committee shall approve and periodically review the Company's risk management framework, which outlines the Company's overarching approach to risk management and the policies, practices, and governance structures used by management to execute its risk management program and Corporate Risk strategy including those relating to the following:

  - *maintaining a strong risk culture* and the independence and stature of Corporate Risk;

  - defining risk roles and responsibilities across the Company's three lines of defense;

  - *establishing protocols and processes for issue escalation and reporting*;

  - facilitating appropriate credible challenge of business decisions; and

  - providing for the recruitment, development, retention, compensation, and succession planning of risk talent, *as well as enterprise-wide incentive-based compensation practices that are consistent with the safety and soundness of the Company and do not encourage excessive risk taking*.

  2. <u>Oversight of Corporate Risk Function</u>.  The Committee shall oversee and receive reports on the operation of the Company's enterprise-wide risk management framework and Corporate Risk function, including Corporate Risk's budget and staffing levels.

                                    *   *   *

  3. <u>Risk Coverage Statement and Risk Profile</u>.  *The Committee shall review and discuss the Company's risk coverage statement, which defines the key risk types facing the Company, including credit risk, financial crimes risk (including Bank Secrecy Act/anti-money laundering risk), information security risk (including cyber defense management), interest rate risk, liquidity risk, market risk, model risk, operational risk, regulatory compliance risk, reputation risk,* strategic risk, and technology risk, and the most significant cross-functional risk areas that cut across multiple risk types and/or require significant coordination across multiple risk oversight functions (including counterparty credit risk).  The Committee also shall review and discuss management's assessment of the Company's aggregate enterprise-wide risk profile, as well as the alignment of the risk profile with the Company's strategic plan, goals, objectives, and risk appetite.

                                    *   *   *

---

[47] *See also* Wells Fargo & Company 2013 Annual Report at 51.

5. <u>Risk Frameworks and Policies</u>.

- ***The Committee shall approve and periodically review the functional framework and oversight policies established by management for the key risk types identified in the Company's risk coverage statement.*** The functional framework and oversight policies, which outline the structures, practices, policies, systems, reports, processes, and roles and responsibilities for managing those key risks may, in some cases, be reviewed and approved by another Board committee primarily responsible for the oversight of the specific risk type, and shall be recommended by such other Board committee for approval by the Risk Committee.

- The Committee retains the right to request updates or changes to any such framework and oversight policies, or other risk policies reviewed and approved by the Board's other committees, based on the Committee's assessment of enterprise-wide risk exposures and other matters it deems appropriate.  The Committee shall approve any other policies or activities it deems appropriate or are required to be approved by the Committee by applicable law or regulation.

\*   \*   \*

9. <u>Emerging Risks and Other Risk Issues</u>.  The Committee shall receive regular reports from the Chief Risk Officer and other members of management regarding emerging risks and other selected risk topics and/or enterprise-wide risk issues, including model risk.  The Committee may request that the Board and/or another committee of the Board review, discuss and assume oversight responsibility for any newly identified risk issues.

10. <u>Assessment of Risk Program</u>.  The Committee shall review and receive regular reports from the Chief Risk Officer and other members of management ***regarding management's assessment of the effectiveness of the Company's enterprise-wide risk program, including corrective actions taken by management*** to address risk issues and the implementation of risk management enhancements.

### 3.    Human Resources Committee

107.    The current members of the Board's Human Resources Committee are Dean (Chair), Chen, Engel, James, and Sanger.  According to the Human Resources Committee Charter, the purpose of the Committee is to assist the Board "in fulfilling its responsibilities relating to the overall compensation strategy for the Company and the compensation of the Company's executive officers."  The Committee is explicitly tasked with overseeing "the implementation of risk-balancing and risk management methodologies for incentive compensation plans and programs for senior executives and those identified employees in a position to expose the Company to material risk."  In addition to "oversee[ing] reputation risk

related to the [Human Resources Committee]'s responsibilities described in this Charter," the

Committee is tasked with the following:

> 2  The [Human Resources Committee] shall establish, in consultation with senior management, the overall strategy for the Company with respect to incentive compensation and shall oversee the Company's incentive compensation practices to help ensure that they are consistent with the safety and soundness of the Company and do not encourage excessive risk-taking.  For this purpose, the [Human Resources Committee] shall review and monitor risk-balancing and implementation and effectiveness of risk management methodologies relating to incentive compensation plans and programs for senior executives and those identified employees in positions to expose the Company to material risk;

> 5.  The [Human Resources Committee] shall make recommendations to the Board with respect to the Company's incentive compensation and equity-based plans that are subject to Board approval, discharge any responsibilities assigned to the [Human Resources Committee] by any of these plans, and periodically review the Company's stock ownership retention guidelines for participants in the Company's Long-Term Incentive Compensation Plan.

108.    Wells Fargo's 2016 Annual Proxy Statement, filed with the SEC on March 16, 2016 ("2016 Proxy Statement"), reiterates the Human Resources Committee's primary responsibilities in both establishing the Company's incentive compensation policies and monitoring any risk exposure created from such policies.  According to the 2016 Proxy Statement, the Committee:

- • Discharges the Board's responsibilities relating to the Company's overall compensation strategy and the compensation of our executive officers;

- • Oversees the Company's incentive compensation practices so that they are consistent with the safety and soundness of the Company and do not encourage excessive risk-taking and reviews and approves benefit and compensation plans and arrangements applicable to executive officers of the Company;

- • Evaluates the CEO's performance and approves and recommends the CEO's compensation to our Board for ratification and approval and approves compensation for our other executive officers and any other officers or employees as the [Human Resources Committee] determines appropriate;

- • Has the sole authority to retain or obtain the advice of and terminate any compensation consultant, independent legal counsel or other advisor to the [Human Resources Committee], and evaluates the independence of its advisors in accordance with [New York Stock Exchange] rules.

**4.    Corporate Responsibility Committee**

109.    The current members of the Board's Corporate Responsibility Committee are Peña (Chair), Baker, Dean, Hernandez, and Milligan.  According to its Charter, the purpose of the Committee is to assist the Board "monitor[ing] the Company's relationships with external stakeholders regarding significant social responsibility matters, and advise the Board of Directors and management on strategies that affect the Company's role and reputation as a socially responsible organization."  The Committee is also charged with "monitor[ing] the Company's reputation generally, including with customers."  The Corporate Responsibility Committee Charter further states:

> 5.  The [Corporate Responsibility Committee] shall review and approve, and recommend to the Risk Committee for its approval, the Company's reputation risk management framework, which outlines the Company's governance framework and approach for managing and monitoring reputation risk.
>
> 6.  The [Corporate Responsibility Committee] shall monitor the Company's reputation generally, including with customers, and review and receive updates and reports from management on:
>
> - the state of the Company's relationships with external stakeholders regarding significant social responsibility matters, how those stakeholders view the Company and the issues and concerns raised by them; and
>
> - customer service and complaint matters and other metrics relating to the Company's brand and reputation, including matters relating to the Company's culture and the focus of its team members on serving our customers.

**5.    Governance and Nominating Committee**

110.    The current members of the Board's Governance and Nominating Committee are Sanger (Chair), Dean, Milligan, Peña, and Swenson.  According to its Charter, the purpose of the Governance and Nominating Committee is to assist the Board in, among other things, the "Company's corporate governance practices," including "recommending to the Board the corporate governance guidelines applicable to the Company."  Specifically, the Committee is tasked with "oversee[ing] the Company's reputation risk and engagement with stockholders and other interested parties concerning governance and other related matters, and shall work with the Board's other committees on such engagement regarding matters subject to the oversight of such other committees."

1

**D.     The Board Touted Wells Fargo's Corporate Governance Structures.**

2

111.    Throughout the Relevant Period, the Board consistently trumpeted the efficacy and

3

importance of Wells Fargo's corporate governance standards, repeatedly claiming "[t]he

4

Company's governance structure is working effectively as evidenced by the Company's strong

5

financial performance."[48]  Moreover, as described below, the Board emphasized to shareholders

6

the purported strong corporate governance as a reason to oppose adoption of a proposal for an

7

independent Chairman, which was included in proxy statements during the Relevant Period.

8

**1.     The Board's Governance and Nominating Committee was responsible for reviewing Wells Fargo's Corporate Governance Guidelines.**

9

10

112.    Defendants Dean, Milligan, Peña, Sanger, and Swenson were members of the

Board's Governance and Nominating Committee during the Relevant Period.  In that role, they

11

were charged with, among other things, "[a]nnually review[ing] and assess[ing] the adequacy of

12

the corporate governance guidelines of the Company and . . . oversee[ing] and report[ing] to the

13

Board an annual review of the Board's performance."

14

113.    Wells Fargo's Corporate Governance Guidelines address the "Role of the Board,"

15

which includes "reviewing, monitoring, and where appropriate, approving the Company's

16

strategic plans and objectives, financial performance, risk management framework and risk

17

appetite," and "ensuring processes are in place for maintaining the integrity and reputation of the

18

Company and reinforcing a culture of ethics, compliance and risk management."

19

114.    Wells Fargo's Corporate Governance Guidelines also address the Company's

20

Code of Ethics, which explains:  "One of the Board's key responsibilities is to ensure that the

21

Company, through its management, maintains high ethical standards and effective policies and

22

practices designed to protect the Company's reputation, assets and business.  The Board has

23

adopted and promotes the Wells Fargo Code of Ethics and Business Conduct applicable to team

24

members as well as directors."

25

115.    By their membership on the Governance and Nominating Committee, Defendants

26

Dean, Milligan, Peña, Sanger, and Swenson had actual knowledge of the Company's corporate

27

_____

28

[48] *See, e.g.*, Wells Fargo & Company 2014 Proxy Statement at 78.

governance structures and represented that Wells Fargo had mechanisms in place to ensure those corporate governance structures were sufficient to "maintain[] the integrity and reputation of the Company and reinforce[e] a culture of ethics, compliance and risk management."

> **2.      Wells Fargo relied on the purported strength of its corporate governance structures to urge shareholders to reject a resolution to adopt an independent Chairman.**

116.    The Board prepared and produced proxy statements prior to each annual and special shareholder meeting.  The information contained in the proxy statements was filed with the SEC before soliciting a shareholder vote on the election of directors and the approval of other corporate action.  Solicitations, whether by management or shareholders, are required to disclose all important facts about the issues on which shareholders are asked to vote.

117.    Wells Fargo's proxy statements contain detailed information about the Company's corporate governance structures.  For example, the 2016 Proxy Statement represented the Board's purported commitment to corporate governance:

> Our Board is committed to sound and effective corporate governance principles and practices.  Our Board has adopted Corporate Governance Guidelines to provide the framework for the governance of the Board and the Company.  These Guidelines address, among other matters, the role of the Board, Board membership criteria, director retirement and resignation policies, our Director Independence Standards, information about the committees of the Board, and information about other policies and procedures of the Board, including the majority vote standard for directors, management succession planning, director compensation, the Board's leadership structure, and the responsibilities of the Lead Director.  The Board reviews the Corporate Governance Guidelines annually.[49]

118.    Wells Fargo's proxy statements also refer shareholders to the Company's Code of Ethics, which state the Company's policy and standards for ethical conduct by its team members, including executive officers and directors.  The 2016 Proxy Statement explains:  "We expect all of our team members and directors to adhere to the highest possible standards of ethics and business conduct with other team members, customers, stockholders, and the communities we serve and to comply with all applicable laws, rules, and regulations that govern our businesses."[50]

---

[49] Wells Fargo & Company 2016 Proxy Statement at 2.

[50] *Id.*

119.    Since 2005, Wells Fargo's proxy statements have consistently included—and, on the Board's recommendation, shareholders have invariably voted down—a stockholder proposal "to adopt a policy to require an independent chairman."[51]  In opposing the proposal, the Board has highlighted existing corporate governance structures, contending they obviate the need for an independent Chairman.

120.    For example, on March 18, 2014, Wells Fargo filed its proxy statement ahead of the 2014 annual meeting of stockholders to be held April 29, 2014 (the "2014 Proxy Statement"). As it had previously, the Board opposed the proposal for an independent Chairman, claiming:

- The Company's corporate governance structure, including the composition of the Board, its committees, and its Lead Director who is available to meet with major stockholders to discuss governance and other matters, already provides effective independent oversight of management and Board accountability and responsiveness to stockholders;

- If adopted, the proposal would unnecessarily restrict the Board's ability to select the director best suited to serve as Chairman of the Board based on criteria the Board deems to be in the best interests of the Company and its stockholders; and

- ***The Company's governance structure is working effectively as evidenced by the Company's strong financial performance***, and our stockholders rejected a similar independent chairman proposal for the ninth consecutive year in 2013.

121.    In its 2015 proxy statement filed on March 17, 2015 in connection with the 2015 annual stockholders meeting to be held on April 28, 2015 (the "2015 Proxy Statement"), the Board successfully recommended that shareholders vote against the same proposal, again citing to the existing corporate governance structure.  The Board stated "combining its CEO with the Chairman of the Board position is the most appropriate structure for the Company and best serves the interests of stockholders."

122.    In the 2016 Proxy Statement, published on March 16, 2016, the Board once again urged shareholders to vote against a proposal to appoint an independent Chairman.  The Board disputed that "a policy mandating an independent Chairman is necessary to achieve effective independent leadership and management."  It cited "flexibility to select . . . the leadership arrangement best able to meet the Company's needs," and again referred to the Company's

---

[51] *See, e.g.*, Wells Fargo & Company 2015 Proxy Statement at v. and 77-79.

"strong financial performance despite the challenging economic and regulatory environment for financial institutions" as support that the governance structure was working.  In short, the Board stated "[t]he Company's corporate governance structure, with its strong emphasis on Board independence, makes an absolute independent chairman requirement unnecessary."

## VI.   DEFENDANTS BOTH ENCOURAGED AND FAILED TO ADDRESS THE ILLICIT ACCOUNT-CREATION SCHEME

123.    Throughout the Relevant Period, Defendants emphasized the importance of cross-selling to Wells Fargo's revenues and other key financial metrics, and touted the purported success of their cross-selling efforts.  Notwithstanding their significant obligations as members of the Board or corporate officers, and (for some Defendants) as members of committees charged with overseeing Wells Fargo's risk exposure, corporate governance, and other critical aspects of the Company's business and operations, Defendants failed to disclose the illicit account-creation scheme or its significant impact on the Company.

### A.   Defendants Regarded Cross-Selling as Critical to Wells Fargo's Success, and Repeatedly Emphasized that to Investors.

124.    Cross-selling has long been considered central to Wells Fargo's business and growth prospects.  The Bank set ambitious—and, as further detailed below, effectively unattainable—quotas referred to as the "Great Eight" or "Gr-eight" initiative, i.e., the goal of selling eight products per household.  As independent bank consultant Michael Moebs put it, Wells Fargo "is the master at [cross selling] . . . No other bank can touch them."[52]

125.    Defendants consistently emphasized the importance of cross-selling to Wells Fargo investors and others.  As early as 1999, according to Wells Fargo's Annual Report for that year, the Bank was "[g]oing for gr-eight product packages," establishing what would become a long-held objective.  The 1999 Annual Report further stated, "We need to take advantage of cross-sell opportunities with our business customers and increase the number of products they have with us."

---

[52] December 2013 *L.A. Times* Article.

126.    Wells Fargo's 2006 Annual Report emphasized that "[s]elling more products to [its] customers—or 'cross-selling'—is the foundation of [its] business model and key to [its] ability to grow revenue and earnings."

127.    The Company's 2007 Annual Report stated the Bank's "vision" was "to satisfy all [its] customers' financial needs, help them succeed financially, be recognized as the premier financial services company in our markets and be one of America's great companies," and the Bank's "primary strategy to achieve this vision" was "to increase the number of products our customers buy from us and to give them all of the financial products that fulfill their needs."  The Bank's cross-sell strategy and diversified business model, the Report added, "facilitate growth in strong and weak economic cycles, as we can grow by expanding the number of products our current customers have with us."  The same Report highlighted that Wells Fargo was "known across [its] industry as **number one, second to none, for cross-sell** and revenue growth."

128.    In earnings calls and investor conferences, Defendants further emphasized the connection between Wells Fargo's success with cross-selling and its overall success.  Defendants Stumpf, Sloan, and Shrewsberry often publicly spoke at length about cross-selling metrics.  For example, even before the start of the Relevant Period, at the Company's 2010 Investor Conference held on May 13, 2010, the Bank explicitly tied cross-selling to its revenue growth, explaining "what differentiates Wells Fargo in generating revenue growth is, in fact, our cross-sell culture and our cross-sell success," and noting "***[t]here's a very causal link between cross-sell and revenue growth***."  Stumpf further described Wells Fargo as "an industry leader" in cross-selling, saying a "hallmark of Wells Fargo is [its] success in providing [its] customers with multiple products and services."

129.    Tolstedt, speaking at the same 2010 Investor Conference, called cross-selling "the core of [Wells Fargo's] customer-centric strategy," explaining she had been with the Bank "for over 20 years and the Company has been focused on cross-sell since I can remember."

130.    The 2010 Annual Report echoed Wells Fargo's sentiment that it was the best in the business when it came to cross-selling.  Stumpf's introduction to the Annual Report called Wells Fargo the "king of cross-sell":

If anyone tells you it's easy to earn more business from current customers in financial services, don't believe them. We should know.  We've been at it almost a quarter century.  We've been called, true or not, the 'king of cross-sell.'  To succeed at it, you have to do a thousand things right.  It requires long-term persistence, significant investment in systems and training, proper team member incentives and recognition, taking the time to understand your customers' financial objectives, then offering them products and solutions to satisfy their needs so they can succeed financially. . . . The bad news is it's hard to do.  The good news is it's hard to do, because once you build it, it's a competitive advantage that can't be copied.

Stumpf also said Wells Fargo had decided on the goal of eight financial products per household "because it rhymed with 'great'" and "[p]erhaps [Wells Fargo's] new cheer should be: 'Let's go again, for ten!'"

131.    Wells Fargo's Q1 2011 Form 10-Q filed with the SEC on May 6, 2011 similarly stated:

Our cross-sell strategy, diversified business model and the breadth of our geographic reach facilitate growth in both strong and weak economic cycles, as we can grow by expanding the number of products our current customers have with us, gain new customers in our extended markets, and increase market share in many businesses.

… We believe there is more opportunity for cross-sell as we continue to earn more business from our Wachovia customers.  *Our goal is eight products per customer, which is approximately half of our estimate of potential demand for an average U.S. household*. …

132.    The 2013 Annual Report expressed similar sentiments.  Highlighting that Wells Fargo aimed to "be one of America's great companies," the Report said the Bank "can grow by expanding the number of products our current customers have with us, gain new customers in our extended markets, and increase market share in many businesses."

133.    On February 26, 2014, the Company filed with the SEC its 2013 Form 10-K for the fiscal year ended December 31, 2013, which attached its 2013 Annual Report as an exhibit. The 2013 Annual Report emphasized the Company had generated "record earnings" because it had "continued to focus on meeting [its] customers' financial needs," and in doing so had "achieved record cross-sell across the Company."  The 2013 Annual Report further explained that to satisfy its customers' financial needs, the Company was providing "financial products that fulfill their needs."  The 2013 Annual Report also stated:

Our vision is to satisfy all our customers' financial needs, help them succeed

financially, be recognized as the premier financial services company in our markets and be one of America's great companies. ***Our primary strategy to achieve this vision is to increase the number of our products our customers utilize and to offer them all of the financial products that fulfill their needs.  Our cross-sell strategy, diversified business model and the breadth of our geographic reach facilitate growth in both strong and weak economic cycles***.  We can grow by expanding the number of products our current customers have with us, gain new customers in our extended markets, and increase market share in many businesses.

134.    The 2013 Annual Report further discussed the impact of Wells Fargo's cross-selling efforts in each of its key business segments, stating:  "***cross-sell of our products is an important part of our strategy to achieve our vision to satisfy all our customers' financial needs. … We believe there is more opportunity for cross-sell as we continue to earn more business from our customers***."  The Annual Report highlighted the "Great Eight" initiative, explaining the Company's "goal is eight products per household."

135.    In addition to the above, the 2013 Form 10-K and 2013 Annual Report identified the Company's cross-selling efforts as a key to its success while also warning investors that if those efforts were unsuccessful, the Company's financial results could suffer.  Specifically, the filings stated:

> ***Our "cross-selling" efforts to increase the number of products our customers buy from us ... is a key part of our growth strategy, and our failure to execute this strategy effectively could have a material adverse effect on our revenue growth and financial results. Selling more products to our customers-"cross-selling"-is very important to our business model and key to our ability to grow revenue and earnings....***

136.    At the Company's 2014 Investor Day conference in May 2014, Stumpf identified the core elements driving Wells Fargo's revenue, including "deeper cross-sell":  "And what is revenue?  It is deposits and loans and more credit cards, deeper cross-sell, longer relationships, more assets under management.  Those are the organic compounds that make up revenue growth because we have seen cycles."[53]  At the same conference, Shrewsberry characterized Wells Fargo's cross-selling capability as "legendary," noting it had been the Company's vision "for decades," and "[w]e've stuck to it."

---

[53] Wells Fargo 2014 Investor Day Conference Tr. at 2.

1      137.    During the same conference, Tolstedt stated "the cross-sell model … drive[s]

2    revenue."   She expounded on the financial performance of the Community Banking segment and

3    the "outstanding growth" resulting from its cross-selling efforts, emphasizing that Wells Fargo's

4    cross-selling was "helping [its] customers succeed financially and meet[] all of their needs."

5    Tolstedt further highlighted the "Great Eight" strategy:  "The beneficial cycle of cross-sell

6    continues. . . . *Our long-term goal continues to be an average cross-sell of 8 and achieving this*

7    *goal will come with higher household purchase rates and growth in profitability*."[54]

8      138.    At the 2014 Investor Conference, Sloan focused on another metric—average

9    tenure of Wells Fargo employees, which was then 10 years, because of what that meant for the

10   Company's ability to cross-sell products.  "It is important because that's what drives cross-sell,"

11   Sloan explained.  He further stated:

12        John [Stumpf] talked about the secret sauce of Wells Fargo earlier today.  To me,
          tenure at a company is the secret sauce of cross-sell. . . . But if you don't
13        fundamentally have people that believe in the Company that you work for, that
          believe in our culture, that work together, you will not be successful in cross-sell.[55]
14
15      139.    Later that year, at the Barclays Capital 2014 Global Financial Services Conference

16   held on September 10, 2014, Shrewsberry's presentation stated "Wells Fargo's model is based on

17   sustainable long-term advantages," including "relationship focus and cross-sell capability."[56]

18      140.    Defendants continued to emphasize the importance of cross-selling to Wells

19   Fargo's business model throughout the Relevant Period, as further detailed in ¶¶ 327-367 below.

20

21

22

23

24

25
    _____
26   [54] 2014 Wells Fargo Investor Day Conference Tr. at 13.

27   [55] 2014 Wells Fargo Investor Day Conference Tr. at 55.

     [56] https://www08.wellsfargomedia.com/assets/pdf/about/investor-
28   relations/presentations/2014/barclays-conference.pdf.

CONSOLIDATED AMENDED VERIFIED
STOCKHOLDER DERIVATIVE COMPLAINT
LEAD CASE NO. 3:16-CV-05541-JST

**B.** **Defendants Had Access to Information Regarding Account Openings and Sales Quotas, as Well as Sales Misconduct Reports, Which Were Closely Tracked at the Company.**

    **1.** **Products per household, a metric for the number of accounts opened by Wells Fargo employees, were closely tracked and reported.**

141.    The number of products per household, a metric for the number of accounts opened by Wells Fargo employees, were closely monitored and reported at the Company.  As the Bank's 2014 Annual Report explained:

> Our cross-sell strategy is to increase the number of products our customers use by offering them all of the financial products that satisfy their financial needs.  We track our cross-sell activities based on whether the customer is a retail banking household or has a wholesale banking relationship [WBR].

> A retail banking household is a household that uses at least one of the following retail products - a demand deposit account, savings account, savings certificate, individual retirement account (IRA) certificate of deposit, IRA savings account, personal line of credit, personal loan, home equity line of credit or home equity loan. . . .

> We report cross-sell metrics for our Community Banking and WBR operating segments based on the average number of retail products used per retail banking household.  For Community Banking the cross-sell metric represents the relationship of all retail products used by customers in retail banking households. For WBR the cross-sell metric represents the relationship of all retail products used by customers in retail banking households who are also WBR customers.

> Products included in our retail banking household cross-sell metrics must be retail products and have the potential for performance, each of our operating segments monitors cross-sell metrics to measure the extent they are satisfying our customers' financial needs. . . ."

142.    Yearly cross-sell numbers were also tracked and reported.  Indeed, it was often the first metric announced in the Annual Reports to shareholders.  In the introduction to the 2010 Annual Report, for example, Stumpf reviewed the average products per retail banking household, which had progressively grown since 1998, when the products per retail banking household was 3.2:

> "1999: 3.4. 2000: 3.7. 2001: 3.8. 2002: 4.2. 2003: 4.3. 2004: 4.6. 2005: 4.8. 2006: 5.2. 2007: 5.5. 2008: 5.7. 2009: our legacy Wells Fargo households, just under 6.0. This year [2010], we crossed a major cross-sell threshold.  Our banking households in the western U.S. now have an average of 6.14 products with us.  For our retail households in the east, it's 5.11 products and growing."

143.    Wells Fargo's Q1 2011 Form 10-Q similarly stated:

> Our combined company retail bank household cross-sell was 5.79 products per

household in first quarter 2011, up from 5.60 a year ago.  …  One of every four of our retail banking households has eight or more products.  Business banking cross-sell offers another potential opportunity for growth, with cross-sell of 4.09 products in our Western footprint (including legacy Wells Fargo and converted Wachovia customers), up from 4.04 in fourth quarter 2010.

144.    The same was true for the following years, as the products per household continued to grow toward Defendants' goal of eight:

- The 2011 Annual Report reported 5.92 products per household in 2011, up from 5.7 in the fourth quarter 2010.

- The 2012 Annual Report reported retail bank household cross-sell of 6.05.

- The 2013 Annual Report stated:  "Our retail bank household cross-sell was a record 6.16 products per household in November 2013, up from 6.05 in November 2012 and 5.93 in November 2011.  We believe there is more opportunity for cross-sell as we continue to earn more business from our customers."

- The 2014 Annual Report touted increased products per household numbers:  "Our retail banking household cross-sell was 6.17 products per household in November 2014, up from 6.16 in November 2013 and 6.05 in November 2012. . . . We believe there is more opportunity for cross-sell as we continue to earn more business from our customers.  Our goal is eight products per household, which is approximately one-half of our estimate of potential demand for an average U.S. household."

- The 2015 Annual Report stated:  "Our retail banking household cross-sell was 6.11 products per household in November 2015, compared with 6.17 in November 2014 and 6.16 in November 2013."

145.    Indeed, Stumpf attested to his close monitoring of account activity, stating on the Company's Q2 2013 earnings call on July 12, 2013:  "[W]hen I wake up in the morning, ***I get here and the first thing I look at is the checking account report from the day before.***  I love checking accounts.  I dream about them."

### 2.    Employee sales quotas were closely tracked.

146.    The number of accounts Wells Fargo employees opened were also closely tracked.  Several former Wells Fargo employees have recounted they were required to open 15 new accounts for products each day.  Daily sales for each branch, and for each branch employee, were reported to and discussed by the district manager four times a day:  at 11:00 a.m., 1:00 p.m., 3:00

p.m., and 5:00 p.m.[57]  Employees who were unable to meet their sales goals faced the prospect of termination.

147.    Wells Fargo's Store Manager Incentive Plan dated January 1, 2008, which was approved by Defendant Tolstedt,[58] was "designed to provide Participants with Incentive compensation opportunities that focus their individual performance on goals that are consistent with Wells Fargo's Corporate and Regional Banking Strategies."[59]  To be deemed eligible for the Incentive Plan compensation bonus, Wells Fargo employees were required to achieve "Minimum Standard" criteria, as follows:[60]

### Quarterly Performance Qualifiers

**Store Manager Minimum Standards**

Participants' will be eligible for quarterly sales incentive upon achievement of the Minimum Standard criteria. Participants will be required to meet: (1) four of the six categories and average 100% goal achievement across all six Quarterly Sales categories to be eligible for any quarterly incentive award.

| Minimum Standards | In-Store Manager | Traditional Manager |
|---|---|---|
| Daily Solutions per PFTE | 5.25 | 5.25 |
| Daily Profit Per PFTE | $325 | $425 |
| Quarterly Partner Referrals Per PFTE | 9 | 9 |
| Quarterly Loan Solutions | Plan | Plan |
| Quarterly Package Penetration | 70% | 70% |
| 11 Ways to WOW! | Jan-June 55% July-Dec 65% | Jan-June 55% July-Dec 65% |

148.    Actions taken on Wells Fargo computers by employees were also monitored at the Company.  Supervisors and management were therefore aware of unusual activity underlying sales misconduct, such as accounts being opened on January 1 (a bank holiday) to meet sales

---

[57] *See* Complaint, *People v. Wells Fargo & Co.*, BC 580778 (Cal. Super. Ct. L.A. Cnty.) at 2.

[58] Wells Fargo Store Manager Incentive Plan (January 1, 2008) at 11.

[59] *Id.* at 1.

[60] *Id.* at 2.

1    quotas, the frequent opening and closing of accounts, and the creation of numerous unfunded

2    accounts.[61]  The monitoring of Bank computers at Wells Fargo would also have alerted

3    management to accounts opened by Wells Fargo employees using apparently false customer

4    contact information, such as noname@wellsfargo.com.[62]

5           149.    Information about customer accounts was available to Wells Fargo employees

6    through the StoreVision Platform, the Company's web-based interactive software for customer

7    account management.  According to the declaration of a former Wells Fargo employee who

8    worked in three Wells Fargo branches in Southern California between November 2012 and

9    September 2015, which was submitted in connection with the L.A. City Attorney's case against

10   Wells Fargo, the StoreVision Platform contains personal information about Wells Fargo

11   customers, as well as all account information of a Wells Fargo customer.  A Wells Fargo

12   employee who signs into the StoreVision Platform using his or her Wells Fargo-issued username

13   and unique password can access each Wells Fargo customer's information on a "homepage"

14   profile.  The Wells Fargo employee can open new accounts and products for that customer from

15   the "homepage" profile.  Selecting the "apply by phone" link (as opposed to "apply in person"

16   link) allows the Wells Fargo employee to create a new account without a physical wet-ink or

17   electronic signature from the customer.  Once that selection is made, the Wells Fargo employee

18   can select certain accounts or products to add, and the StoreVision Platform automatically

19   populates the personal information for that customer from the "homepage" profile into the new

20   account.  In this manner, Wells Fargo employees could use the StoreVision Platform to open

21   unauthorized accounts.

22          150.    Because the StoreVision Platform tracks which Wells Fargo employees access it—

23   including to create new accounts for customers, some of which could be unauthorized—

24   Defendants had the ability to monitor the number of new accounts and products an employee was

25   creating each day, to assess whether that employee was meeting his or her sales quota.

26   _____

27   [61] *See* Complaint, *Hogan, et al. v. Wells Fargo & Company, et al.*, Case No. 4:16-cv-07360-DMR (N.D. Cal.) (Dec. 27, 2016) at 14.

28   [62] *Id.* at 2.

1
2

**3.      Wells Fargo also tracked problems with the cross-selling strategy, including "gaming" and "sales incentives" violations, and the Board was informed of these reports.**

3        151.    Not only was the increase in average products per retail household closely

4    monitored at Wells Fargo, problems that could arise as a result of Defendants' aggressive cross-

5    sell strategy (including the possibility of fake accounts) were closely tracked.  Wells Fargo

6    offered a service called "EthicsLine" for employees to report ethics and compliance concerns

7    online or by phone to third-party interviewers, who then provided the information to Wells

8    Fargo's Office of Global Ethics for assessment and referral to the appropriate review team.[63]  The

9    Wells Fargo Team Member Handbook, dated 2010, describes EthicsLine as follows:

10           Wells Fargo has established a confidential hotline, EthicsLine, that you can use to
            report suspected violations of the Code of Ethics and Business Conduct or any
11          laws, rules, or regulations.  You can also contact EthicsLine if you believe that
            you're being directed to do something that will violate the Code.  . . . Calls will be
12          answered by live interviewers 24 hours a day, 7 days a week.[64]

13           152.    The Team Member Handbook makes clear that the Board's Audit and

14    Examination Committee supervised the administration of the Code of Ethics and Business

15    Conduct and the EthicsLine reports:

16           Wells Fargo Audit & Security is responsible for evaluating compliance with the
            administration procedures of the Code on an ongoing basis as part of regularly
17          scheduled audits.  ***The Chief Auditor reports the results of administrative
            compliance reviews to the Audit and Examination Committee of the Wells Fargo
18          & Company Board of Directors***. . .

19           ***The Audit and Examination Committee of the Wells Fargo & Company Board
            of Directors will oversee the investigation of concerns raised about accounting,***
20          ***internal accounting controls, and auditing matters.***[65]

21           153.    Wells Fargo's Code of Ethics and Business Conduct similarly emphasizes that

22    when a complaint is filed, "the summary is provided to Wells Fargo for assessment and further

23    action" and the Audit & Examination Committee "oversees the investigation of concerns raised

24    about accounting, internal controls, or auditing matters."[66]  The Audit and Examination

25    ────────────────
     [63] Wells Fargo's written response to Senate Banking Committee at 84.

26    [64] Wells Fargo Team Member Handbook, section published January 12, 2010.

27    [65] Wells Fargo Code of Ethics and Business Conduct at 121; Wells Fargo Team Member
     Handbook at 98.

28    [66] Wells Fargo Code of Ethics and Business Conduct at 8 ("Our EthicsLine and how it works").

1  Committee—and, in turn, the Board as a whole—were therefore on notice and aware of those

2  matters and the underlying claims of unlawful conduct at the Bank.

3      154.    Indeed, while testifying before the House Financial Services Committee, Stumpf

4  confirmed that, between 2011 and 2013, certain Committees of the Board were receiving "high-

5  level [information] about ethics, lines [EthicsLine], requests, or information . . . at the company

6  level."[67]

7      155.    He provided further detail on exactly which Board Committees received

8  EthicsLine reports in a November 2016 written responses to questions posed by the Senate

9  Banking Committee to Stumpf after his testimony. Stumpf and Wells Fargo confirmed that "from

10  at least 2011 forward, the Board's Audit and Examination Committee received periodic reports

11  on the activities of Wells Fargo's Internal Investigations group (which investigates issues

12  involving team members), as well as information on EthicsLine and suspicious activity reporting.

13  Among other things, several of those reports discussed increases in sales integrity issues or in

14  notifications to law enforcement in part relating to the uptick in sales integrity issues."[68]

15      156.    Stumpf further acknowledged:

16      Later, the Risk Committee began to receive reports from management of
    noteworthy risk issues, which included, among other risks, sales conduct and

17      practice issues affecting customers and management's efforts to address those
    risks. The Board's Human Resources Committee also received reports from

18      management that it was monitoring sales integrity in Community Banking.

19      157.    Reports on "sales integrity" issues were not limited to the Committees: "[s]ales

20  integrity issues were also discussed periodically with the Board."[69] And Stumpf recalls "learning

21  of an increase in the number of reports of sales-practice issues in late 2013."[70]

22      158.    On information and belief, when a Wells Fargo employee called the EthicsLine to

23  report a complaint, the phone operator identified the issue and filled out the relevant fields in a

24  database intake system. As of at least 2008 (and perhaps earlier), one of the questions the

25  
------------------------------------------

26  [67] Sept. 29, 2016 House Financial Services Committee Hr'g Tr. at 9.

  [68] Wells Fargo's written response to Senate Banking Committee at 72.

27  [69] *Id.*

28  [70] *Id.*

interviewer was instructed to ask the complainant was whether the complaint pertained to "gaming" or "sales incentives."  "Gaming" was described in the Wells Fargo Store Manager Incentive Plan (dated January 1, 2008) as "the manipulation and/or misrepresentation of product solutions or product solutions reporting in order to receive or attempt to receive compensation, or to meet or attempt to meet goals."[71]  The "gaming" and "sales incentives" tracking fields appear in complaints about certain issues—for example, when the complaint relates to "Fraud," "Falsification of Company Records," "Police Issues," and "Sales Incentive Program Violations." (Complaints such as sexual harassment do not include the gaming or sales incentives tracking fields.)  An excerpt of an EthicsLine complaint is reflected below:

| Report# 805272749 | WELLS FARGO | Page 2 of 2 |
| --- | --- | --- |
| | **Supplemental Information** | |

How does caller know about hotline:   Handbook

Interviewer Observations:

**Wells Fargo Gaming Information**
   Is the issue being reported related as "Gaming" or
   "Sales Incentives"?

**DO NOT ASK CALLER**
   DO NOT ASK CALLER. How was this report received?   Web Entry

159.    Accordingly, as of at least 2008 (and perhaps earlier), Wells Fargo's EthicsLine was actively tracking "gaming" and "sales incentives" complaints, which would include the creation of fake accounts.  As noted above, beginning in at least 2011, various Committees of the Board were receiving periodic reports on investigations into sales integrity issues and information from EthicsLine, and sales integrity issues were discussed periodically with the Board.[72]

160.    Moreover, as described in Stumpf's testimony before the Senate Banking Committee, in 2011 one group (the Sales and Service Conduct Oversight Team) "began to engage in proactive monitoring of data analytics, specifically for the purpose of rooting out sales practice violations."[73]

---

[71] Wells Fargo Store Manager Incentive Plan (January 1, 2008) at 10.

[72] Wells Fargo's written response to Senate Banking Committee at 72.

[73] Sept. 20, 2016 Senate Banking Committee Hr'g Tr. at 2.

161.     In 2012, the task of addressing complaints of unauthorized accounts was assigned to the risk management function within Community Banking (Tolstedt's group), "which initiated a number of efforts to proactively monitor sales-integrity issues. . . . This monitoring included tracking metrics such as how many accounts were funded within the first 30 days, how many accounts were closed within the first 30 days after opening, and how frequently accounts were downgraded from a higher value account type to a lower value account type."[74]

162.     In 2013, the Sales and Service Conduct Oversight Team began an analysis of "simulated funding" across the retail banking business.[75]  As noted earlier, simulated funding is the practice of creating an account for a customer and then funding it without the customer's knowledge or consent, to make it appear as if the customer has funded it.  The Sales and Service Conduct Oversight Team identified simulated funding activity in the Los Angeles and Orange County markets, and terminated Wells Fargo employees for that conduct.[76]

**C.     Defendants Learned of Specific Misconduct in Opening Fake Accounts.**

163.     On December 21, 2013, the *Los Angeles Times* ran a detailed article describing the rampant pressure tactics at Wells Fargo to open accounts.[77]  The December 2013 *L.A. Times* Article reported on "[t]he relentless pressure to sell [that] has battered employee morale and led to ethical breaches."  The report, based on "a review of internal bank documents and court records, and from interviews with 28 former and seven current Wells Fargo employees who worked at bank branches in nine states, including California," concluded:  "To meet quotas, employees have opened unneeded accounts for customers, ordered credit cards without customers' permission and forged client signatures on paperwork.  Some employees begged family members to open ghost accounts."

