UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

VICTORIA SHAEV,

          Plaintiff,

    v.

JOHN D. BAKER, et al.,

          Defendants.

Case No.16-cv-05541-JST

**ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS**

Re: ECF No. 99

      Before the Court is nominal Defendant Wells Fargo & Company's ("Wells Fargo") motion to dismiss the Consolidated Amended Verified Amended Stockholder Derivative Complaint ("the Complaint") pursuant to Rules 12(b)(6) and 23.1 for failure to adequately plead demand futility.[1] The Court will grant the motion as to Plaintiff's claim under California Corporations Code section 25403, and deny it in all other respects.

## I.    BACKGROUND

      This is a shareholder derivative action on behalf of nominal party Wells Fargo against the company's officers and directors. Compl. ECF No. 83 at 6, ¶ 64.[2] Plaintiffs allege that, "[f]rom at least January 1, 2011 to the present ('the Relevant Period'), Defendants knew or consciously disregarded that Wells Fargo employees were illicitly creating millions of deposit and credit card accounts for their customers, without those customers' knowledge or consent." Id. ¶ 1.

### A.    The Parties

      Wells Fargo is a financial and bank holding company that provides retail, commercial, and

---

[1] The Individual Director Defendants joined in Wells Fargo's motion. See ECF Nos. 100-102, 107-08, 110.

[2] The Court refers to the pagination created by the electronic docketing system (ECF) throughout this Order.

corporate banking services.  Id. ¶ 66.  The company is incorporated in Delaware and

headquartered in San Francisco, California.  Id.  Wells Fargo's largest reportable operating

segment[3] during the relevant period, the Community Banking division, "focuses on diversified

financial products and services to customers and small businesses, including checking and savings

accounts, credit and debit cards, as well as auto, student, and small-business lending."  Id. ¶ 69.

      The Lead Plaintiffs are Fire and Police Pension Association of Colorado and the City of

Birmingham Retirement and Relief System.  Id. ¶¶ 61, 63.  Plaintiffs have owned Wells Fargo

common stock since at least January 1, 2011 and remain current stockholders of the company.  Id.

¶ 1, 65.

      The Individual Defendants were officers and directors of the company during the relevant

period.  Defendant John G. Stumpf served as Wells Fargo's CEO from June 2007 until his

resignation on October 12, 2016.  Id. ¶ 70.  He was also a director between June 2006 and January

2010, when he became Chairman of the Board.  Id.  Following Stumpf's resignation in October

2016, Defendant Timothy J. Sloan became Wells Fargo's CEO.  Id. ¶ 71.  Defendant Carrie

Tolstedt served as Senior Executive Vice President of the Community Banking division from June

2007 to July 2016.  Id. ¶ 72.  The Director Defendants during the relevant time period include:

John D. Baker II (director since January 2010); Elaine L. Chao (director from July 2011 to January

2017); John S. Chen (director since September 2006); Lloyd H. Dean (director since June 2005);

Elizabeth A. Duke (director since January 2015); Susan E. Engel (director since May 1998);

Enrique Hernandez (director since January 2003); Donald M. James (director since January 2009);

Cynthia H. Milligan (director since July 1992); Enrique Peña (director since November 2011);

James H. Quigley (director since October 2013); Judith M. Runstad (director from May 1998 to

April 2016); Stephen W. Sanger (director since 2003); Susan G. Swenson (director since

November 1998); Suzanne M. Vautrinot (director since February 2015).  ¶¶ 76–91.

---

[3] An "operating segment" is a firm component for which discrete financial information is available
and which meets other specified criteria.  Statement of Fin. Accounting Standards No. 131, ¶ 10
(Fin. Accounting Standards Bd. 1997).  A segment becomes "reportable" when it has assets,
revenues, or profits of at least 10 percent of all operating segments of the company.  Id. ¶ 18.

**B.**     **Cross-Selling**

Throughout the relevant period, Wells Fargo's financial condition and prospects were dependent upon cross-selling – i.e., the sale of new products and services to existing customers. Id. ¶ 3.

As explained in Wells Fargo's 2006 Annual Report, "'[s]elling more products to [its] customers – or "cross-selling" – is the foundation of [its] business model and key to [its] ability to grow revenue and earnings.'" Id. ¶ 126. The 2007 Annual Report further explained that "the Bank's 'primary strategy to achieve [its] vision' was 'to increase the number of products our customers buy from us and to give them all of the financial products that fulfill their needs.'" Id. ¶ 127 (brackets added). The same 2007 Report went on to explain that the "cross-sell strategy and diversified business model . . . 'facilitate growth in strong and weak economic cycles, as we can grow by expanding the number of product out current customers have with us.'" Id. That Report further noted that "Wells Fargo was 'known across [its] industry as number one, second to none, for cross-sell and revenue growth.'" Id. (emphasis omitted). The 2010 Annual Report similarly touted Wells Fargo as "the king of cross-sell." Id. ¶ 130. Likewise, the 2013 Annual Report stated that "cross-sell of our products is an important part of our strategy to achieve our vision to satisfy all our customers' financial needs . . . . We believe there is more opportunity for cross-sell as we continue to earn more business from our customers." Id. ¶ 134 (emphasis omitted). Wells Fargo's 2013 SEC filings explained that cross-selling was critical to the company's financial success:

> Our "cross-selling" efforts to increase the number of products our customers buy from us … is a key part of our growth strategy, and our failure to execute this strategy effectively could have a material adverse effect on our revenue growth and financial results. Selling more products to our customers – "cross-selling" – is very important to our business model and key to our ability to grow revenue and earnings…

Id. ¶ 135.

The company tracked and reported yearly cross-sell numbers, and this "was often the first metric announced in the Annual Reports to shareholders." Id. ¶ 142.

Cross-selling numbers progressively grew between 1998, "when the products per retail banking household was 3.2," and 2010, when that number reached an average of 6.14 products per household.  Id. ¶ 142.  That number reached its zenith in 2014, at 6.17 products per household. Id. ¶ 144.

**C.      Gr-Eight Initiative**

To achieve their cross-selling goals, "Defendants imposed strict quotas regulating the number of products Wells Fargo bankers must sell."  Id. ¶ 2.

As early as 1999, the bank established the "Great Eight" or "Gr-Eight" initiative, which set a goal of selling eight products per household.  Id. ¶¶ 124–25.

"The number of accounts Wells Fargo employees opened were also closely tracked. Several former Wells Fargo employees have recounted they were required to open 15 new accounts for products each day."  Id. ¶ 146.  Daily sales for each branch were reported to the district manager four times a day.  Id.  And "[e]mployees who were unable to meet their sales goals faced the prospect of termination."  Id.

Plaintiffs allege "[t]hose quotas translated into unrelenting pressure on bankers to open numerous accounts per customer."  Id. ¶ 2. "And because Wells Fargo's success in cross-selling was central to its financial results and market participants' assessment of the Company, Defendants were also highly motivated to foster, and perpetuate, those unlawful practices."  Id.

**D.      Letter to Stumpf and the Audit and Examination Committee in September 2007**

In September 2007, Stumpf and the Board's Audit and Examination Committee received letters from an employee discussing how the Gr-Eight Initiative created a high pressure sales culture that resulted in unethical and illegal activity, including fraud.  Id. ¶¶ 22, 484.  The letter warned that, "[l]eft unchecked, the inevitable outcome shall be one of professional and reputational damage, consumer fraud and shareholder lawsuits, coupled with regulator sanctions. Id.

**E.      EthicsLine**

Wells Fargo began tracking employee complaints regarding unethical sales practices

through EthicsLine – a service through which employees can report ethics and compliance concerns to Wells Fargo via a third party – in 2008. Id. ¶¶ 23, 159. Through this system, employees could report "gaming" – defined as "the manipulation and/or misrepresentation of product solutions or product solutions reporting in order to receive or attempt to receive compensation, or to meet or attempt to meet goals" and "sales incentives." Id. ¶¶ 23, 158. After an employee reported an ethics or compliance concern through EthicsLine, the information was provided to Wells Fargo's Office of Global Ethics. Id. ¶ 151.

Stumpf later confirmed in his written responses to questions posed by the Senate Banking Committee that "from at least 2011 forward, the Board's Audit and Examination Committee received period reports on activities of Wells Fargo's Internal Investigations group (which investigates issues involving team members), as well as information on EthicsLine and suspicious activity reporting. Among other things, several of those reports discussed increases in sales integrity issues or in notifications to law enforcement in part relating to the uptick in sales integrity issues." Id. ¶ 155.

### F. Litigation between 2008 and 2013

Between 2008 and 2013, several lawsuits against the company involved allegations of unauthorized account-creation practices. Id. ¶¶ 24–26, 33, 35, 212-219, 501.

In 2008 a former Wells Fargo employee won a whistleblower lawsuit against the company relating to the creation of fake brokerage accounts in 2008. Id. ¶ 24. "In the case, a division of the U.S. Department of Labor ("DOL") found there was 'reasonable cause to believe' Wells Fargo violated whistleblower protection laws by transferring the employee after he flagged illegal activity." Id.

In 2009, six former employees brought wrongful termination suits in which they alleged that they were fired for reordering debit cards without customer authorization after they had been instructed to do so by their manager. Id. ¶ 25, 213.

In 2010, two former Wells Fargo employees filed a discrimination lawsuit in which they pointed to unethical sales activities and unauthorized account openings at the Company. Id. ¶¶ 26, 214.

In 2012, seven former Wells Fargo employees filed a complaint asserting similar allegations. Id. ¶¶ 33, 217.

In 2013, another former employee filed a lawsuit "alleging she was retaliated against and wrongfully terminated after her supervisor forced her to open accounts in the names of family members." Id. ¶¶ 35, 218.

