UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE: WELLS FARGO & COMPANY
SHAREHOLDER DERIVATIVE
LITIGATION

This Order Relates To:

ALL ACTIONS

Lead Case No. 16-cv-05541-JST

**ORDER GRANTING IN PART AND
DENYING IN PART MOTIONS TO
DISMISS**

Re:  ECF Nos. 139, 140, 141, 143, 144

Before the Court are the Motions to Dismiss the Consolidated Amended Verified

Stockholder Derivative Complaint filed by defendants John D. Baker II, Elaine L. Chao, John S.

Chen, Lloyd H. Dean, Elizabeth A. Duke, Susan E. Engel, Enrique Hernandez, Jr., Donald M.

James, Cynthia H. Milligan, Federico F. Peña, James H. Quigley, Judith M. Runstad, Stephen W.

Sanger, Susan G. Swenson, and Suzanne M. Vautrinot (collectively, the "Director Defendants"),

ECF No. 144, Timothy J. Sloan, ECF No. 139, Carrie Tolstedt, ECF No. 140, Michael J.

Loughlin, ECF No. 141, and John R. Shrewsberry, ECF No. 143.[1]  The Court will grant the

motions in part and deny them in part.

I.      **BACKGROUND**

This is a shareholder derivative action on behalf of Wells Fargo & Company ("Wells

Fargo") against the company's officers, directors, and senior management.  ECF No. 83,

Consolidated Amended Verified Stockholder Derivative Complaint ("Compl.") ¶ 64.  Plaintiffs

---

[1] Defendant John G. Stumpf filed a notice of joinder in Sections II.A and II.B of the Dependent
Directors' Motion to Dismiss, ECF No. 144, which relates to Plaintiffs' claims under Section
14(a) of the Securities Exchange Act of 1934, Section II.B.1 of the Tolstedt Motion, ECF No. 140,
which relates to Plaintiffs' claims under Section 20A of the Exchange Act, and Section D of the
Sloan Motion, ECF No. 139, which relates to Plaintiffs' claims under Section 25402 of the
California Corporations Code.  See ECF No. 145 at 1.

United States District Court
Northern District of California

United States District Court
Northern District of California

allege that, "[f]rom at least January 1, 2011 to the present ('the Relevant Period'), Defendants knew or consciously disregarded that Wells Fargo employees were illicitly creating millions of deposit and credit card accounts for their customers, without those customers' knowledge or consent." Id. ¶ 1.

> A.   **Wells Fargo's Cross-Selling and Alleged Fraudulent Account-Creation Scheme[2]**

Plaintiffs allege that Wells Fargo, "under Defendants' watch, . . . defrauded their customers in an attempt to drive up 'cross-selling,' i.e., selling complementary Wells Fargo banking products to prospective or existing customers." Id.  As summarized by Plaintiffs:

> To achieve their publicly touted goal of selling eight products per household—referred to as the 'Great Eight' or 'Gr-eight' initiative—Defendants imposed strict quotas regulating the number of products Wells Fargo bankers must sell.  Those quotas translated into unrelenting pressure on bankers to open numerous accounts per customer.  Bank employees were thus driven to engage in unlawful account-creation practices.  And because Wells Fargo's success in cross-selling was central to its financial results and market participants' assessment of the Company, Defendants were also highly motivated to foster and perpetuate those unlawful practices.  Indeed, the goal of Wells Fargo's high pressure cross-selling strategy was to show leadership in cross-selling, and, most importantly drive up the Bank's share price . . . result[ing] in enormous compensation for the Bank's executives.

Id. ¶ 2.

Plaintiffs allege that Wells Fargo's Officers and Directors either knew or should have known about the allegedly fraudulent cross-selling practices as early as 2007, when the Board's Audit and Examination Committee and then-Chairman and CEO John Stumpf "received letters from an employee discussing how the Gr-Eight Initiative created a high pressure sales culture that resulted in 'unethical and illegal activity,' including 'routine deception and fraudulent exploitation of [Wells Fargo's] clients.'"  Id. ¶ 22.  Plaintiffs further allege that Defendants were on notice of the fraudulent practices based on (1) complaints as early as 2008 through Wells Fargo's

---

[2] The Court summarized Plaintiffs' allegations in considerable detail in its May 4, 2017 order on Defendants' motions to dismiss for failure to adequately plead demand futility.  ECF No. 129 at 1-9.  The Court provides here a more condensed summary of facts relevant to the instant motions to dismiss.

"EthicsLine" service related to "gaming" and "sales incentives"; (2) a 2008 whistleblower lawsuit by an employee related to creation of fake brokerage accounts; (3) several wrongful termination and employment discrimination lawsuits filed as early as 2009 that included allegations of unethical practices; (4) investigations and inquiries by the Office of the Comptroller of the Currency ("OCC") and the Consumer Financial Protection Bureau ("CFPB") as early as 2012; and (5) a December 21, 2013 article in the <u>Los Angeles Times</u> that detailed the fraudulent account creation and the internal policies and pressure that led to it.  <u>Id.</u> ¶¶ 22-38.

Plaintiffs allege that "[n]otwithstanding that knowledge . . . neither Stumpf nor the other Defendants disclosed the improper activities to the public, and instead continued to tout their purported success in cross-selling, including reporting artificially inflated cross-selling metrics." <u>Id.</u> ¶ 17.  Wells Fargo's SEC filings and annual reports not only included these allegedly inflated cross-selling metrics, but repeatedly emphasized the importance of these metrics and its cross-selling strategy to Wells Fargo's financial performance and business model.  <u>See id.</u> ¶¶ 124-140.

According to Plaintiffs, Defendants participated in preparing and signed onto the following public filings, which Plaintiffs allege contained false or misleading statements and "artificially inflated reported retail bank household cross-sell metric for each reporting period":

| Filing | Date | Cross-Sell Metric | Signed by |
|---|---|---|---|
| 1Q 2011 10-Q | May 6, 2011 | 5.79 | Stumpf, Sloan |
| 2Q 2011 10-Q | August 5, 2011 | 5.84 | Stumpf, Sloan |
| 3Q 2011 10-Q | November 8, 2011 | 5.91 | Stumpf, Sloan |
| 2011 10-K | February 28, 2012 | 5.92 | Stumpf, Sloan, Baker, Chao, Chen, Dean, Engel, Hernandez, Milligan, Peña, Runstad, Sanger, Swenson |
| 1Q 2012 10-Q | May 8, 2012 | 5.98 | Stumpf, Sloan |
| 2Q 2012 10-Q | August 7, 2012 | 6.00 | Stumpf, Sloan |
| 3Q 2012 10-Q | November 6, 2012 | 6.04 | Stumpf, Sloan |
| 2012 10-K | February 27, 2013 | 6.05 | Stumpf, Sloan, Baker, Chao, Chen, Dean, Engel, Hernandez, James, Milligan, Peña, Runstad, Sanger |

| Filing | Date | Cross-Sell Metric | Signed by |
|--------|------|-------------------|-----------|
| 1Q 2013 10-Q | May 8, 2013 | 6.10 | Stumpf, Sloan |
| 2Q 2013 10-Q | August 7, 2013 | 6.14 | Stumpf, Sloan |
| 3Q 2013 10-Q | November 6, 2013 | 6.15 | Stumpf, Sloan |
| 2013 10-K | February 26, 2014 | 6.16 | Stumpf, Sloan, Baker, Chao, Dean, Engel, Hernandez, James, Milligan, Peña, Quigley, Runstad, Sanger, Swenson |
| 1Q 2014 10-Q | May 7, 2014 | 6.17 | Stumpf, Sloan |
| 2Q 2014 10-Q | August 6, 2016 | 6.17 | Stumpf, Shrewsberry |
| 3Q 2014 10-Q | November 5, 2014 | 6.15 | Stumpf, Shrewsberry |
| 2014 10-K | February 25, 2014 | 6.17 | Stumpf, Shrewsberry, Baker, Chao, Chen, Dean, Duke, Engel, Hernandez, James, Milligan, Peña, Quigley, Runstad, Sanger, Swenson |
| 1Q 2015 10-Q | May 6, 2015 | 6.13 | Stumpf, Shrewsberry |
| 2Q 2015 10-Q | August 5, 2015 | 6.13 | Stumpf, Shrewsberry |
| 3Q 2015 10-Q | November 4, 2015 | 6.13 | Stumpf, Shrewsberry |
| 2015 10-K | February 24, 2016 | 6.11 | Stumpf, Shrewsbeny, Baker, Chao, Chen, Dean, Duke, Engel, Hernandez, James, Milligan, Peña, Quigley, Sanger, Swenson, Vautrinot |
| 1Q 2016 10-Q | May 4, 2016 | 6.09 | Stumpf, Shrewsberry |
| 1Q 2016 10-Q | August 3, 2016 | Not reported | Stumpf, Shrewsberry |

Id. ¶ 367 (footnotes omitted).

**B.      The Moving Defendants**

**1.      Officer Defendants**

Defendant John G. Stumpf served as Wells Fargo's CEO from June 2007 until his resignation on October 12, 2016.  Id. ¶ 70.  He was also a director between June 2006 and January 2010, when he became Chairman of the Board.  Id.  According to the complaint, Mr. Stumpf admitted in testimony before Congress that he learned of the problem of opening of fraudulent

United States District Court
Northern District of California

accounts as early as 2013, and that he was "made aware, generally, of issues" related to cross-selling as early as 2011.  Id. ¶ 258-260.  In addition to his public statements to investors in conference calls and other public fora – statements chronicled extensively throughout the complaint – Mr. Stumpf signed all of Wells Fargo's quarterly and annual SEC filings from 2011 to 2016, which, according to Plaintiffs, contained false or misleading information regarding cross-selling metrics.  Id. ¶ 367.  Plaintiffs allege that throughout the relevant period, Mr. Stumpf "sold or otherwise disposed of 7,067,446 shares of Wells Fargo common stock for a total of $343,638,237.78," and  "netted over $51.8 million in gains" from the sale of an additional 5,432,400 shares he sold to Wells Fargo at an artificially inflated price using his employee stock options.  Id. ¶ 383-84.

Defendant Timothy J. Sloan became Wells Fargo's CEO following Stumpf's resignation in October 2016.  Id. ¶ 71.  Prior to that time, he served as Wells Fargo's President and COO, a position he assumed in November 2015.  Id.  He served as Senior Executive Vice President of the Wholesale Banking group from February 2011 to May 2014, Senior Executive Vice President and Chief Administrative Officer from September 2010 to February 2011.  Id.  Like Mr. Stumpf, Mr. Sloan repeatedly emphasized the importance of cross-selling to Wells Fargo's business and touted the company's "record-breaking achievements" in products-per-household metrics.  Id. ¶ 138-39 (discussing company's focus on "cross-sell capability" and noting employee tenure as the "secret sauce of cross-sell"), ¶ 329 n. 166 (noting "record-breaking achievements" in cross-sell metrics), ¶ 331-31 (touting Wells Fargo's ability to generate fee income from assets as "the highest in the industry," noting that "we're good at cross-sell"), ¶ 336 (touting "increase[d] cross-sell" and "risk management discipline").  Plaintiffs allege that throughout the relevant period, Mr. Sloan "sold or otherwise disposed of 2,512,359 shares of Wells Fargo common stock for a total of $119,530,828.37," and "netted over $20.7 million in gains" from the sale of an additional 1,585,188 shares he sold to Wells Fargo at an artificially inflated price using his employee stock options.  Id. ¶ 388-89.

Defendant Carrie Tolstedt served as Senior Executive Vice President of the Community Banking division from June 2007 to July 2016, after which she transitioned to retirement and left

the company.  Id. ¶ 72.  The Community Banking segment "was the Company's largest segment during the Relevant Period, and focuses on diversified financial products and services to customers and small businesses . . . ."  Id. ¶ 69.  This segment also appears to be where the fraudulent account creation was most prevalent.  See id. ¶ 223 (OCC supervisory letter requesting that Wells Fargo "address the governance of sales practices within its Community Banking division"); 261 (Board monitored "sales integrity" in Community Banking division).  Throughout the relevant time period, Ms. Tolstedt made several public statements about the importance of Wells Fargo's cross-sell model.  Id. ¶¶ 4, 137 (stating at an analyst conference that "the cross-sell model . . . drives revenue"); 129 (describing cross-selling as "the core of [Wells Fargo's] customer-centric strategy"); 332 (stating that "cross-sell model is more important than it has ever been before" and discussing goal of 8 accounts per customer); 350 (touting success in "retail bank household cross-sell" metrics).  Plaintiffs allege that Ms. Tolstedt approved Wells Fargo's Store Manager Incentive Plan, dated January 2008, which put pressure on bank employees to meet sales goals and encouraged fraudulent account creation.  Id. ¶ 147.  Wells Fargo's 2014 and 2015 Proxy Statements praised Ms. Tolstedt's leadership of the Community Banking division and recommended approval of substantial incentive compensation awards in each year.  Id. ¶ 268-69.  Plaintiffs allege that throughout the relevant period, Ms. Tolstedt "sold or otherwise disposed of 2,482,857 shares of Wells Fargo common stock for a total of $118,622,860.27" and "netted over $13.6 million in gains" from the sale of an additional 1,016,591 shares she sold to Wells Fargo at an artificially inflated price using her employee stock options.  Id. ¶ 386-87.

Defendant Michael Loughlin was a Senior Executive Vice President at Wells Fargo beginning July 2011, and, before that, served as the Chief Risk Officer beginning 2006.  Id. ¶ 174.  In that role, Mr. Loughlin "overs[aw] all risk-taking activities at Wells Fargo, including credit, market, operational, and compliance."  Id.  Plaintiffs allege that throughout the relevant period, Mr. Loughlin "sold or otherwise disposed of 999,921 shares of Wells Fargo common stock for a total of $47,607,897.93," and "netted over $3.9 million in gains" from the sale of an additional 317,353 shares he sold to Wells Fargo at an artificially inflated price using his employee stock options.  Id. ¶ 390-91.

