1    Richard M. Heimann (063607)
     *rheimann@lchb.com*
2    Katherine C. Lubin (259826)
     *kbenson@lchb.com*
3    Michael K. Sheen (288284)
     *msheen@lchb.com*
4    LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
     275 Battery Street, 29th Floor
5    San Francisco, CA 94111-3339
     Telephone: (415) 956-1000
6    Facsimile:  (415) 956-1008

7    *Attorneys for Co-Lead Plaintiff Fire & Police Pension*
     *Association of Colorado and Co-Lead Counsel*

8    Maya Saxena (*Pro hac vice*)
     *msaxena@saxenawhite.com*
9    Joseph E. White, III (*Pro hac vice*)
     *jwhite@saxenawhite.com*
10   Lester R. Hooker (241590)
     *lhooker@saxenawhite.com*
11   SAXENA WHITE P.A.
     150 East Palmetto Park Road, Suite 600
12   Boca Raton, FL 33432
     Telephone:  (561) 394-3399
13   Facsimile:  (561) 394-3382

14   *Attorneys for Co-Lead Plaintiff The City of Birmingham*
15   *Retirement and Relief System and Co-Lead Counsel*

16   [Additional Counsel on Signature Page]

17

18            UNITED STATES DISTRICT COURT

19         NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE WELLS FARGO & COMPANY SHAREHOLDER DERIVATIVE LITIGATION | Lead Case No. 3:16-cv-05541-JST<br><br>**CO-LEAD PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT, AND MEMORANDUM OF POINTS OF AUTHORITIES IN SUPPORT THEREOF** |
| This Document Relates to:<br><br>ALL ACTIONS. | Date: April 4, 2019<br>Time: 2:00 PM<br>The Honorable Jon S. Tigar<br>Courtroom 9, 19th Floor |

# **TABLE OF CONTENTS**

MEMORANDUM OF POINTS AND AUTHORITIES ............................................................... 1

I.      INTRODUCTION ............................................................................................................ 1

II.     BACKGROUND AND PROCEDURAL HISTORY ...................................................... 2

        A.      Factual Background................................................................................................ 2

        B.      Procedural Background ......................................................................................... 4

                1.      The Operative Complaint and Motions to Dismiss..................................... 4

                2.      Co-Lead Plaintiffs Stayed and Coordinated Related Derivative Actions ... 5

                3.      Discovery From Wells Fargo, Individual Defendants, and Non-Parties .... 9

                4.      Mediation and Settlement ......................................................................... 10

III.    SETTLEMENT TERMS.................................................................................................. 10

IV.     LEGAL STANDARD ..................................................................................................... 11

V.      THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE........................... 13

        A.      Co-Lead Plaintiffs Vigorously Pursued This Litigation......................................... 13

        B.      The Settlement Results From Good-Faith, Arm's-Length Negotiations............... 15

        C.      The Settlement Confers Substantial Benefits to the Company ............................ 16

        D.      The Strength of Co-Lead Plaintiffs' Claims........................................................... 17

        E.      Risk, Expenses, and Delay Associated with Continued Litigation ....................... 18

        F.      Co-Lead Plaintiffs' and Co-Lead Counsel's Endorsement of the Settlement........ 20

VI.     THE NOTICE PLAN PROVIDES MORE THAN ADEQUATE NOTICE .................... 21

VII.    ATTORNEY'S FEES, COSTS, AND REPRESENTATIVE REIMBURSEMENT ....... 22

        A.      Attorney's Fees and Costs.................................................................................... 22

        B.      Representative Reimbursement ............................................................................ 23

VIII.   PROPOSED SCHEDULE FOR DISSEMINATION OF NOTICE AND
        SCHEDULE OF FINAL APPROVAL HEARING......................................................... 24

IX.     CONCLUSION ............................................................................................................... 25

1

# TABLE OF AUTHORITIES

2

**Cases**

3
*Angell v. City of Oakland,*
No. 13-CV-00190 NC, 2015 WL 65501 (N.D. Cal. Jan. 5, 2015) ............................................ 21

4
*Chavez v. PVH Corp.,*
No. 13-CV-01797-LHK, 2015 WL 9258144 (N.D. Cal. Dec. 18, 2015) ................................. 21

5
*Churchill Vill., L.L.C. v. Gen. Elec.,*
361 F.3d 566 (9th Cir. 2004) .................................................................................................... 13

6
*Class Plaintiffs v. City of Seattle,*
955 F.2d 1268 (9th Cir. 1992) ................................................................................................... 21

7
*Harris v. Vector Mktg. Corp.,*
No. C-08-5198 EMC, 2011 WL 1627973 (N.D. Cal. Apr. 29, 2011) ...................................... 13

8
*HCL Partners Ltd. P'ship v. Leap Wireless Int'l, Inc.,*
Nos. 07 CV 2245 MMA, 08–CV–0128 MMA, 2010 WL 4027632 (S.D. Cal. Oct. 14, 2010). 16

9
*Hefler v. Wells Fargo & Co.,*
No. 3:16-cv-05479-JST, 2018 WL 4207245 (N.D. Cal. Sept. 4, 2018) ....................... 15, 16, 23

10
*Hefler v. Wells Fargo & Co.,*
No. 3:16-cv-05479-JST, 2018 WL 6619983 (N.D. Cal. Dec. 18, 2018) ................................. 23

11
*Hesse v. Sprint Corp.,*
598 F.3d 581 (9th Cir. 2010) .................................................................................................... 21

12
*In re Activision Blizzard, Inc. Stockholder Litig.,*
124 A.3d 1025 (Del. Ch. 2015) ................................................................................................. 17

13
*In re Atmel Corp. Deriv. Litig.,*
No. 06-cv-04592-JF, 2010 WL 9525643 (N.D. Cal. Mar. 31, 2010) ...................................... 22

14
*In re Bank of Am. Corp. Sec., Derivative & ERISA Litig.,*
No. 1:09-md-02058-PKC (S.D.N.Y. Jan. 18, 2013) ........................................................... 17, 20

15
*In re Broadcom Corp. Derivative Litig.,*
No. 2:06-cv-03252-R-CW (C.D. Cal. Aug. 28, 2009) ....................................................... 17, 20

16
*In re Caremark Int'l Inc. Derivative Litig.,*
698 A.2d 959 (Del. Ch. 1996) ................................................................................................ 2, 19

17
*In re Cendant Corp., Derivative Action Litig.,*
232 F. Supp. 2d 327 (D.N.J. 2002) ........................................................................................... 23

18
*In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices, and Prods. Liab. Litig.,*
2019 WL 536661 (N.D. Cal. Feb. 11, 2019) ............................................................................ 12

19
*In re Duke Energy Corp. Coal Ash Derivative Litig.,*
C.A. No. 9682-VCG (Del. Ch. filed May 22, 2014) ................................................................ 20

20
*In re Galena Biopharma, Inc. Deriv. Litig.,*
No. 3:14-CV-00382-SI, 2016 WL 10840600 (D. Or. June 24, 2016) ..................................... 20

21
*In re Hewlett-Packard Co. S'holder Derivative Litig.,*
716 F. App'x 603 (9th Cir. 2017) ........................................................................................ 12, 21

22
*In re HQ Sustainable Mar. Indus., Inc., Derivative Litig.,*
No. C11-0910 RSL, 2013 WL 3191867 (W.D. Wash. June 20, 2013) .................................... 13

23
*In re Mego Fin. Corp. Sec. Litig.,*
213 F.3d 454 (9th Cir. 2000) .................................................................................................... 13

24

25

26

27

28

- ii -

*In re MRV Commc'ns, Inc. Derivative Litig.*,
   No. CV 08-03800 GAF (MANx), 2013 WL 12210256 (C.D. Cal. Apr. 8, 2013) ..................... 13

*In re News Corp. S'holder Derivative Litig.*,
   C.A. No. 6285-VCN, 2013 WL 1914773 (Del. Ch. May 3, 2013) ........................................ 17

*In re NVIDIA Corp. Derivative Litig.*,
   No. C-06-06110-SBA (JCS), 2008 WL 5382544 (N.D. Cal. Dec. 22, 2008) .................... passim

*In re Oclaro, Inc. Derivative Litig.*,
   No. C-11-3176 EMC, 2014 WL 4684993 (N.D. Cal. Sept. 19, 2014) ...................................... 13

*In re Pac. Enters. Sec. Litig.*,
   47 F.3d 373 (9th Cir. 1995) ....................................................................................... 12, 19

*In re Pfizer Inc. S'holder Derivative Litig.*,
   No. 1:09-cv-07822-JSR (S.D.N.Y. Dec. 14, 2010) ........................................................... 17

*In re Rambus Inc. Derivative Litig.*,
   No. 06-cv-03513-JF, 2009 WL 166689 (N.D. Cal. Jan. 20, 2009) ........................................ 22

*In re the Hospitalist Co., Inc. Consolidated Derivative Litig.*,
   C.A. No. 10258-CB (Del. Ch. filed Oct. 20, 2014) ............................................................ 20

*In re UnitedHealth Grp. Inc. S'holder Derivative Litig.*,
   No. 0:06-cv-01216-JMR-FLN (D. Minn. filed Mar. 29, 2006) .............................................. 20

*In re Volkswagen "Clean Diesel" Mkt'g, Sales Practices & Prods. Liability Litig.*,
   No. 3:15-md-02672-CRB (N.D. Cal.) ............................................................................. 20

*In re Wilmington Tr. Sec. Litig.*,
   Master File No. 10-cv-00990-ER (D. Del.) ...................................................................... 20

*Lloyd v. Gupta*,
   No. 15-cv-04183-MEJ, 2016 WL 3951652 (N.D. Cal. July 22, 2016) .................................... 12

*Maher v. Zapata Corp.*,
   714 F.2d 436 (5th Cir. 1983) ........................................................................................ 19

*Rodriguez v. W. Publ'g Co.*,
   563 F.3d 948 (9th Cir. 2009) ........................................................................................ 23

*Rosenbloom v. Pyott*,
   765 F.3d 1137 (9th Cir. 2014) ....................................................................................... 19

