Richard M. Heimann (063607)
*rheimann@lchb.com*
Katherine C. Lubin (259826)
*kbenson@lchb.com*
Michael K. Sheen (288284)
*msheen@lchb.com*
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
Facsimile:  (415) 956-1008

*Attorneys for Co-Lead Plaintiff Fire & Police Pension*
*Association of Colorado and Co-Lead Counsel*

Maya Saxena (*Pro hac vice*)
*msaxena@saxenawhite.com*
Joseph E. White, III (*Pro hac vice*)
*jwhite@saxenawhite.com*
Lester R. Hooker (241590)
*lhooker@saxenawhite.com*
SAXENA WHITE P.A.
150 East Palmetto Park Road, Suite 600
Boca Raton, FL 33432
Telephone:  (561) 394-3399
Facsimile:  (561) 394-3382

*Attorneys for Co-Lead Plaintiff The City of Birmingham*
*Retirement and Relief System and Co-Lead Counsel*

[Additional Counsel on Signature Page]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE WELLS FARGO & COMPANY SHAREHOLDER DERIVATIVE LITIGATION | Lead Case No. 3:16-cv-05541-JST **SUPPLEMENTAL BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT** |
| This Document Relates to: ALL ACTIONS. | |

1

## I.     **INTRODUCTION**

In support of their Motion for Preliminary Approval of Settlement (Dkt. 270), and

pursuant to the Court's Order Requesting Supplemental Briefing (Dkt. 271), Plaintiffs provide

further information regarding the potential range of recovery were Plaintiffs to prevail on the

claims being released under the proposed Settlement.  The estimated amount of potential damages

at trial based on out-of-pocket injury is approximately $1.1 billion.  Including the claim for lost

income to Wells Fargo, the damages could be as much as $3.5 billion.  Thus, the $320 million

settlement (comprised of $240 million in cash and $80 million in clawbacks and corporate

governance reforms) reflects a recovery of between 9.1 and 29.1 percent of the total potential

damages.  The maximum amount of *recoverable* damages, however, is, as a practical matter,

effectively constrained by the Director and Officer ("D&O") liability insurance policies available

to satisfy a derivative judgment against Defendants in this case—$500 million.  The $240 million

cash portion of the Settlement represents 48 percent of the likely available recoverable damages.

## II.    **ARGUMENT**

In shareholder derivative actions, courts recognize two types of remedies: money damages

payable to the corporation and non-monetary forms of relief, such as corporate governance

reforms.[1]  Deborah A. DeMott, Shareholder Derivative Actions: Law & Practice § 7:6, at 1117

(2018–2019).  The computation of money damages "is governed by the general tort rule that the

defendant's liability is for the full amount of loss or injury suffered by the corporation."  *Id.*; *see*

*also Strassburger v. Earley*, 752 A.2d 557, 579 (Del. Ch. 2000) ("The traditional measure of

damages is that which is utilized in connection with an award of compensatory damages, whose

purpose is to compensate a plaintiff for its proven, actual loss caused by the defendant's wrongful

conduct.").

Plaintiffs identified two categories of potential monetary damages resulting from the

alleged misconduct: (i) out-of-pocket costs incurred by Wells Fargo attributable to the Improper

---

[1] As explained in the Motion, the Parties have agreed that the non-cash components of the
settlement—the clawback of compensation and corporate governance reforms—have a total value
to Wells Fargo of $80 million.  Dkt. 270 at 10–11.

1    Sales Practices, approximately $1.1 billion; and (ii) actual and anticipated loss of income to the

2    Company, preliminarily estimated to be $1.4 billion to $2.4 billion.

3         Category 1: Out-of-Pocket Damages.  The $1.1 billion in out-of-pocket damages Plaintiffs

4    estimate that Wells Fargo suffered from the Improper Sales Practices is based on publicly

5    available information and information provided by Wells Fargo in the course of the litigation.

6    Those damages include the following: (i) $529 million in civil and regulatory fines, penalties, and

7    payments (*i.e.*, including settlements with the Consumer Financial Protection Bureau, the Los

8    Angeles City Attorney, the Office of the Comptroller of Currency, and the Financial Industry

9    Regulatory Authority, and related class actions);[2] (ii) approximately $443 million in costs

10   expended on associated investigations and litigation (*i.e.*, investigations and associated litigation

11   costs, including the Board's Sales Practices Investigation); and (iii) approximately $138 million

12   expended for remediation efforts (*i.e.*, the cost of refunds to customers affected by unauthorized

13   accounts, a 2018 public relations campaign titled "Re-Established 2018," and increased bank

14   monitoring).[3]

