1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE WELLS FARGO & COMPANY
SHAREHOLD DERIVATIVE
LITIGATION

This Document Relates To:

ALL ACTIONS

Lead Case No. 16-cv-05541-JST

**ORDER GRANTING PRELIMINARY
APPROVAL OF DERIVATIVE
ACTION SETTLEMENT**

Re: ECF No. 270

Before the Court is Plaintiffs' unopposed motion for preliminary approval of a derivative action settlement.  ECF No. 270.  The Court will grant the motion.[1]

## I.      BACKGROUND

### A.      Parties and Claims

This is a shareholder derivative action on behalf of nominal Defendant Wells Fargo & Co. against the company's officers, directors, and senior management ("Individual Defendants"). Consolidated Amended Verified Stockholder Derivative Complaint ("Compl."), ECF No. 83 ¶ 64. The substance of Plaintiffs' claims is set forth in greater detail in the Court's prior orders on Defendants' motions to dismiss.  *See* ECF No. 129 at 1-9; ECF No. 174 at 2-4.  In short, Plaintiffs allege that, "[f]rom at least January 1, 2011 to the present ('the Relevant Period'), Defendants knew or consciously disregarded that Wells Fargo employees were illicitly creating millions of deposit and credit card accounts for their customers, without those customers' knowledge or consent."  Compl. ¶ 1.  Plaintiffs seek to hold Individual Defendants accountable for these failures under various securities laws and common-law duties.

---

[1] Pursuant to Federal Rule of Civil Procedure 78(b) and Civil Local Rule 7-1(b), the Court finds this matter suitable for disposition without oral argument.

**B.      Procedural History**

Based on these Improper Sales Practices[2] and alleged oversight failures, several entities filed shareholder derivative complaints in this district, which have since been consolidated into a single action.  ECF Nos. 39, 70, 219.  The Court appointed Fire & Police Pension Association of Colorado and City of Birmingham Retirement & Relief System as Co-Lead Plaintiffs and Lieff Cabraser Heimann & Bernstein and Saxena White as Co-Lead Counsel.  ECF No. 70.  Plaintiffs then filed a consolidated amended complaint on February 24, 2017.  ECF No. 83.

On March 17, 2017, Wells Fargo filed a motion to dismiss for failure to plead demand futility, in which the Individual Defendants joined.  ECF Nos. 99, 100, 101, 102, 107, 108, 110. The Court largely denied the motion.  ECF No. 129.

Various Individual Defendants proceeded to file a series of motions to dismiss for failure to state a claim.  ECF Nos. 139, 140, 141, 143, 144, 145.  On October 4, 2017, the Court denied the motions in large part.  ECF No. 174.

After an initial unsuccessful round of three mediation sessions, the parties resumed intensive negotiations in September 2018.  ECF No. 270 at 16.  The parties engaged in four day-long sessions under the supervision of Judge Daniel Weinstein (Ret.) and Jed Melnick.  ECF No. 270-3 ¶ 7.  On December 12, 2018, the parties accepted Judge Weinstein's mediator's proposal, which forms the basis for the proposed settlement agreement.  *Id.* ¶ 12.

On February 28, 2019, Plaintiffs filed this motion for preliminary approval.  ECF No. 270. At the Court's request, Plaintiffs provided supplemental briefing on the value of their claims on April 2, 2019.  ECF No. 272.

**C.      Terms of the Settlement**

The proposed settlement agreement ("Settlement") resolves the claims Plaintiffs have asserted on behalf of Wells Fargo in this action.  Settlement, ECF No. 270-1 at 1-36.

Pursuant to the Settlement, the Individual Defendants' insurers will pay $240 million to Wells Fargo.  Settlement ¶ V(33).  The Settlement also identifies additional Wells Fargo reform

---

[2] Consistent with Plaintiffs' motion and the parties' settlement agreement, the Court refers to Wells Fargo's illicit account creation as the "Improper Sales Practices."

