Richard M. Heimann (063607)
*rheimann@lchb.com*
Katherine C. Lubin (259826)
*kbenson@lchb.com*
Michael K. Sheen (288284)
*msheen@lchb.com*
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
Facsimile:  (415) 956-1008

*Attorneys for Co-Lead Plaintiff Fire & Police Pension*
*Association of Colorado and Co-Lead Counsel*

Maya Saxena (*Pro hac vice*)
*msaxena@saxenawhite.com*
Joseph E. White, III (*Pro hac vice*)
*jwhite@saxenawhite.com*
Lester R. Hooker (241590)
*lhooker@saxenawhite.com*
SAXENA WHITE P.A.
150 East Palmetto Park Road, Suite 600
Boca Raton, FL 33432
Telephone:  (561) 394-3399
Facsimile:  (561) 394-3382

*Attorneys for Co-Lead Plaintiff The City of Birmingham*
*Retirement and Relief System and Co-Lead Counsel*

[Additional Counsel on Signature Page]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE WELLS FARGO & COMPANY SHAREHOLDER DERIVATIVE LITIGATION<br><br>This Document Relates to:<br><br>ALL ACTIONS. | Lead Case No. 3:16-cv-05541-JST<br><br>**CO-LEAD PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR FINAL APPROVAL OF SETTLEMENT**<br><br>Date: August 1, 2019<br>Time: 2:00 P.M.<br>The Honorable Jon S. Tigar<br>Courtroom 9, 19th Floor |

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION FOR FINAL APPROVAL OF SETTLEMENT ............ 1

STATEMENT OF ISSUE TO BE DECIDED .................................................................. 2

MEMORANDUM OF POINTS AND AUTHORITIES ................................................... 2

I.      INTRODUCTION ............................................................................................ 2

II.     OVERVIEW OF THE ACTION ....................................................................... 5

    A.  Co-Lead Plaintiffs Demonstrate Demand Futility And The Court Upholds The Majority Of Their Claims Against Defendants ................................. 5

    B.  Co-Lead Plaintiffs Engaged In Extensive Discovery to Substantiate Their Claims. ................................................................................................ 6

    C.  Co-Lead Plaintiffs Consolidated This Litigation In This Court To Prevent Inconsistent Outcomes. .......................................................................... 6

    D.  Resolution Of The Action, Preliminary Approval, and Notice Plan ...................... 6

III.    SETTLEMENT TERMS ................................................................................... 7

IV.     LEGAL STANDARD ...................................................................................... 10

V.      THE PROPOSED SETTLEMENT MERITS FINAL APPROVAL ................................. 12

    A.  The Stage of the Proceedings and Co-Lead Plaintiffs' and Co-Lead Counsel's Vigorous Prosecution of this Action Supports Final Approval .......... 12

    B.  The Settlement Results from Arm's-Length Negotiations Overseen by Independent, Renowned Mediators ........................................................... 13

    C.  The Settlement Weighs the Strength of Co-Lead Plaintiffs' Claims with the Substantial Risks of Continuing Litigation .............................................. 15

    D.  The Historic Settlement Amount Confers Substantial Benefit to Wells Fargo and its Shareholders ........................................................................ 19

    E.  The Experience and Views of Lead Counsel Weigh in Favor of Granting Final Approval ....................................................................................... 22

    F.  After A Robust Court-Approved Notice Plan, Wells Fargo Shareholders Overwhelmingly Favor Final Approval of the Settlement ............................. 23

CONCLUSION ....................................................................................................... 24

# TABLE OF AUTHORITIES
**(continued)**

**Page**

**Cases**

*Alaska Elec. Pension Fund v. Brown*,
941 A.2d 1011 (Del. 2007) ..................................................................................................... 21

*Basaraba v. Greenberg*,
2014 WL 12591677 (C.D. Cal. Nov. 10, 2014)........................................................................ 18

*Cicero v. DirecTV, Inc.*,
2010 WL 2991486 (C.D. Cal. July 27, 2010) ......................................................................... 13

*Hanlon v. Chrysler Corp.*,
150 F.3d 1011 (9th Cir. 1998).............................................................................. 12, 14, 15, 22

*HCL Partners Ltd. P'ship v. Leap Wireless Int'l, Inc.*,
2010 WL 4027632 (S.D. Cal. Oct. 14, 2010) ......................................................................... 14

*Hefler v. Wells Fargo & Co.*,
2018 WL 4207245 (N.D. Cal. Sept. 4, 2018) ......................................................................... 14

*Hefler v. Wells Fargo & Co.*,
No. 16-CV-05479-JST, 2018 WL 6619983
(N.D. Cal. Dec. 18, 2018) ..................................................................................... 13, 15, 22, 24

*In re Atmel Corp. Derivative Litig.*,
2010 WL 9525643 (N.D. Cal. Mar. 31, 2010)......................................................................... 11

*In re Bank of Am. Corp. Sec., Derivative & ERISA Litig.*,
No. 09-md-2058 (S.D.N.Y.) ................................................................................................... 23

*In re Broadcom Corp. Derivative Litig.*,
No. C-06-3252 R (CWx) (C.D. Cal.)...................................................................................... 23

*In re Galena Biopharma, Inc. Derivative Litig.*,
2016 WL 10840600 (D. Or. June 24, 2016) ........................................................................... 19

*In re Heritage Bond Litig.*,
2005 WL 1594403 (C.D. Cal. June 10, 2005) ........................................................................ 15

*In re Hewlett-Packard Co. S'holder Derivative Litig.*,
716 F. App'x 603 (9th Cir. 2017) .................................................................................... 11, 20

*In re Mego Fin. Corp. Sec. Litig.*,
213 F.3d 454 (9th Cir. 2000).................................................................................................. 12

*In re MRV Commc'ns Derivative Litig.*,
2013 WL 2897874 (C.D. Cal. June 6, 2013) .................................................................... 14, 22

*In re NVIDIA Corp. Derivative Litig.*,
2008 WL 5382544 (N.D. Cal. Dec. 22, 2008) .................................................................. 10, 21

*In re OSI Sys., Inc. Derivative Litig.*,
2017 WL 5642304 (C.D. Cal. May 2, 2017) .................................................................... 11, 24

*In re Pac. Enter. Sec. Litig.*,
47 F.3d 373 (9th Cir. 1995).............................................................................................. 11, 17

*In re Volkswagen "Clean Diesel" Mkt'g, Sales Practices & Prods. Liab. Litig.*,
No. 3:15-md-02672-CRB (N.D. Cal.)...................................................................................... 23

NOTICE OF MOTION AND MOTION FOR
FINAL APPROVAL OF SETTLEMENT
3:16-CV-05541-JST

**TABLE OF AUTHORITIES**
(continued)

Page

*In re Wilmington Tr. Sec. Litig.*,
Master File No. 10-cv-00990-ER (D. Del.) ............................................................ 23

*Lloyd v. Gupta*,
2016 WL 3951652 (N.D. Cal. July 22, 2016) .......................................................... 11

*Maher v. Zapata Corp.*,
714 F.2d 436 (5th Cir. 1983) .................................................................................... 17

*Mohammed v. Ells*,
2014 WL 4212687 (D. Colo. Aug. 26, 2014) .......................................................... 21

*MWS Wire Indus., Inc. v. Cal. Fine Wire Co.*,
797 F.2d 799 (9th Cir. 1986) .................................................................................... 10

*Officers for Justice v. Civil Service Com'n of City and Cty. of San Francisco*,
688 F.2d 615 (9th Cir. 1982) .................................................................................... 11

*Polk v. Good*,
507 A.2d 531 (Del. 1986) ................................................................................... 11, 21

*Rosenbloom v. Pyott*,
765 F.3d 1137 (9th Cir. 2014) .................................................................................. 16

*Schimmel v. Goldman*,
57 F.R.D. 481 (S.D.N.Y. 1973) ................................................................................ 17

*Shlensky v. Dorsey*,
574 F.2d 131 (3d Cir. 1978) ..................................................................................... 11

*Staton v. Boeing Co.*,
327 F.3d 938 (9th Cir. 2003)..................................................................................... 12

*Stewart v. Applied Materials, Inc.*,
2017 WL 3670711 (N.D. Cal. Aug. 25, 2017)......................................................... 23

*Stone v. Ritter*,
911 A.2d 362 (Del. 2006) ......................................................................................... 16

*Sved v. Chadwick*,
783 F. Supp. 2d 851 (N.D. Tex. 2009)...................................................................... 21

*United Nat'l Ret. Fund v. Watts*,
2005 WL 2877899 (D.N.J. Oct. 28, 2005)................................................................ 21

**Rules**

Fed. R. Civ. P. 23 ........................................................................................................... 15

Fed. R. Civ. P. 23.1 ........................................................................................................ 10

