1  Richard M. Heimann (063607)
    *rheimann@lchb.com*
2  Katherine C. Lubin (259826)
    *kbenson@lchb.com*
3  Michael K. Sheen (288284)
    *msheen@lchb.com*
4  LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
    275 Battery Street, 29th Floor
5  San Francisco, CA 94111-3339
    Telephone: (415) 956-1000
6  Facsimile:  (415) 956-1008

7  *Attorneys for Co-Lead Plaintiff Fire & Police Pension*
    *Association of Colorado and Co-Lead Counsel*

8  Maya Saxena (*Pro hac vice*)
    *msaxena@saxenawhite.com*
9  Joseph E. White, III (*Pro hac vice*)
    *jwhite@saxenawhite.com*
10 Lester R. Hooker (241590)
    *lhooker@saxenawhite.com*
11 SAXENA WHITE P.A.
    150 East Palmetto Park Road, Suite 600
12 Boca Raton, FL 33432
    Telephone:  (561) 394-3399
13 Facsimile:  (561) 394-3382

14 *Attorneys for Co-Lead Plaintiff The City of Birmingham*
15 *Retirement and Relief System and Co-Lead Counsel*

16 [Additional Counsel on Signature Page]

17

18              UNITED STATES DISTRICT COURT

19            NORTHERN DISTRICT OF CALIFORNIA

20

21 | IN RE WELLS FARGO & COMPANY | Lead Case No. 3:16-cv-05541-JST |
    SHAREHOLDER DERIVATIVE
22 LITIGATION                      **CO-LEAD COUNSEL'S MOTION FOR**
                                    **AWARD OF ATTORNEYS' FEES AND**
23                                 **REIMBURSEMENT AWARDS TO CO-**
                                    **LEAD PLAINTIFFS**
24 This Document Relates to:
                                    Date: August 1, 2019
25 ALL ACTIONS.                    Time: 2:00 PM
                                    The Honorable Jon S. Tigar
26                                 Courtroom 9, 19th Floor

27

28

# TABLE OF CONTENTS

Page

NOTICE OF MOTION FOR ATTORNEYS' FEES AND REIMBURSEMENT AWARDS ............................................................................................................ 1

STATEMENT OF ISSUES TO BE DECIDED ................................................................. 1

MEMORANDUM OF POINTS AND AUTHORITIES ..................................................... 2

PRELIMINARY STATEMENT ......................................................................................... 2

ARGUMENT ...................................................................................................................... 4

I.       PLAINTIFFS' FEE REQUEST IS REASONABLE ............................................. 4

         A.       Each of the Factors Relevant to the Fee Analysis Supports the Requested Fee. ............................................................................................ 4

                  1.       Plaintiffs' Counsel have achieved an exceptional result for Wells Fargo and its shareholders. .................................................... 5

                  2.       Plaintiffs' Counsel faced serious substantive and procedural risks. ........... 7

                  3.       Plaintiffs' Counsel devoted more than $22 million on a contingency basis for more than 2 ½ years. ................................. 10

                  4.       That the fee was specifically negotiated by the Parties strongly supports its reasonableness. ..................................................... 12

                  5.       A $68 million fee appropriately accounts for the non-monetary benefits Co-Lead Counsel helped secure. ................................... 13

                  6.       Co-Lead Counsel's fee request is firmly in line with awards from comparable securities class settlements. ................................. 18

         B.       The Fee's Reasonableness Is Further Confirmed by a Lodestar Cross-Check. ..................................................................................................... 20

II.      THE REQUESTED REIMBURSEMENT AWARDS FOR CO-LEAD PLAINTIFFS ARE WELL SUPPORTED AND REASONABLE ................................. 23

CONCLUSION ................................................................................................................. 25

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page**

3

**Cases**

4

*Allapattah Servs., Inc. v. Exxon Corp.*,
  454 F. Supp. 2d 1185 (S.D. Fla. 2006) ..................................................... 19

5

*Bennett v. SimplexGrinnell LP*,
  2015 WL 12932332 (N.D. Cal. Sept. 3, 2015) ................................... 10, 18

6

7

*Blum v. Stenson*,
  465 U.S. 886 (1984) .................................................................................. 22

*Cal. State Teachers' Ret. Sys. v. Alvarez*,
  179 A.3d 824 (Del. 2018) ........................................................................... 9

8

9

*DeStefano v. Zynga, Inc.*,
  2016 WL 537946 (N.D. Cal. Feb. 11, 2016) ............................................ 11

10

*Dyer v. Wells Fargo Bank, N.A.*,
  303 F.R.D. 326 (N.D. Cal. 2014) ....................................................... 21, 25

11

12

*Fischel v. Equitable Life Assurance Soc'y of U.S.*,
  307 F.3d 997 (9th Cir. 2002) .................................................................... 21

*Hefler v. Wells Fargo & Co.*,
  2018 WL 1070116 (N.D. Cal. Feb. 27, 2018) .......................................... 17

13

14

*Hefler v. Wells Fargo & Co.*,
  2018 WL 6619983 (N.D. Cal. Dec. 18, 2018) ................................... passim

15

*Ill. Union Ins. Co. v. Intuitive Surgical, Inc.*,
  188 F. Supp. 3d 978 (N.D. Cal. 2016) ..................................................... 12

16

17

*In re Activision Blizzard, Inc. Stockholder Litig.*,
  124 A.3d 1025 (Del. Ch. 2015) ................................................................ 18

*In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*,
  2006 WL 3378705 (S.D.N.Y. Nov. 16, 2006) ......................................... 19

18

19

*In re Anthem, Inc. Data Breach Litig.*,
  2018 WL 3960068 (N.D. Cal. Aug. 17, 2018) ......................................... 23

20

*In re Atmel Corp. Derivative Litig.*,
  2010 WL 9525643 (N.D. Cal. Mar. 31, 2010) ........................... 12, 15, 16, 17

21

22

*In re Bluetooth Headset Prods. Liab. Litig.*,
  654 F.3d 935 (9th Cir. 2011) ...................................................................... 5

23

*In re Caremark Int'l Inc. Derivative Litig.*,
  698 A.2d 959 (Del. Ch. 1996) .................................................................... 7

24

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
  2016 WL 4126533 (N.D. Cal. Aug. 3, 2016) ............................... 20, 23, 25

25

*In re Cendant Corp., Derivative Action Litig.*,
  232 F. Supp. 2d 327 (D.N.J. 2002) .......................................................... 25

26

27

*In re Checking Account Overdraft Litig.*,
  830 F. Supp. 2d 1330 (S.D. Fla. 2011) .................................................... 19

*In re Compellent Techs., Inc. S'holders Litig.*,
  2011 WL 6382523 (Del. Ch. Dec. 9, 2011) ............................................. 18

28

1

**<u>TABLE OF AUTHORITIES</u>**
(continued)

2

Page

3    *In re Comverse Tech., Inc. Sec. Litig.*,
         2010 WL 2653354 (E.D.N.Y. June 24, 2010) ........................................................ 19

4    *In re High-Tech Emp. Antitrust Litig.*,
5         2015 WL 5158730 (N.D. Cal. Sept. 2, 2015) ........................................................ 24

6    *In re Initial Pub. Offering Sec. Litig.*,
         671 F. Supp. 2d 467 (S.D.N.Y. 2009) .................................................................... 19

7    *In re Linerboard Antitrust Litig.*,
         2004 WL 1221350 (E.D. Pa. June 2, 2004) .......................................................... 19

8    *In re Lithium Ion Batteries Antitrust Litig.*,
         2018 WL 3064391 (N.D. Cal. May 16, 2018) ....................................................... 25

9    *In re Oclaro, Inc. Derivative Litig.*,
10        2014 WL 4684993 (N.D. Cal. Sept. 19, 2014) ............................................. 8, 15, 16

11   *In re Omnivision Techs., Inc.*,
         559 F. Supp. 2d 1036 (N.D. Cal. 2008) ........................................................ 7, 8, 9

12   *In re Oracle Sec. Litig.*,
         852 F. Supp. 1437 (N.D. Cal. 1994) ........................................................... 5, 16, 17

13   *In re OSI Sys., Inc. Derivative Litig.*,
         2017 WL 5642304 (C.D. Cal. May 2, 2017) ......................................................... 25

14   *In re Pac. Enters. Sec. Litig.*,
15        47 F.3d 373 (9th Cir. 1995) .............................................................................. 5, 7

16   *In re Rambus Inc. Derivative Litig.*,
         2009 WL 166689 (N.D. Cal. Jan. 20, 2009) ......................................................... 12

17   *In re TFT-LCD (Flat Panel) Antitrust Litig.*,
         2013 WL 1365900 (N.D. Cal. Apr. 3, 2013) ........................................................ 19

18   *In re Vitamins Antitrust Litig.*,
         2001 WL 34312839 (D.D.C. July 16, 2001) ........................................................ 19

19   *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*,
20        2017 WL 1047834 (N.D. Cal. Mar. 17, 2017) ...................................................... 23

21   *Klein v. Gordon*,
         2019 WL 1751839 (C.D. Cal. Feb. 12, 2019) ....................................................... 13

22   *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Stumpf*,
         2012 WL 12920191 (N.D. Cal. May 17, 2012) ...................................................... 7

23   *Rodman v. Safeway, Inc.*,
         2018 WL 4030558 (N.D. Cal. Aug. 22, 2018) ................................................. passim

24   *Rodriguez v. W. Publ'g Co.*,
25        563 F.3d 948 (9th Cir. 2009) ............................................................................... 24

26   *Shaev v. Baker*,
         2017 WL 1735573 (N.D. Cal. May 4, 2017) .................................................. 7, 8, 11

27   *Smith v. Am. Greetings Corp.*,
         2016 WL 362395 (N.D. Cal. Jan. 29, 2016) ......................................................... 25

28   *Vizcaino v. Microsoft Corp.*,
         290 F.3d 1043 (9th Cir. 2002) ............................................................... 5, 18, 20, 21