164.     The article reported that Wells Fargo managers "coached workers on how to inflate sales numbers."  As recounted in the article, Erik Estrada, a former Wells Fargo personal

---

[74] Wells Fargo's written response to Senate Banking Committee at 73.

[75] Sept. 20, 2016 Senate Banking Committee Hr'g Tr. at 2.

[76] Sept. 20, 2016 Senate Banking Committee Hr'g Tr. at 2; *see also* Wells Fargo's written response to Senate Banking Committee at 73.

[77] December 2013 *L.A. Times* Article.

banker and business specialist at a Wells Fargo branch in Canoga Park, Los Angeles, described his manager greeting Wells Fargo staff each morning with a daily quota for products such as credit cards or direct-deposit accounts. "He would say: 'I don't care how you do it – but do it, or else you're not going home,' Estrada recalled." Further, Estrada said "branch and district managers told him to falsify the phone numbers of angry customers so they couldn't be reached for the bank's satisfaction surveys." Simply put, "[t]he pressure to meet [sales] goals starts with supervisors," Estrada observed.

165.    The article reported that Estrada described "employees open[ing] duplicate accounts, sometimes without customers' knowledge," "workers us[ing] a bank database to identify customers who had been pre-approved for credit cards [and] order[ing] the plastic without asking them." The article added:

> "They'd just tell the customers: 'You're getting a credit card,'" Estrada said. He admitted to opening unneeded accounts, though never without a customer's knowledge, he said.
>
> When customers complained about the unwanted credit cards, the branch manager would blame a computer glitch or say the card had been requested by someone with a similar name, Estrada said.

166.    The article recounted specific instances of Wells Fargo employees:

a.    Talking a homeless woman "into opening six checking and savings accounts with fees totaling $39 a month;"

b.    "[O]pen[ing] accounts or credit lines for customers without their authorization;" and

c.    Using a Wells Fargo customer's "birth date and Social Security number to open accounts in his name and those of fictitious businesses." The article further reported "[a]t least one employee forged his signature several times."

167.    The article noted that Wells Fargo had fired Estrada, together with about 30 Southern California Wells Fargo workers, who "cheated to hit their sales goals."

168.    When the *L.A. Times* reached out to then-CFO Sloan about the article, he stated he was "not aware of any overbearing sales culture" at Wells Fargo.[78]

169.    Stumpf testified before the House Financial Services Committee that he was aware of the December 2013 *L.A. Times* Article around the time it was published, and discussed it with the Board.[79]  He also stated he recalls learning of the increase in the number of reports of sales-practice issues in late 2013.[80]

170.    Stumpf also addressed the December 2013 *L.A. Times* Article at a town hall with Wells Fargo employees held in Hollywood, Florida on February 5, 2014.[81]  At the town hall, Stumpf informed employees that he "want[ed] to address" the issues discussed in the article "head on."[82]  As detailed in this Complaint, he failed to do so.

### D.    Defendants Knew the Illicit Account-Creation Activities Were Subject to Regulatory Investigations and Civil Litigation.

171.    Defendants were confronted with additional red flags of misconduct when the L.A. City Attorney initiated a lawsuit arising from the illicit account-creation scheme on May 4, 2015, which was followed by a consumer class action filed the same month.  Additionally, investigations by the OCC and the Financial Industry Regulatory Authority ("FINRA") focused on the illicit account-creation activities.  The litigation and investigations, taken together with other facts of which the Board was aware or consciously disregarded, alerted Defendants to pervasive wrongdoing at the Company.

172.    In written testimony before the Senate Banking Committee in September 2016, L.A. City Attorney Michael Feuer recounted that, following the December 2013 *L.A. Times* Article, his office embarked on a more than year-long investigation, which resulted in its May 2015 complaint:[83]

---

[78] December 2013 *L.A. Times* Article.

[79] Sept. 29, 2016 House Financial Services Committee Hr'g Tr. at 26.

[80] Wells Fargo's written response to the Senate Banking Committee at 72.

[81] Wells Fargo's written response to the Senate Banking Committee at 86.

[82] *Id.*

[83] Los Angeles City Attorney, *Written Testimony to the U.S. Senate Committee on Banking, Housing and Urban Affairs: By the Honorable Michael N. Feuer, L.A. City Attorney* (Sept. 20,

*Footnote continued on next page*

On a Sunday morning in December, 2013, I was appalled when I opened the Los Angeles Times and read an investigative story by Scott Reckard regarding Wells Fargo bank's sales culture [i.e., the December 2013 *L.A. Times* Article]. The story read in part, "To meet quotas, employees have opened unneeded accounts for customers, ordered credit cards without customers' permission and forged client signatures on paperwork. Some employees begged family members to open ghost accounts."

I immediately instructed my staff to investigate to determine if the facts warranted our Office filing an action pursuant to California laws that protect consumers against, and provide relief for, unfair business practices.

Because these laws do not afford my Office pre-litigation subpoena power, our investigation consisted of good old-fashioned detective work. We conducted numerous interviews with former Wells Fargo employees and Wells Fargo consumers, pored over public records, including voluminous court records from wrongful termination lawsuits former employees filed against Wells Fargo, and made use of the consumer complaint databases of the Consumer Financial Protection Bureau and the Federal Trade Commission.

173.    That investigation resulted in a civil enforcement action filed in May 2015 against Wells Fargo in the name of the People of the State of California seeking relief for consumers and an end to the illicit account-creation practices employed in violation of California's Unfair Competition Law (Cal. Bus. & Prof. Code § 17200 *et seq.*) The complaint describes the tactics Wells Fargo employees used in perpetuating the illicit account-creation scheme. In pursuit of the "Great Eight" or "Gr-eight" cross-selling initiative, employees were pushed to engage in, among other misconduct, "gaming" tactics, including opening and manipulating fee-generating customer accounts by, for example, omitting signatures and adding unwanted secondary accounts to primary accounts without permission. The complaint further alleged employees felt pressured to engage in "gaming" because they were otherwise unable to meet the sales quotas imposed by their superiors.[84]

174.    The complaint further revealed Wells Fargo enforced its unrealistic sales quotas through constant monitoring. Indeed, daily sales for each branch and each employee were reported and discussed by Wells Fargo's District Managers four times each day—at 11 am, 1 pm,

---

*Footnote continued from previous page*
2016), available at http://www.lacityattorney.org/single-post/2016/09/20/Written-Testimony-to-the-US-Senate-Committee-on-Banking-Housing-and-Urban-Affairs-By-the-Honorable-Michael-N-Feuer-LA-City-Attorney.

[84] *People v. Wells Fargo & Co.*, BC 580778 (Cal. Super. Ct. L.A. Cnty.).

3 pm, and 5 pm.  Employees who could not keep up with the sales quota pace were reprimanded by their superiors, and told to "do whatever it takes" to meet the individual sales quotas. "Whatever it takes" often meant "gaming" the sales quota system to artificially inflate the number of "solutions" the Wells Fargo employee sold that day.  The complaint recounted several different methods for "gaming," which had specific names, demonstrating their prevalence throughout the Bank:

a.      "Sandbagging" refers to failing to open accounts when requested by customers, and instead accumulating a number of account applications to be opened by a later date.  These account applications were often hard copy manual applications, which employees stored and opened later when needed to meet their sales quotas, often with additional, unauthorized accounts, in the next sales period, often before or after banking hours or on bank holidays.  In particular, "sandbagging" was popular on New Year's Day, when the Company ran a sales program called "Jump Into January" that required bankers to meet even-more-aggressive sales goals than usual.

b.      "Pinning" refers to assigning PINs to customer ATMs without customer authorization, with the intention of impersonating customers on Wells Fargo computers and then enrolling the customers in online banking or online bill pay programs without their authorization or consent.

c.      "Bundling" refers to incorrectly informing customers that certain products were available only in packages with other products, such as additional accounts, insurance, annuities, and retirement plans, so that the employee could sell additional accounts to a customer under the guise that the account was "bundled" with a product the customer actually requested. Employees were instructed by management to ensure every checking account was sold with three other products, known as a "packed" account.

d.      "Double packing" refers to Wells Fargo's practice of selling unnecessary and redundant products (such as two checking accounts) through deceptive means to overcome customer objections.

175.    In addition to these prevalent "gaming" tactics, Wells Fargo employees made false representations to customers in order to drive sales of "solutions" and hit their sales quotas.  For example, Wells Fargo employees would misrepresent to customers that they would be charged a fee on a single checking account unless they added a savings account, or that certain accounts did not have fees when they did in fact have fees associated with them, in order to encourage the customer to agree to the additional "solution."

176.    The L.A. City Attorney's complaint detailed the ways in which senior personnel at Wells Fargo were aware of these tactics.  Not only were the pressure tactics prevalent, widely discussed, and given specific names, but customers reported the unauthorized accounts to Wells Fargo branches.  But the root of the problem—management's overly aggressive sales quotas—was not addressed.

177.    Shortly after the lawsuit was filed, the L.A. City Attorney's office received "**calls, letters and emails from over 1,000 current and former Wells Fargo customers and employees**."[85]  Customers also described their experiences:

> Customers described their experiences, including having money withdrawn from their authorized accounts to pay fees assessed by Wells Fargo on unauthorized accounts.  They also complained that their unauthorized accounts were sent to debt collection agencies, and derogatory notes were placed on their credit reports.[86]

178.    The L.A. City Attorney's office collected declarations from current and former employees of Wells Fargo, and customers who had been harmed by the illicit account-creation scheme, for use in connection with their lawsuit against Wells Fargo.

179.    Additionally, on May 14, 2015, a consumer class action was filed against Wells Fargo in the United States District Court for the Northern District of California for the same improper practices noted in the December 2013 *L.A. Times* Article and in the L.A. City Attorney's complaint.[87]  The class complaint was supported in part by the testimony of a Wells

---

[85] Sept. 20, 2016 Senate Banking Committee Hr'g Tr. at 51.

[86] Los Angeles City Attorney, *Written Testimony to the U.S. Senate Committee on Banking, Housing and Urban Affairs: By the Honorable Michael N. Feuer, L.A. City Attorney* (Sept. 20, 2016), available at http://www.lacityattorney.org/single-post/2016/09/20/Written-Testimony-to-the-US-Senate-Committee-on-Banking-Housing-and-Urban-Affairs-By-the-Honorable-Michael-N-Feuer-LA-City-Attorney.

[87] *Jabbari vs. Wells Fargo & Company and Wells Fargo Bank, N.A.*, No. 4:15-cv-02159-DMR

*Footnote continued on next page*

1   Fargo employee who confirmed the sales quota system at the Company "creates a culture of

2   doing what you have to do to meet numbers" and detailed some of the "gaming" tactics involving

3   opening sham accounts.

4          180.    For example, the consumer complaint alleges Wells Fargo engaged in the

5   following "gaming" tactics:  (i) withdrawing money from customers' authorized accounts to pay

6   for the fees assessed by Wells Fargo on unauthorized accounts opened in customers' names; (ii)

7   placing customer accounts in collections when unauthorized withdrawals went unpaid; (iii)

8   negatively impacting credit reports when unauthorized fees were not paid; (iv) denying customers

9   access to funds while employees gathered account applications; and (v) causing customers to

10  purchase identity theft protection.[88]

11         181.    The consumer complaint detailed many of the same "gaming" techniques

12  described in the L.A. City Attorney's complaint, including "bundling" and "pinning."[89]

13         182.    The former employee "Confidential Informant" described additional pressure

14  tactics used by Wells Fargo employees to open accounts at customers' expense.  The Confidential

15  Informant explained, for example, that when a customer asked to convert his or her checking or

16  savings account to a free account, Wells Fargo bankers would instead open an entirely new

17  account (rather than convert the old account) in order to create a "sale" for the banker's quota,

18  and would not close the old account.  As a result, the customer had two accounts generating fees,

19  and the new account counted as a "sale" for the banker.  According to the Confidential Informant,

20  bankers were able to hide the creation of a new account by generating the new account

21  application on their computer, but then rather than showing that application to the customer, Bank

22  employees had the customer sign a digital pad, which did not indicate a new account was being

23  created.[90]

24  _____

*Footnote continued from previous page*
25  (N.D. Cal.).

26  [88] Complaint, *Jabbari vs. Wells Fargo & Company and Wells Fargo Bank, N.A.*, No. 4:15-cv-02159-DMR (N.D. Cal.) at 4.

27  [89] *Id.* at 8.

28  [90] *Id.* at 9.

183.    The illicit account-creation scheme also led the OCC to open an investigation.  In March 2012, the OCC "received a small number of complaints from consumers and Bank employees alleging improper sales practices at Wells Fargo, which were forwarded to OCC supervision staff assigned to the Bank."[91]  And, following the December 2013 *L.A. Times* Article, OCC examiners "initiated a series of meetings with various levels of Bank management, ***including executive leadership***, to evaluate Bank activities and actions."[92]  The Bank stated "it was investigating … reports [of ethical complaints] and reevaluating its oversight of sales practices at the Bank."[93]   In early 2014, the OCC identified the need to assess cross-selling as part of its upcoming examination of the Bank's governance processes.[94]

184.    In mid-2013, the CFPB reviewed whistleblower tips of improper sales activity at Wells Fargo.[95]

185.    On December 18, 2014, FINRA fined Wells Fargo $1.5 million for anti-money-laundering failures.[96]  FINRA stated Wells Fargo failed to establish and maintain a written CIP to verify the identity of each customer opening a new account, a requirement for broker-dealers. FINRA also concluded Wells Fargo failed to properly verify identification for nearly 220,000 new customer accounts.

186.    The Board was aware of the litigations and investigations described above.  In particular, the Audit and Examination Committee and the Corporate Responsibility Committee were expressly responsible for tracking, overseeing, and addressing those proceedings and the issues from which they arose.

187.    The Audit and Examination Committee, for example, is responsible for assisting the Board in overseeing "operational risk and legal and regulatory compliance."  Moreover, the

---

[91] Testimony of Thomas J. Curry, Comptroller of the Currency, before the Senate Banking Committee (Sept. 20, 2016) at 3-4.

[92] *Id.*

[93] *Id.*

[94] *Id.* at 4.

[95] Sept. 20, 2016 Senate Banking Committee Hr'g Tr. at 57.

[96] FINRA News Release, Dec. 18, 2014, available at https://www.finra.org/newsroom/2014/finra-fines-wells-fargo-advisorswells-fargo-advisors-financial-network-15-million-aml.

Audit and Examination Committee's Charter directs that the Committee is expressly tasked with reviewing letters to the Board, and regulators' communications, "including areas of criticism or less-than-satisfactory ratings."

188.    Because the litigation initiated by the L.A. City Attorney and by the consumer plaintiffs addressed "legal compliance," and the investigations initiated by the OCC, FINRA, addressed "regulatory compliance," the Audit and Examination Committee—and, in turn, the Board as a whole—were on notice of and aware of those matters and the underlying claims of unethical and unlawful conduct at the Bank.

189.    Additionally, the Corporate Responsibility Committee was not only required to "monitor the Company's reputation generally, including with customers," but also to "review and receive updates and reports from management on … customer service and complaint metrics and other metrics relating to the Company's brand and reputation, including matters relating to the Company's culture and the focus of its team members on serving [Wells Fargo's] customers."

190.    Because the litigation initiated by the L.A. City Attorney and by the consumer plaintiffs, as well as the OCC and FINRA investigations, addressed (i) "customer service;" (ii) "complaint metrics;" and (iii) "other metrics relating to the Company's brand and reputation, including matters relating to the Company's culture," the Corporate Responsibility Committee— and, in turn, the Board as a whole—were on notice of and aware of those matters and the underlying claims of unlawful conduct at the Bank.

191.    The Corporate and Responsibility Committee was also on notice of potential issues relating to "customer service" and "metrics relating to the Company's brand and reputation, including matters relating to the Company's culture," by virtue of the Los Angeles City Attorney's complaint.  As described above, the complaint contained detailed descriptions about how Wells Fargo's focus on cross-selling created undue pressure on employees to create accounts to meet their goals, and that pressure led employees to employ various "gaming" tactics that artificially inflated their sales numbers, including "sandbagging," "pinning," and "bundling."[97]

---

[97] *People v. Wells Fargo & Co.*, BC 580778 (Cal. Super. Ct. L.A. Cnty.).

The complaint also details customer complaints about the opening of accounts without their authorization.  It was the Corporate Responsibility Committee's duty to monitor and review those customer complaints because they constituted "matters relating to the Company's culture and the focus of its team members on serving [Wells Fargo's] customers."

192.    Notwithstanding the gravity of the litigations and regulatory investigations, Defendants failed to disclose them in Wells Fargo's SEC filings.

193.    The only public comment of the L.A. City Attorney's lawsuit, for instance, appeared at an event in May 2015.  During the May 19, 2015 Barclays Americas Select Conference, Shrewsberry stated:

> Well, it's now active litigation, so I can't be too direct.  I would tell you that our response internally has been that what was alleged is completely inconsistent with our vision and values.  It is inconsistent with the relationship that we have both with our team members and with our customers.  So we have some investigation to do to figure out what the real facts are *because none of our internal systems for getting feedback like that have been tripped until this came along*.  So there is not much to say other than it's certainly not how we run our business.  It's not in our best interest to create an environment for employees or to treat customers in a way where they are getting things that they don't really need or want to pay for because that is not what long-term relationships are about.  So the facts will come out over some period of time and my sense is that it won't have turned out to be a real threat, but it's litigation and we have to treat it that way.[98]

194.    Shrewsberry's statements were, moreover, false or misleading—contrary to his representation, as detailed in this Complaint, internal systems at the Company "ha[d] been tripped," multiple times over the better part of a decade, regarding improper account-creation activities.

195.    The only public comment regarding the regulatory investigations appeared on November 18, 2015, when Wells Fargo Senior Executive Vice President David Carroll addressed regulatory interest in cross-selling during the Bank of America Merrill Lynch Banking and Financial Services Conference:

> We segment our relationship managers, our advisors in brokerage, our private bankers.  We segment them by adoption of best practices and at a management level, we are driving adoption through recognition, reinforcement, some incentives, but it's less that.  So it's a very bottoms-up granular approach to start with the client, put the plan in place and then the behaviors that our people are

---

[98] Wells Fargo & Co at Barclays Americas Select Conference, May 19, 2015, at 7-8.

pursuing.  And the question that you may have been heading towards about any regulatory issues around sales practices or cross-selling or those kinds of things, as long as we stick to that plan-based, we've had terrific reaction from our regulators from a compliance standpoint on that.[99]

**E.**    **Defendants Learned of Improper Account-Creation Activities Through Reports by Current and Former Wells Fargo Employees and Through Litigation by Former Employees.**

196.    Defendants received internal warnings of the prevalent unlawful conduct.  Current and former Wells Fargo employees reported unlawful conduct through the Company's EthicsLine system, or separately by email or letter to Stumpf.

197.    Christopher Johnson, who worked as a business banker at a Wells Fargo branch in Malibu, California, learned shortly after being hired in 2008 that his colleagues "routinely opened unauthorized accounts for customers who they thought wouldn't notice, like elderly clients or those who didn't speak English well."[100]  He called EthicsLine to report the behavior, and was fired three days later purportedly for "not meeting expectations."[101]

198.    Rebecca Lewis, a Wells Fargo teller in Idaho, flagged unauthorized accounts to EthicsLine in 2009.[102]

199.    Bill Brado, who worked as a Licensed Personal Banker at a Wells Fargo branch in Richboro, Pennsylvania, revealed to CNN Money that he reported similar unethical sales activities, including orders to open phony bank accounts and credit accounts, to EthicsLine and sent an email to the Human Resources department in September 2013 recounting the same behavior.[103]  Eight days after he sent that email, he was terminated, purportedly for tardiness.[104]  A former Wells Fargo Human Resources official quoted in the CNN Money article explained

---

[99] Wells Fargo & Co at Bank of America Merrill Lynch Banking and Financial Services Conference, Nov. 18, 2015, at 8.

[100] Stacy Cowley, *Wells Fargo Workers Claim Retaliation for Playing by the Rules*, THE NEW YORK TIMES, Sept. 16, 2016, available at https://www.nytimes.com/2016/09/27/business/dealbook/wells-fargo-workers-claim-retaliation-for-playing-by-the-rules.html?_r=0.

[101] *Id.*

[102] Matt Egan, *I called the Wells Fargo ethics line and was fired*, CNN MONEY, Sept. 21, 2016, available at http://money.cnn.com/2016/09/26/investing/wells-fargo-fake-accounts-before-2011/.

[103] *Id.*

[104] *Id.*

1    there was a history at the Company of terminating employees "in retaliation for shining light" on

2    improper practices.[105]

3            200.    Rasheeda Kamar, a former branch manager in New Milford, New Jersey, was fired

4    in 2011.  The day she learned she would be fired for falling short of the branch's goals, she sent

5    an email to Stumpf warning him that Wells Fargo bankers were reaching the Company's goals by

6    creating fake accounts.  Kamar's 2011 email was read to Stumpf by Senator Menendez during

7    Stumpf's September 2016 Senate testimony:[106] "There are challenges that team members are

8    faced with, but those should not be the reason to move money from one account to another and to

9    fool the motivator [i.e., supervisor] that we have new accounts.  These funds that are moved to

10   new accounts to show growth, when in actuality there is no net gain to the company's deposit

11   base, is wrong.  In the past months I was placed on warning for not meeting these goals and the

12   reason that the bankers underneath me do not is because I will not tolerate the movement of

13   existing money just because we need checking account solutions and profit proxy to move to the

14   motivator.  These accounts make no sense for the customer."[107]  Stumpf responded during the

15   Senate hearing, "I don't remember that one."[108]

16           201.    Ricky M. Hansen Jr., a former branch manager in Scottsdale, Arizona, related:

17   "Everybody knew there was fraud going on, and the people trying to flag it were the ones who got

18   in trouble."[109]  He told *The New York Times* he was aware, from the time he started in 2008, that

19   certain of his region's top performers openly cheated to meet sales quotas, but in 2011, while

20   covering another branch for a colleague, he learned of a particularly egregious case:  the branch's

21   bankers were inventing fake businesses and opening accounts in their names.  Hansen

22

23   _____

     [105] *Id.*

24   [106] Sept. 20, 2016 Senate Banking Committee Hr'g Tr. at 43.

25   [107] *Id.*

     [108] *Id.*

26   [109] Stacy Cowley, *Wells Fargo Workers Claim Retaliation for Playing by the Rules*, THE NEW
     YORK TIMES, Sept. 16, 2016, available at
27   https://www.nytimes.com/2016/09/27/business/dealbook/wells-fargo-workers-claim-retaliation-
     for-playing-by-the-rules.html?_r=0.
28

1    immediately called Human Resources to ask what he should do with that information and was

2    told by H.R. to report the activity to EthicsLine.

3          202.    Hansen did as instructed by the Human Resources department:  He called the

4    EthicsLine, and the investigator on the line asked him for specifics about the alleged misconduct,

5    including the account numbers and the names of the bankers who opened them.  Hansen pulled

6    the information and provided it to EthicsLine.  One month later, he was fired, purportedly for

7    improperly looking up account information (which he did at EthicsLine's request for specifics),

8    which he was told was itself an ethics violation.[110]

9          203.    After being fired, Hansen sent an email to Stumpf and several Human Resources

10   executives describing what he had witnessed.  He received a response offering to rehire him at a

11   lower position, making $30,000 less than his previous position.  He took the job because he

12   needed one, but ultimately quit because he was uncomfortable working there.[111]

13         204.    Denny Russo, a former Teller Manager in the Petaluma, California branch, told

14   CNN Money that when he started working at the branch in April 2010, he "found that accounts

15   were already being opened without authorization."[112]  Russo stated "the directives absolutely

16   came from upper management."[113]

17         205.    On April 3, 2015, a business banker located at the Wells Fargo branch in

18   Chatsworth, California mailed and emailed a letter to the Board regarding the constant pressure to

19   open new accounts.  The letter read:

20         Dear Board Members,

21         I am an active Wells Fargo banker working in retail banking division.  I am
           writing to you to start cleaning up the branches in LA [Los Angeles]/OC [Orange
22

_____

[110] *Id.*

23   [111] *Id.*  On February 21, 2017, Wells Fargo announced that Pamela Conboy, Arizona Lead

24   Regional President (which includes the Scottsdale, Arizona territory), was terminated based on
     the Board of Directors' investigation into the Company's retail banking sales practices and related
25   matters.  *See* Wells Fargo Announces Actions Based on Retail Banking Sales Practices
     Investigation (Feb. 21, 2017), available at https://www.wellsfargo.com/about/press/2017/sales-
26   practices-investigation_0221.content.

     [112] Matt Egan, *I called the Wells Fargo ethics line and was fired*, CNN MONEY, Sept. 21, 2016,
27   available at http://money.cnn.com/2016/09/26/investing/wells-fargo-fake-accounts-before-2011/.

28   [113] *Id.*

County] area from; unethical practice in sales due to continuous management threat of negative consequences if they do not produce "solutions" in double digits on daily basis, the threat has come to "do whatever it takes to get this numbers."

…

I have documents, printed emails and official papers that prove my allegations. I recommend as well if you visit this area (undercover with casual attire) on week days unannounced to see for yourselves. I tried several times to seek HR help, with no use, they end up saying "go and talk to your manager", which defies the purpose. These areas are doing and manage their business as they please, as long as the Regional Director is happy with the fake picture they portray on the retail side, she turns on her blind side from all the corruption.

206.    In response to this letter, emailed and mailed to all Board members (at the email address BoardCommunications@wellsfargo.com), the Chatsworth employee received an email from Margaret Mullen, Employee Relations Senior Manager in Community Banking (Tolstedt's department), stating she would be "conducting an escalated review of your recent termination of employment."

207.    Over the course of the next several weeks, the Chatsworth employee repeatedly asked for updates regarding Mullen's investigation into his complaint, including at times copying the Board Communications email on the updates.  In one of those updates, sent August 18, 2015 to Mullen and the Board, the Chatsworth employee forwarded a November 28, 2014 email from a Wells Fargo supervisor in the Chatsworth office, Nicolas D. Ortiz, exemplifying the pressure employees were put under to create "solutions" to meet sales quotas:

Everyone:

It is 3pm and we are at 11 on Friday!  This is beyond unacceptable.  Everyone here is a seasoned banker and knows how to combat slow days.  At this point it is a personal choice to not get on the phone, stage coach, review old accounts, etc. to bring in business.  There is a mandatory goal of 15 by the end of the day.  Please send me an email on your strategy to reach your goal.

208.    As a result of the EthicsLine complaints, beginning in at least 2008, relating to "gaming" and "sales incentives," as well as the individual employee reports coming from branches across the country, Defendants either knew or should have known improper account-creation activities pervaded the Company and spanned several years.[114]

_____

[114] Indeed, a February 2017 article in the *San Francisco Chronicle* suggests the activity has been going on since the early 2000s.  Ian Minto, an assistant branch manager in San Rafael, California, noticed that employees were signing up a large number of customers and that one banker had

*Footnote continued on next page*

209.   Indeed, Stumpf admitted to the House Financial Services Committee in September 2016 that "the Board, from 2011 to 2013, would get reports at a Committee level, at a high-level about ethics, lines [EthicsLine], requests, or information at not a granular but maybe at a company level."[115]  Subsequent written responses to questions submitted by Wells Fargo to the Senate Banking Committee also confirm that, beginning in at least 2011, the Board's Audit and Examination Committee received reports on "sales integrity" issues, and later the Risk Committee and the Human Resources Committee received similar reports, and the issues were discussed with the entire Board.[116]  The Board was therefore aware of the EthicsLine complaints relating to "gaming" or "sales incentives" issues.

210.   Stumpf acknowledged he "receive[d] complaints about sales-practice issues over the years."[117]  His practice was apparently to forward the complaints to the appropriate internal team, such as Human Resources.[118]  Wells Fargo stated in its written response to the Senate Banking Committee, "***Mr. Stumpf has said that he recalls learning of the increase in the number of reports of sales-practice issues in 2013***."[119]

211.   Further, as early as September 2007, a former Wells Fargo employee and whistleblower wrote to inform Stumpf that the employee had reported "unethical (and illegal) activity to Wells Fargo Regional Bank" and had been removed from his position as a result. According to the letter, the illegal activity was "conducted under fraudulent pretense for the sole and singular purpose of acquiring sales and bonus compensation" and was "widespread and so highly encouraged that it ha[d] become a normal sales practice."[120]

*Footnote continued from previous page*
recruited 25 people from a single address.  When Minto looked up the address, he found it was a cemetery.  He reported the creation of false accounts to his supervisor, as instructed by the Bank, and was fired a few months later.  Thomas Lee, *Wells Fargo whistle-blower finds vindication after 15 years*, SAN FRANCISCO CHRONICLE, Feb. 17, 2017.

[115] Sept. 29, 2016 House Financial Services Committee Hr'g Tr. at 9.

[116] Wells Fargo's written response to Senate Banking Committee at 72.

[117] Wells Fargo's written response to Senate Banking Committee at 72.

[118] *Id.*

[119] *Id.*

[120] https://www.documentcloud.org/documents/3143757-Wells-Fargo-Stumpf-Letter.html (as referenced in CNN Money article).

212.    In 2008, that same employee won a federal whistleblower case against Wells Fargo relating to the creation of fake brokerage accounts, which violated SEC rules and thus triggered whistleblower protections under SOX.  Such wins are extremely uncommon—just 2% of whistleblower cases are found in the favor of employees.  In the case, a division of the DOL found there was "reasonable cause to believe" Wells Fargo violated whistleblower protection laws by transferring the employee after he flagged illegal activity.  The DOL ordered Wells Fargo to restore the employee to his old branch and pay damages as well as back wages and bonuses.

213.    In 2009, six former Wells Fargo employees sued Wells Fargo in federal court in Montana alleging that the Bank wrongfully terminated them.[121]  The employees alleged they had been fired in mid-2008 for reordering debit cards without customer authorization—i.e., "gaming"—but had been instructed to do so by their branch manager.  The former employees claimed they had been fired for the activity only after reporting it to Wells Fargo's EthicsLine.

214.    In 2010, former Wells Fargo employees Yesenia Guitron and Judi Klosek filed a discrimination lawsuit in the Northern District of California.[122]  The lawsuit alleged reports from Wells Fargo customers about problems with accounts, including that (i) bankers at the St. Helena, California Wells Fargo branch had allegedly opened or closed accounts without customers' knowledge or consent; (ii) customers had been misled about the terms of opened accounts; (iii) the provision of customers' debit cards had been delayed for an extended period of time; (iv) bankers opened accounts with customer identification that was not accepted under Company policy, such as a foreign driver's license not written in English; (v) Wells Fargo failed to investigate complaints properly; (vi) complaints and reports to the Regional Vice President and the EthicsLine were not carried out effectively; (vii) accounts were being excessively opened and closed; and (viii) bankers were suspected of forcing customers to open and close accounts unnecessarily to gain sales credits.

215.    Although the court granted summary judgment to defendants on Guitron's claim for retaliation under SOX, the court observed "Plaintiffs presented evidence that Guitron reported

---

[121] *See Finstad et al. v. Wells Fargo Bank, N.A.*, No. 6:09-cv-00046-CCL (D. Mont.).

[122] *Guitron v. Wells Fargo Bank, N.A.*, No. C 10-3461 CW (N.D. Cal.) ("*Guitron*").

1  that her former colleagues were engaging in practices such as opening and closing accounts

2  without customer permission or awareness or without proper identification, which would allow

3  them to obtain otherwise unearned bonuses from Wells Fargo, thereby defrauding it."[123]  Neither

4  the existence of that lawsuit nor the court's findings were ever addressed in the Company's public

5  filings.

6          216.    Guitron explained in an October 2016 *New York Times* article that she, like other

7  employees discussed above, reported the fraudulent activity to her branch manager, her branch

8  manager's boss, the EthicsLine, and the Human Resources department.[124]

9          217.    On October 25, 2012, seven former Wells Fargo employees sued the Company,

10 asserting similar allegations as in *Guitron*.[125]  The *Govan* complaint alleged Wells Fargo

11 employees were required to meet quotas for opening new accounts to keep their jobs.

12         218.    On October 3, 2013, another former bank employee sued Wells Fargo in San

13 Mateo Superior Court, alleging she was retaliated against and wrongfully terminated after her

14 supervisor forced her to open accounts in the names of family members.[126]

15         219.    These employee lawsuits further alerted Defendants to the ongoing wrongdoing

16 arising from their cross-selling initiatives.  The only response, as described above, was to include

17 a new entry code on its EthicsLine ethics complaint forms for "gaming" and "sales incentives," to

18 track those specific types of complaints.  But Defendants failed to address and modify the

19 improper sales practices and address the sales-quota pressures that motivated them.

20         F.    **The OCC's Investigation Expressly Alerted Defendants to Deficiencies in**
               **Wells Fargo's Compliance Structures.**
21
       220.    Between January 2012 and July 2016, the OCC conducted multiple supervisory
22
activities related to Wells Fargo, including targeted examinations through which examiners
23

24 _____
[123] *Guitron v. Wells Fargo Bank, N.A.*, No. C 10-3461 CW, 2012 WL 2708517, at *14 (N.D. Cal.
25 July 6, 2012).

26 [124] Stacy Cowley, Wells Fargo Workers Claim Retaliation for Playing by the Rules, THE NEW
YORK TIMES, Sept. 16, 2016.
27 [125] *See Govan v. Wells Fargo & Co.*, No. 2012-CP-07-03709 (Ct. Common Pleas Beaufort Cnty.).
28 [126] *See Zarandian v. Wells Fargo Bank, N.A.*, No. CVI 524564 (Cal. Super. Ct. San Mateo Cnty.).

1    assessed the Bank's governance and risk management practices related to compliance and

2    operational risk.

3          221.    In February 2013, the OCC issued a Supervisory Letter requiring the Bank to

4    develop its operational risk compliance program.

5          222.    In early 2014, the OCC directed the Bank to address weaknesses in compliance

6    risk through the establishment of a comprehensive compliance risk management program related

7    to unfair and deceptive practices.  The OCC specifically identified the need to assess cross-selling

8    and sales practices as part of its upcoming examination of the Bank's governance processes.[127]

9          223.    In February 2015, the OCC conducted an examination of the Bank's Community

10   Bank Operational Risk Management leading to the OCC's April 2015 Supervisory Letter that

11   included an MRA requiring the Bank to address the governance of sales practices within its

12   Community Banking division.[128]

13         224.    In March 2015, OCC examiners completed a multi-year assessment of the Bank's

14   compliance management systems, and identified the need for the Bank to improve its risk

15   management and governance related to operational and compliance risk.

16         225.    In June 2015, the OCC issued an additional Supervisory Letter to Stumpf

17   identifying matters related to the Bank's enterprise-wide risk management and oversight of its

18   sales practices that required corrective action by the Bank.  The June 2015 Supervisory Letter

19   included five MRAs that required the Bank to take significant action to address the inappropriate

20   tone at the top, as described in ¶ 46 above.

21         226.    The June 2015 Supervisory Letter also instructed the Bank to take specific

22   corrective actions to address the practices at issue, including:

23              a.   improving processes to manage sales practices risk;

24   _____
     [127] *Id.* at 5.

25   [128] As noted earlier, the OCC defines MRAs as practices that "[d]eviate from sound governance,
     internal control, and risk management principles, which may adversely impact the bank's
26   earnings or capital, risk profile, or reputation, if not addressed"; or "[r]esult in substantive
     noncompliance with laws and regulations, internal policies or processes, OCC supervisory
27   guidance, or conditions imposed in writing in connection with the approval of any application or
     other request by a bank."  *See* https://occ.gov/publications/publications-by-type/comptrollers-
28   handbook/_paginated/banksupervisionprocess/bank00200.htm.

CONSOLIDATED AMENDED VERIFIED
STOCKHOLDER DERIVATIVE COMPLAINT
LEAD CASE NO. 3:16-CV-05541-JST

b.  re-evaluating compensation and incentive plans to ensure they did not provide an incentive for inappropriate behavior;

c.  improving processes to independently oversee sales practices risk at an enterprise-wide level;

d.  accelerating the implementation of a fully effective customer complaint process and establishing policy and processes for evaluating complaints related to protected classes;

e.  having management of the Bank's Community Bank division establish effective oversight, as well as a testing and quality assurance function, to review branch sales practices; and

f.  having the Bank's audit services develop an enterprise-wide risk management process for sales practices.

227.    The OCC also instructed the Bank to remediate any consumer harm that resulted from the sales practices at issue.

228.    In accordance with OCC Bulletin 2014-52, the Board would have known of the June 2015 Supervisory Letter, given its responsibility "to ensure timely and effective correction of the practices described in [the] MRA[s]."  In particular, those expectations include:

> [i] holding management accountable for the deficient practices; [ii] directing management to develop and implement corrective actions; [iii] approving necessary changes to the bank's policies, processes, and controls; and [iv] establishing processes to monitor progress and verify and validate the effectiveness of management's corrective actions.

229.    In July 2015, the OCC issued its Report of Examination noting the Company needed to act more diligently to control compliance and operational risk.  The July 2015 Report of Examination was followed by a Notice of Deficiency on July 28, 2015, citing the Company's failure to comply with the safety and soundness expectations outlined in OCC regulations.

230.    In October 2015, at the direction of the OCC, two independent consultants presented their first set of three quarterly findings to Wells Fargo following a thorough review of the Bank's approach to enterprise-wide sales practices and to assess consumer harm.

231.     In November 2015, the OCC required Wells Fargo to enter into a consent order due to "deficiencies in an internal control pillar of the Bank's program for BSA/AML compliance covering the Wholesale Banking Group line of business."[129]  The OCC noted Wells Fargo's "[g]overnance and oversight practices are not effective."  The Consent Order details procedures the Bank must have in place related to customer due diligence, including updates to "reflect changes in the customer's behavior, activity profile, [and/or] derogatory information."  The Consent Order further calls for "periodic reviews of the customer relationship" and requires Wells Fargo to "implement and thereafter . . . maintain an effective system/tool that provides relationship staff within the Wholesale Banking Group with the ability to update customer due diligence information as necessary, to better understand the customer activities, and to assist in identification of any unusual or suspicious activity."