**G.      Communications to Stumpf and Human Resources Executives in 2011**

In 2011, two branch managers – one in New Jersey and one in Arizona – emailed Stumpf warning him that employees were creating fake accounts to meet the company's sales quotas. Id. ¶ 28. One of those branch managers, Rasheeda Kamar, stated in her email that she was fired after failing to meet sales quotas because she did not tolerate the creation of fake accounts. Id. ¶ 200. The other branch manager, Ricky Hansen, reported the fraudulent accounts to Human Resources and EthicsLine. Id. ¶ 201–02. He was fired a month later for improperly looking up the fraudulent account information, which he did at EthicsLine's request. Id.

**H.      *Los Angeles Times* Article in December 2013**

On December 21, 2013, the *Los Angeles Times* published an article reporting that, "[t]o meet quotas, [Wells Fargo] employees have opened unneeded accounts for customers, ordered credit cards without customers' permission and forged client signatures on paperwork." Id. ¶ 37. The article further noted "[t]he relentless pressure to sell [that] has battered employee morale and led to ethical breaches." Id. The article's conclusions were based on "a review of internal bank documents and court records, and from interviews with 28 former and seven current Wells Fargo employees who worked at bank  branches in nine states, including California." Id.

Stumpf later admitted during his testimony before the Senate Banking Committee in September 2016 that he discussed the December 2013 *Los Angeles Times* article with the Board. Id. ¶ 40.

**I.      Communication to Stumpf and the Board in April 2015**

On April 3, 2015, a former Wells Fargo banker mailed and emailed a letter to Stumpf and the Board advising them of 'unethical practices in sales due to the continuous management threat of negative consequences if they did not produce 'solutions' in double digits on daily basis, the

threat has come to 'do whatever it takes to get this [sic] numbers.'" Id. ¶¶ 44, 205. "During the next several months, the former employee repeatedly emailed Wells Fargo representatives, copying the Board, asking for updates." Id. ¶ 44, 207.

### J.      Litigation in May 2015

The December 2013 *Los Angeles Times* article prompted a year-long investigation into the illicit account-creation practices by L.A. City Attorney Michael Feuer, which led to the filing on May 4, 2015 of a civil enforcement action on behalf of California consumers. Id. ¶ 42. In that complaint, the L.A. City Attorney alleged "that . . . Wells Fargo employees opened banking and financial accounts, products, and services for California customers without their knowledge or consent . . ." Id. ¶¶ 499, 172-78, 42.

On May 14, 2015, a consumer class action challenging the illicit account-creation scheme was filed against Wells Fargo in this district. Id. ¶¶ 45, 179–82, 500.

### K.      OCC Supervisory Letters between 2014 and 2016

The Office of the Comptroller of the Currency ("OCC") began supervising Wells Fargo's governance and risk management practices in January 2012. Id. ¶ 31.

In 2014, "[t]he OCC specifically identified the need to assess cross-selling and sales practices as part of its upcoming examination of the Bank's governance processes." Id. ¶ 222.

In 2015, the OCC issued several Supervisory Letters "regarding required corrective action in the Bank's enterprise-wide risk management and oversight of its sales practices," among other issues. Id. ¶ 485, 220-238, 46. For example, the OCC issued a Supervisory Letter in June 2015 highlighting the following "MRAs," or "Matters Requiring Attention": "the lack of an appropriate control or oversight structure given corporate emphasis on product sales and cross-selling," "the lack of an enterprise-wide sales practices oversight program," "the lack of a formalized governance process to oversee sales practices and effectively oversee and test branch sales practices," and "the failure of the Bank's audit services to identify the above issues or to aggregate sales practice issues into an enterprise view." Id. ¶ 503.[4]

---

[4] "The OCC defines MRAs as practices that '[d]eviate from sound governance, internal control, and risk management principles, which may adversely impact the bank's earnings or capital, risk

7

**L.      Consent Orders**

On September 8, 2016, the L.A. City Attorney, U.S. Consumer Financial Protection Bureau (CFPB) and the OCC issued separate consent orders and press releases disclosing widespread deficiencies and unsafe or unsound practices in Wells Fargo's risk management and oversight of its sales practices.  Id. ¶ 9.

The CFPB's consent order stated "that from January 1, 2011 to September 8, 2016 thousands of Wells Fargo employees engaged in improper sales practices 'to satisfy sales goals and earn financial rewards under [the Company's] incentive-compensation program,' leading the Company to terminate approximately 5,300 employees for engaging in those practices." Id. ¶ 10 (quoting Wells Fargo Bank, N.A., 2016-CFPB-0015 (Consumer Financial Protection Bureau Sept. 8, 2016)).  "In all, the CFPB found that the Bank 'opened hundreds of thousands of unauthorized deposit accounts and applied for tens of thousands of credit cards for consumers' without their knowledge or consent."  Id.

**M.      Congressional Investigation**

In September 2016, Stumpf testified before the Senate Banking Committee and the House Financial Services Committee.  ¶¶ 15–16.

At the hearing before the House Financial Services Committee, Stumpf testified that "the Board, from 2011 to 2013, would get reports at a Committee level, at a high level about ethics lines [EthicsLine], requests, or information at not a granular but maybe at the company level."  Id. ¶ 29.  He further testified that "[t]he board was made aware, generally, of issues by – in committees, at high levels in the 2011, '12 time frame.  By 2013, we had talked about maybe in one – I can't remember which committee it was, surely by 2014, and then when we finally connected the dots on customer harm in '15, the board was very active on this."  Id. ¶ 260, 498.

In his written responses to questions posed by the Senate Banking Committee, Stumpf confirmed that, "[f]rom at least 2011 forward, the Board's Audit and Examination Committee received periodic reports on the activities of Wells Fargo's Internal Investigations group (which

---

profile, or reputation, if not addressed'; or '[r]esult in substantive noncompliance with laws and regulations, . . ."  Id. ¶ 46.

investigates issues involving team members), as well as information on EthicsLine and suspicious activity reporting." Id. ¶¶ 30, 261. Stumpf explained that, "[a]mong other things, several of those reports discussed increases in sales integrity issues or in notifications to law enforcement in part relating to the uptick in sales integrity issues." Id. Stumpf stated that other committees – including the Risk Committee and the Human Resources Committee – also received reports regarding sales integrity issues. Id. Stumpf admitted that "[s]ales integrity issues were also discussed periodically with the Board." Id.

Stumpf testified before the Senate Banking Committee that he learned of the fraud in 2013 and that the Board learned of it "later [in] 2013 and then 2014 and on." Id. ¶ 41. He further testified that he recalls learning of the increase in the number of reports of sales-practice issues in late 2013. Id. ¶ 169. He stated that the reports regarding the opening of fraudulent accounts "got to the board level – it got to the corporate level in 2013 because progress was not being made." Id. ¶ 258. He further testified: "And I know in 2014, various committees of the Board were made aware of this. The risk committee, the audit and examination [committee], the corporate responsibility [committee]." Id.

### N.     Procedural History

Based on the misconduct alleged above, several entities filed shareholder derivative complaints in this district, which have since been consolidated into a single action. ECF Nos. 39, 70. The Court appointed Lieff Cabraser Heimann & Bernstein and Saxena White as Co-Lead Counsel. ECF No. 70.

In the consolidated complaint, Plaintiffs assert the following causes of action: (1) breach of fiduciary duty (against all Defendants); (2) unjust enrichment (against all Defendants); (3) breach of fiduciary duty for insider selling and misappropriation of information (against the Insider Selling Defendants); (4) violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9 (against the Director Defendants); (5) violations of Section 10(b) of the Exchange Act and SEC Rule 10b–5 (against all Defendants); (6) violation of Section 20A of the Exchange Act (against Insider Selling Defendants); (7) violations of Section 29(b) of the Exchange Act (against all Defendants); (8) violation of Section 25402 of the California Corporations Code (against the

Insider Selling Defendants); (9) violation of Section 25403 of the California Corporations Code (against the Director Defendants); (10) corporate waste (against the Director Defendants); (11) contribution and indemnification (against Defendants Stumpf, Shrewsberry, Sloan, and Tolstedt). Id. ¶¶ 524–596. Plaintiffs seek declaratory relief, damages, injunctive relief, restitution, and attorneys' fees. Id. at 185–86.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 8(a)(2) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." While a complaint need not contain detailed factual allegations, facts pleaded by a plaintiff must be "enough to raise a right to relief above the speculative level." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain sufficient factual matter that, when accepted as true, states a claim that is plausible on its face. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. While this standard is not a probability requirement, "where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." Id. (internal quotation marks omitted). In determining whether a plaintiff has met this plausibility standard, the Court must accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable to the plaintiff. Knievel v. ESPN, 393 F.3d 1068, 1072 (9th Cir. 2005).

## III. ANALYSIS

Nominal Defendant Wells Fargo moves to dismiss the Complaint pursuant to Rule 12(b)(6) and Rule 23.1 on the ground that Plaintiffs have failed to adequately plead demand futility. ECF No. 99.

### A. Requests for Judicial Notice

The Court first addresses Wells Fargo's requests for judicial notice. ECF No. 99-2; ECF No. 116-2.

"As a general rule, we may not consider any material beyond the pleadings in ruling on a

Rule 12(b)(6) motion." United States v. Corinthian Colleges, 655 F.3d 984, 998–99 (9th Cir. 2011) (internal quotation marks and citations omitted). However, "[t]he court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). The Court "must take judicial notice if a party requests it and the court is supplied with the necessary information." Fed. R. Evid. 201(c).