United States District Court
Northern District of California

Defendant John R. Shrewsberry served as Wells Fargo's Senior Vice President and CFO since May 2014, and, before that, served as head of Wells Fargo Securities beginning 2009.  Id. ¶ 73.  At investor conferences in 2014, Mr. Shrewsberry characterized Wells Fargo's cross-selling business model as "legendary," noting that it was a critical part of the company's business model and provided a "sustainable long-term advantage[]."  Id. ¶ 136, 139, 349.  When the alleged fraudulent account-creation scheme came to light and Wells Fargo was sued by the Los Angeles City Attorney, Mr. Shrewsberry stated at another investor conference in 2015 that "none of [Wells Fargo's] internal systems for getting feedback [regarding the problematic account creation and cross-selling] have been tripped until this [lawsuit] came along," and that he did not see the issue of cross-selling or the lawsuit as "a real threat."  Id. ¶ 193.

### 2. The Director Defendants

The Director Defendants during the relevant time period include:  John D. Baker II (director since January 2010); Elaine L. Chao (director from July 2011 to January 2017); John S. Chen (director since September 2006); Lloyd H. Dean (director since June 2005); Elizabeth A. Duke (director since January 2015); Susan E. Engel (director since May 1998); Enrique Hernandez (director since January 2003); Donald M. James (director since January 2009); Cynthia H. Milligan (director since July 1992); Federico F. Peña (director since November 2011); James H. Quigley (director since October 2013); Judith M. Runstad (director from May 1998 to April 2016); Stephen W. Sanger (director since 2003); Susan G. Swenson (director since November 1998); and Suzanne M. Vautrinot (director since February 2015).  Id. ¶¶ 76-91.

As shown below, Plaintiff alleges that each of the Director Defendants led or participated in a board committee responsible for oversight of the allegedly fraudulent banking practices:

| Director/ Defendant | Audit and Examination | Corporate Responsibility | Governance and Nominating | Human Resources | Risk |
|---|---|---|---|---|---|
| Baker | X | X | | | |
| Chao | | X | | | |
| Chen | | | | X | |

| Director/Defendant | Audit and Examination | Corporate Responsibility | Governance and Nominating | Human Resources | Risk |
|---|---|---|---|---|---|
| Dean | | X | X | X | X |
| Duke | | | | | X |
| Engel | | | | X | |
| Hernandez | | X | | | X |
| James | | | | X | |
| Milligan | | X | X | | X |
| Pena | X | X | X | | X |
| Quigley | X | | | | X |
| Runstad | | X | | | X |
| Sanger | | | X | X | X |
| Swenson | X | | X | | |
| Vautrinot | X | | | | |

Id. ¶ 102.

The Audit and Examination Committee is tasked with oversight of "the integrity of the Company's financial statements and the adequacy and reliability of disclosures to stockholders, including management activities related to . . . internal controls." Id. ¶ 103. The Risk Committee is responsible for "overseeing all key risks facing the company," and among other things "maintaining a strong risk culture," "establishing protocols and processes for issue escalation and reporting," and monitoring "enterprise-wide incentive based compensation practices that are consistent with the safety and soundness of the Company and do not encourage excessive risk taking." Id. ¶ 106. The Human Resources Committee is responsible for overseeing the compensation strategy for executive officers, reviewing the Company's stock ownership and retention guidelines, and "implementation of risk-balancing and risk management methodologies for incentive compensation plans and programs for senior executives . . . ." Id. ¶ 107. The Corporate Responsibility Committee is responsible for advising the Board and management on "strategies that affect the Company's role and reputation as a socially responsible organization," including monitoring the company's relationship with customers. Id. ¶ 109. The Governance and

8

1   Nominating Committee is responsible for "oversee[ing] the Company's reputation and risk and

2   engagement with stockholders" and for ensuring recommending "corporate governance

3   guidelines." Id. ¶ 110.

4       Plaintiffs generally allege that the Director Defendants failed to adequately safeguard

5   Wells Fargo's interests and compliance with applicable laws, encouraged and failed to address the

6   fraudulent account creation scheme, and caused the company to issue purportedly false and

7   misleading quarterly and annual reports and proxy statements. See id. at 83-134.

8       **C.     Procedural History**

9       Based on the misconduct alleged above, several entities filed shareholder derivative

10  complaints in this district, which have since been consolidated into a single action. ECF Nos. 39,

11  70. The Court appointed Lieff Cabraser Heimann & Bernstein and Saxena White as Co-Lead

12  Counsel. ECF No. 70.

13      In the consolidated complaint, Plaintiffs assert the following causes of action: (1) breach

14  of fiduciary duty (against all Defendants); (2) unjust enrichment (against all Defendants);

15  (3) breach of fiduciary duty for insider selling and misappropriation of information (against the

16  Insider Selling Defendants); (4) violation of Section 14(a) of the Exchange Act and SEC Rule 14a-

17  9 (against the Director Defendants); (5) violations of Section 10(b) of the Exchange Act and SEC

18  Rule 10b-5 (against all Defendants); (6) violation of Section 20A of the Exchange Act (against

19  Insider Selling Defendants); (7) violations of Section 29(b) of the Exchange Act (against all

20  Defendants); (8) violation of Section 25402 of the California Corporations Code (against the

21  Insider Selling Defendants); (9) violation of Section 25403 of the California Corporations Code

22  (against the Director Defendants); (10) corporate waste (against the Director Defendants);

23  (11) contribution and indemnification (against Defendants Stumpf, Shrewsberry, Sloan, and

24  Tolstedt). Id. ¶¶ 524-596. Plaintiffs seek declaratory relief, damages, injunctive relief, restitution,

25  and attorneys' fees. Id. at 185-86.

26      On March 17, 2017, nominal Defendant Wells Fargo moved to dismiss the Complaint

27  pursuant to Rule 12(b)(6) and Rule 23.1 on the ground that Plaintiffs failed to adequately plead

28  demand futility. ECF No. 99. By order dated May 4, 2017, the Court granted the motion with

United States District Court
Northern District of California

United States District Court
Northern District of California

respect to Plaintiffs' claims under California Corporations Code Section 25403 – as "[t]here is no private right of action" under that statute – but denied the motions in all other respects.  ECF No. 129.  In denying the motions, the Court concluded that "[t]he extensive and detailed allegations in the complaint plausibly suggest[ed] that a majority of the Director Defendants" had "*consciously* disregarded an obligation to be reasonably informed about the business and its risks or *consciously* disregarded the duty to monitor and oversee the business."  Id. at 15 (quoting In re Citigroup Inc. S'holder Derivative Litig., 964 A.2d 106, 125 (Del. Ch. 1996)).  The Court specifically noted that the following "red flags" supported its conclusion:  (1) the Congressional testimony of Mr. Stumpf regarding the Board's knowledge of the company's issues with cross-selling; (2) communications between employees and Board members regarding the allegedly fraudulent activity; (3) the various lawsuits against the company that included allegations of impropriety in account creation; (4) the Los Angeles Times article documenting the fraudulent account creation scheme; (5) regulatory interventions by government agencies; (6) widespread employee terminations seemingly aimed at silencing whistleblowers; and (7) the importance of cross-selling as stated in Wells Fargo's financial reports.  See id. at 15-24.  These facts "collectively . . . support[ed] an inference that a majority of the Director Defendants consciously disregarded their fiduciary duties despite knowledge regarding widespread illegal account-creation activities, and . . . that there is a substantial likelihood of director oversight liability."  Id. at 24.

On June 5, 2017, the Director Defendants and Defendants Sloan, Tolstedt, Loughlin, and Shrewsberry filed motions to dismiss the Consolidated Amended Verified Stockholder Derivative Complaint under Federal Rule of Civil Procedure 12(b)(6).  ECF Nos. 139, 140, 141, 143, 144.  Defendant Stumpf did not file his own motion, but filed a notice of joinder in portions of the other Defendants' briefs.  ECF No. 145.  The Director Defendants generally contend that Plaintiffs' "puzzle" style pleading fails to state a claim with the requisite particularity under Section 10(b) and Rule 10b6, Plaintiffs fail to adequately plead loss causation or allege actionable misrepresentations to support their Section 14(a) claims, and that Plaintiffs do not allege a particular fraudulent contract in support of their Section 29(b) claim.  ECF No. 144.  The Officer Defendants make similar arguments, and argue in addition that Plaintiffs do not adequately allege

specific misrepresentations or scienter on the part of each individual defendant, and instead make blanket allegations about the defendant group as a whole.  On July 5, 2017, Plaintiffs filed an omnibus opposition addressing all the pending motions to dismiss.  ECF No. 151.  Defendants filed their replies on July 26, 2017.

## II.   REQUEST FOR JUDICIAL NOTICE

Defendant Sloan requests that the Court take judicial notice of two court filings from a related case pending in Superior Court for the State of California, In re Wells Fargo & Company Derivative Litigation, CGC 15-554407 (Cal. Super. Ct.).[3]  ECF No. 139-2.  These include (1) a Consolidated Shareholder Derivative Complaint brought on behalf of Wells Fargo shareholders against current and former Wells Fargo officers and directors, filed in San Francisco Superior Court on January 11, 2017, ECF No. 139-1 at 4-88; and (2) a May 10, 2017 order by Judge E.A. Karnow in the same case, sustaining a number of demurrers with leave to amend, ECF No. 139-1 at 90-103.

The Court "must take judicial notice if a party requests it and the court is supplied with the necessary information."  Fed. R. Evid. 201(c)(2).  A matter may be judicially noticed if it is either "generally known within the territorial jurisdiction of the trial court" or "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).  Under Ninth Circuit law, courts may properly take notice of court orders and other matters of public record.  Reyn's Pasta Bella, LLC v. Visa USA, Inc., 442 F.3d 741, 746 n. 6 (9th Cir. 2006).  Moreover, "documents publicly filed in [a] prior suit are proper subjects of judicial notice").  Chrisanthis v. United States, No. C 08-02472 WHA, 2008 WL 4848764, at *1 (N.D. Cal. Nov. 7, 2008).

The Court will take notice of these documents, as each is a public court filing.  However, the Court will not take notice of any disputed facts in either the complaint or Judge Karnow's order.  Lee v. City of Los Angeles, 250 F.3d 668, 689-90 (9th Cir. 2001).

---

[3] Plaintiffs moved to intervene in the consolidated state court case for purposes of seeking a stay pending resolution of the instant action.  See ECF No. 152 at 1.  Judge Karnow granted the motion and now "a general stay [of the state court cases] is in effect."  ECF No. 158-1 at 2.

United States District Court
Northern District of California

United States District Court
Northern District of California

## III.    LEGAL STANDARD

### A.    The Dual Pleading Requirements

Section 10(b) of the Securities Exchange Act of 1934 prohibits any act or omission resulting in fraud or deceit in connection with the purchase or sale of any security.  To establish a violation of Section 10(b), a plaintiff must plead:  (1) a material misrepresentation or omission made by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation.  See Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, 552 U.S. 148, 157 (2008).

On a motion to dismiss, the Court accepts the material facts alleged in the complaint, together with reasonable inferences to be drawn from those facts, as true.  Navarro v. Block, 250 F.3d 729, 732 (9th Cir. 2001).  However, "the tenet that a court must accept a complaint's allegations as true is inapplicable to threadbare recitals of a cause of action's elements, supported by mere conclusory statements."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  Moreover, while a plaintiff generally need only plead "enough facts to state a claim to relief that is plausible on its face" to survive a motion to dismiss, Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007), "[s]ecurities fraud class actions must meet the higher, exacting pleading standards of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ('PSLRA')."  Oregon Pub. Employees Ret. Fund v. Apollo Grp. Inc., 774 F.3d 598, 604 (9th Cir. 2014).

Under the PSLRA and Rule 9(b), a complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" with respect to each alleged false statement or omission, and a party must "state with particularity the circumstances constituting fraud or mistake."  15 U.S.C. § 78u-4(b)(2)(A); Fed. R. Civ. P. 9(b); see also Oregon Pub. Employees Ret. Fund, 774 F.3d at 605.  "In order to show a strong inference of deliberate recklessness, plaintiffs must state facts that come closer to demonstrating intent, as opposed to mere motive and opportunity."  In re Silicon Graphics Inc. Sec. Litig., 183 F.3d 970, 974 (9th Cir. 1999), abrogated on other grounds by, S. Ferry LP, No. 2 v. Killinger, 542 F.3d 776, 784 (9th Cir. 2008).  If the complaint does not satisfy the PSLRA's pleading requirements, the Court must grant a motion to dismiss the complaint.  15 U.S.C. § 78u-4(b)(3)(A).

### B.      Falsity and Materiality

The PSLRA provides that "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1)(B).  For statements to be actionable under the PSLRA, they must be both false or misleading and material.  A statement or omission is misleading under the PSLRA and Section 10(b) of the Exchange Act "if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists."  Berson v. Applied Signal Tech., Inc., 527 F.3d 982, 985 (9th Cir. 2008).

A false or misleading statement or omission is material if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."  TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976).  "To plead materiality, the complaint's allegations must 'suffice to raise a reasonable expectation that discovery will reveal evidence satisfying the materiality requirement, and to allow the court to draw the reasonable inference that the defendant is liable.'"  Reese v. Malone, 747 F.3d 557, 568 (9th Cir. 2014) (quoting Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27, 131 (2011)).  "'Although determining materiality in securities fraud cases should ordinarily be left to the trier of fact, conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss for failure to state a claim.'"  Id. (quoting In re Cutera Sec. Litig., 610 F.3d 1103, 1108 (9th Cir. 2010)).