*Schimmel v. Goldman*,
   57 F.R.D. 481 (S.D.N.Y. 1973) ..................................................................................... 19

*Six (6) Mexican Workers v. Ariz. Citrus Growers*,
   904 F.2d 1301 (9th Cir. 1990) ....................................................................................... 23

*Stone v. Ritter*,
   911 A.2d 362 (Del. 2006) ............................................................................................. 19

*Thomas v. MagnaChip Semiconductor Corp.*,
   No. 14-CV-01160-JST, 2018 WL 2234598 (N.D. Cal. May 15, 2018) .................................... 24

*Vizcaino v. Microsoft Corp.*,
   290 F.3d 1043 (9th Cir. 2002) ....................................................................................... 23

**Statutes**

California Corporations Code, Section 25402 ................................................................... 5

California Corporations Code, Section 25403 ................................................................... 5

Securities Exchange Act of 1934 ................................................................................... 5

**Rules**

Fed. R. Civ. P. 23(e)(2) ............................................................................................ 12

Fed. R. Civ. P. 23(e)(2) 2018 Advisory Comm. Notes ........................................... 12

Fed. R. Civ. P. 23.1 ............................................................................................ 2, 22

Fed. R. Civ. P. 23.1(c) ..................................................................................... 11, 12

**Treatises**

Wright & Miller, 7C Fed. Prac. & Proc. Civ. § 1839 (3d ed.) ................................ 12

**Other Authorities**

Press Release, Wells Fargo & Co., Wells Fargo Launches "Re-Established," a New Brand
   Campaign (May 7, 2018), https://newsroom.wf.com/press-release/marketing-and-
   sponsorships/wells-fargo-launches-re-established-new-brand-campaign ................................. 4

Wells Fargo, Investor Relations, https://www.wellsfargo.com/about/investor-relations/ ............ 21

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1
2

## NOTICE OF MOTION AND MOTION FOR
## PRELIMINARY APPROVAL OF SETTLEMENT

3      PLEASE TAKE NOTICE that on April 4, 2019, at 2:00 p.m., or as soon as counsel may

4   be heard by the Honorable Jon S. Tigar, United States District Judge, of the United States District

5   Court for the Northern District of California, Phillip Burton Federal Building & United States

6   Courthouse, 450 Golden Gate Avenue, San Francisco, CA 94102, the Fire and Police Pension

7   Association of Colorado and the City of Birmingham Retirement and Relief System ("Co-Lead

8   Plaintiffs"), Court-appointed Co-Lead Plaintiffs in this shareholder derivative action, will and

9   hereby do move for an order: (1) preliminarily approving the proposed settlement of this action;

10  (2) approving the form and manner of notice of the proposed settlement; and (3) scheduling a

11  final approval hearing to determine whether to approve the proposed settlement and Co-Lead

12  Plaintiffs' forthcoming motion for an award of attorneys' fees and representative reimbursement.

13      The grounds for this motion are that the proposed settlement is fair, reasonable, and

14  adequate; that the proposed notice of settlement is appropriate and may be disseminated to

15  shareholders; and that a hearing for the final approval of the proposed settlement should be

16  scheduled.  This motion is supported by the following memorandum and points of authorities in

17  support thereof; the Stipulation and Agreement of Compromise, Settlement and Release, dated

18  February 26, 2019, and Exhibits thereto; the Joint Declaration of Richard M. Heimann and Joseph

19  E. White, III in Support of Approval of the Derivative Settlement ("Joint Decl."); the Declaration

20  of the Honorable Daniel Weinstein (Ret.) in Support of Approval of the Derivative Settlement

21  ("Weinstein Decl."); the Declaration of Professor Michael Santoro in Support of Approval of the

22  Derivative Settlement ("Santoro Decl."); the previous filings and orders in this action; and such

23  other matters as the Court may consider.

24
25
26
27
28

**STATEMENT OF ISSUES TO BE DECIDED**

1.     Whether the Court should preliminarily approve the Settlement[1] based on a finding that its terms fall within the range of possible approval.

2.     Whether the Court should approve the proposed form and manner of notice of the Settlement.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.     INTRODUCTION**

Following two years of fiercely contested litigation over "the most difficult legal theory of corporate law," Court-appointed Co-Lead Plaintiffs Fire and Police Pension Association of Colorado and the City of Birmingham Retirement and Relief System have reached an historic settlement of this shareholder derivative action.  This action alleges that the twenty Defendants,[2] each a current or former officer or director of Wells Fargo & Company ("Wells Fargo" or the "Company"), knew or consciously disregarded that the Company's employees were illicitly creating millions of customer accounts without those customers' knowledge or consent (the "Improper Sales Practices").  Through this shareholder derivative action, Co-Lead Plaintiffs have sought to hold Defendants accountable for a scandal that has significantly damaged one of America's largest financial institutions.

The Settlement confers two categories of benefits to the Company.  *First*, the Settlement provides for a cash payment of *$240 million* from Defendants' insurers to Wells Fargo—by far the *largest insurer-funded cash recovery* of any settlement in a shareholder derivative action.  *Second*, Wells Fargo acknowledges that facts alleged in this action were "significant factors" taken into account by the Company and its Board of Directors (the "Board") in implementing a series of remedial measures to prevent future wrongdoing.  These measures include changes to

---

[1]  Unless otherwise defined, capitalized terms appearing in this Motion shall be defined as provided for in the Stipulation & Agreement of Compromise, Settlement and Release dated February 26, 2019, filed concurrently herewith (the "Settlement").

[2]  Defendants are:  (i) John G. Stumpf, Timothy J. Sloan, Carrie L. Tolstedt, John R. Shrewsberry, and Michael J. Loughlin (the "Officer Defendants"); and (ii) John D. Baker II, Elaine L. Chao, John S. Chen, Lloyd H. Dean, Elizabeth A. Duke, Susan E. Engel, Enrique Hernandez, Jr., Donald M. James, Cynthia H. Milligan, Federico F. Peña, James H. Quigley, Judith M. Runstad, Stephen W. Sanger, Susan G. Swenson, and Suzanne M. Vautrinot (the "Director Defendants").

1   top-level management and the composition of the Board, new and improved internal controls, a

2   stronger risk management framework, expanded monitoring of Company culture, and enhanced

3   oversight functions (the "Corporate Governance Reforms").  In addition, the Board reduced

4   compensation for several senior officers and required others (including Defendants Stumpf and

5   Tolstedt) to forfeit past compensation (the "Clawbacks").  The Parties have agreed as part of the

6   Settlement that the portion of the Corporate Governance Reforms and the Clawbacks attributable

7   to Co-Lead Plaintiffs' efforts in this action have a combined value to Wells Fargo of $80

8   million—for a total Settlement value of *$320 million*.

9           The Settlement is fair, reasonable, and adequate.  Co-Lead Plaintiffs vigorously

10   prosecuted this case on behalf of the Company and developed a deep understanding of the

11   strengths and weaknesses of the action.  Notwithstanding their confidence in the merits of their

12   claims, Co-Lead Plaintiffs recognized the challenge of proving at trial that Defendants breached

13   their fiduciary duties to Wells Fargo by consciously disregarding their oversight responsibilities.

14   This *Caremark* claim is widely considered the most difficult theory in corporate law for plaintiffs

15   to win a judgment.  The Settlement is also the product of extensive, arm's-length, and hard-fought

16   negotiations with the assistance of experienced mediators Hon. Daniel Weinstein (Ret.) and Jed D.

17   Melnick, Esq.  This Settlement represents an extraordinary result for Wells Fargo and its

18   shareholders and meets all of the requirements of Rule 23.1 of the Federal Rules of Civil

19   Procedure, due process, and applicable case law.  Accordingly, Co-Lead Plaintiffs respectfully

20   request that the Court grant preliminary approval of the Settlement, approve the form and manner

21   of notice of the Settlement, and schedule a final Settlement Hearing.

22   **II.**   **BACKGROUND AND PROCEDURAL HISTORY**

23           **A.**   **Factual Background**

24           As detailed in Co-Lead Plaintiffs' Consolidated Amended Verified Stockholder

25   Derivative Complaint (the "Complaint"), this case centers on a pattern of misconduct relating to

26   "cross-selling" at Wells Fargo—*i.e.*, the sale of new products to existing customers.  Dkt. 83

27   ("Compl.") ¶¶ 1–6.  As alleged in the Complaint, for over a decade, Wells Fargo employees

28   engaged in the Improper Sales Practices in order to inflate the Company's sales numbers and to

meet unrealistic sales goals.  *See id.* ¶¶ 1–6, 124–40.  Defendants repeatedly touted Wells Fargo's cross-selling prowess as the "foundation of [the Company's] business model and key to [its] ability to grow revenue and earnings," explaining that Wells Fargo was "known across its industry as number one, second to none, for cross-sell and revenue growth."  *Id.* ¶¶ 126-27.

From January 1, 2011 through the present (the "Relevant Period"), Co-Lead Plaintiffs allege that Defendants became aware of significant "red flags" that put them on notice of the Improper Sales Practices.  For example, Defendant and then-CEO Stumpf admitted that he became aware of an increase in "reports of sales-practice issues in late 2013" and that he discussed with the Board a December 2013 *Los Angeles Times* article reporting on the widespread opening of unauthorized accounts around the time it was published.  *Id.* ¶¶ 157, 169, 258.  In addition, certain Board committees received reports on sales integrity issues beginning in at least 2011, *id.* ¶¶ 159, 209, including the Risk Committee, *id.* ¶¶ 156, 209, the Audit and Examination Committee, *id.* ¶¶ 153, 155, 209, the Corporate Responsibility Committee, *id.* ¶¶ 190-91, and the Human Resources Committee.  *Id.* ¶ 156.