15        Category 2: Loss of Income.  Plaintiffs preliminarily assessed the loss of income

16   attributable to Improper Sales Practices at between $1.4 billion and $2.4 billion.  This comprises

17   the impact of the Federal Reserve's asset growth restrictions, implemented in its February 2018

18   ────────────────────────
     [2] *See, e.g.*, Consent Order, *In re Wells Fargo Bank, N.A.*, CFPB No. 2016-CFPB-0015 (Sept. 8,
19   2016) ($100 million settlement with CFPB); Stipulated Final Judgment, *California v. Wells
     Fargo & Co.*, No. BC580778 (Cal. Super. Ct. Sept. 13, 2016) ($50 million settlement with Los
20   Angeles City Attorney); Consent Order, *In re Wells Fargo Bank, N.A.*, No. AA-EC-2016-66 (Sept.
     6, 2016) ($35 million penalty to OCC); Letter of Acceptance, Waiver and Consent, Financial
21   Industry Regulatory Authority, No. 2012034123501 (Dec. 18, 2014) ($1.5 million penalty to
     FINRA); *Hefler v. Wells Fargo & Co.*, No. 16-CV-05479-JST, 2018 WL 6619983, at *2 (N.D.
22   Cal. Dec. 18, 2018) ($480 million settlement with class of shareholders, approximately $200
     million of which was paid directly by Wells Fargo); Order Granting Final Approval of Class
23   Action Settlement, *Jabbari v. Wells Fargo & Co.*, No. 3:15-cv-02159-VC (N.D. Cal. Jun. 14,
     2018), ECF No. 271 ($142 million settlement with class of consumers).

24   [3] *See, e.g.*, Cal. State Sen., Sen. Comm. on Banking & Finance, An Examination of Wells Fargo's
     Sales Practices & Management & Board Oversight: Background Paper (Nov. 22, 2016) ($8
25   million in administration costs attributable to generation of unauthorized accounts); Press Release,
     Wells Fargo & Co., Wells Fargo Reports Completion of Expanded Third-Party Review of Retail
26   Banking Accounts, Paving Way to Complete Remediation Effort (Aug. 31, 2017) ($6.1 million in
     refunds to consumers); Q3 2016 Wells Fargo & Co. Earnings Call, at 2 (FD (Fair Disclosure)
27   Wire Oct. 14, 2016) ($50 million in costs for system and process enhancements, including
     automated email notifications, application acknowledgments, multi-factor authentication, an
28   independent third-party mystery shopper program, and additional risk personnel).

1  consent order,[4] and the loss of income due to lost business and reputational harm attributable to

2  the Improper Sales Practices.  By its nature, this type of damage is difficult to quantify (especially

3  before the conclusion of fact and expert discovery), and Plaintiffs anticipated significant

4  challenges in establishing the existence and value of these damages at trial.  Plaintiffs' estimate of

5  this second category of damages is thus a maximum figure that would have been vigorously

6  disputed, discounted and, inevitably, subjected to continued review as the proceedings advanced

7  to trial and possibly through the appeal process.

8      Estimated Recoverable Damages.  Notwithstanding these potential estimated damages,

9  Plaintiffs also considered the amount of damages they "could have *recovered* if they ultimately

10  prevailed on the merits of their claims."  *See* Dkt. 271 at 1–2 (citing *K.H. v. Sec'y of Dep't of

11  Homeland Sec.*, No. 15-CV-02740-JST, 2018 WL 3585142, at *5 (N.D. Cal. July 26, 2018))

12  (emphasis added).  The amount of recoverable damages after trial is highly dependent on the

13  limits of the D&O insurance available to satisfy a judgment.  Here, the policy limits of the

14  available D&O insurance is $500 million.

15      Percentage of Available Recovery.  Plaintiffs' recovery of $240 million in cash, together

16  with the $80 million in clawbacks and corporate governance reforms, reflects a significant

17  recovery of the total estimated recoverable damages.  The cash recovery of $240 million equates

18  to approximately 21.8 percent of the $1.1 billion in out-of-pocket damages to the Company.[5]

19  Alternatively, the cash recovery of $240 million represents 48 percent of the available D&O

20  insurance.[6]  These rates of recovery far exceed those typically found in shareholder class action

21  litigation.  *See* Stefan Boettrich & Svetlana Starykh, NERA Economic Consulting, Recent Trends

22  in Securities Class Action Litigation: 2018 Full-Year Review 35 fig.27 (2019) (finding the

23  ─────────────
[4] In February 2018, the Federal Reserve prohibited Wells Fargo from growing its asset base until
24  it sufficiently improved its corporate governance and controls.  *See* Dkt. 270 at 18.  That
prohibition remains in place today.