United States District Court
Northern District of California

actions that are purportedly attributable in part to Plaintiffs' pursuit of this action.  First, after this suit was filed, Wells Fargo's board clawed back $122.5 million from certain Individual Defendants through "stock grant forfeitures, reduced compensation, and return of incentive compensation."  *Id.* ¶ V(1); *see also* ECF No. 270-1 at 47-48.  The parties agree that Plaintiffs' suit was a "significant factor in the determination to undertake [these] actions, and that these remedial actions conferred a value to Wells Fargo of $60 million."  ECF No. 270-1 at 48.  Second, the Settlement points to "Corporate Governance Reforms," meaning "the corporate actions undertaken by Wells Fargo to address Improper Sales Practices including, but not limited to, amending certain corporate charters and bylaws, increasing oversight and monitoring of business units, leadership changes, the creation of positions, and the increased reporting from business units."  Settlement ¶ V(5); *see also* ECF No. 270-1 at 40-44.  The parties note that Plaintiffs proposed "certain of these corporate governance reforms" and "agree and acknowledge that these reforms have conferred significant benefits to Wells Fargo," of which $20 million can be attributed to Plaintiffs.  ECF No. 270-1 at 44.

In exchange, Plaintiffs agree to release the following claims on behalf of themselves, Wells Fargo, and its shareholders:

> [A]ny and all manner of claims, demands, rights, liabilities, losses, obligations, duties, damages, costs, debts, expenses, interest, penalties, sanctions, fees, attorneys' fees, actions, potential actions, causes of action, suits, agreements, judgments, decrees, matters, issues and controversies of any kind, nature or description whatsoever, whether known or unknown, disclosed or undisclosed, accrued or unaccrued, apparent or not apparent, foreseen or unforeseen, matured or not matured, suspected or unsuspected, liquidated or not liquidated, fixed or contingent, including Unknown Claims, whether based on state, local, foreign, federal, statutory, regulatory, common or other law or rule, brought or that could be brought derivatively or otherwise by or on behalf of Wells Fargo against any of the Released Parties, which now or hereafter are based upon, arise out of, relate in any way to, or involve, directly or indirectly, any of the actions, transactions, occurrences, statements, representations, misrepresentations, omissions, allegations, facts, practices, events, claims or any other matters, things or causes whatsoever, or any series thereof, that are, were, could have been, or in the future can or might be alleged, asserted, set forth, claimed, embraced, involved or referred to in the Derivative Action and relate to, directly or indirectly, the subject matter of the Derivative Action in any court, tribunal, forum or proceeding, including, without limitation, any and all claims by or on behalf of Wells Fargo which

> are based upon, arise out of, relate in any way to, or involve, directly or indirectly: (i) Improper Sales Practices; or (ii) any of the allegations in any complaint or amendment(s) thereto filed in (x) the Derivative Action or (y) any Action described above in Section II.C, with the exception, as described above, of the CPI Allegations in the *Connecticut Laborers* Action.

Settlement ¶ V(26).[3]  The "Released Parties" consist of the Individual Defendants, Wells Fargo, American Express, and various other "Related Parties."  *Id.* ¶¶ V(25), (27).  The Settlement does not, however, release (1) claims to enforce the agreement, (2) direct claims asserted on behalf of present or former Wells Fargo shareholders at issue in *Hefler v. Wells Fargo & Co.*, No. 16-cv-05479-JST (N.D. Cal.),[4] or (3) certain claims that "the Individual Defendants or Wells Fargo may have against any of the Insurers."  *Id.* ¶ V(26).

In addition, the parties separately negotiated Wells Fargo's payment of attorney's fees to Co-Lead Counsel.  *Id.* ¶ (V)(44).  Wells Fargo has agreed not to oppose Plaintiffs' request for attorney's fees and costs of up to $68 million.  *Id.*  Plaintiffs also intend to seek $25,000 service awards for each Co-Lead Plaintiff, to be paid from the fee award.  *Id.*

The parties propose the following notice plan to inform shareholders of the proposed settlement.  Wells Fargo will (1) publish the Summary Notice in the *Wall Street Journal*, *New York Times*, *Los Angeles Times*, and *Investor Business Daily*; (2) publish a Current Report on Form 8-K with the Securities and Exchange Commission ("SEC"); and (3) make the Settlement and Notice available on the "Investor Relations" page of its website, http://www.wellsfargo.com.  *Id.* ¶ V(35).  The Summary Notice will identify the specific address for that portion of Wells Fargo's website, as well as a hotline number that persons may call to request a copy of the full Notice by mail.  *Id.*  In addition, Co-Lead Counsel will publish the Summary Notice via a national wire service and create an additional website (to be identified in the Summary Notice) where the Settlement and Notice will be made available.  *Id.*

---

[3] As explained in the Settlement, the *Connecticut Laborers* Action includes additional allegations regarding Wells Fargo's implementation of certain collateral protection insurance ("CPI") programs.  Settlement ¶ II(5).