**Other Authorities**

"Largest Derivative Lawsuit Settlements," *The D&O Diary*,
https://www.dandodiary.com/2014/12/articles/shareholders-derivative-litigation/largest-
derivative-lawsuit-settlements/ ................................................................................. 22

"Wells Fargo – Transforming for the Future," (March 2019),
https://www08.wellsfargomedia.com/assets/pdf/about/investor-
relations/presentations/2019/proxy-presentation.pdf .............................................. 19

1

**TABLE OF AUTHORITIES**
(continued)

2

Page

3   Laarni T. Bulan et al., Cornerstone Research,
    *Securities Class Action Settlements, 2018 Review & Analysis* (2019) ..................................... 22

4   News Release, Wells Fargo & Co. (Jan. 12, 2018),
    https://www08.wellsfargomedia.com/assets/pdf/about/investor-relations/earnings/fourth-
5   quarter-2017-earnings.pdf .......................................................................................................... 18

6   Stefan Boettrich & Svetlana Starykh, NERA Economic Consulting,
    *Recent Trends in Securities Class Action Litigation: 2018 Full-Year Review* (2019) ............... 22

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

NOTICE OF MOTION AND MOTION FOR
FINAL APPROVAL OF SETTLEMENT
3:16-CV-05541-JST

**NOTICE OF MOTION AND MOTION FOR FINAL APPROVAL OF SETTLEMENT**

PLEASE TAKE NOTICE that, pursuant to Rule 23.1 of the Federal Rules of Civil Procedure and the Court's Order Granting Preliminary Approval of Derivative Action Settlement (the "PA Order," Dkt. 274), on August 1, 2019, at 2:00 p.m., Court-appointed co-lead plaintiffs the Fire and Police Pension Association of Colorado ("FPPA") and the City of Birmingham Retirement and Relief System ("Birmingham") (together, "Co-Lead Plaintiffs" or "Plaintiffs"), will move the Court, before the Honorable Jon S. Tigar, for entry of a Judgment granting final approval of the proposed settlement of this Action.  The grounds for this motion are that the proposed Settlement is fair, reasonable and adequate.  This motion is supported by the (1) accompanying Memorandum of Points and Authorities; (2) the accompanying Supplemental Joint Declaration of Richard M. Heimann and Joseph E. White, III ("Supp. Joint Decl."); (3)  Declaration of Sean A. Petterson ("Petterson Decl."); (4) Declarations of Richard M. Heimann of Lieff Cabraser ("Lieff Cabraser Decl."), Joseph E. White, III of Saxena White ("Saxena White Decl."), Daniella Quitt of Glancy Prongay & Murray LLP ("Glancy Decl."), Shane P. Sanders of Robbins Arroyo LLP ("Robbins Arroyo Decl."), and Bruce E. Jameson of Prickett, Jones & Elliott, P.A. ("Prickett Jones Decl."), and accompanying exhibits; (5) Declaration of Daniel B. Rehns of Hach Rose Schirripa & Cheverie LLP ("Hach Rose Decl."), and exhibits; (6) Declarations of Professor Brian T. Fitzpatrick ("Fitzpatrick Decl.") and Professor Jeffrey N. Gordon ("Gordon Decl."); (7) Declarations of Kevin B. Lindahl of FPPA ("FPPA Decl.") and James D. Love of Birmingham ("Birmingham Decl."); (8)  previously submitted Declarations of Hon. Daniel Weinstein (Ret.) (Dkt. 270-3) ("Weinstein Decl.") and Professor Michael A. Santoro (Dkt. 270-4) ("Santoro Decl."); and (9) all other prior pleadings and papers in this Action; arguments of counsel; and such additional information or argument as may be required or considered by the Court.  Pursuant to Local Rule 7-2(c), a proposed order granting this motion will be submitted with Co-Lead Counsel's reply on July 25, 2019, after the deadline for objections.

A proposed Judgment and Order of Dismissal approving the Settlement will be submitted with Co-Lead Plaintiffs' reply submission on July 25, 2019, after the July 11, 2019 deadline for objections to the Settlement has passed.

## STATEMENT OF ISSUE TO BE DECIDED

1.      Whether the Court should grant final approval of the proposed Settlement as fair, reasonable and adequate.

## MEMORANDUM OF POINTS AND AUTHORITIES[1]

## I.      INTRODUCTION

The Settlement of this Action is the culmination of more than two years of hard-fought litigation on one of "the most difficult legal theories in corporate law."  The Settlement is comprised of two categories of benefits to the Company:  *first*, a $240 million cash payment from Defendants' insurers—representing the largest insurance-funded monetary component of any shareholder derivative settlement by over $100 million; and *second*, corporate governance reforms and compensation forfeitures and reductions that conferred a substantial benefit to Wells Fargo.  On May 14, 2019, the Court granted preliminary approval of the Settlement, preliminarily determining that the Settlement was fair, adequate and reasonable, and approving the Parties' proposed Notice Plan.  Dkt. 274 (the "PA Order").  After complying with the Court-approved Notice Plan, Co-Lead Plaintiffs now respectfully request that the Court grant final approval of the Settlement as fair, adequate and reasonable.  Final approval of the Settlement is appropriate in light of the following factors:

*First*, the $240 million insurance cash payment to the Company is unprecedented for several reasons.  It is the second largest monetary recovery ever obtained in a derivative action settlement and the largest insurer-funded cash settlement in history, exceeding the second-place settlement by more than $100 million.  It is also the largest settlement of an action predicated on establishing the especially difficult *Caremark* standard.  The $240 million cash payment by the

---

[1]  Unless otherwise noted, capitalized terms generally retain their meanings from the Settlement, except that for purposes of this motion, "Plaintiffs' Counsel" refers to Co-Lead Counsel, Glancy, Robbins Arroyo, and Prickett Jones, and "Defendants" refers collectively to the individuals referenced in the Stipulation as the Officer Defendants and the Director Defendants; all emphasis is added; and all internal citations and quotation marks have been omitted.

1   Company's insurers represents a recovery of between 6.9 and 21.8 percent of estimated maximum

2   recoverable damages—well in excess of settlement recoveries obtained even in similarly sized

3   securities class actions.  Indeed, the Court has already explained that "the insurer-funded payment

4   alone puts the Settlement within the range of possible approval."  PA Order at 10.

5        *Second*, Wells Fargo has acknowledged that the facts alleged in the Action were

6   significant factors taken into account by the Company and its Board of Directors in implementing

7   compensation forfeitures and reductions and a series of corporate governance reforms.

8   Specifically, the Board reduced compensation for several senior officers and required others

9   (including Defendants Stumpf and Tolstedt) to forfeit past compensation, for a total of $122.5

10  million (the "Clawbacks").  In addition, Wells Fargo also adopted corporate governance reforms,

11  including: (i) new oversight responsibilities and amended charters for Committees charged with

12  risk management and legal compliance; (ii) the appointment of a new group of independent

13  directors and an overhaul of top management; (iii) reforms to bolster Board independence and

14  create critical distance from management; and (iv) the alignment of economic incentives with risk

15  mitigation, good governance, and long-term sustainability (the "Reforms").  *See* Dkt. 270-1.

16  These initiatives implemented by Wells Fargo follow and respond to specific proposals requested

17  by Plaintiffs during the pendency of the litigation and the negotiations that culminated in the

18  Settlement.  Indeed, Plaintiffs' corporate governance expert has opined that the Reforms and

19  Clawbacks are "extraordinarily important" whose value may "exceed[] even a substantial out-of-

20  pocket recovery."  Gordon Decl. ¶ 20.  The Parties and the Mediator have agreed that the

21  Reforms and Clawbacks conferred a substantial benefit to Wells Fargo conservatively valued at

22  $80 million, for a total Settlement value of $320 million.

23       *Third*, this Action entailed significant risks with respect to liability, damages, and

24  protecting this Court's favorable rulings against collateral attack.  Derivative lawsuits are rarely

25  successful.  To satisfy the exacting standard for establishing the Director Defendants' liability

26  under a "director oversight" theory, Plaintiffs would have to prove those Defendants (i) had actual

27  or constructive knowledge of the misconduct, and (ii) failed to act in the face of a known duty to

28  act, thereby demonstrating *conscious disregard* for their responsibilities—in effect, that the

NOTICE OF MOTION AND MOTION FOR
FINAL APPROVAL OF SETTLEMENT
3:16-CV-05541-JST

1    Defendants utterly failed to monitor or act at all.  Throughout this litigation, Defendants set forth

2    numerous arguments against a finding of liability that jeopardized success at summary judgment

3    and trial, including the fact that the Board took numerous actions and implemented various

4    initiatives during the Relevant Period to address the Improper Sales Practices.