- iii -

1

## TABLE OF AUTHORITIES
### (continued)

2

Page

3   *Willner v. Manpower Inc.*,
      2015 WL 3863625 (N.D. Cal. June 22, 2015) ............................................................. 10, 18, 25

4   **Other Authorities**

5   Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee
      Awards*, 7 J. EMPIRICAL LEGAL STUD. 811 (2010) ................................................. 19, 20

6   Cornerstone Research, *Securities Class Action Settlements, 2018 Review and Analysis*
      (2019) ................................................................................................................................. 6

7

    David L. Schwartz, *The Rise of Contingent Fee Representation in Patent Litigation*, 64
8     ALA. L. REV. 335 (2012) ................................................................................................. 12

9   Elizabeth Chamblee Burch, *Financiers As Monitors in Aggregate Litigation*, 87 N.Y.U. L.
      REV. 1273 (2012) ............................................................................................................. 10

10  NERA Economic Consulting, *Recent Trends in Securities Class Action Litigation: 2018
      Full-Year Review* (2019) ................................................................................................. 6

11  Theodore Eisenberg and Geoffrey P. Miller, *Attorney Fees in Class Action Settlements:
12    An Empirical Study*, 1 J. EMPIRICAL LEGAL STUD. 27 (2004) ................................. 20

13  Theodore Eisenberg and Geoffrey P. Miller, *Incentive Awards to Class Action Plaintiffs:
      An Empirical Study*, 53 UCLA L. REV. 1303 (2006) ................................................... 25

14  Theodore Eisenberg, Geoffrey P. Miller, & Roy Germano, *Attorneys' Fees in Class
      Actions: 2009-2013*, 92 N.Y.U. L. REV. 937 (2017) ................................................... 19

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**NOTICE OF MOTION FOR ATTORNEYS' FEES AND REIMBURSEMENT AWARDS**

PLEASE TAKE NOTICE that on August 1, 2019, at 2:00 p.m., Co-Lead Counsel Lieff Cabraser Heimann & Bernstein, LLP and Saxena White P.A. will move the Court, before the Honorable Jon S. Tigar, for an order (1) granting their request for attorneys' fees; and (2) granting $25,000 Reimbursement Awards each to Co-Lead Plaintiffs Fire & Police Pension Association of Colorado ("FPPA") and The City of Birmingham Retirement and Relief System ("Birmingham").

This motion is supported by the (1) accompanying brief; (2) Supplemental Joint Declaration of Richard M. Heimann and Joseph E. White, III ("Supp. Joint Decl."); (3) Declaration of Sean A. Petterson Regarding Settlement Notice; (4) Declarations of Richard M. Heimann of Lieff Cabraser ("Lieff Cabraser Decl."), Joseph E. White, III of Saxena White ("Saxena White Decl."), Daniella Quitt of Glancy Prongay & Murray LLP ("Glancy Decl."), Shane P. Sanders of Robbins Arroyo LLP ("Robbins Arroyo Decl."), and Bruce E. Jameson of Prickett, Jones & Elliott, P.A. ("Prickett Jones Decl."), and exhibits; (5) Declaration of Daniel B. Rehns of Hach Rose Schirripa & Cheverie LLP ("Hach Rose Decl."), and exhibits; (6) Declarations of Brian T. Fitzpatrick and Jeffrey N. Gordon; (7) Declarations of Kevin B. Lindahl of FPPA and James D. Love of Birmingham; (8) previously filed Declarations of Hon. Daniel Weinstein (Ret.) (Dkt. 270-3) and Michael A. Santoro (Dkt. 270-4); and (9) other previous filings and orders in this case.  Pursuant to Local Rule 7-2(c), a proposed order granting this motion will be submitted with Co-Lead Counsel's reply on July 25, 2019, after the deadline for objections.

**STATEMENT OF ISSUES TO BE DECIDED**

1.     Whether the Court should approve as reasonable the Parties' negotiated attorneys' fee award of $68 million to be divided among Plaintiffs' Counsel.[1]

2.     Whether the Court should grant each of the Co-Lead Plaintiffs $25,000, to be paid from Co-Lead Counsel's fees, as Reimbursement Awards for their efforts in pursuing claims on Wells Fargo's behalf and helping achieve this Settlement.

---

[1] Capitalized terms generally retain their meanings from the Settlement Stipulation, except that for purposes of this motion, "Plaintiffs' Counsel" refers to Co-Lead Counsel, Glancy, Robbins Arroyo, and Prickett Jones, and "Defendants" refers collectively to the individuals referenced in the Stipulation as the Officer Defendants and the Director Defendants.

1
2

# MEMORANDUM OF POINTS AND AUTHORITIES

## PRELIMINARY STATEMENT

3     For more than 2 ½ years, Co-Lead Plaintiffs and Plaintiffs' Counsel vigorously prosecuted

4  this derivative action for the benefit of Wells Fargo and its shareholders.  These extensive

5  litigation efforts culminated in a Settlement that includes a monetary payment of $240 million as

6  well as valuable corporate governance reforms ("Reforms") and compensation forfeitures and

7  reductions ("Clawbacks"), which the Parties value at $80 million, for a total Settlement value of

8  $320 million.  Co-Lead Counsel now petition this Court for an award of attorneys' fees of $68

9  million and approval of Reimbursement Awards for Co-Lead Plaintiffs.  All of the considerations

10  courts typically evaluate in assessing fees support this request.

11     Of primary importance, Plaintiffs' Counsel have achieved an exceptional recovery for

12  Wells Fargo.  The $240 million cash component alone far surpasses any other insurance-funded

13  resolution of a shareholder derivative action and reflects a percentage of Wells Fargo's estimated

14  damages that is, even under the most-conservative scenario, more than double the typical

15  recovery in comparably sized securities class cases.  Additionally, the Reforms and Clawbacks

16  provide meaningful, continuing benefits to Wells Fargo and its shareholders, for which the

17  Company attributes $80 million to this case.

18     Plaintiffs' Counsel achieved these results in the face of considerable risks, chief among

19  them the challenge of prevailing at trial on notoriously difficult director oversight, or *Caremark*,

20  claims under Delaware law.  Equally uncertain was Plaintiffs' ability to establish that Wells Fargo

21  suffered damages tied to Defendants' breaches of fiduciary duty or violations of federal securities

22  laws.  Those challenges were compounded by the serious risk that favorable rulings by this Court

23  could be undermined, due to collateral estoppel principles, by adverse dispositive rulings in

24  related derivative actions also brought on Wells Fargo's behalf.  Indeed, that risk *materialized*

25  shortly after this Court's ruling that Plaintiffs sufficiently pleaded demand futility, when the court

26  presiding over the California State Derivative Action held the plaintiffs there did not.  Given the

27  potentially preclusive impact of that ruling, and the possibility of similar decisions in related

28  derivative cases in Delaware, Co-Lead Counsel moved to intervene, stay, or dismiss those cases.

1    While Co-Lead Counsel's efforts in the California and Delaware proceedings—which spanned

2    more than 14 months—ultimately led to the resolution of those claims, in the meantime the

3    existential threat posed by those cases subjected Plaintiffs' Counsel to the very real prospect of

4    non-recovery.

5            Further, Plaintiffs' Counsel expended significant resources in litigating and attempting to

6    resolve Wells Fargo's claims, with no guarantee of compensation.  After investigating claims

7    against Defendants and filing a detailed consolidated amended complaint, Co-Lead Counsel

8    overcame two rounds of motions to dismiss; conducted voluminous document discovery in

9    anticipation of more than 40 depositions, summary judgment motions, and trial; protected Wells

10   Fargo's claims against collateral attack; and engaged in an extended, arm's-length mediation

11   process before the Honorable Daniel Weinstein (Ret.) and Jed Melnick, Esq., including seven

12   mediation sessions as well as numerous submissions and presentations on liability and damages.

13   In all, Plaintiffs' Counsel devoted more than $22.4 million on a contingency basis, in addition to

14   more than $1 million in costs for which they do not seek reimbursement, and will devote

15   additional uncompensated time in finalizing this Settlement, including ensuring final judgments

16   are entered in the related derivative actions and addressing inquiries from Wells Fargo

17   shareholders.  Respectfully, their willingness to take on that risk should be rewarded, and the fee

18   percentage they request is at or below the range even a sophisticated entity like Wells Fargo could

19   be expected to pay for an individually negotiated contingent representation.

20           Indeed, Wells Fargo *did* negotiate the fee here.  After the Parties came to agreement on

21   the other terms of the Settlement, they engaged in separate negotiations—overseen by the

22   Mediators—resulting in the Parties' agreement that Co-Lead Counsel would seek up to $68

23   million in fees.  That agreement should be accorded significant weight, particularly as the fee

24   comes entirely from Wells Fargo and does not, as in a class case, detract from others' recovery.

25           The fee request is also reasonable under Ninth Circuit jurisprudence and when compared

26   to awards in similarly sized settlements.  A $68 million award represents 21.25% of the $320

27   million total Settlement value, below the Ninth Circuit's 25% "benchmark."  And even were the

28   Court to decline to adopt *any value* for the Reforms and Clawbacks—contrary to the opinions of

Plaintiffs' corporate governance experts, Professors Jeffrey Gordon and Michael Santoro—$68 million would represent 28.33% of the Settlement's $240 million cash component.  As Professor Brian Fitzpatrick opines, based on his widely cited study of attorneys' fees in other cases as well as his analysis of this litigation and Settlement, that modest upward adjustment from the 25% benchmark would be well justified.

The requested fee's reasonableness is further confirmed by a "lodestar cross-check."  That exercise illustrates the effectiveness of Co-Lead Counsel's pursuit of Wells Fargo's claims and their attention to further protecting the Company's interests by streamlining discovery, avoiding duplication of efforts among counsel, and negotiating the simultaneous resolution of all derivative litigation based on the Improper Sales Practices.  Co-Lead Counsel were, in fact, *conservative* in safeguarding against overbilling: among other things, they ceased substantive casework upon reaching an agreement in principle to settle, more than two months before the Stipulation was executed.  And the 3.03 lodestar multiplier corresponding to the $68 million fee falls well within the presumptively acceptable range in this Circuit.