232.     In February 2016 and May 2016, the two independent consultants engaged by the OCC presented their second and third set of findings to Wells Fargo following a thorough review of the Bank's approach to enterprise-wide sales practices and assessing consumer harm.

233.     Throughout 2016, the OCC held monthly meetings with Wells Fargo management to monitor and follow up on the Bank's progress in addressing the corrective actions the OCC had required.

234.     In July 2016, the OCC issued its Report of Examination concluding that the Bank's sales practices were unethical, the Bank's actions caused harm to consumers, and Bank management had not responded promptly to address those issues.

235.     On July 18, 2016, the OCC sent a Supervisory Letter to Stumpf stating the Bank engaged in unsafe or unsound banking practices.

236.     On September 1, 2016, the OCC issued its Consent Order against Wells Fargo and the attendant $35 million fine for "reckless unsafe or unsound sales practices and the Bank's risk management and oversight of those practices."[130]

---

[129] OCC Consent Order, Nov. 17, 2015.

[130] Press Release, The Office of the Comptroller of the Currency, Sept. 8, 2016, available at https://www.occ.gov/news-issuances/news-releases/2016/nr-occ-2016-106a.pdf.

1     237.     On November 18, 2016, the OCC announced new sanctions that will require Wells

2   Fargo to get federal approval before hiring executives and making other business decisions.[131]

3   Specifically, under the new restrictions, Wells Fargo must notify the OCC before hiring senior

4   executives or even changing their responsibilities, and the OCC can now limit future severance

5   payments —"golden parachutes"—to executives who have left the Bank.[132]

6     238.     Defendants were aware of the weaknesses of Wells Fargo's corporate governance

7   structures and failed to address and repair them.  In particular, as detailed above, the duties of the

8   Board's Governance and Nominating Committee (on which Defendants Dean, Milligan, Peña,

9   Sanger, and Swenson served) included "annually review[ing] and assess[ing] the adequacy of

10  [Wells Fargo's] Corporate Governance Guidelines and oversee[ing] and an annual review of the

11  Board's performance."

12     **G.     The Repeated Shareholder Proposal to Create an Independent Chairman
            Further Highlighted the Deficiencies in Corporate Governance at the
13          Company.**

14     239.     The annual shareholder proposal calling for the Board to appoint an independent

15  Chairman further highlighted the weaknesses in corporate governance at the Company.

16     240.     As noted above, Wells Fargo's proxy statements have since 2005 included a

17  stockholder proposal "to adopt a policy to require an independent chairman,"[133] and the Board has

18  consistently recommended, successfully, that shareholders vote down the proposal.

19     241.     The proposal's proponent, Gerald R. Armstrong of Denver, Colorado, is a

20  longtime Wells Fargo shareholder and "is responsible for [Wells Fargo's] elimination of its

21  'poison pill' and whose 'Say-on-Pay' proposals were approved by shareholders on two occasions

22  despite strong opposition of the Board of Directors."[134]  The 2016 Proxy Statement further

23  explains Armstrong "is familiar with Wells Fargo's problems which were originated under an

---

24  [131] Press Release, The Office of the Comptroller of the Currency, Nov. 18, 2016, available at
    https://www.occ.gov/topics/laws-regulations/enforcement-actions/statement-wellsfargo-
25  111816.pdf.

26  [132] Matt Egan, *Feds 'tightening the straightjacket' around Wells Fargo*, CNN MONEY, Nov. 21,
    2016, available at http://money.cnn.com/2016/11/21/investing/wells-fargo-fake-accounts-occ/.

27  [133] *See* Wells Fargo & Company 2016 Proxy Statement at 77.

28  [134] *Id.*

1    administration where one person serves as Chairman and President and was accountable only to

2    himself."

3          242.    Armstrong further explained the need for his proposal, as stated in the 2016 Proxy

4    Statement:  "Nine current directors began serving prior to the 2008 recession.  The proponent

5    believes an 'independent' chairman would seek qualified board members and prevent apparent

6    entrenchment policies."  He concluded "over-extension of duties weakens leadership and may

7    have caused these failings" and noted "many successful corporations and financial holding

8    companies have independent board chairmen."  Armstrong further noted Norges Bank Investment

9    Management stated in support of a similar proposal:  "The roles of Chairman of the Board and

10   CEO are fundamentally different and should not be held by the same person.  There should be a

11   clear division of responsibilities between these positions to insure a balance of power and

12   authority on the Board."

13         243.    Wells Fargo opposed this resolution in the 2016 Proxy Statement, as it had

14   opposed the same resolution in each proxy statement since 2005.

15         **H.    Defendants Maintained an Illusory System for "Auditing" Branches for
                   Potential Wrongdoing.**
16

17         244.    The inadequacy of Wells Fargo's corporate governance is also reflected in the fact

18   that it is currently under investigation related to the failure to conduct successful audits and

19   internal investigations meant to ferret out wrongdoing.  Like other banks, Wells Fargo conducted

20   internal compliance inspections.  The Company's practices, however, allowed 24-hours advance

21   notice to retail branches prior to an internal compliance inspection.[135]  That practice allowed

22   branches to hide fraudulent account-creation "gaming" tactics; for example, branches hid the fact

23   that fake accounts had been created by "forging" signatures or "shredding documents" evidencing

24   the illicit account-creation scheme.[136]  According to Wells Fargo employees interviewed by *The*

25   *Wall Street Journal*, Wells Fargo's peer banks do not provide advance notice of internal

26   compliance inspections.[137]

[135] *See* Feb. 1, 2017 Letter from U.S. Senate to Timothy Sloan.

27   [136] *Id.*

28   [137] Emily Glazer, *At Wells Fargo, Bank Branches Were Tipped Off to Inspections*, THE WALL

*Footnote continued on next page*

CONSOLIDATED AMENDED VERIFIED
STOCKHOLDER DERIVATIVE COMPLAINT
LEAD CASE NO. 3:16-CV-05541-JST

245.    These allegations "raise yet another red flag indicating that top management and the board of directors of Wells Fargo knew or should have known about the extensive fraud occurring throughout the bank."[138]

## I.    Defendants Knew or Consciously Disregarded that More than 5,300 Wells Fargo Employees Were Terminated for Conduct Relating to the Illicit Account-Creation Scheme.

246.    Yet another glaring red flag to Defendants consisted of the termination, over the span of five years, of *more than 5,300 Wells Fargo employees* for conduct relating to the illicit account-creation scheme.[139]  The terminated employees were located in branches across the country.

247.    Indeed, in just 2011, Wells Fargo terminated nearly 1,000 employees in the retail banking sector for improper sales practices.[140]  Yet Defendants took no action at that time.  As Senator Sherrod Brown (D-OH) explained to Stumpf during the Senate Banking Committee hearing:

> I understand this is a huge profit center for Wells, the retail banking writ large in terms of the unauthorized accounts and everything else.  But it just doesn't seem quite right that that – that, it didn't occur to anyone on the board apparently or at least that had your ear (ph).  Didn't occur to the CEO.  Didn't occur to top management that they should do something more affirmatively until that August 2015 date when the regulators sort of helped you suggest and come to that conclusion.[141]

248.    Further, many of the individuals terminated for creating fake accounts were licensed under FINRA.  Indeed, Wells Fargo may have violated FINRA rules between 2011 and 2015 by failing to file FINRA notices for employees terminated for the illicit account-creation scheme, which would have helped Defendants conceal the reasons for those employees' terminations and thus helped perpetuate the account-creation scheme.[142]

---

*Footnote continued from previous page*
STREET JOURNAL, Jan. 24, 2017.

[138] Feb. 1, 2017 Letter from U.S. Senate to Timothy Sloan.

[139] CFPB Consent Order at 10-13.

[140] Sept. 29, 2016 House Financial Services Committee Hr'g Tr. at 6.

[141] Sept. 20, 2016 Senate Banking Committee Testimony at 11.

[142] Nov. 3, 2016 letter to Timothy Sloan.

249.    FINRA by-laws require registered firms—which include five Wells Fargo subsidiaries—to file a "Uniform Termination Notice for Securities Industry Registration," also called a "Form U5," within 30 days of "a registered representative (RR) leaving a firm for any reason," whether voluntarily or via termination.  The Form U5 asks for information on the reason for an employee's termination and details on any related internal review, regulatory action, customer complaint, or criminal investigation.[143]

250.    Between 2011 and 2015, Wells Fargo filed almost 18,000 Form U5s.  Almost 20% of those forms (3,354 of 17,751) were for employees whose registrations with FINRA were terminated because the employees were listed as "discharged," "permitted to resign," or "other."[144]  Recent preliminary data provided by FINRA to certain Senators investigating Wells Fargo showed that of the 5,300 individuals terminated by Wells Fargo as a result of the scandal, 600 were registered at various times with FINRA, and "207 of them were specifically terminated for issues that fall within the scope of the CFPB order."[145]  For the remaining 400 employees terminated for that behavior, it remains unclear if Form U5s were filed that misrepresented the reasons for their termination from the Company, or if Form U5s were even filed for them.[146]

251.    The fact that such FINRA reports were filed, and in some cases may have misrepresented the reasons for the termination, or that at least in some instances Form U5s were not filed at all, "confirm[s] that Wells Fargo had ample information about the scope of fraudulent sales practices occurring at the bank long before the CFPB settlement, and [] raise[s] additional questions about Wells Fargo's response to this illegal activity."[147]

252.    Further, interviews with former Wells Fargo employees suggest misleading Form U5s may have been filed with respect to whistleblowers who were fired after reporting concerns about sales practices, as retaliation for their whistleblowing activity.[148]

---

[143] *Id*. at 2.

[144] *Id*. at 3.

[145] *Id*. at 3.

[146] *Id*. at 3.

[147] *Id*. at 1.

[148] *Id* at 4.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

J.     **The Internal Investigation Begun in August 2015 Was Initiated Only After "Consultation" with Regulators and the L.A. City Attorney's Office.**

253.    In addition to the numerous facts detailed above of which Defendants were aware or consciously disregarded, an internal investigation—albeit too late and insufficient—into illicit account-opening activities was commenced in August 2015.

254.    Specifically, "in consultation . . . with regulators and with the [L.A.] city attorney's office,"[149] in August 2015 PwC was engaged to review Wells Fargo records for the purpose of determining "who may have suffered financial harm as a result of an account that may not have been authorized, and to quantify what that financial harm might have been."[150]  In other words, the investigation was initiated only in response to regulators and amidst litigation, not as a decision in the ordinary course of business to address the illicit account-creation scheme.

255.    Beginning in September 2015 and continuing into 2016, PwC investigated all Wells Fargo accounts opened between 2011 and 2015.  PwC found that 1.5 million deposit accounts and 565,000 consumer credit card accounts might have been unauthorized.  Further, PwC "calculated that approximately 115,000 of these accounts had incurred $2.6 million of fees."[151]  In February 2016, Wells Fargo began "remediating the deposit and credit card customers" who had been impacted by the illicit account-creation scheme.[152]

256.    The investigation was, however, deficient in both timing and substance:  *First*, it was initiated more than 18 months after the December 2013 *L.A. Times* Article and roughly eight years after facts emerged internally regarding the unlawful creation of accounts, and only after the L.A. City Attorney's case (as well as a consumer class action) was filed.  *Second*, it was not directed at the systemic cause of the improper opening of accounts, i.e., the overly aggressive sales-quota program Defendants cultivated and continued to enforce.

257.    Further, notwithstanding PwC's striking findings and the fact that the Company had begun remediating affected customers, Defendants failed to disclose the internal investigation

---

[149] Sept. 20, 2016 Senate Banking Committee Hr'g Tr. at 11.

[150] *Id*. at 4.

[151] *Id*. at 6.

[152] *Id*. at 4.

in the Company's SEC filings.  PwC's findings were not publicly revealed until September 2016, when the scandal over the illicit account-creation scheme broke.

**K.**    **Stumpf Has *Admitted* He and the Board Learned of the Illicit Account-Creation Scheme Long Before It Was Publicly Revealed.**

258.    In his testimony before the Senate Banking Committee, Stumpf admitted he and the Board were informed in late 2013 of employee wrongdoing in the Company's retail banking segment.  He explained that he learned of the opening of fraudulent accounts in 2013 and that the Board learned of it "later [in] 2013 and then 2014 and on."[153]  He further stated the reports "got to the board level – it got to the corporate level in 2013 because progress was not being made.  And the board level in '14, as the corporate resources started to [sic]."[154]  He added the Board learned "sometime in 2013" that the Bank's regulators were informed of this growing problem.  Stumpf further testified:  "And I know in 2014, various committees of the Board were made aware of this.  The risk committee, the audit and examination [committee], the corporate responsibility [committee]."[155]

259.    While Stumpf's testimony was incomplete and inaccurate in that he failed to recount the facts demonstrating he and the Board knew or consciously disregarded facts concerning the illicit account-creation scheme well before December 2013, his admission is nonetheless striking.

260.    In fact, in testimony before the House Financial Services Committee just nine days later, on September 29, 2016, Stumpf acknowledged:

> The board was made aware, generally, of issues by – in committees, at high levels in the 2011, '12 time frame.  By 2013, we had talked about maybe in one – I can't remember which committee it was, surely by 2014, and then when we finally connected the dots on customer harm (ph) in '15, the board was very active on this.[156]

261.    Wells Fargo's written response to questions posed by the Senate Banking Committee confirms that the Board's Audit and Examination Committee, Risk Committee, and

---

[153] *Id.* at 12.

[154] *Id.* at 13.

[155] *Id.* at 14.

[156] Sept. 29, 2016 House Financial Services Committee Hr'g Tr. at 79.

CONSOLIDATED AMENDED VERIFIED
STOCKHOLDER DERIVATIVE COMPLAINT
LEAD CASE NO. 3:16-CV-05541-JST

Human Resources Committee regularly received reports from EthicsLine and suspicious-activity

reports *beginning in at least 2011*, including reports on "the uptick in sales integrity issues":[157]

> *From at least 2011 forward, the Board's Audit and Examination Committee received periodic reports* on the activities of Wells Fargo's Internal Investigations group (which investigates issues involving team members), as well as information on EthicsLine and suspicious activity reporting.  Among other things, *several of those reports discussed increases in sales integrity issues* or in notifications to law enforcement in part relating to the uptick in sales integrity issues.  *Some reporting discussed reasons for increases in sales integrity investigations and reporting*, which included improved controls, tightening existing controls, and enhancements to better facilitate referrals of potential sales integrity violations to Internal Investigations.

> Later, *the Risk Committee began to receive reports from management of noteworthy risk issues, which included, among other risks, sales conduct* and practice issues affecting customers and management's efforts to address those risks.  The Board's *Human Resources Committee also received reports from management that it was monitoring sales integrity in Community Banking. Sales integrity issues were also discussed periodically with the Board*.[158]

262.    Stumpf also acknowledged the Bank "should have realized earlier that product

sales goals could elicit behavior that is inconsistent with [Wells Fargo's] culture."[159]

## L.    Numerous Defendants' Compensation Was Tied to Wells Fargo's Financial Performance, which in Turn Depended on Successful Cross-Selling.

263.    The success of the Company was tied in large part to cross-selling, and because

Defendants' compensation was tied to the Company's success, it was also heavily dependent on

cross-selling and increasing the number of accounts.  Defendants thus were motivated both to

learn facts relating to the creation of accounts—including facts regarding the unauthorized

creation of accounts—and to conceal or consciously disregard the evidence of wrongdoing that

had accumulated over years.

264.    The 2016 Proxy Statement includes a section titled "Compensation Governance

and Risk Management," which contained the following statements:

> Wells Fargo employs strong and effective corporate governance practices which include active oversight and monitoring by the [Human Resources Committee] of

---

[157] Wells Fargo's written response to Senate Banking Committee at 72.

[158] *Id.*

[159] Sept. 29, 2016 House Financial Services Committee Hr'g Tr. at 51.

our incentive compensation strategy and practices so that they are consistent with the safety and soundness of the Company and do not encourage excessive risk taking.  The [Human Resources Committee] oversees our compensation risk management practices and monitors their effectiveness in managing compensation-related risk appropriately.

Many of the compensation risk management policies and practices that apply to the Company's named executives discussed in the CD&A (see "Governance Framework for Compensation Decisions — Risk Management") apply equally to other senior executives and employees the Company identifies whose activities, individually or as a group, may expose the Company to material risk, including:

- an emphasis on overall Company performance in compensation decisions, and for lines of business, their contribution to overall Company performance;

- *incentives that balance individual short-term performance goals with the long-term strength and stability of the Company*, including longer performance periods and/or performance-based deferrals;

- evaluation of individual performance based on the individual's focus on appropriate risk management practices aligned with the Company's risk appetite as well as risk outcomes;

- robust compliance, internal control, disclosure review, and reporting programs;

- strong compensation recoupment or clawback policies which can result in awards being cancelled or prior payments being recovered in appropriate circumstances so that incentive compensation awards encourage the creation of long-term, sustainable performance, while at the same time discourage unnecessary or excessive risk-taking that would impact the Company's performance;

- an emphasis on compliance with the highest standards of ethical conduct as reflected in our Code of Ethics and Business Conduct, which requires employees to deal fairly with customers and others, and includes a prohibition on, and right to discipline employees for, manipulating or misrepresenting sales or reporting.

265.    According to the 2016 Proxy Statement, the Company established an Incentive Compensation Committee consisting of the Company's senior risk, compliance, and human resources executives, which reported to the Human Resources Committee annually.  Its objective was, among other things, to "oversee [the Company's] incentive compensation risk management program, compliance with applicable corporate policies and regulatory requirements,  … [and] the design and outcomes of business line incentive plans."  The 2016 Proxy Statement added that "[e]ach line of business is responsible for understanding the risks associated with each job

1    covered by an incentive arrangement and making sure the business' incentive arrangements are

2    balanced and do not encourage imprudent risk-taking."

3        266.    Also according to the 2016 Proxy Statement, the Human Resources Committee

4    and the Incentive Compensation Committee reviewed the Company's incentive risk management

5    practices.  It concluded "the Company and the Board have not identified any risks arising from

6    the Company's compensation policies and practices that are reasonably likely to have a material

7    adverse effect on the Company."  This stands in stark contrast to what the Human Resources

8    Committee and the rest of the Board knew about the illicit account-creation scheme.

9        267.    The 2016 Proxy Statement also proposed and endorsed compensation packages to

10   senior executives, some of whom were not only aware of but architects of the cross-selling

11   practices at issue at the Company.  "Item 2 – Advisory Resolution to Approve Executive

12   Compensation" urged shareholders to approve compensation awarded by the Human Resources

13   Committee to Stumpf, Sloan, Shrewsberry, and Tolstedt.  In support of Item 2, the 2016 Proxy

14   Statement said:

15           The [Human Resources Committee] believes that its 2015 compensation decisions
             were consistent with our compensation principles and will benefit stockholders for
16           short-term and long-term Company performance, and that the compensation paid
             to the named executives for 2015 was reasonable and appropriate.  Although your
17           vote is advisory and not binding on the Company, the Board values our
             stockholders' views on executive compensation matters and will consider the
18           outcome of this vote when making future executive compensation decisions for
             named executives.
19
20       268.    The same was true of previous proxy statements during the Relevant Period.  For

21   example, the 2014 Proxy Statement emphasized the importance of cross-selling to the Company's

22   strategic objectives, emphasizing that compensation decisions for senior executives, including

23   Tolstedt, reflected performance in cross-selling.  Specifically, in making the 2013 annual

24   incentive compensation award to Tolstedt and others, one item considered was "success in

25   achieving strategic objectives in the business lines for which each is responsible . . . including

26   success in furthering the Company's objectives of cross-selling products from other business lines

27   to customers."  The 2014 Proxy Statement also explained that Tolstedt's leadership of

28   Community Banking resulted in "record cross-sell and deposit levels."  The 2014 Proxy reflected

1  that the Human Resources Committee approved a 2013 annual incentive compensation award for

2  Tolstedt of $1.53 million.

3  269.   The 2015 Proxy Statement similarly highlighted cross-selling as a basis for

4  awarding Tolstedt's compensation.  It noted "continued strong cross-sell ratios" in the

5  Community Banking division led by Tolstedt, and approved a 2014 annual incentive

6  compensation award of $1.3 million.

7  270.   The 2016 Proxy Statement explains that the Human Resources Committee set

8  Stumpf's 2015 annual incentive compensation award for, among other factors, "primary

9  consumer, small business and business banking checking customers up from 2014."

10  271.   Faced with the numerous red flags detailed in ¶¶ 141-262 above, Defendants failed

11  to meaningfully address the illicit account-creation scheme pervading the Company.  As a result,

12  Defendants breached their fiduciary duties (as further discussed in ¶¶ 524-37 below).  In short,

13  they failed Wells Fargo, and in doing so have caused the Company significant harm, for which

14  they should be held accountable.

15  **VII.   THE DIRECTOR DEFENDANTS VIOLATED SECTION 14(a) OF THE**
    **EXCHANGE ACT AND SEC RULE 14a-9, AND BREACHED THEIR**
16  **FIDUCIARY DUTIES, BY CAUSING THE COMPANY TO FILE  MATERIALLY**
    **MISLEADING PROXY STATEMENTS**
17
18  272.   The Director Defendants also violated Section 14(a) of the Exchange Act and SEC

19  Rule 14a-9 by causing Wells Fargo to issue proxy statements that failed to disclose the illicit

20  account-creation scheme or the seriously deficient internal and disclosure controls that allowed

21  the scheme to begin and helped perpetuate it.  The Director Defendants' failure to disclose those

22  material facts likewise constitutes a breach of their fiduciary duties.

23  **A.   Numerous Director Defendants Caused Wells Fargo to Issue the Materially**
    **False or Misleading 2014 Proxy Statement.**

24  273.   On March 18, 2014, Defendants Stumpf, Baker, Chao, Chen, Dean, Engel,

25  Hernandez, James, Milligan, Peña, Quigley, Runstad, and Sanger caused Wells Fargo to file the

26  2014 Proxy Statement in connection with the 2014 annual stockholders meeting to be held on

27  April 29, 2014.  In the 2014 Proxy Statement, these Defendants solicited stockholder votes to,

28  among other things, (i) re-elect themselves to the Board; (ii) approve executive compensation;

and (iii) decide whether to adopt a policy requiring an independent Chairman.  With respect to each of these solicited votes, these Defendants issued materially false or misleading statements.

274.    With respect to Board re-elections, the 2014 Proxy Statement represented:

> The GNC [Governance and Nominating Committee] is responsible for managing the director nomination process, which includes identifying, evaluating, and recommending for nomination candidates for election as new directors and incumbent directors. The goal of the GNC's nominating process is to assist the Board in attracting and retaining competent individuals with the requisite management, financial, and other expertise who will act as directors in the best interests of the Company and its stockholders. The GNC regularly reviews the composition of the Board in light of its understanding of the backgrounds, industry, professional experience, personal qualities and attributes, and various geographic and demographic communities represented by current members. The GNC also reviews Board self-evaluations and information with respect to the business and professional expertise represented by current directors in order to identify any specific skills desirable for future Board members.

<div align="center">* * *</div>

<div align="center"><strong>CORPORATE GOVERNANCE</strong></div>

> The Board is committed to sound and effective corporate governance principles and practices. The Board has adopted Corporate Governance Guidelines to provide the framework for the governance of the Board and the Company. These Guidelines set forth, among other matters, Board membership criteria, director retirement and resignation policies, our Director Independence Standards, information about the committees of the Board, and information about other policies and procedures of the Board, including management succession planning, the Board's leadership structure and the responsibilities of the Lead Director.

> The Board has also adopted a Director Code of Ethics, which states our policy and standards for ethical conduct by our directors and our expectation that directors will act in a manner that serves the best interests of the Company. ***We have also had in effect for over 100 years a code of ethics for all team members, and we expect all of our team members to adhere to the highest possible standards of ethics and business conduct with other team members, customers, stockholders, and the communities we serve and to comply with all applicable laws, rules, and regulations that govern our businesses.***

275.    With respect to Board's role in risk oversight, the 2014 Proxy Statement represented:

> **The Board's Role in Risk Oversight**

> Financial institutions such as the Company must manage a variety of business risks that can significantly affect financial performance, including credit, operational, interest rate, market, investment, and liquidity and funding risks. ***Our risk culture is strongly rooted in our Vision and Values, and in order to succeed in our mission of satisfying all of our customers' financial needs and helping them succeed financially, our business practices and operating model must support prudent risk management practices.***

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

***Key elements of our risk management framework and culture include understanding and following our overall enterprise statement of risk appetite, which describes the nature and level of risks that we are willing to take to achieve our strategic and business objectives, and the "tone at the top" set by our Board,*** CEO and Operating Committee members, which consists of our Chief Risk Officer and other senior executives. Our senior management develops our enterprise statement of risk appetite in the context of our risk management framework and culture. The Board approves our statement of risk appetite annually and, together with our CEO and the Operating Committee, is the starting point for establishing and reinforcing our risk culture and overseeing our risks.

The Board performs its risk oversight function primarily through its seven standing committees, including its Risk Committee. All of these committees report to the whole Board and are comprised solely of independent directors.

276.    The 2014 Proxy Statement also described the Bank's Risk Management and Compensation Practices:

Wells Fargo employs strong and effective corporate governance which includes active oversight and monitoring by the HRC over our incentive compensation practices. ***The HRC oversees the Company's overall strategy with respect to incentive compensation practices to help ensure that they are consistent with the safety and soundness of the Company and do not encourage excessive risk taking.*** As part of this oversight responsibility, the HRC reviews and monitors risk-balancing and implementation and effectiveness of risk management methodologies for incentive compensation plans and programs for senior executives and employees the Company identifies whose activities, individually or as a group, may expose the Company to material risk (we refer to this group as "Covered Employees").

Many of the compensation risk management policies and practices that apply to the Company's named executives discussed in the CD&A (see " Compensation Program Governance—Risk Management ") and other senior executives apply equally to our Covered Employees, including:

- an emphasis on overall Company performance in compensation decisions;

- incentives that balance individual short-term performance goals with the long-term strength and stability of the Company, including longer performance periods and/or performance-based deferrals;

- evaluation of individual performance based on the individual's focus on appropriate risk-management practices aligned with the Company's risk appetite as well as risk outcomes;

- robust compliance, internal control, disclosure review, and reporting programs;

- strong compensation recoupment or clawback policies which can result in awards being cancelled or prior payments being recovered in appropriate circumstances so that incentive compensation awards encourage the creation of long-term, sustainable performance, while at the same time discourage unnecessary or excessive risk-taking that would impact the Company's performance;

- our Code of Ethics prohibition on, and right to discipline employees for, manipulating business goals or any form of gaming to enhance incentive compensation;

- a prohibition on derivative and hedging transactions in Company stock; and

- our stock ownership policy under which all executive officers are required to retain 50% of their after-tax profit shares acquired upon exercise of options or vesting of stock awards for a period of one year following retirement, subject to a maximum limit of ten times the executive's salary, and other employees are expected to retain that number of shares subject to the same limit while employed by the Company.

* * *

In accordance with our IRCM Policy that was approved by the HRC in July 2011 and last amended in November 2012, the ICRM coordinates annually an enterprise-wide assessment of business line and corporate staff incentive compensation plans in which our Covered Employees participate. In conjunction with this annual review process, our corporate and line of business risk officers provide independent reviews of such incentive compensation arrangements and risk-balancing features and are accountable to our Chief Risk Officer. Currently, the HRC meets with our Chief Risk Officer annually to review and assess any risks posed by our enterprise incentive compensation programs and the appropriateness of risk-balancing features of those programs. ***The ICSC and HRC have reviewed the Company's continued progress to implement effective incentive compensation risk management practices through the ICRM program, including the outcome of an enterprise-wide risk assessment of business line and corporate staff incentive compensation plans. The HRC will continue to monitor our progress so that our compensation programs and practices appropriately balance risk-taking consistent with the safety and soundness of the Company and applicable regulatory guidance.***

***In light of the compensation policies and actions discussed above, the Company and the Board have not identified any risks arising from the Company's compensation policies and practices for our named executives or Covered Employees that are reasonably likely to have a material adverse effect on the Company.***

277.   Those statements conveyed that the Board (i) maintained sufficient compliance, risk controls, review, and reporting programs to identify and address misconduct; (ii) was unaware of existing material risks that could affect the Company; (iii) had policies to deter unnecessary or "excessive risk taking," including compensation and ethics policies; and (iv) maintained risk management practices "following [the Company's] overall enterprise statement of risk appetite … and the 'tone at the top' set by our Board, CEO and Operating Committee members."

278.     The 2014 Proxy Statement omitted any disclosures regarding (i) Wells Fargo's ineffective internal and disclosure controls; (ii) reporting failures that failed to appropriately address rampant illegal sales practices and retaliatory terminations against those reporting improper account-creation practices; and (iii) Board-approved compensation programs that incentivized fraudulent account openings for years.  The 2014 Proxy Statement also omitted any disclosures reflecting or acknowledging that Defendants failed to take appropriate steps to address the illicit account-creation scheme, even after years of red flags alerting them to the improper behavior.

279.     The 2014 Proxy Statement harmed Wells Fargo by interfering with the proper governance on its behalf that follows stockholders' informed voting of directors.  As a result of the false or misleading statements in the 2014 Proxy Statement, Wells Fargo stockholders voted to re-elect Defendants Stumpf, Baker, Chao, Chen, Dean, Engel, Hernandez, James, Milligan, Peña, Quigley, Runstad, and Sanger to the Board.

280.     The 2014 Proxy Statement also urged stockholders to approve an advisory resolution regarding compensation paid to named executives.  In support of the requested approval, the Proxy Statement said:

> We are asking our stockholders to approve an advisory resolution regarding compensation paid to named executives as described in the CD&A, the compensation tables and related disclosures. This item gives our stockholders the opportunity to express their views on our 2013 compensation decisions and policies for our named executives as discussed in this proxy statement. Although the say on pay vote is advisory and not binding on our Board, the HRC [Human Resources Committee] will take the outcome of the vote into consideration when making future executive compensation decisions. We describe in our CD&A and related compensation tables our 2013 compensation principles, governance and decisions for the named executives.
>
> Highlights include:
>
> • Our four compensation principles continued to guide the HRC in making its pay decisions for our named executive officers:
>
>   1.     Pay for Performance
>
>   2.     Foster Risk Management Culture
>
>   3.     Attract and Retain Top Executive Talent
>
>   4.     Encourage Creation of Long-Term Stockholder Value

1

2

3

- For 2013, the HRC maintained the relative balance between base salary and annual incentive award opportunity for each of our named executive officers to reduce undue focus on short-term financial performance at the risk of the Company's long-term interests.

4

5

- The HRC also maintained the high proportion of total pay in long-term performance-based equity compensation to align management and stockholder interests in increasing stockholder value

6

7

- *The HRC continued to enhance our strong compensation risk-management practices to discourage imprudent short-term risk taking by requiring executives to bear the long-term risk of their activities.*

\* \* \*

8

9

**Board Recommendation**

10

11

*As noted in the CD&A, the HRC believes its 2013 compensation decisions were consistent with our compensation principles, they will benefit stockholders for short-term and long-term Company performance, and the compensation paid to the named executives for 2013 was reasonable and appropriate.*

12

13

14

15

16

17

18

281.     Those statements conveyed that Wells Fargo's compensation system encouraged proper risk management and advanced long-term stockholder value.  In reality, Wells Fargo's compensation system actually encouraged—and consistently rewarded—extreme risk-taking and widespread illegal practices.  Defendants knew or should have known the executives had breached their fiduciary duties to the Company and exposed it to significant and material risks and liability through their conduct related to the immense sales pressures and resulting illicit account-creation scheme.

19

20

21

22

23

24

25

282.     Under this false impression, numerous Wells Fargo stockholders voted in support of  compensation to Defendants Stumpf, Sloan, and Tolstedt, totaling $19.3 million, $8.8 million, and $8.7 million, respectively, in 2013, without the benefit of material information regarding these Defendants' continued and ongoing failure to address Wells Fargo's unauthorized opening of customer accounts and control deficiencies, and their continued and ongoing failure to reform the Company's compensation structures to ensure they did not promote widespread illegal activity.

26

27

28

283.     The 2014 Proxy Statement also contained a stockholder proposal to adopt a policy to require an independent Chairman.  The Board recommended voting against this proposal for the following reasons:

- • ***The Company's corporate governance structure, including the composition of the Board, its committees, and its Lead Director who is available to meet with major stockholders to discuss governance and other matters, already provides effective independent oversight of management and Board accountability and responsiveness to stockholders***;

- • If adopted, the proposal would unnecessarily restrict the Board's ability to select the director best suited to serve as Chairman of the Board based on criteria the Board deems to be in the best interests of the Company and its stockholders; and

- • ***The Company's governance structure is working effectively as evidenced by the Company's strong financial performance***, and our stockholders rejected a similar independent chairman proposal for the ninth consecutive year in 2013.

284. Those statements conveyed that the Company's corporate governance structure was "effective" and provided "oversight of management and Board accountability." In reality, Wells Fargo's corporate government structure allowed senior executives and the Board to sidestep real accountability and instead punish ground-level employees who illegally created accounts in response to unreasonable account quotas, in order to continue perpetuating Defendants' purported success in cross-selling. The 2014 Proxy Statement also omitted the fact that certain of the cross-selling metrics reported by Defendants were based on false, illegally-generated cross-sell numbers.

285. The 2014 Proxy Statement, which contained materially misleading statements and thus deprived shareholders of adequate information necessary to make a reasonably informed decision, caused the Company's stockholders to vote down the proposed policy to require an independent Chairman.

**B.      Numerous Director Defendants Caused Wells Fargo to Issue the Materially False or Misleading 2015 Proxy Statement.**

286. On March 17, 2015, Defendants Stumpf, Baker, Chao, Chen, Dean, Duke, Engel, Hernandez, James, Milligan, Peña, Quigley, Runstad, Sanger, Swenson, and Vautrinot caused Wells Fargo to file the 2015 Proxy Statement in connection with the 2015 annual stockholders meeting to be held on April 28, 2015. In the 2015 Proxy Statement, these Defendants solicited stockholder votes to, among other things, (i) re-elect themselves to the Board; (ii) approve executive compensation; and (iii) decide whether to adopt a policy requiring an independent

Chairman.  With respect to each of these solicited votes, these Defendants issued materially false or misleading statements.

287.    With respect to Board re-elections, the 2015 Proxy Statement represented:

**Board Performance Evaluations and Succession Planning**

***Our Board has a robust process for evaluating the performance of the Board and its committees***. As part of the Board's annual self-evaluation process, the directors consider various topics relating to Board composition, structure, effectiveness and responsibilities, as well as the overall mix of director skills, experience and backgrounds. In 2014, the Board enhanced its self-evaluation process by encouraging directors also to provide feedback on the individual contributions of directors to the work of the Board and its committees. Mr. Sanger, as GNC Chair and Lead Director, contacted each of our directors individually during 2014 to discuss and obtain his or her assessment of the Board's performance. He presented those assessments to the Board for discussion in executive session, and any necessary follow-up items were reviewed by Mr. Sanger with the GNC, the Board and management, as appropriate. Each committee conducts a separate self-evaluation process led by the committee chair, as provided in its charter. The Board's and each committee's performance evaluation includes a review of the Corporate Governance Guidelines and its committee charter, respectively, to consider any proposed changes.

The Board's annual performance evaluation is a key component of its director nomination process and succession planning…. The Board's succession planning in 2014 focused primarily on the composition of the Board and its committees, the upcoming retirements of directors under the director retirement policy, succession plans for committee chairs, our commitment to Board diversity, and recruiting strategies for adding new directors to complement ***the existing skills and experience of the Board in areas identified in the Board's performance evaluation process and consistent with the Company's strategic priorities such as managing risk***.

\* \* \*

**CORPORATE GOVERNANCE**

***The Board is committed to sound and effective corporate governance principles and practices***…. We expect all of our team members to adhere to the highest possible standards of ethics and business conduct with other team members, customers, stockholders, and the communities we serve and to comply with all applicable laws, rules and regulations that govern our businesses.

\* \* \*

**The Board's Role in Risk Oversight**

***Financial institutions such as the Company must manage a variety of business risks that can significantly affect financial performance, including operational***, credit, interest rate, market, investment, and liquidity and funding risks. ***Our risk culture is strongly rooted in our vision and values and, in order to succeed in our mission of satisfying all of our customers' financial needs and helping them succeed financially, our business practices and operating model must support***

1     *prudent risk management practices.*

2     *Key elements of our risk management framework and culture include*
*understanding and following our overall enterprise statement of risk appetite,*
3     *which describes the nature and level of risks that we are willing to take to*
*achieve our strategic and business objectives, and the "tone at the top" set by*
4     *our Board, CEO and Operating Committee members*, which consist of our Chief
Risk Officer and other senior executives reporting directly to our CEO. Our senior
5     management develops our enterprise statement of risk appetite in the context of
our risk management framework and culture.

6                          * * *

7

8     *The Board and its committees work closely with management in overseeing risk.*
*Each Board committee receives reports and information regarding risk issues*
9     *directly from management. Managers are accountable for managing risks*
*through day-to-day operations and, in some cases, management committees*
10     *have been established to inform the risk management framework and provide*
*governance and advice regarding management functions.* These management
11     committees include the Company's Operating Committee, which meets weekly, to
discuss, among other things, strategic, operational and risk issues at the enterprise
12     level, and the Enterprise Risk Management Committee, which is chaired by the
Company's Chief Risk Officer and includes other senior executives who meet
13     regularly during the year, and reviews significant and emerging risk topics and
high-risk business initiatives, particularly those that may result in additional
14     regulatory or reputational risk.  These and other committees help management
facilitate enterprise-wide understanding and monitoring of risks and challenges
15     faced by the Company. Management's corporate risk organization is headed by the
Company's Chief Risk Officer who, among other things, provides oversight,
16     opines on the performance strategy of all risks taken by the businesses, and
provides credible challenge to risks incurred. The Chief Risk Officer is appointed
17     by and reports to the Board's Risk Committee. The Chief Risk Officer, as well as
the Chief Enterprise, Credit, Market, Compliance, Operational Risk, Information
18     Security and Financial Crimes Risk Officers as his direct reports, work closely
with the Board's committees and frequently provide reports and updates to the
19     committees and the committee chairs on risk issues during and outside of regular
committee meetings, as appropriate. The full Board receives reports at each of its
20     meetings from the committee chairs about committee activities, including risk
oversight matters, and receives a quarterly report from the Enterprise Risk
21     Management Committee regarding current or emerging risk issues.