The Court takes judicial notice of the following documents under the incorporation by reference doctrine: *Los Angeles Times Article* from December 21, 2013 (Exhibit A); Office of the Comptroller Currency's Consent Order in the Matter of Wells Fargo Bank, N.A. (Exhibit D); Stumpf's testimony before the U.S. Senate Committee on Banking, Housing, and Urban Affairs on September 20, 2016 (Exhibit E). A court may "take into account documents 'whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached the [plaintiff's] pleading." Knievel v. ESPN, 393 F.3d 1068, 1076 (9th Cir. 2005) (quoting In re Silicon Graphics Inc. Sec. Litig., 183 F.3d 970, 986 (9th Cir.1999)). Each of these exhibits is referenced in the complaint and Plaintiffs do not question the authenticity of these documents. Plaintiffs oppose this request on the ground that Wells Fargo relies on these exhibits to challenge factual assertions in the Plaintiffs' complaint that could reasonably be disputed – for example, to show that Wells Fargo took adequate remedial actions. ECF No. 115-1 at 2-4. This argument fails. See Fecht v. Price Co., 70 F.3d 1078, 1083, n. 1 (9th Cir. 1995) (rejecting Plaintiffs' argument that the district court improperly considered the full text of documents that were only partially pleaded in the complaint) (citing Branch v. Tunnell, 14 F.3d 449, 454 (9th Cir.), *cert. denied*, 512 U.S. 1219 (1994)). District courts are "entitled to take notice of the full contents of the published articles referenced in the complaint, from which the truncated quotations were drawn." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 569, n. 13 (2007) (citing Fed. Rule Evid. 201). However, because the facts contained in the documents are subject to reasonable dispute, "the Court takes judicial notice only of the statements contained therein, but not for the purpose of determining the truth of those statements." In re LDK Solar Sec. Litig., 584 F. Supp. 2d 1230,

1254 (N.D. Cal. 2008) (internal quotation marks and citations omitted).

Second, the Court takes judicial notice of several SEC filings (Motion Exhibits B, F-I, K-L, N-P, and Reply Exhibit C). These exhibits are properly subject to judicial notice. See Metzler Inv. GMBH v. Corinthian Colleges, Inc., 540 F.3d 1049, 1064 n. 7 (9th Cir. 2008) (holding that the district court properly took judicial notice of publicly available financial documents and SEC filings); Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Stumpf, No. C 11-2369 SI, 2012 WL 424557, at *4 (N.D. Cal. Feb. 9, 2012) (granting defendants' request for judicial notice of documents that Wells Fargo filed with the SEC). Plaintiffs oppose judicial notice of the SEC filings to the extent the Court is inclined to accept the truth of the matters asserted therein. ECF No. 115-1 at 4-5; ECF No. 118. Again, the Court takes judicial notice of the statements in the SEC filings, but not for the purpose of determining the truth of those statements.

Third, Wells Fargo requests that the Court take judicial notice of documents from government websites, including the Bureau of Labor Statistics, the Federal Deposit Insurance Corporation, the U.S. Census Bureau, the Center for Disease Control, and PACER (Exhibits C, Q-T). Again, Plaintiffs oppose this request to the extent the documents are considered for the truth of the matters asserted therein. ECF No. 115-1 at 7. The population data, labor statistics, and public court docket information contained in these exhibits is not reasonably subject to dispute. Therefore, the Court takes judicial notice of these exhibits. See Daniels-Hall v. Nat'l Educ. Ass'n, 629 F.3d 992, 998–99 (9th Cir. 2010).

Fourth, the Court takes judicial notice of the news release titled "Wells Fargo Announces Actions Based on Retail Banking Sales Practices Investigation" (Exhibit M), which was released by Wells Fargo on February 21, 2017. The Court takes judicial notice of Exhibit M solely "to indicate what was in the public realm at the time, not whether the contents of those articles were in fact true." Von Saher v. Norton Simon Museum of Art at Pasadena, 592 F.3d 954, 960 (9th Cir. 2010) (quoting Premier Growth Fund v. Alliance Capital Mgmt., 435 F.3d 396, 401 n. 15 (3d Cir.2006)).

Fifth, the Court takes judicial notice of court filings in other cases and search results from

United States District Court
Northern District of California

the PACER database (Motion Exhibits J and T, and Reply Exhibits A and B) because they are matters of public record. See <u>Reyn's Pasta Bella, LLC v. Visa USA, Inc.</u>, 442 F.3d 741, 746 n. 6 (9th Cir. 2006) ("We may take judicial notice of court filings and other matters of public record"). Again, the Court only takes judicial notice of the existence of these court filings, and does not accept the matters asserted therein as true. <u>Salas v. Gomez</u>, No. 14-CV-01676-JST, 2016 WL 3971206, at *5 (N.D. Cal. July 25, 2016) ("Although the Court 'may take judicial notice of the existence of unrelated court documents...it will not take judicial notice of such documents for the truth of the matter asserted therein.'") (quoting <u>In re Bare Escentuals, Inc. Sec. Lit.</u>, 745 F. Supp. 2d 1052, 1067 (N.D. Cal. 2010) ).

Finally, the Court takes judicial notice of Wells Fargo's stock price history between December 20, 2013 and January 17, 2014 (Reply Exhibit D). <u>Metzler Inv. GMBH v. Corinthian Colleges, Inc.</u>, 540 F.3d 1049, 1064, n. 7 (9th Cir. 2008) (noting that judicial notice of "reported stock price history and other publicly available financial documents" was proper).

The Court now turns to the merits of Defendants' motion to dismiss.

## B.    Pleading Standards under Rule 23.1

"The derivative form of action permits an individual shareholder to bring 'suit to enforce a *corporate* cause of action against officers, directors, and third parties.'" <u>Kamen v. Kemper Fin. Servs., Inc.</u>, 500 U.S. 90, 95 (1991) (emphasis in original) (quoting <u>Ross v. Bernhard</u>, 396 U.S. 531, 534 (1970)).

However, "[a] shareholder seeking to vindicate the interests of a corporation through a derivative suit must first demand action from the corporation's directors or plead with particularity the reasons why such demand would have been futile." <u>In re Silicon Graphics Inc. Sec. Litig.</u>, 183 F.3d 970, 989 (9th Cir. 1999), <u>as amended</u> (Aug. 4, 1999) (citing Fed.R.Civ.P. 23.1). "The purpose of the demand requirement is to affor[d] the directors an opportunity to exercise their reasonable business judgment and waive a legal right vested in the corporation in the belief that its best interests will be promoted by not insisting on such right." <u>Kamen</u>, 500 U.S. at 96 (internal quotation marks omitted).

This demand requirement is articulated in Federal Rule of Civil Procedure 23.1, which

requires that a shareholder derivative complaint "state with particularity: . . . any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and . . . the reasons for not obtaining the action or not making the effort." Fed. R. Civ. P. 23.1(b). Although "Rule 23.1 requires that a plaintiff allege specific facts," a plaintiff is not required to plead particularized facts "sufficient to sustain a judicial finding," nor is a plaintiff required to "plead evidence." In re Ezcorp Inc. Consulting Agreement Derivative Litig., No. CV 9962-VCL, 2016 WL 301245, at *33 (Del. Ch. Jan. 25, 2016) (internal quotation marks and citations omitted).

## C. Demand Futility under Delaware Law

Plaintiffs concede in the Complaint that they did not make a pre-suit demand on the Board before filing this action. ECF No. 83 ¶ 477. They allege that demand should be excused as futile. Id. ¶¶ 477-517.

"To show futility under Delaware law,[5] a plaintiff must allege particularized facts creating a reasonable doubt that (1) the directors are disinterested and independent, or (2) the challenged transaction was otherwise the product of a valid exercise of business judgment." Silicon Graphics, 183 F.3d at 990 (citing Aronson v. Lewis, 473 A.2d 805, 814 (Del. 1984), overruled on other grounds by Brehm v. Eisner, 746 A.2d 244 (Del. 2000)).

Plaintiffs allege that demand would have been futile for three reasons: (1) the Director Defendants' conduct did not constitute a valid exercise of business judgment; (2) the Director Defendants face a substantial likelihood of liability due to their knowledge or conscious disregard of facts relating to the illicit account-creation scheme; and (3) the Board lacks independence from Stumpf because it repeatedly granted him excessive compensation. Id. ¶¶ 477-517.

The Court concludes that demand is futile because the allegations in the Complaint create a reasonable doubt as to whether a majority of the Director Defendants face a substantial likelihood of liability as to Plaintiffs' claims.[6]

---

[5] Delaware law applies because Wells Fargo is a Delaware corporation. Kamen, 500 U.S. at 108–09 ("[A] court that is entertaining a derivative action under that statute must apply the demand futility exception as it is defined by the law of the State of incorporation.").
[6] Given this finding, the Court does not address the other demand futility theories.

**D.      Substantial Likelihood of Liability as to Plaintiffs' Claims**

"[D]emand is excused if Plaintiffs' particularized allegations create a reasonable doubt as to whether a majority of the board of directors faces a substantial likelihood of personal liability for breaching the duty of loyalty." Rosenbloom v. Pyott, 765 F.3d 1137, 1150 (9th Cir. 2014). Because the Board contained fifteen directors at the time the first complaint was filed,[7] Plaintiffs must establish a reasonable doubt as to whether at least eight of those Directors could exercise disinterested and independent business judgment in responding to a demand. See Rales v. Blasband, 634 A.2d 927, 930 (Del. 1993).

"Demand will be excused only if the plaintiff's allegations show the defendants' actions 'were so egregious that a substantial likelihood of director liability exists.'" Silicon Graphics, 183 F.3d at 990 (quoting Aronson, 473 A.2d at 815). "[T]he mere threat of personal liability for approving a questioned transaction, standing alone, is insufficient to challenge either the independence or disinterestedness of directors." Id. Neither are allegations that simply "describ[e] the calamity and alleg[e] that it occurred on the directors' watch." South v. Baker, 62 A.3d 1, 14 (Del. Ch. 2012) (internal quotation marks omitted). Rather, a shareholder plaintiff "must plead facts establishing a sufficient connection between the corporate trauma and the board . . ." Id.