### C.      Scienter

The required state of mind under the PSLRA is a "mental state embracing intent to deceive, manipulate, or defraud."  Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193–94 n.12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976).  In order to adequately establish scienter, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2)(A).

13

The "strong inference" required by the PSLRA "must be more than merely 'reasonable' or 'permissible'—it must be cogent and compelling, thus strong in light of other explanations." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 324 (2007).  "A court must compare the malicious and innocent references cognizable from the facts pled in the complaint, and only allow the complaint to survive a motion to dismiss if the malicious inference is at least as compelling as any opposing innocent inference."  Zucco Partners, LLC v. Digimarc Corp., 552 F.3d 981, 991 (9th Cir. 2009).  In evaluating whether a complaint satisfies the "strong inference" requirement, courts must consider the allegations and other relevant material holistically, not "scrutinized in isolation."  In re VeriFone Holdings, 704 F.3d 694, 701 (9th Cir. 2012).

Deliberate or conscious recklessness constitutes intentional conduct sufficient to satisfy the scienter requirement.  "An actor is deliberately reckless if he had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although he could have done so without extraordinary effort."  Reese, 747 F.3d at 569 (quoting In re Oracle Corp. Sec. Litig., 627 F.3d 376, 390 (9th Cir. 2010) (internal alterations omitted)).  "[T]he ultimate question is whether the defendant knew his or her statements were false, or was consciously reckless as to their truth or falsity."  Gebhart v. SEC, 595 F.3d 1034, 1042 (9th Cir. 2010).  "Facts showing mere recklessness or a motive to commit fraud and opportunity to do so provide some reasonable inference of intent, but are not independently sufficient."  Reese, 747 F.3d at 569 (quoting In re Silicon, 183 F.3d at 974).

## IV.   DISCUSSION

Defendants move to dismiss Plaintiffs' complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6).  All Defendants move to dismiss Plaintiffs' claims under Section 10(b) and Rule 10b5, and the derivative claims under Section 29(b) and Section 20A.  The Director Defendants also move to dismiss Plaintiffs' claims for breach of fiduciary duty under Section14(a).  Defendants Sloan, Tolstedt, Shrewsberry, and Loughlin (collectively, the "Officer Defendants") move to dismiss Plaintiffs' claims for breach of fiduciary duty under Delaware law, insider trading under California Law, and claims for unjust enrichment, contribution and indemnification.  The Court addresses each in turn.

United States District Court
Northern District of California

### A.      Claims Under Section 10(b) and Rule 10b-5

To survive a motion to dismiss, Plaintiffs must plausibly allege:  (1) a material misrepresentation or omission made by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation.  <u>Stoneridge Inv. Partners, LLC</u>, 552 at 157.  Defendants generally challenge the sufficiency of the complaint with respect to the first two of these elements.  The Director Defendants contend that Plaintiffs fail to plead their claim under Section 10(b) with the requisite particularity.  ECF No. 144 at 10-11.  The Officer Defendants similarly contend that Plaintiffs do not allege material misrepresentations to support their Section 10(b) claim, and do not allege facts supporting an inference of scienter.[4]  <u>See</u> ECF No. 139 at 13-14, ECF No. 140 at 11-17, ECF No. 141 at 12-13, ECF No. 143 at 16-17.

### 1.      Material and Misleading Statements by the Director Defendants

The Director Defendants assert that "[t]he Complaint fails to allege with sufficient particularity the specific statements made by the Independent Directors that are alleged to have been false or misleading, the reasons for falsity, or the 'who, what, when, where, and how' of the supposed fraud.'"  ECF No. 144 at 10.  They characterize the complaint as "impermissible 'puzzle' or 'shotgun' pleading" that forces defendants to identify the allegedly misleading statements and match the statements up with reasons they are misleading.  <u>Id.</u>  The Director Defendants note that the vast majority of the allegations in the complaint refer generally to "Defendants," without "delineat[ing] which actions were taken by which Defendant."  <u>Id.</u> at 12.  Though the Director Defendants acknowledge that Plaintiffs allege misstatements in Wells Fargo's SEC filings, and that the Director Defendants signed the Wells Fargo 10-K filings from 2011 to 2015, they argue that Plaintiffs "fail to identify with particularity which statements in those SEC filings were supposedly false and why."  <u>Id.</u> at 11.  Moreover, the Director Defendants argue that Plaintiffs' reliance on the "group pleading" doctrine to assign individual statements in

---

[4] While the Director Defendants argue that Plaintiffs fail to plead loss causation in support of their claims under Section 14(a), they do not argue that Plaintiffs fail to plead facts showing loss causation for purposes of the Section 10(b) claims.

the SEC filings to all Director Defendants, without facts regarding each individual's role in the alleged misstatement, is inconsistent with the PSLRA.  See id. at 12 n. 4 (because of Plaintiffs' reliance on "group pleading" doctrine, "which alleged misstatements the Independent Directors are responsible for is completely opaque.").  In sum, according to the Director Defendants, the complaint consists of a "morass of ambiguity . . . followed by eleven claims for relief."  ECF No. 144 at 12.

Plaintiffs counter that "the Complaint provides a clear roadmap of Plaintiffs' Section 10(b) claims."  ECF No. 151 at 19.  Plaintiffs argue that the complaint includes extensive allegations regarding Wells Fargo's misrepresentations in SEC filings regarding cross-sell metrics.  Plaintiffs point to the chart at paragraph 367 of the complaint, which identifies SEC filings from the class period that the Director Defendants signed.  Id.  According to Plaintiffs, each of these filings included cross-sell metrics that were allegedly "artificially inflated as a result of the unauthorized creation of millions of accounts," as well as false or misleading statements concerning these metrics.  Id.  In their opposition, Plaintiffs identify two statements in Wells Fargo's SEC filings that were allegedly false and misleading.  First, Plaintiffs point to "[t]he representation in Wells Fargo's 2013 Form 10-K that the Company 'ended the year as America's most profitable bank' and 'achieved record cross-sell across the Company' . . . ."  Id. at 20, citing Compl. ¶ 344. Second, Plaintiffs point to Wells Fargo's statement in its 2014 Form 10-K that its "ability to grow primary customers is important . . . because these customers . . . have higher cross-sell and are more than twice as profitable as non-primary customers."  Id. at 21, quoting Compl. ¶ 358. According to Plaintiffs, both statements were materially false and misleading because they were based on artificially inflated cross-sell metrics.  Id. at 20-21.

Plaintiffs also argue that the complaint adequately alleges that the Director Defendants made false or misleading statements in Wells Fargo's SEC filings and annual reports related to risk-management processes and internal controls.  Plaintiffs note that the 2013 and 2014 Annual Reports, which were incorporated by reference into the Form 10-K filings, touted Wells Fargo's focus on "the financial success of [its] customers" and its management of "operational risk" in line with "regulatory requirements."  Id. at 22, quoting Compl. ¶ 372-74, nn. 183-85.  Plaintiffs point

to representations in the 2015 Annual Report regarding Wells Fargo's "adherence to regulatory guidelines" and how its compensation scheme discouraged employees from taking "inappropriate risk . . . that is not in the best interest of customers." Id. at 23, quoting Compl. ¶ 375-76. According to Plaintiffs, these statements were false and misleading because Wells Fargo's "risk controls and oversight policies . . . were not strong and robust but were rather . . . weak and near-nonexistent" and because Wells Fargo's compensation scheme actually encouraged employees to engage in illegal behavior, according to the findings of the OCC in its Consent Order. Id. at 23-24.

Plaintiffs also defend their repeated reference to the collective knowledge and actions of all "Defendants" and their use of incorporation by reference, both of which the Director Defendants cite as evidence that Plaintiffs have impermissibly engaged in shotgun pleading. ECF No. 151 at 25. Plaintiffs argue that the Court has already declined to engage in a "director-by-director" analysis with respect to demand futility, and the same logic dictates that the Court would not do so with respect to the instant motion. Id.; ECF No. 129 at 17 n. 8 ("Because Plaintiffs allege that the Board as a whole or specific committees within the Board had knowledge of the illegal account-creation scheme, the Court does not evaluate demand futility on a director-by-director basis."). And Plaintiffs note that the use of incorporation by reference does not make a complaint subject to dismissal for shotgun pleading. Espinosa v. Blumercury, Inc., No. 16-cv-07202-JST, 2017 1079553, at *5 (N.D. Cal. Mar. 22, 2017) ("a complaint does not employ impermissible shotgun pleading just because it re-alleges by reference all of the factual paragraphs preceding the claims for relief.").

On reply, the Director Defendants argue that the "group pleading" doctrine on which Plaintiffs rely to hold the Director Defendants liable for statements not specifically attributable to them "is not compatible with the PSLRA . . . ." ECF No. 154 at 9. They point to numerous cases in which courts in this circuit have declined to apply the doctrine in light of the stricter pleading requirements of the PSLRA. See id. at 9 (citing In re Cadence Design Sys., Inc. Sec. Litig., 692 F.Supp.2d 1181, 1193 (N.D. Cal. 2010) (group pleading doctrine "has been rejected by a majority of district courts in this circuit and this district")).

United States District Court
Northern District of California

The Court finds that Plaintiffs have plausibly alleged that the Director Defendants made material and misleading statements through their participation in and approval of Wells Fargo's public filings.  First, the complaint adequately identifies the allegedly false and misleading statements made by the Director Defendants and does not engage in shotgun pleading.  As the Court already observed in denying the prior motions to dismiss based on demand futility, the complaint includes "extensive and detailed allegations" that the Director Defendants knew of the improper account creation scheme by 2014, and that they made disclosures in SEC filings that they knew were false or misleading as of the time they were made.  ECF No. 129 at 29.  Indeed, Plaintiffs identified specific statements in the SEC filings that they allege to be false or misleading – namely, the cross-selling metrics that were reported in all quarterly and annual filings and statements in those filings regarding Wells Fargo's success at cross-selling and its risk-management controls.  See, e.g., Compl. ¶¶ 124-45; ECF No. 151 at 19-26.  For example, in the complaint Plaintiffs cite to a disclosure in Wells Fargo's 2013 annual report, stating that the company's "cross-sell strategy" would "facilitate growth in both strong and weak economic cycles."  Compl. ¶ 133.  The complaint also cites to the products per household cross-selling metrics reported in annual reports between 2011 and 2015.  Compl. ¶ 144.  Plaintiffs allege these metrics and statements about the contribution of cross-selling to the company's financial performance were misleading because of the company's illicit account-creation scheme.  The complaint identifies such statements in nearly all of Wells Fargo's SEC filings over the relevant period, and includes a table that shows which Defendants signed, and are thus presumed to have made the statements in, each filing.  Id. ¶ 367.  Thus, the Court rejects the Director Defendants' suggestion that they cannot tell from the complaint "which allegedly false or misleading statements he or she is being accused of making . . . ."  ECF No. 144 at 12.

Second, the Court rejects the Director Defendants' arguments that Plaintiffs' claims should be dismissed for relying on the "group pleading" doctrine.  Plaintiffs do purport to rely on "the group pleading doctrine . . . to render Defendants responsible for statements as to which they are not explicitly identified as the speaker or signatory."  Compl. ¶ 404-410.  Under this doctrine, "plaintiffs are allowed to plead claims for fraud against officers of the corporation using group

18

pleading presumptions that the fraud was the collective action of the officers." Thomas v. Magnachip Semiconductor Corp., 167 F. Supp. 3d 1029, 1047 (N.D. Cal. 2016) (quoting In re Ross Sys. Sec Litig., No. C-94-0017 DLJ, 1994 WL 583114 at *5-6 (N.D. Cal. July 21, 1994)). The Director Defendants correctly note that, in the absence of guidance from the Ninth Circuit, a majority of courts in the district have held that the doctrine is inconsistent with the strict pleading requirements of the PSLRA. Kelley v. Rambus, Inc., No. C 07-1238JFHRL, 2008 WL 5170598, at *6 (N.D. Cal. Dec. 9, 2008), aff'd, 384 F. App'x 570 (9th Cir. 2010) ("Previously, the so-called 'group pleading' doctrine permitted an inference that certain documents and statements were the collective work of individuals with 'direct involvement' in high-level operations. . . .  The group pleading doctrine was eliminated by the PSLRA.").  The Court agrees that Plaintiffs cannot prevail on their Section 10(b) claims purely under a group pleading theory.

However, Plaintiffs do not exclusively rely on this doctrine.  Compl. ¶ 404 ("While this Complaint identifies Defendant signatories or speakers with respect to the false or misleading statements identified above (see ¶¶ 320-81), the group pleading doctrine also applies to render Defendants responsible for statements as to which they are not explicitly identified as the speaker or signatory.") (emphasis added).  Plaintiffs principally allege that the Director Defendants are liable because they signed SEC filings with material and misleading information.  This allegation is sufficient, and does not depend on the viability of the group pleading doctrine.[5]  Howard v. Everex Sys., Inc., 228 F.3d 1057, 1061 (9th Cir. 2000) (director who "signs a SEC filing containing misrepresentations, 'make[s]' a statement so as to be liable as a primary violator under § 10(b)"); Thomas, 167 F. Supp. 3d at 1047-48 (rejecting argument that the holding in Howard

---

[5] The Court acknowledges the tension between this holding and those of other courts in this district who have rejected attempts to hold directors liable for misleading SEC filings under the group pleading doctrine.  In re Marvell Tech. Grp. Ltd. Sec. Litig., No. C-06-06286 RMW, 2008 WL 4544439, at *3-4 (N.D. Cal. Sept. 29, 2008) (declining to attribute false or misleading statements in SEC filings to directors who signed the filings under the group pleading doctrine); see also In re Oak Tech. Sec. Litig., No. 96-20552 SW, 1997 WL 448168, at *10 (N.D. Cal. Aug. 1, 1997) (rejecting group pleading, noting "Rule 9(b) requires a plaintiff to attribute fraudulent acts or statements to a particular defendant.").  However, as the Ninth Circuit has held, if directors are not held accountable for false and misleading statements in public filings they sign, "that signature will be rendered meaningless . . . ."  Howard, 228 F.3d at 1061.