The Complaint also alleges that because Wells Fargo's success in cross-selling was central to its financial results, Defendants were highly motivated to foster and perpetuate the Improper Sales Practices.  *Id.* ¶¶ 124–40.  Indeed, the Complaint alleges that the Officer Defendants personally benefited from a conscious failure to address the misconduct.  Defendant Stumpf was the banking industry's highest-paid CEO, receiving tens of millions of dollars in salary and equity compensation every year.  *Id.* ¶¶ 2, 70, 282, 294, 308.  Defendants Sloan, Tolstedt, and Shrewsberry received compensation of more than $40 million, $45 million, and $16 million, respectively, between 2011 and 2015.  *Id.* ¶¶ 71–73, 282, 294, 308.  Moreover, the Complaint alleges that Defendants Stumpf, Sloan, Tolstedt, and Loughlin capitalized on the artificial inflation of Wells Fargo shares by collectively selling or otherwise disposing of over $629 million in Wells Fargo stock, all while in possession of material, non-public information.  *Id.* ¶¶ 312–94.

Beginning in September 2016, public disclosures about the Improper Sales Practices triggered a wave of fallout.  Wells Fargo publicly acknowledged the Improper Sales Practices for

- 3 -

the first time when the Company announced settlements with the Los Angeles City Attorney, the Office of the Comptroller of the Currency, and the Consumer Financial Protection Bureau.  *Id.* ¶¶ 412–25.  In subsequent oral and written Congressional testimony, Defendant Stumpf confirmed that between 2011 and 2013, many Board members were receiving "high-level" information about ethics complaints and noteworthy risk issues, including about conduct related to the Improper Sales Practices.  *Id.* ¶¶ 154–57.  By late 2013, as Defendant Stumpf testified, he became aware of the increased incidence of the Improper Sales Practices and of the *Los Angeles Times* article, and thereafter discussed the issue with the Board.  *Id.* ¶ 169.  Regulatory scrutiny of the Company and its senior officials only continued: on February 2, 2018, the Federal Reserve issued an unprecedented consent order, imposing significant penalties and growth restrictions on the Company.[3]  And for over a year, the Company itself has undertaken a nationwide effort to remedy the harm to consumers and to reestablish trust with stakeholders.[4]

### B.     Procedural Background

Co-Lead Plaintiffs vigorously prosecuted the action: they prepared a detailed, 189-page consolidated complaint; prevailed in two rounds of motions to dismiss; successfully obtained stays or dismissals of at least four related derivative cases pending in other jurisdictions in order to preserve this Court's rulings and ensure coordinated resolution on behalf of the Company; and conducted exhaustive document discovery—before finally reaching a resolution in principle with Defendants in December 2018.

### 1.     The Operative Complaint and Motions to Dismiss

Following the September 2016 public revelations, several derivative actions were filed in this Court and consolidated on December 12, 2016.  Dkt. 39.  In January 2017, the Court appointed the Fire and Police Pension Association of Colorado and the City of Birmingham Retirement and Relief System as Co-Lead Plaintiffs, and Lieff Cabraser Heimann & Bernstein, LLP and Saxena White P.A. as Co-Lead Counsel.  Dkt. 70.  On February 24, 2017, Co-Lead

---

[3]  Order to Cease and Desist Issued Upon Consent Pursuant to the Federal Deposit Insurance Act, as Amended, *In the Matter of Wells Fargo & Company*, Docket No. 18-007-B-HC (Feb. 2, 2018).
[4]  *See, e.g.*, Press Release, Wells Fargo & Co., Wells Fargo Launches "Re-Established," a New Brand Campaign (May 7, 2018), https://newsroom.wf.com/press-release/marketing-and-sponsorships/wells-fargo-launches-re-established-new-brand-campaign.

1    Plaintiffs filed the Complaint, asserting, on behalf of Wells Fargo, breaches of fiduciary duty,

2    unjust enrichment, violations of the Securities Exchange Act of 1934, violations of Sections

3    25402 and 25403 of the California Corporations Code, corporate waste, and contribution and

4    indemnification from certain Defendants.  Dkt. 83.

5            On May 4, 2017, the Court largely denied Wells Fargo's motion to dismiss the Complaint

6    for a failure to adequately plead demand futility, finding that "[t]he extensive and detailed

7    allegations in the complaint plausibly suggest that a majority of the Director Defendants" had

8    "*consciously* disregarded an obligation to be reasonably informed about the business and its risks

9    or *consciously* disregarded the duty to monitor and oversee the business."  Dkt. 129 ("Demand

10   Futility Order") at 17 (emphases in original) (citation omitted).  The Court also highlighted

11   particular "red flags" that "collectively . . .  support[ed] an inference that a majority of the

12   Director Defendants consciously disregarded their fiduciary duties despite knowledge regarding

13   widespread illegal account-creation activities, and . . . that there is a substantial likelihood of

14   director oversight liability."  *Id.* at 24.

15           One month after the Demand Futility Order, each Defendant moved again to dismiss the

16   Complaint for failure to state a claim.  *See* Dkts. 139–41, 143–45.  Co-Lead Plaintiffs filed a 70-

17   page omnibus opposition to the motions to dismiss.  Dkt. 151.  On October 4, 2017, the Court

18   denied in large part Defendants' motions to dismiss.  Dkt. 174 ("12(b)(6) Order").

19           **2.    Co-Lead Plaintiffs Stayed and Coordinated Related Derivative Actions**

20           Following issuance of the Demand Futility Order and the 12(b)(6) Order, Co-Lead

21   Plaintiffs undertook a comprehensive nationwide effort to coordinate related derivative actions in

22   order to preserve their standing to pursue claims on behalf of the Company, avoid unnecessary

23   and duplicative efforts, and prevent inconsistent outcomes in those proceedings.  *First*, Co-Lead

24   Plaintiffs successfully sought to stay or dismiss similar claims in concurrently pending actions in

25   California and Delaware state courts.  Doing so ensured that potentially adverse determinations in

26   those cases would not have collateral estoppel effects in this Court.  *Second*, Co-Lead Plaintiffs

27   moved to relate or consolidate similar derivative actions in this Court, to ensure that all derivative

28   claims related to the Improper Sales Practices would be adjudicated through a single action.  Co-

1   Lead Plaintiffs thereby saved the Company from unnecessary litigation expenses and ultimately

2   obtained this Settlement, which will assist in the prompt resolution of all other derivative actions

3   concerning the Improper Sales Practices.

4                    **a.     Co-Lead Plaintiffs Obtained Stays of All California Actions**

5              Around the same time this action was commenced, other derivative lawsuits were filed in

6   San Francisco Superior Court and consolidated into a single proceeding, *In re Wells Fargo & Co.*

7   *Derivative Litigation*, No. CGC 16-554407 (Cal. Super. Ct.) (the "California State Derivative

8   Action").  The California State Derivative Action never advanced beyond the pleadings.  On May

9   10, 2017, six days after this Court issued its Demand Futility Order, the state court sustained

10  defendants' demurrers with leave to amend, for failure to allege facts establishing demand

11  futility.[5]  A final adverse judgment in the state court proceedings regarding demand futility could

12  threaten to undermine this Court's order to the contrary.  To avoid that result, on May 26, 2017,

13  Co-Lead Plaintiffs moved to intervene in and stay the California State Derivative Action.  On

14  July 28, 2017, after finding that "[Co-Lead Plaintiffs'] interests could be severely impacted by the

15  proceedings in this court,"[6] the state court permitted intervention by Co-Lead Plaintiffs and

16  entered a general stay of the California State Derivative Action.[7]  And on November 30, 2017,

17  following this Court's 12(b)(6) Order, the state court entered a partial stay of that case, staying

18  those portions of the claims that overlapped with claims asserted in this action.[8]

19             The parties in the California State Derivative Action proceeded to brief a second round of

20  demurrers.  On April 25, 2018, the state court sustained the demurrer finding that plaintiffs had

21  again failed to plead demand futility as to the non-stayed causes of action, noted that "it may not

22  _____

23  [5]  Order Sustaining Dems. in Part with Leave to Amend & in Part without Leave to Amend &
    Setting Case Mgmt. Conf., California State Derivative Action (May 10, 2017).

24  [6]  Order re Mot. for Leave to Intervene & for a Stay, California State Derivative Action (July 10,
    2017).

25  [7]  Order Granting Mot. for Leave to Intervene & for a Stay, California State Derivative Action
    (July 28, 2017).

26  [8]  Case Mgmt. Order No. 4 & Order on Stay, California State Derivative Action (Nov. 30, 2017).
    Specifically, the state court stayed the California State Derivative Action except as to (i) the state
    plaintiffs' fourth cause of action for breach of fiduciary duty for insider selling and

27  misappropriation of information, and (ii) other causes of action to the extent they accrued during
    the time period preceding the Relevant Period in this action (*i.e.*, alleged misconduct prior to

28  2011) and relate to damages incurred during the period prior to 2011.

1    be in the best interests of Wells Fargo . . . to proceed now with the claims remaining," and

2    ordered further briefing as to whether it should impose a general stay of the case.[9]  On May 14,

3    2018, after Co-Lead Plaintiffs submitted further briefing in support of a stay, the state court

4    concluded that "a full stay is best now to preserve the derivative claims" and stayed the California

5    State Derivative Action in its entirety.[10]

6             On January 30, 2018, plaintiff Joan Herron initiated a second state court derivative action

7    arising from the Improper Sales Practices, in San Mateo Superior Court, *Herron v. Stumpf*, No.

8    18-CIV-00466 (Cal. Super. Ct.) (the "*Herron* Action").  After the *Herron* Action was coordinated

9    with the California State Derivative Action, Co-Lead Plaintiffs successfully intervened and

10   moved to stay the *Herron* Action entirely, for the same reasons described above.[11]

11                        **b.    Co-Lead Plaintiffs Obtained a Stay or Dismissal of the
                               Delaware Actions.**
12

13            Two derivative actions were separately filed in the Delaware Court of Chancery:

14   *Connecticut Laborers Pension & Annuity Funds v. Stumpf*, C.A. No. 2017-0380-SG (Del. Ch.

15   filed May 17, 2017) (the "*Connecticut Laborers* Action"), and *Rosenfeld v. Stumpf*, C.A. No.