25  [5] The cash recovery of $240 million represents between 6.9 and 9.6 percent of the $2.5 billion to
$3.5 billion total maximum damages, inclusive of the more speculative loss of income.

26  [6] Including the value of clawback compensation and corporate governance reforms to which the
27  Parties agreed ($80 million) for a total Settlement value of $320 million, the Settlement equates to
64 percent of the available D&O insurance, approximately 29.1 percent of the $1.1 billion in out-
of-pocket damages, and between 9.1 and 12.8 percent of the $2.5 billion to $3.5 billion in total
28  maximum damages, inclusive of the more speculative loss of income.

median ratio of settlement value to investor losses was 1.2 percent for investor losses of $1.000–$4.999 billion);[7] Laarni T. Bulan et al., Cornerstone Research, Securities Class Action Settlements, 2018 Review & Analysis 6 fig.5 (2019) (finding that in cases with "simplified tiered damages" of over $1 billion, the median settlement value was 2.0 percent of the "simplified tiered damages" for settlements in 2018);[8] *see also Hefler v. Wells Fargo & Co.,* No. 16-CV-05479-JST, 2018 WL 4207245, at *9 (N.D. Cal. Sept. 4, 2018) (approving settlement with "a greater than 15 percent recovery").[9]

## III.  CONCLUSION

The Settlement's cash recovery of $240 million, combined with the additional $80 million in compensation clawbacks and corporate governance reforms, represents a significant percentage of the range of potential damages to Wells Fargo, and nearly half of the potential recoverable damages, as represented by available D&O insurance.  As discussed above and in Plaintiffs' Motion for Preliminary Approval of Settlement, the Settlement falls well within the range of reasonableness regularly approved by courts in shareholder derivative actions.

Dated: April 2, 2019                    LIEFF CABRASER HEIMANN & BERNSTEIN

By: */s/ Richard M. Heimann*
Richard M. Heimann (063607)
*rheimann@lchb.com*
Katherine C. Lubin (259826)
*kbenson@lchb.com*
Michael K. Sheen (288284)
*msheen@lchb.com*
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

---

[7] https://www.nera.com/content/dam/nera/publications/2019/PUB_Year_End_Trends_012819_Final.pdf (last visited Mar. 28, 2019).

[8] https://www.cornerstone.com/Publications/Reports/Securities-Class-Action-Settlements-2018-Review-and-Analysis (last visited Apr. 1, 2019).

[9] Plaintiffs refer to percentages of recovery in securities class action litigation because no similar analyses exist for comparably sized shareholder derivative recoveries.

1    Steven E. Fineman (140335)
     *sfineman@lchb.com*
2    Daniel P. Chiplock (*Pro hac vice*)
     *dchiplock@lchb.com*
3    Nicholas Diamand (*Pro hac vice*)
     *ndiamand@lchb.com*
4    Michael J. Miarmi (*Pro hac vice*)
     *mmiarmi@lchb.com*
5    Sean A. Petterson (*Pro hac vice*)
     *spetterson@lchb.com*
6    LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
     250 Hudson Street, 8th Floor
7    New York, NY 10013-1413
     Telephone: (212) 355-9500
8    Facsimile: (212) 355-9592

9    *Attorneys for Co-Lead Plaintiff Fire & Police Pension*
     *Association of Colorado and Co-Lead Counsel*
10
     Maya Saxena (*Pro hac vice*)
11   *msaxena@saxenawhite.com*
     Joseph E. White, III (*Pro hac vice*)
12   *jwhite@saxenawhite.com*
     Lester R. Hooker (241590)
13   *lhooker@saxenawhite.com*
     Adam D. Warden (*Pro hac vice*)
14   *awarden@saxenawhite.com*
     Dianne M. Anderson (286199)
15   *danderson@saxenawhite.com*
     SAXENA WHITE P.A.
16   150 East Palmetto Park Road, Suite 600
     Boca Raton, FL 33432
17   Telephone: (561) 394-3399
     Facsimile: (561) 394-3382
18
     Steven B. Singer (*Pro hac vice*)
19   *ssinger@saxenawhite.com*
     Kyla Grant (*Pro hac vice*)
20   *kgrant@saxenawhite.com*
     Sara DiLeo (*Pro hac vice*)
21   *sdileo@saxenawhite.com*
     SAXENA WHITE P.A.
22   10 Bank Street, 8th Floor
     White Plains, NY 10606
23   Telephone: (914) 437-8551
     Facsimile: (888) 631-3611
24
     *Attorneys for Co-Lead Plaintiff The City of Birmingham and*
25   *Co-Lead Counsel*

26

27

28