[4] The Court previously approved a Rule 23 class action settlement in the *Hefler* case.  *See Hefler*, ECF Nos. 252-255.  An objector has appealed the settlement.  *Id.*, ECF No. 260.

United States District Court
Northern District of California

## II.    LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 23.1, "[a] derivative action may be settled, voluntarily dismissed, or compromised only with the court's approval."  Fed. R. Civ. P. 23.1(c). Rule 23, in turn, "governs a district court's analysis of the fairness of a settlement of a shareholder derivative action."  *In re Hewlett-Packard Co. S'holder Derivative Litig.*, No. 3:12-CV-06003-CRB, 2015 WL 1153864, at *3 (N.D. Cal. Mar. 13, 2015); *see also In re Cadence Design Sys., Inc. Sec. Litig.*, No. 08-4966 SC, 2011 WL 13156644, at *2 (N.D. Cal. Aug. 26, 2011) ("Within the Ninth Circuit, Rule 23's requirements for approval of class action settlements apply to proposed settlements of derivative actions." (citing *In re Pac. Enters. Sec. Litig.*, 47 F.3d 373, 377 (9th Cir. 1995)).  Accordingly, "[c]ourts considering settlements of derivative actions have generally found '[c]ases involving dismissal or compromise under Rule 23(e) of nonderivative cases . . . relevant by analogy."  *Lloyd v. Gupta*, No. 15-CV-04183-MEJ, 2016 WL 3951652, at *4 (N.D. Cal. July 22, 2016) (second and third alterations in original) (quoting 7C Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1839 (3d ed. 2007)).  The Ninth Circuit maintains a "strong judicial policy" that favors the settlement of class actions.  *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992).

Rule 23 requires courts to employ a two-step process in evaluating a class action or derivative action settlement.  First, the parties must show "that the court will likely be able to . . . (i) approve the proposal under Rule 23(e)(2)."  Fed. R. Civ. P. 23(e)(1)(B).  In other words, a court must make a preliminary determination that the settlement "is fair, reasonable, and adequate" when considering the factors set out in Rule 23(e)(2).  Fed. R. Civ. P. 23(e)(2).  The court's task at the preliminary approval stage is to determine whether the settlement falls "within the range of possible approval."  *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1080 (N.D. Cal. 2007) (citation omitted).  "The initial decision to approve or reject a settlement proposal is committed to the sound discretion of the trial judge."  *City of Seattle*, 955 F.2d at 1276 (citation omitted).

Second, if the court preliminarily approves a derivative action settlement, notice "must be given to shareholders or members in the manner that the court orders."  Fed. R. Civ. P. 23.1(c). The court must then hold a hearing to make a final determination whether the settlement is "fair,

1 reasonable, and adequate." Fed. R. Civ. P. 23(e)(2).

2          Within this framework, preliminary approval of a settlement is appropriate if "the proposed

3 settlement appears to be the product of serious, informed, non-collusive negotiations, has no

4 obvious deficiencies, does not improperly grant preferential treatment to class representatives or

5 segments of the class, and falls within the range of possible approval." *In re Tableware*, 484 F.