5        But even if Plaintiffs established liability at trial, proving damages would be equally if not

6    more difficult.  First, Defendants asserted that the $1.1 billion in "out-of-pocket" damages Wells

7    Fargo suffered due to fines, penalties and costs were not proximately caused by the misconduct at

8    issue in the Action, and that they instead related to settlements of alleged misconduct that took

9    place before the alleged Relevant Period, were attributable to misconduct distinct from the

10   Improper Sales Practices, or were part of Wells Fargo's ongoing course of business.  Second, the

11   $1.4 to $2.4 billion in lost income Plaintiffs asserted was suffered as a result of Defendants

12   breaches is inherently speculative and difficult to prove.  Finally, even if Plaintiffs could prove

13   that lost business, they would be required to specifically tie such damages to Defendants'

14   misconduct, as opposed to other potential causes including general market effects or the

15   independent conduct of employees unrelated to Defendants' fiduciary duties.  As the Court

16   explained, Plaintiffs faced "particular difficulties" in establishing this "larger category of lost

17   income damages."  PA Order at 11.

18       *Fourth*, the Settlement resulted from years of diligent and complex work by Co-Lead

19   Plaintiffs and Co-Lead Counsel.  Plaintiffs conducted thorough investigation of the claims to

20   substantiate them and ensure demand futility was adequately pled.  Plaintiffs litigated not just in

21   this forum but also in California State Court and Delaware Chancery Court to protect

22   shareholders' interests from collateral attack.  Later, Plaintiffs consulted with a string of experts

23   in the areas specific to this lawsuit, including corporate governance, banking regulation, insurance

24   coverage, and damages.  And they engaged in extensive document discovery and prepared to take

25   more than 40 fact witness depositions, had the case not settled.

26       Indeed, before settling in December 2018, Co-Lead Plaintiffs rejected several

27   opportunities to settle the case at an earlier stage of the litigation, and instead pressed on with

28   their litigation efforts.  Those efforts culminated in an intensive mediation process in 2018

1    overseen by the Honorable Daniel Weinstein (Ret.), a former judge and highly respected mediator,

2    and Jed Melnick, Esq., who brought valuable experience in securities and derivative actions.  In

3    all, the Parties participated in seven in-person, bi-coastal mediation sessions; prepared and

4    exchanged at least five rounds of written submissions addressing legal and factual disputes; made

5    numerous, detailed presentations on liability and damages; communicated extensively with the

6    mediators; and negotiated directly with each other.  This Settlement is, in short, the product of

7    hard-fought, ably overseen negotiations between well-informed counsel.

8         The Settlement is fair, reasonable and adequate.  It should be approved.

9    **II.     OVERVIEW OF THE ACTION**

10        **A.     Co-Lead Plaintiffs Demonstrate Demand Futility And The Court Upholds
              The Majority Of Their Claims Against Defendants.**

11

12        The Court appointed Co-Lead Plaintiffs and Co-Lead Counsel on January 12, 2017.  Dkt.

13   70.  On February 24, 2017, Co-Lead Plaintiffs filed their Consolidated Amended Verified

14   Stockholder Derivative Complaint (the "Amended Complaint").  Dkt. 83.  The Action alleges

15   that, from January 2011, Defendants knew or consciously disregarded that the Company's

16   employees were illicitly creating millions of customer accounts without those customers'

17   knowledge or consent.

18        On March 17, 2017, Wells Fargo, joined by the Individual Defendants, moved to dismiss

19   for failure to plead demand futility, federal securities claims, or a breach of fiduciary duty.  Dkt.

20   Nos. 99-102, 107, 108, 110.  After briefing and oral argument, on May 4, 2017 the Court largely

21   denied Wells Fargo's motion based on "[t]he extensive and detailed allegations in the complaint."

22   Dkt. 129.   In doing so, the Court highlighted particular "red flags" that "collectively . . .

23   support[ed] an inference that a majority of the Director Defendants consciously disregarded their

24   fiduciary duties despite knowledge regarding widespread illegal account-creation activities,

25   and . . . that there is a substantial likelihood of director oversight liability." *Id.* at 24.  On June 5,

26   2017, the Individual Defendants filed a series of motions to dismiss for failure to state a claim,

27   which were heard by this Court on August 14, 2017 and substantially denied on October 4, 2017.

28   Dkt. Nos. 139-141, 143-145, 174.

1

  **B.**  **Co-Lead Plaintiffs Engaged In Extensive Discovery to Substantiate Their Claims.**

2

3   The parties engaged in fact discovery for over a year.  Co-Lead Plaintiffs sought discovery

4 from Wells Fargo, each of the 20 individual defendants, as well as third parties.  That discovery

5 included extensive meet and confer over the adequacy of Defendants' discovery responses and

6 the scope of Defendants' and Wells Fargo's productions.  Co-Lead Plaintiffs also engaged in

7 discovery with non-party regulatory agencies including the Federal Reserve, the Office of the

8 Comptroller of the Currency, and the Consumer Financial Protection Bureau.  Co-Lead Plaintiffs

9 obtained and analyzed more than 3.5 million pages of documents and prepared for over 40

10 depositions of Defendants and relevant fact witnesses.

11   **C.**  **Co-Lead Plaintiffs Consolidated This Litigation In This Court To Prevent Inconsistent Outcomes.**

12

13   Simultaneously, following the issuance of the Demand Futility Order and the 12(b)(6)

14 Order, Co-Lead Plaintiffs undertook a comprehensive nationwide effort to coordinate related

15 derivative actions in order to preserve their standing to pursue claims on behalf of the Company,

16 avoid unnecessary and duplicative efforts, and prevent inconsistent outcomes in those

17 proceedings.  First, Co-Lead Plaintiffs successfully sought to stay or dismiss similar claims in

18 concurrently pending actions in California and Delaware state courts.  Doing so ensured that

19 potentially adverse determinations in those cases would not have collateral estoppel effects in this

20 Court, which represented a particularly heightened risk as the parallel California state action was

21 twice dismissed on the pleadings.  Second, Co-Lead Plaintiffs moved to relate or consolidate

22 similar derivative actions in this Court, to ensure that all derivative claims related to the Improper

23 Sales Practices would be adjudicated through a single action.  *See* Dkt. Nos. 204, 228, 243.  Co-

24 Lead Plaintiffs thereby saved the Company from unnecessary and substantial litigation expenses.

25   **D.**  **Resolution Of The Action, Preliminary Approval, and Notice Plan.**

26   The Parties engaged in an extensive settlement and mediation process, including three in-

27 person sessions in August and September 2017, which did not result in a resolution.  After

28 continued litigation and discovery, the Parties engaged in four day-long mediation sessions under

1  the supervision of Judge Daniel Weinstein (Ret.) and Jed Melnick in the fall of 2018.  Dkt. 270-3.

2  On December 12, 2018, the Parties accepted Judge Weinstein's mediator's proposal, and

3  thereafter negotiated the specific terms of the Settlement.

4        Based on Co-Lead Plaintiffs' direct oversight of the prosecution of this matter and with

5  the advice of Co-Lead Counsel, Co-Lead Plaintiffs agreed to settle the claims in the Action

6  pursuant to the terms and provisions of the Stipulation, discussed below, after considering (a) the

7  very substantial financial benefit that Wells Fargo will receive under the proposed Settlement;

8  (b) the significant Clawbacks and Reforms that Wells Fargo has implemented as part of the

9  proposed Settlement; (c) the significant risks of continued litigation and trial; and (d) the

10  desirability of consummating the Settlement as provided by the terms of the Stipulation.

11        On February 28, 2019, Co-Lead Plaintiffs moved for preliminary approval. Dkt. 270.  On

12  April 2, 2019, Plaintiffs filed a supplemental brief in further support of the preliminary approval

13  of the Settlement.  Dkt. 272.  On May 14, 2019, the Court entered the Preliminary Approval

14  Order.  Thereafter, and pursuant to the Court-approved Notice Plan, the notice was published in

15  several major newspapers and Wells Fargo filed a Form 8-K with the SEC on May 20, 2019.

16  Notice was also published on Wells Fargo's website, via a national newswire service by Co-Lead

17  Plaintiffs, and on an additional website created by Co-Lead Plaintiffs specifically for the purpose

18  of providing notice to shareholders.  Notice was also posted on the websites of Co-Lead

19  Counsel—Lieff Cabraser and Saxena White.

20        Pursuant to the Preliminary Approval Order, the deadline for objections to the Settlement

21  is July 11, 2019.  Plaintiffs will file their reply brief on July 25, 2019.  The Court has set a

22  Fairness Hearing for August 1, 2019, at 2:00 P.M.

23  **III.**    **SETTLEMENT TERMS**

24        The Settlement has two basic components:

25        *First*, Wells Fargo will receive a $240 million cash payment, representing 48 percent of

26  the $500 million limit of the D&O insurance available to satisfy a judgment—the most realistic

27  and significant source of recovery in the Action.  Dkt. 272 at 2.