Finally, Co-Lead Counsel's request for $25,000 Reimbursement Awards to each of the Co-Lead Plaintiffs is reasonable given their extraordinary service to Wells Fargo, which helped achieve this historic Settlement.  FPPA's and Birmingham's representatives closely participated in every aspect of this case, collectively devoting more than 400 hours of time they otherwise would have spent on other work for those institutions.  Unlike in a class case, moreover, these awards will not lessen other shareholders' recovery, but rather come from *Co-Lead Counsel's fee*, and they represent a miniscule percentage of even just the $240 million cash recovery.  As with Plaintiffs' Counsel's requested fee, these awards are warranted and should be approved.

## ARGUMENT

## I.     PLAINTIFFS' FEE REQUEST IS REASONABLE

### A.     Each of the Factors Relevant to the Fee Analysis Supports the Requested Fee.

Because the benefit achieved "is easily quantified in common-fund settlements," courts can "award attorneys a percentage of the common fund in lieu of the often more time-consuming task of calculating the lodestar."  *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 942

1  (9th Cir. 2011).[2]  The Ninth Circuit instructs that "[t]wenty-five percent is the benchmark that

2  district courts should award in common fund cases."  *In re Pac. Enters. Sec. Litig.*, 47 F.3d 373,

3  379 (9th Cir. 1995).  Courts typically adjust the 25% base award up or down depending on:

> the extent to which class counsel achieved exceptional results for
> the class, whether the case was risky for class counsel, whether
> counsel's performance generated benefits beyond the cash . . . fund,
> the market rate for the particular field of law (in some
> circumstances), the burdens class counsel experienced while
> litigating the case (e.g., cost, duration, foregoing other work), and
> whether the case was handled on a contingency basis.

8  *Hefler v. Wells Fargo & Co.*, 2018 WL 6619983, at *12-13 (N.D. Cal. Dec. 18, 2018) (Tigar, J.)

9  (ellipsis in original).[3]  These factors strongly support a $68 million award to Plaintiffs' Counsel.[4]

### 1.     Plaintiffs' Counsel have achieved an exceptional result for Wells Fargo and its shareholders.

12  "The first and 'most critical factor [in determining an attorneys' fee] is the degree of

13  success obtained.'"  *Hefler*, 2018 WL 6619983, at *13 (alteration in original).  This Court has

14  recognized "the law appropriately provides for some upward adjustment [from the 25%

15  benchmark] where the results achieved are significantly better than the norm."  *Rodman v.*

16  *Safeway, Inc.*, 2018 WL 4030558, at *3 n.3 (N.D. Cal. Aug. 22, 2018).  The numbers here speak

17  for themselves: the $240 million monetary component alone is the largest-ever insurer-funded

18  cash derivative recovery by more than $100 million (PA Mot. at 16-17), as well as the second-

19  largest overall cash derivative recovery, and represents (1) 48% of the $500 million in D&O

---

[2] Unless otherwise indicated, all emphasis in this brief has been added, and all internal citations and quotation marks have been omitted.

[3] Because Plaintiffs' claims arise under the federal securities laws and Delaware law, both federal common law and Delaware principles apply to the fee analysis.  *See Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047 (9th Cir. 2002) ("Because Washington law governed the claim, it also governs the award of fees.").  In any event, "Delaware and federal law are in accord on the issue of derivative counsel fees."  *In re Oracle Sec. Litig.*, 852 F. Supp. 1437, 1445 (N.D. Cal. 1994).

[4] Co-Lead Counsel were assisted in connection with this case, under limited circumstances, by Glancy, Robbins Arroyo, and Prickett Jones.  *See* Prelim. Approval Mot. ("PA Mot.") (Dkt. 270) 23 n.28.  Additionally, as part of the Settlement, Co-Lead Counsel have agreed to allocate 5% of the awarded fee to a group of additional law firms (identified in the Stipulation, at ¶ V(37)) that pursued derivative claims in Delaware Chancery Court that are also being released under the Settlement (collectively, "Delaware Derivative Counsel").  While the Hach Rose Declaration summarizes (at ¶¶ 8-29 & Exs. 1-2) the time and work Delaware Derivative Counsel devoted to their cases, only time billed by Co-Lead Counsel, Glancy, Robbins Arroyo, and Prickett Jones is being submitted for purposes of calculating the lodestar for this fee application.

insurance available to satisfy a judgment; (2) 21.8% of the estimated $1.1 billion in out-of-pocket

costs Plaintiffs assert Wells Fargo incurred due to the Improper Sales Practices; and (3) 9.6% of

the low-end estimate ($2.5 billion), and 6.9% of the high-end estimate ($3.5 billion), of total

damages including the Company's actual and anticipated lost income, which are more difficult to

quantify.  *See* Supp. Prelim. Approval Br. (Dkt. 272) at 3; Prelim. Approval Order ("PA Order")

(Dkt. 274) at 11 (noting "the particular difficulties of establishing the larger category of lost

income damages").[5]  Further, the $320 million total Settlement value represents between 9.1%

and 29.1% of Wells Fargo's estimated damages.  The percentage recovery is exceptional by any

of these measures, particularly considering that fewer than 10 derivative actions in history have

settled for over $100 million.  *See* Final Approval Br. at 22 n.9.

The Settlement is also extraordinary in comparison to securities class actions.  According

to one study, for example, the median percentage recovery in securities class cases from 1996 to

2018 involving investor losses between $1 billion and $4.999 billion was 1.2%,[6] and another

study found the median recovery achieved in settlements from 2009 to 2017 in securities class

cases of over $1 billion in "simplified tiered damages" was 2.7%, and was 2.0% in 2018.[7]  Thus,

measured as a percentage of Wells Fargo's total estimated damages, the Settlement is at minimum

more than double, and potentially *many times greater* than, the median percentage recovery in

comparable securities class cases.

Even treating Wells Fargo's recovery as $240 million less Plaintiffs' Counsel's $68

million fee (*see* PA Order at 11) would result in $172 million, representing 15.6% of the

estimated out-of-pocket damages and 4.9% of the highest estimate of total potential damages.

---

[5] While the Court has noted it "does not have a clear picture of the Individual Defendants' financial resources," which "would also be available to pay a potential judgment" (PA Order at 10 n.6), even assuming they could contribute $500 million to a judgment—surely an inflated number—the $240 million cash recovery would represent 24% of the amount Plaintiffs potentially could recover at trial given the insurance limit.

[6] NERA Economic Consulting, *Recent Trends in Securities Class Action Litigation: 2018 Full-Year Review*, at 35 (2019), available at https://www.nera.com/content/dam/nera/publications/2019/PUB_Year_End_Trends_012819_Final.pdf.

[7] Cornerstone Research, *Securities Class Action Settlements, 2018 Review and Analysis*, at 6 (2019), available at https://www.cornerstone.com/Publications/Reports/Securities-Class-Action-Settlements-2018-Review-and-Analysis.

1    Under that analysis, Wells Fargo would recover as much as *13 times more* in monetary relief than

2    the median recovery rate in similarly sized securities class cases.  Co-Lead Counsel have, in short,

3    achieved a recovery far beyond the norm, and should be compensated accordingly.  *See, e.g.*, *In*

4    *re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1046 (N.D. Cal. 2008) ($13.75 million

5    recovery of "approximately 9% of the possible damages," which was "more than triple the

6    average recovery in securities class action settlements," constituted "a substantial achievement on

7    behalf of the class" and "weigh[ed] in favor of granting the requested 28% fee").

8              **2.      Plaintiffs' Counsel faced serious substantive and procedural risks.**

9              "The risk that further litigation might result in Plaintiffs not recovering at all, particularly

10   a case involving complicated legal issues, is a significant factor in the award of fees."  *Id.* at

11   1046-47.  Reflecting the Ninth Circuit's observation that "derivative lawsuits are rarely

12   successful," *Pac. Enters.*, 47 F.3d at 378, Plaintiffs' Counsel confronted significant hurdles to

13   obtaining any recovery.

14             Co-Lead Counsel first had to surpass *two* rounds of motions to dismiss.  Most critically, to

15   satisfy the exacting standard for pleading demand futility, Plaintiffs needed to allege with

16   particularity "that the directors *knew* they were not discharging their fiduciary obligations or that

17   the directors demonstrated a *conscious* disregard for their responsibilities."  *Shaev v. Baker*, 2017

18   WL 1735573, at *9 (N.D. Cal. May 4, 2017) ("*Wells Fargo I*") (emphasis in original).  Those

19   claims rest on "possibly the most difficult theory in corporation law upon which a plaintiff might

20   hope to win a judgment," *In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959, 967 (Del. Ch.

21   1996), especially given that Wells Fargo's charter "exculpates its Directors from liability unless

22   the directors breached their duty of loyalty or the conduct involved bad faith, intentional

23   misconduct, or a knowing violation of the law."  *Wells Fargo I*, 2017 WL 1735573, at *10.

24             Co-Lead Counsel's early success by no means guaranteed the same result later in the

25   litigation.  Defendants would have challenged demand futility again (as well as other aspects of

26   Plaintiffs' claims) at summary judgment.  *See Pirelli Armstrong Tire Corp. Retiree Med. Benefits*

27   *Trust v. Stumpf*, 2012 WL 12920191, at *1 & n.1 (N.D. Cal. May 17, 2012) ("disagree[ing]" with

28   plaintiff's contention "that the individual defendants cannot relitigate the issue of demand futility

1   on summary judgment").  At trial, the factfinder would—unlike at the pleading stage—weigh the

2   evidence for and against liability, as well as whether demand on the Board would have been

3   futile.  *See Omnivision*, 559 F. Supp. 2d at 1047 (observing that in the previous five years, "only

4   two securities class action lawsuits in this district ha[d] resulted in verdicts, both of which were

5   for defendants," and that "[n]ationwide, Plaintiffs ha[d] won only three of eleven such cases to

6   reach verdicts since 1996"); *In re Oclaro, Inc. Derivative Litig.*, 2014 WL 4684993, at *2 (N.D.