22     *The Board believes that its Board leadership structure has the effect of*
*enhancing the Board's risk oversight function* because of the Lead Director's and
23     Chairman's direct involvement in risk oversight matters and their *strong efforts to*
*promote open communication regarding risk issues among Board members and*
24     *the Board's committees. The Board also believes that Mr. Stumpf's knowledge*
*of the Company's businesses and risks significantly contributes to the Board's*
*understanding and appreciation of risk issues.*
25

26         288.    The 2015 Proxy Statement also described the Bank's Risk Management and

Compensation Practices:
27

28     *Wells Fargo employs strong and effective corporate governance practices which*
*include active oversight and monitoring by the HRC over our incentive*

*compensation practices…* The HRC has delegated authority to the Director of Human Resources and the Director of Compensation and Benefits for the administration of the Company's benefit and compensation programs; however, the HRC generally has sole authority relating to incentive compensation plans applicable to executive officers, the approval of awards under any equity-based plans or programs and material amendments to any benefit or compensation plans or programs.

In addition, *the HRC oversees the Company's overall strategy with respect to incentive compensation practices so that they are consistent with the safety and soundness of the Company and do not encourage excessive risk taking.* As part of this oversight responsibility, *the HRC reviews and monitors risk-balancing and implementation and effectiveness of risk management methodologies for incentive compensation plans and programs for senior executives and employees the Company identifies whose activities, individually or as a group, may expose the Company to material risk* (we refer to this group as "Covered Employees").

*Many of the compensation risk management policies and practices that apply to the Company's named executives discussed in the CD&A* (see "<u>Compensation Program Governance—Risk Management</u>") *apply equally to our Covered Employees* (which include other senior executives), including:

- an emphasis on overall Company performance in compensation decisions, and for lines of business, their contribution to overall Company performance;

- incentives that balance individual short-term performance goals with the long-term strength and stability of the Company, including longer performance periods and/or performance-based deferrals;

- *evaluation of individual performance based on the individual's focus on appropriate risk-management practices aligned with the Company's risk appetite as well as risk outcomes;*

- *robust compliance, internal control, disclosure review, and reporting programs;*

- *strong compensation recoupment or clawback policies which can result in awards being cancelled or prior payments being recovered in appropriate circumstances so that incentive compensation awards encourage the creation of long-term, sustainable performance, while at the same time discourage unnecessary or excessive risk-taking that would impact the Company's performance;*

- *our Code of Ethics prohibition on, and right to discipline employees for, manipulating business goals or any form of gaming to enhance incentive compensation[.]*

\*   \*   \*

In light of the compensation policies and actions discussed above, *the Company and the Board have not identified any risks arising from the Company's compensation policies and practices for our named executives or Covered Employees that are reasonably likely to have a material adverse effect on the Company.*

289.   Those statements conveyed that the Board (i) maintained sufficient compliance, risk controls, review, and reporting programs to identify and address misconduct; (ii) was unaware of existing material risks that could affect the Company; (iii) had policies to deter unnecessary or "excessive risk taking," including compensation and ethics policies; and (iv) maintained risk management practices "following [the Company's] overall enterprise statement of risk appetite … and the 'tone at the top' set by our Board, CEO and Operating Committee members."

290.   The 2015 Proxy Statement omitted any disclosures regarding (i) Wells Fargo's ineffective internal and disclosure controls; (ii) reporting failures that failed to appropriately address rampant illegal sales practices and retaliatory terminations against those reporting improper account-creation practices; (iii) the known pending investigations by the U.S. Department of Justice ("DOJ"), DOL, congressional committees, the SEC, California state prosecutors, and attorneys general into the fraudulent account openings and Wells Fargo's related deficient controls; and (iv) Board-approved compensation programs that incentivized fraudulent account openings for years.  The 2015 Proxy Statement also omitted any disclosures reflecting or acknowledging that Defendants failed to address the illicit account-creation scheme, even after years of red flags alerting them to the improper behavior.

291.   The 2015 Proxy Statement harmed Wells Fargo by interfering with the proper governance on its behalf that follows stockholders' informed voting of directors.  As a result of the false or misleading statements in the 2015 Proxy Statement, Wells Fargo stockholders voted to re-elect Defendants Stumpf, Baker, Chao, Chen, Dean, Duke, Engel, Hernandez, James, Milligan, Peña, Quigley, Runstad, Sanger, Swenson, and Vautrinot to the Board.

292.   The 2015 Proxy Statement also urged stockholders to approve an advisory resolution regarding compensation paid to named executives.  In support of the requested approval, the Proxy Statement said:

> We are asking our stockholders to approve an advisory resolution regarding compensation paid to named executives as described in the CD&A, the compensation tables and related disclosures. This item gives our stockholders the opportunity to express their views on our 2014 compensation decisions and policies for our named executives as discussed in this proxy statement. Although

the say on pay vote is advisory and not binding on our Board, the HRC will take the outcome of the vote into consideration when making future executive compensation decisions. We describe in our CD&A and related compensation tables our 2014 compensation principles, governance and decisions for the named executives.

Highlights include:

- Our four compensation principles continued to guide the HRC in making its pay decisions for our named executive officers:

    1. Pay for Performance

    2. *Foster Risk Management Culture*

    3. Attract and Retain Top Executive Talent

    4. *Encourage Creation of Long-Term Stockholder Value*

- *For 2014, the HRC maintained the relative balance between base salary and annual incentive award opportunity for each of our named executive officers to reduce undue focus on short-term financial performance at the risk of the Company's long-term interests.*

- The HRC also maintained the high proportion of total pay in long-term performance-based equity compensation to align management and stockholder interests in increasing stockholder value over the long-term.

- *The HRC continued to enhance our strong compensation risk-management practices to discourage imprudent short-term risk taking* by requiring executives to bear the long-term risk of their activities.

\* \* \*

**Board Recommendation**

As noted in the CD&A, *the HRC believes its 2014 compensation decisions were consistent with our compensation principles, they will benefit stockholders for short-term and long-term Company performance, and the compensation paid to the named executives for 2014 was reasonable and appropriate.*

293.    Those statements conveyed that Wells Fargo's compensation system encouraged proper risk management and advanced long-term stockholder value.  In reality, Wells Fargo's compensation system actually encouraged—and consistently rewarded—extreme risk-taking and widespread illegal practices, which furthered only short-term growth fueled by artificially inflated numbers while rewarding executives overseeing such endeavors.  Defendants knew or should have known that the executives had breached their fiduciary duties to the Company and exposed

1  the Company to significant and material risks and liability through their conduct related to the

2  immense sales pressures and resulting fraudulent account openings scheme.

3    294. Under this false impression, numerous Wells Fargo stockholders voted in support

4  of compensation to Defendants Stumpf, Shrewsberry, Sloan, and Tolstedt, totaling $19.3 million,

5  $8.1 million, $10.6 million, and $9.5 million, respectively, in 2014, without the benefit of

6  material information regarding these Defendants' continued and ongoing failure to address the

7  unauthorized opening of customer accounts and control deficiencies at the Company, and their

8  continued and ongoing failure to reform the Company's compensation structures to ensure they

9  did not promote widespread illegal activity.

10    295. The 2015 Proxy Statement also contained a stockholder proposal to adopt a policy

11  to require an independent Chairman.  The Board recommended voting against this proposal for

12  the following reasons:

13    &bull; ***The Company's corporate governance structure***, including the
composition of the Board, its committees, and its Lead Director who is
14  available to meet with major stockholders to discuss governance and other
matters, ***already provides effective independent oversight of management***
15  ***and Board accountability*** and responsiveness to stockholders;

16    &bull; If adopted, the proposal would unnecessarily restrict the Board's ability to
select the director best suited to serve as Chairman of the Board based on
17  criteria the Board deems to be in the best interests of the Company and its
stockholders; and
18

19    &bull; ***The Company's governance structure is working effectively as evidenced***
***by the Company's strong financial performance***, and our stockholders
20  rejected a similar independent chairman proposal for the tenth consecutive
year in 2014.

21    296. Those statements conveyed that Wells Fargo's corporate governance structure was

22  "effective" and provided "oversight of management and Board accountability."  In reality, Wells

23  Fargo's corporate government structure allowed senior executives and the Board to sidestep real

24  accountability and instead punish ground-level employees who illegally created accounts in

25  response to unreasonable account quotas, in order to continue perpetuating Defendants' purported

26  success in cross-selling.  The 2015 Proxy Statement also omitted the fact that certain of the cross-

27  selling metrics reported by Defendants were based on false, illegally-generated cross-sell

28  numbers.

297.     The 2015 Proxy Statement, which contained materially misleading statements and thus deprived shareholders of adequate information necessary to make a reasonably informed decision, caused the Company's stockholders to vote down the proposed policy to require an independent Chairman.

C.     **All of the Director Defendants Caused Wells Fargo to Issue the Materially False or Misleading 2016 Proxy Statement.**

298.     On March 16, 2016, the Director Defendants caused Wells Fargo to issue the 2016 Proxy Statement in connection with the 2016 annual stockholders meeting to be held on April 26, 2016.  The 2016 Proxy Statement contained substantially similar statements as in the 2014 and 2015 Proxy Statements, as detailed below.

299.     The 2016 Proxy Statement represented the following in support of re-electing the current directors:

**Board Performance Evaluations and Succession Planning**

*Our Board has a robust process for evaluating the performance of the Board and its committees*. As part of the Board's annual self-evaluation process, the directors consider various topics relating to Board composition, structure, effectiveness, and responsibilities, as well as the overall mix of director skills, experience, and backgrounds. In 2014, the Board enhanced its self-evaluation process by encouraging directors also to provide feedback on the individual contributions of directors to the work of the Board and its committees. Mr. Sanger, as GNC Chair and Lead Director, contacted each of our directors individually during 2015 to discuss and obtain his or her assessment of the Board's performance. He presented those assessments to the Board for discussion in executive session, and any necessary follow-up items were reviewed by Mr. Sanger with the GNC, the Board, and management, as appropriate. Each committee annually conducts a separate self-evaluation process led by the committee chair, as provided in its charter. The Board's and each committee's performance evaluation includes a review of the Corporate Governance Guidelines and its committee charter, respectively, to consider any proposed changes.

300.     The 2016 Proxy described the Board's key role in risk oversight:

**Our Board's Role in Risk Oversight**

*Wells Fargo manages a variety of risks that can significantly affect our financial performance and our ability to meet the expectations of our customers*, stockholders, *regulators*, and other stakeholders. *Among the key risk types that we manage are* credit risk, *financial crimes risk*, information security risk (including cyber), interest rate risk, liquidity risk, *market risk*, model risk, *operational risk, regulatory compliance risk, reputation risk*, strategic risk, and technology risk. *Our risk culture is strongly rooted in our Vision and Values and, in order to succeed in our mission of satisfying our customers' financial needs and helping them succeed financially, our business practices and operating model must*

*support prudent risk management practices.*

*Key elements of our risk culture and risk management framework include understanding and following our enterprise-wide statement of risk appetite, which describes the nature and magnitude of risk that we are willing to assume in pursuit of our strategic and business objectives, and the "tone at the top" set by our Board, CEO, Operating Committee* (which consists of our Chief Risk Officer and other senior executives), and other members of senior management. Our senior management develops our enterprise statement of risk appetite in the context of our risk management framework and risk culture. *The Board, together with our CEO and the Operating Committee, is the starting point for establishing and reinforcing our risk culture and overseeing our risks.*

\* \* \*

*Each Board committee has defined authorities and responsibilities for considering a specific set of risk issues,* as outlined in its charter, *and works closely with management to understand and oversee the Company's key risk exposures. Allocating risk responsibilities among each Board committee increases the overall amount of attention devoted to risk management.* The Risk Committee serves as a focal point for enterprise-wide risk issues, overseeing all key risks facing the Company. In this role, the Risk Committee supports and assists the Board's other standing committees as they consider their specific risk issues. The Risk Committee includes the chairs of each of the Board's other standing committees so that it does not duplicate the risk oversight efforts of other Board committees and to provide it with a comprehensive perspective on risk across the Company and across all individual risk types.

\* \* \*

*The Board and its committees work closely with management in overseeing risk. Each Board committee receives reports and information regarding risk issues directly from management. Managers are accountable for managing risks through day-to-day operations, and the Company has established several management-level committees to support Wells Fargo leaders in carrying out their risk management responsibilities.* These management committees include the Company's Operating Committee, which meets weekly, to discuss, among other things, strategic, operational and risk issues at the enterprise level, and the Enterprise Risk Management Committee, which is chaired by the Company's Chief Risk Officer and reports to the Board's Risk Committee. The Enterprise Risk Management Committee serves as the focal point for risk governance and oversight at the management level. A number of governance committees that are responsible for issues specific to an individual risk type report to the Enterprise Risk Management Committee.

\* \* \*

*The Board believes that its Board leadership structure has the effect of enhancing the Board's risk oversight function because of the Lead Director's and Chairman's direct involvement in risk oversight matters and their strong efforts to promote open communication regarding risk issues among Board members and the Board's committees. The Board also believes that Mr. Stump's knowledge of the Company's businesses and risks significantly contributes to the Board's understanding and appreciation of risk issues.*

1          301.    Those statements falsely or misleadingly suggested the Board (i) maintained

2    sufficient compliance, risk controls, review, and reporting programs to identify and address

3    misconduct; (ii) was unaware of existing material risks that could affect the Company; (iii) had

4    policies to deter unnecessary or "excessive risk taking," including compensation and ethics

5    policies; and (iv) maintained risk management practices "following [the Company's] overall

6    enterprise statement of risk appetite … and the "tone at the top" set by [its] Board, CEO and

7    Operating Committee members."

8          302.    The 2016 Proxy Statement omitted any disclosures regarding (i) Wells Fargo's

9    ineffective internal and disclosure controls; (ii) reporting failures that failed to appropriately

10   address rampant illegal sales practices and retaliatory terminations against those reporting

11   improper account-creation practices; (iii) the known pending governmental investigations by the

12   DOJ, DOL, congressional committees, the SEC, California state prosecutors, and attorneys

13   general into the fraudulent account openings and Wells Fargo's related deficient controls; and (iv)

14   Board-approved compensation programs that incentivized fraudulent account openings for years.

15   The 2016 Proxy Statement also omitted any disclosures reflecting or acknowledging that

16   Defendants failed to address years after numerous red flags alerted them to the improper

17   behavior.

18         303.    Further, the 2016 Proxy Statement failed to disclose that the L.A. City Attorney

19   had filed an action on May 4, 2015 against the Company for the very practices that were central

20   to the purported success of Wells Fargo's cross-selling scheme.

21         304.    The 2016 Proxy Statement harmed Wells Fargo by interfering with the proper

22   governance on its behalf that follows stockholders' informed voting of directors.  As a result of

23   the misleading statements in the 2016 Proxy Statement, Wells Fargo stockholders voted to re-

24   elect defendants the Director Defendants to the Board.

25         305.    For the same reasons as detailed regarding the 2014 and 2015 Proxy Statements,

26   the statements in the 2016 Proxy Statement were materially misleading and caused stockholders

27   to vote in accord with the Board's respective recommendations.

28

306.    The 2016 Proxy Statement also urged stockholders to approve an advisory resolution regarding compensation paid to named executives:

> We are asking our stockholders to approve an advisory resolution to approve compensation paid to named executives as described in the CD&A, the compensation tables and related disclosures. This item gives our stockholders the opportunity to express their views on our 2015 compensation decisions and policies for our named executives as discussed in this proxy statement. Although the say on pay vote is advisory and not binding on our Board, the HRC will take the outcome of the vote into consideration when making future executive compensation decisions. We describe in our CD&A and related compensation tables our 2015 compensation principles, governance, and decisions for our named executives.
>
> Highlights include:
>
> - Our four compensation principles continued to guide the HRC in making its pay decisions for our named executive officers:
>
>     1. Pay for Performance
>
>     2. *Foster Risk Management Culture*
>
>     3. Attract and Retain Top Executive Talent
>
>     4. *Encourage Creation of Long-Term Stockholder Value*
>
> - For 2015, the HRC maintained the relative balance between base salary and annual incentive award opportunity for each of our named executive officers to reduce undue focus on short-term financial performance at the risk of the Company's long-term interests.
>
> - The HRC also maintained the high proportion of total pay in long-term performance-based equity compensation to align management and stockholder interests in increasing stockholder value over the long-term.
>
> - The HRC continued to enhance our strong compensation risk management practices to discourage imprudent risk taking by requiring executives to bear the long-term risk of their activities.
>
> *      *      *
>
> **Board Recommendation**
>
> As noted in the CD&A, ***the HRC believes that its 2015 compensation decisions were consistent with our compensation principles and will benefit stockholders for short-term and long-term Company performance, and that the compensation paid to the named executives for 2015 was reasonable and appropriate.***
>
> *      *      *
>
> **Compensation Governance and Risk Management**
>
> ***Wells Fargo employs strong and effective corporate governance practices which***

*include active oversight and monitoring by the HRC of our incentive compensation strategy and practices so that they are consistent with the safety and soundness of the Company and do not encourage excessive risk taking.* The HRC oversees our compensation risk management practices and monitors their effectiveness in managing compensation-related risk appropriately.

*Many of the compensation risk management policies and practices that apply to the Company's named executives discussed in the CD&A* (see "Governance Framework for Compensation Decisions—Risk Management") *apply equally to other senior executives and employees the Company identifies whose activities, individually or as a group, may expose the Company to material risk, including*:

- an emphasis on overall Company performance in compensation decisions, and for lines of business, their contribution to overall Company performance;

- incentives that balance individual short-term performance goals with the long-term strength and stability of the Company, including longer performance periods and/or performance-based deferrals;

- *evaluation of individual performance based on the individual's focus on appropriate risk management practices aligned with the Company's risk appetite as well as risk outcomes*;

- *robust compliance, internal control, disclosure review, and reporting programs*;

- *strong compensation recoupment or clawback policies which can result in awards being cancelled or prior payments being recovered in appropriate circumstances so that incentive compensation awards encourage the creation of long-term, sustainable performance, while at the same time discourage unnecessary or excessive risk-taking that would impact the Company's performance*;

- *an emphasis on compliance with the highest standards of ethical conduct as reflected in our Code of Ethics and Business Conduct, which requires employees to deal fairly with customers and others, and includes a prohibition on, and right to discipline employees for, manipulating or misrepresenting sales or reporting*;

- a prohibition on derivative and hedging transactions in Company stock;

- our stock ownership policy under which all executive officers are required to retain 50% of their after-tax profit shares (assuming a 50% tax rate) acquired upon exercise of options or vesting of stock awards for a period of one year following retirement, subject to a maximum limit of ten times the executive's salary, and other employees are expected to retain that number of shares subject to the same limit while employed by the Company.

\* \* \*

In light of the compensation policies and actions discussed above, the Company and *the Board have not identified any risks arising from the Company's compensation policies and practices that are reasonably likely to have a material adverse effect on the Company.*

307.   Those statements misleadingly conveyed that Wells Fargo's compensation structures emphasized risk management and encouraged long-term stockholder value.  In contrast, as revealed by the recent Consent Orders with regulators and Senate hearings, the compensation principles at the Company actually fostered excessive risk-taking and widespread illegal practices.  Those practices rewarded the very executives who had taken excessive short-term risks while exposing Wells Fargo to severe reputational damage and liability.  Further, while the 2016 Proxy Statement stated the Company prohibited employees from misrepresenting sales or reporting and had a right to discipline employees for such actions, it misleadingly omitted the fact that thousands of employees were actually terminated across the United States for these prohibited actions while Wells Fargo executives continued to reap rewards for the inflated performance attributable to those illegal acts.

308.   Without the benefit of material information regarding the Director Defendants' continued failure to address the illicit account-creation scheme and control deficiencies, and their continued failure to reform the Company's compensation structures to ensure they did not promote widespread illegal, in 2015, Wells Fargo's stockholders voted in support of the advisory resolution regarding compensation to Defendants Stumpf, Shrewsberry, Sloan, and Tolstedt, totaling $19.3 million, $9.05 million, $11 million, and $9.05 million, respectively.

309.   The 2016 Proxy Statement also contained a stockholder proposal to adopt a policy requiring that the Company's Chairman be independent.  The Board once again recommended voting against this proposal, stating:

- The Company's corporate governance structure, including the composition of the Board, its committees, and its Lead Director who is available to meet with major stockholders to discuss governance and other matters, already provides effective independent oversight of management and Board accountability and responsiveness to stockholders;

- If adopted, the proposal would unnecessarily restrict the Board's ability to select the director best suited to serve as Chairman of the Board based on criteria the Board deems to be in the best interests of the Company and its stockholders; and

- The Company's governance structure is working effectively as evidenced by the Company's strong financial performance, and our stockholders rejected a similar independent chairman proposal for the eleventh consecutive year in 2015.

310.    Those statements misleadingly stated that the corporate governance structure at Wells Fargo was effective and provided adequate oversight and Board accountability.  In fact, the corporate governance structure at the Company was designed to absolve senior executives and the Board of any meaningful accountability and instead punish employees for implementing the illicit account-creation scheme that developed as a result of immense pressures from the top.  Further, the 2016 Proxy Statement misleadingly suggested Wells Fargo's strong financial performance was attributable to a purportedly effective governance structure, while improperly omitting that such financial performance stemmed, in material part, from the illicit account-creation scheme.

311.    The 2016 Proxy Statement, which contained materially misleading statements and thus deprived shareholders of adequate information necessary to make a reasonably informed decision, caused the Company's stockholders to vote down the proposed policy to require an independent Chairman.

## VIII.   DEFENDANTS VIOLATED SECTION 10(b) OF THE EXCHANGE ACT AND SEC RULE 10b-5, AND BREACHED THEIR FIDUCIARY DUTIES, BY KNOWINGLY OR RECKLESSLY ISSUING MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE RELEVANT PERIOD

312.    In breach of their fiduciary duties to Wells Fargo and its shareholders, and in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5, Defendants issued, and caused the Company to issue, statements that, in light of the illicit account-creation scheme detailed above, were materially false or misleading when made.  Defendants' misrepresentations artificially inflated the price of Wells Fargo shares, causing the Company to purchase shares at artificially inflated prices, through its significant stock repurchase program.

313.    Defendants' misconduct had two aims, both of which were realized:

*First*, by causing Wells Fargo to conduct share repurchases, Defendants signaled to investors their purported belief that Wells Fargo shares were trading at a discount, which caused investors to purchase shares and thereby drive the price up.  Further, and relatedly, the Company's repurchasing of shares artificially inflated its financial metrics such as earnings per share, as the repurchases resulted in fewer outstanding shares.  The artificial inflation of Wells Fargo shares was both financially beneficial to Defendants, as numerous Defendants'

compensation was tied to the Company's financial performance, and helped mask the illicit account-creation scheme (and thus helped perpetuate it).

*Second*, as detailed below, as a result of the artificial inflation of the price of Wells Fargo shares, the Insider Selling Defendants sold shares at higher prices, and in some instances sold them to the Company—and thus reaped greater proceeds—than they would have absent the artificial inflation.

### A.   Defendants Caused Wells Fargo to Conduct a Massive Stock Repurchase Program.

314.   Wells Fargo's Board periodically authorizes the Company to repurchase its own shares of common stock.  The Board authorized a series of share repurchases during the Relevant Period that, collectively, were substantially higher than any other repurchases in the Company's history.

315.   In March 2011, the Board approved the repurchase of 200 million shares of Wells Fargo stock; in October 2012, the Board approved the repurchase of another 200 million shares; in April 2014, the Board approved the repurchase of another 350 million shares; and in January 2016, the Board approved the repurchase of another 350 million shares.  To put the magnitude of these share repurchases in perspective, the repurchase of 200 million shares announced in March 2011 represented about 3.8% of the Company's outstanding shares; the repurchase of 200 million shares announced in October 2012 represented about 3.8% of the Company's outstanding shares; the repurchase of 350 million shares announced in April 2014 represented about 6.6% of the Company's outstanding shares; and the repurchase of 350 million shares announced in January 2016 represented about 6.9% of the Company's outstanding shares.

316.   In sum, as detailed in the chart below, between October 2011 and September 2016 Wells Fargo repurchased approximately 772 million shares of its stock, paying over $35 billion for them:

| Month/Year of Repurchase | Number of Shares Repurchased | Weighted-Average Price per Share | Total Amount Paid ($) |
|---|---|---|---|
| October 2011 | 2,098,981 | $24.92 | $52,306,606.52 |
| November 2011 | 21,981,056 | $24.41 | $536,557,576.96 |
| December 2011 | 2,497,232 | $26.45 | $66,051,786.40 |

- 100 -

| Month/Year of Repurchase | Number of Shares Repurchased | Weighted-Average Price per Share | Total Amount Paid ($) |
|---|---|---|---|
| January 2012 | 945,722 | $29.57 | $27,964,999.54 |
| February 2012 | 6,214,772 | $27.31 | $169,725,423.32 |
| March 2012 | 471,115 | $33.79 | $15,918,975.85 |
| April 2012 | 275,904 | $33.72 | $9,303,482.88 |
| May 2012 | 18,371,127 | $32.05 | $588,794,620.35 |
| June 2012 | 34,703,056 | $31.39 | $1,089,328,927.84 |
| July 2012 | 694,776 | $33.90 | $23,552,906.40 |
| August 2012 | 2,031,116 | $33.76 | $68,570,476.16 |
| September 2012 | 13,813,965 | $32.81 | $453,236,191.65 |
| October 2012 | 30,966,882 | $34.17 | $1,058,138,357.94 |
| November 2012 | 9,533,540 | $32.72 | $311,937,428.80 |
| December 2012 | 1,564,898 | $33.14 | $51,860,719.72 |
| January 2013 | 230,885 | $35.04 | $8,090,210.40 |
| February 2013 | 6,599,588 | $35.09 | $231,579,542.92 |
| March 2013 | 9,804,818 | $34.99 | $343,070,581.82 |
| April 2013 | 4,806,518 | $36.72 | $176,495,340.96 |
| May 2013 | 6,629,021 | $39.05 | $258,863,270.05 |
| June 2013 | 15,223,075 | $40.60 | $618,056,845.00 |
| July 2013 | 3,551,862 | $43.76 | $155,429,481.12 |
| August 2013 | 38,999,686 | $42.08 | $1,641,106,786.88 |
| September 2013 | 8,299,531 | $41.68 | $345,924,452.08 |
| October 2013 | 8,026,129 | $42.23 | $338,943,427.67 |
| November 2013 | 6,565,119 | $42.65 | $280,002,325.35 |
| December 2013 | 15,443,151 | $42.63 | $658,341,527.13 |
| January 2014 | 3,881,380 | $45.85 | $177,961,273.00 |
| February 2014 | 14,835,711 | $45.34 | $672,651,136.74 |
| March 2014 | 14,782,982 | $45.66 | $674,990,958.12 |
| April 2014 | 8,695,090 | $48.74 | $423,798,686.60 |
| May 2014 | 9,910,853 | $49.40 | $489,596,138.20 |
| June 2014 | 20,791,552 | $50.01 | $1,039,785,515.52 |
| July 2014 | 32,031,505 | $51.31 | $1,643,536,521.55 |
| August 2014 | 11,802,749 | $50.52 | $596,274,879.48 |
| September 2014 | 4,835,188 | $51.79 | $250,414,386.52 |
| October 2014 | 31,116,572 | $49.81 | $1,549,916,451.32 |
| November 2014 | 31,116,572 | $53.46 | $1,663,491,939.12 |
| December 2014 | 19,702,495 | $54.30 | $1,069,845,478.50 |
| January 2015 | 22,807,070 | $52.15 | $1,189,388,700.50 |
| February 2015 | 12,232,119 | $53.97 | $660,167,462.43 |
| March 2015 | 13,387,018 | $55.44 | $742,176,277.92 |

| Month/Year of Repurchase | Number of Shares Repurchased | Weighted-Average Price per Share | Total Amount Paid ($) |
|---|---|---|---|
| April 2015 | 19,846,525 | $53.89 | $1,069,529,232.25 |
| May 2015 | 7,322,611 | $55.54 | $406,697,814.94 |
| June 2015 | 9,110,037 | $56.85 | $517,905,603.45 |
| July 2015 | 16,635,418 | $55.75 | $927,424,553.50 |
| August 2015 | 34,034,185 | $56.09 | $1,908,977,436.65 |
| September 2015 | 988,453 | $51.81 | $51,211,749.93 |
| October 2015 | 1,881,995 | $53.20 | $100,122,134.00 |
| November 2015 | 4,975,556 | $55.21 | $274,700,446.76 |
| December 2015 | 20,179,945 | $54.46 | $1,098,999,804.70 |
| January 2016 | 19,386,861 | $51.10 | $990,668,597.10 |
| February 2016 | 26,144,580 | $47.32 | $1,237,161,525.60 |
| March 2016 | 6,143,103 | $49.05 | $301,319,202.15 |
| April 2016 | 4,055,979 | $49.59 | $201,135,998.61 |
| May 2016 | 29,673,157 | $49.29 | $1,462,589,908.53 |
| June 2016 | 11,076,060 | $49.65 | $549,926,379.00 |
| July 2016 | 4,285,238 | $48.20 | $206,548,471.60 |
| August 2016 | 12,032,209 | $48.25 | $580,554,084.25 |
| September 2016 | 21,990,586 | $47.83 | $1,051,809,728.38 |
| **Total** | **772,034,879** | | **$35,360,430,748.63** |

317.    In conducting share repurchases, Defendants falsely signaled to the public that they believed Wells Fargo shares were undervalued and that the repurchases were the best use of the Company's cash.  The share repurchases also had the effect of growing the Company's earnings per share—as share repurchases lower the number of shares outstanding, on which earnings per share are based—as well as its return on assets, return on equity, and other metrics.  Together, these actions helped inflate Wells Fargo's share price.

318.    Among its responsibilities, the Board's Finance Committee is charged with the task of recommending securities repurchases to the Board.  As members of the Finance Committee during all or part of the Relevant Period, Defendants Chao, Engel, Hernandez, James, and Runstad recommended share repurchases, and the Board approved them.  Specifically:

- All the Director Defendants except Duke, Quigley, Peña (who joined the Board in November 2011), and Vautrinot approved the share repurchase announced in March 2011;

- All the Director Defendants except Duke, Quigley, and Vautrinot approved the

share repurchase announced in October 2012;

- All the Director Defendants except Duke approved the share repurchase announced in March 2014; and

- All the Director Defendants approved the share repurchase announced in January 2016.

319. Defendants cited the stock repurchase program as an important part of Wells Fargo's strategic corporate objectives.  In Wells Fargo's 2016 Proxy Statement, for example, the Board identified the program as an example of "the Company's success in attaining strategic objectives."  Additionally, the Human Resources Committee considered the "success of the stock repurchase program" as one of the factors in determining Stumpf's annual incentive compensation during the Relevant Period.

**B.** **In Connection with the Share Repurchases, Defendants Issued False or Misleading Statements Regarding the Extent of Their Purported Success in Cross-Selling and Related Topics.**

320. During the Relevant Period, Defendants issued materially false or misleading statements and omissions concerning (i) the Company's reported cross-sell ratios per customer; (ii) Wells Fargo's monitoring of its cross-sell metrics; (iii) the revenue-generating capability of the accounts included in Wells Fargo's cross-sell ratios; (iv) Defendants' purported commitment to meeting customers' needs through cross-selling; and (v) the sustainability of Wells Fargo's sales practices.  Moreover, in addition to the materially false or misleading misstatements and omissions related to cross-selling, Defendants knowingly or recklessly made materially false or misleading statements and omissions regarding the Company's purported risk management practices, as Defendants have known since at least 2007 that Wells Fargo encouraged excessive risk taking, had "far too few common-sense controls in place to prevent the kind of abuse that customers were subject to,"[160] and rewarded the very executives who had taken undisclosed risks and exposed the Company to severe reputational damage and liability.

321. These materially false or misleading representations failed to disclose the following facts:

---

[160] Sept. 20, 2016 Senate Banking Committee Hr'g Tr. at 15.

a.      As encouraged by Defendants, Wells Fargo employees were fraudulently opening millions of unauthorized checking accounts, credit cards, and other accounts and services, without the customers' knowledge or consent, in connection with the Company's cross-selling strategy;

b.      To satisfy the unrealistic sales quotas set by Defendants, Wells Fargo employees used deceptive tactics, including (i) making misrepresentations to customers regarding costs, benefits, fees, and services concerning the Company's accounts and products; (ii) using fake e-mail addresses to enroll customers for banking products and assigning PIN numbers to customers without their knowledge or consent, known as "pinning"; (iii) "bundling," or incorrectly informing customers that certain products were solely available in packages with other products; (iv) "sandbagging," or belatedly opening requested customer accounts to meet quotas at a later date; and (v) "double packing," or selling redundant products to customers that were not required;

c.      Defendants knew or recklessly disregarded that employees were engaged in that improper conduct, and Defendants allowed it to continue.  Moreover, Defendants actually encouraged the Company's employees to continue the illicit account-creation scheme through compensation practices structured such that, to meet compensation targets and receive bonuses or avoid punishment and termination, employees were pressured into opening millions of unauthorized checking accounts, credit cards, and other accounts and services;

d.      The Company's cross-selling strategy was, in material part, the result of fraudulent conduct on the part of Defendants designed to generate fee income and, in turn, stoke shareholder interest and compensation rewards for themselves;

e.      As a result of the illegal and fraudulent conduct described in this Complaint, the cross-selling metrics Wells Fargo reported were artificially inflated, as, at a minimum, they were based on 1,534,280 unauthorized deposit accounts and 565,443 unauthorized credit-card accounts, and thus were false or misleading;[161] and

---

[161] CFPB Consent Order at 5, 7.

CONSOLIDATED AMENDED VERIFIED
STOCKHOLDER DERIVATIVE COMPLAINT
LEAD CASE NO. 3:16-CV-05541-JST

1          f.      Defendants failed to implement the requisite risk controls to prevent or

2    detect Wells Fargo employees from signing up customers for millions of unauthorized checking

3    accounts, credit cards, and other accounts and services.

4          322.    In their September 28, 2016 letter requesting that the SEC investigate whether

5    Wells Fargo's senior executives "violated federal securities laws," Senators Warren, Merkley,

6    and Menendez cited "securities law violations" implicated by Defendants' misconduct.

7          323.    The Senators stated the SEC's investigations should focus on whether Defendants

8    "committed securities fraud by failing to promptly disclose material facts to investors and by

9    knowingly providing investors with material false information."  The Senators noted Section

10   10(b) of the Exchange Act and SEC Rule 10b-5 "prohibit companies from misleading investors

11   about facts that could affect their business and their stock price."[162]

12         324.    The Senators highlighted Stumpf's testimony in which he "admitted that he

13   became aware of widespread fraud at the bank in 2013, yet neither he nor the company disclosed

14   that information to investors until the CFPB Consent Order became public in September 2016."

15   The Senators added:

16       In the interim, during quarterly earnings calls, *Mr. Stumpf personally touted
         Wells' cross-sell ratio* - its measure of the average number of accounts per
17       customer - as well as Wells' success in opening new deposit accounts and credit
         card accounts.  *He did so apparently with knowledge that many of these retail
18       accounts were created without customer authorization.*

19   The senators emphasized the SEC "has previously found securities fraud when an executive

20   makes misleading statements on earnings calls," while noting some of the more notorious

21   examples of corporate fraud in recent years.

22         325.    The Senators further acknowledged that Stumpf tried to minimize the misconduct

23   as not "material" but that he "personally emphasized the company's increasing number of retail

24   accounts and growing cross-sell ratio on quarterly earnings calls with investors and analysts, and

25   a number of analyst reports from that period recommend purchasing Wells Fargo stock in part

26   because of those strong numbers."  The Senators made a number of these representative analyst

27   _____
     [162] Sept. 28, 2106 Letter from Senators Merkley, Menendez, and Warren to Hon. Mary Jo White

28   at 1-2.

1    reports available on Senator Warren's website specifically devoted to the illicit account-creation

2    scandal.[163]

3          326.    The Senators concluded the "Securities Fraud" section of their letter by stating,

4    "Mr. Stumpf and Wells Fargo investors clearly believed that the cross-sell ratio and the number

5    of retail accounts were material to investment decisions - **and yet Mr. Stumpf did not disclose**

6    **that those numbers had been inflated by millions of fraudulent accounts**."[164]

7                    **1.    Defendants made false or misleading statements regarding cross-
                            selling efforts and specific cross-selling metrics reported by Wells
8                           Fargo.**

9          327.    Defendants also made false or misleading statements in Wells Fargo's press

10   releases, conference calls, investor presentations, and SEC filings concerning the average number

11   of banking products per customer, as well as Wells Fargo's goal to increase that average to eight

12   per customer.  Defendants repeatedly and falsely trumpeted Wells Fargo's cross-selling results,

13   which they claimed differentiated the Company from its peers, and caused the Company to

14   purchase billions of dollars of its stock in order to inflate Wells Fargo's stock price, including for

15   personal gain.

16         328.    For example, in the Company's third quarter 2011 Form 10-Q filed on November

17   8, 2011, and in subsequent quarterly and yearly filings, Defendants emphasized the importance of

18   cross-selling as Wells Fargo's "Vision and Strategy."  Defendants further explained that to satisfy

19   its customers' financial needs, the Bank was providing "financial products that fulfill their

20   needs," and they touted the growth generating capabilities of cross-selling.  The 10-Q further

21   stated, "Our cross-sell strategy, diversified business model and the breadth of our geographic

22   reach facilitate growth in both strong and weak economic cycles, as we can grow by expanding

23   the number of products our current customers have with us, gain new customers in our extended

24   markets, and increase market share in many businesses."[165]  The 10-Q further reported, "Our

25

26   _____
     [163] *Id.*

27   [164] *Id.*

     [165] This statement was repeated in substantially similar form in the Company's filings throughout
28   the Relevant Period.

retail bank household cross-sell was 5.91 products per household in third quarter 2011, up from 5.68 a year ago. . . . Business banking cross-sell offers another potential opportunity for growth, with cross-sell of 4.21 products in our Western footprint in third quarter 2011 (including legacy Wells Fargo and converted Wachovia customers), up from 3.97 a year ago.[166]

329.    In Wells Fargo's 2011 Annual Report, Stumpf stated cross-selling could grow the Company's revenues and also reduce expenses.  Moreover, Stumpf touted a cross-sell ratio in Wells Fargo's "top region" of 7.38 products—very close to the long-held goal of eight per household:

> Our average retail bank household cross-sell reached a record 5.92 products in 2011,[167] up from 5.70 in the fourth quarter of 2010. **In our Western markets it was a record 6.29, in the East 5.43, and our top region had 7.38. The opportunities, therefore, are immense. Even if we get to eight products per retail bank household, we still have room to grow.** We believe the average American household has between 14 and 16 financial services products."[168]

330.    Analysts reacted positively to Wells Fargo's manipulated cross-selling growth. For instance, on January 10, 2012, Morningstar highlighted Wells Fargo's "***dominant market share and a business model built on customer service and cross-selling***," further stating that "[i]n addition to boosting the top line, ***the bank's storied focus on cross-selling*** also deepens customer relationships with the company, increasing switching costs and ***adding to the bank's pricing power***."