**1.      Breach of Fiduciary Duty Claims**

Plaintiffs allege that all fifteen Director Defendants face a substantial risk of personal liability "given their awareness or conscious disregard of significant red flags relating to the illicit account-creation scheme." ECF No. 83 ¶¶ 483, 494. Plaintiffs further allege that the Board as a whole failed to fulfill its "duty to ensure wells Fargo's systems were sufficiently well-designed to detect suspicious activity at the customer level," and that "the Board either deliberately or recklessly failed to take remedial action to stop the illicit account-creation scheme." Id. ¶¶

---

[7] Baker, Chao, Chen, Dean, Duke, Engel, Hernandez, James, Milligan, Peña, Quigley, Sanger, Stumpf, Swenson, and Vautrinot. ECF No. 83 ¶ 91. Although Stumpf resigned after the filing of the action, courts assess demand futility "as of the time the complaint is filed" because the relevant question is "whether the board that would be addressing the demand can impartially consider its merits without being influenced by improper considerations." Rales v. Blasband, 634 A.2d 927, 934 (Del. 1993).

495-96. As a result, Plaintiffs allege that "the Board is incapable or unwilling to take the actions required to seek the relief requested in this Complaint." Id. ¶ 497.

To prevail on this theory of director oversight liability, Plaintiffs "must show that the directors *knew* they were not discharging their fiduciary obligations or that the directors demonstrated a *conscious* disregard for their responsibilities . . ." In re Citigroup Inc. S'holder Derivative Litig., 964 A.2d 106, 122–23 (Del. Ch. 2009) (emphases in original). This "scienter-based standard" is rooted in the Delaware Supreme Court's decision in In re Caremark Int'l Inc. Derivative Litig., 698 A.2d 959 (Del. Ch. 1996). Desimone v. Barrows, 924 A.2d 908, 935–36 (Del. Ch. 2007). In that case, the Delaware Supreme Court held that, "where a claim of directorial liability for corporate loss is predicated upon ignorance of liability creating activities within the corporation, . . . only a sustained or systematic failure of the board to exercise oversight – such as an utter failure to attempt to assure a reasonable information and reporting system exists – will establish the lack of good faith that is a necessary condition to liability." Caremark, 698 A.2d at 971. "Such a test of liability . . . is quite high." Id. (describing breach of fiduciary duty claims asserted against the directors as "extremely weak" because the record "does not support the conclusion that the defendants either lacked good faith in the exercise of their monitoring responsibilities or consciously permitted a known violation of law by the corporation to occur"). The Delaware Supreme Court "reinforc[ed]" the Caremark decision in Stone ex rel. AmSouth Bancorporation v. Ritter, 911 A.2d 362 (Del. 2006). Desimone, 924 A.2d at 935. There, the Delaware Supreme Court held "that *Caremark* articulates the necessary conditions predicate for director oversight liability: (a) the directors utterly failed to implement any reporting or information system or controls; *or* (b) having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention." Stone, 911 A.2d at 370 (citing Guttman v. Huang, 823 A.2d 492, 506 (Del. Ch. 2003)). "In either case, imposition of liability requires a showing that the directors knew that they were not discharging their fiduciary obligations." Id.

Plaintiffs must allege scienter here for an additional reason: Wells Fargo's charter exculpates its Directors from liability unless the directors breached their duty of loyalty or the

16

conduct involved bad faith, intentional misconduct, or a knowing violation of the law.  See ECF No. 99-1 at 409, Ex. P.  Section 102(b)(7) of the Delaware General Corporation Law permits a corporation to include such an exculpatory clause in a certificate of incorporation.  In re Midway Games Inc., 428 B.R. 303, 316 (Bankr. D. Del. 2010), on reconsideration in part (Mar. 19, 2010) (citing 8 Del. C. § 102(b)(7)).  Therefore, under both the standard for director oversight liability and the standard for director liability for breach of the duty of care when the company has adopted an exculpatory provision, Plaintiffs must "alleg[e] particularized facts that show that a director *consciously* disregarded an obligation to be reasonably informed about the business and its risks or *consciously* disregarded the duty to monitor and oversee the business."  Citigroup, 964 A.2d at 125.

The extensive and detailed allegations in the complaint plausibly suggest that a majority of the Director Defendants did precisely that.[8]

First, Plaintiffs point to Stumpf's admissions to both the Senate Banking Committee and the House Financial Services Committee regarding the Board's monitoring of sales integrity issues.  Where a complaint contains particularized allegations "that the Board continued to closely and regularly monitor [the realm where the illegal activity occurred]," a court "can – and at [the motion to dismiss] stage must – reasonably infer that the Board's discussion of these matters afforded its members a view of [the company's] illegal conduct."  Rosenbloom, 765 F.3d at 1152.  The Complaint includes such allegations.  Specifically, the Complaint points to the following testimony that Stumpf gave to the House Financial Services Committee on September 29, 2016:  "The board was made aware, generally, of issues by – in committees, at high levels in the 2011, '12 time frame.  By 2013, we had talked about maybe in one – I can't remember which committee

_____

[8] Because Plaintiffs allege that the Board as a whole or specific committees within the Board had knowledge of the illegal account-creation scheme, the Court does not evaluate demand futility on a director-by-director basis.  Rosenbloom v. Pyott, 765 F.3d 1137, 1159, n. 13 (9th Cir. 2014) ("Although in many cases involving demand futility the parties go director by director to determine whether demand is excused, the parties here do not do so, mainly because Plaintiffs repeatedly allege that a majority of the Board was involved in all (or nearly all) of the programs and decisions at issue. When appropriate, courts may evaluate demand futility by looking to the whole board of directors rather than by going one by one through its ranks.") (citing Pfizer, 722 F.Supp.2d at 461).

it was, surely by 2014, and then when we finally connected the dots on customer harm in '15, the board was very active on this." Id. ¶ 260, 498. Stumpf confirmed in written responses to questions posed by the Senate Banking Committee that, "[f]rom at least 2011 forward, the Board's Audit and Examination Committee received periodic reports on the activities of Wells Fargo's Internal Investigations group (which investigates issues involving team members), as well as information on EthicsLine and suspicious activity reporting." Id. ¶ 261. Notably, Stumpf explained that, "[a]mong other things, *several of those reports discussed increases in sales integrity issues or in notifications to law enforcement in part relating to the uptick in sales integrity issues.*" Id. (emphasis added). Stumpf stated that other committees – including the Risk Committee and the Human Resources Committee – also received reports regarding sales integrity issues. Id. Stumpf admitted that "[s]ales integrity issues were also discussed periodically with the Board." Id. In his testimony before the Senate Banking Committee, Stumpf testified that reports regarding the opening of fraudulent accounts "got to the board level – it got to the corporate level in 2013 because progress was not being made." Id. ¶ 258. He further testified: "And I know in 2014, various committees of the Board were made aware of this. The risk committee, the audit and examination [committee], the corporate responsibility [committee]." Id. Collectively, those three committees contain twelve out of the fifteen Directors who were on the Board at the time this complaint was filed. Id. ¶¶ 484, 490, 491. Therefore, these allegations plausibly suggest that a majority of the Director Defendants knew about the widespread illegal activity by 2014 at the latest, and perhaps as early as 2011, but nonetheless failed to take action, thereby consciously disregarding their fiduciary duty to monitor and oversee the business.

Second, Plaintiffs point to direct communications from a former Wells Fargo employee to the Board in 2015.[9] Specifically, Plaintiffs allege that, "[o]n April 3, 2015, a former Wells Fargo

_____

[9] Plaintiffs also allege that the Audit and Examination Committee "failed to act when the Committee and Stumpf received a letter in September 2007 from an employee discussing how the Gr-Eight Initiative created a high pressure sales culture that resulted in 'unethical and illegal activity,' including 'routine deception and fraudulent exploitation of [Wells Fargo's] clients." Id. ¶¶ 22, 484. However, Plaintiffs do not allege that any of the current Director Defendants were on the Audit and Examination Committee in September 2007. See id. ¶¶ 484. Rather, according to other allegations in the complaint, it appears that those Director Defendants did not join the Audit

18

banker . . . mailed and emailed a letter to Stumpf and the Board advising them of 'unethical practices in sales due to the continuous management threat of negative consequences if they did not produce solutions.'" Id. ¶¶ 44, 205. "During the next several months, the former employee repeatedly emailed Wells Fargo representatives, *copying the Board*, asking for updates." Id. (emphasis added). Defendants' only response to this allegation is that these communications "are not alleged to have been sent to the individual Board members but to an email address of unalleged ownership (BoardCommunications@wellsfargo.com)." ECF No. 99 at 18. But Delaware law does not require the Plaintiffs to plead "facts sufficient to sustain a 'judicial finding' either of director interest or lack of director independence" or "to plead evidence" at this stage of the litigation. Ezcorp, 2016 WL 301245, at *33; Brehm v. Eisner, 746 A.2d 244, 254 (Del. 2000). And a communication to an email address that is clearly associated with the Board and which warns of precisely the misconduct at issue here, especially when viewed in conjunction with the plethora of other allegations in the complaint regarding the Board's knowledge, further supports the inference that the Director Defendants consciously disregarded their duties to the company.

Third, Plaintiffs point to several lawsuits between 2008 and 2013 which involved allegations of unauthorized account-creation practices at the company. ECF No. 83 ¶¶ 212-219, 501. For example, Plaintiffs allege that a former Wells Fargo employee won a whistleblower lawsuit against the company relating to the creation of fake brokerage accounts in 2008. Id. ¶ 24. "In the case, a division of the U.S. Department of Labor ("DOL") found there was 'reasonable cause to believe' Wells Fargo violated whistleblower protection laws by transferring the employee after he flagged illegal activity." Id. Plaintiffs further allege that six former employees brought wrongful termination suits in 2009, in which they alleged that they were fired for reordering debit cards without customer authorization after they had been instructed to do so by their manager, and

---

and Examination Committee until March 2010. See id. ¶¶ 76, 79, 82, 84, 85, 86, 89, 90.