United States District Court
Northern District of California

should not be extended to outside directors who do not have "ultimate authority" over the contents of the filings); Cho v. UCBH Holdings, Inc., No. C 09-7208 JSW, 2011 WL 3809903, *9 (N.D. Cal. May 17, 2011) ("Based on Plaintiffs' allegations that each of the Director Defendants signed the 20078 10K . . . the alleged misstatements are attributable to the Director Defendants."). And Plaintiffs do more than simply allege liability based on a signature. They allege that each of the Director Defendants was part of a specific committee whose general responsibilities would have afforded members knowledge regarding the illicit account creation scheme, and knowledge that the statements in the public filings were false or misleading. See Compl. ¶ 102 (table showing Board committee membership for each Director Defendant during the relevant period); id. at ¶¶ 103-10 (describing oversight role of each committee).

Thus, the Court concludes that Plaintiffs adequately allege that the Director Defendants made false and misleading statements for purposes of their Section 10(b) claims.

### 2.    Material and Misleading Statements by the Officer Defendants

Mr. Sloan argues that "[a]ll but one of the allegations in the Complaint particular to Mr. Sloan refer to statements he made about the value of cross-selling and the bank's achievement of cross-sell growth." ECF No. 139 at 8. This, according to Mr. Sloan, is insufficient, because, as the Court and regulatory agencies have found, "cross-selling is not inherently improper." Id. at 9; see ECF No. 129 at 2 ("[T]hese allegations regarding the importance of cross-selling and the simultaneous rise in cross-selling and sales integrity issues would not be sufficient on their own to establish conscious inaction on the part of the Board."). Finally, Mr. Sloan argues that "Plaintiffs plead no facts in support of any assertion that unauthorized account creation had a material impact on the bank's reported cross-sell performance." ECF No. 139 at 14.

Plaintiffs counter that Mr. Sloan made at least two materially false or misleading statements during the relevant period. First, at an analyst conference, Mr. Sloan emphasized the importance of cross-selling to the company's financial performance. Compl. ¶ 335. Second, Mr. Sloan's statement in May 2014 that the "secret sauce" of Wells Fargo's cross-selling success was tenure of employees was materially false and misleading because over the relevant period Wells Fargo allegedly terminated "thousands" of employees as a result of their creation of fraudulent

accounts.  Id. ¶ 336; ECF No. 151 at 14-15.  Plaintiffs also allege that Mr. Sloan signed at least 13 of Wells Fargo's quarterly and annual SEC filings over the relevant period.  Compl. ¶ 367.  In doing so, Plaintiffs allege that "Sloan [falsely] attested in certifications under the Sarbanes-Oxley Act of 2002 ('SOX') that the financial information contained in the filings was true and did not omit material facts, and that the Company's internal and disclosure controls were effective."  ECF No. 151 at 14, citing Compl. ¶ 379.

For the reasons discussed above with respect to the Director Defendants, the Court concludes that Plaintiffs adequately allege that Mr. Sloan is responsible for false and misleading information in Wells Fargo SEC filings, including specifically the cross-selling metrics that Plaintiffs allege were artificially inflated.  Howard, 228 F.3d at 1061.  Moreover, while statements regarding the general importance of cross-selling to Wells Fargo's performance may not have been false and misleading, Plaintiffs plausibly allege that Mr. Sloan's statement regarding the importance of employee tenure to cross-selling was false and misleading when made, given the termination of thousands of Wells Fargo employees involved in cross-selling.  And the allegedly artificially inflated cross-sell metrics were material, given Wells Fargo's own numerous statements about the importance of cross-selling to its financial performance and the fact that, according to the CPFB Consent Order, the account-creation scheme resulted in cross-sell figures "based on 1,534,280 unauthorized deposit accounts and 565,443 unauthorized credit-card accounts."  Compl. ¶ 321(e).  The fact that a critical performance metric was based on a significant number of fraudulent accounts would certainly "give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists."[6] Berson, 527 F.3d at 985.

---

[6] Defendant Tolstedt criticizes Plaintiffs' reliance on these figures as devoid of context, because absent information about Wells Fargo's total number of accounts and account holders, it is not clear that the millions of fraudulently-created accounts were significant enough to materially affect cross-selling metrics.  See ECF No. 155 at 11.  The Court disagrees.  Plaintiffs may, and perhaps should, seek this contextual information through discovery.  But the allegations in the complaint, combined with the significant civil penalty levied against Wells Fargo pursuant to the OCC's Consent Order and the thousands of employees terminated after the account-creation scheme came to light all plausibly suggest that the number of fraudulent accounts was significant and material.

Defendant Carrie Tolstedt notes that she is only alleged to have made three misstatements: (1) statements at a 2012 Investor Day presentation touting Wells Fargo's products per customer metrics, and noting that "8 cross sells can be done"; (2) statements at a 2014 Investor Day presentation that the company was "bullish on cross-sell," that the goal of 8 products per customer was attainable, and that cross-selling results in a "better deal and greater value" for customers; (3) statements at a 2016 Investor Day presentation that the company's cross-selling scheme was meant to "satisfy[] customers' needs and help[] them succeed financially."  ECF No. 140 at 8-9. She argues that the statements that can be directly attributed to her are nothing more than "puffing" or "subjective assessments" of past and future performance, which are not actionable representations under Section 10(b).  Id. at 15.  Ms. Tolstedt notes that, as she is not alleged to have signed any Wells Fargo SEC filings, she cannot be liable for other misstatements not directly attributable to her.  Id. at 12.

Plaintiffs, while acknowledging that mere puffery may not give rise to liability under Section 10(b), contend that Ms. Tolstedt's statements were more than just puffery, as they are "capable of objective verification and, when considered in context, misleading."  ECF No. 151 at 28.  Specifically, Plaintiffs argue that Ms. Tolstedt's statements regarding the value to customers of Wells Fargo's cross-selling practices and her statements that Wells Fargo would be able to achieve its goal of 8 products per customer were both materially false and misleading.  Id. at 28-29.

As Plaintiffs note, the line between puffery and a misleading statement is often indistinct, and requires an analysis of the context in which the statements were made.  Mulligan v. Impax Labs., Inc., 36 F. Supp. 3d 942, 966 (N.D. Cal. 2014).  "Even a statement of opinion or an expression of corporate optimism may be deemed actionable in certain circumstances because 'there is a difference between enthusiastic statements amounting to general puffery and opinion-based statements that are anchored in 'misrepresentations of existing facts.''"  Id. (quoting In re Bank of Am. Corp. Sec., Derivative, & ERISA Litig., 757 F.Supp.2d 260, 310 (S.D.N.Y.2010)).

Given this context, Plaintiffs adequately allege that Ms. Tolstedt's statements were materially false or misleading when made.  Plaintiffs allege that Ms. Tolstedt was at all relevant

times a senior executive in the Community Banking division, Wells Fargo's largest division and the one where the fraudulent cross-selling practices were alleged to have taken place.  See Compl. ¶¶ 30, 69, 72.  Plaintiffs further allege that Ms. Tolstedt was involved in developing the group's cross-selling strategy, including approving a store manager incentive plan that Plaintiffs allege placed undue pressure on Wells Fargo employees and contributed to the fraudulent account-creation.  See id. ¶ 147.  Plaintiffs also allege that Ms. Tolstedt, as head of the Community Banking group, oversaw risk management function within the group, which conducted oversight on "sales-integrity issues."  Id. ¶ 161.  Given this context, Plaintiffs adequately allege that Ms. Tolstedt's statements regarding the past and future success of Wells Fargo's cross-selling and its commitment to providing value for customers were both material and false or misleading.

Defendant John Shrewsberry contends that while Plaintiffs identify three statements attributable to him in their complaint, they do not sufficiently allege that these statements were materially false or misleading.  ECF No. 143 at 10, 16.  Plaintiffs argue that Mr. Shrewsberry (1) was CFO during 2014, "when the Company's cross-selling metrics reached its highest levels"; (2) described Wells Fargo's cross-selling capabilities as "legendary"; (3) "signed SOX certifications in SEC filings, certifying the adequacy of the Company's internal controls and falsely claiming he had no knowledge of fraud at the Company, notwithstanding the series of major lawsuits and regulatory investigations that occurred just before and after he assumed the role of CFO"; and (4) provided public statements in response to the Los Angeles Times article suggesting that Wells Fargo's "internal systems" had not been tripped until the article came out.  ECF No. 151 at 15-16.  Plaintiffs also allege that Mr. Shrewsberry signed Wells Fargo's SEC filings, with allegedly inflated cross-sell metrics, from Q1 2014 to Q2 2016.  Compl. ¶ 367.

Plaintiffs sufficiently allege numerous false and misleading statements by Mr. Shrewsberry.  First, just as the Director Defendants, Mr. Shrewsberry is liable for false and misleading statements identified by Plaintiffs in any SEC filings he signed.  Second, Plaintiffs allege that, throughout the relevant period, the reason Wells Fargo's cross-selling metrics remained high was because of the illicit account-creation scheme that Wells Fargo management encouraged.  As the Court has previously noted, Plaintiffs have plausibly alleged that the Board

23

1   and Wells Fargo senior management, and certainly a company CFO, should have known – based

2   on any of a number of "red flags" – that the company's cross-selling practices were fraudulent.

3   <u>See</u> ECF No. 129 at 23-27.  Thus, Mr. Shrewsberry's statement regarding Wells Fargo's

4   "legendary" cross-sell capabilities and his statements regarding the <u>Los Angeles Times</u> article

5   were false, or at a minimum, misleading, and gave shareholders a different impression of Wells

6   Fargo than was warranted based on facts known to management.  <u>Berson</u>, 527 F.3d at 985.

7          Defendant Michael Loughlin contends that "the complaint includes no allegation that Mr.

8   Loughlin had knowledge of any 'material adverse non-public information,' made or caused to be

9   made any false or misleading statements, or otherwise possessed the required scienter for th[e]

10  [Section 10(b)] claim."  ECF No. 141 at 13.  Plaintiffs do not appear to allege in the complaint that

11  Mr. Loughlin made any false or misleading statements during the relevant period or signed any

12  SEC filings containing such information.  Nor do Plaintiffs identify any such statements in their

13  opposition, except to suggest that Mr. Loughlin may be liable for Wells Fargo's public statements

14  under the group pleading doctrine.  <u>See</u> ECF No. 151 at 16.  As the Court has already held that, in

15  the absence of other factual allegations, Plaintiffs cannot maintain a Section 10(b) claim solely

16  under the group pleading doctrine, the Court will dismiss Plaintiffs' claims against Mr. Loughlin

17  under Section 10(b).

18         Thus, the Court concludes that Plaintiffs adequately allege facts showing that Defendants

19  Sloan, Tolstedt, and Shrewsberry each made materially false or misleading statements, but that

20  they do not allege a material false or misleading statement by Defendant Loughlin.

21                  **3.      Scienter**

22         In its prior order, the Court concluded that, with respect to the Director Defendants, "the

23  Plaintiffs have successfully pleaded facts giving rise to a strong inference of scienter for purposes

24  of their 10(b) claims."  ECF No. 129 at 31.  Thus, the Court need only resolve whether Plaintiffs'

25  have adequately alleged scienter as to the Officer Defendants.[7]  The Officer Defendants generally

26

27  [7] As Plaintiffs do not sufficiently allege that Defendant Loughlin made a materially false or
    misleading statement, it follows that Plaintiffs do not sufficiently allege scienter with regard to

28  him.

24

United States District Court
Northern District of California

United States District Court
Northern District of California

1   contend that the complaint does not allege facts showing that each individual defendant <u>knowingly</u>

2   made false statements, and therefore does not adequately plead scienter for purposes of the Section

3   10(b) claims.

4        Defendant Sloan argues that even "[a]ssuming . . . that any one of the[] [statements

5   attributed to him] was actually false, Plaintiffs fail to plead sufficient facts to support an inference

6   that Mr. Sloan knew it was false."  ECF No. 139 at 13-14 (emphasis omitted).  Mr. Sloan contends

7   that Plaintiffs do not allege any facts suggesting that Mr. Sloan knew that the cross-sell metrics

8   may have been inflated.  <u>Id.</u> at 14.  Ms. Tolstedt contends that, since the investigation into the

9   account-creation scheme did not occur until one year after her last allegedly misleading statement,

10   the "substantial passage of time eliminates any inference of scienter with respect to the [cross-

11   selling] figures offered by Ms. Tolstedt."  ECF No. 155 at 11-12.  She further notes that there are

12   no facts in the complaint suggesting that Ms. Tolstedt knew about the "red flags" the Court relied

13   on in making its determination regarding scienter for the Director Defendants, and, in any event,

14   many of these red flags occurred after her last allegedly misleading statement in 2014.  <u>Id.</u> at 12.