16   2017-0383 (Del. Ch. filed May 18, 2017) (the "*Rosenfeld* Action").  In the *Rosenfeld* Action, Co-

17   Lead Plaintiffs moved to intervene and stay the case on January 12, 2018.  While that motion was

18   still pending, the parties filed, and the Delaware court granted, a stipulation to dismiss the

19   *Rosenfeld* Action, with prejudice only as to plaintiff Barry Rosenfeld.[12]

20            Similarly, on April 6, 2018, Co-Lead Plaintiffs filed a motion to intervene and stay

21   proceedings in the *Connecticut Laborers* Action.  Notably, defendants in that action (all named as

22   Defendants here) opposed Co-Lead Plaintiffs' motion and specifically requested that the

23   Delaware court issue a decision contrary to this Court's Demand Futility Order and 12(b)(6)

24   Order, citing "ongoing confusion" and "diverging decisions" in this action and the California

25   State Derivative Action.  *See* Dkt. 223.  On July 11, 2018, after a hearing on the motion and

26   ───────────────
     [9]  Order on Demurrer & Request for Further Briefing, California State Derivative Action (Apr. 25,
     2018).
27   [10]  Order Imposing General Stay, California State Derivative Action (May 14, 2018).
     [11]  Order Granting Mot. to Stay *Herron* Action (July 11, 2018).
28   [12]  Stipulation & Order of Dismissal, *Rosenfeld* Action (May 11, 2018).

MOTION FOR PRELIMINARY APPROVAL
OF SETTLEMENT
LEAD CASE NO. 3:16-cv-05541-JST

1   finding "that there's a possibility of inconsistent judgments, that efficiency supports a stay, [and]

2   that comity supports a stay,"[13] the Chancery Court stayed the *Connecticut Laborers* Action

3   pending resolution of this action.[14]

         **c.**     **Co-Lead Plaintiffs Sought to Consolidate or Foreclose Several**
4
                  **Late-Filed Derivative Actions in This Court.**
5

6         Well after this Court consolidated the original related shareholder derivative actions

7   before it, appointed lead plaintiffs, and issued its Demand Futility Order and 12(b)(6) Order, a

8   second wave of late-filed complaints came before this Court.  In each instance, the Court resolved

9   potential conflicts by ensuring that Co-Lead Plaintiffs would continue to represent the Company's

10  interests on behalf of all shareholders and to ensure resolution of all derivative claims relating to

11  the Improper Sales Practices.

12        On December 20, 2017, plaintiff George Hannon filed, in *Hannon v. Loughlin*, No. 3:17-

13  cv-07236-JST (N.D. Cal.) ("*Hannon II*"), a shareholder derivative complaint that was nearly

14  identical to the one he filed a year earlier.[15]  Mr. Hannon's new complaint added two California

15  causes of action against American Express Company.  After the Court granted Co-Lead Plaintiffs'

16  administrative motion to relate *Hannon II*, *see* Dkt. 197, Co-Lead Plaintiffs moved to consolidate

17  *Hannon II* with this action.  Dkt. 204.  On May 2, 2018, the Court granted Co-Lead Counsel's

18  motion and consolidated *Hannon II* with this action, after concluding that "there is good reason to

19  believe that [Mr. Hannon's] counsel's dominant purpose in adding claims against American

20  Express was simply to escape the Court's prior order of consolidation."  Dkt. 219 at 2.[16]

21        On May 6, 2018, plaintiff R.A. Feuer filed a shareholder derivative complaint, in *Feuer v.*

22  *Baker*, No. 3:18-cv-02866-JST (N.D. Cal.) (the "*Feuer* Action").  Given the broad scope of Mr.

---

23  [13]  Transcript of Telephonic Oral Argument on Pls.' & Federal Pls.' Mots. to Stay & Rulings of
24  the Court, *Connecticut Laborers* Action (June 12, 2018).
    [14]  Order to Stay Proceedings, *Connecticut Laborers* Action (July 11, 2018).
25  [15]  Plaintiff Hannon filed his first complaint on November 15, 2016.  *Hannon v. Loughlin*, No.
    3:16-cv-06624 (N.D. Cal.) ("*Hannon I*").  This Court consolidated *Hannon I* into this action. *See*
26  Dkt. 39.  Mr. Hannon and his counsel unsuccessfully sought to be appointed lead plaintiff and
    counsel, respectively, *see* Dkt. 36, and shortly thereafter, Mr. Hannon's counsel filed a separate
27  unsuccessful motion to be appointed lead counsel, *see* Dkt. 41.
    [16]  On June 1, 2018, Hannon sought interlocutory review of the Court's consolidation order.  *See*
28  Dkt. 226; *Hannon v. Am. Express Co.*, No. 18-16115 (9th Cir.).  That appeal is pending.

1   Feuer's claims—both relating to Improper Sales Practices and other unrelated misconduct—Co-

2   Lead Plaintiffs sought and the Court approved a stipulation, signed by all parties including

3   plaintiff Feuer, that (i) the *Feuer* complaint cannot be construed to assert claims based on the

4   Improper Sales Practices, and (ii) Mr. Feuer cannot assert claims for any relief involving the

5   Improper Sales Practices.  Dkt. 252.  The remaining claims in the *Feuer* Action are neither related

6   to this case nor released by the Settlement.[17]

7                  **3.      Discovery From Wells Fargo, Individual Defendants, and Non-Parties**

8          Following the 12(b)(6) Order, Co-Lead Plaintiffs sought and obtained extensive document

9   discovery from Wells Fargo, the Individual Defendants, and several non-parties; engaged in

10  iterative negotiations over the adequacy of their discovery responses; and pursued relevant

11  information from the Federal Reserve.  The Parties also agreed to an expedited case schedule

12  providing for substantial completion of document production in less than nine months.  *See* Dkt.

13  199.

14         Document discovery commenced on November 3, 2017, when Co-Lead Plaintiffs served

15  Wells Fargo with their first set of document requests.  Following extensive negotiations between

16  the Parties over a search protocol, Wells Fargo made its initial document production on March 7,

17  2018.  In total, over the course of approximately seven months, Wells Fargo made fourteen

18  productions of documents spanning 16 years and hundreds of custodians.  In October 2018, Co-

19  Lead Plaintiffs and Wells Fargo engaged in further meet and confer communications, which

20  resulted in Wells Fargo agreeing to produce an additional 520,000 responsive documents,

21  comprising over 2.5 million pages.  Co-Lead Plaintiffs also negotiated with counsel for the

22  Individual Defendants and received document productions from each.  Additionally, Co-Lead

23  Plaintiffs subpoenaed seven non-parties who collectively produced over 4,000 pages.  In total,

24  Co-Lead Plaintiffs obtained 727,679 documents comprising 3,529,385 pages and reviewed over

25  1.1 million pages of documents before reaching an agreement in principle to settle the case.  In

26  conducting discovery, Co-Lead Plaintiffs employed efficient measures—specifically, technology-

---

27  [17]  Similarly, on May 17, 2018, plaintiff Timothy Himstreet filed a derivative complaint relating
    to the Improper Sales Practices, in *Himstreet v. Sloan*, 3:18-cv-02922-JST (N.D. Cal.).  On
28  August 9, 2018, Mr. Himstreet voluntarily dismissed his action.  *Himstreet*, Dkt. 29.

assisted review software—to identify for manual review documents most likely to be both unique and relevant to the claims and defenses in the case.  In addition, by late 2018, Co-Lead Counsel had begun earnestly and conscientiously to prepare for the initial depositions of the more than forty anticipated fact witnesses.

### 4.    Mediation and Settlement

The Settlement is the product of extensive negotiations, including multiple, bi-coastal mediation sessions before nationally renowned mediators.  Settlement negotiations took place in earnest beginning in 2017 following the Demand Futility Order.  However, after three mediation sessions, the Parties were unable to reach a resolution.  In September 2018, following months of discovery and Co-Lead Plaintiffs' successful efforts to stay or consolidate the related derivative actions, the Parties engaged in a second round of negotiations under the auspices of Judge Daniel Weinstein (Ret.) and Jed D. Melnick, Esq.  Over four separate day-long sessions in San Francisco and New York City, the Parties engaged in mediation.  The sessions involved detailed presentations on liability, damages, and the documentary evidence obtained in discovery, along with serial expert presentations on these issues.  Weinstein Decl. ¶ 7.

In all, the Parties prepared and exchanged at least five rounds of written submissions addressing legal and factual disputes, communicated with the mediators, and negotiated directly with each other.  As described below, the settlement negotiations were complex, at arm's length, and hard fought.  The Parties' mediation efforts culminated in a final session on December 4, 2018.  On December 5, 2018, Judge Weinstein made a comprehensive mediator's proposal, which the Parties accepted on December 12, 2018.  Judge Weinstein's proposal is the basis for the Settlement now before the Court, which the Parties present as a fair and principled conclusion to this action.

## III.    SETTLEMENT TERMS

Consideration.  The Settlement contains two components: (1) a monetary payment of $240 million from Defendants' insurers to Wells Fargo; and (2) the Corporate Governance Reforms, *see* Settlement, Ex. A, and the Clawbacks, *see* Settlement, Ex. B, for which Wells Fargo agrees and acknowledges that facts alleged in the Complaint were significant factors in the determination

1  to undertake those remedial actions.  The Parties agree that the Corporate Governance Reforms

2  and the Clawbacks attributable to Co-Lead Plaintiffs' efforts conferred a benefit to Wells Fargo

3  of $80 million, for a total Settlement value of $320 million.  Critically, the Corporate Governance

4  Reforms ensure greater Board oversight, "completely eliminate the sales incentives that

5  encouraged employees to defraud customers," and resolve Board-level structural issues.  Santoro

6  Decl. ¶ 48.  In the opinion of Professor Michael Santoro, Co-Lead Plaintiffs' expert on corporate

7  governance, the Corporate Governance Reforms "represent a major step forward for Wells

8  Fargo's overall corporate governance that not only creates substantial and sustainable value for

9  the Company and its shareholders, but also helps to protect the public and the Company's

10  customers from future abuse and wrongdoing."  *Id.* at ¶ 4.