6 Supp. 2d at 1079 (citation omitted). The proposed settlement need not be ideal, but it must be fair

7 and free of collusion, consistent with counsel's fiduciary obligations to the class. *Hanlon v.*

8 *Chrysler Corp.*, 150 F.3d 1011, 1027 (9th Cir. 1998) ("Settlement is the offspring of compromise;

9 the question we address is not whether the final product could be prettier, smarter or snazzier, but

10 whether it is fair, adequate and free from collusion."). To assess a settlement proposal, courts

11 must balance a number of factors:

12          [T]he strength of the plaintiffs' case; the risk, expense, complexity, and likely
           duration of further litigation; the risk of maintaining class action status throughout
13         the trial; the amount offered in settlement; the extent of discovery completed and the
           stage of the proceedings; the experience and views of counsel; the presence of a
14         governmental participant; and the reaction of the class members to the proposed
           settlement.
15

16 *Id.* at 1026 (citations omitted).[5] The proposed settlement must be "taken as a whole, rather than

17 the individual component parts," in the examination for overall fairness. *Id.* Courts do not have

18 the ability to "delete, modify, or substitute certain provisions"; the settlement "must stand or fall in

19 its entirety." *Id.* (citation omitted).

20 **III.    ANALYSIS**

21          **A.      Preliminary Settlement Approval**

22                    **1.      Procedural Concerns**

23          In the class action context, the Court must consider whether "the class representatives and

24 class counsel have adequately represented the class" and whether "the proposal was negotiated at

25 _____

26 [5] These factors are substantially similar to those articulated in the 2018 amendments to Rule 23(e),
   which were not intended "to displace any factor [developed under existing Circuit precedent], but
27 rather to focus the court and the lawyers on the core concerns of procedure and substance that
   should guide the decision whether to approve the proposal." *Hefler v. Wells Fargo & Co.*, No. 16-
28 cv-05479-JST, 2018 WL 6619983, at *4 (N.D. Cal. Dec. 18, 2018) (quoting Fed. R. Civ. P.
   23(e)(2) advisory committee's note to 2018 amendment).

United States District Court
Northern District of California

1    arm's length." Fed. R. Civ. P. 23(e)(2)(A)-(B).  As the Advisory Committee notes suggest, these

2    are "matters that might be described as 'procedural' concerns, looking to the conduct of the

3    litigation and of the negotiations leading up to the proposed settlement."  Fed. R. Civ. P.

4    23(e)(2)(A)-(B) advisory committee's note to 2018 amendment.

### a.    Adequate Representation

6        Like class representatives, "a stockholder who brings suit on a cause of action derived

7    from the corporation . . . sues, not for himself alone, but as representative of a class comprising all

8    who are similarly situated."  *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 549 (1949).

9        Here, Co-Lead Plaintiffs and their counsel have "prosecute[d] the action vigorously on

10   behalf of the [shareholders]."  *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 462 (9th Cir.

11   2000).  As detailed in their motion, not only did they prevail on two intensive rounds of motions to

12   dismiss, but they also obtained stays of numerous related derivative actions pending in other

13   courts.  ECF No. 270 at 12-15; *see also* ECF No. 270-2 ¶¶ 11-14.

14       Prior to reaching the Settlement, the parties also engaged in extensive document discovery.

15   Co-Lead Plaintiffs obtained hundreds of thousands of documents from Wells Fargo, the Individual

16   Defendants, and non-parties.  ECF No. 270-2 ¶ 15.  Co-Lead Plaintiffs subjected over 332,000 of

17   those documents to a multi-stage review and had begun preparing to depose over 40 fact

18   witnesses, including all 20 Individual Defendants.  *Id.* ¶¶ 16-19.  Under these circumstances, the

19   Court is satisfied that they possessed "sufficient information to make an informed decision about

20   settlement."  *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d at 459 (citation omitted).  Accordingly,

21   this factor also weighs in favor of approval.

### b.    Arm's Length Negotiation

23       The Settlement was the product of multiple sessions of arm's length negotiations

24   supervised by mediators Jed Melnick and former Judge Daniel Weinstein.  ECF No. 270-3 ¶ 7.

25   That the major terms of the Settlement came from Judge Weinstein's proposal further supports the

26   procedural fairness of the Settlement.  *Id.* ¶ 12.

27       The Court therefore concludes that this factor weighs in favor of approval.

28

United States District Court
Northern District of California

1

2. **Substantive Concerns**

2      Rule 23(e)(2)(C) and (D) set forth factors for conducting "a 'substantive' review of the

3  terms of the proposed settlement."  Fed. R. Civ. P. 23(e)(2)(C)-(D) advisory committee's note to

4  2018 amendment.  Most relevant to a shareholder derivative settlement, the Court examines, "the

5  costs, risks, and delay of trial and appeal," and "the terms of any proposed award of attorney's

6  fees, including timing of payment."  Fed. R. Civ. P. 23(e)(2)(C)(i), (iii).