28

*Second*, Wells Fargo has implemented numerous important Reforms, for which Wells Fargo and Defendants agree and acknowledge that facts alleged in Co-Lead Plaintiffs' Complaint were "significant factors" in the determination to undertake those remedial actions.  Several of these corporate governance changes were implemented in direct response to Co-Lead Plaintiffs proposing them to Wells Fargo in the August and September 2017 mediations.  *See* Dkt. 270-1, Ex. A.; Gordon Decl.  These Reforms include:

- The Company has updated Board reporting structures, including committee charters, in the wake of the Improper Sales Practices issues to include the type of reporting contemplated by Co-Lead Plaintiffs' proposals, including reporting in executive sessions;

- Since 2017, nine directors have departed, and seven new directors have joined the Board (in the Parties' prior mediation sessions in 2017, Co-Lead Plaintiffs requested the resignation of five directors, all of whom subsequently left the Board);

- The Company has ended product sales goals for retail banking team members in branches and call centers, and implemented new compensation and performance management programs in the Community Bank focused on the customer experience;

- The Company has and continues to formalize its training programs for directors, including training and onboarding for new directors, and has documented those processes and training plans in writing;

- The Company and the Board enhanced oversight of risk, including conduct risk and compliance risk, by, among other things, strengthening and enhancing the Company's Board approved risk management framework and emphasizing the role of risk management when setting corporate strategy and by further rationalizing and integrating certain risk management organizational, governance, and reporting practices; and

- The Company has implemented numerous new controls and enhanced many existing controls and customer feedback mechanisms (e.g., customer alerts and "mystery shopper" programs) to help ensure that account activity is authorized.

The Reforms included in the Settlement were specifically designed both to address and to prevent weaknesses in internal controls covered by the Action, including those relating to the Company's retail sales practices.  Indeed, as Professor Michael A. Santoro, an expert on corporate governance, explains, "the Corporate Governance Reforms will help to detect, prevent, and mitigate the types of illegal and unethical activities that have been alleged to be at the heart of this litigation, including those that directly affect consumers in Wells Fargo's Community Banking business unit."  Dkt. 270-4 at 2.  He further opines that given the substantial value inherent in preventing misconduct that could result in billions of dollars of damages to Wells

Fargo and its shareholders, "the $20 million value the settling parties ascribe to the Corporate Governance Reforms is eminently reasonable." *Id.* at 14.

Similarly, Professor Gordon also determined that the prevention of similar misconduct from occurring in the future manifests the inherent value of the Reforms: "The test of the Reforms is whether they will substantially reduce the likelihood of a recurrence of serious compliance issues as exemplified by the Improper Sales Practices. . . . Reforms that reduced even a small recurrence risk by a meaningful amount would generate substantial value." Gordon Decl. ¶¶ 21, 23; *see also id.* ¶ 20 ("Thus in my opinion the $20 million attributed to Co-Lead Plaintiffs in the proposed Settlement is well within the range of value-creation-in-fact, perhaps even at the low end.").

The Clawbacks, totaling $122.5 million, were appropriate remedial steps to address the Improper Sales Practices. Dkt. 270-1 at 48. As Professor Gordon noted, "the Clawbacks transmit an important governance message: there will be significant financial penalties for failure to assure that the Company operates in a lawful way. . . . This effort to force employees to internalize the costs of compliance failures is an important governance step." Gordon Decl. ¶ 27. Wells Fargo acknowledged that facts alleged in the Action were a significant factor in the Board's determination to undertake the aforementioned personnel and compensation actions, and the Parties agreed that Plaintiffs' efforts related thereto conferred a value to Wells Fargo of $60 million. Dkt. 270-1 at 48.

The Settlement provides that Co-Lead Plaintiffs will release, on behalf of Wells Fargo, all claims related to the Improper Sales Practices, including all claims arising from the facts alleged in the Action or any of the related state court actions. Dkt. 270-1 at ¶¶ 25-27, 37-38. It also provides for the release of claims against the defendants named in the related state court actions, including certain other current or former directors, and American Express. *Id.*

Only after agreeing to these terms did the parties discuss Co-Lead Counsel's fee: Wells Fargo separately negotiated and agree to pay attorneys' fees totaling $68 million to Co-Lead Counsel (with no recovery of associated litigation expenses). *See* Dkt. 270-1 at 21. Wells Fargo agreed to these fees based on its own independent assessment of the monetary and non-monetary

1    value of the Settlement benefits to the Company.  *See* Dkt. 270-1 at 66; Dkt. 270-3 at 6 ("stating

2    that the requested fee award "was agreed to by Wells Fargo" and "is fair and reasonable in light

3    of the substantial benefit conferred upon Wells Fargo and the effort expended by Co-Lead

4    Counsel in achieving it").

5        Wells Fargo and its Board have approved the Settlement, including the monetary relief,

6    Reforms, Clawbacks and attorneys' fees, and concluded that the Settlement of the Action under

7    the terms set forth in the Stipulation was in the best interests of the Company and conferred a

8    substantial benefit to Wells Fargo—an acknowledgment that underscores that the Settlement is

9    fair, reasonable and adequate.  *See* Fitzpatrick Decl. ¶ 28 ("Wells Fargo has conceded that these

10   benefits were caused in 'significant' part by this litigation.  This concession can only decrease

11   Wells Fargo's take from this settlement by increasing class counsel's fee percentage.  Thus,

12   unlike the class action situation where a defendant might be indifferent over what the fee

13   percentage is and feel free to make all sorts of statements to facilitate settlement, I put more

14   credence in Wells Fargo's concession in a derivative action as it comes with a substantial

15   financial price.").

16   **IV.    LEGAL STANDARD**

17       Ninth Circuit jurisprudence reflects a strong public policy in favor of settlement.  *See In re*

18   *NVIDIA Corp. Derivative Litig.*, 2008 WL 5382544, at *2 (N.D. Cal. Dec. 22, 2008) (citing *MWS*

19   *Wire Indus., Inc. v. Cal. Fine Wire Co*., 797 F.2d 799, 802 (9th Cir. 1986)).  This general

20   principle is especially true in the context of shareholder derivative actions, which are "notoriously

21   difficult and unpredictable" and where "settlements are favored."  *Id.*

22       A derivative action "may be settled, voluntarily dismissed, or compromised only with the

23   court's approval."  Fed. R. Civ. P. 23.1(c).  While it exercises its "sound discretion" in evaluating

24   a settlement, "the court's intrusion upon what is otherwise a private consensual agreement

25   negotiated between the parties to a lawsuit must be limited to the extent necessary to reach a

26   reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion

27   between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and

28   adequate to all concerned."  *Officers for Justice v. Civil Service Com'n of City and Cty. of San*

NOTICE OF MOTION AND MOTION FOR
FINAL APPROVAL OF SETTLEMENT
3:16-CV-05541-JST

*Francisco*, 688 F.2d 615, 625 (9th Cir. 1982); *see also In re Pac. Enter. Sec. Litig.*, 47 F.3d 373, 377-78 (9th Cir. 1995) (affirming ruling that shareholder derivative settlement was "'fair, reasonable and adequate to [the company]'").

In determining whether a settlement is fair, reasonable, and adequate, courts "may consider a range of factors, including the strength of the plaintiffs' case, the risk, expense, complexity, and likely duration of further litigation, the amount offered in settlement, the stage of the proceedings, the experience and views of counsel, and the reaction of class members to the proposed settlement."[2] *In re Hewlett-Packard Co. S'holder Derivative Litig.*, 716 F. App'x 603, 605 (9th Cir. 2017). "The principal factor to be considered in determining the fairness of a settlement concluding a shareholders' derivative action is the extent of the benefit to be derived from the proposed settlement by the corporation, the real party in interest." *In re OSI Sys., Inc. Derivative Litig.*, 2017 WL 5642304, at *2 (C.D. Cal. May 2, 2017); *In re Atmel Corp. Derivative Litig.*, 2010 WL 9525643, at *12 (N.D. Cal. Mar. 31, 2010) (quoting *Shlensky v. Dorsey*, 574 F.2d 131, 147 (3d Cir. 1978)). The Ninth Circuit has cautioned that "the settlement or fairness hearing is not to be turned into a trial or rehearsal for trial on the merits." *Officers for Justice*, 688 F.2d at 625.

Additionally, Rule 23(e)(2)[3] identifies factors that courts must consider in determining whether a class action settlement is "fair, reasonable, and adequate," including whether:

    (A)    the class representatives and class counsel have adequately represented the class;

    (B)    the proposal was negotiated at arm's length;

    (C)    the relief provided for the class is adequate, taking into account:

---

[2] As the Delaware Supreme Court summarized in *Polk v. Good*, 507 A.2d 531, 536 (Del. 1986), the "facts and circumstances" to be considered by courts in assessing the overall fairness of a proposed settlement include: (1) the probable validity of the claims; (2) the apparent difficulties in enforcing the claims through the courts; (3) the delay, expense and trouble of litigation; (4) the amount of the compromise as compared with the amount of any collectible judgment; and (5) the views of the parties involved. The applicable factors for settlement review under Delaware law— the *Polk* factors—are substantially similar to the Ninth Circuit's *Officers for Justice* factors, and regardless of which factors are applied by this Court, the Settlement clearly is fair, adequate, and reasonable and should be finally approved.