7   Cal. Sept. 19, 2014) (the "significant difficulty" in demonstrating demand futility "would arise in

8   both motion practice and at trial," and "[t]he powerful presumption created by the business

9   judgment rule would pose an additional hurdle to the derivative plaintiffs' fiduciary duty claim").

10          Among other things, Defendants would point to Wells Fargo's purported efforts to address

11   the Improper Sales Practices during the Relevant Period, including (1) establishing working

12   groups, as well as engaging third-party consultants, to identify, analyze, and rectify sales practices

13   violations; (2) conducting town hall meetings with employees to encourage the reporting of sales-

14   related misconduct; and (3) encouraging reporting of the progress of sales practice remediation

15   initiatives.  While Plaintiffs would have argued those actions were illusory and inadequate based

16   on facts developed in discovery, there was a palpable risk the jury could find the evidence failed

17   to demonstrate Defendants' knowledge or conscious disregard of wrongdoing.

18          Plaintiffs' Counsel also faced "the inherent uncertainties of trying securities fraud cases

19   and the demanding pleading standards of the PSLRA," which applied to Plaintiffs' federal

20   securities claims.  *Hefler*, 2018 WL 6619983, at *13.  Those risks were magnified by the

21   peculiarities of a company asserting securities claims against its senior executives, who, in typical

22   securities cases, are the conduits through which *the company itself* is subject to liability.  The

23   extraordinary nature of those derivative claims is borne out in divisions in the caselaw regarding,

24   for example, the company's ability to demonstrate reliance on statements by its own officers.  *See*

25   *Wells Fargo I*, 2017 WL 1735573, at *17-18 (noting issue but holding Plaintiffs sufficiently

26   pleaded reliance).  While Plaintiffs maintain they had the better of those arguments, a factfinder

27   might ultimately have determined the evidence did not support their allegations.

28

1    Even if a jury found Defendants liable, establishing a causal connection between their

2    violations of law and damages to Wells Fargo posed a serious challenge.  Defendants would

3    attempt to demonstrate a lack of proximate causation with respect to out-of-pocket damages based

4    on regulatory fines, penalties, and other payments by the Company, claiming those costs related

5    to alleged misconduct before the Relevant Period, resulted from actions distinct from the

6    Improper Sales Practices, or constituted unrecoverable "business" expenses.  Defendants would

7    further argue Wells Fargo did not in fact suffer any lost business or reputational harm—which, in

8    any event, are difficult to quantify—as evidenced by the Company's increasing levels of reported

9    profitability following the revelation of the Improper Sales Practices.  They would also point to

10   general market fluctuations, the independent conduct of Wells Fargo employees, or unrelated

11   allegations of misconduct at the Company as alternative or superseding causes of the asserted

12   damages.  Establishing damages thus would have likely turned on a "battle of the experts," an

13   inherently risky proposition.  *See Omnivision*, 559 F. Supp. 2d at 1047 (noting "[t]he parties'

14   estimates of possible damages varied dramatically, such that if Plaintiffs prevailed on liability but

15   Defendants prevailed on damages, the reward could have been even smaller").

16   And, even if Plaintiffs overcame the numerous hurdles to establishing liability and

17   damages, a favorable verdict "would almost certainly have had to be defended on appeal."

18   *Hefler*, 2018 WL 6619983, at *13.  Given the uncertainty of victory and the *certainty* of delay in

19   attempting to secure it, Plaintiffs' Counsel should be rewarded for achieving this excellent

20   recovery for Wells Fargo without subjecting it to the cost of years of additional litigation.

21   Finally, because plaintiffs in related derivative actions "share an identity of interest in

22   seeking to prosecute claims by and in the right of . . . the corporation," *Cal. State Teachers' Ret.*

23   *Sys. v. Alvarez*, 179 A.3d 824, 847 (Del. 2018), a dispositive ruling adverse to plaintiffs in the

24   California State Derivative Action or the Delaware Derivative Actions could have precluded Co-

25   Lead Plaintiffs from pursuing Wells Fargo's claims in this case—notwithstanding this Court's

26   favorable (but not final) rulings at the pleading stage.  *See id.* at 855 (derivative plaintiffs in

27   Delaware Chancery proceedings were collaterally estopped from continuing with their case due to

28   adverse demand futility ruling in related federal derivative action).  Indeed, that risk *materialized*

less than a week after this Court's decision on demand futility, when the court overseeing the California State Derivative Action held plaintiffs there failed to sufficiently allege demand futility (though it allowed leave to amend). Given the potentially preclusive impact of a final adverse judgment in those proceedings, Co-Lead Plaintiffs moved to intervene in and stay the case, which the state court ultimately granted. *See* Supp. Joint Decl. ¶ 55-63. The risk of collateral attack persisted, however, given the pendency of the Delaware Derivative Actions. To protect Wells Fargo's interests, Co-Lead Counsel moved expeditiously to intervene and stay those cases, ultimately achieving complete stays or voluntary dismissals. *Id.* ¶¶ 73-85. In all, Co-Lead Counsel's efforts with respect to the California and Delaware state cases spanned more than 14 months and required at least 13 briefs on behalf of Co-Lead Plaintiffs, as well as Co-Lead Counsel's participation in at least 17 hearings. *Id.* ¶ 51. Co-Lead Counsel also achieved the consolidation or secured the dismissal of, or otherwise immunized this case from the potential negative effects of, tag-along derivative actions filed in this District. *Id.* ¶¶ 38-49. Faced with those procedural challenges, along with the hurdles to obtaining and preserving a favorable verdict, Plaintiffs' Counsel achieved a high-value Settlement, which also affords Wells Fargo global peace with respect to derivative claims based on the Improper Sales Practices. *See* Stip. ¶ V(26). The requested fee is commensurate with those efforts and results.

### 3.     Plaintiffs' Counsel devoted more than $22 million on a contingency basis for more than 2 ½ years.

Plaintiffs' Counsel's fee should "take into account the risk of representing . . . Plaintiffs on a contingency basis over a period of [2 ½] years." *Bennett v. SimplexGrinnell LP*, 2015 WL 12932332, at *6 (N.D. Cal. Sept. 3, 2015) (Tigar, J.). Attorneys' stakes in contingency cases also do not exist in a vacuum, but rather comprise "a portfolio of risk," such that "the winning cases finance not only their own costs, but the costs of the losing cases as well." *Willner v. Manpower Inc.*, 2015 WL 3863625, at *6 (N.D. Cal. June 22, 2015) (Tigar, J.) (quoting Elizabeth Chamblee Burch, *Financiers As Monitors in Aggregate Litigation*, 87 N.Y.U. L. REV. 1273, 1290 (2012)). These considerations support a $68 million award.

1    Co-Lead Counsel (and other Plaintiffs' Counsel working under their direction) devoted

2  more than 48,000 hours to (1) thoroughly investigating the relevant claims; (2) filing a 189-page

3  consolidated complaint with an "abundance of particularized allegations," *Wells Fargo I*, 2017

4  WL 1735573, at *15; (3) defeating two rounds of motions to dismiss; (4) securing Wells Fargo's

5  claims against the risk of collateral attack based on the related state court cases; (5) consolidating

6  and coordinating related federal actions with this case; (6) obtaining and processing over 3.5

7  million pages of documents produced by Defendants, Wells Fargo, and third-parties, more than

8  1.1 million pages of which were reviewed and analyzed at the time the Parties reached an

9  agreement in principle to settle this case; (7) reviewing tens of thousands of pages of documents

10  from other civil and regulatory proceedings, public reports, press coverage, and congressional

11  testimony related to the Improper Sales Practices; (8) researching and preparing for as many as 40

12  anticipated depositions; (9) consulting with experts regarding liability and damages; and

13  (10) negotiating this Settlement.  Supp. Joint Decl. ¶¶ 22-35; 38-86; 92-94; 97-134; 135-55.

14  Throughout the litigation and mediation process, Plaintiffs' Counsel faced defense counsel at the

15  top of their profession from highly respected firms.  *See DeStefano v. Zynga, Inc.*, 2016 WL

16  537946, at *17 (N.D. Cal. Feb. 11, 2016) ("The quality of opposing counsel is also relevant to the

17  quality and skill that class counsel provided.").  And while "the two-plus year lifespan of this

18  litigation is not as lengthy as some other cases," Plaintiffs' Counsel "bore a heavy financial

19  burden in expending substantial resources—a claimed lodestar of over $[22] million—on a

20  contingency basis," *Hefler*, 2018 WL 6619983, at *13.  That is in addition to the more than $1

21  million in costs Plaintiffs' Counsel have incurred, for which they do not seek reimbursement, as

22  well as further (uncompensated) time Co-Lead Counsel will devote to continuing to correspond

23  with Wells Fargo shareholders and helping effectuate the dismissal of the California State

24  Derivative Action and the Delaware Derivative Actions, without which this Settlement will not

25  become final.  *See* Stip. ¶¶ V(40-42).  Plaintiffs' Counsel's requested compensation is appropriate.

26

27

28

**4.      That the fee was specifically negotiated by the Parties strongly supports its reasonableness.**

That Co-Lead Counsel's proposed fee "is the product of arm's-length negotiation between counsel highly experienced in shareholder derivative actions and agreed upon only after the other terms of the Settlement were negotiated" supports its reasonableness.  *In re Rambus Inc. Derivative Litig.*, 2009 WL 166689, at *4 (N.D. Cal. Jan. 20, 2009); *see also* Stip. ¶ V(44). Significantly, those negotiations were overseen by the Mediators, with Judge Weinstein attesting that the requested fee "is fair and reasonable in light of the substantial benefit conferred upon Wells Fargo and the effort expended by Co-Lead Counsel in achieving it."  Weinstein Decl. ¶ 19.