---

[166] References to the Wachovia customers and business banking cross-sell were no longer included in Wells Fargo filings beginning in the Company's 2011 Form 10-K.

[167] Stumpf touted the Company's record-breaking achievements not only in Wells Fargo's annual and quarterly reports, but also during the Company's earnings calls. *See, e.g.*, Q4 2011 Earnings Call ("We achieved record retail banking cross-sell of 5.9 products per household."); Q2 2012 Earnings Call ("Retail banking cross-sell reached a new record of 6.00 products per household for the entire community bank consumer base."); Q3 2012 Earnings Call ("We have a broad set of products that enables us to meet all of our customers' financial needs, which is reflected by our record retail banking cross-sell this quarter of 6.04 products per household.").  Additionally, Sloan stressed Wells Fargo's purported record-breaking achievements. *See, e.g.*, Q3 2011 Earnings Call ("Retail banking cross-sell continued to grow to record of 5.91 products per household."); Q1 2012 Earnings Call ("Retail Banking cross-sell grew to 5.98 products per household, up from 5.76 a year ago."); Q1 2014 Earnings Call ("Cross-sell increased to a record 7.2 products per relationship, up from 6.8 products a year ago.").

[168] Wells Fargo & Company 2011 Annual Report at 6.

331.    On May 22, 2012, during a Wells Fargo Investor Day presentation, Sloan noted there were "lots of ways to measure our cross-sell success," stating:

> But another way to think about is how *we take our balance sheet and provide it to our customers and what do we get in return for it* -- when you look at that from a fee income to assets standpoint, not only during the last three years which this slide talks about that *we have the highest in the industry, this is going on for 10 years, this isn't something new, we're good at cross-sell* but there still a lot of opportunities to grow.

332.    Additionally, during the May 2012 Investor Day presentation, Tolstedt stressed the Gr-Eight initiative and how Wells Fargo was on the path to meeting its goal, stating:

> I believe that *cross-sell model is more important than it has ever been before. With the current headwinds, it's more difficult for retail bank households with only one or two products to be profitable*.
>
> We build our products with that in mind, offering packages to customers to provide more value. The good news is, even though we've been at this for a very long time, we still have some distance from achieving *our goal of 8 cross-sells, which we estimate to be an over $5 billion revenue opportunity even in lower interest rate environment*. On the upper right-hand, you can see that customers with greater cross-sell and tenure continue to purchase products from us. *Currently, our customers hold around 6; the East is 5.5. We know that 8 cross-sells can be done. Already, our best region is approaching a goal of 7.5.*

333.    Defendants stated the following in the Company's 2012 Form 10-K regarding Wells Fargo's cross-selling performance:

> Cross-sell of our products is an important part of our strategy to achieve our vision to satisfy all our customers' financial needs. Our retail bank household cross-sell was 6.05 products per household in fourth quarter 2012, up from 5.93 a year ago. We believe there is more opportunity for cross-sell as we continue to earn more business from our customers. Our goal is eight products per customer, which is approximately half of our estimate of potential demand for an average U.S. household. In fourth quarter 2012, one of every four of our retail banking households had eight or more of our products.[169]

334.    Further, in Wells Fargo's Community Banking section in its Form 10-Q for the third quarter of 2012, Defendants stressed continuous growth in cross-selling:  "*Our retail bank household cross-sell has increased each quarter since the beginning of 2011*, and in August 2012 our cross-sell was 6.04 products per household, up from 5.90 a year ago."

---

[169] Wells Fargo & Company 2012 Form 10-K at 44.  This statement was repeated in substantially similar form in the Company's filings throughout the Relevant Period.

335.    Despite knowing or recklessly disregarding that Wells Fargo employees were fraudulently opening accounts that could, and actually did, improperly subject unknowing customers to fees (85,000 accounts incurred approximately $2 million in fees),[170]  Sloan discussed at the February 13, 2013 Credit Suisse Financial Services Forum how cross-selling could cause the Company to reap fees from customers, stressing "valuable new deposits into new customers and *deepened relationships with existing customers will help drive future growth in lending and fees as we remain focused on cross-selling.*"

336.    Additionally, Wells Fargo's record-breaking achievement in cross-selling was consistently discussed during the Company's earnings calls.  During the Company's Q1 2013 earnings call held on April 12, 2013, Stumpf stated Wells Fargo's "growth reflects the benefit of our *relationship model*, as demonstrated by *achieving record retail banking cross-sell of 6.1 products per household*."  Moreover, Stumpf described how Wells Fargo's success involved cross-selling and adhering to the Company's supposed risk management discipline:

> We're obviously off to a great start in 2013, and I couldn't be happier with the ability of *our team members to continue to make more loans and grow deposits, increase cross-sell, and reduce expenses, all while we continue to invest in our franchise and adhere to our risk management discipline*.[171]

337.    Analysts again focused on the purported "competitive advantages" associated with Wells Fargo's cross-selling strategy.  On April 12, 2013, Morningstar issued a report commenting on the Company's Q1 2013 results:

> Core deposits grew more than $51 billion over the past year, providing a low-cost source of funds for the company's operations, and *just under half of the company's revenue came from sources other than interest income, demonstrating the effects of cross-selling, which could increase customer switching costs as well as boost pricing power*.

---

[170] CFPB Consent Order at 5.

[171] Sloan similarly discussed increasing cross-selling while also purportedly adhering to Wells Fargo's risk strategies.  *See* Q2 2012 Earnings Call ("And while we had great results this quarter, we have plenty of opportunity ahead for future growth including a strong mortgage pipeline, recently completed acquisitions, improving cross-sell, increasing market share, and improving efficiency, all while remaining very focused on risk.").

338.    On May 21, 2013, at the Barclay's Americas Select Franchise Conference, Stumpf stressed Wells Fargo's demonstrated "performance versus [its] peers" and how "[i]n this low-rate environment, our cross-sell model is more important than it has ever been before."[172]

339.    During Wells Fargo's Q2 2013 earnings call on July 12, 2013, in response to a question regarding the cause for the Company's improvement in cross-selling, Stumpf failed to disclose that increased cross-selling stemmed from fraudulent account-creation practices of which he had been aware since at least 2007:

> <Q - Nancy Avans Bush>: All right. Second question is this. Your improvement in cross-sell from 6% to 6.14% and your ongoing improvements in cross-sell, is this merely one product, two products? I mean is there sort of still a "lead" product you guys have that sort of leads cross-sell?
>
> <A - John G. Stumpf>: Yes, it's checking accounts. That's why when I wake up in the morning, ***I get here and the first thing I look at is the checking account report from the day before.*** I love checking accounts. I dream about them.

340.    Stumpf discussed during Wells Fargo's Q3 2013 earnings call that "we deepened relationships across our company, achieving ***record retail banking cross-sell of 6.15 products per household***."

341.    Once again, during the Q4 2013 earnings call, Stumpf stated that "by focusing on meeting our customers' financial needs, ***we achieved record cross-sell across the company with retail banking cross-sell growing to 6.16 products per household***."[173]   The 6.16 metric exceeded the national average fourfold.

342.    On December 10, 2013, shortly before the December 2013 *L.A. Times* Article was published, Stumpf presented at the Goldman Sachs Financial Services Conference, boasting of Wells Fargo's "best-in-class in cross-sell" as a "competitive advantage for Wells Fargo."[174]

---

[172] Similarly, on June 11, 2013, at the Morgan Stanley Financials Conference, Stumpf again emphasized how Wells Fargo "outperformed [its] peers," stating it "reflect[ed] the benefit of [Wells Fargo's] cross-sell focus."   Stumpf added that "[b]y remaining focused on meeting our customers' financial needs, we've been able to generate strong fee income growth that is very well diversified."

[173] Stumpf similarly stated during the Company's Q1 2014 earnings call:  "We deepened relationships across our company, achieving record retail banking cross-sell of 6.17 products per household."

[174] E. Scott Reckard, *Wells Fargo's Pressure-Cooker Sales Culture Comes At A Cost*, LOS ANGELES TIMES, Dec. 14, 2013.

343.     In 2014, analysts continued to praise the Company's "vaunted cross-selling expertise."  Morningstar noted in a January 14, 2014 report that the Company's "reported products per household grew across the bank's segments."

344.     On February 26, 2014, in touting yet another outstanding year of financial results and stating the Company "ended the year as America's most profitable bank," Defendants highlighted in Wells Fargo's 2013 Form 10-K that the Bank "achieved record cross-sell across the Company."[175]

345.     On April 11, 2014, Stumpf and Sloan caused Wells Fargo to issue a press release announcing its Q1 2014 financial results, which highlighted the importance of cross-selling to the Company's results.  The release quoted Stumpf as stating, "Our 265,000 team members remained focused on achieving our vision of serving the financial needs of our customers as we grew loans, deposits and increased cross-sell."

346.     On the same day, during the Company's Q1 2014 earnings call, Stumpf said:  "I'll take all the deposits we can get that are part of a primary relationship, and we cross-sell off that.  And it's a major driver in customer loyalty.  So it's a big emphasis here for us."

347.     Wells Fargo's 1Q 2014 Form 10-Q, filed on May 7, 2014, described cross-selling as "important to our strategy," and represented, "*[o]ur cross-sell strategy, diversified business model and the breadth of our geographic reach facilitate growth in both strong and weak economic cycles.*"  The 10-Q further stated, "We deepened relationships across our company, *achieving record Retail Banking cross-sell of 6.17 products per household* (February 2014)."

348.     In a research report dated April 30, 2014, Morningstar praised Wells Fargo's "dominant market share" and "business model built on customer service and cross-selling."

349.     At the Company's May 20, 2014 Investor Day conference, Shrewsberry stated:  "Our relationship focus and cross-sell capability is hopefully legendary at this point.  It has been our vision for decades.  We've stuck to it.[176]

---

[175] Wells Fargo & Company 2013 Form 10-K.

[176] Similarly, on September 10, 2014, the Company presented at the Barclays Global Financial Services Conference.  At the conference, Shrewsberry compared Wells Fargo to its peers, noting the Company generated more fee income than its competitors due in part to its cross-selling

*Footnote continued on next page*

350.    Also during the conference, Tolstedt discussed the financial performance of that segment and the growth resulting from the Company's cross-selling efforts, emphasizing that Wells Fargo's cross-selling was "helping [its] customers succeed financially and meet[] all of their needs."  She further attributed the growth in credit card business and retail banking business to the cross-selling strategy:

> The beneficial cycle of cross-sell continues. The more products the customers have with us, the better deal and greater value we can provide. . . .***Our retail bank household cross-sell is now at 6.17 products, up from two years ago 5.98, and at the time of the merger we were at 5.2.*** Our long-term goal continues to be an average cross-sell of 8 and achieving this goal will come with higher household purchase rates and growth in profitability.

Tolstedt reiterated that "[t]ogether, the density and cross-sell model drive revenue. . . We are bullish on cross-sell, we are confident on cross-sell, and we still believe that we can get to an eight cross-sell."

351.    During that same conference, Sloan told investors the "secret sauce" of Wells Fargo's cross-sell success is that the Company has long-tenured employees who "believe in our culture [and] work together" driving the initiative.

352.    On May 21, 2014, UBS issued a report discussing the Company's recent Analyst Day.  The report, titled  "WFC promises more of the same," emphasized that the Company's primary strategy for growth remained cross-selling to existing customers:

> **Management is focused on growth and execution of cross-selling strategy**
> WFC's investor day highlighted a growth strategy – the presentations mention growth 116 times versus 39 mentions of costs. ***The strategy for growth is unchanged and focuses on cross-selling across all products and client segments with particular attention paid to cards,*** wealth management (where pre-tax margin target was increased from 22% to 25%) and corporate banking.

353.    Wells Fargo's 3Q 2014 Form 10-Q, filed on November 5, 2014, represented, "Our retail bank household cross-sell was 6.15 products per household in August 2014, unchanged from the prior year."

---

*Footnote continued from previous page*
strategy:  "[W]e generate more fee income per average assets than our peers.  This outperformance demonstrates our consistent focus on earning more of our customers' business and our culture of cross-sell."

354.   Further, during the corresponding Q3 2014 earnings call, Stumpf touted the Company's success in opening new deposit accounts and credit card accounts, stating Wells Fargo "grew primary consumer checking customers by 4.9%" and that "the increases you're seeing in debit card activity and credit card, we almost have 40% of our customers now [] carry our credit card," compared to "22% in 2009."

355.   Analysts consistently praised Wells Fargo's cross-selling expertise.  In November 2014, RBC Capital Markets met with Stumpf, Shrewsberry, and Tolstedt to discuss the Company's financial performance and future prospects.  On November 5, 2014, RBC issued a report, titled "Highlights from recent company visit," discussing the meetings and also how the Company had "attractive growth opportunities" given how "Wells is willing to price more aggressively on the lending side, partly because it is confident in its ability to cross-sell other products and build a profitable relationship."

356.   Further, on January 14, 2015, Morningstar issued a report discussing Wells Fargo's growth in cross-selling:

> Wells Fargo also demonstrated a continued ability to cross-sell during the quarter. The company added more than $4 billion in credit card loans during the year, including an expansion of its private-label business.

357.   Defendants continued to tout their purported success in cross-selling.  During the Q4 2014 earnings call on January 14, 2015, Stumpf stated "we grew the number of primary consumer checking customers by 5.2%"

358.   On February 25, 2015, Defendants caused the Company to file its 2014 Form 10-K, which was signed by Wells Fargo's Board.  The 2014 Form 10-K emphasized that Wells Fargo's "ability to grow primary customers is important to our results because these customers have more interactions with us, have higher cross-sell and are more than twice as profitable as non-primary customers."  The 2014 Form 10-K explicitly stated "each of [the Bank's] operating segments monitors cross-sell metrics to measure the extent they are satisfying [Wells Fargo's] customers' financial needs."  It also stated:

> [R]etail banking household cross-sell was 6.17 products per household in November 2014, up from 6.16 in November 2013 and 6.05 in November 2012. The November 2014 cross-sell ratio included the acquisition of an existing private

label and co-branded credit card loan portfolio in connection with a new program agreement with Dillard's, Inc. (Dillard's), a major retail department store.

359.    On April 14, 2015, Morningstar published a report noting the Company gave employees incentives to grow their cross-selling efforts and saying investors therefore should not be concerned with increases in Wells Fargo's overall headcount:

> Wells Fargo's longstanding focus on **cross-selling helps lock in customer relationships and access to low-cost funding** - namely, $1 trillion in deposits at a cost of only 9 basis points as 2014 came to a close.

> * * *

> The company's simple, domestically focused business is clearly not "too big to manage" as the company has thrived under the leadership of several CEOs. Though the company expects its efficiency ratio to be at the high end of its 55%-59% target for 2015, we don't view increases in headcount negatively. Along these lines, **Wells Fargo's emphasis on cross-selling is associated with significant incentive spending. We see these expenses as worthwhile in building long-term customer relationships and consequently, switching costs.**

360.    On April 15, 2015, Morningstar issued a report noting that Wells Fargo had reported increased income of 6.7% sequentially for its largest unit, Community Banking.  The report also noted results in Wholesale Banking had increased 3.25%, stating "[m]anagement attributed this growth to successful cross-selling with the Community Banking segment." Additionally, Morningstar underscored the "significant incentive spending" by Wells Fargo in connection with its cross-selling strategy:  "Wells Fargo's emphasis on cross-selling is associated with significant incentive spending.  We see these expenses as worthwhile in building long-term customer relationships and consequently, switching costs."

361.    In late 2015, after the August 2015 commencement of PwC's investigation in consultation with regulators and the L.A. City Attorney's office, members of the Board's Finance Committee—Defendants Chao, Duke, Engel, Hernandez, James, and Runstad—recommended to the Board a significant increase in the shares available for repurchase under the stock repurchase program.  According to a January 26, 2016 press release, all Director Defendants "increased the [C]ompany's authority to repurchase common stock by an additional 350 million shares."

1    362.    On February 24, 2016, Defendants filed the Company's 2015 Form 10-K with the

2    SEC, which explicitly stated the Bank's "*approach to cross-sell is needs-based as some*

3    *customers will benefit from more products*."

4    363.    Despite her extensive knowledge of the illicit account creation scheme, at Wells

5    Fargo's Analyst Day conference on May 24, 2016, Tolstedt still asserted that Wells Fargo was

6    customer-focused in its cross-selling stating, and that with respect to "products per household or

7    cross-sell, the first thing we anchor ourselves on is our vision of satisfying our customers' needs

8    and helping them succeed financially," and so "everything that we do is really about them."

9    364.    On May 25, 2016, Evercore issued a report discussing the Company's May 24,

10   2016 conference titled "Investor Day Wrap: Targets Sliced, but Still a Conservative Drive Down

11   the Fairway."   The report discussed, among other things, the growth in the Company's credit card

12   business due to its cross-selling ability, stating:  "Card biz growth to remain above industry pace

13   with greater cross-sell and new products,"  and "[management] noted they have improved their

14   penetration rates with 43.2% of checking customers now holding a WFC card, versus 33.5% in

15   2012."

16   365.    On July 15, 2016, Wells Fargo held a conference call for analysts and investors to

17   discuss the Company's 2Q 2016 financial results.  During the call, Stumpf noted the Company

18   had previously announced that Tolstedt was retiring.  Stumpf concealed the fact that PwC had

19   made substantial findings of the fraud in the Community Banking segment as part of its

20   investigation, which not only exposed millions of customers to unlawful fees and potential

21   identity theft, but put the Company in the crosshairs of federal investigations and untold financial

22   and regulatory penalties and liability.  Instead, Defendants stated Wells Fargo was committed to

23   "transparency[] and ensur[ing] customers are receiving the right products to meet their financial

24   needs because the key to our success is long-lasting customer relationships built on trust," with

25   Stumpf claiming Tolstedt had built an extraordinary franchise that met the needs of millions of

26   customers.  As Stumpf testified in September 2016 before the United States Senate, he and his

27   fellow Board members allowed Tolstedt to "retire" instead of firing her for cause, resulting in

28   Tolstedt being allowed to receive *$124.6 million* in stock and options upon her retirement.

1      366.    On August 3, 2016, Wells Fargo filed its Form 10-Q for 2Q 2016, mere weeks

2 after the OCC's Supervisory Letter stating the Company engaged in unsafe and unsound banking

3 practices and a little over a month before the revelations of the $185 million fine and findings of

4 "widespread illegal" sales practices.  In the Form 10-Q, Wells Fargo disclosed that "[d]uring

5 second quarter 2016, we changed how we determine retail banking households within

6 Community Banking to include only those households that maintain a retail checking account,

7 which we believe provides the foundation for long-term retail banking relationships."

8      367.    In sum, throughout the Relevant Period, Defendants made multiple false or

9 misleading statements about cross-selling and Wells Fargo's financial results.  The Company's

10 SEC filings, press releases, and other communications involving Defendants failed to disclose

11 that their purported success in cross-selling was due in material part to the illicit account-creation

12 scheme, and the cross-selling metrics they reported were artificially inflated as a result of the

13 scheme.  The following chart lists SEC filings from the Relevant Period that contain false or

14 misleading statements (and notes which of the Defendants signed each of the filings), along with

15 the artificially inflated reported retail bank household cross-sell metric for each reporting period:

| Filing | Date | Cross-sell metric[177] | Signed by |
|---|---|---|---|
| 1Q 2011 10-Q | May 6, 2011 | 5.79 | Stumpf, Sloan |
| 2Q 2011 10-Q | August 5, 2011 | 5.84 | Stumpf, Sloan |
| 3Q 2011 10-Q | November 8, 2011 | 5.91 | Stumpf, Sloan |
| 2011 10-K | February 28, 2012 | 5.92 | Stumpf, Sloan, Baker, Chao, Chen, Dean, Engel, Hernandez, Milligan, Peña, Runstad, Sanger, Swenson |
| 1Q 2012 10-Q | May 8, 2012 | 5.98 | Stumpf, Sloan |
| 2Q 2012 10-Q | August 7, 2012 | 6.00 | Stumpf, Sloan |
| 3Q 2012 10-Q | November 6, 2012 | 6.04 | Stumpf, Sloan |
| 2012 10-K | February 27, 2013 | 6.05 | Stumpf, Sloan, Baker, Chao, Chen, Dean, Engel, Hernandez, James, Milligan, Peña, Runstad, Sanger |
| 1Q 2013 10-Q | May 8, 2013 | 6.10 | Stumpf, Sloan |
| 2Q 2013 10-Q | August 7, 2013 | 6.14 | Stumpf, Sloan |
| 3Q 2013 10-Q | November 6, 2013 | 6.15 | Stumpf, Sloan |

[177] As stated earlier, these retail bank household cross-sell figures were also repeated in each of the Company's quarterly earnings press releases and in the Company's quarterly earnings conference calls during the Relevant Period.

| Filing | Date | Cross-sell metric[177] | Signed by |
|--------|------|---------------------|-----------|
| 2013 10-K | February 26, 2014 | 6.16 | Stumpf, Sloan, Baker, Chao, Dean, Engel, Hernandez, James, Milligan, Peña, Quigley, Runstad, Sanger, Swenson |
| 1Q 2014 10-Q | May 7, 2014 | 6.17 | Stumpf, Sloan |
| 2Q 2014 10-Q | August 6, 2014 | 6.17 | Stumpf, Shrewsberry |
| 3Q 2014 10-Q | November 5, 2014 | 6.15 | Stumpf, Shrewsberry |
| 2014 10-K | February 25, 2015 | 6.17 | Stumpf, Shrewsberry, Baker, Chao, Chen, Dean, Duke, Engel Hernandez, James, Milligan, Peña, Quigley, Runstad, Sanger, Swenson |
| 1Q 2015 10-Q | May 6, 2015 | 6.13 | Stumpf, Shrewsberry |
| 2Q 2015 10-Q | August 5, 2015 | 6.13 | Stumpf, Shrewsberry |
| 3Q 2015 10-Q | November 4, 2015 | 6.13 | Stumpf, Shrewsberry |
| 2015 10-K | February 24, 2016 | 6.11 | Stumpf, Shrewsberry, Baker, Chao, Chen, Dean, Duke, Engel, Hernandez, James, Milligan, Peña, Quigley, Sanger, Swenson, Vautrinot |
| 1Q 2016 10-Q | May 4, 2016 | 6.09 | Stumpf, Shrewsberry |
| 2Q 2016 10-Q | August 3, 2016 | Not reported[178] | Stumpf, Shrewsberry |

368.    The statements in ¶¶ 320-67 above relating to cross-selling were materially false and misleading for the reasons stated in Section VI. In sum:

a.    The "retail bank household cross-sell" metrics disclosed in the quarterly and annual filings, which ranged from 5.79 to 6.17, were artificially inflated because Wells Fargo employees were fraudulently opening millions of unauthorized checking accounts, credit cards, and other accounts and services in connection with the Company's cross-selling strategy;

b.    These fraudulent accounts were opened because compensation practices at the Company were structured such that employees felt pressured to engage in this illegal activity to meet unrealistically high sales quotas;

c.    Defendants knew or recklessly disregarded that Wells Fargo employees were engaging in the illegal conduct referenced above, and Defendants allowed it to continue;

---

[178] The Company's 2Q 2016 Form 10-Q, filed on August 3, 2016, stated the Company had changed its calculation of the "retail bank household cross-sell" metric.

d.      Despite numerous complaints from employee whistleblowers and customers, media attention (including the December 2013 *L.A. Times* Article), and investigations or litigation by governmental entities (including the OCC, CFPB, and L.A. City Attorney's office), Defendants allowed the illegal activity to continue; and

e.      Contrary to Defendants' assertions that the Company was cross-selling to meet "customers' financial needs as [Wells Fargo] builds lifelong relationships," Defendants' conduct was immoral, unethical, oppressive, and unscrupulous in that Defendants (i) profited by allowing the illicit account-creation scheme to develop and continue; (ii) touted the average number of accounts per customer they achieved, knowing or recklessly disregarding that many of those accounts were unauthorized; (iii) exposed customers to financial hardships involving unjustified debt collection and negative credit reporting; and (iv) otherwise garnered an unfair advantage over lawfully competing businesses.

### 2.      Defendants made false or misleading statements regarding risk controls.

369.    Wells Fargo's press releases, investor presentations, conference calls, and SEC filings included representations concerning the Company's risk management, which were materially false or misleading in light of the illicit account-creation scheme detailed in this Complaint.  Indeed, the OCC identified substantial deficiencies and unsafe and unsound practices in the Company's risk management and oversight of its sales practices.  The Comptroller of the Currency observed the Bank's "opening and manipulation of fee generating customer accounts without the customer's authorization are completely unacceptable and . . . reflect a lack of effective risk management [and] a breakdown in controls."

370.    Defendants nonetheless represented that they maintained a robust risk management system where the Board and senior executives have overall and ultimate responsibility for the management of risk, and which were carried out "through committees with specific and well-defined risk management functions." [179]  The Company's 2013 Annual Report, which was

---

[179] 2012 Annual Report at 50; *see also* 2013 Annual Report at 53; 2014 Annual Report at 54; 2015 Annual Report at 59.

incorporated by reference into the Company's 2013 Form 10-K,[180] explained the Board's oversight functions through "seven standing committees, all of which report to the full Board. Each of the Board's committees is responsible for oversight of specific risks, including reputation risks. . . ."[181]  The 2013 Annual Report described management's oversight of risk:

> The Board and its committees work closely with management in overseeing risk. Each Board committee receives reports and information regarding risk issues directly from management.  Managers are accountable for managing risks through day-today operations and, in some cases, management committees have been established to inform the risk management framework and provide governance and advice regarding management functions.

371.    On May 22, 2012, at Wells Fargo's Investor Day, Stumpf represented that the employee culture at Wells Fargo involved "telling the truth, doing what's right" and "understanding risk."[182]

372.    Wells Fargo's 2013 Annual Report described the Company's operational risk management:

> We have a long-term customer focus. ***Our focus is on knowing our customers and meeting our customers' long-term financial needs by offering products and value-added services that are appropriate for their needs and circumstances.*** In addition, our team members are committed to operational excellence, and we recognize that our infrastructure, systems, processes, and compliance programs must support the financial success of our customers through a superior customer service experience.[183]

373.    The Annual Report further described the Bank's Operational Risk Management objectives and represented that its operational risk management program "manag[es] operational risk across the Company in a comprehensive, interconnected, and consistent manner, ***in line with the enterprise statement of risk appetite and relevant regulatory requirements***."[184]

---

[180] Wells Fargo & Company 2013 Form 10-K at 11, Item 7A ("Information in response to this Item 7A can be found in the 2013 Annual Report to Stockholders under "Financial Review – Risk Management – Asset/Liability Management." That information is incorporated into this item by reference."); Item 9A ("Information in response to this Item 9A can be found in the 2013 Annual Report to Stockholders under "Controls and Procedures. That information is incorporated into this item by reference.").

[181] *See also* Wells Fargo & Company 2012 Annual Report at 50; Wells Fargo & Company 2014 Annual Report at 54; Wells Fargo & Company 2015 Annual Report at 59.

[182] 2012 Wells Fargo Investor Conference transcript at 4.

[183] *See also* Wells Fargo & Company 2014 Annual Report at 54.

[184] *See also* Wells Fargo & Company 2014 Annual Report at 57; Wells Fargo & Company 2015 Annual Report at 62.

374.    In Wells Fargo's 2014 Annual Report, Defendants incorporated by reference the Company's 2014 Form 10-K, which contained the same or substantially similar language.[185]

375.    Wells Fargo's 2015 Annual Report similarly touted the following "key elements" of the Company's risk framework, which included the purported presence of an independent internal audit function:

> Maintaining an ***independent internal audit function*** that is primarily responsible for adopting a systematic, disciplined approach to evaluating the effectiveness of risk management, control and governance processes and activities as well as evaluating risk framework adherence to relevant regulatory guidelines and appropriateness for Wells Fargo's size and risk profile.

376.    The 2015 Annual Report also stated, "Wells Fargo's incentive-based compensation practices are designed to balance risk and financial reward in a manner that does not provide team members with an incentive to take inappropriate risk or act in a way that is not in the best interest of customers."

377.    Defendants' statements (contained in Wells Fargo's SEC filings, press releases, earnings calls, and other documents or communications) concerning risk controls as well as internal and disclosure controls were materially false and misleading for the reasons stated in Section VI.  In sum:

    a.    The risk controls and oversight policies Defendants touted were not strong and robust but rather were weak and near-nonexistent in several operational segments.  This failure of risk controls and oversight allowed thousands of Wells Fargo employees to illegally open millions of unauthorized checking accounts, credit cards, and other accounts and services, in connection with the Company's cross-selling strategy.  Those ineffective risk controls and procedures systematically failed to evaluate and disclose thousands of reported instances of improper behavior.  This lack of controls persisted despite multiple requests from the OCC to enhance these practices.  As the OCC found (as stated in the Consent Order), Wells Fargo "lacked

---

[185] Wells Fargo & Company 2014 10-K at 10-11, Item 7A ("Information in response to this Item 7A can be found in the 2013 Annual Report to Stockholders under "Financial Review – Risk Management – Asset/Liability Management." That information is incorporated into this item by reference."); Item 9A ("Information in response to this Item 9A can be found in the Wells Fargo & Company 2013 Annual Report to Stockholders under "Controls and Procedures. That information is incorporated into this item by reference.").

1   an enterprise-wide sales practices oversight program, and thus failed to provide sufficient

2   oversight to prevent and detect these illegal behaviors" and "failed to mitigate the risks that

3   resulted from such sales practices."  The OCC also found the Community Bank Group "failed to

4   adequately oversee sales practices and failed to adequately test and monitor branch employee

5   sales practices."  Defendants failed in their responsibility to implement and maintain adequate

6   risk controls at the Company.

7           b.      Defendants caused material deficiencies at the Company that helped

8   perpetuate the illicit account-creation scheme, including the lack of an appropriate control or

9   oversight structure given corporate emphasis on product sales and cross-selling.

10          c.      Defendants failed to cultivate a risk culture designed to promote

11  compliance.  Specifically, Defendants routinely punished or terminated employees who

12  complained about the high-pressure sales culture at the Company, which included sales

13  requirements that could not be achieved through legitimate means.  Defendants also failed to

14  properly address customer complaints.  As the OCC found (as stated in the Consent Order), Wells

15  Fargo "lacked a comprehensive customer complaint monitoring process that impeded" its "ability

16  to assess customer complaints, adequately monitor, manage, and report on customer complaints,

17  and analyze and understand the potential sales practices risk."

18          d.      The compensation practices Defendants implemented were not "designed to

19  balance risk and financial reward in a manner that does not provide team members with an

20  incentive to take inappropriate risk or act in a way that is not in the best interest of customers."[186]

21  As U.S regulators, investigative journalists, and numerous former Wells Fargo employees have

22  detailed, the compensation practices at the Company were the exact opposite of a risk-deterrent

23  and were in reality a driving force behind the illegal behavior detailed in this Complaint.  Indeed,

24  the OCC found (as stated in the Consent Order) that the "incentive compensation program

25  fostered [Wells Fargo's] unsafe or unsound sales practices," and that Wells Fargo employees

26  engaged in illegal behavior "to obtain credit under the incentive-compensation program."  The

27

28  [186] Wells Fargo & Company 2015 Annual Report.

1    CFPB Consent similarly found (as stated in its Consent Order) that thousands of Wells Fargo

2    employees engaged in improper sales practices "to satisfy sales goals and earn financial rewards."

3            e.      Defendants did not maintain a sufficient independent internal audit function;

4    the OCC Consent Order specifically noted Wells Fargo's "audit coverage was inadequate because

5    it failed to include in its scope an enterprise-wide view of the Bank's sales practices."

6            **3.      Defendants Stumpf, Sloan, and Shrewsberry made false or misleading
                        statements regarding the accuracy of financial information contained
7                       in Wells Fargo's SEC filings, and regarding the Company's internal
                        and disclosure controls.**
8
9    378.    Defendants Stumpf, Sloan, and Shrewsberry also violated SOX, which charges

10   corporate officers with reviewing and attesting to (i) the accuracy of financial information

11   reported to the SEC and (ii) the sufficiency of the Company's controls over financial reporting

12   and disclosure.  Indeed, in their September 28, 2016 letter to the SEC, Senators Warren, Merkley,

13   and Menendez stated:

14       Mr. Stumpf's testimony under oath before the Senate Banking Committee raises
         questions about whether he violated the Sarbanes-Oxley Act. ***According to his***
15       ***testimony before the Banking Committee, Mr. Stumpf became aware of the***
         ***widespread fraud occurring at his bank in 2013, yet Mr. Stumpf and the***
16       ***company's CFO submitted certifications relating to SEC filings after 2013 that***
         ***did not indicate any knowledge of this massive fraud***.

17   379.    Each of Wells Fargo quarterly and annual reports identified in this Complaint

18   contained certifications signed by Defendants Stumpf, Sloan, or Shrewsberry pursuant to Section

19   302 of SOX attesting that the financial information contained in the filing was true and did not

20   omit material facts, and that the Company's internal and disclosure controls were effective.

21   Specifically, the SOX certifications included in Wells Fargo's 2015 Form 10-K stated:

22       1.  I have reviewed this annual report on Form 10-K for the fiscal year ended
         December 31, 2015 of Wells Fargo & Company;
23
24       2.  Based on my knowledge, ***this report does not contain any untrue statement of***
         ***a material fact or omit to state a material fact necessary to make the statements***
25       ***made, in light of the circumstances under which such statements were made, not***
         ***misleading with respect to the period covered by this report***;
26
         3.  Based on my knowledge, the financial statements, and ***other financial***
27       ***information included in this report, fairly present in all material respects the***
         ***financial condition, results of operations and cash flows of the registrant as of,***
28       ***and for, the periods presented in this report***;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)), for the registrant and have:

> a) ***Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared***;

> b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

> c) ***Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation***; and

> d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

> a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

> b) ***Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting***.[187]

380.   Moreover, Wells Fargo's SEC filings stated the following concerning the Company's Controls and Procedures:

---

[187] Wells Fargo & Company 2015 Form 10-K at Exhibits 31.A and 31.B.  This statement was repeated in substantially similar form in the Company's filings throughout the Relevant Period, including in the following: 2011 Form 10-K at Exhibits 31.(A) (Stumpf) and 31.(B) (Sloan) (Feb. 28, 2012); 2012 Form 10-K at Exhibits 31.(A) (Stumpf) and 31.(B) (Sloan) (Feb. 27, 2013); 2013 Form 10-K at Exhibits 31.(a) (Stumpf) and 31.(B) (Sloan) (Feb. 26, 2014); 2014 Form 10-K at Exhibits 31.A (Stumpf) and 31.B (Shrewsberry) (Feb. 25, 2015).

**Controls and Procedures**

**Disclosure Controls and Procedures**

The Company's management evaluated the effectiveness, as of December 31, 2015, of the Company's disclosure controls and procedures. The Company's chief executive officer and chief financial officer participated in the evaluation. ***Based on this evaluation, the Company's chief executive officer and chief financial officer concluded that the Company's disclosure controls and procedures were effective as of December 31, 2015.***[188]

381.   Defendants' representations concerning Wells Fargo's internal and disclosure controls identified in ¶¶ 369-81 above were false or misleading for the reasons detailed in Section VI.  Among other things, Wells Fargo's reported cross-selling metrics and financial results derived from them were false or misleading, as a result of the Company's cross-selling strategy designed and implemented to incentivize and reward employees for using illegal means to open accounts for customers they did not want or need, and the controls at the Company relating to financial reporting and disclosure were woefully inadequate and failed to prevent or stop the illicit account-creation scheme.

### C.   The Insider Selling Defendants Unlawfully Profited at Wells Fargo's Expense by Selling Back Shares to the Company at Artificially Inflated Prices.

382.   During the Relevant Period, the Insider Selling Defendants (Stumpf, Tolstedt, Sloan, and Loughlin) took advantage of the artificial inflation of Wells Fargo's shares caused by Defendants' false or misleading statements.  These Defendants collectively sold or otherwise disposed of[189] over $629 million in Wells Fargo stock during that time, all while in the possession of material, non-public information.  The Company's share price was also lifted during that time by the share repurchase program, which was approved despite Defendants' knowledge or reckless disregard of the unlawful practices detailed in this Complaint.

---

[188] Wells Fargo & Company 2015 Annual Report at 131.  This statement was repeated in substantially similar form in the Company's filings throughout the Relevant Period, including in the following: 2011 Annual Report at 112 (Feb. 28, 2012); 2012 Annual Report at 119 (Feb. 27, 2013); 2013 Annual Report at 131 (Feb. 26, 2014); 2014 Annual Report at 129 (Feb. 25, 2015).

[189] The information contained in this section includes both open market and non-open-market transactions.

383.   As detailed in the below chart, between March 2012 and August 2016 Stumpf sold or otherwise disposed of 7,067,446 shares of Wells Fargo common stock for a total of $343,638,237.78:

| Transaction Date | Number of Shares | Transaction Price per Share | Total Value |
|---|---|---|---|
| 3/15/2012 | 3,758 | $34.07 | $128,035.06 |
| 8/3/2012 | 17,077 | $34.34 | $586,424.18 |
| 2/1/2013 | 216,272 | $35.13 | $7,597,635.36 |
| 3/1/2013 | 313,553 | $35.39 | $11,096,640.67 |
| 3/15/2013 | 8,088 | $38.20 | $308,961.60 |
| 7/23/2013 | 333,915 | $44.57 | $14,882,591.55 |
| 7/30/2013 | 38,000 | $43.26 | $1,643,880.00 |
| 10/30/2013 | 460,696 | $43.10 | $19,855,997.60 |
| 10/30/2013 | 300,000 | $43.18 | $12,954,000.00 |
| 3/15/2014 | 336,611 | $47.40 | $15,955,361.40 |
| 10/30/2014 | 627,237 | $52.46 | $32,904,853.02 |
| 11/3/2014 | 725,706 | $53.37 | $38,730,929.22 |
| 11/6/2014 | 160,663 | $54.02 | $8,679,015.26 |
| 11/7/2014 | 168,534 | $54.08 | $9,114,318.72 |
| 3/15/2015 | 351,991 | $55.34 | $19,479,181.94 |
| 12/11/2015 | 30,000 | $53.72 | $1,611,600.00 |
| 3/15/2016 | 303,013 | $49.98 | $15,144,606.73 |
| 5/25/2016 | 1,421,665 | $50.50 | $71,794,082.50 |
| 8/8/2016 | 1,250,667 | $48.91 | $61,170,122.97 |
| **Total** | **7,067,446** | | **$343,638,237.38** |

384.   In addition to sales he made on the open market, between October 2013 and August 2016 Stumpf purchased 5,432,400 shares of Wells Fargo stock through the exercise of employee stock options.   The exercise price for the options ranged from $29.91 per share to $35.06 per share.   The combined cost of purchase of these shares based on the option exercise price was in excess of $172 million. The payment of over $172 million for the exercise price of these options was made by Stumpf to Wells Fargo from the funds he received from the delivery and disposition of 4,485,971 shares to Wells Fargo for a value of over $224 million.   Accordingly, Stumpf in effect sold 4,485,971 shares to Wells Fargo.   The sales of these shares occurred on the same days as Stumpf exercised the options, and were priced at the closing market prices on the New York Stock Exchange ("NYSE"), where Wells Fargo shares are listed,

on the same days as the options exercises. Thus, after paying for the cost of the shares, Stumpf netted over $51.8 million in gains from the sale of these shares to Wells Fargo at prices that were artificially inflated due to his and other Defendants' materially false or misleading statements regarding cross-selling and related issues. Wells Fargo purchased these shares from Stumpf during the same time period when it was engaged in the share repurchase program described in ¶¶ 314-19.