Plaintiffs further allege that two branch managers emailed Stumpf regarding the creation of fake accounts in 2011, but they do not allege that these emails were sent to the Board, and "Delaware law does not permit the wholesale imputation of one director's knowledge to every other for demand excusal purposes." Id. ¶ 28; Desimone v. Barrows, 924 A.2d 908, 943 (Del. Ch. 2007).

that two former employees brought a discrimination lawsuit in 2010, in which they pointed to unethical sales activities and unauthorized account openings at the Company.  Id. ¶¶ 25-26, 213-14.  In 2012, seven former Wells Fargo employees filed a complaint asserting similar allegations.  Id. ¶ 217.  In 2013, another former employee filed a lawsuit "alleging she was retaliated against and wrongfully terminated after her supervisor forced her to open accounts in the names of family members."  Id. ¶ 218.  In a complaint filed in May 2015, the L.A. City Attorney alleged "that . . . Wells Fargo employees opened banking and financial accounts, products, and services for California customers without their knowledge or consent . . ."  Id. ¶¶ 499, 172-78, 42.  In the same month, a consumer class action challenging the same practices was filed in this district.  Id. ¶¶ 500, 179-82, 45.

Defendants respond that the Court should disregard these lawsuits because they involve "unproven allegations in other litigations."  ECF No. 99 at 19, 21.  However, Plaintiffs do not rely on those lawsuits to show that the allegations asserted in them are factually true; rather, they rely on the plain existence of those lawsuits to show that the Board was aware of yet another red flag.  Cf. Maine State Ret. Sys. v. Countrywide Fin. Corp., No. 2:10-CV-0302 MRP, 2011 WL 4389689, at *19-21 (C.D. Cal. May 5, 2011) (striking portions of the complaint that "quote[d] and cite[d] to unproven, untested allegations in complaints filed in separate lawsuits, as if they were facts" because plaintiffs did "not reasonably investigate the allegations they copied from complaints in other cases").  And, although Plaintiffs do not specifically allege that the Board knew about these lawsuits, it is reasonable to infer at this stage of the litigation that the Board would be aware of lawsuits stemming from sales practices that were essential to its cross-selling strategy.  In re Intuitive Surgical S'holder Derivative Litig.., 146 F. Supp. 3d 1106, 1117 (N.D. Cal. 2015) ("While Plaintiff does not specifically allege that information regarding the . . . products liability lawsuits were brought to the board's attention, . . . it is . . . reasonable to infer that the board would have been aware of any product liability lawsuits arising from the da Vinci system.").

Fourth, Plaintiffs point to an article published by the *Los Angeles Times* on December 21, 2013 that described in detail how the intense pressure to meet cross-selling quotas drove

20

employees to open unauthorized customer accounts. Id. ¶ 37. This article is directly relevant to Board knowledge because "Stumpf admitted during his testimony before the House Financial Services Committee that he discussed the December 2013 L.A. Times article with the Board." Id. ¶¶ 40, 169. The article itself was based on "a review of internal bank documents and court records, and [] interviews with 28 former and seven current Wells Fargo employees who worked at bank branches in nine states, including California."[10] Id. Plaintiffs allege that this article "unquestionably alerted Defendants that [unlawful account-creation] activities were pervasive and stemmed from the culture – directed by management and supported by the Board – of pressuring Bank employees to grow accounts by any means necessary." Id. ¶ 40.

Fifth, Plaintiffs point to significant regulatory interventions between 2012 and 2016. Specifically, Plaintiffs allege that the Audit and Examination Committee "failed to act when it received information" about several OCC Supervisory Letters between in 2015 "regarding required corrective action in the Bank's enterprise-wide risk management and oversight of its sales practices," among other issues. Id. ¶ 485, 220-238, 46. For example, the OCC issued a Supervisory Letter in June 2015 highlighting the following "MRAs," or "Matters Requiring Attention": "the lack of an appropriate control or oversight structure given corporate emphasis on product sales and cross-selling," "the lack of an enterprise-wide sales practices oversight program," "the lack of a formalized governance process to oversee sales practices and effectively oversee and test branch sales practices," and "the failure of the Bank's audit services to identify the above issues or to aggregate sales practice issues into an enterprise view." Id. ¶ 503. Earlier, in 2014, "[t]he OCC specifically identified the need to assess cross-selling and sales practices as part of its upcoming examination of the Bank's governance processes." Id. ¶ 222.[11]

---

[10] Wells Fargo's gloss on the L.A. Times article – that it "informed the reader that the problem was localized to Los Angeles," ECF No. 116 at 11 – is flatly inconsistent with the article's text.
[11] Defendants argue that these OCC supervisory letters were directed to Wells Fargo's subsidiary, Wells Fargo Bank, N.A., and only seven of the members of the Bank's board were also members of the Wells Fargo board. ECF No. 99 at 23-24. Although seven directors does not constitute a majority of the Board, the Plaintiffs elsewhere allege, by way of Stumpf's testimony and written responses to Congressional committees, that the entire Board and several committees that collectively make up a majority of the Board knew about these issues through other means – namely, regular reporting on sales integrity issues and the opening of fraudulent accounts.

Sixth, Plaintiffs cite widespread employee terminations due to unauthorized account creation between 2011 and September 2016 as another red flag. According to the Consumer Financial Protection Bureau's consent order from, "more than 5,300 Wells Fargo employees" were terminated during a five-year period "for conduct relating to the illicit account-creation scheme." Id. ¶ 246, 505 (emphasis omitted). Plaintiffs further allege that "Wells Fargo terminated nearly 1,000 employees in the retail banking sector for improper sales practices" in 2011 alone, but "Defendants took no action at that time." Id. ¶ 247.

Seventh, because cross-selling was so essential to Wells Fargo's financial growth and success during the relevant time period, it is reasonable to infer "that the Board was intensely interested in" the success of its cross-selling initiative, that the Board saw cross-selling "as a critical driver of growth" for the company, and that the Board "planned on very closely monitoring" cross-selling numbers. Rosenbloom, 765 F.3d at 1151-52. Indeed, "[y]early cross-sell numbers were also tracked and reported" and this "was often the first metric announced in the Annual Reports to shareholders." ECF No. 83, ¶ 142. As noted above, the complaint further alleges that various committees of the Board did, in fact, "receiv[e] periodic reports on investigations into sales integrity issues and information from EthicsLine," as confirmed by Stumpf's testimony and written responses to Congress that the Board as a whole and several specific committees on the Board. See id. ¶¶ 159, 261. The rise in cross-selling numbers, which reached its peak in 2014, coincides with the rise in sales integrity issues: Stumpf told the Senate Banking Committee that he recalls learning of the increase in the number of reports of sales-practice issues in late 2013. Id. ¶¶ 144, 169. This further suggests that the Director Defendants knew about the illicit account-creation scheme.

Of course, these allegations regarding the importance of cross-selling and the simultaneous rise in cross-selling and sales integrity issues would not be sufficient on their own to establish conscious inaction on the part of the Board. See Rosenbloom, 765 F.3d at 1152 (noting that, although "the bare facts of the Board's hunger for higher off-label sales and an ultimate increase in

---

Therefore, the regulatory interventions, though not sufficient on their own, bolster the Court's conclusion that the Director Defendants consciously disregarded their duties to the company.

those sales do not suffice to show conscious inaction on the part of the Board," the plaintiffs presented several other allegations that strongly supported an inference of conscious inaction). Rather, these allegations are just one piece of a much larger puzzle, as demonstrated by the numerous other allegations outlined above. Importantly, though, these allegations provide a reason why the Director Defendants might have chosen to consciously disregard their fiduciary duties and allow widespread illegal account creation practices to continue: Wells Fargo's success was dependent upon cross-selling, which was in turn dependent upon the same strict sales quotas that drove employees to create fake accounts. Therefore, these allegations further bolster the Court's conclusion that the Director Defendants consciously disregarded their fiduciary duties to the company.

Defendants respond that these red flags are insignificant when viewed in their larger context. For example, Defendants argue that the termination of 5,300 employees over the span of five years is minimal when viewed in light of the bank's size and layoffs in the financial services sector during this time. ECF No. 99 at 17-18, n. 9. Defendants similarly argue that "[t]he existence of four employee complaints over a nine-year period in an organization as large as Wells Fargo hardly evidences the sort of systemic failure of controls that Plaintiffs must plead to support a failure of oversight claim." Id. at 18. Defendants also contend that, "[i]f Wells Fargo's Directors undertook to read all of those complaints [in which it is a named defendant], they would do nothing else." Id. at 19.

As a preliminary matter, no one would expect the Director Defendants to read every complaint naming Wells Fargo as a defendant, it is not unreasonable to expect them to be aware of a large-scale lawsuit tied to the company's central business strategy. See, e.g., In re Biopure Corp. Derivative Litig., 424 F. Supp. 2d 305, 307–08 (D. Mass. 2006) (imputing knowledge of an FDA clinical hold to director defendants because the "company's primary product or service [was] in jeopardy") (citing In re Keyspan Corp. Sec. Litig., 383 F. Supp. 2d 358, 387-88 (D.N.Y. 2003)). The action filed by the Los Angeles City Attorney in May 2015 certainly falls into that category. So does the consumer class action filed in this district, which Wells Fargo recently settled for $110 million. See Jabbari v. Wells Fargo, N.A., et al., Case No. 15-cv-02159-VC, ECF No. 96 (N.D.

Cal. March 28, 2017).  Moreover, all of these lawsuits raised the same issue – the creation of unauthorized accounts by employees – thereby pointing to a widespread problem within the company.  Therefore, these allegations go to the heart of the Director Defendants' duty to monitor and oversee operations after controls have been implemented in order to stay "informed of risks or problems requiring their attention."  Stone, 911 A.2d at 370 (citing Guttman v. Huang, 823 A.2d 492, 506 (Del. Ch. 2003)).