15   Mr. Shrewsberry argues that the only allegations regarding his knowledge of the allegedly

16   fraudulent account-creation scheme relate to his 2015 public statements regarding the lawsuit filed

17   by the Los Angeles City Attorney, and thus no inference of scienter could be drawn from his

18   statements prior to that time.  ECF No. 143 at 18.  Mr. Shrewsberry argues that Plaintiffs'

19   allegations regarding his SOX disclosures and certifications do not show he had actual knowledge

20   of the alleged fraud in the Community Banking division, and thus Plaintiffs have not adequately

21   alleged scienter.  <u>Id.</u>

22        Plaintiffs counter that "[t]he Officer Defendants' scienter challenge rests on an erroneously

23   narrow view of what Plaintiffs need to plead."  ECF No. 151 at 42.  They contend that no

24   authority requires them to plead facts showing that each Officer Defendant knew of the full extent

25   of the fraudulent account-creation scheme and that this fraud led to artificial inflation of cross-sell

26   metrics.  <u>Id.</u>  Instead, according to Plaintiffs, "[w]here, as here, Plaintiffs' claims arise from a

27   pervasive and undisputed fraud going to the core of the Company's business, it is reasonable to

28   infer senior executives knew about, or at least '[r]ecklessly turn[ed] a 'blind eye' to,' the stream of

1    red flags alerting them that employees were committing fraud to meet otherwise unattainable sales

2    goals and that the Company's risk-management processes and internal controls were not sufficient

3    to prevent or curtail those practices." Id. at 34 (quoting In re VeriFone Holdings, Inc. Sec. Litig.,

4    704 F.3d 694, 708 (9th Cir. 2012)).  Plaintiffs also note that Defendants Tolstedt and Shrewsberry

5    both admit to having knowledge about the alleged fraud at least as of the date of publication of the

6    Los Angeles Times article.  Id. at 43.

7          The Court agrees with Plaintiffs.  In determining that Plaintiffs adequately pleaded scienter

8    for the Director Defendants, the Court noted that the following factual allegations "plausibly

9    suggest[ed] that a majority of the Director Defendants knew about the widespread illegal activity

10    by 2014":  (1) Defendant Stumpf testified before Congress that the Board was made aware of

11    "issues" related to fraudulent account-creation by 2011, and by 2014 or 2015 had "connected the

12    dots on customer harm"; (2) from 2011 forward, the Board's Audit and Examination Committee

13    received periodic reports on the activities of Wells Fargo's Internal Investigations Group, which

14    would have reviewed EthicsLine complaints; (3) consumer lawsuits regarding violation of

15    whistleblower protection laws and the action filed by the Los Angeles City Attorney's Office; (4)

16    the Los Angeles Times article regarding the fraudulent account-creation scheme; (5) intervention

17    by government regulatory agencies, including the OCC and CFPB; and (6) widespread termination

18    of employees due to unauthorized account creation.  ECF No. 129 at 17-27.

19          While it is true that not all of these red flags apply to the Officer Defendants, the Court's

20    logic applies with equal – if not greater – force to those defendants.  Just as it is implausible that

21    the Director Defendants were unaware of the account-creation scheme given the extent of the

22    alleged fraud and the number of red flags, it is implausible that Wells Fargo's senior management,

23    involved in the day-to-day operations of the bank and with greater access to the underlying cross-

24    sell metrics and employee whistleblower complaints than independent board members, was

25    unaware of the alleged fraud.  Ms. Tolstedt, as head of the group at the center of the fraudulent

26    account-creation allegations, not only would have had access to the cross-sell metrics for her

27    group, but would have had access to any complaints by employees in her group regarding the

28    pressures created by the incentive schemes that she approved.  Compl. ¶ 30, 69, 72, 147.  Mr.

United States District Court
Northern District of California

26

Sloan spoke extensively about Wells Fargo's success at cross-selling and the purported value these practices provided for customers, made public statements about Wells Fargo's financial performance and the importance of cross-selling to that performance, and provided insight to analysis about the "secret sauce" of the company's cross-selling success. Id. ¶ 345, 351, 351. Plaintiffs allege that, following hearings on the allegedly fraudulent practices, two United States Senators wrote a letter expressing great skepticism that Mr. Sloan had no knowledge of the fraudulent account-creation scheme that occurred under his watch as CFO. Id. ¶ 443. Mr. Shrewsberry was a CFO, with access to data regarding cross-sell metrics, and was knowledgeable enough regarding the alleged fraudulent account-creation scheme to publicly comment on the merit of the Los Angeles City Attorney's lawsuit and make what may have been an objectively false statement that Wells Fargo's "internal systems" had not been tripped until the Los Angeles Times article was published. Id. ¶ 193-94. These allegations plausibly suggest that each of Defendants Sloan, Tolstedt, and Shrewsberry either "knew his or her statements were false, or was consciously reckless as to their truth or falsity." Gebhart, 595 F.3d at 1042.

And even if Plaintiffs failed to allege facts showing each individual Officer Defendant had the requisite state of mind, the core operations doctrine supports a strong inference of scienter. Und this doctrine, "[a]llegations regarding management's role may help satisfy the PSLRA scienter requirement in three circumstances:"

> First, the allegations may be viewed holistically, along with other allegations in the complaint, to raise a strong inference of scienter under the Tellabs standard. Second, the allegations "may independently satisfy the PSLRA where they are particular and suggest that defendants had actual access to the disputed information[.]" . . . . Third, in rare circumstances, such allegations may be sufficient, without accompanying particularized allegations, where the nature of the relevant fact is of such prominence that it would be "absurd" to suggest that management was without knowledge of the matter.

Reese, 747 F.3d at 575-76.

Plaintiffs have established a strong inference of scienter under at least the third prong of this test. In their complaint, Plaintiffs pleaded extensive facts showing the "importance of cross-selling to Wells Fargo investors and others." Compl. ¶ 125; see also id. at ¶¶ 327-67. Defendants Sloan, Tolstedt, and Shrewsberry repeatedly emphasized that Wells Fargo's cross-selling scheme

United States District Court
Northern District of California

1    was critical to the company's success and growth prospects.  See id. ¶¶ 136 (Shrewsberry

2    characterizing Wells Fargo's cross-sell success as "legendary"); 137 (Tolstedt stating "the cross-

3    sell model . . . drive[s] revenue" and that achieving the goal of 8 products per customer would lead

4    to "higher household purchase rates and growth in profitability"); 138 (Sloan describing "secret

5    sauce of cross-sell"); 139 (Shrewsberry describing cross-selling as one of the company's "long-

6    term advantages"); 329 n. 167 (Sloan touting "record" cross-sell metrics); 332 (Tolstedt stating

7    "that cross-sell model is more important than it has ever been before"); 335 (Sloan describing

8    company's "focus[] on cross-selling" as a driver of growth in lending and fees).  Plaintiffs also

9    pleaded facts showing that not only was cross-selling important to Wells Fargo's success, but it

10   was closely tracked, both at the company level and at the individual branch level.  See id. at ¶¶

11   141-50.  Given the "prominence" of cross-selling in Wells Fargo's business, the close manner in

12   which it was monitored, and the red flags from the employee complaints, the Los Angeles Times

13   article, and the investigations by regulatory agencies, "it would be 'absurd' to suggest that

14   management was without knowledge of the matter."  Reese, 747 F.3d at 575-76.

15           Thus, the Court concludes that Plaintiffs adequately allege facts showing a strong inference

16   of scienter as to Defendants Sloan, Tolstedt, and Shrewsberry.[8]  Since Plaintiffs failed to allege a

17   materially false or misleading statement by Defendant Loughlin, the Court will dismiss Plaintiffs'

18   claim against Mr. Loughlin under Section 10(b) without prejudice.

19           **B.      Claims Under Section 14(a)**

20           Section 14(a) of the Securities Exchange Act makes it unlawful to solicit shareholder

21   approval by use of a proxy statement that does not comply with the rules and regulations of the

22   Securities Exchange Commission.  15 U.S.C. § 78n.  Rule 14a-9 prohibits proxy statements that

23   are false or misleading with regard to any material facts at the time they are issued and in light of

24   the circumstances under which they are made.  17 C.F.R. § 240.14a-9.  Collectively, these

25   provisions "disallow the solicitation of a proxy by a statement that contains either (1) a false or

26

27   ─────────────────────

     [8] Based on this finding, the Court does not reach Plaintiffs' argument that the company's
28   repurchase of shares from Defendants Stumpf, Tolstedt, Sloan, and Loughlin supports a strong
     inference of scienter.  ECF No. 151 at 44-45.

misleading declaration of material fact, or (2) an omission of material fact that makes any portion of the statement misleading." Desaigoudar v. Meyercord, 223 F.3d 1020, 1022 (9th Cir. 2000).

"[A] Section 14(a), Rule 14a-9 plaintiff must demonstrate that the misstatement or omission was made with the requisite level of culpability and that it was an essential link in the accomplishment of the proposed transaction." Desaigoudar, 223 F.3d at 1022-23.  Where, as here, the claim "sounds in fraud," both Federal Rule of Civil Procedure 9(b) and the heightened pleading standard of the Private Securities Litigation Reform Act (PSLRA) apply, and the plaintiff must "identify: (1) each statement alleged to have been misleading; (2) the reason or reasons why the statement is misleading; and (3) all facts on which that belief is formed." Id.; In re Countrywide Fin. Corp. Derivative Litig., 554 F. Supp. 2d 1044, 1076 (C.D. Cal. 2008).

Plaintiffs allege that the Director Defendants "violated Section 14(a) of the Exchange Act and Rule 14a-9 by causing Wells Fargo to issue proxy statements that failed to disclose the illicit account-creation scheme or the serious deficient internal and disclosure controls that allow the scheme to begin and helped perpetuate it." Compl. ¶ 272.  Specifically, Plaintiffs allege that the 2014, 2015, and 2016 Proxy Statements omitted several material facts, including disclosures regarding "ineffective internal and disclosure controls"; "reporting failures that failed to appropriately address rampant illegal sales practices and retaliatory terminations against those reporting improper account-creation practices"; "Board-approved compensation programs that incentivized fraudulent account openings for years"; and "known pending investigations by the U.S. Department of Justice ('DOJ'), DOL, congressional committees, the SEC, California state prosecutors, and attorneys general into the fraudulent account openings." Id. ¶¶ 278, 290, 302.  In addition, Plaintiffs allege that the Proxy Statements "omitted the fact that certain of the cross-selling metrics reported by Defendants were based on false, illegally-generated cross-sell numbers." Id. ¶¶ 284, 296.  Plaintiffs allege that but for these alleged misrepresentations, shareholders would not have voted to re-elect Board members, approve executive compensation packages, and reject an independent board chairman.  Id. ¶¶ 116-22, 273-311.

The Court previously concluded that "[t]he Director Defendants . . . face a substantial likelihood of liability on Plaintiffs' claims under Section 14(a) of the Exchange Act and SEC Rule

United States District Court
Northern District of California

1 14a-9." ECF No. 129 at 27.  The Court noted that Plaintiffs "identif[ied] specific statements in the

2 proxy statements that they allege are false and misleading," and that the Court could reasonably

3 infer from the "extensive and detailed allegations suggesting that the Director Defendants knew

4 about the illegal account-creation scheme by 2014" that "the Director Defendants knew that these

5 disclosures were false or misleading at the time they were issued" and thus had the requisite

6 scienter."  Id. at 29.

7      The Director Defendants now contend that Plaintiffs have failed to state a claim under

8 Section 14(a) because (1) "proxy claims alleging corporate mismanagement or breaches of

9 fiduciary duty not involving self-dealing (not alleged here) are not actionable"; and (2) the

10 complaint "does not allege the requisite economic harm or causation necessary to support a claim

11 under Section 14(a)." ECF No. 144 at 13.[9]

12                **1.**     **Actionable Claim**

13      The Court first considers whether Plaintiffs assert an actionable claim under Section 14(a).

14 Under Ninth Circuit law, Section 14(a) claims may not be premised solely on "alleged

15 mismanagement or breach of fiduciary duty."  Desaigoudar, 223 F.3d at 1024; see also In re

16 Diamond Foods, Inc. Derivative Litig., No. C 11-05692 WHA, 2012 WL 1945814, at *7 (N.D.

17 Cal. May 29, 2012), aff'd, 575 F. App'x 716 (9th Cir. 2014) ("A 'claim that the reelection of the

18 directors was an essential link to loss-generating corporate action because of the directors'

19 subsequent mismanagement' cannot form the basis of liability under Section 14(a)") (quoting

20 Kelley, 2008 WL 5170598 at *8 n. 8).

21      The Director Defendants first contend that "Plaintiffs' Section 14(a) claim is deficient

22 because to the extent Plaintiffs attempt to allege misstatements and omissions in the 2014, 2015,

23 and 2016 proxy statements, Plaintiffs are seeking to criticize the Independent Directors for failure

24 to disclose their alleged mismanagement."  ECF No. 144 at 17.  The Director Defendants argue

25

26 ───────────────

27 [9] The Director Defendants also argue that "[t]his claim . . . fails to meet the particularity requirements of the PSLRA," ECF No. 144 at 13, but the Court already explicitly rejected this argument.  ECF No. 129 at 28 ("Contrary to Defendants' contention, Plaintiffs' allegations [under Section 14(a)] meet the heightened pleading requirements of the PSLRA.").

28

that the allegation in the complaint that Wells Fargo failed to institute sufficient internal controls resulting in the perpetuation of the alleged fraudulent account-creation "is a classic example of alleged mismanagement not subject to Section 14(a) liability." Id. at 18.

Plaintiffs counter that their Section 14(a) claim is based not only on mismanagement and breach of fiduciary duty, but also on fraud. ECF No. 151 at 57. The Court agrees. While some of Plaintiffs' allegations do concern mismanagement – such as their allegations that Defendants failed to put in place internal controls to prevent fraudulent account-creation – others concern fraud. For example, Plaintiffs allege that the Proxy Statements "omitted the fact that certain of the cross-selling metrics reported by Defendants were based on false, illegally-generated cross-sell numbers." Compl. ¶¶ 284, 296.