11       <u>Release.</u>  In exchange for the consideration described above, the Settlement provides that

12  Co-Lead Plaintiffs will release, on behalf of the Company, all claims arising from facts alleged in

13  this action or any of several related state court actions—including all claims related to the

14  Improper Sales Practices.  Settlement ¶¶ 37-38.  The Settlement also provides for the release of

15  claims against American Express, and against defendants named in the related state court actions,

16  including certain other current or former directors.  Settlement ¶¶ 25-27.[18]

17       <u>Attorney's Fees, Costs, and Representative Reimbursement.</u>  In accordance with the

18  Settlement, Co-Lead Plaintiffs intend to seek a Court-approved award of attorney's fees, which

19  was separately negotiated after the Parties agreed on the Settlement terms and which Wells Fargo

20  fully supports.  In addition, Co-Lead Plaintiffs intend to seek reimbursement for their time and

21  costs associated with these proceedings—such amount to be deducted from the Court-awarded

22  attorney's fees.  No separate reimbursement of expenses or other awards will be sought.

23  **IV.**   **LEGAL STANDARD**

24       Under Rule 23.1(c) of the Federal Rules of Civil Procedure, "[a] derivative action may be

25  settled . . . only with the court's approval."  Reflecting "a strong judicial policy" that favors

26  settlement in complex cases, district courts have broad discretion to approve settlements in

27

28  [18] These individuals include Richard D. McCormick, Mackey J. McDonald, Nicholas G. Moore, Philip J. Quigley, and Howard V. Richardson.  *See* Settlement ¶ 14.

1  shareholder derivative actions.  *See In re Hewlett-Packard Co. S'holder Derivative Litig.*, 716 F.

2  App'x 603, 605 (9th Cir. 2017); *In re Pac. Enters. Sec. Litig.*, 47 F.3d 373, 378 (9th Cir. 1995);

3  *see also In re NVIDIA Corp. Derivative Litig.*, No. C-06-06110-SBA (JCS), 2008 WL 5382544,

4  at *2 (N.D. Cal. Dec. 22, 2008) ("Because shareholder derivative actions are notoriously difficult

5  and unpredictable . . . settlements are favored." (citation and internal quotation marks omitted)).

6  In evaluating settlements in derivative actions, courts have routinely looked to cases involving

7  class action settlements under Rule 23(e) as "relevant by analogy."  Wright & Miller, 7C Fed.

8  Prac. & Proc. Civ. § 1839 (3d ed.); *see, e.g.*, *Pac. Enters.*, 47 F.3d at 377; *Lloyd v. Gupta*, No. 15-

9  cv-04183-MEJ, 2016 WL 3951652, at *4 (N.D. Cal. July 22, 2016).

10        Approval of a settlement in a derivative action proceeds in two steps.  At the preliminary

11  approval stage, the court conducts an initial evaluation of proposed settlement terms to determine

12  whether they fall "within the range of possible approval" as fair, reasonable, and adequate.  *See*

13  *NVIDIA Corp.*, 2008 WL 5382544, at *2.  In doing so, the court should look to (1) whether

14  plaintiffs effectively represented the interests of the corporation and its shareholders; (2) whether

15  the settlement results from serious, informed, arm's-length negotiations; and (3) whether the

16  settlement's substantive terms are in the interests of the corporation and its shareholders.  *Lloyd*,

17  2016 WL 3951652, at *4.[19]  Upon preliminary approval, the court then directs notice of the

18  proposed settlement to shareholders.  Fed. R. Civ. P. 23.1(c).  The Ninth Circuit has "generally

19  held notice to be satisfactory where it 'describes the terms of the settlement in sufficient detail to

20  alert those with adverse viewpoints to investigate and to come forward and be heard.'"  *Hewlett-*

21  *Packard*, 716 F. App'x at 609 (citing *Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th

---

22  [19]  Recent amendments to Rule 23(e), which governs class actions and not derivative suits, but is
    nonetheless relevant by analogy, now explicitly set forth factors to consider in determining
23  whether a proposed settlement is "fair, reasonable, and adequate."  *See* Fed. R. Civ. P. 23(e)(2).
    Specifically, the Rule now requires courts to consider whether:  (i) class representatives and class
24  counsel have adequately represented the class; (ii) the proposal was negotiated at arm's length;
    (iii) the relief provided for the class is adequate; and (iv) the proposal treats class members
25  equitably.  *Id.*  These factors reflect considerations that courts in the Northern District have long
    taken into account in the class action context.  *See, e.g.*, *In re Chrysler-Dodge-Jeep Ecodiesel*
26  *Mktg., Sales Practices, and Prods. Liab. Litig.*, 2019 WL 536661, at *8 (N.D. Cal. Feb. 11, 2019).
    Consistent with case law governing derivative settlements, these factors reflect both procedural
27  concerns (*e.g.*, the conduct of the litigation and of negotiations leading to the proposed settlement)
    and substantive concerns (*e.g.*, the relief provided).  *See* Fed. R. Civ. P. 23(e)(2) 2018 Advisory
28  Comm. Notes.

MOTION FOR PRELIMINARY APPROVAL
OF SETTLEMENT
LEAD CASE NO. 3:16-cv-05541-JST

1    Cir. 2004)); *see also In re HQ Sustainable Mar. Indus., Inc., Derivative Litig.*, No. C11-0910

2    RSL, 2013 WL 3191867, at *3 (W.D. Wash. June 20, 2013) (notice of proposed settlement must

3    be "best notice practicable under the circumstances" and comport with due process requirements).

4           Following notice to shareholders, the court holds a final fairness hearing to consider

5    approval of the settlement as fair, reasonable, and adequate.  *See NVIDIA Corp.*, 2008 WL

6    5382544, at *2; *accord In re MRV Commc'ns, Inc. Derivative Litig.*, No. CV 08-03800 GAF

7    (MANx), 2013 WL 12210256, at *2 (C.D. Cal. Apr. 8, 2013).  "[C]loser scrutiny" is reserved for

8    this stage of the approval process.  *MRV Commc'ns*, 2013 WL 12210256, at *2 (quoting *Harris v.*

9    *Vector Mktg. Corp.*, No. C-08-5198 EMC, 2011 WL 1627973, at *7 (N.D. Cal. Apr. 29, 2011)).

10   **V.      THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE**

11          The Parties have reached an historic Settlement that achieves not only significant

12   monetary benefit for the Company but also meaningful corporate governance reforms that are

13   designed to reduce the likelihood of future misconduct.  In assessing the substantive

14   reasonableness and adequacy of a proposed settlement, courts consider a number of factors,

15   including the strength of a plaintiff's case; the extent of discovery completed and the stage of the

16   proceedings; the amount offered in settlement; the risk, expense, complexity, and likely duration

17   of further litigation; and the experience and views of counsel.  *See In re Oclaro, Inc. Derivative*

18   *Litig.*, No. C-11-3176 EMC, 2014 WL 4684993, at *1 (N.D. Cal. Sept. 19, 2014) (citing *In re*

19   *Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 458 (9th Cir. 2000)).  Considering the extraordinary

20   efforts of Co-Lead Plaintiffs and their counsel, the strengths of Co-Lead Plaintiffs' claims, and

21   the risks inherent in continued litigation, preliminary approval of the Settlement is warranted.

22          **A.      Co-Lead Plaintiffs Vigorously Pursued This Litigation**

23          Co-Lead Plaintiffs and their counsel zealously advocated for the interests of the Company

24   and have obtained excellent results.  Co-Lead Plaintiffs' decision to settle this case was informed

25   by a thorough investigation of the relevant claims; the filing of a detailed Complaint; success in

26   defeating two motions to dismiss; active intervention in, stays of, and dismissals of multiple state

27   court actions; consolidation and coordination with related federal actions; extensive review of

28

1   documents from Defendants, Wells Fargo, and numerous third parties; consultation with experts;

2   and research and preparation for depositions.

3        Following Wells Fargo's announcement of settlements with several government agencies

4   and its public acknowledgement of the underlying misconduct, Co-Lead Plaintiffs individually

5   undertook considerable investigation and filed detailed complaints against the Defendants.  Joint

6   Decl. ¶ 9.[20]  After their appointment as Co-Lead Plaintiffs, they conducted further investigation

7   and filed a comprehensive 189-page consolidated complaint.  *Id.* at ¶ 10.  The Parties then briefed

8   two rounds of motions to dismiss, involving six separate motions and fourteen briefs.  *Id.* at ¶ 11.

9   The Court's Demand Futility Order and 12(b)(6) Order predominantly sustained those claims.

10       Following the Court's favorable decisions, Co-Lead Plaintiffs made an extensive effort to

11  intervene and stay a host of related cases pending in state courts, in order to protect the interests

12  of the Company and its shareholders, and ensure efficient, non-duplicative pursuit of those claims.

13  *See* Section II.B.2, *supra*.  Co-Lead Plaintiffs sought and eventually obtained complete stays or

14  voluntary dismissals of all related derivative actions.  These efforts, which spanned over fourteen

15  months, required submission of at least thirteen briefs on behalf of Co-Lead Plaintiffs, as well as

16  attendance (and argument) in at least seventeen hearings.  Joint Decl. at ¶ 13.  In addition, Co-

17  Lead Plaintiffs have, to date, submitted at least four briefs (to this Court and the Ninth Circuit)

18  concerning consolidation of the *Hannon II* Action, and engaged in extensive coordination with

19  parties in the *Feuer* Action in order to avoid unnecessary duplication and conflict with those cases.

20  *Id.* at ¶ 14.

21       Co-Lead Plaintiffs aggressively pursued document discovery from Wells Fargo, the

22  Individual Defendants, and non-parties, in compliance with the Court-approved discovery

23  schedule.  Co-Lead Plaintiffs served a total of 204 document requests, and conducted extensive

24  and iterative negotiations regarding the appropriate scope of discovery.  In total, Co-Lead

25  Plaintiffs received 707,835 documents from Wells Fargo, 19,844 documents from the Individual

26  ─────────────────────

27  [20]  *See* Verified Stockholder Derivative Compl., *Fire & Police Pension Ass'n of Colorado v. Stumpf*, No. 3:16-cv-06631-JST (N.D. Cal. Nov. 15, 2016), Dkt. 1; Verified Stockholder Derivative Compl., *City of Birmingham Ret. & Relief Sys. v. Baker*, No. 3:16-cv-05915-JST (N.D.