7      a.      **Strength of Plaintiffs' Case, Risk of Continuing Litigation, and**
              **Settlement Amount**

8

9      Consistent with Rule 23's instruction to consider "the costs, risks, and delay of trial and

10  appeal," Fed. R. Civ. P. 23(e)(2)(C)(i), courts in this circuit evaluate "the strength of the plaintiffs'

11  case; the risk, expense, complexity, and likely duration of further litigation," *Hanlon*, 150 F.3d at

12  1026.  In addition, though not articulated as a separate factor in Rule 23(e), "[t]he relief that the

13  settlement is expected to provide to [the company] is a central concern."  Fed. R. Civ. P.

14  23(e)(2)(C)-(D) advisory committee's note to 2018 amendment.  To evaluate the adequacy of the

15  settlement amount in light of the case's risks, "courts primarily consider plaintiffs' expected

16  recovery balanced against the value of the settlement offer."  *In re Tableware*, 484 F. Supp. 2d at

17  1080.  But "[i]t is well-settled law that a cash settlement amounting to only a fraction of the

18  potential recovery does not per se render the settlement inadequate or unfair."  *Officers for Justice*,

19  688 F.2d at 628.

20      Here, the risk, expense, complexity, and likely duration of further litigation weigh in favor

21  of preliminary approval.  While Plaintiffs have survived motions to dismiss on the threshold issue

22  of demand futility, ECF No. 129, and on their ability to state a claim, ECF No. 174, significant

23  obstacles remain to proving their case and prevailing at trial.  For instance, as Plaintiffs highlight,

24  their breach of fiduciary duty claims based on the Director Defendants' "alleged failure adequately

25  to oversee corporate activities is, 'possibly the most difficult theory in corporation law upon which

26  a plaintiff might hope to win a judgment.'"  *In re Oracle Corp. Derivative Litig.*, No. C 10-3392

27  RS, 2011 WL 5444262, at *3 (N.D. Cal. Nov. 9, 2011) (quoting *In re Caremark Int'l Inc.*

28  *Derivative Litig.*, 698 A.2d 959, 967 (Del. Ch. 1996)).  More generally, courts have recognized

*United States District Court*
*Northern District of California*

that it is often difficult for plaintiffs to prevail in derivative actions and on securities fraud claims. *See, e.g.*, *Hefler*, 2018 WL 6619983, at *13 ("Courts have recognized that, in general, securities actions are highly complex and that securities class litigation is notably difficult and notoriously uncertain." (quoting *In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 2018 WL 6168013, at *15)); *In re Oclaro, Inc. Derivative Litig.*, No. C-11-3176 EMC, 2014 WL 4684993, at *2 (N.D. Cal. Sept. 19, 2014) ("[A]s other courts have commented, it is generally difficult to prevail in a derivative suit.").

Moreover, not only would litigating this complex case on the merits have been a lengthy and costly process, the lingering uncertainty would have hampered Wells Fargo's efforts to move past this series of scandals. These accumulating costs could significantly mitigate the value of a judgment on the merits. *Cf. In re Apple Computer, Inc. Derivative Litig.*, No. C 06-4128 JF (HRL), 2008 WL 4820784, at *2 (N.D. Cal. Nov. 5, 2008) ("The principal factor to be considered in determining the fairness of a settlement concluding a shareholders' derivative action is the extent of the benefit to be derived from the proposed settlement by the corporation, the real party in interest." (quoting *Shlensky v. Dorsey*, 574 F.2d 131, 147 (3d Cir. 1978)).

Finally, without a settlement, Plaintiffs faced the prospect of additional or collateral litigation with Individual Defendants' insurers, further prolonging any resolution beneficial to Wells Fargo. *See In re Galena Biopharma, Inc. Derivative Litig.*, No. 3:14-CV-00382-SI, 2016 WL 10840600, at *2 (D. Or. June 24, 2016) (noting that the individual defendants' "insurers dispute coverage and if the Action does not settle and continues to be litigated, there is a risk that insurance coverage will be denied and an additional insurance coverage lawsuit may ensue").