[3] In determining the standards applicable to approval of a derivative settlement, "[c]ases involving dismissal or compromise under Rule 23(e) of non-derivative class actions . . . [are] relevant by analogy." *Lloyd v. Gupta*, 2016 WL 3951652, at *4 (N.D. Cal. July 22, 2016).

(i)     the costs, risks, and delay of trial and appeal;

(ii)     the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

(iii)     the terms of any proposed award of attorney's fees, including timing of payment; and

(iv)     any agreement required to be identified under Rule 23(e)(3); and

(D)     the proposal treats class members equitably relative to each other.

"It is the settlement taken as a whole, rather than the individual component parts, that must be examined for overall fairness, and the settlement must stand or fall in its entirety." *Staton v. Boeing Co.*, 327 F.3d 938, 960 (9th Cir. 2003) (quoting *Hanlon*, 150 F.3d at 1026). As set forth below, each of these factors strongly weighs in favor of final approval of the Settlement.

## V.     THE PROPOSED SETTLEMENT MERITS FINAL APPROVAL

### A.     The Stage of the Proceedings and Co-Lead Plaintiffs' and Co-Lead Counsel's Vigorous Prosecution of this Action Supports Final Approval

The Settlement is the product of vigorous prosecution of the Action by Co-Lead Plaintiffs and Co-Lead Counsel and no conflicts have ever existed in this litigation. "Adequacy of representation . . . requires that two questions be addressed: (a) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (b) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 462 (9th Cir. 2000). In the PA Order, the Court found no evidence of a conflict between either Co-Lead Plaintiffs or Co-Lead Counsel, and Wells Fargo and its "similarly situated" shareholders. Dkt. 274 at 7. That has not changed.

Moreover, the Court found that Co-Lead Plaintiffs "possessed 'sufficient information to make an informed decision about settlement'" by virtue of "two intensive rounds of motions to dismiss," "stays of numerous related derivative actions pending in other courts," and "extensive document discovery." *Id.* (citing *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d at 459). Indeed, the Settlement was reached only after over two years of fiercely-contested litigation, and after Co-Lead Plaintiffs conducted substantial fact discovery, including obtaining 727,679 documents from Defendants and seven non-parties comprising 3,529,385 pages, before reaching an agreement in

1  principle to settle the case.  Dkt. 270 at 15.  Co-Lead Plaintiffs also consulted with experts in

2  corporate governance, regulatory matters, insurance coverage, and damages (Supp. Joint Decl.

3  ¶ 94); and researched and prepared for depositions of over forty anticipated fact witnesses,

4  including the twenty named Defendants (*id*. ¶ 128).

5          In sum, by the time the Settlement was reached, each side had sufficient information to

6  assess the strengths and weaknesses of its claims.  *Cicero v. DirecTV, Inc*., 2010 WL 2991486, at

7  *3 (C.D. Cal. July 27, 2010) (holding that a settlement is "presumptively fair" where, as here, the

8  parties engage in "meaningful discovery" before settlement); Dkt. 270-3 at 3 ("While the contents

9  of the mediation statements and arguments are confidential, they were evidently the product of

10  hard work, presented complex and novel legal arguments, and were highly adversarial").

11          Moreover, Co-Lead Plaintiffs, the Fire and Police Pension Association of Colorado and

12  the City of Birmingham Retirement and Relief System, sophisticated institutional investors, have

13  played a very active role in supervising and participating in the litigation.  Co-Lead Plaintiffs

14  regularly conferred with Co-Lead Counsel, reviewed and commented on filings, attended several

15  hearings, attended each of the seven in-person mediation sessions in San Francisco and New York

16  City, and actively participated in the settlement negotiations.  *See* FPPA Decl. ¶ 5; Birmingham

17  Decl. ¶ 5.  Furthermore, throughout the settlement-approval process, Co-Lead Plaintiffs have

18  represented Wells Fargo and shareholders' interests by, among other things, "diligently

19  complying with the notice plan and other settlement procedures."  *Hefler v. Wells Fargo & Co*.,

20  No. 16-CV-05479-JST, 2018 WL 6619983, at *6 (N.D. Cal. Dec. 18, 2018) ("*Hefler II*").  Lieff

21  Cabraser and Saxena White are highly experienced in securities class and derivative action

22  litigation and have vigorously pursued this case on behalf of the Settlement Class.  *See* Lieff

23  Cabraser Decl., Ex. 7 (Lieff Cabraser firm resume); Saxena White Decl., Ex. 7 (Saxena White

24  firm resume).  Accordingly, this factor supports approval of the Settlement.

25          **B.     The Settlement Results from Arm's-Length Negotiations Overseen by
                     Independent, Renowned Mediators**
26

27          There is a strong presumption of fairness to settlements negotiated at arm's-length by

28  experienced counsel and with the assistance of an independent mediator.  *See, e.g.*, *Hanlon v.*

1    *Chrysler Corp.*, 150 F.3d 1011, 1029 (9th Cir. 1998); *In re MRV Commc'ns Derivative Litig.*,

2    2013 WL 2897874, at *2 (C.D. Cal. June 6, 2013) ("'The involvement of experienced [] counsel

3    and the fact that the settlement agreement was reached in arm's length negotiations, after relevant

4    discovery ha[s] taken place create a presumption that the agreement is fair.'" (citation omitted)).

5         Here, as detailed above, the Settlement was only reached after extensive motion practice,

6    the production and review of hundreds of thousands of pages of documents, and lengthy and

7    protracted negotiations over the course of several months.  All counsel possessed a firm

8    understanding of the strengths and weaknesses of their respective claims and defenses.  The

9    Settlement came about after seven in-person mediation sessions under the auspices of

10   experienced and respected neutral mediators.  During the sessions, the Parties made extremely

11   detailed presentations regarding their respective positions on the merits of the claims, as well on

12   damages, and experts for both sides also participated in and made presentations at these sessions.

13   The final settlement negotiations included two rounds of written submissions and four days of

14   mediation with Judge Weinstein and Mr. Melnick, culminating in the mediator's proposal being

15   submitted to the Parties on December 5, 2018, and accepted in principle by the Parties on

16   December 12, 2018.  *See* Dkt. 270-3 at 6 ("I view the Settlement [] as an excellent compromise

17   and resolution of a hard-fought case that presents many risks to both sides.  I believe the

18   Settlement represented the highest settlement amount and most favorable terms that Co-Lead

19   Plaintiffs could have achieved at that time").

20        Accordingly, the advanced posture of this case, and the deliberative nature of the

21   negotiations evidence a fair process involving good-faith arm's-length bargaining.  *See, e.g.*,

22   *Hefler v. Wells Fargo & Co.*, 2018 WL 4207245, at *9 (N.D. Cal. Sept. 4, 2018) ("*Hefler I*")

23   ("[I]n light of the fact that the Settlement was reached after the parties engaged in motion practice

24   and participated in multiple days of formal mediation, the Court concludes that the negotiations

25   and agreement were non-collusive."); *HCL Partners Ltd. P'ship v. Leap Wireless Int'l, Inc.*, 2010

26   WL 4027632, at *2 (S.D. Cal. Oct. 14, 2010) ("Counsel for the parties participated in arm's

27   length negotiations for several months before reaching an agreement.  All parties are represented

28   by competent, experienced litigators, and the active involvement of the Honorable Weinstein

1    (Ret.) as a mediator . . . weighs considerably in favor of concluding this is not a collusive

2    settlement").

3        **C.      The Settlement Weighs the Strength of Co-Lead Plaintiffs' Claims with the
             Substantial Risks of Continuing Litigation**

4

5        Consistent with Rule 23's instruction to consider "the costs, risks, and delay of trial and

6    appeal," Fed. R. Civ. P. 23(e)(2)(C)(i), courts in this Circuit evaluate "the strength of the

7    plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation."  *Hefler II*,

8    2018 WL 6619983, at *7 (citing *Hanlon*, 150 F.3d at 1026).