Those negotiations bear even further relevance than they might in a securities class settlement, as Plaintiffs' Counsel's fee comes directly from *Wells Fargo*, not from the recoveries of absent class members.  Wells Fargo has determined the amount it is willing to pay for Plaintiffs' Counsel's services, which merits strong consideration.  *See In re Atmel Corp. Derivative Litig.*, 2010 WL 9525643, at *13 (N.D. Cal. Mar. 31, 2010) ("The parties first agreed on a gross settlement of $9.65 million and the implementation of the new corporate governance rules, and only then did they allocate the attorneys' fees.  A court should refrain from substituting its own value for a properly bargained-for agreement.").[8]  Further, as Professor Fitzpatrick observes, "it is well known that standard contingency-fee percentages in individual litigation are *at least* 33%," and even sophisticated clients like Wells Fargo might pay at least 28%.  Fitzpatrick Decl. ¶ 30 (emphasis in original) (citing, *inter alia*, David L. Schwartz, *The Rise of Contingent Fee Representation in Patent Litigation*, 64 ALA. L. REV. 335, 360 (2012)).  The fee negotiated here is consistent with, or even more favorable than, those typical arrangements.

Additionally, as of May 21, 2019, Wells Fargo and Co-Lead Counsel disseminated notice in accordance with the PA Order.  Petterson Decl. ¶ 5.  The approval of Wells Fargo

---

[8] This Court and others have cited *Atmel* (*see, e.g.*, PA Order at 11) notwithstanding the decision's notation that it is "not designated for publication and may not be cited."  2010 WL 9525643, at n.1.  Regardless of *Atmel*'s precedential value, Co-Lead Counsel submit its reasoning is persuasive here.  *See also Ill. Union Ins. Co. v. Intuitive Surgical, Inc.*, 188 F. Supp. 3d 978, 984 & n.7 (N.D. Cal. 2016) (Tigar, J.) ("agree[ing] with [the] conclusion" of decision designated as uncitable, "as applied to the facts [of the case at bar]," and further noting Court was "not relying on [the decision] for its precedential value" and Court's ruling did not turn on that decision).

- 12 -

shareholders, including Co-Lead Plaintiffs and other "institutional investors who presumably had the means, the motive, and the sophistication to raise objections," weighs "in favor of approval" of the fee.  *Hefler*, 2018 WL 6619983, at *15.[9]

### 5.  A $68 million fee appropriately accounts for the non-monetary benefits Co-Lead Counsel helped secure.

Plaintiffs' Counsel's fee should also reflect Wells Fargo's attribution of $80 million to this case for the Reforms and Clawbacks, given the case's "significant" role in achieving those benefits.  *See* Stip. Ex. A at 4, 8; Stip. Ex. B at 4.  But the fee request is nonetheless reasonable even if the Court declines to assign a specific valuation to the Reforms and Clawbacks or determine precisely how much credit Co-Lead Counsel deserve for them.

*First*, the record strongly supports assigning $80 million in value to the Reforms and Clawbacks, for a total Settlement value of $320 million.  This valuation resulted from extensive negotiations between sophisticated parties, aided by the Mediators, which should be credited. *See, e.g.*, Stip. at 9; Weinstein Decl. ¶ 12 ("The mediator's proposal placed a combined value of $80 million on the non-monetary Corporate Governance Reforms and Clawbacks."); *Klein v. Gordon*, 2019 WL 1751839, at *2 (C.D. Cal. Feb. 12, 2019) (noting with approval "the settlement agreement . . . acknowledges that [the] derivative action contributed, at least in part, to the initial corporate reforms adopted by Opus which are aimed at preventing future misconduct").

There can be little question regarding the $60 million Wells Fargo attributes to this case from the Clawbacks (out of a total $122.5 million), Stip. Ex. B at 4, which are readily quantifiable.  Additionally, corporate governance experts Jeffrey Gordon and Michael Santoro attest to the Reforms' value.  Indeed, Professor Gordon opines "[t]his may be the rare settlement of derivative litigation in which the value of the governance reforms exceeds even a substantial out-of-pocket recovery."  Gordon Decl. ¶ 20.  He classifies the creation of a Conduct Management Office ("CMO") as "[a]mong the most important Reforms."  *Id.* ¶ 29.  In particular, locating the CMO outside the line businesses that are subject to its monitoring "is an important element in creating a credible compliance structure," as it protects against the pressure

---

[9] Shareholders have until July 11, 2019 to file objections, and Co-Lead Counsel will respond by July 25, 2019 to any objections.

1    compliance employees otherwise might feel "to be 'team players.'"  *Id.*; *see also* Santoro Decl.

2    ¶¶ 20-21 (enhancing the Risk Committee's oversight responsibilities and creating the CMO

3    "introduc[e] a previously nonexistent locus of responsibility and means of exercising managerial

4    control over risk and compliance issues").

5         Professor Gordon also highlights "the reshaping of several board committees that will

6    result in much deeper board oversight of 'compliance' as a distinct category of business issues

7    and much deeper board oversight of business conduct and culture that is often the source of

8    compliance problems."  Gordon Decl. ¶ 33.  He notes the establishment of the "Compliance"

9    subcommittee of the Risk Committee, amendment of the Risk Committee's charter to include

10   oversight of the "risk" components of the Company's culture, and expansion of the Human

11   Resources Committee's responsibilities to include training in ethics and business conduct as well

12   as the interaction of incentive compensation and risk management—issues "at the heart of the

13   Improper Sales Practices."  *Id.*  And separating the roles of CEO and Board Chairman "may be a

14   critical element in assuring that compliance failures are squarely and promptly addressed by the

15   Board," given that "[t]he high-powered stock-based compensation incentives of a CEO may lead

16   him/her to downplay compliance problems with strategies that generate outsize returns," whereas

17   "the reputation-focused perspective of a separate chair is likely to lead to a quicker focus on

18   compliance questions as they emerge."  *Id.* ¶ 32; *see also* Santoro Decl. ¶ 27.

19        Additionally, Professor Santoro explains prohibiting directors from serving on more than

20   three other boards "gives due recognition to the level of time, effort and attention required to be

21   an effective fiduciary of such a large and complex company as Wells Fargo."  Santoro Decl. ¶ 29.

22   Engaging former SEC Chair Mary Jo White to facilitate the Board's annual evaluation process,

23   moreover, "provides a layer of assurance for shareholders, employees, customers, and the public

24   that complacency will not settle in over the reconstituted Board."  *Id.* ¶ 40.  He further opines that

25   ending product sales goals in Wells Fargo's retail banking business, implementing new controls

26   to help ensure new accounts have been authorized, and launching a new compensation plan in the

27   Company's Retail Bank (as well as raising the minimum hourly wage for U.S.-based employees

28

MOTION FOR ATTORNEYS' FEES AND
REIMBURSEMENT AWARDS
LEAD CASE NO. 3:16-cv-05541-JST

1   and enhancing benefits) "appropriately and adequately address the compensation incentives that

2   contributed to the Improper Sales Practices. *Id.* ¶¶ 49-50.

3          Professor Santoro concludes the Reforms "are sufficient to prevent the recurrence of the

4   Improper Sales Practices or similar misconduct in the Company's Community Bank sector" and

5   "provide value in helping restore confidence and trust in the Company which in turn could have a

6   substantial impact on its current economic performance and long-term sustainability." *Id.* ¶ 53.

7   He accordingly opines that the $20 million value the Parties ascribe to the Reforms "is eminently

8   reasonable." *Id.* ¶ 54.  Professor Gordon likewise concludes "that the Reforms will deliver

9   substantial value for Wells Fargo and its shareholders and that Co-Lead Plaintiffs' efforts in

10  promoting these reforms have thus created substantial value for Wells Fargo and its shareholders,"

11  and therefore, "the $20 million attributed to Co-Lead Plaintiffs in the Proposed Settlement is well

12  within the range of value-creation-in-fact, perhaps even at the low end."  Gordon Decl. ¶ 38.

13  Indeed, attempting to quantify the Reforms "understates the[ir] importance," given the

14  "existential" threat Wells Fargo could face in the event of "a recurrence of a major compliance

15  failure." *Id.* ¶ 24.  These experts' opinions regarding the value of the Reforms should be

16  accorded substantial weight. *See, e.g.*, *Atmel*, 2010 WL 9525643, at *11 (crediting declaration by

17  Professor Gordon, who "opine[d] that the value of [the corporate reforms] is 'significant' because

18  they prevent a 'recurrence of the particular governance failures that led to the need for the

19  restatement' and 'improve corporate governance in a way that will promote long term shareholder

20  value'") (second alteration in original).

21         *Second*, the record strongly supports finding the Reforms and Clawbacks were at least "*a*

22  proximate result of th[is] derivative lawsuit[]." *Oclaro*, 2014 WL 4684993, at *4.  As Professor

23  Fitzpatrick observes, Wells Fargo's acknowledgment that facts alleged in this case were

24  "significant factors" in implementing the Reforms and Clawbacks (Stip. Ex. A at 4, Stip. Ex. B at

25  4) "can only decrease Wells Fargo's take from this settlement by increasing plaintiffs' counsel's

26  fee percentage."  Fitzpatrick Decl. ¶ 28.  Accordingly, "unlike the class action situation where a

27  defendant might be indifferent to what the fee percentage is and feel free to make all sorts of

28  statements to facilitate settlement," Professor Fitzpatrick "put[s] more credence in Wells Fargo's

- 15 -

1   concession in a derivative action as it comes with a substantial financial price." *Id.* Additionally,

2   Wells Fargo stipulates that "[p]rior to [its] implementation of several of the[] . . . [R]eforms, the

3   Parties engaged in mediation efforts during which Co-Lead Plaintiffs proposed a resolution of this

4   matter that included proposals of certain of these corporate governance reforms." Stip. Ex. A at

5   8; *see also* Weinstein Decl. ¶ 12. Wells Fargo's representations are a far cry from "hearsay

6   testimony" in an "attorney declaration," as in *Oclaro*, 2014 WL 4684993, at *4; *see also Atmel*,

7   2010 WL 9525643, at *11 (noting reforms "were all adopted after the [] derivative actions were

8   filed" and Atmel made "representations . . . in the record that the filing of the actions and later

9   settlement negotiations were material factors in the implementation of the measures").