385. Stumpf's two largest insider transactions during the Relevant Period are especially suspicious. On May 25, 2016, Stumpf disposed of 1,421,665 shares of Wells Fargo common stock for a total value of approximately $71.7 million. Just 2½ months later, on August 8, 2016, he disposed of an additional 1,250,667 shares of Wells Fargo common stock for a total value of over $61 million. Each of these sales of Wells Fargo stock by Stumpf was made to Wells Fargo as the buyer at the closing price on the NYSE on that day. After paying for the cost of these shares, which were acquired through options exercises, Stumpf realized a net gain of over $43 million from these two dispositions alone. As depicted in the above chart detailing Stumpf's insider transactions, these two transactions, involving a combined 2.67 million shares, exceeded the approximately 2.4 million shares Stumpf disposed of in 2014 and 2015 combined. Further, the announcement of the Company's $185 million settlement with the CFPB, the OCC, and the L.A. City Attorney's office on September 8, 2016 came just one month after Stumpf's $61 million stock disposition. Stumpf accordingly took full advantage of his insider knowledge, including that a regulatory penalty was imminent, and disposed of over 1.2 million shares of Wells Fargo stock on August 8, 2016 at prices that were artificially inflated due to his and other Defendants' materially false or misleading statements regarding cross-selling and related issues.

386. As detailed in the below chart, between January 2012 and July 2016 Tolstedt sold or otherwise disposed of 2,482,857 shares of Wells Fargo common stock for a total of $118,622,860.27:

| Transaction Date | Number of Shares | Transaction Price per Share | Total Value |
|---|---|---|---|
| 1/11/2012 | 32,238 | $29.62 | $954,889.56 |
| 3/15/2012 | 2,351 | $34.07 | $80,098.57 |

| Transaction Date | Number of Shares | Transaction Price per Share | Total Value |
|---|---|---|---|
| 7/1/2012 | 15,276 | $33.44 | $510,829.44 |
| 7/18/2012 | 243,681 | $33.96 | $8,275,406.76 |
| 2/12/2013 | 301,949 | $35.51 | $10,722,208.99 |
| 3/15/2013 | 3,470 | $38.20 | $132,554.00 |
| 7/1/2013 | 17,552 | $41.36 | $725,950.72 |
| 7/23/2013 | 166,958 | $44.57 | $7,441,318.06 |
| 3/15/2014 | 150,444 | $47.40 | $7,131,045.60 |
| 5/29/2014 | 308,373 | $50.27 | $15,501,910.71 |
| 7/1/2014 | 24,053 | $52.72 | $1,268,074.16 |
| 11/11/2014 | 219,835 | $53.76 | $11,818,329.60 |
| 3/15/2015 | 151,632 | $55.34 | $8,391,314.88 |
| 4/16/2015 | 708,218 | $54.81 | $38,817,428.58 |
| 7/22/2015 | 2,492 | $58.52 | $145,831.84 |
| 3/15/2016 | 129,534 | $49.98 | $6,474,109.32 |
| 7/22/2016 | 2,565 | $48.32 | $123,940.80 |
| 7/28/2016 | 2,236 | $48.13 | $107,618.68 |
| **Total** | **2,482,857** | | **$118,622,860.27** |

387.    In addition to sales she made on the open market, between May 2014 and April 2015 Tolstedt purchased 1,251,090 shares of Wells Fargo stock through the exercise of employee stock options.  The exercise price for the options ranged from $29.91 per share to $35.06 per share.  The combined cost of purchase of these shares based on the option exercise price was in excess of $40 million.  The payment of over $40 million for the exercise price of these options was made by Tolstedt to Wells Fargo from the funds she received from the delivery and disposition of 1,016,591 shares to Wells Fargo for a value of over $54 million.  Accordingly, Tolstedt in effect sold 1,016,591 shares to Wells Fargo.  The sales of these shares occurred on the same days as Tolstedt exercised the options, and were priced at the closing market prices on the NYSE on the same days as the options exercises.  Thus, after paying for the cost of the shares, Tolstedt netted over $13.6 million in gains from the sale of these shares to Wells Fargo at prices that were artificially inflated due to her and other Defendants' materially false or misleading statements regarding cross-selling and related issues.  Wells Fargo purchased these shares from Tolstedt during the same time period when it was engaged in the share repurchase program described in ¶¶ 314-19.

388.    As detailed in the below chart, between March 2012 and August 2016 Sloan sold or otherwise disposed of 2,512,359 shares of Wells Fargo common stock for a total of $119,530,828.37:

| Transaction Date | Number of Shares | Transaction Price per Share | Total Value |
|---|---|---|---|
| 3/15/2012 | 9,387 | $34.07 | $319,815.09 |
| 7/20/2012 | 58,140 | $33.81 | $1,965,713.40 |
| 12/21/2012 | 57,499 | $34.48 | $1,982,565.52 |
| 2/8/2013 | 54,348 | $34.88 | $1,895,658.24 |
| 3/15/2013 | 34,360 | $38.20 | $1,312,552.00 |
| 4/25/2013 | 36,386 | $37.64 | $1,369,569.04 |
| 5/9/2013 | 145,299 | $37.89 | $5,505,379.11 |
| 8/1/2013 | 83,694 | $44.26 | $3,704,296.44 |
| 11/26/2013 | 163,687 | $44.31 | $7,252,970.97 |
| 12/13/2013 | 162,803 | $43.73 | $7,119,375.19 |
| 1/17/2014 | 158,301 | $46.39 | $7,343,583.39 |
| 1/24/2014 | 75,000 | $45.84 | $3,438,000.00 |
| 3/15/2014 | 182,493 | $47.40 | $8,650,168.20 |
| 4/28/2014 | 80,000 | $48.65 | $3,892,000.00 |
| 9/2/2014 | 50,000 | $51.48 | $2,573,950.00 |
| 12/9/2014 | 207,244 | $54.83 | $11,363,188.52 |
| 1/23/2015 | 25,000 | $53.50 | $1,337,500.00 |
| 3/15/2015 | 188,602 | $55.34 | $10,437,234.68 |
| 5/15/2015 | 50,000 | $56.00 | $2,800,000.00 |
| 7/22/2015 | 3,737 | $58.52 | $218,689.24 |
| 10/22/2015 | 24,000 | $54.28 | $1,302,720.00 |
| 10/22/2015 | 204,958 | $54.06 | $11,080,029.48 |
| 3/1/2016 | 109,740 | $48.72 | $5,346,532.80 |
| 3/10/2016 | 10,000 | $48.16 | $481,600.00 |
| 3/15/2016 | 130,506 | $49.98 | $6,522,689.88 |
| 5/2/2016 | 111,100 | $50.59 | $5,620,549.00 |
| 7/22/2016 | 3,847 | $48.32 | $185,887.04 |
| 7/28/2016 | 3,353 | $48.13 | $161,379.89 |
| 8/8/2016 | 20,500 | $48.92 | $1,002,860.00 |
| 8/8/2016 | 68,375 | $48.91 | $3,344,221.25 |
| **Total** | **2,512,359** | | **$119,530,828.37** |

389.    In addition to sales he made on the open market, between July 2012 and August 2016 Sloan purchased 2,014,941 shares of Wells Fargo stock through the exercise of employee

stock options.  The exercise price for the options ranged from $13.05 per share to $34.39 per share.  The combined cost of purchase of these shares based on the option exercise price was in excess of $52.7 million.  The payment of over $52.7 million for the exercise price of these options was made by Sloan to Wells Fargo from the funds he received from the delivery and disposition of 1,585,188 shares to Wells Fargo for a value of over $73.5 million.  Accordingly, Sloan in effect sold 1,585,188 shares to Wells Fargo.  The sales of these shares occurred on the same days as Sloan exercised the options, and were priced at the closing market prices on the NYSE on the same days as the options exercises.  Thus, after paying for the cost of the shares, Sloan netted over $20.7 million in gains from the sale of these shares to Wells Fargo at prices that were artificially inflated due to his and other Defendants' materially false or misleading statements regarding cross-selling and related issues.  Wells Fargo purchased these shares from Sloan during the same time period when it was engaged in the share repurchase program described in ¶¶ 314-19.

390.    As detailed in the below chart, between February 2012 and July 2016 Loughlin sold or otherwise disposed of 999,921 shares of Wells Fargo common stock for a total of $47,607,897.93:

| Transaction Date | Number of Shares | Transaction Price per Share | Total Value |
|---|---|---|---|
| 2/3/2012 | 16,077 | $30.63 | $492,438.51 |
| 3/1/2012 | 4 | $31.54 | $126.16 |
| 3/15/2012 | 948 | $34.07 | $32,298.36 |
| 7/19/2012 | 46,362 | $34.15 | $1,583,262.30 |
| 7/27/2012 | 24,673 | $34.02 | $839,350.79 |
| 3/1/2013 | 309 | $35.39 | $10,935.51 |
| 3/15/2013 | 11,028 | $38.20 | $421,269.60 |
| 3/22/2013 | 23,486 | $37.20 | $873,679.20 |
| 4/15/2013 | 45,000 | $36.89 | $1,659,928.50 |
| 7/15/2013 | 12,355 | $43.35 | $535,589.25 |
| 7/18/2013 | 78,372 | $44.41 | $3,480,500.52 |
| 7/26/2013 | 70,953 | $43.52 | $3,087,661.70 |
| 11/22/2013 | 89,043 | $44.36 | $3,949,947.48 |
| 11/29/2013 | 13,377 | $44.17 | $590,862.09 |
| 2/28/2014 | 25,794 | $46.54 | $1,200,452.76 |

| Transaction Date | Number of Shares | Transaction Price per Share | Total Value |
|---|---|---|---|
| 3/1/2014 | 5 | $46.15 | $230.75 |
| 3/15/2014 | 79,997 | $47.40 | $3,791,857.80 |
| 9/2/2014 | 10,000 | $51.55 | $515,500.00 |
| 10/29/2014 | 10,000 | $51.77 | $517,700.00 |
| 1/23/2015 | 10,000 | $53.47 | $534,700.00 |
| 3/1/2015 | 6 | $55.55 | $333.30 |
| 3/15/2015 | 83,698 | $55.34 | $4,631,847.32 |
| 4/20/2015 | 92,414 | $54.36 | $5,023,625.04 |
| 4/27/2015 | 19,696 | $55.10 | $1,085,249.60 |
| 6/2/2015 | 20,000 | $55.98 | $1,119,600.00 |
| 7/22/2015 | 1,246 | $58.52 | $72,915.92 |
| 10/23/2015 | 68,221 | $54.75 | $3,735,099.75 |
| 11/20/2015 | 67,675 | $55.82 | $3,777,618.50 |
| 12/9/2015 | 20,000 | $54.48 | $1,089,600.00 |
| 3/1/2016 | 6 | $48.72 | $292.32 |
| 3/15/2016 | 56,775 | $49.98 | $2,837,614.50 |
| 7/22/2016 | 1,283 | $48.32 | $61,994.56 |
| 7/28/2016 | 1,118 | $48.13 | $53,809.34 |
| **Total** | **999,921** | | **$47,607,897.93** |

391.    In addition to sales he made on the open market, between November 2013 and November 2015 Loughlin purchased 385,810 shares of Wells Fargo stock through the exercise of employee stock options. The exercise price for the options ranged from $31.40 per share to $34.39 per share. The combined cost of purchase of these shares based on the option exercise price was in excess of $12.5 million. The payment of over $12.5 million for the exercise price of these options was made by Loughlin to Wells Fargo from the funds he received from the delivery and disposition of 317,353 shares to Wells Fargo for a value of over $16.4 million. Accordingly, Loughlin in effect sold 317,353 shares to Wells Fargo. The sales of these shares occurred on the same days as Loughlin exercised the options, and were priced at the closing market prices on the NYSE on the same days as the options exercises. Thus, after paying for the cost of the shares, Loughlin netted over $3.9 million in gains from the sale of these shares to Wells Fargo at prices that were artificially inflated due to his and other Defendants' materially false or misleading statements regarding cross-selling and related issues. Wells Fargo purchased these shares from

Loughlin during the same time period when it was engaged in the share repurchase program described in ¶¶ 314-19.

392.    At the time of these stock transactions, the Insider Selling Defendants knew about or recklessly disregarded material, non-public information regarding the illicit account-creation scheme as detailed in Section VI above, but nonetheless sold or otherwise disposed of Wells Fargo common stock on the basis of that information.

393.    When compared with their peers, Wells Fargo insiders engaged in some of the heaviest insider selling in the banking industry in recent years.  An analysis by the *Financial Times* of the share selling habits of bank executives between 2009 and 2015 found:  "Ranked by sales as a percentage of total holdings, Wells Fargo executives occupy five places in the top 10."[190]  The *Financial Times* analysis reserved special scrutiny for Stumpf, noting he had "sold $38.1m of Wells Fargo stock since 2009, more than the chief executives of Goldman, Morgan Stanley, Bank of America, Citigroup, and JPMorgan Chase put together.  In fact, most of his counterparts have sold nothing."

394.    That article followed another *Financial Times* article, published on June 16, 2015, noting that while Stumpf's position as the second-largest seller among top executives at the six largest U.S. banks (surpassed only by Mike Sherwood, the London-based co-head of Goldman's international division) "could partly be a result of the relative outperformance of Wells Fargo's stock in the past few years," the stock performance "does not account for the gulf between him and most other chief executives, some of whom make a point of selling nothing."[191]

**D.    In Repurchasing Stock, Wells Fargo Relied on Defendants' False or Misleading Statements.**

395.    In repurchasing shares in connection with the stock repurchase program, Wells Fargo relied on Defendants' false or misleading statements, either directly or through the "fraud on the market" doctrine articulated in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), and

---

[190] "Share sale signals from bank executives on Wall Street," Tom Braithwaite, *The Financial Times* (accessed online), June 19, 2015.

[191] "Top US bank executives abandon share sale taboo," https://www.ft.com/content/5662b638-1147-11e5-9bf8-00144feabdc0.

1   *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398 (2014), or through the doctrine

2   articulated in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972).

3         396.   Throughout the Relevant Period, Wells Fargo justifiably expected Defendants to

4   disclose material information as required by law and SEC regulations in the Company's periodic

5   filings with the SEC.  Wells Fargo would not have repurchased its securities at artificially inflated

6   prices had Defendants disclosed all material information then known to them, as detailed in this

7   Complaint.  Thus, reliance by Wells Fargo should be presumed with respect to Defendants'

8   omissions of material information as established under the *Affiliated Ute* presumption of reliance.

9         397.   Additionally, the "fraud on the market" presumption applies to Defendants'

10  misstatements of material fact or failures to disclose material facts.

11        398.   At all relevant times, the market for Wells Fargo's common stock was efficient,

12  for the following reasons, among others:

13        a.   Wells Fargo's stock met the requirements for listing, and was listed and

14  actively traded on the NYSE, a highly efficient and automated market;

15        b.   As a regulated issuer, Wells Fargo filed periodic reports with the SEC and

16  the NYSE;

17        c.   Wells Fargo's common-stock trading volume was substantial on a daily

18  basis, exceeding an average of over 20 million shares per day throughout the Relevant Period;

19        d.   Wells Fargo regularly communicated with public investors via established

20  market communication mechanisms, including through regular disseminations of press releases

21  on the national circuits of major newswire services and through other wide-ranging public

22  disclosures, such as communications with the financial press and other similar reporting services;

23        e.   Wells Fargo was followed by numerous securities analysts employed by

24  major brokerage firms, who wrote reports that were distributed to those brokerage firms' sales

25  force and certain customers, and each of those reports was publicly available and entered the

26  public market place; and

27        f.   The market price of Wells Fargo's stock reacted rapidly to new information

28  entering the market.

CONSOLIDATED AMENDED VERIFIED
STOCKHOLDER DERIVATIVE COMPLAINT
LEAD CASE NO. 3:16-CV-05541-JST

399.    As a result of the foregoing, the market for Wells Fargo's common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in the price of Wells Fargo's stock.  The foregoing facts indicate the existence of an efficient market for trading of Wells Fargo stock and support application of the fraud-on-the-market doctrine.

400.    Wells Fargo relied on the integrity of the market price for the repurchase of its stock and is entitled to a presumption of reliance with respect to Defendants' misstatements and omissions alleged in this Complaint.

401.    Had Wells Fargo known of the material adverse information not disclosed by Defendants, or been aware of the truth behind Defendants' material misstatements, the Company would not have repurchased Wells Fargo stock at artificially inflated prices.

**E.    Neither the Statutory "Safe Harbor" Nor the "Bespeaks Caution" Doctrine Applies to Defendants' Misrepresentations.**

402.    Neither the safe-harbor provision of the Private Securities Litigation Reform Act of 1995 ("PSLRA") nor the judicially created "bespeaks caution" doctrine applicable to forward-looking statements under certain circumstances applies to any of the false or misleading statements pleaded in this Complaint.  None of the subject statements constituted a forward-looking statement; rather, they were historical statements or statements of purportedly current facts and conditions at the time the statements were made, including statements about Wells Fargo's cross-selling metrics, its present financial condition, and its internal controls, among other things.

403.    Alternatively, to the extent any of the false or misleading statements pleaded in this Complaint could be construed as forward-looking statements, they were not accompanied by any meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Further, to the extent the PSLRA's safe harbor would otherwise apply to any forward-looking statements pleaded in this Complaint, Defendants are liable for those false or misleading statements because at the time each of those statements was made, the speaker(s) knew the statement was false or misleading, or

the statement was authorized or approved by an executive officer of Wells Fargo or a Defendant who knew the statement was materially false or misleading when made.

### F. The Group Pleading Doctrine Applies to Defendants' Misstatements and Omissions.

404.   While this Complaint identifies Defendant signatories or speakers with respect to the false or misleading statements identified above (*see* ¶¶ 320-81), the group pleading doctrine also applies to render Defendants responsible for statements as to which they are not explicitly identified as the speaker or signatory.  Defendants participated in the drafting, preparation, or approval of the various shareholder and investor reports and other communications concerning Wells Fargo identified in this Complaint, and were aware of or recklessly disregarded the misstatements contained in those reports and other communications as well as the omissions from them, and were aware of their materially false and misleading nature.  Each Defendant, by virtue of his or her position(s) at Wells Fargo, had access to adverse undisclosed information about the Company's business prospects and financial condition and performance as alleged in this Complaint, and knew or recklessly disregarded that those adverse facts rendered the subject statements materially false or misleading when made.

405.   Defendants, because of their positions of control and authority as officers or directors of Wells Fargo, were able to and did control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Relevant Period. Each Defendant was provided with copies of the documents alleged in this Complaint to be false or misleading prior to or shortly after their issuance, or had the ability or opportunity to prevent their issuance or to cause them to be corrected.  Accordingly, each Defendant is responsible for the accuracy of the public reports, releases, and other statements detailed in this Complaint and is therefore primarily liable for the misrepresentations in them or misleading omissions from them.

### G. Defendants' Misstatements and Omissions Caused Damages to Wells Fargo.

406.   Throughout the Relevant Period, the price of Wells Fargo's common stock was artificially inflated as a result of Defendants' materially false and misleading statements and omissions identified above.  Defendants engaged in a scheme to deceive the market and a course

1   of conduct that operated as a fraud or deceit on Wells Fargo, which repurchased shares at

2   artificially inflated prices.  When Defendants' prior misrepresentations and fraudulent conduct

3   were disclosed and became apparent to the market, the price of Wells Fargo stock fell as the prior

4   artificial inflation dissipated.  As a result of its purchases of Wells Fargo shares during the

5   Relevant Period, the Company suffered damages under the federal securities laws.

6          407.   On August 31, 2016, barely a week before the scandal was revealed, Wells Fargo's

7   common stock closed at $50.80 per share.  On September 7, 2016, the last trading day before

8   Defendants' fraud was revealed, Wells Fargo common stock traded at $49.90 per share.

9          408.   Defendants' disclosures on September 8, 2016 revealed to the market the false and

10  misleading nature of Defendants' statements and omissions.  On that day, the CFPB, the OCC,

11  and the L.A. City Attorney announced that fines in the total amount of $185 million had been

12  levied against Wells Fargo.  The orders, press releases, and other communications and media

13  coverage related to these penalties revealed several facts as described above, including that (i)

14  Wells Fargo employees had fraudulently opened millions of unauthorized checking accounts,

15  credit cards, and other accounts and services in connection with the Company's cross-selling

16  strategy; (ii) the fraudulent conduct occurred because the Company's compensation practices

17  were structured such that employees felt pressured to engage in illegal activity to meet

18  unrealistically high sales quotas; and (iii) the Company lacked the requisite risk controls as well

19  as internal and disclosure controls to detect and prevent its employees from signing up customers

20  for millions of unauthorized checking accounts, credit cards, and other accounts and services.

21         409.   In response to those disclosures, the price of Wells Fargo common stock declined

22  precipitously.  Over a period of several weeks, as new information about the scandal continued to

23  be revealed, Wells Fargo's share price plummeted by over 12%, falling from its September 8,

24  2016 share price of $49.90 to close as low as $43.75 on October 4, 2016, wiping out over $30

25  billion in market capitalization during that time.

26         410.   The decline in Wells Fargo's share price was a direct result of the nature and

27  extent of Defendants' fraud finally being revealed to the market.  The timing and magnitude of

28  the decline in the Company's share price negates any inference that the losses suffered by Wells

1   Fargo were caused by changed market conditions, macroeconomic or industry factors, or

2   Company-specific facts unrelated to Defendants' fraudulent conduct.

3   **IX.   THE REVELATIONS BEGINNING IN SEPTEMBER 2016 SHED FURTHER
        LIGHT ON DEFENDANTS' KNOWLEDGE OR CONSCIOUS DISREGARD OF
4       THE SCHEME, AS WELL AS THE SIGNIFICANT DAMAGES WELLS FARGO
        HAS SUFFERED AND WILL CONTINUE TO SUFFER.**

5       411.   The fallout from the illicit account-creation scheme has been dramatic, severe, and

6   commercially destructive for Wells Fargo.  Further, information gleaned through the various

7   government and regulatory investigations of the Bank, as well as civil litigations against Wells

8   Fargo, have revealed that Defendants were well aware of the scheme for years prior to its public

9   disclosure.

10      **A.   Resolutions with the Los Angeles City Attorney, the CFPB, and the OCC
             Have Revealed Details Concerning the Illicit Account-Creation Scheme and
11           Defendants' Knowledge or Conscious Disregard of It.**

12      412.   On September 8, 2016, news of the Bank's illicit account-creation scheme became

13  public when the Los Angeles City Attorney, the CFPB, and the OCC announced that fines of

14  more than $185 million had been imposed on Wells Fargo for the Bank's misconduct.[192]  In

15  addition to the monetary penalties, the final judgments entered into with these government

16  agencies required Wells Fargo to take steps to prevent similar schemes in the future.  On

17  September 20, 2016, Wells Fargo's then-CEO, Defendant Stumpf, appeared before the Senate

18  Banking Committee in which he, other members of Wells Fargo senior management, and the

19  Board were excoriated for their failure to address the fraudulent misconduct at issue here.  Shortly

20  thereafter, Stumpf resigned from his position as Wells Fargo Chairman and CEO.

21      413.   In a news conference announcing the penalties, regulators said Wells Fargo

22  employees opened roughly 1.5 million bank accounts and applied for 565,000 credit cards that

23  may not have been authorized by customers.  The regulators stated these practices reflected

24  serious flaws in the internal culture and oversight at Wells Fargo.  "Unchecked incentives can

---

[192] *See, e.g.,* Announcement of Los Angeles City Attorney, Mike Feuer, Sept. 8, 2016.
http://www.lacityattorney.org/single-post/2016/09/08/Los-Angeles-City-Attorney-Mike-Feuer-
Achieves-Historic-Result-in-Consumer-Action-Against-Wells-Fargo-Bank-to-Make-Restitution-
to-Customers-Pay-50-million-in-Penalties-Unprecedented-Coordination-with-Federal-Regulators-
to-Benefit-Consumers-Nationwide.

1   lead to serious consumer harm, and that is what happened here," said CFPB Director Richard

2   Cordray.  "The gravity and breadth of the fraud that occurred at Wells Fargo cannot be pushed

3   aside as the stray misconduct of just a few bad apples," he added; "the stunning nature and scale

4   of these practices reflects instead the consequences of a diseased orchard."[193]

5   ### 1.    Settlement with the L.A. City Attorney

6   414.    In announcing the settlement with Wells Fargo on September 8, 2016, L.A. City

7   Attorney Feuer described the settlement as "a major victory for consumers."[194]  He further stated,

8   "Consumers must be able to trust their banks.  They should never be taken advantage of by their

9   banks."

10   415.    The final judgment entered into with the L.A. City Attorney requires that Wells

11   Fargo provide restitution to any customer that suffered a direct monetary loss in connection with

12   an unauthorized account and pay $50 million in civil penalties.

13   416.    The final judgment also directs Wells Fargo to establish policies and procedures

14   requiring that Wells Fargo Community Banking employees provide customers with information

15   about their accounts, including (i) a form document that lists all accounts directly owned by the

16   customer, including an account description and the last four digits of the account numbers; (ii) a

17   printout of a current statement for any of the accounts the customer owns; and (iii) in the event a

18   customer visits a branch and requests to close or cancel any checking or savings account, a

19   written receipt on a form document confirming the account will be closed.

20   417.    The final judgment further mandates that Wells Fargo establish a mediation

21   procedure for current or former customers who contend they incurred fees or were otherwise

22   harmed in connection with an unauthorized account.

23   _____

24   [193] *See, e.g.*, Michael Corkery, *Wells Fargo Fined $185 Million for Fraudulently Opening Accounts*, THE NEW YORK TIMES, Sept. 8, 2016, available at

25   http://www.nytimes.com/2016/09/09/business/dealbook/wells-fargo-fined-for-years-of-harm-to-customers.html?_r=0.

26   [194] Press Release, Los Angeles City Attorney's Office, Sept. 8, 2016, available at http://www.lacityattorney.org/single-post/2016/09/08/Los-Angeles-City-Attorney-Mike-Feuer-

27   Achieves-Historic-Result-in-Consumer-Action-Against-Wells-Fargo-Bank-to-Make-Restitution-to-Customers-Pay-50-million-in-Penalties-Unprecedented-Coordination-with-Federal-Regulators-

28   to-Benefit-Consumers-Nationwide.

CONSOLIDATED AMENDED VERIFIED
STOCKHOLDER DERIVATIVE COMPLAINT
LEAD CASE NO. 3:16-CV-05541-JST

## 2.     Settlement with the CFPB

418.     The same day that the L.A. City Attorney announced the settlement with the Bank, Wells Fargo also entered into a Consent Order with the CFPB.  The Consent Order revealed that the CFPB had reviewed Wells Fargo's sales practices and determined the Bank had engaged in several illegal acts, including (i) opening unauthorized deposit accounts for existing customers and transferring funds to those accounts from their owners' other accounts without the customers' knowledge or consent; (ii) submitting applications for credit cards in consumers' names using consumers' information without their knowledge or consent; (iii) enrolling customers in online-banking services they did not request; and (iv) ordering and activating debit cards using consumers' information without their knowledge or consent.[195]

419.     The CFPB Consent Order detailed the illicit account-creation scheme and noted the internal investigation into Wells Fargo's cross-selling practices, which demonstrated that, without customer knowledge or consent, Wells Fargo employees opened approximately 1.5 million unauthorized deposit accounts; applied for 565,000 unauthorized credit card accounts; and issued, activated, and created PINs for debit cards without authorization and created phony email addresses to enroll consumers in online banking services.[196]  Over five years, more than 5,300 Wells Fargo employees were terminated for that misconduct.[197]

420.     In addition to the monetary penalties imposed by the CFPB, its Consent Order, which remains in effect until September 2021, mandates an overhaul of Wells Fargo's corporate governance policies, procedures, and practices.  An independent consultant with specialized experience in consumer-finance compliance issues has been directed to conduct an independent review of (i) the Bank's retail accounts sales practices with particular attention to employee training; (ii) the Bank's monitoring of employees' sales practices; (iii) its protocols relating to customer complaints, especially regarding improper sales practices; (iv) the Bank's procedures for obtaining and confirming customer consent; and (v) the proper alignment between, on the one

---

[195] *See* CFPB Consent Order.

[196] *Id.*

[197] *Id.*

1    hand, the Bank's performance and sales goals and, on the other, compliance with correct and

2    lawful sales practices.  The Board will be charged with developing a compliance plan grounded in

3    these findings, which must be submitted to the CFPB.[198]

4         421.   In written testimony before the Senate Banking Committee on September 20,

5    2016, CFPB Director Cordray stated the $100 million fine was "the largest fine by far that the

6    Consumer Bureau has imposed on any financial company to date."[199]

7              **3.    Settlement with the OCC**

8         422.   In addition to settling with the L.A. City Attorney and the CFPB, on September 8,

9    2016 the OCC entered its own Consent Order directing that Wells Fargo immediately cease and

10   desist "unsafe" sales practices.  In addition to the OCC's findings about the Bank's deficiencies

11   and unsafe or unsound risk management and oversight of sales practices, the OCC concluded that

12   the Bank "engaged in reckless unsafe or unsound banking practices that were part of a pattern of

13   misconduct."[200]

14        423.   The OCC's Consent Order also charged the Bank with an internal corporate

15   governance review, including appointing and maintaining a Compliance Committee; submitting a

16   Comprehensive Action Plan to ensure the Bank "achieves and maintains an enterprise-wide risk

17   management program designed to prevent and detect unsafe or unsound sales practices";

18   preparing (and providing to the OCC) a report of the Bank's enterprise-wide governance and risk

19   management of sales practices related to deposit accounts, credit card accounts, unsecured lines

20   of credit and related services; adopting an "Enterprise Complaints Management Policy"; and

21   revising its existing monitoring and testing programs.[201]

22        424.   In addition to the above settlements, Wells Fargo announced on September 13,

23   2016 that effective January 1, 2017, it would end product sales goals within its retail banking

24

25   ---
     [198]  *In the Matter of Wells Fargo, N.A.*, 2016-CFPB 0015, Consent Order, Sept 8, 2016, at 10-13.
     http://files.consumerfinance.gov/f/documents/092016_cfpb_WFBconsentorder.pdf.

26   [199] Director Cordray Written Testimony to Senate Banking Committee (Sept. 20, 2016).

27   [200] *In the Matter of Wells Fargo Bank, N.A., Sioux Falls, South Dakota*, AA-EC 2016-67, Consent
     Order, at 3.  https://www.occ.gov/news-issuances/news-releases/2016/nr-occ-2016-106b.pdf.

28   [201] *Id.* at 3-11.

business.[202]  In a January 13, 2017 press release, Wells Fargo confirmed it had "recently launched a new compensation plan in [its] Retail Bank focused on customer service, growth in primary customers, household relationship growth and risk management."[203]

425.    As the investing public digested the information regarding the misconduct at Wells Fargo, the Bank's stock price plummeted.  Between September 8, 2016 and September 16, 2016, Wells Fargo shares dropped almost 9%, from $49.90 to $45.43, wiping out more than $22.5 billion in market capitalization.

B.    **The Congressional Response to the Scandal Further Demonstrated Defendants' Knowledge or Conscious Disregard of the Illicit Account-Creation Scheme.**

1.    **During his testimony before the Senate Banking Committee, Stumpf confirmed Defendants' breaches of fiduciary duty.**

426.    In the wake of the September 8, 2016 settlement with federal and local authorities, U.S. senators and state and national government authorities initiated wide-ranging investigations into the illicit account-creation scheme.  Several letters addressed to the Board, management, and the Company's auditor have continued to reveal Defendants' breaches of fiduciary duty and their fraudulent misconduct throughout the Relevant Period.

427.    On September 16, 2016, Senator Elizabeth Warren, along with Senators Sherrod Brown, Jack Reed, Bob Menendez, and Jeff Merkley, sent a letter to Stumpf, copying Wells Fargo's Human Resources Committee, in which the Senators inquired whether the Bank would use its clawback authority to recover compensation it paid to senior executives, including to Defendant Tolstedt.[204]  The Senators stated:  "This was not the work of a few rogue employees over the course of a few weeks.  *Wells Fargo had a long-standing, systemic problem created by stringent sales quotas and incentives imposed by senior management*."[205]  The letter further

---

[202] Wells Fargo News Release, *Wells Fargo to Eliminate Product Sales Goals for Retail Bankers*, Sept. 13, 2016, available at https://www.wellsfargo.com/about/press/2016/eliminate-sales-goals_0913/.

[203] Wells Fargo Press Release (January 13, 2017) at 8.

[204] Sept. 15, 2016 Letter from U.S. Senators Warren, Brow, Reed, Menendez, and Merkley, available at https://www.warren.senate.gov/files/documents/2016-9-16_Letter_to_Wells_Fargo.pdf.

[205] *Id.*

1   described Tolstedt's role in the "misconduct [that] was occurring," and how the "'strong cross-

2   sell ratios' her division had achieved . . . is a direct reference to the extraordinary number of

3   accounts created by her division, many of which were never authorized by customers."[206]

4      428. On September 20, 2016, Stumpf testified before the Senate Banking Committee.

5   Stumpf's opening remarks to the Committee began to reveal the scope and duration of Wells

6   Fargo's misconduct.  Specifically, Stumpf stated that beginning in August 2015, PwC conducted

7   extensive large-scale data analysis and approximately *1.5 million deposit accounts* and *565,000*

8   *consumer credit card accounts* "were identified as accounts that may have been unauthorized."

9   Furthermore, "PWC calculated that approximately 115,000 of these accounts had incurred $2.6

10  million of fees, which have been refunded to those customers."[207]

11     429. Stumpf acknowledged that the decision to retain PwC was made "in consultation

12  with the regulators and the [Los Angeles] City Attorney's Office."[208]  Specifically, he admitted he

13  *did not* initiate the investigation when he first learned about the illicit account-creation scheme

14  (which he purported was in 2013, but as discussed in this Complaint, was much earlier):  "It was

15  early in 2014, . . . that we finally connected a dot, and *there's no excuse why we didn't connect it*

16  *before*."[209]

17     430. Stumpf further stated he learned of the fraud in 2013 and that the Board learned of

18  it "later [in] 2013 and then 2014 and on."[210]  He further stated the reports "got to the board level –

19  it got to the corporate level in 2013 because progress was not being made.  And the board level in

20  '14, as the corporate resources started to [sic]."[211]  The Board also learned "sometime in 2013"

21  that the Bank's regulators were informed of this growing problem, he testified.  Stumpf further

22  testified:  "And I know in 2014, various committees of the Board were made aware of this.  The

23

----

24  [206] *Id.*

25  [207] Sept. 20, 2016 Senate Banking Committee Hr'g Tr. at 5-6.

    [208] *Id.* at 11.

26  [209] *Id.*

27  [210] *Id.* at 12.

    [211] *Id.* at 13.

28

1  risk committee, the audit and examination [committee], the corporate responsibility

2  [committee]."[212]

3       431.    Stumpf also testified that the then-imminent retirement of Carrie Tolstedt was

4  precipitated in part by communications regarding the findings of PwC's investigation.

5       432.    Stumpf further admitted that senior management and the Board "failed to fulfill

6  [their] responsibility to [Wells Fargo's] customers, [the Company's] team members and to the

7  American public."

8       433.    During the Senate Banking Committee hearing, Senators from both sides of the

9  political aisle condemned the illicit account-creation scheme and the failure to hold any officers

10  or directors accountable for the years of misconduct.  Below are just a few of the criticisms the

11  Senators directed at Stumpf:

12  • Senator Warren:  "You squeezed your employees to the breaking point so you
         could cheat customers and drive up the value of your stock. And when it all
13       blew up, you kept your job, your multi-million dollar bonuses, and went on TV
         and blamed thousands of $12-an-hour employees trying to meet cross-sell
14       quotas. You should resign."[213]  She further stated, "You should give back the
         money you took while this scam was going on and you should be criminally
15       investigated by both the Department of Justice and the Securities and
         Exchange Commission."[214]
16
     • Also from Senator Warren:  "You keep saying, 'The board, the board,' as if
17       these are strangers you met in a dark alley....  You are not passive here.  If you
         have nothing to do, then what are you doing serving as chairman of the board?
18       If you have no opinion on the most massive fraud to hit this bank since the
         beginning of time, how do you get to continue getting a check as chairman of
19       the board."[215]

20   • Senator Toomey:  "You state unequivocally that there are [sic] no orchestrated
         effort or scheme, as some have called it, by the company.  But when thousands
21       of people conduct the same kind of fraudulent activity, it's a stretch to believe
         that every one of them independently conjured up this idea of how they would
22       commit this fraud."[216]

23   • Senator Brown:  "You would think the lessons of the financial crisis, which
         came at such a high cost to our country, would change the way banks do
24

_____

25  [212] *Id.* at 14.

    [213] Sept. 20, 2016 Senate Banking Committee Hr'g Tr. at 28.
26  [214] *Id.*

27  [215] *Id.* at 48-49.

    [216] *Id.* at 17.
28

1   business."[217]

2       434.    Senator Brown further described the scheme as "fraud" that was "not treat[ed] . . .

3   as a big problem until it appeared in the newspapers."[218]  He observed that Wells Fargo failed

4   under every metric that could reasonably be expected of a bank to address the fraudulent scheme,

5   and that "if you pay people on the basis of how many products they sell that's what they'll do,

6   whether it's in the interest of the customers or not."[219]

7       435.    Senator Toomey noted there were "far too few common-sense controls in place [at

8   Wells Fargo] to prevent the kind of abuse that customers were subject to."[220]  He also emphasized

9   the absence of disclosures in the Company's SEC filings of the illicit account-creation scheme:

10  TOOMEY:  When did you begin to disclose in SEC filings that you had this
    potentially material adverse set of circumstances that could certainly have huge
11  damage to your reputational value?