More importantly, though, Defendants ignore the bigger picture by addressing each of these red flags in piecemeal fashion.  While any of these red flags might appear relatively insignificant to a large company like Wells Fargo when viewed in isolation, when viewed collectively they support an inference that a majority of the Director Defendants consciously disregarded their fiduciary duties despite knowledge regarding widespread illegal account-creation activities, and therefore, that there is a substantial likelihood of director oversight liability.  See Delaware Cty. Employees Ret. Fund v. Sanchez, 124 A.3d 1017, 1019 (Del. 2015) ("[I]t is important that the trial court consider all the particularized facts pled by the plaintiffs . . . in their totality and not in isolation from each other, and draw all reasonable inferences from the totality of those facts in favor of the plaintiffs.").  Like in Rosenbloom, the Plaintiffs have pointed to a "battery of particularized factual allegations that strongly support an inference at this stage of the litigation that the Board knew of and did nothing about illegal activity."  Rosenbloom, 765 F.3d at 1152.  Such allegations "that the board consciously failed to act after learning about evidence of illegality – the proverbial 'red flag'" – are sufficient at the motion to dismiss stage.  South v. Baker, 62 A.3d at 15 (citing "[a] claim that an audit committee or board had notice of serious misconduct and simply failed to investigate" as an example of a case that "would survive a motion to dismiss, even if the committee or board was well constituted and was otherwise functioning") (quoting David B. Shaev Profit Sharing Account v. Armstrong, 2006 WL 391931, at *5 (Del. Ch. Feb. 13, 2006)).  "A board that fails to act in the face of such information makes a conscious decision, and the decision not to act is just as much of a decision as a decision to act."  Id. (citing Aronson, 473 A.2d at 813).

Defendants further argue that, if anything, these allegations would have led the Board to

24

conclude that Wells Fargo's oversight system and controls were working as they were supposed to. For example, with respect to the Board's apparent inaction in response to communications from and litigation involving current and former employees, Defendants argue that "[a] more appropriate inference is that the Board leaves individual ethics and related employment cases to management and counsel, who are equipped to handle those individual issues in a manner that the Board is not." ECF No. 99 at 20. Regarding the *Los Angeles Times* article, Defendants argue that "the article indicates that management had detected and had dealt with [the problem] in the most serious way that a company can discipline employees: dismissal." Id. at 21. Defendants place particular focus on the complaint's allegation that, "in 2011, one group (the Sales and Service Conduct Oversight Team) 'began to engage in proactive monitoring of data analytics, specifically for the purpose of rooting out sales practice violations'" and that those controls "identified simulated funding activity in the Los Angeles and Orange County markets, and terminated Wells Fargo employees for that conduct." Id. at 19; ECF No. 83 ¶ 27. With respect to the employee terminations, Defendants similarly argue that the terminations "might well have communicated to the Directors that the controls in place were functioning properly and that the Company was taking misconduct seriously when it discovered it." ECF No. 99 at 17-18.

This is one inference that could be drawn from the allegations. But at this stage of the litigation the Court must construe all reasonable inferences in Plaintiffs' favor. See Brehm v. Eisner, 746 A.2d 244, 255 (Del. 2000) ("Plaintiffs are entitled to all reasonable factual inferences that logically flow from the particularized facts alleged . . ."); see also, e.g., Rosenbloom, 765 F.3d at 1153 ("Whereas Allergan argues that the Board could have viewed the increase in off-label Botox sales as the natural operation of the medical community, at this stage of the case we must make reasonable inferences for Plaintiffs, not against them – and it is reasonable to infer that the data repeatedly presented to Allergan's board linking Allergan programs to fluctuations in off-label sales support a finding of scienter."). And it is just as reasonable to infer from Plaintiffs' allegations as a whole that the Director Defendants knew that (1) unauthorized account-creation practices were not confined to a few employees and sufficiently dealt with on a one-off basis through termination, but rather a systemic issue that was rampant in branches across the country,

inadequate at detecting, preventing, and rooting out this problem.  <u>McCall v. Scott</u>, 239 F.3d 808, 821 (6th Cir.), <u>amended on denial of reh'g</u>, 250 F.3d 997 (6th Cir. 2001).  In sum, by "focus[ing] on other hypothetical explanations for the [their] conduct," the Defendants "improperly ignore[] the rule that any inferences reasonably drawn from the factual allegations of the complaint must be viewed in the light most favorable to the plaintiffs."  <u>Westmoreland Cty. Employee Ret. Sys. v. Parkinson</u>, 727 F.3d 719, 729 (7th Cir. 2013) (internal quotation marks and citations omitted).

Throughout their briefing, Defendants seem to suggest that the mere presence of control systems is sufficient on its own to satisfy the fiduciary duty to monitor.  By way of example, this position is demonstrated in the following passage in Defendants' motion:

> Even if the Wells Fargo Directors had been made aware of the June 2015 letter containing MRAs, that correspondence would not have communicated *an utter lack of control systems*.  To be sure, the June 2015 correspondence called upon Wells Fargo Bank, N.A. to . . . "improv[e] processes."  But the instruction to 'improve processes' presupposes processes.

ECF No. 99 at 24 (emphasis added).  But the Delaware Supreme Court has clearly explained that a director can be held liable for a failure to monitor even if control systems were in place.  As that court explained in <u>Stone</u>, director oversight liability can result in one of two ways: "(a) the directors utterly failed to implement any reporting or information system or controls; *or* (b) having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention."  <u>Stone</u>, 911 A.2d at 370 (citing <u>Guttman</u>, 823 A.2d at 506) (emphasis in original).  Given the court's use of the disjunctive "or" in that sentence, Defendants' singular focus on the presence of control systems is misplaced.  In other words, a director cannot simply implement control systems, consciously fail to oversee its operations, and then claim to have satisfied its fiduciary duty to monitor.

The allegations in the complaint plausibly suggest that that is what occurred here.  For example, Plaintiffs allege that, despite multiple lawsuits brought by former employees related to the unlawful account creation practices between 2008 and 2013, "[t]he only response . . . was to

include a new entry code on its EthicsLine ethics complaint forms for 'gaming' and 'sales incentives,' to track those specific types of complaints." ECF No. 83. ¶ 219. But implementation of a reporting system is not sufficient on its own to preclude director oversight liability. As explained above, Stumpf admitted that the Board and several committees within the Board learned of an uptick in sales integrity issues, based partially on EthicsLine reporting, between the 2011 to 2014 time period. But, despite having "knowledge that the company controls [were] inadequate," the allegations plausibly suggest that the Director Defendants "knowingly failed to stop further problems from occurring," thus breaching their fiduciary duties to the company. Rich ex rel. Fuqi Int'l, Inc. v. Yu Kwai Chong, 66 A.3d 963, 984 (Del. Ch. 2013) ("When faced with knowledge that the company controls are inadequate, the directors must *act,* i.e., they must prevent further wrongdoing from occurring."). Where, as here, Plaintiffs allege that directors "failed to exercise reasonable oversight over pervasive *fraudulent* and *criminal* conduct," the directors' conscious inaction is not protected by the business judgment rule. In re Citigroup Inc. S'holder Derivative Litig., 964 A.2d 106, 130-131 (Del. Ch. 2009) (emphasis in original).

In sum, the abundance of particularized allegations in the Consolidated Amended Complaint support an inference that a majority of the Director Defendants – and in particular those Director Defendants who were on the risk committee, audit and examination committee, and corporate responsibility committee – knew about widespread illegal activity and consciously disregarded their fiduciary duties to oversee and monitor the company. As a result, they face a substantial likelihood of liability for Plaintiffs' breach of fiduciary duty claims.

### 2. Section 14(a) Claims

The Director Defendants also face a substantial likelihood of liability on Plaintiffs' claims under Section 14(a) of the Exchange Act and SEC Rule 14a-9.

Section 14(a) of the Securities Exchange Act makes it unlawful to solicit shareholder approval by use of a proxy statement that does not comply with the rules and regulations of the Securities Exchange Commission. 15 U.S.C. § 78n. In turn, regulation 14a–9 prohibits proxy statements that are false or misleading with regard to any material facts at the time they are issued and in light of the circumstances under which they are made. 17 C.F.R. § 240.14a–9.

Collectively, these provisions "disallow the solicitation of a proxy by a statement that contains either (1) a false or misleading declaration of material fact, or (2) an omission of material fact that makes any portion of the statement misleading." Desaigoudar v. Meyercord, 223 F.3d 1020, 1022 (9th Cir. 2000).

"[A] Section 14(a), Rule 14a–9 plaintiff must demonstrate that the misstatement or omission was made with the requisite level of culpability and that it was an essential link in the accomplishment of the proposed transaction." Desaigoudar v. Meyercord, 223 F.3d 1020, 1022–23 (9th Cir. 2000). Where, as here, the claim "sounds in fraud," both Federal Rule of Civil Procedure 9(b) and the heightened pleading standard of the Private Securities Litigation Reform Act (PSLRA) apply, and the plaintiff must "identify: (1) each statement alleged to have been misleading; (2) the reason or reasons why the statement is misleading; and (3) all facts on which that belief is formed." Id.; In re Countrywide Fin. Corp. Derivative Litig., 554 F. Supp. 2d 1044, 1076 (C.D. Cal. 2008).

As with the breach of fiduciary duty claims, "to establish a threat of director liability based on a disclosure violation, plaintiffs must plead facts that show that the violation was made knowingly or in bad faith." In re Citigroup Inc. S'holder Derivative Litig., 964 A.2d 106, 133–34 (Del. Ch. 2009).