This case is similar to In re Countrywide Financial Corporation Derivative Litigation, 554 F.Supp.3d 1044 (C.D. Cal. 2008). There, the plaintiffs alleged that Countrywide omitted from its Proxy Statements in three different years "the material fact that Individual Defendants . . . [were] making undisclosed fundamental changes to the Company's business model that relied on riskier products . . . in order to inflate its stock price and drive its short-term performance." Id. at 1075. The plaintiffs "argue[d] that if shareholders had been told the truth about the Company, they would never have voted (1) to reelect the current directors in those three years; or (2) to approve two compensation plans for executives and directors . . . ." Id. The defendants moved to dismiss the Section 14(a) claims based on their assertion that the plaintiffs' claims were impermissibly based on "a failure to disclose a breach of fiduciary duty." Id. at 1076. The court disagreed, finding that the claims were ultimately based on Countrywide's assumption of "heightened risk" through a change in its underwriting standards, and that the corresponding claims for "failing to monitor . . . adherence to underwriting standards is of secondary importance to Plaintiffs' Rule 14a-9 case." Id. at 1077.

Similarly here, the thrust of Plaintiffs' complaint is that Defendants knew of, but failed to disclose, a fraudulent business practice that put the company at material risk – namely, the fraudulent account-creation scheme. And just as in Countrywide, Plaintiffs argue that, had this information been disclosed, shareholders would not have voted to re-elect Board members,

1  approve executive compensation packages, and reject an independent board chairman.  Compl. ¶¶

2  116-22, 273-311.  Just as in Countrywide, Plaintiffs here assert an actionable claim against the

3  Director Defendants under Section 14(a).

4          Next, the Director Defendants argue that the misrepresentations identified by Plaintiffs in

5  the Wells Fargo Proxy Statements are "generic, aspirational corporate statements" that amount to

6  nothing more than "puffery."  ECF No. 144 at 19.  However, Plaintiffs allege that the 2014, 2015,

7  and 2016 Proxy Statements omitted several material facts – including regarding Wells Fargo's

8  ineffective internal controls, compensation programs that encouraged fraudulent account-creation,

9  and the existence of pending investigations – and included several affirmative misrepresentations.

10  ECF No. 129 at 28-29.  The statements in the Proxy Statements regarding Wells Fargo's internal

11  controls and risk management amount to more than mere puffery.  For example, the 2014, 2015,

12  and 2016 Proxy Statements each outlined a specific set of "compensation risk management

13  policies and practices" and described "active oversight and monitoring" that would "not encourage

14  excessive risktaking."  See Compl. ¶ 306; see also id. at ¶ 276, 288.  Plaintiffs allege that "[t]hose

15  statements misleadingly conveyed that Wells Fargo's compensation structures emphasized risk

16  management and encouraged long-term stockholder value."  Id. ¶ 307.  As another example, the

17  2014 Proxy Statement recommended voting against an independent chairman, touting the

18  effectiveness of the company's "governance structure . . . as evidenced by the Company's strong

19  financial performance. . . ."[10]  Id. ¶ 283.  Plaintiffs allege that this was false and misleading

20  because the supposed strong financial performance was based on artificially inflated account-

21  creation figures and the Board's oversight failed to identify and stop the allegedly fraudulent

22  account-creation scheme.  Id. ¶ 284.  These allegations go far beyond mere puffery, and state an

23  actionable claim for relief under Section 14(a).

24

25

26  ─────────────────
[10] As the Court already found that Plaintiffs alleged facts plausibly showing that the Director
Defendants had knowledge of the fraudulent account-creation scheme as early as 2014, ECF No.

27  129 at 29, the Court rejects the Director Defendants' argument that Plaintiffs failed to allege facts
showing the Board's recommendation regarding an independent chairman was not "sincerely

28  held."  ECF No. 144 at 20.

United States District Court
Northern District of California

2.        **Loss Causation**

"[A] Section 14(a), Rule 14a-9 plaintiff must demonstrate that the misstatement or omission was made with the requisite level of culpability and that it was an essential link in the accomplishment of the proposed transaction."  Desaigoudar, 223 F.3d at 1022-23.  "The essential link requirement can 'only be established when the proxy statement at issue directly authorizes the loss-generating corporate action.'"  S.E.C. v. Mercury Interactive, LLC, No. C 07-2822 JF (RS), 2009 WL 2984769, at *4 (N.D. Cal. Sept. 15, 2009) (quoting Hulliung v. Bolen, 548 F.Supp.2d 336, 341 (N.D. Tex.2008)) (emphasis in original).

The Director Defendants contend that "[h]ere, the 'loss-generating corporate action' is supposedly mismanagement that led to allegedly improper sales practices," but the relevant Proxy Statements sought authorization regarding executive compensation and a proposal for an independent chairman.  ECF No. 144 at 14.  Thus, according to the Director Defendants, Plaintiffs have not pleaded facts showing a connection between the actual votes solicited by the Proxy Statements and the harm they allege.  Id.  The Director Defendants also argue that, since the cross-selling practices that Plaintiffs allege caused harm to shareholders began well before the Proxy Statements were issued, Plaintiffs cannot allege a connection between the transactions authorized by shareholders and the alleged harm.  Id. at 15.

Plaintiffs respond that they "sufficiently allege loss causation, i.e. that the transactions approved by shareholders harmed the company."  ECF No. 151 at 63.  They argue that shareholders were harmed by "approval of incentive compensation awards to certain executive officers, such as Stumpf, and Tolstedt, who helped perpetrate the illegal sales practices."  Id.  They also allege that "had shareholders known of the underlying misconduct at the Company, they would not have voted to keep the same Directors who were allowing the illegal sales practices to continue."  Id.  Plaintiffs further note that, even if the alleged fraudulent account-creation scheme began before the Proxy Statements issued, they continued after those statements issued because Board members elected by shareholders pursuant to the Proxy Statements allowed the practice to continue.  Id. at 65.

Plaintiffs adequately allege loss causation.  Plaintiffs allege they were harmed by, among

other things, the excessive compensation provided to Defendants such as Stumpf and Tolstedt.  Id. at 63.  Plaintiffs allege that this compensation was approved by shareholders based on Proxy Statements containing false and misleading statements, including specifically the characterization of the "record cross-sell and deposit levels" under Tolstedt's management.  Id.  Thus, at least with respect to this allegation, shareholders "directly authorize[d]" a transaction that resulted in a harm alleged in the complaint.  Mercury Interactive, LLC, 2009 WL 2984769 at *4.

Plaintiffs also adequately allege that shareholders suffered a loss as a result of their vote to re-elect Board members based on false or misleading information in the Proxy Statements.  The Director Defendants, primarily relying on In re Diamond Foods, Inc. Derivative Litigation, No. C 11-05692 WHA, 2012 WL 1945814, *7 (N.D. Cal. May 29, 2012), argue that Plaintiffs cannot establish loss causation under this theory.  In that case, Judge Alsup held that "the re-election of directors who have allegedly mismanaged the company is insufficient to meet the 'essential link' requirement of Section 14(a)."  Id.[11]  Here, however, Plaintiffs' allegations go far beyond simple mismanagement.  Plaintiffs allege that the Director Defendants perpetrated a fraud by making misleading statements and omissions.  Indeed, other courts have found the re-election of board members based on false or misleading proxy statements sufficient to establish an "essential link" for purposes of a Section 14(a) claim.  See Countrywide, 554 F. Supp. 2d at 1077 ("Shareholders would reasonably consider the Company's financial performance in deciding whether to reelect the directors.").

### C.    Claims Under Section 29(b)

In their complaint, Plaintiffs "on behalf of Wells Fargo, seek rescission of the contracts between Defendants and Wells Fargo due to Defendants' violations of the Exchange Act while performing their job duties."  Compl. ¶ 576.  Plaintiffs specifically allege that "Defendants

---

[11] The principle articulated by Judge Alsup – and restated by other courts in this district – appears to trace its roots to an out-of-district case from Texas.  In re Affiliated Computer Servs. Deriv. Litig., 540 F.Supp.2d 695, 704 (N.D. Tex.2007) ("The mere fact that omissions in proxy materials, by permitting directors to win re-election, indirectly led to financial loss through mismanagement will not create a sufficient nexus with the alleged monetary loss.").  The Court is unaware of any Ninth Circuit authority adopting this bright-line rule.

United States District Court
Northern District of California

violated provisions of the Exchange Act while performing their duties arising under various

employment and other contracts they entered into with Wells Fargo."  Id. ¶ 574.

"In order to void [an] Agreement under Section 29(b), [an individual] must establish that:

(1) the contract involved a prohibited transaction; (2) he is in contractual privity with [the entity];

and (3) [the individual] is in the class of persons that the securities acts were designed to protect."

In re Asyst Techs., Inc. Derivative Litig., No. C-06-04669 EDL, 2008 WL 4891220, at *9 (N.D.

Cal. Nov. 12, 2008)

The Director Defendants argue that this claim should be dismissed because "Plaintiffs have

not alleged any particular contract that was entered into or performed in violation of the Exchange

Act, and thus have failed to plead an essential element of a Section 29(b) claim."  ECF No. 144 at

21.  Officer Defendants Tolstedt, Shrewsberry, and Loughlin make substantially similar

arguments.  ECF No. 140 at 22; ECF No. 141 at 14; ECF No. 143 at 21.

Plaintiffs respond that "[a]s Defendants committed violations of the securities laws while

performing their employment contracts entered into with Wells Fargo, the Company is entitled to

rescission of those agreements."  ECF No. 151 at 67.  Plaintiffs argue that the complaint need not

identify a specific contract subject to rescission to survive a motion to dismiss.  Id.

The Court concludes that Plaintiffs adequately state a claim for rescission under Section

29(b).  Both parties cite an opinion by Judge Laporte in In re Asyst Technologies, Inc. Derivative

Litigation, No. C-06-04669 EDL, 2008 WL 4891220 (N.D. Cal. Nov. 12, 2008).  There, the

plaintiff asserted a claim under Section 29(b) seeking to void various option contracts entered into

between officer defendants and the company.  Id. at *9.  The defendants argued that to survive

dismissal, the "Plaintiffs must allege 'which contracts should be rescinded, the contents of the

contracts, or why any contracts should be rescinded given that plaintiffs fail to allege facts

sufficient to demonstrate that the performance of these option contracts violated Section 10(b).'"

Id. (citation omitted).  Judge Laporte concluded that Plaintiffs had adequately alleged a claim

under Section 29(b), noting that the plaintiffs had alleged:  (i) the existence of an option contract

between the defendants and the company; (ii) the defendants engaged in prohibited conduct; and

(ii) the company was a party deserving protection under securities laws.  Id.  Here, Plaintiffs plead

similar facts, and their claims should likewise survive dismissal.

**D.      Claims Under Section 20A**

Defendants Tolstedt and Loughlin move to dismiss Plaintiffs claims under Section 20A. Plaintiffs generally allege that the Insider Trading Defendants – Defendants Stumpf, Sloan, Tolstedt, Shrewsberry, and Loughlin – violated Section 20A by selling shares they knew to be artificially inflated in price back to Wells Fargo as part of the company's share repurchase program.  See Compl. ¶¶ 566-67.

"Section 20A of the Exchange Act creates a private cause of action for "contemporaneous" insider trading.  To satisfy § 20A, a plaintiff must plead (i) a predicate violation of the securities laws; and (2) facts showing that the trading activity of plaintiffs and defendants occur "contemporaneously."  Countrywide, 554 F. Supp. 2d at 1074-75 (internal citations omitted).

Both Ms. Tolstedt and Mr. Loughlin argue these claims should be dismissed because the claims under Section 20A are derivative of the independent claims for violation of the Exchange Act.  ECF No. 140 at 21-22; ECF No. 141 at 13.  As the Court already concluded that Plaintiffs state viable claims for relief under both Section 10(b) and Section 14(a), the Section 20A claims are not subject to dismissal on this basis.

Defendant Tolstedt (joined by Defendant Stumpf) also argues that Plaintiffs Section 20A claims should be dismissed for failure to allege that Wells Fargo made trades that were "contemporaneous" with the trades of Ms. Tolstedt.  ECF No. 140 at 21-22.  As Ms. Tolstedt concedes, "[t]he duration of the period in which an insider defendant's trade can be considered 'contemporaneous' with the plaintiff's is 'not fixed,' and the Ninth Circuit [has] . . . expressly declined to elaborate on its 'exact contours.'"  Countrywide, 554 F. Supp. 2d at 1074-75.  Nevertheless, Ms. Tolstedt contends that "the Complaint's allegations [with respect to Wells Fargo's share purchases] are too general even to permit . . . an analysis" under any standard.  ECF No. 140 at 22.

Plaintiffs respond that they have alleged that Wells Fargo engaged in a share repurchase program and provided the general time frame of the repurchases, and this should be sufficient to proceed to discovery.  ECF No. 151 at 70.

United States District Court
Northern District of California

Plaintiffs have alleged all public information available in support of their claim:  they allege that "[a]s part of Wells Fargo's publicly disclosed share repurchase program, the Company purchased over 772 million shares of its common stock throughout the Relevant Period," and provide detailed charts showing the dates of Defendants' various stock sales.  See Compl. ¶¶ 567, 383, 386, 388, 390 above.  The Court concludes that Plaintiffs allege sufficient facts to state a claim under Section 20A, and can proceed to discovery to identify the timing of Wells Fargo's share repurchases.  See Countrywide, 554 F. Supp. 2d at 1075 ("The Court agrees with Plaintiffs that a narrow interpretation of 'contemporaneously' is not warranted here, where the actual days on which Countrywide traded its stock is not significant.").

### E.    Supplemental Jurisdiction Over State Law Claims

As the Court concludes that Plaintiffs adequately state claims under Sections 12(b), 14(a), and 20A, the Court denies the Director Defendants and Ms. Tolstedt's request to decline jurisdiction over Plaintiffs' state law claims.  The Court addresses the state law claims below.