28  Cal. Oct. 12, 2016), Dkt. 1.

1   Defendants, and 62 documents from non-parties.  *Id.* at ¶ 15.  Co-Lead Plaintiffs then manually

2   reviewed and carefully analyzed over 332,000 documents, using technology-assisted review

3   software to first identify the documents most likely to be relevant to the central issues in the case

4   and greatly minimize review of extraneous or duplicative materials.  *Id.* at ¶ 18.  Co-Lead

5   Plaintiffs also began a comprehensive process of preparing for the depositions of over forty

6   anticipated fact witnesses, including the twenty named Defendants.  *Id.* at ¶ 19.  Concurrently,

7   Co-Lead Plaintiffs consulted with experts in corporate governance, regulatory matters, insurance

8   coverage, and damages.  *Id.* at ¶ 20.

9          The Settlement is demonstrably the product of well-informed negotiations and vigorous

10   advocacy on behalf of the Company.  At the time Co-Lead Counsel agreed to a compromise of

11   their claims—after over two years of intense litigation and after a year of copious discovery—

12   they had obtained a thorough understanding of the strengths and weaknesses of the claims and

13   defenses in this case.  Co-Lead Plaintiffs possessed "sufficient information to make an informed

14   decision about settlement."  *See Hefler v. Wells Fargo & Co.*, No. 3:16-cv-05479-JST, 2018 WL

15   4207245, at *10 (N.D. Cal. Sept. 4, 2018).

16          **B.      The Settlement Results From Good-Faith, Arm's-Length Negotiations**

17          The Settlement arises out of serious, informed, and non-collusive negotiations between the

18   experienced counsel for Co-Lead Plaintiffs, Wells Fargo, Defendants, and Defendants' insurers.

19   By the time they came to agreement, the Parties had benefited from extensive motion practice and

20   document discovery, affording them the opportunity to carefully consider the unique legal and

21   factual issues at stake in this case.

22          Moreover, the Settlement only came about after seven in-person mediation sessions under

23   the guidance of experienced and prominent mediators, as well as numerous direct negotiations

24   between counsel.  The Parties began preliminary settlement discussions in 2017, before this Court

25   issued its 12(b)(6) Order.  Then, after the Court upheld nearly all of Co-Lead Plaintiffs' claims

26   and after significant document discovery, the Parties restarted negotiations in 2018, under the

27   supervision of the Honorable Daniel Weinstein (Ret.), and Mr. Jed Melnick.  After two rounds of

28   written submissions and four intense days of mediation with Judge Weinstein and Mr. Melnick,

1   which culminated in the mediator's proposal to the Parties on December 5, 2018, the Parties

2   reached a settlement in principle on December 12, 2018.  *See* Weinstein Decl. ¶ 12; Joint Decl.

3   ¶ 6.  Accordingly, the advanced posture of this case and the deliberative nature of the negotiations

4   evidence a fair process involving good-faith arm's-length bargaining.  *See, e.g.*, *Hefler*, 2018 WL

5   4207245, at *9 ("[I]n light of the fact that the Settlement was reached after the parties engaged in

6   motion practice and participated in multiple days of formal mediation, the Court concludes that

7   the negotiations and agreement were non-collusive"); *HCL Partners Ltd. P'ship v. Leap Wireless*

8   *Int'l, Inc*., Nos. 07 CV 2245 MMA, 08–CV–0128 MMA, 2010 WL 4027632, at *2 (S.D. Cal. Oct.

9   14, 2010) ("Counsel for the parties participated in arm's length negotiations for several months

10  before reaching an agreement.  All parties are represented by competent, experienced litigators,

11  and the active involvement of the Honorable Weinstein (Ret.) as a mediator . . . weighs

12  considerably in favor of concluding this is not a collusive settlement"); *NVIDIA Corp.*, 2008 WL

13  5382544, at *3 ("The Settlement was negotiated by experienced counsel on behalf of all parties,

14  the parties appear to have engaged in significant negotiations, including at least four formal

15  mediation sessions, and the parties were assisted by an experienced mediator in the reaching the

16  Settlement.").

17      **C.**      **The Settlement Confers Substantial Benefits to the Company**

18          The Settlement results in substantial benefits to the Company in the form of both

19  monetary and non-monetary components—valued at $320 million in the aggregate.  First and

20  foremost, the Settlement provides a $240 million insurer-funded cash payment to the Company—

21  the largest of its kind.  By comparison, no derivative settlement has previously involved an

22  insurer-funded payment in excess of $139 million.  The following table summarizes the largest

23  known insurer-funded cash recoveries in shareholder derivative actions.

24

| Case Name & Citation | Insurer-Funded Cash Recovery | Other Benefits |
|---|---|---|
| *In re Wells Fargo S'holder Derivative Litig.* (N.D. Cal.) | **$240 million** | Changes to management and board composition, enhanced internal controls and risk management, other corporate governance reforms, clawback of compensation |

- 16 -

| Case Name & Citation | Insurer-Funded Cash Recovery | Other Benefits |
|---|---|---|
| *In re News Corp. S'holder Derivative Litig.*, C.A. No. 6285-VCN, 2013 WL 1914773 (Del. Ch. May 3, 2013) | $139 million | Changes to compliance infrastructure, board composition, and management succession and compensation |
| *In re Broadcom Corp. Derivative Litig.*, No. 2:06-cv-03252-R-CW (C.D. Cal. Aug. 28, 2009), Dkt. 432 | $118 million | Repricing and cancellation of certain stock options |
| *City of Monroe Emps.' Ret. Sys. v. Murdoch*, C.A. No. 2017-0833-AGB (Del. Ch. 2017) | $90 million | Certain corporate governance enhancements |
| *In re Pfizer Inc. S'holder Derivative Litig.*, No. 1:09-cv-07822-JSR (S.D.N.Y. Dec. 14, 2010), Dkt. 95 | $75 million | Corporate governance reforms funded by cash |
| *In re Bank of Am. Corp. Sec., Derivative & ERISA Litig.*, No. 1:09-md-02058-PKC (S.D.N.Y. Jan. 18, 2013), Dkt. 795-3 | $62.5 million | Certain corporate governance enhancements |
| *In re Activision Blizzard, Inc. Stockholder Litig.*, 124 A.3d 1025 (Del. Ch. 2015)[21] | approx. $57.5 million | Payments from other defendants, addition of two new independent directors, reducing voting power of insiders |

The Corporate Governance Reforms and Clawbacks also provide considerable additional value and benefits to Wells Fargo, which also weigh in favor of preliminary approval.  As Co-Lead Plaintiffs' corporate governance expert Professor Michael Santoro, opines, the Corporate Governance Reforms "are sufficient to prevent the recurrence of the Improper Sales Practices or similar misconduct in the Company's Community Bank sector."  Santoro Decl. ¶ 53. Accordingly, the amount of the Settlement and the benefits conferred to Wells Fargo through the Corporate Governance Reforms and Clawbacks weigh heavily in favor of preliminary approval.

In total, the benefits of the Settlement are unparalleled, comprising the largest shareholder derivative recovery in history—an extraordinary result for Wells Fargo and its shareholders.

**D.      The Strength of Co-Lead Plaintiffs' Claims**

Co-Lead Plaintiffs assert uniquely strong claims in this case.  Co-Lead Plaintiffs allege that Wells Fargo's senior executives and members of the Board were aware of ongoing

---

[21]  The settlement agreement in *Activision* also provided for payment from two corporate defendants in excess of $217.5 million.  *See In re Activision*, 124 A.3d at 1042.

1    misconduct at the Company for years, and that Defendants consciously disregarded their

2    responsibilities during the Relevant Period.  This Court recognized the strength of Co-Lead

3    Plaintiffs' allegations through its Demand Futility Order and 12(b)(6) Order, when it determined

4    that the facts as pled give rise to cognizable claims and support Co-Lead Plaintiffs' standing to

5    pursue these claims on the Company's behalf.

6           Subsequent events and document discovery support Co-Lead Plaintiffs' claims.  In early

7    2018, the Federal Reserve Board directly implicated the Company's failure to maintain adequate

8    risk management and internal control functions.  Concurrently, the Federal Reserve Board

9    implemented the unprecedented step of prohibiting Wells Fargo from growing its asset base until

10   it sufficiently improved its corporate governance and controls.  Documents produced in the case

11   bolstered the picture of the alleged misconduct.

12          By the time the Parties reached an agreement to settle this case, Co-Lead Plaintiffs

13   conservatively estimated that Defendants' alleged misconduct had caused hundreds of millions of

14   dollars in regulatory and civil fines, penalties, and payments directly attributable to the Improper

15   Sales Practices.  In addition, Co-Lead Plaintiffs estimated that Wells Fargo's ongoing remediation

16   efforts, the Federal Reserve Board's growth restrictions, lost profits and business, and

17   reputational harm had caused and would continue to cause the Company ongoing harm.

18          Given the evidentiary record developed by Co-Lead Plaintiffs' vigorous prosecution of the

19   litigation, Co-Lead Plaintiffs were well-positioned to continue litigating this case through trial.

20   Nonetheless, for the reasons detailed above, Co-Lead Plaintiffs strongly advocated that the

21   strength of their case merited a commensurately historic Settlement.

22          **E.      Risk, Expenses, and Delay Associated with Continued Litigation**

23          Despite Co-Lead Plaintiffs' confidence in the strengths of their case, significant risks

24   remained in continuing to litigate this action through trial and a near-certain appeal.

25          *First*, the derivative nature of this litigation compels Co-Lead Plaintiffs to act in the best

26   interests of the Company and its shareholders.  Accordingly, despite their confidence in their

27   claims, Co-Lead Plaintiffs faced countervailing pressures to minimize continued damage to the

28   Company caused by protracted litigation.  Continued litigation would have (i) taken at least

1    another year (if not more), at significant cost to Wells Fargo; (ii) subjected the Company to the

2    disruption and uncertainty inherent in a trial on the issues; and (iii) deprived the Company of an

3    opportunity to move past the scandal.  Thus, in broad terms, Co-Lead Plaintiffs were motivated to

4    achieve meaningful results for Wells Fargo while at the same time putting the Company in the

5    best possible position to move its business forward.