With those risks in mind, the Court considers the fractional recovery represented by the Settlement amount. In supplemental briefing, Plaintiffs identify two categories of potential monetary damages. ECF No. 272 at 2. First, Plaintiffs catalogue $1.1 billion in out-of-pocket costs incurred by Wells Fargo as a result of the Improper Sales Practices, including $529 million in civil and regulatory fines, penalties, and payments, as well as $443 million in related investigations and litigation. *Id.* at 3. Second, Plaintiffs estimate that Wells Fargo suffered between $1.4 billion and $2.4 billion in lost income, due to both the Federal Reserve's asset

1    growth restrictions and general lost business and reputational harm.  *Id.* at 3-4.  The Court is

2    persuaded that $2.5 to $3.5 billion represents a reasonable estimate of the value of Plaintiffs'

3    claims.

4         At a minimum, then, the Settlement's $240 million insurer-funded payment represents a

5    6.9 percent recovery of the maximum $3.5 billion value.  At the other end of the spectrum,

6    crediting the full $80 million value asserted for clawbacks and corporate governance reforms,

7    measured against the low-end $2.5 billion liability estimate, the Settlement represents a 12.8

8    percent recovery.[6]

9         Pending any objection from shareholders and further information from the parties, the

10   Court withholds a definitive conclusion on what value to assign to the remedial actions taken by

11   Wells Fargo.  The Court acknowledges that the parties agree that "facts alleged in the Derivative

12   Action were a significant factor" in the clawback decisions, ECF No. 270-1 at 48, and that Co-

13   Lead Plaintiffs proposed "certain of these corporate governance reforms," *id.* at 44.  At the same

14   time, these conclusory assertions by parties to the Settlement do not eliminate "[o]ther causative

15   factors such as the [regulatory] investigation[s], the class action and public scrutiny," which were

16   clearly present here.  *In re Oracle Sec. Litig.*, 852 F. Supp. 1437, 1447 (N.D. Cal. 1994); *see also*

17   *In re Oclaro*, 2014 WL 4684993, at *4 (discounting attorney's declaration representing company's

18   acknowledgment that suit was contributing factor because "[t]his hearsay testimony of a self-

19   interested declarant fails to prove those reforms were a proximate result of their derivative

20   lawsuits").

21        Nonetheless, the Court need not decide the issue now, because even setting aside these

22   secondary benefits, the insurer-funded payment alone puts the Settlement within the range of

23   possible approval.  As Plaintiffs point out by rough analogy,[7] their low-end recovery estimate

24

25   ──────────────
     [6] Plaintiffs also assert that the $500 million in combined insurance policy limits for Individual
26   Defendants represents a practical ceiling on what they could recover at trial.  ECF No. 272 at 4.
     Given that the Court does not have a clear picture of the Individual Defendants' financial
27   resources – which would also be available to pay a potential judgment – the Court declines to
     adopt the Plaintiffs' analysis.  *Cf.* Compl. ¶ 476 (alleging that "while overseeing and encouraging
28   Wells Fargo's aggressive sales culture, [Defendants] Stumpf and Tolstedt together earned nearly
     $300 million").

United States District Court
Northern District of California

10

1  exceeds "recoveries achieved in . . . securities fraud class actions of similar size (over $1 billion in

2  estimated damages), which settled for median recoveries of 2.5 percent between 2008 and 2016,

3  and 3 percent in 2017." *Hefler*, 2018 WL 6619983, at *8 (citing Cornerstone Research, Securities

4  Class Action Settlements, 2017 Review and Analysis, at 8 (2018)); *see also* Cornerstone Research,

5  Securities Class Action Settlements, 2018 Review and Analysis, at 6 (2019) (noting average 2

6  percent recovery for 2018).  The Court also takes into account the particular difficulties of

7  establishing the larger category of lost income damages.  *See* ECF No. 272 at 4.  In light of the

8  risks described above, the Court finds that the Settlement amount weighs in favor of preliminary

9  approval.