9        The strength of Plaintiffs' claims.  Co-Lead Plaintiffs have secured a historic settlement of

10   this derivative Action, and the substantial amount of the Settlement reflects that Plaintiffs' claims

11   in this case were strong.  Indeed, this Court recognized the strength of Plaintiffs' allegations

12   through its Demand Futility Order and 12(b)(6) Order, when it determined that the facts as pled

13   gave rise to cognizable claims and supported Co-Lead Plaintiffs' standing to pursue these claims

14   on the Company's behalf.  Given the evidentiary record developed by Co-Lead Plaintiffs'

15   vigorous prosecution of the litigation, Plaintiffs were well-positioned to continue litigating this

16   case through trial.  However, as the Court noted in its PA Order, "[w]hile Plaintiffs have survived

17   motions to dismiss on the threshold issue of demand futility [] and on their ability to state a claim

18   [], significant obstacles remain to proving their case and prevailing at trial."  *See* Dkt. 274 at 8; *In*

19   *re Heritage Bond Litig.*, 2005 WL 1594403, at *7 (C.D. Cal. June 10, 2005) ("[I]t is known from

20   past experience that no matter how confident one may be of the outcome of litigation, such

21   confidence is often misplaced"); Dkt. 270-3 at 3 ("Counsel for the Parties presented significant

22   arguments regarding their clients' respective positions, and it was apparent that each side faced

23   risks in proceeding with the case.").  Despite Plaintiffs' confidence in their claims, the risks of

24   continued litigation were particularly acute.

25       Significant and costly procedural hurdles remained.  This Action was challenging given

26   the complicated facts and law at issue in the litigation.  Based on the volume of evidence obtained

27   and reviewed, the complexity of the issues involved, and the tenacity of Defendants and their

28   counsel, Co-Lead Plaintiffs reasonably expected that the continued prosecution of the Action

- 15 -

through the completion of discovery, summary judgment, and trial would have involved substantial additional work and expense by counsel and this Court, with an uncertain outcome. Specifically, Co-Lead Plaintiffs would need to complete fact and expert discovery, including taking depositions of Wells Fargo employees, the Individual Defendants, and other fact witnesses, and preparing and exchanging expert reports on various issues, including damages.  Co-Lead Plaintiffs would also need to brief the inevitable summary judgment and *Daubert* motions and other pre-trial motions.  Adverse rulings on a host of issues could have placed the viability of Plaintiffs' claims in jeopardy.

Liability was far from assured.  A trial would have been difficult and expensive, requiring extensive factual and expert testimony to prove the elements of Plaintiffs' claims.  In order to prevail on Plaintiffs' core *Caremark* breach of fiduciary duty claim at trial, Plaintiffs would bear the burden of establishing that Defendants (i) had *actual or constructive knowledge* of the misconduct, and (ii) failed to act in the face of a known duty to act, thereby demonstrating *conscious disregard* for their responsibilities.  *Rosenbloom v. Pyott*, 765 F.3d 1137, 1151 (9th Cir. 2014); *Stone v. Ritter*, 911 A.2d 362, 368-69 (Del. 2006).  Defendants would have argued that, contrary to an intentional dereliction of their fiduciary duties to Wells Fargo that allowed the Improper Sales Practices to occur, the Board in fact took numerous steps to expand internal controls, encourage management to prevent sales practice violations, and address the Improper Sales Practices throughout the Relevant Period.  For example:

- In 2011, the Board created the Sales and Service Conduct Oversight Team to detect and root out sales practice violations, and formed the Sales Quality Project Group to improve training and monitor sales quality issues;

- In 2013, the Board implemented Quality of Sales Report Cards in 2013 to measure and ensure compliance with proper sales practices and prevent violations;

- In 2013, the Board engaged McKinsey & Co. to analyze and improve Wells Fargo's risk function and organization, including increased funding and staffing, which the Board and management worked cooperatively to implement;

- In 2013, the Board began a proactive analysis into "simulated funding"—the creation and funding of unauthorized accounts—to identify and address improper sales practices;

- In 2013, the Board created a multi-department, cross-functional team of representatives tasked with overseeing, improving and preventing retail banking sales practices issues;

1

- In 2014, the Board received reports from management indicating that sales practices issues were being scrutinized and that they were decreasing;

2

3

- In 2014, management held town hall meetings instructing team members to report any alleged sales misconduct to Wells Fargo's ethics line;

4

- In 2015, the Board and the Officer Defendants approved two separate third-party consultant reviews: one by PwC focused on consumer harm, and another by Covington & Burlington LLP and Accenture to assess training, compensation and sales practices; and

5

6

- In 2015 and 2016, several additional actions and reports purportedly indicating that the sales issues were being addressed, including the establishment of the Sales Practices Oversight Unit within Corporate Risk and other corporate measures.

7

8

9   Defendants would not doubt have pointed to these and other affirmative steps taken by the Board

10  and Officers as evidence that they could not have consciously disregarded their duties, and thus

11  Plaintiffs *Caremark* claim must fail.  While Co-Lead Plaintiffs would have vigorously disputed

12  that claim using evidence uncovered in discovery, they also recognized that those efforts and

13  these measures may well have resonated with a jury at trial.  For these and other reasons, "the

14  odds of winning [a] derivative lawsuit [are] extremely small" and "rarely successful."  *In re Pac.*

15  *Enters. Sec. Litig.*, 47 F.3d at 378.[4]   Indeed, counsel has not identified a single *Caremark* claim

    that has been successfully tried before a finder of fact in a shareholder derivative action.

16

17          <u>Damages would have been contested</u>.  Moreover, even if Co-Lead Plaintiffs successfully

18  established liability, the Parties' assessments of damages would be hotly contested and would

19  primarily entail a "battle of the experts."  As noted in Co-Lead Plaintiffs' supplemental brief in

20  support of preliminary approval, Co-Lead Plaintiffs would have sought $1.1 billion in out-of-

21  pocket damages, which includes $529 million in civil and regulatory fines, penalties, and

22  payments; $443 million in investigation and litigation costs; and $138 million in remediation

23  efforts.  Dkt. 272.  Plaintiffs would have been put to the task of demonstrating those out-of-pocket

24  damages were proximately caused by Defendants' breach of their fiduciary duties—that is, their

25  failure to act—rather than some other cause.  Wells Fargo also claimed that most if not all of

26

---

27  [4] *See also Maher v. Zapata Corp.*, 714 F.2d 436, 455 (5th Cir. 1983) ("Settlements of shareholder derivative actions are particularly favored because such litigation is 'notoriously difficult and unpredictable.'") (quoting *Schimmel v. Goldman*, 57 F.R.D. 481, 487 (S.D.N.Y. 1973)).

28

1   these expenses were part of the Bank's ongoing course of business operations, and therefore not

2   cognizable damages.

3          Co-Lead Plaintiffs also faced hurdles with respect to demonstrating lost income damages.

4   Co-Lead Plaintiffs estimated that the Company suffered "lost income" of between $1.4 billion

5   and $2.4 billion; however, Defendants disputed that Wells Fargo suffered *any harm* as a result of

6   the alleged wrongdoing, based in part on the fact that Wells Fargo continued to report substantial

7   profits even after the September 2016 disclosure of wrongdoing.[5]  Indeed, to the extent that Wells

8   Fargo did lose income, Co-Lead Plaintiffs would have faced significant challenges establishing

9   that Wells Fargo lost business specifically due to the Improper Sales Practices, as opposed to

10  general market effects; the conduct of employees independent of any wrongful act or omission by

11  Defendants; or the financial effects of other alleged wrongdoing.  Of course, how a jury might

12  assess these categories of damages is among the uncertainties of trial that weighs in favor of

13  approving settlement.  *See Basaraba v. Greenberg*, 2014 WL 12591677, at *3 (C.D. Cal. Nov. 10,

14  2014) ("Juries can be very unpredictable in their reactions to expert testimony and theories.").

15  There was a serious risk that even after establishing liability, Co-Lead Plaintiffs might well have

16  obtained a damages award from the jury of much less than the Settlement, and perhaps nothing at

17  all.

18          <u>Success at trial may have resulted in an inferior outcome</u>.  Even if Co-Lead Plaintiffs were

19  successful at trial, they would have faced challenges collecting judgment against certain

20  Defendants.  Several of the Officer Defendants have had their compensation returned to the

21  Company through the Clawbacks, as well as other compensation forfeitures and reductions

22  implemented in the wake of the Improper Sales Practices.  These remediation efforts totaled $180

23  million.[6]  A jury could have easily found a large monetary judgment against the Defendants

24  inappropriate in light of the money already forfeited or clawed back from these defendants.

25  ───────────────
[5] Indeed, for the full year 2017, Wells Fargo reported $22.183 billion in net income, slightly more

26  than the $21.938 billion the Bank reported in 2016.  *See* News Release, Wells Fargo & Co. (Jan. 12, 2018), https://www08.wellsfargomedia.com/assets/pdf/about/investor-

27  relations/earnings/fourth-quarter-2017-earnings.pdf.

[6] *See* "Wells Fargo – Transforming for the Future," at 12 (March 2019),

28  https://www08.wellsfargomedia.com/assets/pdf/about/investor-relations/presentations/2019/

*Footnote continued on next page*

1        Even a jury verdict and damages award of $240 million—the same exact cash value of

2    this Settlement—would not guarantee cash recovery of $240 million to the Company.