10       This Court's statement that "[o]ther causative factors such as the [regulatory]

11   investigation[s], the class action and public scrutiny" may have contributed to Wells Fargo's

12   implementation of the Reforms and Clawbacks," PA Order at 10 (alterations in original) (quoting

13   *Oracle*, 852 F. Supp. at 1447), is not inconsistent with the Parties' agreement that "significant"—

14   not *sole*—credit belongs to Co-Lead Counsel. And the cases cited in the PA Order bear little, if

15   any, resemblance to this one. The corporate reforms in *Oclaro*, for example, were "exceedingly

16   modest," including one that "require[d] the board to *continue* to comply with NASDAQ's

17   requirements regarding the board's independence" and another that plaintiffs failed to show was

18   "likely to prevent the kind of alleged wrongdoing in th[at] case." 2014 WL 4684993, at *2, *3

19   (emphasis in original). The reforms, which resulted from "a one-day mediation and several

20   follow-up discussions," also did not "provide the relief prayed for in the complaint or moot any of

21   the claims." *Id.* at *4, *5. Additionally, "an actively-litigated Securities Class Action led the

22   derivative actions, which were stayed for years," rendering it "far more likely that, if anything,

23   the voluntary reforms were proximately caused by the actively litigated Securities Class Action

24   rather than the stayed Federal [derivative] Action." *Id.* at *4. In *Oracle*, moreover, Judge Walker

25   criticized the "fecklessly prosecuted derivative action," which rendered other causative factors

26   "considerably more compelling." 852 F. Supp. at 1447.

27       In stark contrast to those cases, Wells Fargo implemented these important Reforms and

28   Clawbacks while this consolidated action was in the throes of litigation. *See* Stip. Ex. A at 4-8.

- 16 -

1    These measures resulted, moreover, from months of intensive negotiations, including seven

2    mediation sessions.  *See* Supp. Joint Decl. ¶¶ 135-55.  Certain of the Reforms also reflect the

3    express relief sought in Plaintiffs' consolidated complaint, which requested (in addition to

4    monetary relief) that the judgment direct Wells Fargo to, among other things, allow for a vote on

5    proposals to strengthen (1) "Board oversight and supervision of Wells Fargo's Community

6    Banking sales practices," (2) the Company's "disclosure controls to ensure material information

7    is adequately and timely disclosed to the SEC and the public," and (3) "the Board's supervision of

8    operations."  Consol. Compl. (Dkt. 83) at 180-81.  Additionally, unlike the derivative action in

9    *Oclaro*, this case has been actively litigated since the fall of 2016 and has largely set the pace for,

10   not lagged behind, the securities class case.  *See, e.g.*, *Hefler v. Wells Fargo & Co.*, 2018 WL

11   1070116, at *1 (N.D. Cal. Feb. 27, 2018) ("refer[ring] to the Derivative Litigation Order when

12   that order sets forth the Court's reasoning as to a particular claim or argument [in the securities

13   class case]").  There is no indication in the record that the class case contributed in any way to the

14   non-monetary benefits achieved here.  Nor could the California State Derivative Action—which

15   never proceeded past the pleading stage, having been dismissed twice on demand futility grounds

16   and then stayed—receive credit for these Reforms or Clawbacks (as opposed to any reforms or

17   clawbacks specific to that case).

18         Finally, the requested $68 million fee is reasonable even if the Court concludes it cannot

19   reliably estimate the dollar value of the Reforms and Clawbacks or determine how much credit to

20   assign Co-Lead Counsel for them.  Regardless of their precise value, these measures "are

21   designed to prevent future improper[] [sales practices] as well as other acts of corporate

22   misbehavior," and "at the very least, potential buyers of [Wells Fargo] stock likely will view such

23   reforms as an additional reason to purchase the stock."  *Atmel*, 2010 WL 9525643, at *12; *see*

24   *also* Gordon Decl. ¶¶ 36-37.  And given Wells Fargo's market capitalization of more than $200

25   billion,[10] even determining the Reforms and Clawbacks afford only a very small benefit to the

26   Company would support Co-Lead Counsel's fee request.  In *In re Activision Blizzard, Inc.*

27   *Stockholder Litigation*, for example, the Delaware Chancery Court reasoned an "award of $5-10

28   [10] *See* https://finance.yahoo.com/quote/WFC/, last visited on June 27, 2019.

1   million"—included in a total $72.5 million award out of the $275 million cash recovery—could

2   be justified for "a valuable non-monetary benefit" to the corporation "with a market capitalization

3   in excess of $15 billion." 124 A.3d 1025, 1071 (Del. Ch. 2015). Here, even if the Court were to

4   consider the cash and non-monetary components separately, assigning a benchmark 25% (or $60

5   million) fee award with respect to the $240 million cash recovery and an $8 million award for

6   non-monetary benefits achieved for one of the world's largest banks is reasonable.

7        Indeed, if the Court assumes the Reforms and Clawbacks provide just $32 million in value

8   to Wells Fargo—40% of the value the Parties assign to them—a $68 million fee would represent

9   25% of the resulting $272 million total value of the Settlement. *See Bennett*, 2015 WL 12932332,

10  at *6 (applying a "conservative [valuation] assumption" of $1 million for prospective relief whose

11  monetary value was "difficult to determine," and noting the total requested fee award was "less

12  than one-third of the total recovery"); *Willner*, 2015 WL 3863625, at *7 (awarding 30% fee

13  where "the parties ha[d] not provided sufficient information from which the Court could place a

14  specific value on [the policy change]," noting "if the policy change were valued at . . . about 13%

15  of Plaintiff's counsel's estimate . . . then a fee award of $2,625,000.00 would represent 25% of

16  the total actual and constructive relief obtained by counsel"). "[S]cientific precision is not

17  required when awarding fees," and the Court "has substantial discretion in the methods it uses

18  and the evidence it relies upon." *In re Compellent Techs., Inc. S'holders Litig.*, 2011 WL

19  6382523, at *21 (Del. Ch. Dec. 9, 2011); *see also Rodman*, 2018 WL 4030558, at *6 (in

20  determining reasonable fee, Court "seeks to do rough justice"). In short, whether the Court

21  includes the Reforms and Clawbacks to value the Settlement at $320 million or simply adjusts the

22  25% benchmark upward to account for them, "it is important to reward counsel in *some* way for

23  pursuing the non-cash relief." Fitzpatrick Decl. ¶ 16 (emphasis in original).

24                  **6.      Co-Lead Counsel's fee request is firmly in line with awards from
                            comparable securities class settlements.**

25        The Ninth Circuit instructs that fund size is merely "one relevant circumstance to which

26  courts must refer," and has *not* endorsed a rule that fee awards should automatically decrease as

27  the fund amount increases. *Vizcaino*, 290 F.3d at 1047; *see also* Fitzpatrick Decl. ¶ 22 ("The

28

- 18 -

1   practice among some district courts to decrease fee percentages as settlement sizes increase has

2   been criticized by scholars and other courts, and, in my opinion, this court should not follow it.").

3   In any event, "the fact that average and median fee percentages are lower in larger cases does not

4   mean, of course, that courts do not award higher fee percentages when the facts and

5   circumstances justify it." Fitzpatrick Decl. ¶ 24.[11]  Awarding $68 million, which represents *at*

6   *most* 28.33% of the Settlement's value, is well justified here.

7           In performing this analysis, the Court has looked to empirical studies, while noting their

8   data "does not replace the 25 percent benchmark" but rather "is simply an important additional

9   data point in the determination of an appropriate award." *Rodman*, 2018 WL 4030558, at *5.  In

10  one comprehensive study, Professor Fitzpatrick analyzed 688 reported and unreported federal

11  class action settlements between 2006 and 2007.  *See* Brian T. Fitzpatrick, *An Empirical Study of*

12  *Class Action Settlements and Their Fee Awards*, 7 J. EMPIRICAL LEGAL STUD. 811, 817 (2010)

13  ("Fitzpatrick Study").  The Fitzpatrick Study shows that for settlements of between $250 million

14  and $500 million, the mean and median fee percentages were 17.8% and 19.5%, respectively,

15  with a standard deviation of 7.9%.  *Id.* at 839 (tbl. 11).  Another widely cited study similarly

16  found the average fee percentage for settlements in 2009-2013 of greater than $67.5 million was

17  22.3%.  *See* Theodore Eisenberg, Geoffrey P. Miller, & Roy Germano, *Attorneys' Fees in Class*

18  *Actions: 2009-2013*, 92 N.Y.U. L. REV. 937, 948 (2017) ("Eisenberg & Miller 2017 Study").  An

19  award reflecting 21.25% of the $320 million Settlement value would thus fall below the average

20  fee percentage recorded for comparably sized settlements in the Eisenberg & Miller 2017 Study

---

21  [11] *See also, e.g.*, *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2013 WL 1365900, at *7 (N.D. Cal.
    Apr. 3, 2013) (awarding 28.5% of $1.1 billion); *In re Checking Account Overdraft Litig.*, 830 F.

22  Supp. 2d 1330, 1367 (S.D. Fla. 2011) (awarding 30% of approximately $410 million); *In re
    Converse Tech., Inc. Sec. Litig.*, 2010 WL 2653354, at *5 (E.D.N.Y. June 24, 2010) (awarding

23  25% of $225 million settlement in case that involved, *inter alia*, "uncertainty of key issues
    relating to liability and damages" and lead counsel "engaged in lengthy, contentious settlement

24  and mediation sessions over the course of [ ] eighteen months," resulting in "the second largest
    securities class action settlement involving options backdating claims"); *In re Initial Pub.*

25  *Offering Sec. Litig.*, 671 F. Supp. 2d 467, 515 (S.D.N.Y. 2009) (one-third of $510 million); *In re
    Adelphia Commc'ns Corp. Sec. & Derivative Litig.*, 2006 WL 3378705, at *3 (S.D.N.Y. Nov. 16,

26  2006) (awarding 2.89 multiplier, corresponding to 21.4% of $455 million settlement); *Allapattah
    Servs., Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1240 (S.D. Fla. 2006) (31.33% of $1.038

27  billion); *In re Linerboard Antitrust Litig.*, 2004 WL 1221350, at *17 (E.D. Pa. June 2, 2004) (30%
    of approximately $202.6 million); *In re Vitamins Antitrust Litig.*, 2001 WL 34312839, at *10

28  (D.D.C. July 16, 2001) (34.06% of $359.4 million).