12  STUMPF:  Well, I can't answer that.  I'd have to get to our legal team.  I don't
    have that in front of me.  I'd just have to get back to you on that.  I don't know.
13
    TOOMEY:  Well, we haven't been able to discover such a disclosure and the SEC
14  very clearly requires disclosure of material adverse circumstances.  And I don't
    know how this could not be deemed material.  I think the market cap lost nine
15  percent over the last couple of weeks, that's pretty material.

16  STUMPF:  Yeah, well, from a financial perspective, you know $2.6 million.  And,
    it's $2.6 million too much …
17
    TOOMEY:  I get that those dollar amounts might not qualify as material to a bank
18  the size of Wells Fargo but the reputational damage done to the bank is clearly
    material.  And that has been manifested by this huge, adverse movement in stock
19  prices.[221]

20          **2.      Additional testimony by Stumpf, as well as additional congressional
                      actions, further confirmed the extent of Defendants' misconduct.**
21
        436.    The criticism continued after the hearing.  Ed Mierzwinski, consumer program
22
    director at the U.S. Public Interest Research Group, said Stumpf's apology was not enough to
23

24  _____

25  [217] *Id*. at 3.

26  [218] *Id*. at 2.

    [219] *Id*. at 3.
27
    [220] *Id*. at 15.
28
    [221] *Id*. at 16-17.

1    contain the scandal.  "I think the CEO of Wells Fargo failed to disprove that it was a massive

2    fraud," said Mierzwinski, who attended the hearing.  "No senator believed him."[222]

3            437.    On September 22, 2016, Senators Warren, Brown, Reed, Menendez, Merkley,

4    Bernie Sanders (I-VT), Kirsten Gillibrand (D-NY), and Mazie Hirono (D-HI) sent a letter to

5    Labor Secretary Tom Perez and Wage and Hour Division Administrator David Weil.[223]  The

6    September 22, 2016 letter stated "a company that fired 5,300 employees over five years due to

7    improper selling but made little effort to change its policies - does not appear to be grounded in

8    reality."[224]

9            438.    On September 28, 2016, Senator Warren addressed the egregious compensation of

10   Wells Fargo's executives, in a letter to Defendant Sanger.[225]  Senator Warren noted the Board's

11   compensation decisions were not a true "clawback" because they did not recoup earlier

12   compensation or vested stock awards.[226]  The piecemeal measures instead merely "disqualify

13   these senior executives from this year's future bonus - which may well be nominal, given the

14   company's poor stock performance to date in 2016 - and unvested equity awards."[227]  Senator

15   Warren pressed the independent directors, stating that if "senior executives like John Stumpf and

16   Carrie Tolstedt were responsible for the sales goals, incentives, and firm culture that led to this

17   massive scam, then forfeiting a fraction of their future compensation does not remotely approach

18   real accountability."[228]

19

20

21   [222] *E.g.*, James Rufus Koren, *Wells Fargo CEO's testimony was not believable, expert says*, LOS
     ANGELES TIMES, Sep. 20, 2016, available at http://www.latimes.com/business/la-fi-wells-fargo-
22   live-1474402107-htmlstory.html.

     [223] September 22, 2016 Letter from U.S. Senators to Labor Secretary Tom Perez and Wage and
23   Hour Division Administrator David Weil, available at
     https://www.warren.senate.gov/?p=press_release&id=1248.
24   [224] *Id.*

25   [225] September 28, 2016 Letter from U.S. Senator Warren to Steven Sanger, available at
     https://www.warren.senate.gov/?p=press_release&id=1265.
26   [226] *Id.*

27   [227] *Id.*

28   [228] *Id.*

1    439.    Also on September 28, 2016, the State of California issued sanctions on Wells

2    Fargo that included (i) the suspension of investments by the Treasurer's Office in all Wells Fargo

3    securities; (ii) suspension of the use of Wells Fargo as a broker-dealer for purchasing of

4    investments by the Treasurer's office; and (iii) suspension of Wells Fargo as a managing

5    underwriter on negotiated sales of California state bonds.   California Treasurer John Chiang

6    stated "opening fraudulent accounts for the purpose of extracting millions in illegal fees

7    demonstrates, at best, a reckless lack of institutional control, and, at worst, a culture which

8    actively promotes wanton greed."  Chiang added:  "Just days before the bank admitted these

9    wrongdoings, the company touted its 'deep culture and right team' to investors in the company's

10   securities. Wells Fargo has not lived-up to its billing."

11   440.    On September 29, 2016, Stumpf returned to Washington D.C. to testify before the

12   House Financial Services Committee.[229]   Representatives expressed their disdain for Stumpf's

13   and the Board's practices:

14   - Rep. Maxine Waters compared the fraudulent account opening practices to identity
     theft, stating:  "***Let's call it what it really is: some of the most egregious fraud we***
15     ***have seen since the foreclosure crisis***."[230]

16   - Texas representative Jeb Hensarling, chair of the Financial Services Committee,
     added that:  "Fraud is fraud and theft and is theft.  What happened at Wells Fargo
17     over the course of many years cannot be described any other way."[231]

18   - Rep. Carolyn Maloney questioned the timing of when Stumpf first learned of the
     accounts, and noted that Stumpf sold $13 million of Wells Fargo stock right after
19     finding out about the fraudulent accounts:  "The timing is very, very suspicious
       and raises some serious questions."[232]
20
21   - Rep. Gregory Meeks stated:  "I can't believe what I'm hearing here."  Meeks listed
     several times that the bank had been penalized in 2013.  "You're going to tell me
22     there's not a problem with the culture" at Wells Fargo, Meeks added.  Further,
       Meeks said Stumpf was running a "criminal enterprise," noting the bank had been
23     penalized multiple times during the CEO's leadership, and should step down.  "I
       serve at the pleasure of the board," Stumpf responded.  "Then the entire board
24     needs to go," Meeks said. "Something is going wrong at this bank."[233]

25   _____

     [229] *See* Sept. 29, 2016 House Financial Services Committee Hr'g Tr.
26
     [230] *Id*. at 2.
27   [231] *Id*. at 1.
     [232] *Id*. at 10.
28   [233] *Id*. at 20.

- • Rep. Stephen Lynch stated the situation "covers every aspect of fraud" and "under the Racketeer Influenced and Corruption Act ... you've satisfied all the elements of that.  No. 1 is fraud, and there is no question about that -- mail fraud, securities fraud, you've done it all.  You've covered basically every aspect of fraud in your bank over the last five years."

441.    On September 29, 2016, members of the Senate Banking Committee, Senators Merkley, Warren, and Menendez, formally called on the SEC to investigate Defendants for violations of the securities laws.  Noting the DOJ, DOL, and state attorneys general, among others, already had begun investigating, the Senators concluded:  "The SEC should join in these efforts to ensure that Wells Fargo and its senior executives are held accountable for a ***massive, years-long fraud that hurt thousands of customers and potentially cost investors billions of dollars***."   The Senators requested SEC investigations into securities law violations in three areas: (i) violations of the internal controls provision of SOX by signing off on inaccurate financial reporting; (ii) violations of the Securities Act of 1933 and the Exchange Act by failing to disclose problems with fake accounts at the same time Stumpf was promoting the Company's high cross-selling numbers as a reason to invest in Wells Fargo; and (iii) whether Wells Fargo violated whistleblower protection laws by firing employees after they tried to report misconduct. Specifically, the letter noted Stumpf touted Wells Fargo's cross-selling success "with knowledge that many of these retail accounts were created without customer authorization."

442.    As noted above, on October 12, 2016, Stumpf abruptly resigned from Wells Fargo and was replaced as CEO by Sloan, the Company's President and former COO and as Board Chair by Defendant Sanger.  Prior to his resignation, Stumpf confirmed he would forgo $41 million in unvested Wells Fargo stock.

443.    On October 20, 2016, Senators Warren and Menendez wrote to the Board to raise concerns related to Stumpf's resignation and the promotion of Sloan as the Company's new CEO, stating "a resignation alone is not enough to assure proper accountability at Wells Fargo," but rather "raises additional questions."  As stated in the letter, Stumpf's "reduced compensation represents only a fraction of the total pay and bonuses [he] received during the years that his compensation was based in part on inflated retail account growth and cross-selling success." Senators Warren and Menendez further stated it was unclear "if the Board has properly addressed

the question of whether Tim Sloan . . . knew about or played any role in the scandal," *as Sloan had admitted that he was aware of the reports of fraudulent activity since at least 2013*.   The Senators added, "it is difficult to believe that [Sloan] had no knowledge of or bears no responsibility for the actions of thousands of Wells Fargo employees creating fake accounts under his and other top executives' watch."   The Senators further expressed they "continue to have questions about who is being held accountable at Wells Fargo."  The letter further states:

> If Mr. Stumpf is allowed to walk away with tens of millions of dollars in compensation that he received while bank employees were engaging in widespread fraudulent activity, *then he has profited from the bank's fraud*.  And if Mr. Stumpf is simply replaced by another top company executive who was aware of, but did nothing to prevent the widespread fraud that harmed hundreds of thousands of Wells Fargo customers and shareholders, then the bank is turning its back on accountability.

## X.    ADDITIONAL DAMAGES TO WELLS FARGO

### A.    Wells Fargo Has Lost Significant Business Due to the Scandal.

444.    Defendants' misconduct has wrought extreme reputational damage upon the Company.  This is especially harmful to Wells Fargo because banking, and particularly retail banking, is an industry built on customer trust.  Wells Fargo has taken great pains to set itself apart from its competitors, holding itself out as a bank for Main Street rather than Wall Street.  As Wells Fargo emphasizes in its own literature:

> We have a responsibility to always act with honesty and integrity. When we do so, we earn the trust of our customers. We have to earn that trust every day by behaving ethically, rewarding open, honest communication, and holding ourselves accountable for our decisions and actions. [234]

445.    Defendants clearly breached this trust by acting in direct contravention of the Bank's publicly-touted credo.  This reputational harm undoubtedly translates into long-term damage to the Company.

446.    Further, J.P. Morgan downgraded Wells Fargo stock following the disclosure of the $185 million in civil penalties, with analyst Vivek Juneja warning that the Bank has suffered a "material reputational hit" and that "mounting public scrutiny" of the unauthorized account openings "will result in additional investigations."  That is likely to "pressure expenses and

---

[234] Wells Fargo Code of Ethics and Business Conduct.

revenues" at Wells Fargo, leading Juneja to conclude that there was "significant uncertainty" about how the issue will affect the Bank, he wrote in a research note.

447.    The $185 million in fines Wells Fargo already has been forced to pay is likely the tip of the iceberg, given that the Company remains subject to a litany of criminal and civil lawsuits and investigations by both governmental and private entities.

448.    The costs to Wells Fargo in terms of lost revenue and profits from the illicit account-creation scheme have yet to fully materialize.  Initial reports, however, suggest the costs associated with the scandal will continue to grow.

449.    Indeed, in its Q3 2016 Form 10-Q, the Company disclosed it had increased its litigation loss reserves to $1.7 billion as of September 30, 2016, an increase of $700 million from the previous high end range of $1 billion.  According to the Form 10-Q, the increase was related to "mortgage related regulatory investigations" and "sales practices matters."

450.    In a November 17, 2016 press release, Wells Fargo reported that new consumer account openings had *fallen 44% in October 2016* over the year prior.[235]  October 2016 reflected the first pull month of impact of Wells Fargo's settlement with the CFPB, the L.A. City Attorney, and the OCC.

451.    On December 16, 2016, Wells Fargo issued another press release with Retail Banking customer activity data for November 2016.  The November 2016 data reflected that new consumer checking account openings continued to fall, down an additional 9% from the previous month, and *down 41% overall* from November 2015.[236]

452.    On February 17, 2017, Wells Fargo issued a press release with Retail Banking consumer activity data for January 2017.  The January 2017 data reflected new consumer checking account opens were *down 31%* from January 2016.

453.    The significant drop-off in account openings was consistent with an October 2016 Mini-Study of Wells Fargo by advisory firm CG42, which sought to "model[] the impact of Wells

---

[235] Wells Fargo Press Release (November 17, 2016) at 2.

[236] Wells Fargo Press Release (December 16, 2016) at 2.

1   Fargo's fraudulent sales scandal on its reputation, competitive position and finances."[237]  The

2   Mini-Study examined several questions, including "To what degree has Wells Fargo's reputation

3   been tarnished by the scandal?" and "What is Wells Fargo's projected financial loss – both in

4   terms of deposit and revenues—over the next 12-18 months?"

5   454.   The Mini-Study was an online study conducted between October 18 and October

6   20, 2016.  The Mini-Study included a total of over 1,500 primary customers of the top 10 U.S.

7   banks, 1,000 of whom were Wells Fargo primary customers and the remaining 500 of whom were

8   customers of other banks (Bank of America, Chase, Citibank, SunTrust, BB&T, TD Bank, PNC

9   Bank, Capital One, and US Bank).  According to the Mini-Study, the sample was representative

10  of the U.S. market.

11  455.   The Mini-Study highlighted the effect the scandal is likely to have on existing

12  customers.  In particular, it noted that while only 3% of Wells Fargo's customers reported being

13  affected by the scandal, 14% were projected to switch banks in the next 12-18 months,

14  representing $99 billion in deposits and $4 billion in revenues lost.  The Mini-Study concluded

15  "the full financial impact of the scandal is yet to be felt."

16  456.   The Mini-Study also concluded that not only will Wells Fargo lose existing

17  customers as a result of the scandal, but the scandal has also significantly limited Wells Fargo's

18  ability to attract new customers.  According to the Mini-Study, prior to the scandal, 21% of

19  prospective customers stated they were "very" or "extremely likely" to consider doing business

20  with Wells Fargo.  After the scandal, only 3% say they would do business with the Bank.

21  457.   The Mini-Study also highlighted Wells Fargo's historical focus on cross-selling

22  and the negative reaction customers had to such tactics, noting that its 2011-2015 Retail Banking

23  Vulnerability Studies predicted Wells Fargo "stood to lose tens of billions of dollars in revenues

24  and deposits if they did not address the frustration of 'trying to be sold on products I don't need or

25  want,' which customers reported as the one frustration they experience most frequently" with

26  Wells Fargo.

27

28  [237] Available at http://cg42.com/2016-wells-fargo-scandal-impact-study/.

CONSOLIDATED AMENDED VERIFIED
STOCKHOLDER DERIVATIVE COMPLAINT
LEAD CASE NO. 3:16-CV-05541-JST

458.    The illegal practices and Defendants' gross failures to timely address, remedy, or disclose them also severely damaged Wells Fargo's reputation within the business community and in the capital markets, as evidenced by, for example, the more than $22.5 billion loss in market capitalization after the illicit account-creation scheme, and Defendants' knowledge of or conscious disregard of it, were revealed.  Further, Wells Fargo's customers and current and potential investors consider a bank's ability to protect its customers, curb known abuses, and implement adequate controls to ensure illegal practices are timely discovered and properly addressed.  Customers are less likely to use banks that knowingly permit or encourage unscrupulous behavior, and investors are less likely to invest in companies that lack internal controls and fail to timely disclose material information. Wells Fargo's ability to attract customers and investors is now impaired.  Indeed, several states and cities already have withdrawn their business from the Company as a result of the wrongdoing detailed in this Complaint and have urged other states to do the same.

459.    On September 28, 2016, for example, the State of California suspended Wells Fargo from underwriting state debt and handling the state's banking transactions.  California State Treasurer John Chiang announced that the suspension, effective immediately, will remain in place for 12 months and a "permanent severance" will result if the Company fails to change its wrongful practices.  Further, California will no longer add to its investments in Wells Fargo securities and has already replaced Wells Fargo with Loop Capital for two transportation deals totaling about $527 million.  Describing the reasons for California's termination of Wells Fargo, the State Treasurer pointed to the "venal abuse of its customers by secretly opening unauthorized, illegal accounts illegally extracted millions of dollars between 2011 and 2015."

460.    Chiang urged other state treasurers to similarly withhold business from the Company, stating "[t]hose that have the financial wherewithal, those who have the courage, I think they ought to follow suit."

461.    Other states followed California's lead.  For example, on September 29, 2016, Illinois Treasurer Michael Frerichs announced that Wells Fargo will lose millions of dollars in fees after the state suspended $30 billion in investment activity.  On October 3, 2016, Treasurer

1   Frerichs suspended $30 billion in state investment activity with Wells Fargo due to the illicit

2   account-creation scheme.

3       462.    On October 14, 2016, Ohio Governor John Kasich issued a press release

4   announcing the state was "barring Wells Fargo & Company from participating in future state debt

5   offerings and financial services contracts initiated by state agencies under his authority" and that

6   he would "seek to exclude Wells Fargo from participating in debt offerings initiated by the Ohio

7   Public Facilities Commission (OPFC)."  Governor Kasich stated:  "It's clear that Wells Fargo's

8   culture was compromised by greed and by a desire to make money that was stronger than a

9   commitment to following proper ethical standards. . . . This company has lost the right to do

10  business with the State of Ohio because its actions have cost it the public's confidence."

11      463.    Massachusetts followed suit on October 17, 2016.  Treasurer Deborah Goldberg

12  suspended Wells Fargo for one year from acting as a bond underwriter for the state.

13      464.    On October 11, 2016, New York Governor Andrew Cuomo announced that the

14  state's financial regulator, the New York Department of Financial Services ("NYDFS"), was

15  issuing "new guidance" designed to restrict incentive pay for bank employees, requiring banks to

16  tie those incentives to proper corporate behavior.  According to Governor Cuomo's office, the

17  NYDFS guidance directs all state-regulated banks in New York to ensure any employee incentive

18  arrangements do not encourage "inappropriate corporate practices."

19      465.    On November 3, 2016, the Pennsylvania treasury announced that it suspended the

20  Company from any treasury investment or trading activities in the state for a year because of its

21  "fraudulent accounts scandal."   As stated by Pennsylvania Treasurer, Timothy Reese, "the bank's

22  actions call into question its internal controls and culture, and until the bank fixes those problems,

23  they will not be eligible for investment or trading work with Treasury."

24      466.    On November 28, 2016, California State Senate's Committee on Banking and

25  Financial Institutions held an oversight hearing—"An Examination of Wells Fargo's Sales

26  Practices and Management and Board Oversight"—"to highlight new information that has come

27  to light since the September settlement agreements were announced and identify key questions

28  that remain unanswered about Wells Fargo's actions."   Wells Fargo did not attend the hearing

1    and the California State Senate's Committee on Banking and Financial Institutions' Chairman

2    stated that "[t]heir unwillingness to stand before this committee is a sign of bad faith with their

3    customers and all of California," going on to compare the Bank's absence to Enron's failure to

4    appear at a 2002 Senate committee hearing, stating that "[i]t is sad to see Wells Fargo join this

5    elite hall of shame."

6         467.   In addition to those states, the cities of Chicago, Seattle, and Sacramento have

7    independently suspended business with Wells Fargo.  Those city suspensions could themselves

8    result in significant lost revenue for Wells Fargo.  Wells Fargo has, for example, earned $19.5

9    million in fees from Chicago since 2005.

10        468.   Further, as a direct and proximate result of Defendants' actions, Wells Fargo has

11   expended and will continue to expend significant additional money, including:

12        a.    costs incurred in defending against, and the potential settlement of, civil

13   and criminal legal proceedings brought against the Company related to the illicit account-creation

14   scheme; and

15        b.    costs incurred from the substantial compensation and benefits paid to

16   Defendants, who are liable for the illicit account-creation scheme.

17        469.   Among those legal proceedings, on September 16, 2016, a consumer class action

18   complaint was filed against Wells Fargo in the United States District Court for the District of

19   Utah seeking in excess of $5 million for the unauthorized opening of customer accounts.[238]

20   Given the high publicity of Wells Fargo's misconduct, the number of fraudulent accounts opened

21   by Wells Fargo employees, and the fact that customers' credit reports may have been negatively

22   affected by the misconduct, additional consumer class actions are likely to be filed in the future.

23        470.   A putative shareholder class action was also filed in this District on September 29,

24   2016, asserting claims under the federal securities laws against Wells Fargo and others.[239]

25        471.   A class action complaint on behalf of all other similarly-situated participants in,

26   and beneficiaries of, Wells Fargo & Company's 401(k) Plan for violations of Sections 409 and

27   [238] *Lawrence K. Mitchell et al., v. Wells Fargo Bank et al.*, Case 2:16-cv-00966.

28   [239] *Hefler v. Wells Fargo & Company*, 3:16-cv-05479-JST (N.D. Cal.).

1    502 of the Employee Retirement Income Security Act has been filed in the District of

2    Minnesota.[240]

3          472.    A class action alleging violations of the Racketeer Included and Corrupt

4    Organizations Act has been filed in this District.[241]

5          473.    Additionally, federal prosecutors in the U.S. Attorney's Offices for the Southern

6    District of New York and the Northern District of California have opened investigations into

7    Wells Fargo's sales practices.  The prosecutors have issued a subpoena to the Bank for documents

8    and materials.

9          474.    The Company must shoulder the cost of defending against the new investigations,

10   which could result in criminal as well as civil penalties.

11         **B.     The Clawback of a Portion of Stumpf's and Tolstedt's Ill-Gotten Gains Is "a
            Dollar Short and a Day Late."**

12         475.    On September 28, 2016, the Board announced that the Bank would claw back

13   compensation valued at $41 million and $19 million, respectively, from Stumpf and Tolstedt.

14   The announcement came one day before Stumpf would have to return to Capitol Hill and face

15   further questioning, this time before the House Committee on Financial Services.  As analysts

16   were quick to note, instead of constituting any type of true reckoning by the Board for its long-

17   ongoing oversight failures, the clawback measure appeared to be an attempt to buy more time to

18   deal with the scandal and was "more about optics than substance."[242]

19         476.    Indeed, while overseeing and encouraging Wells Fargo's aggressive sales culture,

20   Stumpf and Tolstedt together earned nearly $300 million and caused untold damage to the Bank.

21   Given Defendants' failures and the significant damage suffered by the Bank as result, the public

22   reaction to the announcement was as dismissive as it was swift—as one analyst put it:  "The bank

23

24   _____

25   [240] *In Re: Wells Fargo ERISA 401(k) Litigation*, 0:16-cv-03405-PJS-BRT (D. Minn.).

     [241] *Hogan et al v. Wells Fargo & Company et al.*, 4:16-cv-07360-DMR (N.D. Cal.).

26   [242]  Elizabeth Dexheimer Dakin Campbell, and Caleb Melby, *Wells Fargo's CEO Forfeits $41
     Million in Fight to Keep Job*, BLOOMBERG, Sept. 28, 2016, available at
27   http://www.bloomberg.com/news/articles/2016-09-27/wells-fargo-ceo-forfeits-more-than-41-
     million-amid-board-review.
28

1  already waited too long to start sanctioning top executives ... 'It's a dollar short and a day

2  late.'"[243]

3  **XI.   DEMAND ON THE WELLS FARGO BOARD WOULD HAVE BEEN FUTILE**

4        477.   Plaintiffs have not made a demand on the Board to institute this action against

5  Defendants because, for the reasons detailed above and as further set forth below, any such

6  demand would be a futile and useless act.

7        478.   The facts detailed in this Complaint demonstrate that the Director Defendants (i)

8  affirmatively adopted, implemented, and condoned a business strategy based on deliberate and

9  widespread violations of applicable law, which is not a legally protected business decision and

10  can in no way be considered a valid exercise of business judgment; and/or (ii) consciously

11  disregarded numerous red flags of misconduct throughout the Relevant Period, subjecting them to

12  a substantial likelihood of liability as to Plaintiffs' claims against them in this action. *See* ¶¶ 123-

13  271.  Accordingly, demand on the Board is excused.

14        **A.   Demand Is Excused Because the Director Defendants' Conduct Did Not**
          **Constitute a Valid Exercise of Business Judgment.**

15        479.   Plaintiffs did not make a demand on the Wells Fargo Board prior to instituting this

16  action because the wrongful acts complained of in this Complaint evidence a pattern of conduct

17  showing a wholesale abandonment of the Director Defendants' fiduciary duties.  Those acts,

18  which are detailed in ¶¶ 123-271 above, include:

19        a.   allowing Wells Fargo employees to engage in the pervasive illicit account-

20  creation scheme that involved secretly signing up customers for over two million unauthorized

21  accounts (*see* ¶¶ 151-238; 244-52; 258-62);

22        b.   allowing Wells Fargo insiders—Stumpf, Sloan, Tolstedt, and Loughlin—to

23  engage in insider selling while in possession of material, non-public information relating to the

24  illicit account-creation scheme (*see* ¶¶ 382-394);

25        c.   perpetuating woefully inadequate controls over the Company's financial

26  reporting, corporate governance, and risk monitoring, which allowed the illicit account-creation

27  _____
[243] *Id.*

28

1   scheme to begin and persist for years, and allowed the Insider Selling Defendants to sell millions

2   of dollars' worth of Wells Fargo stock at prices that were artificially inflated due to Defendants'

3   misconduct (*see* ¶¶ 239-45; 369-377);

4          d.      causing Wells Fargo to file materially false and misleading SEC filings

5   (*see* ¶¶ 272-311; 312-81);

6          e.      approving a share repurchase program through which Wells Fargo bought

7   back millions of shares of stock at artificially inflated prices (*see* ¶¶ 382-401); and

8          f.      causing the Company to give inflated compensation packages to Stumpf,

9   Sloan, Shrewsberry, Tolstedt, and Loughlin during the Relevant Period that were out of

10  proportion to their actual performance, i.e., absent the illicit account-creation scheme (*see* ¶¶ 263-

11  271; 272-311).

12         480.    These acts, and the other improper acts set forth in this Complaint, which

13  demonstrate a pattern of misconduct, were not the product of a valid or good faith exercise of

14  business judgment, nor could they have been.

15         481.    The Director Defendants' misconduct at the heart of this case constitutes the direct

16  facilitation of violations of federal law, including knowingly and consciously presiding over the

17  Company's systematic deficiencies and unsound practices in the Bank's risk management and

18  oversight of the Bank's sales practices, as well as concealing the illicit account-creation scheme

19  and its corresponding effects on Wells Fargo's financial results.  Among other things, the

20  Director Defendants made, or caused Wells Fargo to make, materially false or misleading

21  statements (such as in Wells Fargo's Form 10-Ks filed with the SEC during the Relevant Period).

22         482.    The Director Defendants' blatant and repeated disregard of their responsibility to

23  safeguard the Company against wrongdoing indicate they knowingly adopted, endorsed, or

24  condoned a business strategy that incorporated the illicit creation of unauthorized accounts, which

25  cannot be considered a legitimate exercise of business judgment.  Demand is therefore excused.

26

27

28

**B.**    <u>**Demand Is Excused Because the Director Defendants Face a Substantial Likelihood of Liability Due to Their Knowledge or Conscious Disregard of Facts Relating to the Illicit Account-Creation Scheme.**</u>

483.    Demand is also excused because the Director Defendants face a substantial likelihood of liability for the claims alleged against them in this Complaint, given their awareness or conscious disregard of significant red flags relating to the illicit account-creation scheme.

484.    More specifically, under the Audit and Examination Committee Charter, Defendants Baker, Dean, Hernandez, Milligan, Peña, Quigley, Swenson, and Vautrinot, as members of that Committee, owed specific duties to Wells Fargo that related directly to the misconduct alleged in this Complaint.  The Audit and Examination Committee's Charter charges the Committee with the obligation to oversee and monitor the Bank's compliance with laws and regulations, including minimizing the Bank's financial crimes/money-laundering/reputational risk.  During the Relevant Period, the Committee received regulatory examination reports, and at least quarterly received summaries of significant examination reports and significant communications from regulators.  At a minimum, then, the Audit and Examination Committee failed to act when the Committee and Stumpf received a letter in September 2007 from an employee discussing how the Gr-Eight Initiative created a high pressure sales culture that resulted in "unethical and illegal activity," including "routine deception and fraudulent exploitation of [Wells Fargo's] clients."  The letter warned:  "Left unchecked, the inevitable outcome shall be one of professional and reputational damage, consumer fraud and shareholder lawsuits, coupled with regulator sanctions."

485.    Similarly, the Committee failed to act when it received information about the OCC's February 2013 Supervisory Letter to the Bank regarding serious deficiencies in the Bank's operational risk compliance program, the OCC's April 2015 Supervisory Letter requiring the Bank to address the governance of its sales practices, the OCC's June 2015 Supervisory Letter regarding required corrective action in the Bank's enterprise-wide risk management and oversight of its sales practices, the July 2015 OCC Notice of Deficiency, the 2014 FINRA fine for anti-money-laundering failures, and the November 2015 OCC Consent Order regarding the Bank's deficiencies in internal controls with regard to compliance with the BSA.

486.    The members of the Audit and Examination Committee failed to meet their obligations as provided in the Audit and Examination Committee Charter, in addition to their duties imposed by law, because despite the numerous regulatory fines, examinations, and reports finding fundamental failings in the Bank's internal controls, they did not cause Wells Fargo to remediate those control deficiencies.  The Audit and Examination Committee's deliberate failure of oversight constituted breaches of their fiduciary duties to Wells Fargo and has resulted in significant harm to the Company.

487.    Further, as members of the Audit and Examination Committee, Defendants Baker, Peña, Quigley, Swenson, and Vautrinot were charged with assisting the Board in overseeing the integrity of the Bank's financial statements and the adequacy and reliability of disclosures to its stockholders, including the Company's internal and disclosure controls.

488.    But Wells Fargo's internal and disclosure controls were deficient, causing the Bank to issue materially false and misleading information regarding the Company's cross-selling metrics.  The Audit and Examination Committee was directly responsible for approving the Company's materially false and misleading annual Forms 10-K and quarterly Forms 10-Q, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," as well as the Company's earnings press releases during the Relevant Period.

489.    Accordingly, there is significant doubt that these Defendants are disinterested because they face a substantial likelihood of liability for their breaches of fiduciary duties, including their duties of good faith, fair dealing, and loyalty, as well as other violations of law.

490.    Additionally, pursuant to the Board's Risk Committee Charter, Defendants Dean, Duke, Hernandez, Milligan, Peña, Quigley, Runstad, and Sanger, as members of that Committee, likewise owed specific duties to Wells Fargo that were implicated by the misconduct alleged in this Complaint.  The Risk Committee's Charter charges its members with "[a]pprov[ing] and oversee[ing] the Company's enterprise-wide risk management framework and structure, including through the approval of the risk management framework which outlines the Company's approach to risk management and the policies, processes, and governance structures."  The OCC

1   investigations and resulting Supervisory Letters found that the Bank's risk management

2   framework was significantly deficient, yet the Committee members did not rectify those

3   deficiencies.  These Defendants breached their fiduciary obligations to the Company, and

4   therefore cannot impartially consider a demand to address the wrongdoing detailed in this

5   Complaint.

6            491.    Further, under the Board's Corporate Responsibility Committee Charter,

7   Defendants Baker, Chao, Dean, Hernandez, Milligan, Peña, and Runstad, as members of that

8   Committee, owed specific duties to Wells Fargo that, like the duties imposed on the members of

9   the other Committees referenced above, relate directly to the misconduct alleged in this

10  Complaint.  The Corporate Responsibility Committee's Charter charges its members with taking

11  steps to monitor the Company's reputation generally, including with customers, and to provide

12  oversight of the Company's reputation risk management framework.  The members of the

13  Corporate Responsibility Committee failed to ensure the Company's risk management framework

14  was working effectively to prevent highly aggressive sales practices that created the conditions

15  for unlawful activity, resulting in extreme reputational risk.  As CFPB Director Richard Cordray

16  commented in his prepared statements, "[u]nderlying all of this egregious conduct, we found a

17  fundamental breach of trust by the Bank."  Thus, the Defendants who served on the Corporate

18  Responsibility Committee during the Relevant Period now face a substantial likelihood of

19  liability for their breach of fiduciary duties, rendering any demand on them futile.

20           492.    Pursuant to the Board's Human Resources Committee Charter, Defendants Chen,

21  Dean, Engel, James, and Sanger, as members of that Committee, owed specific duties to Wells

22  Fargo pertinent to the misconduct detailed in this Complaint.  The Human Resources

23  Committee's Charter charges its members with taking steps to ensure the Company's incentive

24  compensation practices are consistent with the safety and soundness of the Company and do not

25  encourage excessive risk-taking.  Thus, the members of the Human Resources Committee had

26  heightened duties to consider the risks of whether the Company's incentive compensation

27  practices were reasonably likely to have a material adverse effect on the Company.  Because the

28  members of the Human Resources Committee failed to ensure the Company's incentive

1    compensation practices would comply with sound and safe business practices and in turn

2    discourage excessive risk-taking, the Defendants who served on the Human Resources

3    Committee during the Relevant Period now face a substantial likelihood of liability for their

4    breach of fiduciary duties, making any demand upon them futile.

5           493.    Pursuant to the Board's Governance and Nominating Committee Charter,

6    Defendants Sanger, Dean, Milligan, Peña, and Swenson, as members of that Committee, owed

7    specific duties to Wells Fargo that were implicated by the misconduct alleged in this Complaint.

8    Specifically, the Governance and Nominating Committee's Charter tasks the Committee with

9    overseeing the Company's reputation risk and assisting the Board in overseeing the Company's

10   corporate governance practices.  The Committee has repeatedly failed to fulfill its responsibilities

11   and allowed the Bank to engage in practices that violate the law and that have adversely impacted

12   the Bank's reputation and financial condition.  Indeed, the illicit account-creation scheme has

13   exposed Wells Fargo to significant reputational risks and liability.  *See* ¶¶ 110; Section VI.

14          494.    Given their membership on the Audit and Examination, Risk, Corporate

15   Responsibility, Governance and Nominating, and/or Human Resources Committees, their

16   respective responsibilities, and their failures to meet them, Defendants Baker, Chao, Chen, Dean,

17   Duke, Engel, Hernandez, James, Milligan, Peña, Quigley, Runstad, Sanger, Swenson, and

18   Vautrinot face a substantial likelihood of liability for the misconduct alleged in this Complaint,

19   and making a demand on the Board would therefore be futile.

20          495.    The Board as a whole had the duty to ensure Wells Fargo's systems were

21   sufficiently well-designed to detect suspicious activity at the customer level.  The Board's duty

22   was heightened by the fact that Wells Fargo is a regulated banking institution, and was made even

23   more crucial in light of the extraordinarily aggressive cross-selling business model the Board

24   condoned.

25          496.    The Board failed to fulfill that duty, and its failure is even more egregious in light

26   of the many blatant warnings both before and during the Relevant Period that Wells Fargo's

27   systems were not sufficient to address the misconduct at issue in this Complaint.  Given the

28   combination of the cross-selling business model and the Board's awareness of employees'

1    misconduct—wrongful actions that resulted in the creation of millions of unauthorized accounts

2    over several years—it is clear the Board either deliberately or recklessly failed to take remedial

3    action to stop the illicit account-creation scheme.

4          497.    For these reasons, the Board is incapable or unwilling to take the actions required

5    to seek the relief requested in this Complaint.  Because a majority of the Board faces a substantial

6    risk of liability, demand is futile.

7          498.    Indeed, Stumpf has admitted he and other Board members knew about the illicit

8    account-creation scheme "in committees, at high levels in the 2011, '12 time frame," and

9    certainly by December 2013, when the December 2013 *L.A. Times* Article was published.  The

10   facts detailed in this Complaint demonstrate the Board knew or consciously disregarded pertinent

11   facts far earlier, but Stumpf's admission itself is nonetheless damning.  *See* ¶¶ 141-62; 196-238;

12   246-52; 258-62.

13         499.    Further, the L.A. City Attorney's complaint filed in May 2015 alleged, among

14   other things, that (i) Wells Fargo employees opened banking and financial accounts, products,

15   and services for California customers without their knowledge or consent; and (ii) after

16   discovering accounts, products, and services were opened for these customers without their

17   knowledge or consent, Wells Fargo employees failed to inform them of the opening of those

18   accounts, products, and services.  *See* ¶¶ 171-78.  The Board knew or consciously disregarded the

19   facts detailed in the L.A. City Attorney's action.

20         500.    The consumer class action filed in May 2015 further alerted the Director

21   Defendants to the illicit account-creation scheme.  *See* ¶¶ 179-82.

22         501.    The Board was further alerted to the very misconduct at issue here by current and

23   former Wells Fargo employees themselves, either through direct warnings to the Company (*see*

24   ¶¶ 196-211) or through litigation initiated by employees alleging they were improperly terminated

25   following their attempts to report illicit account-creation activities at the Company (*see* ¶¶ 212-

26   19).

27

28

502.     Additionally, the OCC and CFPB both undertook investigations of Wells Fargo, including a prior OCC action against Wells Fargo's Wholesale Banking Group for practices similar to those now at issue.

503.     For instance, in June 2015, the OCC issued an additional Supervisory Letter Stumpf identifying matters related to the Bank's enterprise-wide risk management and oversight of its sales practices that required corrective action by the Bank.  The OCC letter included five MRAs that required the Bank to take significant action to address the inappropriate tone at the top, including:

a.     the lack of an appropriate control or oversight structure given corporate emphasis on product sales and cross-selling;

b.     the lack of an enterprise-wide sales practices oversight program;

c.     the lack of an effective enterprise-wide customer complaint process;

d.     the lack of a formalized governance process to oversee sales practices and effectively oversee and test branch sales practices; and

e.     the failure of the Bank's audit services to identify the above issues or to aggregate sales practice issues into an enterprise view.

504.     The internal investigation, beginning in August 2015, into improper account-creation activities clearly afforded the Director Defendants additional, and significant, knowledge of the illicit account-creation scheme, which PwC reported resulted in more than two million unauthorized accounts.  Yet the Board still did not publicly disclose those facts.  *See* ¶¶ 253-57.

505.     That more than 5,300 Wells Fargo employees were terminated for improper account-creation activities further demonstrates the pervasiveness of the misconduct.  It also highlights, again, the extent to which the Director Defendants abandoned their fiduciary duties, as they failed to act in the face of those widespread terminations to address the overly aggressive sales quotas that encouraged the unlawful activities or to curtail those activities.  *See* ¶¶ 246-52.

506.     Indeed, the sheer length of time and scope of the wrongdoing occurring at the Company concerning deficiencies and unsafe or unsound practices in the Bank's risk

1    management and oversight of the Bank's sales practices make it implausible to suggest the Board

2    would be unaware of the wrongdoing if its members were fulfilling their fiduciary duties.