Contrary to Defendants' contention, Plaintiffs' allegations meet the heightened pleading requirements of the PSLRA. See ECF No. 116 at 16, n. 13. Plaintiffs allege that "[t]he Director Defendants . . . caus[ed] Wells Fargo to issue proxy statements that failed to disclose the illicit account-creation scheme or the seriously deficient internal and disclosure controls that allowed the scheme to begin and helped perpetuate it." ECF No. 83 ¶¶ 272-311. Specifically, Plaintiffs allege that the 2014, 2015, and 2016 Proxy Statements omitted several material facts, including disclosures regarding "ineffective internal and disclosure controls"; "reporting failures that failed to appropriately address rampant illegal sales practices and retaliatory terminations against those reporting improper account-creation practices"; "Board-approved compensation programs that incentivized fraudulent account openings for years"; and "known pending investigations by the U.S. Department of Justice ('DOJ'), DOL, congressional committees, the SEC, California state

prosecutors, and attorneys general into the fraudulent account openings." Id. ¶¶ 278, 290, 302. In addition, Plaintiffs allege that the Proxy Statements "omitted the fact that certain of the cross-selling metrics reported by Defendants were based on false, illegally-generated cross-sell numbers." Id. ¶¶ 284, 296. Plaintiffs also explain in detail why the proxy statements were misleading – for example, the disclosures "suggested that Wells Fargo's strong financial performance was attributable to a purportedly effective governance structure, while improperly omitting that such financial performance stemmed, in material part, from the illicit account-creation scheme." Id. ¶¶ 310, 281, 293, 296. In addition, Plaintiffs identify specific statements in the proxy statements that they allege are affirmatively false and misleading. Id. ¶¶ 272-311. Absent these false or misleading statements and omissions in the Proxy Statements, Plaintiffs contend that shareholders would not have voted to re-elect Board members, approve executive compensation packages (including approval of an incentive compensation award for Officer Defendant Tolstedt based on "record cross-sell and deposit levels"), and reject an independent Board chairman. Id. ¶¶ 116-22, 273-311.[12]

In light of the extensive and detailed allegations suggesting that the Director Defendants knew about the illegal account-creation scheme by 2014 at the latest, the Court can also reasonably infer that the Director Defendants knew that these disclosures were false or misleading at the time they were issued. Therefore, Plaintiffs have adequately alleged scienter on the part of the Director Defendants for the reasons already discussed.

Defendants argue that the complaint does not allege sufficient Board involvement in the preparation of the disclosures such that the Director Defendants face a substantial likelihood of liability. ECF No. 116 at 15. To the contrary, Plaintiffs allege that "Defendants Stumpf, Baker, Chao, Chen, Dean, Engel, Hernandez, James, Milligan, Peña, Quigley, Runstad, and Sanger caused Wells Fargo to file the 2014 Proxy Statement in connection with the 2014 annual

---

[12] Defendants do not argue that these allegedly false or misleading disclosures would have been immaterial to a reasonable investor. In any event, it is clear that "[s]hareholders would reasonably consider the Company's financial performance in deciding whether to reelect the directors" and "would be interested in knowing whether the directors would use deceptive methods to achieve the performance measures that were the benchmarks of the . . . compensation plans." Countrywide, 554 F. Supp. 2d at 1077.

stockholders meeting to be held on April 29, 2014." ECF No. 83 ¶ 273. Because all but Runstad were on the Board at the time the first complaint was filed, the allegations in the complaint suggest that a majority of the Director Defendants knowingly participated in the issuance of the allegedly false or misleading disclosures. ECF No. 83 ¶ 91. Plaintiffs similarly allege with particularity that the Director Defendants were involved in the preparation of the 2015 and 2016 Proxy Statements. Id. ¶¶ 286, 298.

The Court therefore concludes that the Director Defendants face a substantial likelihood of liability on Plaintiffs' claims under Section 14(a) of the Exchange Act.[13]

### 3. Section 10(b) Claims

"A § 10(b) claim requires the following elements: (1) a material misrepresentation or omission; (2) scienter; (3) reliance; (4) economic loss; and (5) loss causation, which is 'a causal connection between the material misrepresentation and the loss.'" Countrywide, 554 F. Supp. 2d at 1057 (quoting Dura Pharm. v. Broudo, 544 U.S. 336, 341–42 (2005)); 15 U.S.C. § 78u–4(b)(4)).

Plaintiffs allege that the Defendants violated Section 10(b) by "caus[ing] the Company to issue statements that, in light of the illicit account-creation scheme detailed above, were materially false or misleading when made." ECF No. 83 ¶ 312. In turn, Plaintiffs allege that these statements "artificially inflated the price of Wells Fargo's shares, causing the Company to purchase shares at artificially inflated prices, through its significant stock repurchase program." Id. Plaintiffs allege that the stock repurchase program "signaled to investors . . . that Wells Fargo shares were trading at a discount, which caused investors to purchase shares and thereby drive the price up." Id. ¶ 313. In addition, "the Company's repurchasing of shares artificially inflated its financial metrics such as earnings per share, as the repurchases resulted in fewer outstanding

---

[13] Based on this alleged misconduct, the Director Defendants also face a substantial likelihood of liability for breach of their fiduciary duty of loyalty, which "requires honesty from corporate directors in their communications with the public and shareholders about corporate matters." Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Stumpf, No. C 11-2369 SI, 2012 WL 424557, at *6-*7 (N.D. Cal. Feb. 9, 2012) (holding that director defendants faced a substantial likelihood of liability for breach of their duty of loyalty by omitting material information in a proxy statement).

United States District Court
Northern District of California

shares." Id. "The artificial inflation of Wells Fargo shares was both financially beneficial to Defendants, as numerous Defendants' compensation was tied to the Company's financial performance, and helped mask the illicit account-creation scheme (and thus helped perpetuate it)." Id. Moreover, "as a result of the artificial inflation of the price of Wells Fargo shares, the Insider Selling Defendants sold shares at higher prices, and in some instances sold them to the Company – and thus reaped greater proceeds – than they would have absent the artificial inflation." Id.

Defendants' argue that the directors do not face a substantial likelihood of liability under Section 10(b) because Plaintiffs have failed to allege scienter and reliance. ECF No. 99 at 27; ECF No. 116 at 16-17.

The Court has already concluded that the allegations in the complaint create a strong inference of scienter on the part of a majority of the Director Defendants, particularly the twelve Director Defendants who were members of the risk committee, the audit and examination committee, and the corporate responsibility committee. For the same reasons, the Court concludes that the Plaintiffs have successfully pleaded facts giving rise to a strong inference of scienter for purposes of their 10(b) claims. Countrywide, 554 F. Supp. 2d at 1056 (applying a "scienter-based standard" to Plaintiffs' 10(b) claims and Plaintiffs' Caremark claims).

With respect to reliance, Defendants argue that "Wells Fargo could never plead or prove, as it would have to, that it had reasonably relied on either its own misstatements or on the market price that reflected those misstatements given that the knowledge of the people who allegedly knowingly made those misstatements is Wells Fargo's knowledge." ECF No. 99 at 27 (emphasis in original). In other words, Defendants argue that the Director Defendants and Wells Fargo are one and the same, and therefore Wells Fargo could not possibly rely on misstatements that the Director Defendants knowingly made. Defendants contend that this "is merely the logical application of the long-standing corporate law proposition that corporations operate through their senior officers, whose knowledge is the corporation's knowledge." ECF No. 116 at 16. To support this argument, Defendants rely on In re Verisign, Inc. Deriv. Litig., 531 F. Supp. 2d 1173, 1209 (N.D. Cal. 2007).

In Verisign, the plaintiffs similarly alleged that the director defendants made false or

misleading statements that "artificially inflated the value of VeriSign's stock" and then caused VeriSign to repurchase its own stock at those inflated prices. VeriSign, 531 F. Supp. 2d at 1203. The court held that plaintiffs could not plead reliance under such a theory because the corporate decision-maker for the repurchase of shares also had knowledge of the alleged fraud. See id. at 1209.

However, several courts have rejected VeriSign's reasoning as flawed, and have accordingly declined to follow it. See In re Finisar Corp. Derivative Litig., No. C-06-07660 RMW, 2012 WL 2873844, at *17 (N.D. Cal. July 12, 2012); In re Fossil, Inc., 713 F. Supp. 2d 644, 654 (N.D. Tex. 2010); Countrywide, 554 F. Supp. 2d at 1073. For example, another court in this district concluded that "the Verisign court 'extended too far the legal fiction that the company is the same as its leadership.'" Finisar, 2012 WL 2873844, at *17 (quoting In re Fossil, Inc., 713 F.Supp.2d at 653). The Finisar court further explained that, "if Finisar issues or purchases stock at a loss, it does not do so recklessly – it is a puppet whose strings are pulled by the very directors and officers responsible for the fraud." Id. Courts have also noted that VeriSign's holding leads to an absurd result: "[I]t requires dismissal of a fraud claim where all of the directors are in on the scheme, but allows the claim to proceed if the corruption is less widespread." Id. (emphasis in original); see also Fossil, 713 F. Supp 2d at 654 ("This Court declines to hold that in order to sufficiently plead reliance a derivative plaintiff must allege that some directors or officers acted with the alleged scienter and material misrepresentations but that some did not and that the company's justifiable reliance on its Board exists only because of those who did not take part in the alleged fraud.").

Moreover, the only authority upon which the VeriSign court relied in reaching its conclusion – the Ninth Circuit's decision in Atari Corp. v. Ernst & Whinney, 981 F.2d 1025 (9th Cir. 1992) – was entirely inapplicable because Atari was not a derivative action and therefore did not involve allegations brought by a company against its own directors. See Atari, 981 F.2d at 1027 (describing securities fraud claims brought by one company against the auditors and officers of another company with which the first company had entered into a merger); Fossil, 713 F. Supp. 2d at 653 ("The key distinction between the statement in *Atari* and the allegations in this case and

32

*Verisign* is that Plaintiffs here allege that certain directors and officers misled the company, and Plaintiffs bring their claim derivatively on the company's behalf.").