### F.    Breach of Fiduciary Duty Claims

Defendants Sloan, Shrewsberry, and Loughlin move to dismiss Plaintiffs' claims for breach of fiduciary duty under Delaware law.[12]  ECF No. 139 at 8; ECF No. 141 at 11; ECF No. 143 at 11.  To prevail on their claims for oversight liability, Plaintiffs must establish that Defendants "(a) . . . utterly failed to implement any reporting or information system or controls; *or* (b) having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention."  Stone ex rel. AmSouth Bancorporation v. Ritter, 911 A.2d 362, 370 (Del. 2006) (emphasis in original).  "In either case, imposition of liability requires a showing that the directors knew that they were not discharging their fiduciary obligations."  Id.

Defendant Sloan contends that "Plaintiffs' complaint is devoid of specific allegations that

---

[12] The Court already found that Plaintiffs alleged facts plausibly showing that the Director Defendants consciously disregarded an obligation to be reasonably informed about the business and its risks or consciously disregarded the duty to monitor and oversee the business.  ECF No. 129 at 17.  Defendants Tolstedt and Stumpf do not seek dismissal of Plaintiffs' claims for breach of fiduciary duty.

United States District Court
Northern District of California

[he] consciously disregarded his oversight responsibilities." ECF No. 139 at 8. He notes that "[a]ll but one of the allegations in the Complaint particular to Mr. Sloan refer to statements he made about the value of cross-selling and the bank's achievement of cross-sell growth," which do not "support an inference that he knew about the extent of the sales integrity issues and consciously failed to take corrective action." Id. Mr. Sloan further argues that the lack of specific allegations regarding his oversight of Wells Fargo are particularly problematic because he had "various and shifting" roles at the company – he only became CEO in September 2016, was COO for nearly a year before that, and prior to that ran Wells Fargo's wholesale banking division, which is not implicated by Plaintiffs' allegations regarding fraudulent cross-selling. Id. at 139.

Plaintiffs counter that "[i]n his role as CFO, Sloan was directly responsible for Wells Fargo's financial reporting, rendering him aware of the Company's cross-selling numbers," and as COO "was directly in charge of the Company's operations" for a significant portion of the relevant time period. ECF No. 151 at 49. Plaintiffs argue that Mr. Sloan's "shifting" roles as a Wells Fargo executive support an inference that he was aware of the cross-selling fraud and privy to the various red flags the Court highlighted in its earlier order, as he was involved in multiple aspects of the company's operations. Id. Plaintiffs further note that Mr. Sloan admits to being contacted by the Los Angeles Times in connection with the December 2013 article on the allegations of unauthorized account creation, and providing a comment on the allegations from his "vantage as CFO." Id.; ECF No. 139 at 11. According to Plaintiffs, this means that Mr. Sloan had knowledge of the fraudulent account-creation scheme and did nothing as CFO to remedy the operational deficiencies described in the article. ECF No. 151 at 49.

Plaintiffs allegations as to Mr. Sloan are sufficient to survive dismissal. The same red flags that the Court noted in finding that the Director Defendants faced a substantial likelihood of liability for breach of fiduciary duty apply to Mr. Sloan, as a senior manager and officer of the company. As CFO and CEO of Wells Fargo during the relevant period, Mr. Sloan would have been privy to the cross-sell metrics that Plaintiffs allege were fraudulent. And even if somehow Mr. Sloan had no knowledge of the fraudulent practices before 2013, which seems unlikely given the senior positions he held at the company, he certainly was aware of these issues as of December

38

United States District Court
Northern District of California

2013 when the <u>Los Angeles Times</u> article was published.  <u>See</u> Compl. ¶ 168 (commenting that he was "not aware of any overbearing sales culture" at Wells Fargo).  The Court therefore concludes that Plaintiffs have plausibly alleged a breach of fiduciary duty by Mr. Sloan.

Mr. Shrewsberry contends that, even if Plaintiffs allegations that he "misrepresented Wells Fargo's cross-selling metric, risk controls and disclosure controls" were true, "Plaintiffs' theory [for breach of fiduciary duty] depends upon the Court inferring that, because it later became known that employees opened unauthorized accounts, the internal risk and disclosure controls must have been inadequate and that Mr. Shrewsberry knew of this inadequacy."  ECF No. 143 at 13.  Mr. Shrewsberry contends that the Court cannot make such an inference, as "Plaintiffs do not allege what Mr. Shrewsberry knew of this inadequacy."  <u>Id.</u>  Mr. Shrewsberry also argues that Plaintiffs do not allege facts showing that "Mr. Shrewsberry knew the cross-sell metrics were inaccurate at the time he made the statement."  <u>Id.</u>

Plaintiffs counter that Mr. Shrewsberry made comments about the Los Angeles City Attorney's lawsuit – commenting in May 2015 that "none of [the company's] internal systems for getting feedback [on sales practices] like that have been tripped until this [lawsuit] came along" – indicating that at least as of that date, he had knowledge of the lawsuit.  ECF No. 151 at 52.  According to Plaintiffs, not only was this statement false or misleading when made, but it shows that he was both aware of the allegations of fraud and did nothing to fix the problems.  <u>Id.</u> at 52-53; <u>Rich ex rel. Fuqi Int'l, Inc. v. Yu Kwai Chong</u>, 66 A.3d 963, 984 (Del. Ch. 2013) ("When faced with knowledge that the company controls are inadequate, the directors must <u>act</u>, i.e., they must prevent further wrongdoing from occurring.  A conscious failure to act, in the face of a known duty, is a breach of the duty of loyalty.") (emphasis in original).  Plaintiffs further argue that Mr. Shrewsberry, like Mr. Sloan, had access to the allegedly fraudulent cross-sell numbers as CFO and from his role on the company's Operating Committee, and was therefore either aware of or consciously disregarded the fraudulent acts.  ECF No. 151 at 53.

The Court concludes that Plaintiffs adequately allege a breach of fiduciary duty by Mr. Shrewsberry.  Just as Mr. Sloan and the Director Defendants, Mr. Shrewsberry was a senior manager at Wells Fargo with access to data regarding cross-selling that, drawing all inferences in

United States District Court
Northern District of California

1  Plaintiffs' favor, may have put him on notice of the alleged fraud.  Moreover, Mr. Shrewsberry's

2  comment on the Los Angeles City Attorney's lawsuit suggests that, at least as of that time, he was

3  aware of the fraud allegations and took no action in response.  Rich ex rel. Fuqi Int'l, Inc., 66 A.3d

4  at 984.

5       Mr. Loughlin contends that Plaintiffs' complaint "includes no allegations that Mr.

6  Loughlin supervised, endorsed, or allowed any of the allegedly offensive sales practices" or that

7  he "approved, allowed or endorsed any of the other alleged misconduct, including the structuring

8  of compensation policies, the approval of repurchase policies, the issuance of public statements,

9  etc."  ECF No. 141 at 11.  Mr. Loughlin asserts that "as Chief Risk Officer . . . [h]e did not

10  participate in or supervise the day-to-day operations of the bank's business and was not

11  responsible for the adoption and/or implementation of the policy."  Id.  Mr. Loughlin further

12  argues that Plaintiffs do not allege facts showing an inference of scienter, as the complaint does

13  not have any allegation that he was aware of misconduct and failed to take appropriate action.  Id.

14       Plaintiffs respond that "[i]n light of Mr. Loughlin's duties as CRO [Chief Risk Officer], an

15  inference that he could have remained ignorant of the cross-selling fraud would be implausible."

16  ECF No. 151 at 55.  Plaintiffs note that as alleged in the complaint, Mr. Loughlin served on the

17  Operating Committee, led the Corporate Risk Group, oversaw all risk activities at the company,

18  and chaired the Enterprise Risk Management Committee.  Id.  Plaintiffs also argue that given his

19  position as CRO it would be reasonable to assume that Mr. Loughlin was involved in responding

20  to the various regulatory interventions that occurred between 2012 and 2016, including interviews

21  with OCC examiners after the publication of the Los Angeles Times article.  Id.  Plaintiffs assert

22  that Mr. Loughlin was a "senior executive on the front lines of the sales-integrity issues at the

23  Company" and his arguments that he was unaware of or powerless to remedy the allegedly

24  fraudulent account-creation scheme are implausible.

25       The Court agrees with Plaintiffs, and concludes that Plaintiffs adequately allege that Mr.

26  Loughlin breached his fiduciary duty.  The Court acknowledges that the complaint's allegations

27  regarding Mr. Loughlin are somewhat sparse, and primarily relate to his stock sales.  However,

28  Plaintiffs allege that Mr. Loughlin "oversees all risk-taking activities at Wells Fargo, including

credit, market, operational, and compliance," and is on the company's "Operational and Management Committees."  Compl. ¶ 74.  Given his alleged role in the company, drawing all inferences in Plaintiffs' favor, it is reasonable to infer that Mr. Loughlin had access to information about the alleged fraud, the various lawsuits relating to the fraud, and the regulatory investigations, and took no action to remedy these problems.  Thus, the Plaintiffs' claims against Mr. Loughlin for breach of fiduciary duty are sufficient to survive a motion to dismiss.

### G.      Unjust Enrichment Claims

Defendants Sloan, Shrewsberry, and Loughlin each move to dismiss Plaintiffs' claims for unjust enrichment.  ECF No. 139 at 15; ECF No. 141 at 12; ECF No. 143 at 14.

Each of these Defendants makes essentially the same argument:  Plaintiffs fail to allege a breach of fiduciary duty, and therefore cannot establish that the defendant was compensated as a result of this breach.  ECF No. 139 at 15 ("Because Plaintiffs' claim against Mr. Sloan for breach of fiduciary duty fails, their second claim for unjust enrichment—which is premised on that allege breach—necessary fails as well."); ECF No. 141 at 12 ("This cause of action is essentially derivative of the first claim and fails for precisely the same reasons."); ECF No. 143 at 14 ("Plaintiff's entire unjust enrichment claim against Mr. Shrewsberry here relies upon the allegation that Mr. Shrewsberry acted in bad faith.").  They also contend that Plaintiffs do not plead facts showing that the compensation provided to the Defendants "offended principles fundamental principles of justice."  See ECF No. 139 at 15.

As noted above, Plaintiffs adequately allege that Defendants Sloan, Shrewsberry, and Loughlin each breached their fiduciary duties.  Plaintiffs also plead facts showing the compensation for each Defendant, and allege that this compensation was improper given the failure of each Defendant to act to prevent the fraud and resulting shareholder losses.  See Compl. Compl. ¶¶ 8, 71, 73, 74 406-25, 444-74.  The Court concludes that Plaintiffs adequately state claims for unjust enrichment against Defendants Sloan, Shrewsberry, and Loughlin.

### H.      Claims Under California Corporations Code § 25402

Defendants Sloan, Tolstedt, and Loughlin move to dismiss Plaintiffs' claims for insider trading in violation of California Corporations Code Section 25402.  ECF No. 139 at 16; ECF No.

140 at 25; ECF No. 141 at 14.  Defendant Stumpf joins in Mr. Sloan's motion with respect to this claim.  ECF No. 145 at 1-2.

To state a claim under Section 25402 of the California Corporations Code, a plaintiff must plead:  (1) an officer, director or controlling person (2) had direct or indirect access to material information (3) at the time of a purchase or sale of a security (4) that was generally not available to the public.  Cal. Corp. Code § 25402.

Defendant Sloan argues that under the internal affairs doctrine, because Wells Fargo is incorporated in Delaware, he should not be subject to suit under California law.[13]  ECF No. 139 at 17-18.  Defendant Tolstedt contends that Plaintiffs failed to plead their claim under Section 25402 with the requisite particularity.  ECF No. 140 at 25.

"'The internal affairs doctrine is a conflict of laws principle which recognizes that only one State should have the authority to regulate a corporation's internal affairs—matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders—because otherwise a corporation could be faced with conflicting demands.' . . . 'States normally look to the State of a business' incorporation for the law that provides the relevant corporate governance general standard of care.'"  Friese v. Superior Court, 134 Cal. App. 4th 693, 706 (2005), as modified on denial of reh'g (Dec. 29, 2005), as modified (Jan. 24, 2006) (internal citation omitted).

The internal affairs doctrine is codified in California Corporations Code Section 2116:

> The directors of a foreign corporation transacting intrastate business are liable to the corporation, its shareholders, creditors, receiver, liquidator or trustee in bankruptcy for the making of unauthorized dividends, purchase of shares or distribution of assets or false certificates, reports or public notices or other violation of official duty according to any applicable laws of the state or place of incorporation or organization, whether committed or done in this state or elsewhere.  Such liability may be enforced in the courts of this state.

---

[13] Defendant Sloan argued in his motion that Plaintiffs' claim under Section 25402 was precluded by Judge Karnow's order sustaining a demurrer as to that claim and dismissing it with prejudice.  See ECF No. 139 at 16-17.  Mr. Loughlin joined in this argument.  ECF No. 141 at 14.  However, as the state court judgment is now on appeal, and is therefore not a final judgment for purposes of claim preclusion, Mr. Sloan withdrew this argument on reply.  ECF No. 157 at 8 n. 2.

Cal. Corp. Code § 2116 (emphasis added).

Relying on In re Sagent Technology, Inc. Derivative Litigation , 278 F. Supp. 2d 1079 (N.D. Cal. 2003), Mr. Sloan argues that "under § 2116 and the internal affairs doctrine, Mr. Sloan is 'liable to the corporation' according to the law of Delaware, even if the purportedly wrongfully insider selling occurred in California." ECF No. 139 at 18.  In Sagent, the plaintiffs asserted a claim under Section 25402 for insider trading and the defendants moved to dismiss under the internal affairs doctrine.  Sagent, 278 F. Supp. 2d at 1090-91.  The court, looking to the Restatement (Second), Conflict of Laws, held that insider trading "fit comfortably within the categories of 'fraudulent or negligent mismanagement of the corporation's affairs' and 'unlawfully profiting at the corporation's expense,'" and therefore constituted a "violation of official duty" under the internal affairs doctrine and Section 2116. Id. at 1091.  Thus, the court held that Delaware, and not California law, applied to the insider trading claims, and dismissed the plaintiffs' claims under Section 25402. Id. at 1092.  In doing so, the court distinguished Diamond Multimedia Sys., Inc. v. Superior Court, 19 Cal.4th 1036 (1999), a case in which a court permitted a plaintiff to pursue a Section 25402 claim against officers of a foreign corporation, by noting "[t]he suit was not a derivative action seeking recovery on behalf of a Delaware corporation." Id. at 1091.