6         *Second*, Co-Lead Plaintiffs' core *Caremark* fiduciary duty claim[22] is notoriously difficult

7    to prove.  To succeed, Co-Lead Plaintiffs bear the burden of establishing that Defendants (i) had

8    actual or constructive knowledge of the misconduct, and (ii) failed to act in the face of a known

9    duty to act, thereby demonstrating conscious disregard for their responsibilities.  *Rosenbloom v.*

10   *Pyott*, 765 F.3d 1137, 1151 (9th Cir. 2014); *Stone v. Ritter*, 911 A.2d 362, 368 (Del. 2006).  As

11   the *Caremark* court noted, the theory of liability advanced through such a claim "is possibly the

12   most difficult theory in corporation law upon which a plaintiff might hope to win a judgment."

13   *Caremark*, 698 A.2d at 967.  Moreover, the Ninth Circuit has noted that "the odds of winning

14   [any] derivative lawsuit [are] extremely small," in part because "derivative lawsuits are rarely

15   successful."  *Pac. Enters.*, 47 F.3d at 378; *accord NVIDIA Corp.*, 2008 WL 5382544, at *3.[23]

16        *Third*, during the course of this litigation, the Parties raised several legal and factual issues

17   that have little precedent in the case law.  Given the procedural hurdles associated with

18   prosecuting a derivative action and the substantive challenges in asserting a *Caremark* claim,

19   Co-Lead Plaintiffs could not rely on a well-established body of summary judgment decisions,

20   calculations of damages, and procedural questions post-pleadings.  Moreover, counsel is aware of

21   no instance of a *Caremark* claim being tried before a finder of fact.  Therefore, the Parties faced

22   uncertainty as to how legal and factual issues would be ultimately resolved, and resolution of any

23   one issue might alter the Parties' valuation of claims.  Furthermore, the potential for appeal on

24

25

---

26   [22]  *See In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959 (Del. Ch. 1996).
     [23]  *See also Maher v. Zapata Corp.*, 714 F.2d 436, 455 (5th Cir. 1983) ("Settlements of
27   shareholder derivative actions are particularly favored because such litigation is 'notoriously
     difficult and unpredictable.'" (quoting *Schimmel v. Goldman*, 57 F.R.D. 481, 487 (S.D.N.Y.
28   1973))).

1  any one of these issues injected further uncertainty into the equation.  In light of these

2  considerations, Co-Lead Plaintiffs faced considerable risk in continuing to litigate the case.

3       *Fourth*, recovery of damages in this litigation was further complicated by the complexities

4  of a director and officer liability insurance policy covering the alleged misconduct.  A settlement

5  provides Wells Fargo the benefit of immediacy, allowing the Company to benefit from a cash

6  payment without having to await additional appeals or potential litigation between Defendants

7  and their insurers.  *See In re Galena Biopharma, Inc. Deriv. Litig.*, No. 3:14-CV-00382-SI, 2016

8  WL 10840600, at *2 (D. Or. June 24, 2016) (noting that an insurance coverage lawsuit "would

9  also further deplete the financial resources of Galena").

10      **F.      Co-Lead Plaintiffs' and Co-Lead Counsel's Endorsement of the Settlement**

11           In addition, the collective experience of Co-Lead Plaintiffs and their counsel is further

12  reason to conclude that the Settlement resulted from well-informed deliberations.  Co-Lead

13  Plaintiffs are sophisticated institutional investors, each publicly regulated and accountable

14  through a board of directors, and each with significant derivative litigation experience of its

15  own.[24]  Counsel for Co-Lead Plaintiffs are among the nation's leading securities class action and

16  derivative litigation firms, with extensive experience in litigating complex actions.  *See* Dkt. 34-3,

17  34-4; *see also* Dkt. 70 (noting Co-Lead Counsel's "significant experience obtaining favorable

18  results as lead counsel in shareholder derivative litigation").[25]  Together, the collective experience

19  and judgment of Co-Lead Counsel supports approval of the Settlement.

---

20  [24]  *See, e.g.*, *In re the Hospitalist Co., Inc. Consolidated Derivative Litig.*, C.A. No. 10258-CB (Del. Ch. filed Oct. 20, 2014) (The City of Birmingham Retirement and Relief System appointed

21  as co-lead plaintiff); *In re Duke Energy Corp. Coal Ash Derivative Litig.*, C.A. No. 9682-VCG (Del. Ch. filed May 22, 2014) (same); *In re UnitedHealth Grp. Inc. S'holder Derivative Litig.*, No.

22  0:06-cv-01216-JMR-FLN (D. Minn. filed Mar. 29, 2006) (Fire & Police Pension Association of Colorado appointed as co-lead plaintiff).

23  [25]  *See also In re Volkswagen "Clean Diesel" Mkt' g, Sales Practices & Prods. Liability Litig.*, No. 3:15-md-02672-CRB (N.D. Cal.) (Lieff Cabraser, as lead counsel, obtained a series of class

24  action settlements totaling over $11 billion); *In re Broadcom Corp. Derivative Litig.*, No. C-06-3252 R (CWx) (C.D. Cal.) (in a shareholder derivative action and the largest stock options

25  backdating case in the country, Lieff Cabraser achieved settlements totaling $197 million); *In re Wilmington Tr. Sec. Litig.*, Master File No. 10-cv-00990-ER (D. Del.) (Saxena White as co-lead

26  counsel achieved $210 million settlement representing a recovery of nearly 40% of maximum recoverable damages, ranking among the top-ten securities fraud settlements in the Third Circuit);

27  *In re Bank of America Corp. Sec., Derivative & ERISA Litig.*, No. 09-md-2058 (S.D.N.Y.) (Saxena White recovered $62.5 million for the company and its shareholders, along with

28  fundamental, board-level corporate governance reforms).

MOTION FOR PRELIMINARY APPROVAL
OF SETTLEMENT
LEAD CASE NO. 3:16-cv-05541-JST

1    At bottom, this Settlement enables Wells Fargo to recover substantial monetary and non-

2    monetary benefits without incurring any additional risks or costs.[26]

3    **VI.      THE NOTICE PLAN PROVIDES MORE THAN ADEQUATE NOTICE**

4    Co-Lead Plaintiffs propose a publication-only notice plan consistent with shareholder

5    derivative settlement notice procedure and precedent, *see, e.g.*, *Hewlett-Packard*, 716 F. App'x at

6    608, which includes the following:  (1) publication, by Wells Fargo, of a Summary Notice, *see*

7    Settlement, Ex. E, as a quarter-page advertisement in the national and local editions of the *Wall*

8    *Street Journal*, the *New York Times*, the *Los Angeles Times*, and *Investor's Business Daily*;

9    (2) publication, by Co-Lead Counsel, of the Summary Notice via a national wire service;

10   (3) publication, by Wells Fargo, of a Current Report on its Form 8-K with the Securities and

11   Exchange Commission; (4) electronic publication, by Wells Fargo, of the Settlement and a Notice,

12   *see* Settlement, Ex. D, via a link on the "Investor Relations" page of the Wells Fargo website,[27]

13   the address of which shall be contained in the Notice and the Summary Notice, and which shall

14   be sent by U.S. Mail to persons who request the Notice; and (5) electronic publication, by Co-

15   Lead Counsel, of the Settlement and the Notice at a website created specifically for the purpose of

16   disseminating notice.  Settlement ¶ 35.

17   Co-Lead Plaintiffs seek Court approval of the form of the Notice and Summary Notice.

18   *See* Settlement, Exs. D (Notice) & E (Summary Notice).  The Notice and Summary Notice are

19   written in accordance with the Ninth Circuit's requirement that a notice to shareholders "describe[]

20   the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate

21   and to come forward and be heard."  *Hewlett-Packard*, 716 F. App'x at 608.  Specifically, the

22   Notice and Summary Notice each include a summary of the litigation; the reasons for settlement;

23   ─────────────────
[26] The Settlement provides a broad release of all claims arising from facts alleged in this action
or any of several related state court actions.  *See* Section III, *supra*.  As the Ninth Circuit has held,

24   "[a] settlement agreement may preclude a party from bringing a related claim in the future even
though the claim was not presented and might not have been presentable in the class action, but

25   only where the released claim is based on the identical factual predicate as that underlying the
claims in the settled class action."  *Hesse v. Sprint Corp.*, 598 F.3d 581, 590 (9th Cir. 2010)

26   (citations and internal quotation marks omitted); *see also Class Plaintiffs v. City of Seattle*, 955
F.2d 1268, 1287 (9th Cir. 1992); *Chavez v. PVH Corp.*, No. 13-CV-01797-LHK, 2015 WL

27   9258144, at *4 (N.D. Cal. Dec. 18, 2015); *Angell v. City of Oakland*, No. 13-CV-00190 NC, 2015
WL 65501, at *7 (N.D. Cal. Jan. 5, 2015).

28   [27]  *See* Wells Fargo, Investor Relations, https://www.wellsfargo.com/about/investor-relations/.

1    the terms of the Settlement, including an overview of the Corporate Governance Reforms and

2    Clawbacks; the effect of court approval of the Settlement on shareholders' rights; the anticipated

3    attorney's fee request; and an explanation of a shareholder's right to object, the deadline to object,

4    and the right to appear at the Final Approval Hearing.  *Id.*  Indeed, the proposed notice plan

5    contemplates broader dissemination than plans that have been approved in other derivative

6    settlements.  *See, e.g.*, *id.* at 608 (affirming approval of notice plan providing for publication of

7    notice (i) in leading papers for two days, (ii) in a Form 8-K, and (iii) on the company's website);

8    *In re Atmel Corp. Deriv. Litig.*, No. 06-cv-04592-JF, 2010 WL 9525643, at *5 (N.D. Cal. Mar. 31,

9    2010) (requiring publication of notice though (i) a press release, (ii) a link on the company's

10   website, and (iii) in *Investor's Business Daily*); *In re Rambus Inc. Derivative Litig.*, No. 06-cv-

11   03513-JF, 2009 WL 166689, at *2 (N.D. Cal. Jan. 20, 2009) (noting that court preliminarily

12   approved notice through (i) press release on Business Wire, (ii) a Form 8-K, and (iii) on the

13   company's website).