10                                    **b.      Terms of Attorney's Fees**

11         "For more than two decades, the Ninth Circuit has set the 'benchmark for an attorneys' fee

12  award in a successful class action [at] twenty-five percent of the entire common fund.'" *Rodman*

13  *v. Safeway Inc.*, No. 11-CV-03003-JST, 2018 WL 4030558, at *3 (N.D. Cal. Aug. 23, 2018)

14  (quoting *Williams v. MGM-Pathe Commc'ns Co.*, 129 F.3d 1026, 1027 (9th Cir. 1997)).

15         The Court agrees with Plaintiffs' implicit assumption that it is appropriate to measure Co-

16  Lead Counsel's fee award as a percentage of the total Settlement value, because the value of the

17  Settlement will be conferred *to* Wells Fargo, while Wells Fargo will *pay* attorney's fees.

18  Settlement ¶¶ V(33), (44).  In like circumstances, courts have recognized that the difference

19  between those two amounts equals the actual value received by the company, much as a Rule 23

20  class receives the value of a settlement minus attorney's fees paid from a common fund.  *See In re*

21  *Atmel Corp. Derivative Litig.*, No. C 06-4592 JF (HRL), 2010 WL 9525643, at *12 (N.D. Cal.

22  Mar. 31, 2010) ("The Agreement provides for a cash payment of $9.65 million to Atmel and a

23  payment of $4.94 million in attorneys' fees and costs. Because Atmel is responsible for paying the

24  attorneys' fees, the net payment to Atmel is $4.71 million."); *In re Apple Computer*, 2008 WL

25  4820784, at *2 (similar analysis).

26

27  [7] At least one other court in this district has found the comparison useful.  *See In re Atmel Corp.*

28  *Derivative Litig.*, No. C 06-4592 JF (HRL), 2010 WL 9525643, at *12 (N.D. Cal. Mar. 31, 2010)
   (comparing company's "net cash recovery" to securities class action settlements).

United States District Court
Northern District of California

1    Here, Co-Lead Counsel intend to request $68 million in attorney's fees and costs, which

2    represents 21.25 percent of the asserted $320 million value of the Settlement.  ECF No. 270 at 28-

3    29.  Even were the Court to consider only the $240 million cash payment, the requested fee award

4    would be approximately 28.33 percent of the Settlement.  At the preliminary approval stage, this

5    percentage range of attorney's fees does not weigh against approval.[8]

6                            **c.      Preferential Treatment**

7    The two Co-Lead Plaintiffs intend to seek a total of $50,000 in service awards, or $25,000

8    each.  Settlement ¶ V(45).  The awards, if approved, will be paid from Co-Lead Counsel's

9    attorney's fees.  *Id.*

10    The Ninth Circuit has recognized that service awards to named plaintiffs in a class action

11    are permissible and do not necessarily render a settlement unfair or unreasonable.  *See, e.g.*,

12    *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 958-59 (9th Cir. 2009).  Derivative plaintiffs may

13    likewise merit compensation "for work done on behalf of the [shareholders]."  *Id.*; *see also In re*

14    *Galena Biopharma*, 2016 WL 3457165, at *12 (approving incentive award to derivative action

15    lead plaintiffs).  The Court notes, however, that an average award of $25,000 is five times the

16    presumptively reasonable amount of $5,000 for such awards.  *See Smith v. Am. Greetings Corp.*,

17    No. 14-CV-02577-JST, 2016 WL 362395, at *10 (N.D. Cal. Jan. 29, 2016) ("Several courts in this

18    District have indicated that incentive payments of $10,000 or $25,000 are quite high and /or that,

19    as a general matter, $5,000 is a reasonable amount." (quoting *Harris v. Vector Marketing Corp.*,

20    No. C-08-5198 EMC, 2012 WL 381202, at *7 (N.D. Cal. Feb. 6, 2012)).

21    The Court need not resolve the specific amount of the service award at this time as the

22    matter will be conclusively determined at the final hearing.  However, Co-Lead Plaintiffs should

23

---

24    [8] Plaintiffs' motion for attorney's fees is not yet before the Court.  However, Co-Lead Counsel

25    estimate that the award would represent a multiplier on counsel's lodestar of 3.32.  ECF No. 270 at 29.  While Plaintiffs correctly note that this multiplier falls within the upper end of the range of

26    multipliers commonly awarded in common fund cases, *see Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1051 & n.6 (9th Cir. 2002), Co-Lead Counsel should ensure that the motion for attorney's

27    fees provides appropriate detail and documentation.  The parties are also invited to consider this Court's recent opinion in a class action concerning the relationship between total recovery by the

28    class and the appropriate percentage of that recovery to be allocated to attorney's fees.  *Rodman*, 2018 WL 4030558, at *4-5.