3    Defendants and their insurers would undoubtedly appeal that verdict, and the appellate process

4    could be expected to last for years with no assurance of a sustained favorable outcome for Wells

5    Fargo.  The Company's recovery would also be threatened through collateral litigation with

6    Defendants' insurers seeking to avoid payment from the primary source of cash funds, the D&O

7    insurance tower.  *See In re Galena Biopharma, Inc. Derivative Litig.*, 2016 WL 10840600, at *2

8    (D. Or. June 24, 2016) (noting that the individual defendants' "insurers dispute coverage and if

9    the Action does not settle and continues to be litigated, there is a risk that insurance coverage will

10   be denied and an additional insurance coverage lawsuit may ensue").

11       Lastly, as the Court noted in the PA Order, continued litigation would have deprived the

12   Company of a valuable opportunity to move past the scandal, which provides additional support

13   for the Settlement.  PA Order at 9.  Co-Lead Plaintiffs were motivated to achieve meaningful and

14   lasting results for Wells Fargo while, at the same time, putting the Company in the best possible

15   position going forward.  Thus, this factor strongly weighs in favor of final approval.

16       **D.**    **The Historic Settlement Amount Confers Substantial Benefit to Wells Fargo**
17                **and its Shareholders**

18       The Settlement provides precedent-setting benefits to the Company and its shareholders.

19   The Settlement provides that Wells Fargo will receive $240 million in cash, paid by insurers on

20   behalf of the Settling Defendants.  The merits of the cash recovery alone are remarkable,

21   representing the second-largest cash settlement of a derivative action in history, the largest

22   insurer-funded payment ever by over $100 million, and by far the largest overall cash recovery in

23   a *Caremark* claim case ever.  *See* Dkt. 270 at 22-23.  This substantial amount reflects the fact that

24   Defendants understood that Co-Lead Plaintiffs and Co-Lead Counsel were determined and

25   willing to take these claims to trial.

26

27   *Footnote continued from previous page*
     proxy-presentation.pdf (noting $180 million in Executive Accountability Actions Taken by
28   [Wells Fargo's] Board and the [Human Resources Committee]).

1        Beyond the monetary recovery, the proposed Settlement includes $122.5 million in

2  Clawbacks, which Wells Fargo acknowledges conferred a remedial value of $60 million to the

3  Company, and which represent an enduring deterrent against future misconduct.  *See* Dkt. 270-1,

4  Ex. B.  Similarly, the Reforms, which Wells Fargo values at $20 million, mark a departure from

5  the problems of the past and signal that the Company is effectively turning a new page and is

6  dedicated to preventing and investigating sales and related conduct issues, and promoting more

7  active monitoring of Company culture.  *See* Dkt. 270-1, Ex. A.  The Reforms are not only

8  designed to address the allegations in the Action, but also to strengthen and enhance compliance,

9  as well as oversight of compliance, in the highly regulated banking industry.  These Reforms also

10  augment the functionality and accountability of the Board and its various governing committees.

11  *See* Dkt. 270-3 at 4-5 (Judge Weinstein stating that "the Corporate Governance Reforms

12  enhanced oversight of conduct and compliance risk, changed the compensation incentives for

13  employees of the Company, and updated Board-level reporting structures"); *see also* Dkt. 270-4

14  at 2-3 ("the Corporate Governance Reforms represent a major step forward for Wells Fargo's

15  overall corporate governance that. . . helps to protect the public and customers from future abuse

16  and wrongdoing").  These Reforms will materially improve the Company's corporate governance,

17  and thus its financial prospects, for years to come.  *See* Gordon Decl. ¶ 38 ("The compliance

18  failure reflected in the Improper Sales Practices was enormously costly for Wells Fargo and its

19  shareholders. . .  For this reason it is my opinion that the Reforms will deliver substantial value

20  for Wells Fargo and its shareholders and that Co-Lead Plaintiffs' efforts in promoting these

21  reforms have thus created substantial value for Wells Fargo and its shareholders.").

22        As Defendants explicitly acknowledge, this litigation was a significant factor that the

23  Board took into account in determining to adopt the Clawbacks and the Reforms.  *See In re*

24  *Hewlett-Packard Co. S'holder Derivative Litig.*, 716 F. App'x at 607 ("The district court found

25  that this litigation at least 'in part' caused the governance reforms that HP adopted . . . HP

26  acknowledged that the lawsuits were a contributing factor to the reforms").  Co-Lead Plaintiffs'

27  efforts were a direct catalyst for many of these initiatives; indeed, Wells Fargo decided to

28  implement these reforms in response to Co-Lead Plaintiffs' proposals during the pendency of

1    Settlement negotiations.  The Ninth Circuit has held that there is a "presumption that there is a

2    causal relationship between" a timely filed lawsuit and a subsequently enacted reform or benefit.

3    *Id.* (citing *Alaska Elec. Pension Fund v. Brown*, 941 A.2d 1011, 1015 (Del. 2007)).  And

4    "benefits to a corporation that are 'causally related to the [derivative] lawsuit' may serve as valid

5    consideration for approval of a settlement." *Id.* (citing *Polk*, 507 A.2d at 538).

6         The fact that the Reforms provided by the Settlement directly target the organizational and

7    corporate compliance failures alleged in the Action strongly militates in favor of approval.  *See*

8    *Sved v. Chadwick*, 783 F. Supp. 2d 851, 866 (N.D. Tex. 2009) (approving derivative litigation

9    settlement because it "offers tangible, long-term remedial measures that are specifically designed

10   to avoid the alleged missteps in [the company's] past and protect shareholders as the company

11   moves forward"); *Mohammed v. Ells*, 2014 WL 4212687, at *3 (D. Colo. Aug. 26, 2014) (finding

12   settlement fair and adequate where "the corporate governance reforms provided for as part of the

13   settlement are specifically and appropriately designed to prevent the recurrence of the alleged

14   misconduct that formed the basis for this action").  Corporate governance reforms that "serve to

15   prevent and protect [the company] from the reoccurrence of" alleged wrongdoing confer a

16   substantial benefit, warranting settlement approval.  *United Nat'l Ret. Fund v. Watts*, 2005 WL

17   2877899, at *5 (D.N.J. Oct. 28, 2005).[7]  Indeed, "[a]s corporate debacles such as Enron, Tyco and

18   WorldCom demonstrate, strong corporate governance is fundamental to the economic well-being

19   and success of a corporation," and "'[c]ourts have recognized that corporate governance reforms

20   such as those achieved here provide valuable benefits to public companies.'" *NVIDIA*, 2008 WL

21   5382544, at *3.

22        Finally, the Settlement reflects a recovery of between 9.1 and 29.1 percent of the total

23   potential damages.  *See* Dkt. 272 at 2.  That the Settlement "is higher than recoveries achieved in

24   other…actions of similar size (over $1 billion in estimated damages), which settled for median

25   _____

26   [7] In recognition of the fact that Wells Fargo was addressing other factors beyond the Action
     during the implementation of the Clawbacks and the Reforms—including regulatory
     investigations, other shareholder actions and public scrutiny—as well as the inherent difficulty in
27   quantifying the value of the Reforms, the Parties valued these non-monetary benefits at $80
     million.  ECF No. 270-1 at 9.  This valuation is supported by Wells Fargo, the Individual
28   Defendants, Judge Weinstein and Professor Santoro.  *See* ECF Nos. 270-1, 270-3, 270-4.

recoveries of 2.5 percent between 2008 and 2016, and 3 percent in 2017" weighs "in favor of approval." *Hefler II*, 2018 WL 6619983, at \*8.[8]  Indeed, the $240 million cash recovery alone equates to approximately 21.8 percent of the $1.1 billion in out-of-pocket damages to the Company, and between 6.9 and 9.6 percent of the $2.5 billion to $3.5 billion total maximum damages, inclusive of the more speculative loss of income category of damages.  *See* Dkt. 272 at 4; Dkt. 274 at 11 (noting "the particular difficulties of establishing the larger category of lost income damages").[9]  The Settlement is exceptional by any measure.

### E.   The Experience and Views of Lead Counsel Weigh in Favor of Granting Final Approval

The Court also considers "the experience and views of counsel."  *Hanlon*, 150 F.3d at 1026.  As this Court has stated, "[t]hat counsel advocate in favor of this Settlement weighs in favor of its approval."  *Hefler II*, 2018 WL 6619983, at \*9; *see also MRV Commc'ns*, 2013 WL 2897874, at \*5 ("'Great weight' is accorded to the recommendation of counsel, who are most closely acquainted with the facts of the underlying litigation.").  Here, experienced counsel, operating at arm's length, have weighed all of the foregoing factors and endorse the proposed Settlement.  Counsel for Co-Lead Plaintiffs are among the nation's leading complex securities litigation firms, each with extensive experience in litigating complex actions such as this one.  *See*

---

[8] *See also* Stefan Boettrich & Svetlana Starykh, NERA Economic Consulting, *Recent Trends in Securities Class Action Litigation: 2018 Full-Year Review*, 35 fig. 27 (2019) (finding the median ratio of settlement value to investor losses was 1.2 percent for investor losses of $1.000–$4.999 billion); Laarni T. Bulan et al., Cornerstone Research, *Securities Class Action Settlements, 2018 Review & Analysis*, 6 fig. 5 (2019) (finding that in cases with "simplified tiered damages" of over $1 billion, the median settlement value was 2.0 percent of the "simplified tiered damages" for 2018 settlements).