1    and within one standard deviation of the most-relevant mean and median percentages in the

2    Fitzpatrick Study.

3         Even measuring the $68 million fee based solely on the $240 million cash component

4    yields 28.33%, which is reasonable under those studies.  The Fitzpatrick Study, for example,

5    found that for settlements of between $100 million and $250 million, the mean and median fee

6    percentages were 17.9% and 16.9%, respectively, with a standard deviation of 5.2%.  7 J.

7    EMPIRICAL LEGAL STUD. at 839 (tbl. 11).  As Professors Eisenberg and Miller have explained,

8    "[f]ee requests falling within one and two standard deviations above or below the mean"—which

9    would be the case for 28.33% here—"should be viewed as potentially reasonable but in need of

10   affirmative justification."  Theodore Eisenberg and Geoffrey P. Miller, *Attorney Fees in Class

11   Action Settlements: An Empirical Study*, 1 J. EMPIRICAL LEGAL STUD. 27, 74 (2004).  Drawing on

12   that study, Professor Fitzpatrick opines "the facts and circumstances justify an above-average fee

13   percentage in this case—*especially* if the court is not going to add any of the value of the non-

14   cash benefits to the denominator from which the fee is calculated."  Fitzpatrick Decl. ¶ 25

15   (emphasis in original); *see also, e.g.*, *Rodman*, 2018 WL 4030558, at *6 (awarding 28% where

16   "the exceptionally strong result obtained, the risk undertaken by counsel litigating on

17   contingency, the complexity of the legal issues, and the duration of the litigation all weigh[ed] in

18   favor of an upward adjustment," and "the size of the common fund weigh[ed] in favor of a

19   downward adjustment").

20        **B.      The Fee's Reasonableness Is Further Confirmed by a Lodestar Cross-Check.**

21        Courts "have routinely enhanced [counsel]'s lodestar to reflect the risk of non-payment in

22   common fund cases."  *Vizcaino*, 290 F.3d at 1051.  Recognizing the lodestar method's potential

23   to encourage overbilling, the Ninth Circuit limits it to "a cross-check on the reasonableness of a

24   percentage figure."  *Id.* at 1050 n.5.  As this Court has observed, moreover, "when an objection is

25   made to the use of a percentage award in a megafund case, it is usually on the ground that a flat

26   percentage results in a *windfall* to plaintiffs' counsel relative to their lodestar."  *In re Cathode Ray

27   Tube (CRT) Antitrust Litig.*, 2016 WL 4126533, at *2 (N.D. Cal. Aug. 3, 2016).  There is no

28   windfall here.  The requested $68 million fee would result in a blended multiplier of 3.03 of the

total lodestar contributed by Plaintiffs' Counsel ($22,426,479.50), based on 48,367.65 total hours—well within the "presumptively acceptable range of 1.0-4.0" in this Circuit.  *Dyer v. Wells Fargo Bank, N.A.*, 303 F.R.D. 326, 334 (N.D. Cal. 2014) (Tigar, J.); *see also Vizcaino*, 290 F.3d at 1051 n.6 (approving 3.65 multiplier, and citing appendix of cases showing "a range of 0.6-19.6, with most . . . from 1.0-4.0 and a bare majority . . . in the 1.5-3.0 range").[12]

The requested multiplier is justified by the risks Plaintiffs' Counsel faced, the complexity of this non-typical litigation, and the creativity and diligence they demonstrated in pursuing Wells Fargo's claims to this exceptional conclusion for the Company and its shareholders.  *See supra* pp. 5-11, 13-18; Supp. Joint Decl. ¶¶ 160-76.  Over more than 2 ½ years, Co-Lead Counsel and other firms acting at their direction devoted more than 48,000 hours to litigating and resolving Wells Fargo's claims.  Much of that time was spent amassing the necessary factual support to defeat two pleading motions and prepare for trial; protecting Wells Fargo's claims against the threat of collateral attack; and responding to the numerous substantive challenges to Co-Lead Plaintiffs' claims during the course of the extended mediation process that led to this Settlement.  *See generally* Supp. Joint Decl. ¶¶ 16-155.  With respect to document discovery, Plaintiffs' Counsel carefully reviewed and analyzed more than 332,000 documents produced by Wells Fargo and third-parties, totaling more than 1.1 million pages, *id.* ¶ 122, but did so efficiently.  To that end, Co-Lead Counsel implemented a streamlined process, including incorporating technology-assisted review ("TAR"), by which documents were subjected to multiple levels of review and coding (and re-coding as appropriate).  *Id.* ¶¶ 123-27.  Those documents were analyzed, moreover, specifically in preparation for the depositions of over 40 anticipated fact witnesses, including the 20 named Defendants.  *Id.* ¶ 128.  Among other things, Co-Lead Counsel used information gained through their prior analyses of documents, targeted document searches, and the TAR software to develop detailed summaries and outlines of key issues.  *Id.* ¶¶ 126-27.

---

[12] Plaintiffs' Counsel's lodestar is calculated using current positions and hourly rates, "a well established method of ensuring that '[a]ttorneys in common fund cases [are] compensated for any delay in payment.'"  *Hefler*, 2018 WL 6619983, at *14 n.17 (alterations in *Hefler*) (quoting *Fischel v. Equitable Life Assurance Soc'y of U.S.*, 307 F.3d 997, 1010 (9th Cir. 2002)).  The lodestar does not include time from Glancy, Robbins Arroyo, or Prickett Jones before January 12, 2017, when Lieff Cabraser and Saxena White were appointed Co-Lead Counsel.

Given the size and complexity of this action, Plaintiffs' Counsel's lodestar is reasonable, and compares favorably to other recent complex cases, including the securities class litigation in this Court based on the Improper Sales Practices.  *See, e.g.*, *Hefler*, 2018 WL 6619983, at *13-14 (approving 3.22 multiplier based on lodestar of approximately $29.5 million over "the two-plus year lifespan of th[e] litigation").  Indeed, Plaintiffs' Counsel's recorded hours are *conservative*: among other things, they discontinued document review and other casework once the Parties reached an agreement in principle (not a final agreement) to settle the litigation.  Supp. Joint Decl. ¶ 93.  Further, virtually all of Plaintiffs' Counsel's lodestar reflects "at-risk time" incurred during adversarial litigation before a settlement was reached.  *Cf. Hefler*, No. 16-cv-05479-JST, Dkt. 240-5, at 5-6 ("ongoing diligence discovery" to follow agreement in principle) & Ex. 5.

Further supporting the fee request, Plaintiffs' Counsel's hours and rates are well documented.  Each firm has submitted a declaration that includes exhibits showing (1) the hours and rates for each attorney and staff member, and a general description of his or her work on the case; (2) the hours each attorney and staff member devoted to particular categories of work during each month of the case; (3) the portion of total lodestar devoted to particular categories of work during each month of the case; (4) the hours and lodestar each attorney and staff member devoted to particular categories of work for the entirety of the case; (5) a description of the work each attorney and staff member performed for the case; and (6) biographies of each attorney and staff member.  *See* Lieff Cabraser Decl. Exs. 1-6; Saxena White Decl. Exs. 1-6; Glancy Decl. Exs. 1-6; Robbins Arroyo Decl. Exs. 1-6; Prickett Jones Decl. Exs. 1-6.  These submissions are consistent with those provided in connection with other recent fee applications to this Court.  *See, e.g.*, *Hefler*, 2018 WL 6619983, at *14 (noting plaintiffs' counsel "documented in detail the amount of hours spent on different tasks per month").

Finally, Plaintiffs' Counsel's hourly rates reflect "prevailing [rates] in the community for similar services by lawyers of reasonably comparable skill, expertise and reputation," *Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984)—i.e., the Northern District of California.  *See Rodman*, 2018 WL 4030558, at *6 ("[t]he relevant community is typically the forum").  The rates in this case range from $560 to $1,075 for partners/of counsel; $250 to $660 for associates/counsel; $365

1  to $420 for staff/project attorneys; $295 to $415 for "contract"/"discovery" attorneys (i.e.,

2  attorneys who are not full-time firm employees but rather were hired through an outside agency);

3  and $180 to $495 for paralegals, clerks, investigators, and other support staff.  These rates are

4  comparable to those found reasonable by this Court and others in this District.  *See, e.g.*, *Hefler*,

5  2018 WL 6619983, at *14 (approving rates "rang[ing] from $650 to $1,250 for partners or senior

6  counsel, from $400 to $650 for associates, and from $245 to $350 for paralegals"); *In re*

7  *Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, 2017 WL 1047834, at

8  *5 (N.D. Cal. Mar. 17, 2017) (approving rates "ranging from $275 to $1600 for partners, $150 to

9  $790 for associates, and $80 to $490 for paralegals"); *In re Chrysler-Dodge-Jeep Ecodiesel Mktg.,*

10  *Sales Practices, & Prods. Liab. Litig.*, No. 17-md-02777-EMC (N.D. Cal.), Dkt. 538-1 ¶¶ 26-27

11  (declaration showing staff attorney and contract attorney rates ranging from $290 to $470), Dkt.