3         507.   The Board's lack of good faith and oversight exposed the Company to other

4    increased risks, including (i) civil penalties and restitution payments of over $185 million as a

5    result of the deceptive sales practices; (ii) significant damages resulting from the Company's

6    repurchases of stock at prices that were artificially inflated due to Defendants' materially false or

7    misleading statements during the Relevant Period; (iii) the loss of business from governmental

8    entities; (iii) investigations by the U.S. Attorney's Offices for the Southern District of New York

9    and the Northern District of California, and the Senate Banking Committee, among others; (iv)

10   exposure to lawsuits, including a shareholder putative class action asserting federal securities

11   claims against the Company, consumer class actions, and others; and (v) serious damage to the

12   Company's reputation and goodwill.  *See* ¶¶ 406-425; 444-74.

13        508.   Further, senior executives responsible for the wrongdoing at the Bank were

14   permitted to resign under the Board's watch, rather than be fired.  In particular, as Stumpf

15   testified in September 2016 before the United States Senate, Stumpf and his fellow Board

16   members allowed Tolstedt to "retire" instead of firing her for cause, resulting in Tolstedt

17   remaining eligible to receive $124.6 million in stock and options upon her retirement.  *See* ¶ 365.

18        509.   The Director Defendants' failure to meet their fiduciary obligations also allowed

19   the Insider Selling Defendants to reap unlawful profits from selling or disposing of Wells Fargo

20   shares at artificially inflated prices.  Not only did the Board approve of the illegal insider

21   transactions, it specifically authorized the Company's stock repurchase program to maintain the

22   price of the Company's stock at artificially inflated levels while insiders were selling stock.

23        510.   In March 2014, the Board authorized the repurchase of $350 million Wells Fargo

24   shares, just three months after the December 2013 *L.A. Times* Article, despite Defendants'

25   knowledge that the Company had engaged in unlawful banking practices exposing Wells Fargo to

26   significant and material risks and liability through their conduct related to the immense sales

27   pressures and resulting illicit account-creation scheme, and as such the Company's stock price

28

was already artificially inflated.  The repurchase program, accordingly, caused Wells Fargo to buy back stock at inflated prices from Stumpf, Sloan, Tolstedt, and Loughlin.  *See* ¶¶ 382-94.

511.    All of the Director Defendants failed to exercise any oversight over Stumpf, Sloan, Tolstedt, and Loughlin with respect to their significant insider transactions.  Accordingly, a clear majority of the Board is unable to consider a demand to investigate Plaintiffs' allegations that the Defendants engaged in illegal insider selling of Company stock, committed other wrongdoing in violation of their fiduciary duties, and artificially inflated the Company's stock price for their own personal gain.  The Director Defendants cannot investigate allegations of Defendants' wrongdoing in a disinterested and independent manner.

512.    In light of the foregoing facts, the Director Defendants face a substantial likelihood of liability in this case, thus rendering demand on them futile.

**C.      Demand Is Excused Because the Board Has Shown Its Lack of Independence from Stumpf by Repeatedly Granting Him Excessive Compensation.**

513.    According to the Company's proxy statements, Defendants Chen, Dean, Engel, James, and Sanger served during the Relevant Period on the Board's Human Resources Committee.  The Committee was directly responsible for administering and managing the Company's executive compensation program and its stock option plans.

514.    As members of the Human Resources Committee during the Relevant Period who were responsible for approving the Wells Fargo executive compensation, Defendants Chen, Dean, Engel, James, and Sanger knew or recklessly disregarded that they were approving the Officer Defendants' compensation in a manner that was not a valid exercise of business judgment.  Specifically, those Defendants' compensation was tied, in part, to the financial success of the Company, which (as detailed in this Complaint) was materially misrepresented due to the illicit account-creation scheme, and Defendants Chen, Dean, Engel, James, and Sanger (like the other Director Defendants) knew of or recklessly disregarded myriad facts relating to that scheme.  *See* ¶¶ 272-310.

515.    For instance, according to Wells Fargo's 2015 Proxy Statement, in determining the incentive compensation awards for 2014 for Sloan and Tolstedt, the Committee considered,

1    among other factors, the Company's "success in achieving strategic objectives in the business

2    lines for which each is responsible as discussed below, including success in furthering the

3    Company's objectives of cross-selling products from other business lines to customers,

4    reinforcing a strong risk culture and continuing to strengthen risk management practices in our

5    businesses, continued focus on expense control and realization of efficiency initiatives, progress

6    on diversity and inclusion initiatives, and each executive's ability to operate as a member of a

7    team."  But the executives' purported success was premised in material part on the illicit account-

8    creation scheme, and thus their compensation was higher than it would have been absent the

9    misconduct.  This was in direct contravention of the Human Resources Committee's Charter that

10   charges its members with taking steps to ensure the Company's incentive compensation practices

11   are consistent with the safety and soundness of the Company and do not encourage excessive

12   risk-taking.

13        516.   Moreover, the manner in which Defendants Chen, Dean, Engel, James, and Sanger

14   handled the issue of clawbacks demonstrates their lack of independence and lack of

15   disinterestedness.  On September 20, 2016, Stumpf told the Senate that the Human Resources

16   Committee, not Stumpf, would address the clawback issue and would do so in a deliberate and

17   considered manner.  But just one week later, on September 28, 2016, Wells Fargo announced it

18   would claw back compensation valued at $41 million and $19 million, respectively, from Stumpf

19   and Tolstedt.  The announcement came one day before Stumpf would have to return to Capitol

20   Hill and face further questioning, this time before the House Committee on Financial Services.

21   Indeed, this was a desperate attempt by Stumpf and the Board to deflect political pressure and

22   submit a token offering to the Senate prior to Stumpf's follow-up testimony before the Senate on

23   September 29, 2016.  Analysts noted the clawback measure appeared to be an attempt to buy

24   more time to deal with the scandal and was "more about optics than substance."  Critically, the

25   Human Resources Committee did not initiate the clawback but only "agreed" with Stumpf's

26   recommendation "that he [] forfeit all of his outstanding unvested equity awards," as well as his

27   2016 bonus and salary.  *See* ¶¶ 475-76

28

517. The abdication by Defendants Chen, Dean, Engel, James, and Sanger to Stumpf of their responsibility with respect to clawbacks further demonstrates these Defendants' lack of independence and lack of disinterestedness, rendering demand on them futile.

## XII.  PLAINTIFFS' CLAIMS ARE TIMELY

518. In the face of the rampant illicit account-creation scheme that allowed them to falsely represent the extent of their purported success in cross-selling, including by artificially inflating cross-selling figures in Wells Fargo's SEC filings, Defendants publicly downplayed, or outright disregarded, the impact of that misconduct on the Company.

519. During the May 19, 2015 Barclays Americas Select Conference discussed above, for instance, Shrewsberry commented on the L.A. City Attorney's recently filed case:

> Well, it's now active litigation, so I can't be too direct. I would tell you that our response internally has been that what was alleged is completely inconsistent with our vision and values. It is inconsistent with the relationship that we have both with our team members and with our customers. So we have some investigation to do to figure out what the real facts are because none of our internal systems for getting feedback like that have been tripped until this came along. So there is not much to say other than it's certainly not how we run our business. ***It's not in our best interest to create an environment for employees or to treat customers in a way where they are getting things that they don't really need or want to pay for because that is not what long-term relationships are about.*** So the facts will come out over some period of time and my sense is that it won't have turned out to be a real threat, but it's litigation and we have to treat it that way.

520. Additionally, during a May 29, 2015 presentation at the Sanford C. Bernstein Strategic Decisions Conference, an analyst asked Stumpf about regulatory investigations and whether he was concerned that the Company was providing customers with products that they did not want.  Stumpf falsely rejected this notion:

> [Analyst]: There's a question about the regulatory investigations, the key part of your strategy has been sales, you've only been revenue-focused in cross-selling. Sometimes that might be a little too far, and I guess, there's been some investigations that you're selling the wrong thing to the wrong people. How do you make sure you're pushing a sales culture, but not giving customers something that they don't need or don't understand?

> [Stumpf]: Absolutely. Our culture for 163 years has been to help our customers succeed financially and provide other financial needs. ***It's not in our interest, not in our team members' interest, not in our customer's interest, surely not our shareholders' interest to have a customer have a product or service they didn't want, don't need or doesn't help them.***

> I don't know that there's much more to say about it than that. My annual statement

this year was about culture. It's about how we go to market, how we think about that. And in large institutions you are not going to be perfect and we are not perfect; we try to make it better.

521.    Defendants' (at best) conscious disregard for the illicit account-creation scheme, as well as their public denials of wrongdoing at the Company, allowed the scheme to continue undetected for years.

522.    To the extent (if at all) Plaintiffs' claims accrued outside the statutes of limitations applicable to those claims, their claims are nonetheless timely, for one or both of the following reasons:

*First*, given the concealed nature of the misconduct alleged in this Complaint, Plaintiffs did not discover, and could not with reasonable diligence have discovered, facts sufficient to place them on notice of the illicit account-creation scheme.

*Second*, to the extent (if at all) the statute of limitations applicable to any of Plaintiffs' claims would otherwise have been deemed to commence, it was tolled due to Defendants' active concealment of the misconduct alleged in this Complaint.

523.    Further, Plaintiffs' claims under Section 10(b) of the Exchange Act and SEC Rule 10b-5 are timely because Plaintiffs did not "discover," more than two years before filing their initial complaints in this litigation, "the facts constituting the violation," as provided by 28 U.S.C. § 1658(b)(1) and articulated in *Merck & Co. v. Reynolds*, 559 U.S. 633 (2010), and subsequent decisions.

## XIII.   CLAIMS FOR RELIEF

<div align="center">

**COUNT I**
**Breach of Fiduciary Duty**
**(Against All Defendants)**

</div>

524.    Plaintiffs incorporate by reference and reallege each of the foregoing allegations as though fully set forth in this paragraph.

525.    Each of the Defendants owed and owe fiduciary duties to Wells Fargo and its stockholders.  By reason of their fiduciary relationships, Defendants specifically owed and owe Wells Fargo the highest obligation of good faith, fair dealing, loyalty, and due care in the

administration and management of the affairs of the Company, including the Company's financial reporting, internal controls, and compensation practices.

526.   Each of the Defendants consciously and deliberately breached their fiduciary duties of candor, good faith, loyalty, and reasonable inquiry to Wells Fargo and its stockholders in at least the following ways:

a.   Overseeing and endorsing the unreasonable sales quotas attendant with the cross-selling program at the Company;

b.   Allowing the Company's employees to illegally open millions of unauthorized checking accounts, credit cards, and other accounts and services, in connection with the Company's cross-selling strategy;

c.   Ignoring or consciously disregarding the many red flags related to the cross-selling program's rampant misconduct;

d.   Structuring the Company's compensation policies so that Company employees were incentivized to fraudulently open unauthorized checking accounts, credit cards, and other accounts and services, and rewarding Company executives were rewarded for the purported "success" of cross selling (such success being built on misconduct);

e.   Allowing Wells Fargo insiders to conduct insider sales and dispositions of Company stock while in the possession of material, adverse, non-public information;

f.   Approving the Company's repurchase of Wells Fargo shares at a time when the shares were artificially inflated;

g.   Allowing Wells Fargo's public statements on cross-selling metrics to be false and misleading due to the illicit account-creation scheme, which also resulted in the artificial inflation of the Company's share price;

h.   Allowing for inadequate risk controls over the Company's policies and practices, which allowed Company employees to illegally open millions of unauthorized checking accounts, credit cards, and other accounts and services, in connection with the Company's cross-selling strategy; and

1          i.       Engaging in abuse of control and gross mismanagement of Wells Fargo's

2    assets and business through a failure to prevent the illicit account-creation scheme.[244]

3          527.     Defendants, individually and in concert, engaged in the above referenced conduct

4    in intentional, reckless, or grossly negligent breaches of the fiduciary duties they owed to Wells

5    Fargo to protect its rights and interests.

6          528.     In breach of their fiduciary duties owed to Wells Fargo, Defendants willfully

7    participated in misrepresentations related to the Company's cross-selling, risk controls, and

8    internal and disclosure controls, failed to correct the Company's public statements, and failed to

9    fully inform themselves prior to making decisions as directors and officers, rendering them

10   personally liable to the Company for breaching their fiduciary duties.

11         529.     Defendants had actual or constructive knowledge that they had caused the

12   Company to improperly misrepresent its financial condition and they failed to correct the

13   Company's public statements.  Defendants had actual knowledge of the misstatements and

14   omissions of material facts set forth in this Complaint, or acted with reckless disregard for the

15   truth, in that they failed to ascertain and to disclose such facts, even though such facts were

16   available to them.  Such material misrepresentations and omissions were committed knowingly or

17   recklessly and for the purpose and effect of artificially inflating the price of Wells Fargo's

18   securities.

19         530.     These actions were not a good-faith exercise of prudent business judgment to

20   protect and promote the Company's corporate interests.

21         531.     Additionally, Defendants have specific fiduciary duties as defined by the

22   Company's corporate governance documents, including the Code of Conduct and the charters of

23   various Board committees that, had they been discharged in accordance with Defendants'

24   obligations, would have necessarily prevented the misconduct and the consequent harm to the

25   Company alleged in this Complaint.

26   _____

27   [244] Plaintiffs' claims for breach of fiduciary duty include abuse of control and gross
     mismanagement; Delaware law does not recognize an independent cause of action against
28   corporate directors or officers for gross mismanagement or abuse of control.

532.   Defendants conspired to abuse, and did abuse, the control vested in them by virtue of their positions in the Company.

533.   Wells Fargo's certificate of incorporation contains a provision, pursuant to 8 Del. C. § 102(b)(7) ("Section 102(b)(7)"), eliminating the monetary liability of directors for certain breaches of duty.  Section 102(b)(7) affords corporations a limited and narrow ability to exculpate directors from monetary liability, but only for their breaches of the duty of care.  Section 102(b)(7) mandates, however, that such a provision cannot "eliminate or limit the liability of a director" for, *inter alia*, "any breach of the director's duty of loyalty to the corporation or its stockholders," "acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law," or "any transaction from which the director derived an improper personal benefit."

534.   Accordingly, to the extent Wells Fargo's exculpatory provision applies to the Director Defendants' acts or omissions while acting in their capacity as directors, it cannot immunize them from (i) any non-monetary liability, (ii) monetary liability for their breaches of the duty of loyalty, (iii) monetary liability for acts or omissions not in good faith or that involved intentional misconduct or a knowing violation of law, or (iv) monetary liability in connection with any transaction from which they derived an improper personal benefit. As detailed in this Complaint, the Director Defendants' misconduct with respect to the illicit account-creation scheme (i) involved breaches of their duty of loyalty; (ii) involved acts or omissions not in good faith or that involved intentional misconduct or a knowing violation of law; and (iii) at least with respect to the Insider Selling Defendants, occurred in connection with a transaction from which those Defendants derived improper personal benefits.  Wells Fargo's exculpatory provision therefore cannot immunize the Director Defendants from liability for that misconduct. Additionally, Stumpf is not entitled to claim any immunity under Section 102(b)(7) to the extent this claim is asserted against him in his capacity as an officer of the Company.

535.   Similarly, Section 102(b)(7) does not exculpate Sloan, Tolstedt, Shrewsberry, or Loughlin from any breaches of their fiduciary duty, as they are liable in their capacity as officers of the Company.

536.     Defendants' actions as detailed in this Complaint were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

537.     As a direct and proximate result of Defendants' breaches of their fiduciary obligations, Wells Fargo has sustained and continues to sustain significant damages.  As a result of the misconduct alleged in this Complaint, Defendants are liable to the Company.

**COUNT II**
**Unjust Enrichment**
**(Against All Defendants)**

538.     Plaintiffs incorporate by reference and reallege each of the foregoing allegations as though fully set forth in this paragraph.

539.     During the Relevant Period, Defendants received bonuses, stock options, stock, or similar compensation from Wells Fargo that was tied to the Company's financial performance, or otherwise received compensation that was unjust in light of Defendants' bad faith conduct, violation of the Company's code of ethics, and self-dealing.

540.     Plaintiffs, as shareholders and representatives of Wells Fargo, seek restitution from Defendants and seek an order of this Court disgorging all profits, benefits, and other compensation—including any salary, options, performance-based compensation, and stock—obtained by Defendants due to their wrongful conduct alleged in this Complaint.

**COUNT III**
**Breach of Fiduciary Duty for Insider Selling and Misappropriation of Information**
**(Against the Insider Selling Defendants)**

541.     Plaintiffs incorporate by reference and reallege each of the foregoing allegations as though fully set forth in this paragraph.

542.     At the time of the stock sales set forth in ¶¶ 382-94 above, the Insider Selling Defendants—Stumpf, Tolstedt, Sloan, and Loughlin—knew or recklessly disregarded the information described in this Complaint regarding the illicit account-creation scheme and sold Wells Fargo common stock on the basis of that information.

543.     The information described above was proprietary non-public information concerning the Company's unlawful conduct associated with its cross-selling strategy.  The

1    information was a proprietary asset belonging to the Company, which the Insider Selling

2    Defendants used for their own benefit when they sold Wells Fargo common stock.

3        544.    The Insider Selling Defendants' sales of Wells Fargo common stock while in

4    possession and control of this material adverse non-public information was a breach of their

5    fiduciary duties of loyalty and good faith.

6        545.    Because the use of the Company's proprietary information for their own gain

7    constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to

8    the imposition of a constructive trust on any profits the Insider Selling Defendants obtained

9    thereby.

10                                   **COUNT IV**
                  **Violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9**
11                              **(Against the Director Defendants)**

12       546.    Plaintiffs incorporate by reference and reallege each and every allegation

13   contained above, as though fully set forth in this paragraph, except to the extent those allegations

14   plead knowing or reckless conduct by the Director Defendants.  This claim is based solely on

15   negligence, not on any allegation of reckless or knowing conduct by or on behalf of the Director

16   Defendants.  Plaintiffs specifically disclaim any allegations of, reliance upon any allegation of, or

17   reference to any allegation of fraud, scienter, or recklessness with regard to this claim.

18       547.    SEC Rule 14a-9 (17 C.F.R. § 240.14a-9), promulgated under Section 14(a) of the

19   Exchange Act, provides:

20           No solicitation subject to this regulation shall be made by means of any proxy
             statement form of proxy, notice of meeting or other communication, written or
21           oral, containing any statement which, at the time and in the light of the
             circumstances under which it is made, is false or misleading with respect to any
22           material fact, or which omits to state any material fact necessary in order to make
             the statements therein not false or misleading or necessary to correct any statement
23           in any earlier communication with respect to the solicitation of a proxy for the
             same meeting or subject matter which has become false or misleading.
24
         548.    The Director Defendants negligently issued, caused to be issued, and participated
25
     in the issuance of materially misleading written statements to stockholders that were contained in
26
     the 2014, 2015, and 2016 Proxy Statements.  The 2014, 2015, and 2016 Proxy Statements
27
     contained proposals to Wells Fargo's stockholders urging them to re-elect the members of the
28

1    Board, approve executive compensation, and vote against stockholder proposals for the Company

2    to adopt a policy to require an independent Chairman.  The Proxy Statements, however, misstated

3    or failed to disclose (i) deficiencies in Wells Fargo's internal and disclosure controls that were

4    known to the Board when the Proxy Statements were filed; (ii) reporting failures known to the

5    Board when the Proxy Statements were filed, which failed to address the illicit account-creation

6    scheme and thousands of related employee terminations; (iii) pending governmental

7    investigations into the illicit account-creation scheme and Wells Fargo's inadequate controls that

8    were known to the Board when the Proxy Statements were filed; (iv) Board-approved

9    compensation structures that encouraged the illicit account-creation scheme to continue for years,

10   including several years after the Board learned of the scheme; and (v) the fact that Wells Fargo

11   employees continued to illegally open accounts on behalf of its customers for years after the

12   Board learned of the scheme, and Wells Fargo faced significant reputational harm when the truth

13   would inevitably unfold.  By reasons of the conduct alleged in this Complaint, the Director

14   Defendants violated Section 14(a) of the Exchange Act and SEC Rule 14a-9.  As a direct and

15   proximate result of the Director Defendants' wrongful conduct, Wells Fargo misled or deceived

16   its stockholders by making misleading statements that were an essential link in stockholders

17   heeding Wells Fargo's recommendation to re-elect the current Board, approve certain executive

18   compensation, and vote against stockholder proposals for the Company to adopt a policy to

19   require an independent Chairman.

20        549.    The misleading information contained in the 2014, 2015, and 2016 Proxy

21   Statements was material to Wells Fargo's stockholders in determining whether or not to elect the

22   Director Defendants, approve certain executive compensation, and determine whether the

23   Company should adopt a policy to require an independent Chairman.  This information was also

24   material to the integrity of the directors that were proposed for election to the Board.  The proxy-

25   solicitation process in connection with the Proxy Statements was an essential link in (i) the re-

26   election of nominees to the Board, (ii) the approval of the executive compensation plan, and (iii)

27   the decision not to require an independent Chairman.

28

550.   Plaintiffs, on behalf of Wells Fargo, thereby seek relief for damages inflicted upon the Company based on the misleading 2014, 2015, and 2016 Proxy Statements in connection with the improper re-election of the members of the Board, approval of executive compensation, and vote against stockholder proposals for the Company to adopt a policy to require an independent Chairman.

551.   This action was timely commenced within three years of the date of each Proxy Statement and within one year from the time Plaintiffs discovered or reasonably could have discovered the facts on which this claim is based.

**COUNT V**
**Violations of Section 10(b) of the Exchange Act**
**and SEC Rule 10b-5 Promulgated Thereunder**
**(Against All Defendants)**

552.   Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth in this paragraph.

553.   During the Relevant Period, in connection with Wells Fargo's repurchases of Wells Fargo shares, Defendants disseminated or approved false or misleading statements about Wells Fargo specified in ¶¶ 320-81, which they knew or recklessly disregarded were false or misleading and were intended to deceive, manipulate, or defraud.  Those false or misleading statements and Defendants' course of conduct were designed to artificially inflate the price of the Company's common stock.

554.   At the same time that the price of the Company's common stock was inflated due to the false or misleading statements made by Defendants, Defendants caused the Company to repurchase millions of shares of its own common stock at prices that were artificially inflated due to Defendants' false or misleading statements.  Defendants engaged in a scheme to defraud Wells Fargo by causing the Company to purchase at least $35 billion in shares of Wells Fargo stock at artificially inflated prices.

555.   Defendants violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in

1    light of the circumstances under which they were made, not misleading; and/or (c) engaged in

2    acts, practices, and a course of business that operated as a fraud or deceit upon Wells Fargo in

3    connection with the Bank's purchases of Wells Fargo stock during the Relevant Period.

4    556.   Defendants, individually and in concert, directly and indirectly, by the use of

5    means or instrumentalities of interstate commerce or of the mails, engaged and participated in a

6    continuous course of conduct that operated as a fraud and deceit upon the Company; made

7    various false or misleading statements of material facts and omitted to state material facts

8    necessary in order to make the statements made, in light of the circumstances under which they

9    were made, not misleading; made the above statements intentionally or with a severely reckless

10   disregard for the truth; and employed devices and artifices to defraud in connection with the

11   purchase and sale of Wells Fargo stock, which were intended to, and did, (a) deceive Wells Fargo

12   regarding, among other things, its cross-selling metrics, the Company's internal controls and

13   compensation practices, and the Company's financial statements; (b) artificially inflate and

14   maintain the market price of Wells Fargo stock; and (c) cause Wells Fargo to purchase the

15   Company's stock at artificially inflated prices and suffer losses when the true facts became

16   known.  Throughout the Relevant Period, Defendants were in possession of material, adverse

17   non-public information regarding the illicit account creation scheme.

18   557.   Defendants were among the senior management and the directors of the Company,

19   and were therefore directly responsible for, and are liable for, all materially false or misleading

20   statements made during the Relevant Period, as alleged above.

21   558.   As described above, Defendants acted with scienter throughout the Relevant

22   Period, in that they acted either with intent to deceive, manipulate, or defraud, or with severe

23   recklessness.  The misstatements and omissions of material facts set forth in this Complaint were

24   either known to Defendants or were so obvious that Defendants should have been aware of them.

25   Throughout the Relevant Period, Defendants also had a duty to disclose new information that

26   came to their attention and rendered their prior statements to the market materially false or

27   misleading.

28

559.   Defendants' false or misleading statements and omissions were made in connection with the purchase or sale of the Company's stock, both by the Company itself and by the Insider Selling Defendants.

560.   As a result of Defendants' misconduct, Wells Fargo has and will suffer damages in that it paid artificially inflated prices for Wells Fargo common stock purchased as part of the repurchase program and suffered losses when the previously undisclosed facts relating to the illicit account-creation scheme were disclosed beginning in September 2016.  Wells Fargo would not have purchased these securities at the prices it paid, or at all, but for the artificial inflation in the Company's stock price caused by Defendants' false or misleading statements.

561.   As a direct and proximate result of Defendants' wrongful conduct, the Company suffered damages in connection with its purchases of Wells Fargo stock during the Relevant Period.  By reason of such conduct, Defendants are liable to the Company pursuant to Section 10(b) of the Exchange Act and SEC Rule 10b-5.

562.   Plaintiffs brought this claim within two years of their discovery of the facts constituting the violation and within five years of the violation.

**COUNT VI**
**Violations of Section 20A of the Exchange Act**
**(Against the Insider Selling Defendants)**

563.   Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth in this paragraph.

564.   The Insider Selling Defendants, by reason of their relationship with the Company as officers and directors of the Company, had access, directly or indirectly, to material information about the Company not available to the public.

565.   The Insider Selling Defendants knowingly traded on this material, non-public information about the Company.

566.   The Insider Selling Defendants sold Wells Fargo securities with actual knowledge that the value of these securities was inflated as a result of Defendants' false and misleading statements and other fraudulent activities detailed in this Complaint.

567.    As part of Wells Fargo's publicly disclosed share repurchase program, the Company purchased over 772 million shares of its common stock throughout the Relevant Period. Wells Fargo was a contemporaneous purchaser of Wells Fargo securities, pursuant to Section 20A of the Exchange Act, when the Insider Selling Defendants sold Wells Fargo securities, as set forth in the charts in ¶¶ 383; 386; 388; 390 above.

568.    As a contemporaneous purchaser, Wells Fargo was damaged by the actions of the Insider Selling Defendants, as alleged in this Complaint, in that (i) in reliance on the integrity of the market, the Company paid artificially inflated prices as a result of the violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5; and (ii) the Company would not have purchased the securities at the prices it paid, or at all, had it been aware that the market prices had been artificially inflated by Defendants' false or misleading statements.  At the time of the purchase of the securities by the Company, the fair and true market value of the securities was substantially less than the price paid by the Company.

<div align="center">

**COUNT VII**
**Violations of Section 29(b) of the Exchange Act**
**(Against All Defendants)**

</div>

569.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth in this paragraph.

570.    As a result a result of their conduct, as alleged in this Complaint, Defendants violated Sections 10(b) and 14(a) of the Exchange Act during the time they entered into contracts with Wells Fargo regarding their compensation.

571.    As opposed to many companies that limit clawback compensation to situations where a company restates its financial results, Wells Fargo has an extensive compensation clawback policy, pursuant to which compensation can be clawed back based on reputational harm to the Company, failure to supervise, a violation of the Company's Code of Ethics, and other circumstances.

572.    If Wells Fargo attempts to claw back compensation to Defendants, Defendants might assert a breach of contract claim.

573.    Section 29(b) of the Exchange Act provides equitable remedies that include, among other things, provisions allowing for the voiding of contracts where the performance of the contract involved violation of any provision of the Exchange Act.

574.    Defendants violated provisions of the Exchange Act while performing their duties arising under various employment and other contracts they entered into with Wells Fargo.

575.    Wells Fargo was and is an innocent party with respect to Defendants' Exchange Act violations.

576.    Plaintiffs, on behalf of Wells Fargo, seek rescission of the contracts between Defendants and Wells Fargo due to Defendants' violations of the Exchange Act while performing their job duties.

577.    Even if the contracts are not rescinded by the Court as a result of Defendants' Exchange Act violations, the Court can and should award equitable remedies in the form of injunctive relief barring Defendants from asserting breach of contract by Wells Fargo in any action by Plaintiffs on behalf of Wells Fargo to claw back compensation from Defendants.

578.    Plaintiffs seek only declaratory, injunctive, and equitable relief in this claim.

**COUNT VIII**
**Violation of Section 25402 of the California Corporations Code**
**(Against the Insider Selling Defendants)**

579.    Plaintiffs incorporate by reference and reallege each of the foregoing allegations as though fully set forth in this paragraph.

580.    At the time that the Insider Selling Defendants—Stumpf, Sloan, Tolstedt, and Loughlin—sold their Wells Fargo common stock as set forth in this Complaint, by reason of their high executive or directorship positions with Wells Fargo, these Defendants had access to highly material information regarding the Company, including the information set forth in this Complaint regarding the illicit account-creation scheme.  Further, the Insider Selling Defendants received millions of dollars of proceeds from trading on material, non-public information, which information was an asset of, and belonged exclusively to, Wells Fargo.

581.    At the time of the Insider Selling Defendants' sales, that information was not generally available to the public or the securities markets. Had such information been generally available, it would have significantly reduced the market price of Wells Fargo shares at that time.

582.    Each of the Insider Selling Defendants had actual knowledge of material, adverse, non-public information and thus sold their Wells Fargo common stock in California in violation of California Corporations Code § 25402.

583.    Pursuant to California Corporations Code § 25502.5, each of the Insider Selling Defendants is liable to Wells Fargo for damages in an amount up to three times the difference between the price at which Wells Fargo common stock was sold by the Defendant and the market value that stock would have had at the time of the sale if the information known to the Defendant had been publicly disseminated prior to that time and a reasonable time had elapsed for the market to absorb the information.

**COUNT IX**
**Violation of Section 25403 of the California Corporations Code**
**(Against the Director Defendants)**

584.    Plaintiffs incorporate by reference and reallege each of the foregoing allegations as though fully set forth in this paragraph.

585.    The Director Defendants, through their positions, possessed control and influence over the Insider Selling Defendants' sale of Wells Fargo common stock in violation of the California Corporations Code.  The Director Defendants are statutorily liable to the same extent as the Insider Selling Defendants under California Corporations Code § 25403.

586.    The Director Defendants were aware of the Insider Selling Defendants' knowledge of the material adverse non-public information, and the Director Defendants were aware of the Insider Selling Defendants' intent to sell Wells Fargo common stock while in possession of material adverse non-public information.

587.    The Director Defendants are culpable for the Insider Selling Defendants' underlying violations of California Corporations Code § 25402 because of their knowledge and ability to control and influence the Insider Selling Defendants and due to their involvement in

preparing, approving, and signing the Company's false or misleading Form 10-Ks, and Proxy Statements during the Relevant Period.

588.    Under California Corporations Code § 25403, each of the Director Defendants is liable to Wells Fargo for damages in an amount up to three times the difference between the price at which Wells Fargo common stock was sold by the Defendant and the market value that stock would have had at the time of the sale if the information known to the Defendants had been publicly disseminated prior to that time and a reasonable time had elapsed for the market to absorb the information.

**COUNT X**
**Corporate Waste**
**(Against the Director Defendants)**

589.    Plaintiffs incorporate by reference and reallege each of the foregoing allegations as though fully set forth in this paragraph.

590.    The Director Defendants have a fiduciary duty to protect Wells Fargo's assets from loss or waste.

591.    By approving the stock repurchase program, the Director Defendants breached this fiduciary duty and have caused Wells Fargo to waste its corporate assets on the repurchase of stock at artificially inflated prices.

592.    As a result of the Director Defendants' corporate waste, the Company has suffered damages.

**COUNT XI**
**Contribution and Indemnification**
**(Against Defendants Stumpf, Shrewsberry, Sloan, and Tolstedt)**

593.    Plaintiffs incorporate by reference and reallege each of the foregoing allegations as though fully set forth in this paragraph.

594.    This claim is brought derivatively on behalf of the Company against Defendants Stumpf, Shrewsberry, Sloan, and Tolstedt for contribution and indemnification.

595.    Wells Fargo is named as a defendant in a putative shareholder class action filed in this District on September 29, 2016, asserting claims under the federal securities laws for, intera alia, false and misleading statements related to cross-selling and the Company's financial

reporting.  In the event the Company is found liable for violating the federal securities laws, the Company's liability will arise, in whole or in part, from the intentional, knowing, or reckless acts or omissions of some or all of the Defendants as alleged herein.  The Company is entitled to receive contribution from those Defendants in connection with the securities fraud class action against the Company currently pending in this District.

596.    Accordingly, Wells Fargo is entitled to all appropriate contribution or indemnification from Defendants.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand for a judgment as follows:

A.    determination that this action is a proper derivative action maintainable under the law and that demand was excused as futile;

B.    Declaring that Defendants have breached their fiduciary duties to Wells Fargo;

C.    Determining and awarding to Wells Fargo the damages sustained by it as a result of the violations set forth above from each Defendant, jointly and severally, together with prejudgment and post-judgment interest thereon;

D.    Directing Wells Fargo to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its stockholders from a repeat of the damaging events described in this Complaint, including putting forward for a stockholder vote resolutions for amendments to the Company's by-laws or articles of incorporation, and taking such other actions as may be necessary to place before stockholders for a vote the following corporate governance policies:

1.    a proposal to strengthen Board oversight and supervision of Wells Fargo's Community Banking sales practices;

2.    a proposal to strengthen the Company's disclosure controls to ensure material information is adequately and timely disclosed to the SEC and the public;

3.    a proposal to ensure that all Board members take appropriate action to rid the Company of its lawless culture, particularly in the Community Banking segment;

4.        a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board; and

5.        a proposal to permit the stockholders of Wells Fargo to nominate at least three candidates for election to the Board;

E.        Extraordinary equitable or injunctive relief as permitted by law or equity, including attaching, impounding, imposing a constructive trust on, or otherwise restricting Defendants' assets so as to assure that Plaintiffs, on behalf of Wells Fargo, have an effective remedy;

F.        Awarding to Wells Fargo restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by Defendants, including the proceeds of insider transactions made in violation of federal and state securities laws;

G.        Ordering an accounting of all compensation awarded to the Individual Defendants during the Relevant Period;

H.        Canceling the votes to re-elect the Director Defendants in connection with the annual shareholder meetings in 2014, 2015, and 2016, and ordering Defendants to disgorge to the Company all compensation they received for service on the Board following those invalid elections;

I.        Awarding to Plaintiffs costs and disbursements related to this action, including reasonable attorneys' fees, consultant and expert fees, costs, and expenses; and

J.        Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

CONSOLIDATED AMENDED VERIFIED
STOCKHOLDER DERIVATIVE COMPLAINT
LEAD CASE NO. 3:16-CV-05541-JST

1

Dated: February 24, 2017          LIEFF CABRASER HEIMANN & BERNSTEIN, LLP

2

3                                 By:        */s/ Richard M. Heimann*

4                                 Richard M. Heimann (CA Bar No.063607)
                                  *rheimann@lchb.com*
5                                 Joy A. Kruse (CA Bar No. 142799)
                                  *jakruse@lchb.com*
6                                 Katherine C. Lubin (CA Bar No. 259826)
                                  *kbenson@lchb.com*
7                                 275 Battery Street, 29th Floor
                                  San Francisco, CA 94111-3339
8                                 Telephone: (415) 956-1000
                                  Facsimile:  (415) 956-1008
9
                                  Steven E. Fineman (CA Bar No. 140335)
10                                *sfineman@lchb.com*
                                  Daniel P. Chiplock (*Pro hac vice application to be filed*)
11                                *dchiplock@lchb.com*
                                  Nicholas Diamand (*Pro hac vice*)
12                                *ndiamand@lchb.com*
                                  Michael J. Miarmi (*Pro hac vice application to be filed*)
13                                *mmiarmi@lchb.com*
                                  250 Hudson Street, 8th Floor
14                                New York, NY 10013-1413
                                  Telephone: (212) 355-9500
15                                Facsimile:  (212) 355-9592

16                                *Attorneys for Plaintiff Fire & Police Pension Association*
                                  *of Colorado and Co-Lead Counsel*
17
                                  Maya Saxena (*Pro hac vice*)
18                                *msaxena@saxenawhite.com*
                                  Joseph E. White, III (*Pro hac vice*)
19                                *jwhite@saxenawhite.com*
                                  Lester R. Hooker (CA Bar No. 241590)
20                                *lhooker@saxenawhite.com*
                                  Jorge A. Amador (CA Bar No. 237800)
21                                *jamador@saxenawhite.com*
                                  Adam D. Warden (*Pro hac vice application to be filed*)
22                                *awarden@saxenawhite.com*
                                  Dianne M. Anderson (CA Bar No. 103670)
23                                *danderson@saxenawhite.com*
                                  SAXENA WHITE P.A.
24                                5200 Town Center Circle, Suite 601
                                  Boca Raton, FL  33486
25                                Telephone:  (561) 394-3399
                                  Facsimile:  (561) 394-3382
26
                                  *Attorneys for Plaintiff The City of Birmingham*
27                                *Retirement and Relief System and Co-Lead Counsel*

28

CONSOLIDATED AMENDED VERIFIED
STOCKHOLDER DERIVATIVE COMPLAINT
LEAD CASE NO. 3:16-CV-05541-JST

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**<u>VERIFICATION</u>**

I, Kevin B. Lindahl, being duly sworn, declare as follows:

I am the General Counsel of Plaintiff Fire and Police Pension Association of Colorado ("Colorado Fire and Police") and am authorized to act on its behalf.  Colorado Fire and Police is a shareholder of Wells Fargo & Company and has been throughout the relevant period defined in the foregoing Consolidated Amended Verified Stockholder Derivative Complaint ("Complaint"). Colorado Fire and Police has retained competent counsel and is ready, willing, and able to pursue this action vigorously on behalf of the Company.  I have reviewed the Complaint, and based upon discussions with and reliance upon counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated:  February 24, 2017

_____
Kevin B. Lindahl
General Counsel
Fire and Police Pension Association of
Colorado

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**VERIFICATION**

I, James D. Love, being duly sworn, declare as follows:

I am the Assistant City Attorney for Plaintiff The City of Birmingham Retirement and Relief System ("Birmingham" or the "System") and am authorized to act on its behalf. Birmingham is a shareholder of Wells Fargo & Company and has been throughout the relevant period defined in the foregoing Consolidated Amended Verified Stockholder Derivative Complaint ("Complaint"). Birmingham has retained competent counsel and is ready, willing, and able to pursue this action vigorously on behalf of the Company. I have reviewed the Complaint, and based upon discussions with and reliance upon counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: February 23, 2017

James D. Love
Assistant City Attorney
The City of Birmingham Retirement and Relief
System