Defendants argue that the courts that have declined to follow <u>VeriSign</u> improperly relied, either directly or indirectly, on the Second Circuit's decision in <u>Ruckle v. Roto Am. Corp.</u>, 339 F.3d 24 (2d Cir. 1964). ECF No. 116 at 17. Defendants contend that <u>Ruckle</u> is no longer good law because it was overruled in <u>O'Neill v. Maytag</u>, 339 F.2d 764. <u>Id.</u> Defendants are wrong. Although a Second Circuit panel declined to follow <u>Ruckle</u> a month after that decision was issued in 1964, the Second Circuit explained more than a decade later that "[t]he future, both in this circuit and in others, lay with the <u>Ruckle</u> dictum rather than with <u>O'Neill</u>." <u>Goldberg v. Meridor</u>, 567 F.2d 209, 215 (2d Cir. 1977) (explaining that the Second Circuit's decision in <u>Schoenbaum</u> "effectively overrul[ed] any requirement of <u>O'Neill</u> that there must be one virtuous or ignorant lamb among the directors in order for liability to arise under s 10(b) . . .").

The Court respectfully disagrees with the reasoning in <u>VeriSign</u> because it "exalts form over substance" and "restricts the application of [10(b) liability] in a way which is at odds with its basic purpose." <u>Pappas v. Moss</u>, 393 F.2d 865, 869 (3d Cir. 1968). As the Second Circuit explained in <u>Goldberg v. Meridor</u>:

> If . . . the board defrauded the corporation into issuing shares either to its members or others, we can think of no reason to say that redress under Rule 10B-5 is precluded, though it would have been available had anyone else committed the fraud. There can be no more effective way to emasculate the policies of the federal securities laws than to deny relief solely because a fraud was committed by a director rather than by an outsider. Denial of relief on this basis would surely undercut the congressional determination to prevent the public distribution of worthless securities.

567 F.2d 209, 215 (2d Cir. 1977). Here, Plaintiffs allege that, "[h]ad Wells Fargo known of the material adverse information not disclosed by Defendants, or been aware of the truth behind Defendants' material misstatements, the Company would not have repurchased Wells Fargo stock at artificially inflated prices." ECF No. 83 ¶ 401. They have sufficiently alleged reliance for purposes of their 10(b) claims.

United States District Court
Northern District of California

1    Therefore, the Director Defendants face a substantial likelihood of liability as to Plaintiffs'

2    Section 10(b) claims.

3                    **4.    Remaining Claims**

4        Defendants argue that Plaintiffs' remaining causes of action for unjust enrichment,

5    corporate waste, and mismanagement do not independently give rise to a substantial likelihood of

6    Director liability because they are merely duplicative of the breach of fiduciary duty claims.  ECF

7    No. 98 at 16, n. 8.  Defendants further argue that "Plaintiffs come nowhere near pleading waste"

8    and that the Directors do not face a substantial likelihood of liability under California

9    Corporations Code § 24503 because there is no private right of action under that statute.  ECF No.

10   99 at 27.

11                   **a.    Unjust Enrichment**

12       Because Plaintiffs' claim for unjust enrichment rests on the same theory as the claim for

13   breach of fiduciary duty, the Court concludes that Defendants also face a substantial likelihood of

14   liability as to that claim for the same reasons.  See MCG Capital Corp. v. Maginn, No. CIV.A.

15   4521-CC, 2010 WL 1782271, at *25, n. 147 (Del. Ch. May 5, 2010) ("If [plaintiff] is able prove

16   [defendant] breached his duty of loyalty in Count Five then it will also be successful in proving

17   unjust enrichment in Count Six."); Jackson Nat. Life Ins. Co. v. Kennedy, 741 A.2d 377, 394 (Del.

18   Ch. 1999) (same).  Where, as here, the plaintiff's theory of liability for unjust enrichment is the

19   same as the theory for breach of fiduciary duty, such that "the unjust enrichment claim depends

20   *per force* on the breach of fiduciary duty claim," courts often "treat [those claims] in the same

21   manner when resolving a motion to dismiss."  Frank v. Elgamal, No. CIV.A 6120-VCN, 2014 WL

22   957550, at *31 (Del. Ch. Mar. 10, 2014), order enforced, (Del. Ch. Mar. 14, 2014).

23       To the extent Defendants argue that the unjust enrichment claim should be dismissed as

24   duplicative at this stage in the litigation, they are wrong.  Although courts have dismissed

25   redundant claims at the summary judgment stage because the plaintiff is only entitled to one

26   recovery, they have noted "that, assuming there is a reasonably conceivable basis for both claims,

27   the plaintiff is entitled to discovery on them."  Id. at *32.  In sum, "there is no bar to bringing both

28   claims against a director," and "it is not at all clear that the Court, on a motion to dismiss, should

                                                34

reject an equitable claim on the basis that it is duplicative of another equitable claim." Dubroff v. Wren Holdings, LLC, No. CIV.A. 3940-VCN, 2011 WL 5137175, at *15, n. 58 (Del. Ch. Oct. 28, 2011) (quoting MCG Capital Corp., 2010 WL 1782271 at *25, n. 147).

### b. Corporate Waste

Plaintiffs allege that, "[b]y approving the stock repurchase program, the Director Defendants . . . caused Wells Fargo to waste its corporate assets on the repurchase of stock at artificially inflated prices." ECF No. 83 ¶ 591.

Faced with allegations similar to those raised in this Complaint, the Countrywide court held that plaintiffs had adequately pleaded a corporate waste claim based on a stock repurchase program, and that demand was accordingly excused as futile with respect to that claim. Countrywide, 554 F. Supp. 2d at 1078, 1082–83. The plaintiffs in Countrywide similarly alleged that the director defendants caused the company to repurchase common stock during the relevant time period, thus signaling to the market that the Board thought the shares were underpriced, while simultaneously selling their own personal shares. Id. at 1066–67. The court concluded that "the repurchase program could properly be viewed as an attempt to keep the ball rolling – i.e. to propel the Company forward (steadying the stock price, or sending it upward) for a period of time before the weight of the loan origination practices began taking its toll on the Company's operations and the value of its stock." Id. at 1068. Since the allegations in the complaint created "a strong inference of scienter" on behalf of several of the director defendants, "it follow[ed] that Plaintiffs have stated a claim that the repurchase is not subject to protection by the business judgment rule because . . . it may have served to delay the eventual impairment caused by unsound business practices." Id. at 1078. In other words, the court's prior finding of scienter provided "reason to doubt that the stock repurchase program . . . was the product of the Board's 'valid exercise of business judgment,'" and therefore demand was futile. Id. at 1082–83.

The same is true here. Because Plaintiffs have alleged particularized facts that create a reasonable doubt as to whether the stock repurchase program was the product of a valid exercise of business judgment, demand is excused as futile with respect to Plaintiffs' corporate waste claim challenging that transaction. Silicon Graphics, 183 F.3d at 990.

35

### c. Mismanagement

Contrary to Defendants' assertion, the complaint does not state a separate cause of action for "mismanagement." ECF No. 99 at 16, n. 8. Rather, the complaint acknowledges that "Delaware law does not recognize an independent cause of action against corporate directors or officers for gross mismanagement or abuse of control," and states that "Plaintiffs' claims for breach of fiduciary duty include abuse of control and gross mismanagement." ECF No. 83 ¶ 244.

### d. California Corporations Code Section 25403

There is no private right of action under California Corporations Code Section 25403. Apollo Capital Fund, LLC v. Roth Capital Partners, LLC, 158 Cal. App. 4th 226, 233, 255 (2007) ("[T]he civil liability provisions of [Section 25403] do not expressly provide a private right of action for a violation of section 25403, as they do for other specified provisions of the Act."). As a result, Defendants do not face a substantial likelihood of liability for that claim.

Plaintiffs' only response is that "the California Supreme Court has yet to resolve whether Section 25403 of the California Corporations Code affords a private right of action . . ." ECF No. 115 at 30, n. 15. While that may be true, "[a] state appellate court's announcement of a rule of law is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." Miller v. Cty. of Santa Cruz, 39 F.3d 1030, 1036, n. 5 (9th Cir. 1994), as amended (Dec. 27, 1994) (internal quotation marks omitted). Plaintiffs have failed to point to any such data here.

The Court therefore dismisses Count IX of the Consolidated Amended Complaint.

### e. Exchange Act Section 29(b)

Defendants argue that "Count VII, which seeks injunctive relief or rescission of Defendants' contracts under Section 29(b) as a means to ensure that any clawback of compensation is unencumbered, is entirely derivative of the breach of duty and Securities Exchange Act claims – Directors face no independent liability pursuant to this cause of action." ECF No. 99 at 28, n. 16.

Defendants are correct that "Section 29(b) itself does not define a substantive violation of the securities laws; rather, it is the vehicle through which private parties may rescind contracts that

were made or performed in violation of other substantive provisions." In re Asyst Techs., Inc. Derivative Litig., No. C-06-04669 EDL, 2008 WL 4891220, at *9 (N.D. Cal. Nov. 12, 2008) (quoting Berckeley Inv. Group Ltd v. Colkitt, 455 F.3d 195, 205 (3d Cir. 2006)). However, for the reasons stated above, Plaintiffs have already demonstrated that the Director Defendants face a substantial likelihood of liability for both the breach of fiduciary duty and Securities Exchange Act claims. And Defendants do not otherwise argue that Plaintiffs have failed to state a claim under Section 29(b).

Therefore, the Court denies the motion to dismiss Count VII.

## CONCLUSION

The particularized factual allegations in the Consolidated Amended Complaint create a reasonable doubt as to whether a majority of the Director Defendants face a substantial likelihood of personal liability for Plaintiffs' breach of fiduciary duty, securities, and derivative claims. The allegations also create a reasonable doubt as to whether the stock repurchase program was the product of a valid exercise of business judgment. Therefore, the Court concludes that demand is excused as futile, and accordingly denies Defendants motion to dismiss on that ground. However, the Court grants Defendants' motion to dismiss Count IX of the Consolidated Amended Complaint because there is no private right of action under California Corporations Code Section 25403.

IT IS SO ORDERED.

Dated: May 4, 2017

_____
JON S. TIGAR
United States District Judge