Plaintiffs, in turn, rely on the California Court of Appeal's decision in Friese v. Superior Court, 134 Cal.App.4th 693 (2005). ECF No. 151 at 76.  There, Friese, a trustee of Peregrine Litigation Trust, a trust established to represent the interests of purchasers of shares of Peregrine Systems, Inc., asserted claims against former employees for insider trading in violation of California law.  Friese, 134 Cal.App.4th at 698-99.  The California Court of Appeal considered whether the trial court properly sustained a demurrer holding that Friese's claims were barred by the internal affairs doctrine. Id. at 699.  After surveying cases addressing application of state securities laws to foreign corporations, the court held that the internal affairs doctrine did not preclude claims brought against foreign corporations under Section 25402. See id. at 708-09.  In doing so, the Friese court explicitly considered Sagent, finding it "not persuasive authority for limitation of [California] securities laws to securities issued by domestic corporations." Id. at 709.

1   The court noted that it appeared that the Sagent court "was persuaded that the plaintiffs' insider

2   claims were governed by the internal affairs doctrine because of the derivative nature of the claims

3   asserted." Id. at 708.

4           This issue turns on whether, in finding Sagent to be unpersuasive, the California Court of

5   Appeal in Friese rejected Sagent as a legally erroneous application of California law or, instead,

6   simply interpreted Sagent to be limited to derivative actions. While a close issue, the Court

7   concludes that Plaintiffs claims under Section 25402 are barred by the internal affairs doctrine.

8   California law codifying the internal affairs doctrine is relatively clear that "[t]he directors of a

9   foreign corporation are liable to the corporation . . . according to any applicable laws of the state

10  or place of incorporation," and not California law. Cal. Corp. Code § 2116. Wells Fargo is a

11  Delaware corporation, and in this derivative action, the corporation seeks to hold its officers and

12  directors liable for insider trading and breach of fiduciary duty. Under Section 2116 such a claim

13  must be brought under Delaware law. The Court notes that its conclusion is consistent with the

14  well-reasoned opinion of Judge Karnow of the Superior Court for the County of San Francisco.

15  ECF No. 139-1 at 101. In that opinion, Judge Karnow noted that "Friese in its alternative holding

16  may be a bit of an outlier in its imposition of California law on what might be considered the

17  internal affairs of a foreign corporation generally governed by the foreign state's law," and that

18  derivative actions "by definition involve internal affairs." Id. at 101, n. 6. The Court agrees with

19  Judge Karnow's analysis.

20          Though only Mr. Sloan moves to dismiss Plaintiffs' Section 25402 claim on this ground

21  (and Mr. Stumpf joins), the Court's reasoning applies equally to Plaintiffs' claims against the

22  other Insider Trading Defendants, Tolstedt and Loughlin. The Court will therefore dismiss

23  Plaintiffs' Section 25402 claims against Defendants Sloan, Tolstedt, Loughlin, and Stumpf with

24  prejudice. See Sotanski v. HSBC Bank USA, Nat'l Ass'n, No. 15-CV-01489-LHK, 2015 WL

25  4760506, at *6 (N.D. Cal. Aug. 12, 2015) (district court may sua sponte dismiss a claim without

26  notice to the plaintiff if the plaintiff "cannot possibly win relief") (quoting Sparling v. Hoffman

27  Const. Co., 864 F.2d 635, 638 (9th Cir. 1988)).

28

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

**I.     Insider Trading Under Delaware Law**

Defendant Tolstedt moves to dismiss Plaintiffs' claim for insider trading under Delaware law.  ECF No. 140 at 23.

"To state a claim for insider trading under Delaware law, plaintiff must plead that "(1) the corporate fiduciary possessed material, nonpublic company information; and (2) the corporate fiduciary used that information improperly by making trades because she was motivated, wholly or in part, by the substance of that information."  In re Finisar Corp. Derivative Litig., No. C-06-07660 RMW, 2012 WL 2873844, at *20 (N.D. Cal. July 12, 2012) (citing In re Oracle Corp. Deriv. Litig., 867 A.2d 904, 934 (Del.Ch.2004)).  With respect to insider trading claims, "Delaware case law makes the same policy judgment as federal law does, which is that insider trading claims depend importantly on proof that the selling defendants acted with scienter."  Guttman v. Huang, 823 A.2d 492, 505 (Del. Ch. 2003).

Ms. Tolstedt does not dispute that she possessed material, nonpublic information.  However, she contends that Plaintiffs do not adequately allege scienter because the complaint "is wholly devoid of particularized allegations that Ms. Tolstedt sold Wells Fargo stock because she was motivated by the substance of any nonpublic information."  ECF No. 140 at 24.

Plaintiffs counter that the complaint includes a chart showing all of Ms. Tolstedt's stock sales during the relevant period, and "her trades increased significantly in 2013 and continued robustly in 2014" when Wells Fargo's cross-sell metrics peaked.  ECF No. 151 at 71; see Compl. ¶ 386 (showing Ms. Tolstedt's stock sales).  Plaintiffs argue that days after making an allegedly false statement regarding her confidence in the company's continued ability to achieve strong cross-sell numbers, Ms. Tolstedt "made her largest disposition to that point . . . amounting to over $15.5 million."  Id.

Ms. Tolstedt argues that the complaint (as opposed to Plaintiffs' opposition brief) does not explicitly allege that the timing of her trades was suspicious or was motivated by her knowledge of nonpublic information, and that the trading information in the complaint reflects her sale of stock on a "regular schedule."  ECF No. 140 at 24.  She argues that Plaintiffs cannot attempt to bolster their complaint with post hoc rationalizations regarding the timing of trades that were not

45

1    specifically alleged in the complaint.  Id. at 18-19.  Finally, Ms. Tolstedt notes that based on the

2    trading information in the complaint, she made more sales in 2015 after the cross-sell metrics had

3    allegedly reached their peak.  Id. at 19.

4         Ms. Tolstedt cites to two Delaware cases holding that merely alleging that a defendant

5    made stock trades without pleading "particularized facts" showing that the trade was made on the

6    basis of material nonpublic information is insufficient to survive a motion to dismiss.  Rattner v.

7    Bidzos, No. Civ.A. 19700, 2003 WL 22284323, at *10 (Del. Ch. Sept. 30, 2003) (dismissing

8    complaint "devoid of any particularized facts that could lead to the inference that the timing of the

9    trades reflected the Selling Defendants' impermissible insider trading."); Guttman v. Huang, 823

10   A.2d 492, 504 (Del. Ch. 2003) ("the complaint fails to address whether the directors traded

11   because options were expiring or because IPO-related restrictions on liquidity had recently

12   ended.").

13        The present case is distinguishable from both Rattner and Guttman.  In each of those cases,

14   the plaintiff had failed to plead any facts from which the court could conclude that the selling

15   defendants were aware that the company's financial statements were misleading or that they

16   participated in the company's misstatements.  Guttman, 823 A.2d at 503–04 ("Although the

17   plaintiffs allege that [the defendants] had reason to know that the company's financial statements

18   were misstated, this allegation is wholly conclusory.   Entirely absent from the complaint are well-

19   pled, particularized allegations of fact detailing the precise roles that these directors played at the

20   company, the information that would have come to their attention in those roles, and any

21   indication as to why they would have perceived the accounting irregularities." (footnote omitted));

22   Rattner, 2003 WL 22284323, at *10 (Del. Ch. Sept. 30, 2003) ("Rattner merely posits, without

23   any particularized facts, that the Director Defendants knew of inside information, and that they

24   knew of (or directly participated in) the allegedly material misstatements.  Thus, absent from the

25   particularized allegations of the Amended Complaint are the "precise roles that [the Director

26   Defendants] played at the [C]ompany [and] the information that would have come to their

27   attention in those roles." (quoting Guttman) (footnotes omitted)).

28        More analogous to the present case is In re Am. Int'l Grp., Inc., 965 A.2d 763 (Del. Ch.

2009), aff'd sub nom. Teachers' Ret. Sys. of Louisiana v. PricewaterhouseCoopers LLP, 11 A.3d

228 (Del. 2011).  In that derivative action, the plaintiffs sued former senior officers of AIG "to

recover funds to make American International Group, Inc. whole for harm it suffered when it was

revealed that the corporation's financial statements were materially misleading and overstated the

value of the corporation by billions of dollars."  Id. at 774.  The defendants included "Edward E.

Matthews, who served on AIG's board for almost thirty years and was Vice Chairman of

Investments and Financial Services; and Thomas R. Tizzio, who was a director, Senior Vice

Chairman of General Insurance, and a member of AIG's reinsurance security committee."  Id.

Plaintiffs alleged, among other things, that Matthews and Tizio breached their fiduciary duty to

the company by engaging in insider trading.  Id. at 777-78.  The court rejected a motion to dismiss

these claims, concluding that "the Complaint pleads facts supportive of the inference that

Matthews and Tizzio sold AIG stock during time periods when they were aware that the

corporation's books and records were materially misleading."  Id.  The Court stated:

> In addition, Matthews and Tizzio both argue that the Stockholder Plaintiffs fail to
> show that they were motivated at least in part by their knowledge of the fraud at
> AIG.  But, although the Stockholder Plaintiffs do not specifically allege this, they
> have pled facts that create a reasonable inference that Matthews and Tizzio sold
> stock to take advantage of their material non-public information.  As has been
> shown, Matthews and Tizzio both were provided huge equity incentive packages,
> rendering both their total net wealth and ongoing income highly dependent on
> AIG's stock-trading price.  Moreover, much of the fraud alleged was motivated by a
> desire to prop up that price.  If Matthews and Tizzio knew about much or all of the
> fraud that was occurring, as I must infer at this stage that they did, it is reasonable
> to assume that they sold their stock to diversify their holdings and lock in the value
> the market placed on AIG while in ignorance of AIG's real worth.

Id. at 801.[14]

The factual allegations before the Court in In re Am. Int'l Grp., Inc. more closely resemble

the ones present here than do the allegations in Rattner or Guttman.  While the Complaint's

allegations regarding Ms. Tolstedt's stock sales are not as robust as they could be, the Court

concludes that Plaintiffs allege enough facts in support of their Delaware insider trading claims to

survive dismissal.  Plaintiffs allege in detailed fashion all of Ms. Tolstedt's sales during the

relevant period, which amount to roughly $130 million.  Compl. ¶ 386.  Plaintiffs also plausibly

---

[14] Ms. Tolstedt does not address In re Am. Int'l Grp., Inc. in her reply brief.

United States District Court
Northern District of California

allege that Ms. Tolstedt had material nonpublic information regarding Wells Fargo's cross-sell metrics and, as head of the Community Banking Division, made repeated public statements about the company's cross-sell success and would have uniquely knowledge regarding the allegedly fraudulent account-creation scheme.  See e.g. id. ¶ 72, 129, 137, 332, 350, 363.  While Plaintiffs do not connect the dots by alleging, for example, suspicious timing of trades, one could infer from the detailed information about Ms. Tolstedt's trades and the extensive timeline in the complaint that Ms. Tolstedt traded based on material nonpublic information – namely, the knowledge that cross-sell metrics were artificially inflated.  Moreover, whether Ms. Tolstedt's trades were part of a regular schedule or deviated from her normal trade practices is a question of fact that should be left to a jury.

### J.    Contribution and Indemnification

Defendants Sloan, Tolstedt, and Shrewsberry each move to dismiss Plaintiffs' claims for contribution and indemnification.  ECF No. 139 at 19; ECF No. 140 at 26; ECF No. 143 at 21.  Plaintiffs seek compensation on the company's behalf "[i]n the event [Wells Fargo] is found liable for violating the federal securities laws" in a related securities action pending in this Court.  Compl. ¶ 595.

Defendants contend that these claims are not ripe because there has not been any finding of liability.  See ECF No. 139 at 19.  Plaintiffs respond that "Wells Fargo has already incurred billions of dollars in damages as a result of the illicit account-creation scheme," and faces additional liability in other actions.  ECF No. 151 at 78.

The financial harm Wells Fargo has suffered as a result of the allegedly fraudulent account-creation scheme is not relevant to this claim, as Plaintiffs specifically seek compensation as a result of liability "in connection with the securities fraud class action against the Company currently pending in this district."  Compl. ¶ 595.  As there is no final judgment in the related case, Plaintiffs' claim is not ripe and must be dismissed.  In re Brocade Commc'ns Sys., Inc. Derivative Litig., 615 F. Supp. 2d 1018, 1049 (N.D. Cal. 2009) ("As there is no final judgment in that case, the claim for contribution is not ripe and is hereby dismissed without prejudice.").

Plaintiffs' claims for indemnification and contribution will be dismissed without prejudice.

United States District Court
Northern District of California

1

**CONCLUSION**

Plaintiffs' claims against Defendant Michael Loughlin under Section 10(b) and claims for indemnification and contribution are dismissed without prejudice.  Plaintiffs' claims against Defendants Sloan, Tolstedt, Loughlin, and Stumpf under California Corporations Code Section 25402 are dismissed with prejudice.

In all other respects, the motions to dismiss are denied.

IT IS SO ORDERED.

Dated:  October 4, 2017

_____
JON S. TIGAR
United States District Judge