14          Accordingly, the form and manner of the proposed notice constitute the best notice

15   practicable under the circumstances and satisfies the requirements of Rule 23.1 and due process.

16   **VII.**   **ATTORNEY'S FEES, COSTS, AND REPRESENTATIVE REIMBURSEMENT**

17          **A.**   **Attorney's Fees and Costs**

18          After negotiating the principal terms of the Settlement, Co-Lead Counsel and counsel for

19   Wells Fargo, with the assistance of the mediators, separately negotiated the amount of attorney's

20   fees and expenses that the Company would pay to Co-Lead Counsel, in light of the benefits

21   conferred by Co-Lead Plaintiffs' efforts.  Weinstein Decl. ¶ 18.  In accordance with the

22   Settlement, Co-Lead Plaintiffs anticipate requesting an award of up to $68 million in attorney's

23   fees, to be paid by the Company.  *See* Settlement ¶ 44.  Wells Fargo fully supports Co-Lead

24   Counsel's request for an award of attorney's fees of up to $68 million and Co-Lead Plaintiffs'

25   Reimbursement Award request.  Co-Lead Counsel will not separately seek reimbursement of their

26   own costs or expenses incurred in connection with this litigation.

27          The $68-million amount represents 21.25 percent of the $320 million total value of the

28   Settlement, which falls well under the 25-percent benchmark rate for attorney's fee awards in the

1   Ninth Circuit.  *See Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047 (9th Cir. 2002); *Six (6)*

2   *Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990); *accord Hefler*,

3   2018 WL 4207245, at *8.  Moreover, Co-Lead Counsel[28] have dedicated more than 47,000 hours

4   of attorney and other professional staff time to bring this action to a successful conclusion,

5   without having yet received compensation for these efforts.  Joint Decl. ¶ 21.  Co-Lead Plaintiffs

6   and Wells Fargo have agreed and acknowledge that the facts alleged in this action were

7   significant factors taken into account by Wells Fargo in implementing the Corporate Governance

8   Reforms and the Clawbacks.  In view of an estimated lodestar in excess of $20,490,000,[29] a $68-

9   million fee award would result in a multiplier of at most 3.32.  Accordingly, a lodestar cross-

10  check would support the reasonableness of such a fee request.  *See, e.g.*, *Vizcaino*, 290 F.3d

11  1052–54 (concluding that multipliers most commonly fall range from 1.0 to 4.0); *accord Hefler v.*

12  *Wells Fargo & Co.*, No. 3:16-cv-05479-JST, 2018 WL 6619983, at *14 (N.D. Cal. Dec. 18, 2018)

13  ("Plaintiffs' Counsel's total lodestar of $29,504,271.25 results in a multiplier of 3.22 . . . .

14  Because Plaintiffs' Counsel's lodestar multiplier is within the range of reasonableness, it supports

15  the requested award").

16          **B.      Representative Reimbursement**

17          Concurrently, Co-Lead Plaintiffs also intend to seek an award for reimbursement for their

18  time and expenses in representing Wells Fargo in an amount up to an aggregate of $50,000,

19  which amount will be paid from Co-Lead Counsel's fee award.  Such an award would recognize

20  the resources that Co-Lead Plaintiffs devoted to zealously litigating this case on behalf of the

21  Company and its shareholders, and would "reward the public service performed by lead plaintiffs

22  in contributing to the vitality and enforcement of securities laws."  *In re Cendant Corp.,*

23  *Derivative Action Litig.*, 232 F. Supp. 2d 327, 344 (D.N.J. 2002); *see also Rodriguez v. W. Publ'g*

24  *Co.*, 563 F.3d 948, 958–59 (9th Cir. 2009) ("[Incentive awards] are intended to . . . to make up for

25  _____

26  [28]  During the course of this litigation, Co-Lead Counsel were assisted by the following law firms
    under limited circumstances: Glancy Prongay & Murray LLP; Robbins Arroyo LLP; and Prickett,
    Jones & Elliott, P.A.

27  [29]  This figure represents counsel's best estimate to date, and will be subject to additional work
    performed in this case and a further audit of time records prior to a formal request for an award of
28  attorney's fees.

1    financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their

2    willingness to act as a private attorney general.").

3          The amount to be requested is fully supported by the substantial time and effort spent

4    during the course of this litigation.  Co-Lead Plaintiffs represented the best interests of the

5    Company and actively pursued this litigation by, among other things, reviewing filings, attending

6    hearings, personally attending every mediation session, participating in settlement-related

7    presentations, reviewing the Settlement terms, and approving the Settlement.  Joint Decl. ¶ 23.

8    *See Thomas v. MagnaChip Semiconductor Corp.*, No. 14-CV-01160-JST, 2018 WL 2234598, at

9    *4 (N.D. Cal. May 15, 2018) (among other things, "communicat[ing] with counsel about the

10   Action and help[ing] evaluate settlement proposals" found by the Court to "warrant incentive

11   awards").  Their efforts resulted in the largest derivative settlement in history.

12   **VIII.   PROPOSED SCHEDULE FOR DISSEMINATION OF NOTICE AND SCHEDULE
            OF FINAL APPROVAL HEARING**

13

14         In connection with preliminary approval of the Settlement, Co-Lead Plaintiffs request that

15   the Court set deadlines by which notice of the Settlement will be disseminated to Wells Fargo

16   shareholders, Wells Fargo shareholders may object to or comment on the Settlement, and a Final

17   Approval Hearing.  As set forth in the Proposed Order Preliminarily Approving Derivative

18   Settlement and Providing for Notice, *see* Settlement, Ex. C, Co-Lead Plaintiffs propose the

19   following:

20

| Event | Deadline |
|---|---|
| Publication of Notice and Summary Notice, including:<br><br>• publication, by Wells Fargo, of the Summary Notice in national and local editions of the *Wall Street Journal*, the *New York Times*, the *Los Angeles Times*, and *Investor's Business Daily*;<br><br>• publication, by Co-Lead Counsel, of the Summary Notice via a national wire service;<br><br>• publication, by Wells Fargo, of a Current Report on its Form 8-K with the Securities and Exchange Commission;<br><br>• electronic publication, by Wells Fargo, of the Settlement and the Notice its website; and | 7 calendar days after Court enters the Preliminary Approval Order |

21

22

23

24

25

26

27

28

| Event | Deadline |
|---|---|
| • electronic publication, by Co-Lead Counsel, of the Settlement and the Notice at a website created specifically for the purpose of disseminating notice | |
| Last day to file Motion for Final Approval of Settlement, Motion for Attorney's Fees and Reimbursement Awards | 35 calendar days before the Final Approval Hearing |
| Last day for Wells Fargo shareholders to object to or otherwise comment on the Settlement or the Motion for Attorney's Fees and Reimbursement Awards | 21 calendar days before the Final Approval Hearing |
| Last day to file papers in response to any objection to or comment on the Settlement or the Motion for Attorney's Fees and Reimbursement Awards | 7 calendar days before the Final Approval Hearing |
| Final Approval Hearing | At least 65 days after entry of an order preliminarily approving the Settlement |

This schedule is similar to those used in connection with other derivative settlements[30] and provides due process to Wells Fargo shareholders with respect to the Settlement.

**IX.    CONCLUSION**

For all the foregoing reasons, Co-Lead Plaintiffs respectfully request that this Court grant preliminary approval of the Settlement, approve and direct the implementation of the notice plan, and schedule a Final Approval Hearing.

---

[30] *See, e.g.*, *NVIDIA Corp.*, 2008 WL 5382544, at *4 (settlement hearing 36 days after approval, notice provided within 10 business days of preliminary approval).

Dated: February 28, 2019

LIEFF CABRASER HEIMANN & BERNSTEIN

By: */s/ Richard M. Heimann*
Richard M. Heimann (063607)
*rheimann@lchb.com*
Katherine C. Lubin (259826)
*kbenson@lchb.com*
Michael K. Sheen (288284)
*msheen@lchb.com*
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

Steven E. Fineman (140335)
*sfineman@lchb.com*
Daniel P. Chiplock (*Pro hac vice*)
*dchiplock@lchb.com*
Nicholas Diamand (*Pro hac vice*)
*ndiamand@lchb.com*
Michael J. Miarmi (*Pro hac vice*)
*mmiarmi@lchb.com*
Sean A. Petterson (*Pro hac vice*)
*spetterson@lchb.com*
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, NY 10013-1413
Telephone: (212) 355-9500
Facsimile: (212) 355-9592

*Attorneys for Co-Lead Plaintiff Fire & Police Pension Association of Colorado and Co-Lead Counsel*

MOTION FOR PRELIMINARY APPROVAL
OF SETTLEMENT
LEAD CASE NO. 3:16-cv-05541-JST

Maya Saxena (*Pro hac vice*)
*msaxena@saxenawhite.com*
Joseph E. White, III (*Pro hac vice*)
*jwhite@saxenawhite.com*
Lester R. Hooker (241590)
*lhooker@saxenawhite.com*
Adam D. Warden (*Pro hac vice*)
*awarden@saxenawhite.com*
Dianne M. Anderson (286199)
*danderson@saxenawhite.com*
SAXENA WHITE P.A.
150 East Palmetto Park Road, Suite 600
Boca Raton, FL 33432
Telephone: (561) 394-3399
Facsimile: (561) 394-3382

Steven B. Singer (*Pro hac vice*)
*ssinger@saxenawhite.com*
Kyla Grant (*Pro hac vice*)
*kgrant@saxenawhite.com*
Sara DiLeo (*Pro hac vice*)
*sdileo@saxenawhite.com*
SAXENA WHITE P.A.
10 Bank Street, 8th Floor
White Plains, NY 10606
Telephone: (914) 437-8551
Facsimile: (888) 631-3611

*Attorneys for Co-Lead Plaintiff The City of Birmingham and Co-Lead Counsel*