United States District Court
Northern District of California

be mindful of addressing these issues and providing appropriate detail and documentation in connection with their motion for service awards.

### d.    Experience and Views of Counsel

As the Court has previously noted, Co-Lead Counsel have "significant experience obtaining favorable results as lead counsel in shareholder derivative litigation." ECF No. 70 at 4. That counsel advocate in favor of this Settlement weighs in favor of its approval.[9]

### 3.    Reaction of Shareholders to Proposed Settlement

The Court will wait until the final approval hearing to determine shareholders' reaction to the Settlement.

### 4.    Presence of Obvious Deficiencies

The Court has reviewed the Settlement and did not find any obvious deficiencies. To the extent any shareholder calls attention to any such deficiency, the Court will consider it at the final hearing.

### B.    Notice Plan

The Court must separately evaluate the proposed notice procedure. Rule 23.1(c) requires that notice of the Settlement "must be given to shareholders or members in the manner that the court orders." Fed. R. Civ. P. 23.1(c). In determining the appropriate notice method, "the Court considers whether such notice would be sufficient to reach the majority of interested stockholders." *Bushansky v. Armacost*, No. 12-CV-01597-JST, 2014 WL 2905143, at *6 (N.D. Cal. June 25, 2014) (citing Wright & Miller, Federal Practice & Procedure § 1839).

The parties propose to provide notice through (1) publication in several major newspapers and a national newswire service, (2) filing a Form 8-K with the SEC, and (3) publishing notice on both Wells Fargo's website and an additional website created specifically for this purpose. Settlement ¶ V(35). Courts have found that similar procedures satisfy Rule 23.1 and due process.

---

[9] The Court considers this factor, as it must, but gives it little weight. "[A]lthough a court might give weight to the fact that counsel for the class or the defendant favors the settlement, the court should keep in mind that the lawyers who negotiated the settlement will rarely offer anything less than a strong, favorable endorsement." *Principles of the Law of Aggregate Litigation* § 3.05 cmt. a (Am. Law. Inst. 2010).

United States District Court
Northern District of California

1   *See In re Hewlett-Packard Co. S'holder Derivative Litig.*, 716 F. App'x 603, 608 (9th Cir. 2017)

2   (affirming district court's approval of "notice procedures, which included placing notice of the

3   settlement on two consecutive days in *The New York Times*, *Investor's Business Daily*, *The Wall*

4   *Street Journal*, and *The San Francisco Chronicle*, filing an 8-K with the SEC, and publishing the

5   notice on its website")[10]; *Bushansky*, 2014 WL 2905143, at *6 (collecting cases).  The Court

6   reaches the same conclusion here.

7          Similarly, the Court finds that the content of the proposed notice "describes the terms of

8   the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come

9   forward and be heard."  *In re Hewlett-Packard*, 716 F. App'x at 609 (quoting *Churchill Vill.,*

10  *L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004)).

## CONCLUSION

11

12         For the foregoing reasons, the Court preliminarily approves the proposed Settlement and

13  Notice Plan.  The fairness hearing shall be held on August 1, 2019 at 2:00 p.m.  All other dates

14  and deadlines shall be calculated pursuant to the terms of the Settlement.

15         **IT IS SO ORDERED.**

16  Dated:  May 14, 2019



17

18                                                  JON S. TIGAR
                                                    United States District Judge

19

20

21

22

23

24

25

26

27

28  _____
    [10] Pursuant to Ninth Circuit Rule 36-3, *Hewlett-Packard* is not binding precedent.  The Court
    nonetheless considers it as persuasive authority.

14

*United States District Court*
*Northern District of California*