[9] While Plaintiffs have analogized the monetary component to comparable securities class action settlements, this is only because settlements of this magnitude in the derivative context are virtually unprecedented.  Indeed, the vast majority of derivative cases settle for little to no cash, and in the history of derivative litigation, fewer than ten cases have settled for $100 million or more—and most of this small sub-set of cases did not include *Caremark* claims, but were actions contesting a merger or acquisition.  *See, e.g.*, "Largest Derivative Lawsuit Settlements," *The D&O Diary*, https://www.dandodiary.com/2014/12/articles/shareholders-derivative-litigation/largest-derivative-lawsuit-settlements/ (last updated March 3, 2019). This fact reflects the extraordinary difficulties that Co-Lead Plaintiffs faced in seeking to establish substantial monetary liability on behalf of a corporation against its outside directors for alleged breaches of fiduciary duty.

Dkt. 34-3, 34-4.[10]  Together, the collective experience and judgment of Co-Lead Counsel supports approval of the Settlement.  *See Stewart v. Applied Materials, Inc.*, 2017 WL 3670711, at *6 (N.D. Cal. Aug. 25, 2017) ("finding class counsel's recommendation in favor of settlement presumptively reasonable because counsel demonstrated knowledge about the case and securities litigation in general").

Similarly, Wells Fargo is represented by Sullivan & Cromwell LLP.  The Director Defendants are represented by Shearman & Sterling LLP.  The Officer Defendants are individually represented by Goodwin Procter LLP, Clarence Dyer & Cohen LLP, Ramsey & Ehrlich LLP, Skaggs Faucette LLP, and Arguedas, Cassman & Headley, LLP.  These defense firms are among the most prestigious in the country, and the individual lawyers for all Defendants involved have many years of experience representing defendants in complex securities and derivative litigation.  The Settlement was reached only after all counsel had conducted a substantial investigation, discovery and protracted settlement negotiations; considered the relative strengths and weaknesses of their respective cases; and concluded that the Settlement is a fair and reasonable result, recommending its approval.

F.    **After A Robust Court-Approved Notice Plan, Wells Fargo Shareholders Overwhelmingly Favor Final Approval of the Settlement**

Pursuant to the terms of the May 14, 2019 PA Order, Wells Fargo published a copy of the Notice in several major newspapers and filed a Form 8-K with the SEC on May 20, 2019.  Notice was also published via a national newswire service, on Wells Fargo's website, and on an additional website created specifically for the purpose of providing notice to shareholders.  The contents of the Notice were also approved by the Court and contained detailed descriptions of the

---

[10] *See also In re Volkswagen "Clean Diesel" Mkt'g, Sales Practices & Prods. Liab. Litig.*, No. 3:15-md-02672-CRB (N.D. Cal.) (Lieff Cabraser, as lead counsel, obtained a series of class action settlements totaling over $11 billion); *In re Broadcom Corp. Derivative Litig.*, No. C-06-3252 R (CWx) (C.D. Cal.), (in a shareholder derivative action and the largest stock options backdating case in the country, Lieff Cabraser achieved settlements totaling $197.5 million); *In re Wilmington Tr. Sec. Litig.*, Master File No. 10-cv-00990-ER (D. Del.) (Saxena White as co-lead counsel achieved $210 million settlement representing a recovery of nearly 40% of maximum recoverable damages, ranking among the top-ten securities fraud settlements in the Third Circuit); *In re Bank of Am. Corp. Sec., Derivative & ERISA Litig.*, No. 09-md-2058 (S.D.N.Y.) (Saxena White recovered $62.5 million for the company and its shareholders, along with fundamental, board-level corporate governance reforms).

1    history of the Action and proposed Settlement, and the claims that will be released if the proposed

2    Settlement is approved.  Notice was also posted on the websites of Lieff Cabraser and Saxena

3    White.

4        The Notice advised shareholders of the July 11, 2019 deadline to file objections.[11]  Co-

5    Lead Counsel have not received any objections to the Settlement.  *See* Petterson Decl. ¶ 5.  "[T]he

6    absence of a large number of objections to a…settlement raises a strong presumption that the

7    terms of a proposed class settlement action are favorable. . ."  *Hefler II*, 2018 WL 6619983, at *9.

8    Even a small number of objections in the face of overwhelming support is convincing evidence of

9    a proposed settlement's fairness and adequacy—particularly here, where the vast majority of

10   shareholders are sophisticated institutional investors with the resources to object to a settlement if

11   they so chose.  *See id.* ("[T]hat not one sophisticated institutional investor objected to the

12   Proposed Settlement is indicia of its fairness."); *OSI Sys.*, 2017 WL 5642304, at *4 (approving a

13   derivative settlement in part because "the lack of objection" created a strong presumption that the

14   terms of a proposed settlement were fair).[12]

15                                         **CONCLUSION**

16       The Settlement represents an outstanding result for Wells Fargo and its shareholders.

17   Based on all of the foregoing considerations, Co-Lead Plaintiffs respectfully request that the

18   Court grant final approval of the Settlement as fair, reasonable, and adequate.

19

20

21

22

23

24

---

25   [11] To the extent that any shareholder submits an objection to any aspect of the Settlement, Co-
     Lead Plaintiffs will address such objection in their reply brief in further support of final approval
26   of the Settlement, which is due to be filed on July 25, 2019.

     [12] As detailed in the accompanying Motion for Award of Attorneys' Fees and Reimbursements to
27   Co-Lead Plaintiffs ("Fee Motion"), incorporated by reference herein, Co-Lead Counsel's request
     for an award of attorney's fees and Co-Lead Plaintiffs' requested Reimbursement Awards are fair
28   and reasonable and fully supported by all factors considered by Courts in the Ninth Circuit.

1   Dated:  June 27, 2019

**LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP**

2

3   By: */s/ Richard M. Heimann*
Richard M. Heimann (063607)

4   *rheimann@lchb.com*
Katherine C. Lubin (259826)

5   *kbenson@lchb.com*
Michael K. Sheen (288284)

6   *msheen@lchb.com*
275 Battery Street, 29th Floor

7   San Francisco, CA 94111-3339
Telephone: (415) 956-1000

8   Facsimile: (415) 956-1008

9

10   Steven E. Fineman (140335)
*sfineman@lchb.com*

11   Daniel P. Chiplock (*Pro hac vice*)
*dchiplock@lchb.com*

12   Nicholas Diamand (*Pro hac vice*)
*ndiamand@lchb.com*

13   Michael J. Miarmi (*Pro hac vice*)
*mmiarmi@lchb.com*

14   Sean A. Petterson (*Pro hac vice*)
*spetterson@lchb.com*

15   250 Hudson Street, 8th Floor

16   New York, NY 10013-1413
Telephone: (212) 355-9500

17   Facsimile: (212) 355-9592

18   *Attorneys for Co-Lead Plaintiff Fire & Police*

19   *Pension Association of Colorado and Co-Lead
Counsel*

20

21

22

23

24

25

26

27

28

NOTICE OF MOTION AND MOTION FOR
FINAL APPROVAL OF SETTLEMENT
3:16-CV-05541-JST

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**SAXENA WHITE P.A.**

Maya Saxena (*Pro hac vice*)
*msaxena@saxenawhite.com*
Joseph E. White, III (*Pro hac vice*)
*jwhite@saxenawhite.com*
Lester R. Hooker (241590)
*lhooker@saxenawhite.com*
Adam D. Warden (*Pro hac vice*)
*awarden@saxenawhite.com*
Dianne M. Pitre (286199)
*dpitre@saxenawhite.com*
150 East Palmetto Park Road, Suite 600
Boca Raton, FL 33432
Telephone: (561) 394-3399
Facsimile: (561) 394-3382

Steven B. Singer (*Pro hac vice*)
*ssinger@saxenawhite.com*
Kyla Grant (*Pro hac vice*)
*kgrant@saxenawhite.com*
Sara DiLeo (*Pro hac vice*)
*sdileo@saxenawhite.com*
10 Bank Street, 8th Floor
White Plains, NY 10606
Telephone: (914) 437-8551
Facsimile: (888) 631-3611

*Attorneys for Co-Lead Plaintiff The City of Birmingham and Co-Lead Counsel*

NOTICE OF MOTION AND MOTION FOR
FINAL APPROVAL OF SETTLEMENT
3:16-CV-05541-JST