12  561 (approving fee request).  And the blended hourly rate for all attorneys and other firm

13  personnel is $463.67, a reasonable figure for work by sophisticated counsel in the San Francisco

14  area.  *See, e.g.*, *Volkswagen*, 2017 WL 1047834, at *5 (approving blended hourly rate of $529).[13]

15  ## II.  THE REQUESTED REIMBURSEMENT AWARDS FOR CO-LEAD PLAINTIFFS ARE WELL SUPPORTED AND REASONABLE

16
17  The Ninth Circuit has long recognized the propriety of awards "intended to compensate

18  class representatives for work done on behalf of the class, to make up for financial or reputational

---

[13] In *CRT*, this Court addressed an objector's argument that class counsel "used contract attorneys
19  to prosecute the case, and paid them at contract attorney rates, but assigned much higher hourly
rates to those lawyers for purposes of calculating Class Counsel's lodestar."  2016 WL 4126533,
20  at *8.  The special master there "reviewed the evidence in support of this objection and concluded
that there was 'not the slightest justification to downgrade [contract attorneys'] billing rates or not
21  apply a multiplier to them.'"  *Id.* (quoting special master's report and recommendation).  While
noting "[t]he courts have not spoken with one voice concerning the proper treatment of contract
22  attorney costs in the calculation of a lodestar," the Court concluded it "need not weigh in on this
conflict, . . . because even if the Court were to reduce the Plaintiffs' lodestar to reflect the contract
23  attorneys' lower billing rates, the multiplier that would result would still be well within an
acceptable range."  *Id.* at *8, *9.  Co-Lead Counsel submit that the correct approach, as "[m]any
24  courts hold"—is that "contract attorneys' hours should be billed at market rates and included in
the lodestar."  *Id.* at *8 (citing cases); *but cf. In re Anthem, Inc. Data Breach Litig.*, 2018 WL
25  3960068, at *18, *20 (N.D. Cal. Aug. 17, 2018) (noting "courts routinely reject claims that
contract attorneys should be billed at the rate paid by the law firms," but adopting $240 hourly
26  rate for all contract and staff attorneys).  As in *CRT*, the Court need not resolve the issue here,
because even if all contract attorney time in this case (including time billed by current staff
27  attorneys while they were contract attorneys) were billed at the $40-$50 hourly rates Plaintiffs'
Counsel actually paid for them, the resulting lodestar would be $19,017,696.50, and the multiplier
28  would be 3.58, still within the presumptively acceptable range in this Circuit.

1   risk undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a

2   private attorney general." *Rodriguez v. W. Publ'g Co.*, 563 F.3d 948, 958-59 (9th Cir. 2009).  In

3   addition to furthering the public policy of encouraging investors to protect corporations' interests,

4   the Reimbursement Awards requested here aim to compensate Co-Lead Plaintiffs for the

5   extraordinary, and quantifiable, time and effort they devoted to this litigation and its resolution.

6         Co-Lead Plaintiffs closely monitored and actively participated in all stages of this case,

7   including (1) reviewing and commenting on the consolidated amended complaint and numerous

8   other significant filings; (2) conferring with Co-Lead Counsel about, and attending, three motion

9   and case-management hearings (in addition to the lead-plaintiff hearing), including travel

10  between Denver/Birmingham and San Francisco; (3) conferring with counsel about Rule 26(a)(1)

11  disclosures as well as potentially relevant documents and data to be provided by FPPA and

12  Birmingham; (4) coordinating with Co-Lead Counsel regarding, among other things, discovery

13  disputes, document productions, case scheduling, and strategy with respect to intervening in and

14  staying related derivative actions; (5) overseeing the extensive settlement negotiations, including

15  participating in all seven mediation sessions; and (6) securing approval of the Settlement by

16  FPPA's and Birmingham's respective boards.  FPPA Decl. ¶ 5; Birmingham Decl. ¶ 5.  Further,

17  FPPA's and Birmingham's representatives attest that the time they devoted to this case was time

18  they otherwise would have devoted to other work, which "represents a direct cost to" those

19  institutions.  FPPA Decl. ¶ 7; Birmingham Decl. ¶ 7.  Multiplying the approximate hours each

20  representative spent on this case by rates commensurate with their respective salaries and benefits

21  (i.e., an approximated $150 hourly rate) exceeds $25,000 each for FPPA and Birmingham.  FPPA

22  Decl. ¶ 7; Birmingham Decl. ¶ 7.  Accordingly, as Professor Fitzpatrick notes, these awards will

23  not confer a "windfall" on Co-Lead Plaintiffs.  Fitzpatrick Decl. ¶ 43.

24        While this Court has referenced "the presumptively reasonable amount of $5,000" for

25  awards in this Circuit (PA Order at 12), Co-Lead Plaintiffs' contributions were exceptional, as is

26  the Settlement they helped achieve.  The requested awards are commensurate with those efforts

27  and results, and "are in line with awards in other 'megafund' cases."  *In re High-Tech Emp.*

28  *Antitrust Litig.*, 2015 WL 5158730, at *18 (N.D. Cal. Sept. 2, 2015) (awarding $120,000 to one

- 24 -

1  class representative and $80,000 each to four others in connection with $415 million settlement);

2  *see also In re Lithium Ion Batteries Antitrust Litig.*, 2018 WL 3064391, at *2 (N.D. Cal. May 16,

3  2018) (awarding certain class representatives $30,000 each in connection with $139.3 million

4  settlement).  The $50,000 total award represents, moreover, 0.021% of even just the $240 million

5  cash recovery, below the mean and median percentages (both 0.024%) of incentive awards in

6  securities class cases analyzed by Professors Eisenberg and Miller.  Theodore Eisenberg and

7  Geoffrey P. Miller, *Incentive Awards to Class Action Plaintiffs: An Empirical Study*, 53 UCLA L.

8  REV. 1303, 1339 (tbl. 7) (2006); *see also CRT*, 2016 WL 4126533, at *12 (approving $450,000 in

9  total awards, which represented "0.07% of the settlement fund").

10          Additionally, unlike in a class case, these awards do not detract from class members'

11  recovery, but rather from *Co-Lead Counsel's fee*.  They accordingly "need not be subject to

12  intensive scrutiny, as the interests of the corporation, the public, and the defendants are not

13  directly affected."  *In re OSI Sys., Inc. Derivative Litig.*, 2017 WL 5642304, at *5 (C.D. Cal. May

14  2, 2017); *see also In re Cendant Corp., Derivative Action Litig.*, 232 F. Supp. 2d 327, 344 (D.N.J.

15  2002) (awarding $25,000 where derivative plaintiff "performed a public service" by

16  "represent[ing] Cendant and its shareholders," and the proposed payment "w[ould] come from

17  Derivative Plaintiff's counsel's attorneys' fees").  The awards likewise raise no concern regarding

18  "the proportionality between the incentive payment and the range of class members' settlement

19  awards."  *Dyer*, 303 F.R.D. at 335; *cf. also Smith v. Am. Greetings Corp.*, 2016 WL 362395, at

20  *10-11 (N.D. Cal. Jan. 29, 2016) (Tigar, J.) (granting $5,000, rather than $7,500, awards where

21  the latter would amount "to roughly 4.7 times" the projected average class participant's recovery

22  and named plaintiffs estimated they devoted 20 and 20-25 hours, respectively, to the case);

23  *Willner*, 2015 WL 3863625, at *9 (awarding $7,500 rather than $11,000 where, *inter alia*, "the

24  expected average settlement payment to each class member [wa]s approximately $605.02, while

25  the maximum award wa[s] expected to be approximately $4,105.33").  They should be approved.

26                                                   **CONCLUSION**

27          Co-Lead Counsel's request for $68 million in fees should be granted, and they should be

28  permitted to pay $50,000 of that amount for Reimbursement Awards to Co-Lead Plaintiffs.

MOTION FOR ATTORNEYS' FEES AND
REIMBURSEMENT AWARDS
LEAD CASE NO. 3:16-cv-05541-JST

1    Dated:  June 27, 2019

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP

By: */s/ Richard M. Heimann*
Richard M. Heimann (063607)
*rheimann@lchb.com*
Katherine C. Lubin (259826)
*kbenson@lchb.com*
Michael K. Sheen (288284)
*msheen@lchb.com*
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

Steven E. Fineman (140335)
*sfineman@lchb.com*
Daniel P. Chiplock (*Pro hac vice*)
*dchiplock@lchb.com*
Nicholas Diamand (*Pro hac vice*)
*ndiamand@lchb.com*
Michael J. Miarmi (*Pro hac vice*)
*mmiarmi@lchb.com*
Sean A. Petterson (*Pro hac vice*)
*spetterson@lchb.com*
250 Hudson Street, 8th Floor
New York, NY 10013-1413
Telephone: (212) 355-9500
Facsimile: (212) 355-9592

*Attorneys for Co-Lead Plaintiff Fire & Police
Pension Association of Colorado and Co-Lead
Counsel*

MOTION FOR ATTORNEYS' FEES AND
REIMBURSEMENT AWARDS
LEAD CASE NO. 3:16-cv-05541-JST

1

**SAXENA WHITE P.A.**

2

Maya Saxena (*Pro hac vice*)
msaxena@saxenawhite.com

3

Joseph E. White, III (*Pro hac vice*)
jwhite@saxenawhite.com

4

Lester R. Hooker (241590)
lhooker@saxenawhite.com

5

Adam D. Warden (*Pro hac vice*)
awarden@saxenawhite.com

6

Dianne M. Pitre (286199)
dpitre@saxenawhite.com

7

150 East Palmetto Park Road, Suite 600
Boca Raton, FL 33432

8

Telephone: (561) 394-3399
Facsimile: (561) 394-3382

9

10

Steven B. Singer (*Pro hac vice*)
ssinger@saxenawhite.com
Kyla Grant (*Pro hac vice*)

11

kgrant@saxenawhite.com
Sara DiLeo (*Pro hac vice*)

12

sdileo@saxenawhite.com
10 Bank Street, 8th Floor

13

White Plains, NY 10606
Telephone: (914) 437-8551

14

Facsimile: (888) 631-3611

15

*Attorneys for Co-Lead Plaintiff The City of Birmingham and Co-Lead Counsel*

16

17

18

19

20

21

22

23

24

25

26

27

28

MOTION FOR ATTORNEYS' FEES AND
REIMBURSEMENT AWARDS
LEAD CASE NO. 3:16-cv-05541-JST