Richard M. Heimann (063607)
*rheimann@lchb.com*
Katherine C. Lubin (259826)
*kbenson@lchb.com*
Michael K. Sheen (288284)
*msheen@lchb.com*
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
Facsimile:  (415) 956-1008

*Attorneys for Co-Lead Plaintiff Fire & Police Pension*
*Association of Colorado and Co-Lead Counsel*

Maya Saxena (*Pro hac vice*)
*msaxena@saxenawhite.com*
Joseph E. White, III (*Pro hac vice*)
*jwhite@saxenawhite.com*
Lester R. Hooker (241590)
*lhooker@saxenawhite.com*
SAXENA WHITE P.A.
150 East Palmetto Park Road, Suite 600
Boca Raton, FL 33432
Telephone:  (561) 394-3399
Facsimile:  (561) 394-3382

*Attorneys for Co-Lead Plaintiff The City of Birmingham*
*Retirement and Relief System and Co-Lead Counsel*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE WELLS FARGO & COMPANY SHAREHOLDER DERIVATIVE LITIGATION | Lead Case No. 3:16-cv-05541-JST<br><br>**SUPPLEMENTAL JOINT DECLARATION OF RICHARD M. HEIMANN AND JOSEPH E. WHITE, III IN SUPPORT OF (1) CO-LEAD PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENT, AND (2) CO-LEAD COUNSEL'S MOTION FOR AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT AWARDS TO CO-LEAD PLAINTIFFS** |

# TABLE OF CONTENTS

**Page**

I.    PRELIMINARY STATEMENT ................................................................................. 2

II.    BACKGROUND OF THE ACTION ..................................................................... 3

     A.    Relevant Procedural History ...................................................................... 4

         1.    Commencement of the Action and Appointment of Co-Lead Plaintiffs .................................................................................... 4

         2.    Co-Lead Plaintiffs' Preparation and Filing of the Consolidated Complaint ................................................................... 6

         3.    Motion to Dismiss the Complaint on Demand Futility Grounds ............... 6

         4.    Motions to Dismiss the Complaint on Pleading Sufficiency Grounds ................................................................................... 9

         5.    Defendants' Answers ................................................................... 10

         6.    Late-Filed Federal Court Derivative Actions ............................................ 11

            a.    The *Hannon II* Action .................................................... 11

            b.    The *Feuer* Action .......................................................... 12

            c.    The *Himstreet* Action .................................................... 13

         7.    Co-Lead Plaintiffs' Efforts to Stay or Dismiss Related State Court Derivative Actions ................................................ 13

            a.    The California State Derivative Action ......................... 13

            b.    The *Herron* Action ........................................................ 17

            c.    The *Gordon* Actions ...................................................... 19

            d.    The *Massachusetts Laborers* Action ............................ 19

            e.    The *Rosenfeld* Action .................................................... 19

            f.    The *Connecticut Laborers* Action ................................ 20

     B.    Negotiations Regarding Initial Discovery and Scheduling ................................. 23

     C.    Co-Lead Plaintiffs' Discovery Efforts ................................................................... 24

         1.    Discovery from Wells Fargo .................................................... 24

         2.    Discovery from Defendants ...................................................... 26

            a.    Director Defendants ....................................................... 27

            b.    Officer Defendants ......................................................... 27

         3.    Discovery from Third-Parties .................................................. 28

         4.    The Federal Reserve ................................................................. 29

     D.    Co-Lead Plaintiffs' Review and Synthesis of Document Discovery ................... 30

     E.    Notable Discovery Disputes .................................................................................. 32

         1.    Applicable Time Period for Discovery .................................... 32

         2.    Depositions and Case Scheduling ............................................ 33

**TABLE OF CONTENTS**
(continued)

Page

III. SETTLEMENT DISCUSSIONS, MEDIATION, AND NEGOTIATION OF SETTLEMENT DOCUMENTS ........................................................................ 34

    A. Mediations with Judge Layn R. Phillips (Ret.) ..................................... 34

    B. Mediations with Judge Daniel Weinstein (Ret.) and Jed Melnick, Esq. .............. 35

    C. The Settlement Agreement and Preliminary Approval ......................... 37

IV. THE RISKS OF CONTINUED LITIGATION .............................................. 38

    A. Procedural Risks ....................................................................... 39

    B. Risks of Establishing Liability ..................................................... 40

    C. Risks Related to Damages............................................................. 40

V. CO-LEAD PLAINTIFFS' EFFORTS ON BEHALF OF WELLS FARGO ................... 41

VI. SUPPORTING DOCUMENTS ............................................................... 42

We, RICHARD M. HEIMANN and JOSEPH E. WHITE, III, jointly declare and state as follows:

1. Richard M. Heimann is an attorney duly licensed to practice law in the State of California and admitted to practice in this Court and other federal courts. Mr. Heimann is a founding partner at the law firm Lieff Cabraser Heimann & Bernstein, LLP ("Lieff Cabraser"), which serves as counsel for Co-Lead Plaintiff Fire and Police Pension Association of Colorado ("FPPA") and Co-Lead Counsel in the above-captioned shareholder derivative action (the "Action").

2. Joseph E. White, III is an attorney duly licensed to practice law in the States of Florida, New York, Massachusetts, and Pennsylvania and admitted to practice in this Court *pro hac vice.* Mr. White is a founding shareholder at the law firm Saxena White P.A. ("Saxena White"), which serves as counsel for Co-Lead Plaintiff The City of Birmingham Retirement and Relief System ("Birmingham") and Co-Lead Counsel in this Action.

3. We have personal knowledge of the matters set forth herein based on our active supervision of and participation in the prosecution and resolution of the Action, and if either of us were called upon as a witness, we could and would testify competently thereto.

4. We make this Supplemental Joint Declaration in support of Co-Lead Plaintiffs' motion for final approval of the proposed Settlement.[1] The Settlement will resolve, on behalf of Nominal Defendant Wells Fargo & Co. ("Wells Fargo" or the "Company"), all claims asserted in this Action against the Defendants.[2]

5. We also respectfully submit this Joint Declaration in support of Co-Lead Counsel's motion (i) for an award of attorney's fees in the amount of $68 million; and (ii) for reimbursement awards of $50,000 in the aggregate for the time and effort Co-Lead Plaintiffs

---

[1] Unless otherwise defined, capitalized terms appearing herein shall be defined as provided for in the Stipulation & Agreement of Compromise, Settlement and Release dated February 26, 2019 (Dkt. 270-1) (the "Stipulation").

[2] Defendants are: (i) John G. Stumpf, Timothy J. Sloan, Carrie L. Tolstedt, John R. Shrewsberry, and Michael J. Loughlin (the "Officer Defendants"); and (ii) John D. Baker II, Elaine L. Chao, John S. Chen, Lloyd H. Dean, Elizabeth A. Duke, Susan E. Engel, Enrique Hernandez, Jr., Donald M. James, Cynthia H. Milligan, Federico F. Peña, James H. Quigley, Judith M. Runstad, Stephen W. Sanger, Susan G. Swenson, and Suzanne M. Vautrinot (the "Director Defendants").

expended in representing Wells Fargo's interests, which amount will be paid from Co-Lead Counsel's fee award.

## I. PRELIMINARY STATEMENT

6. Following more than two years of active and vigorous litigation, Co-Lead Plaintiffs and Co-Lead Counsel have reached a significant Settlement of this shareholder derivative action on behalf of Wells Fargo to settle claims arising from the creation of unauthorized or fictitious customer accounts at the Company (the "Improper Sales Practices").

7. During the course of this Action, Co-Lead Counsel worked diligently and dedicated substantial resources toward advancing this case. After significant litigation efforts, extensive negotiations, and careful consideration of both the strength of Plaintiffs' claims and the significant risks of continued litigation, Co-Lead Plaintiffs and Co-Lead Counsel succeeded in securing the recovery of (i) a $240 million monetary payment from Defendants' insurers to Wells Fargo; and (ii) acknowledgement from Wells Fargo that facts alleged in the Action were a significant factor in causing certain corporate governance changes and remedial steps with respect to compensation reductions and forfeitures to be implemented, which conferred a value to Wells Fargo of $80 million. The resulting total settlement value is $320 million.

8. Before agreeing to settle this Action, Co-Lead Plaintiffs undertook extensive efforts to advance Wells Fargo's claims and to ensure that the Company was in a position to maximize its recovery. These efforts included, among other things: (i) conducting significant legal and factual investigation into the events underlying Wells Fargo's claims; (ii) drafting detailed complaints, including the Consolidated Amended Verified Shareholder Derivative Complaint filed on February 24, 2017; (iii) achieving the denial in large part of two sets of motions to dismiss; (iv) engaging in extensive efforts to consolidate, coordinate, dismiss, or stay numerous related shareholder derivative actions across the country, in order to protect Wells Fargo's claims against collateral attack based on potentially adverse rulings in those cases; (v) aggressively pursuing document discovery, which resulted in the review of over 1.1 million pages of documents and the composite total production of 727,679 documents from Defendants and seven non-parties, comprising 3,529,385 pages; (vi) preparing for the anticipated depositions of

over 40 fact witness, including the 20 named Defendants; and (vii) consulting with several experts and consultants to develop a comprehensive approach to establishing liability and damages in the Action.

9.     As a result of these efforts, Co-Lead Plaintiffs had a deep understanding of the strengths and weaknesses of the Parties' respective positions.  This understanding was further deepened over the course of seven in-person mediation sessions, which were conducted by experienced and renowned mediators.  In preparation for these mediation sessions, the Parties submitted several rounds of extensive briefing regarding key legal and factual disputes in this Action, made numerous presentations on liability and damages, and engaged in vigorous, multi-party debate about the strengths and weaknesses of their positions.

10.     After lengthy negotiations, on December 12, 2018, the Parties accepted a Mediators' proposal to settle this Action.  The Parties engaged in further discussion over the following months to memorialize the terms of their agreement in the Stipulation.

11.     Co-Lead Plaintiffs brought their claims in good faith and continue to believe that their claims have merit.  However, Co-Lead Plaintiffs recognize that there are legal and factual defenses to the claims asserted in the Action, which present substantial risks to the successful resolution of any litigation, especially in complex shareholder derivative litigation such as this Action.  Accordingly, in light of these risks and based on their evaluation of the claims and their substantial experience, Co-Lead Plaintiffs and Co-Lead Counsel have determined that the Settlement, which confers substantial benefits upon Wells Fargo and its shareholders, is fair, reasonable, and adequate, and in the best interests of the Company and its shareholders.

## II.     BACKGROUND OF THE ACTION

12.     This Action centers on Wells Fargo's decade-long pattern of misconduct with respect to "cross-selling"—*i.e.*, the sale of new products to existing Wells Fargo customers.  Co-Lead Plaintiffs alleged that Defendants knew or consciously disregarded that Wells Fargo employees illicitly created millions of customer accounts without those customers' knowledge or consent, in order to meet unrealistic sales goals, thereby inflating the Company's cross-selling numbers (*i.e.*, the Improper Sales Practices).

13.     Co-Lead Plaintiffs alleged that to achieve their publicly touted goal of selling eight products per household—referred to as the "Great Eight" or "Gr-eight" initiative—Defendants imposed strict quotas regulating the number of products Wells Fargo bankers were required to sell.  Those quotas translated into unrelenting pressure on Wells Fargo employees to open numerous accounts per customer and engage in unlawful account-creation practices.  Since Wells Fargo's success in cross-selling was central to its financial results and market participants' assessment of the Company, Defendants were also highly motivated to foster, and perpetuate, those unlawful practices.

14.     Furthermore, Co-Lead Plaintiffs alleged that, from at least January 1, 2011 to the present (the "Relevant Period"), Defendants knew about or consciously disregarded the Improper Sales Practices, did nothing to effectively address indications of pervasive misconduct at the Company, and even implemented policies that enabled the misconduct to flourish.

15.     As a result, Co-Lead Plaintiffs, as shareholders of Wells Fargo, brought this Action on the Company's behalf for relief under federal and state law arising from Defendants' alleged misconduct.

A.      **Relevant Procedural History**

1.      **Commencement of the Action and Appointment of Co-Lead Plaintiffs**

16.     On September 8, 2016, the Los Angeles City Attorney, the Consumer Financial Protection Bureau ("CFPB"), and the Office of the Comptroller of the Currency ("OCC") each separately announced that fines totaling more than $185 million had been imposed on Wells Fargo for widespread deficiencies and unsafe or unsound practices in Wells Fargo's risk management and oversight of its sales practices.  Specifically, Wells Fargo and its regulators disclosed and acknowledged for the first time that the Company's employees had engaged in the Improper Sales Practices.

17.     Shortly after those public revelations, beginning on September 29, 2016, several shareholders, including Co-Lead Plaintiffs, commenced a series of putative shareholder derivative actions in this Court, in California state courts, and in Delaware Chancery Court.

18. On December 12, 2016, pursuant to stipulation, this Court entered an order consolidating the following eight related shareholder derivative actions into this Action: (i) *Shaev v. Baker*, No. 3:16-cv-05541-JST; (ii) *Cook v. Loughlin*, No. 3:16-cv-05592-JST; (iii) *Sherman v. Stumpf*, No. 3:16-cv-05745-JST; (iv) *Elson, IRA v. Stumpf*, No. 3:16-cv-05817-JST; (v) *The City of Birmingham Ret. & Relief Sys. v. Baker*, No. 3:16-cv-05915-JST; (vi) *LeBendig v. Wells Fargo & Co.*, No. 3:16-cv-06262-JST; (vii) *Hannon v. Loughlin*, No. 3:16-cv-06624-MEJ; and (viii) *Fire & Police Pension Ass'n of Colorado v. Stumpf*, No. 3:16-cv-06631-JST. Dkt. 39. Among other things, the stipulation and order also specified that "[a]ny other actions or claims filed in or removed or transferred to this Court after the date of this Stipulation that (i) are styled as shareholder derivative actions or claims brought on behalf of Wells Fargo and (ii) arise out of the same transactions and occurrences and involve the same or substantially similar issues of law and facts as the Related Actions, shall automatically be consolidated for all purposes, if and when they are brought to the Court's attention." *Id.* at 3. The Stipulation also set forth an agreed-upon schedule for the filing of motions for appointment of lead plaintiff and lead counsel. *See id.* at 5. A hearing on the matter was set for January 12, 2017. *Id.*

19. Two groups of plaintiffs ultimately sought appointment as lead plaintiffs in this Action. Plaintiffs FPPA and Birmingham jointly moved to be appointed as co-lead plaintiffs and to appoint Lieff Cabraser and Saxena White as co-lead counsel. Dkt. 34. Plaintiffs Police & Fire Retirement System City of Detroit and Public School Teachers' Pension and Retirement Fund of Chicago jointly moved to be appointed as co-lead plaintiffs and to appoint Bernstein Litowitz Berger & Grossmann and Bottini & Bottini as co-lead counsel. Dkt. 41.

20. On January 12, 2017, following a hearing, the Court issued an Order: (a) consolidating a ninth action, *Public School Teachers' Pension & Retirement Fund of Chicago v. Stumpf*, No. 3:16-cv-7089-JST, into this Action; (b) appointing FPPA and Birmingham as Co-Lead Plaintiffs; and (c) appointing Lieff Cabraser and Saxena White as Co-Lead Counsel. Dkt. 70.

21. The Parties then conferred and, on February 8, 2017, submitted a stipulated agreement governing the filing of a consolidated complaint and briefing on motions to dismiss.

Dkt. 80. With the exception of one proposed deadline (regarding the filing deadline for replies in support of motions to dismiss), the Court granted the stipulation and set a February 24, 2017 deadline to file a consolidated complaint. Dkt. 81.

### 2. Co-Lead Plaintiffs' Preparation and Filing of the Consolidated Complaint

22. Co-Lead Plaintiffs conducted an extensive investigation and review of relevant information in preparing its consolidated complaint. Specifically, Co-Lead Plaintiffs' investigation included a review of (i) filings by Wells Fargo with the U.S. Securities and Exchange Commission ("SEC"); (ii) findings or allegations by government entities in connection with investigations into the Improper Sales Practices; (iii) records of congressional proceedings; (iv) news articles; (v) securities analysts' reports about Wells Fargo; (vi) wire and press releases; (vii) documents received by the Los Angeles City Attorney in connection with its case against Wells Fargo; and (viii) additional information readily obtainable on the Internet.

23. On February 24, 2017, Co-Lead Plaintiffs filed the 189-page Consolidated Amended Verified Shareholder Derivative Complaint in the Derivative Action naming as defendants the Officer and Director Defendants, and alleging generally, on behalf of Wells Fargo, claims against the Officer and Director Defendants for breaches of fiduciary duty, unjust enrichment, breach of fiduciary duty for insider selling and misappropriation of information, violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Securities and Exchange Commission ("SEC") Rule 14a-9, Section 10(b) of the Exchange Act and SEC Rule 10b-5 (the "Section 10(b) Claim"), Section 20A of the Exchange Act, Section 29(b) of the Exchange Act, Section 25402 of the California Corporations Code, Section 25403 of the California Corporations Code, corporate waste, and contribution and indemnification. Dkt. 83 (the "Complaint"). As specified in the Complaint, some claims were asserted against all Defendants and some were asserted against a subset thereof.

### 3. Motion to Dismiss the Complaint on Demand Futility Grounds

24. On March 17, 2017, Wells Fargo moved to dismiss the Complaint for failure to plead demand futility pursuant to Rules 12(b)(6) and 23.1 of the Federal Rules of Civil Procedure

(the "Demand Futility Motion to Dismiss"). Dkt. 99. Defendants filed joinders to Wells Fargo's motion. Dkts. 100 (Stumpf), 101 (Tolstedt), 102 (Director Defendants), 107 (Sloan), 108 (Loughlin), 110 (Shrewsberry).

25. In the Demand Futility Motion to Dismiss, Wells Fargo and the Defendants set forth three primary reasons why Co-Lead Plaintiffs had failed to allege that demand on the Company's Board of Directors (the "Board") was futile: (i) a failure to allege "red flags" sufficient to establish that Board members "utterly failed" to oversee the Company, (ii) a failure to allege a substantial likelihood of liability for "pattern of conduct" and intentional misrepresentation claims, and (iii) a failure to plead that the Company's outside directors lacked independence. Dkt. 99 at 10-23.

26. On April 3, 2017, Co-Lead Plaintiffs filed a 25-page opposition to the Demand Futility Motion to Dismiss. Dkt. 115. In their opposition, Co-Lead Plaintiffs primarily argued that demand had been excused because the Complaint sufficiently alleged facts to establish that a majority—indeed, all—of the Company's Board members "would face a substantial risk of liability if the litigation were pursued." *Id.* at 8. Relying on applicable Delaware law, Co-Lead Plaintiffs maintained that they "need only 'make a threshold showing, through the allegation of particularized facts, that their claims have some merit.'" *Id.* at 8–9. Co-Lead Plaintiffs then identified specific allegations in the Complaint that supported a finding that (i) the Defendants had consciously disregarded the pervasive fraud at Wells Fargo, (ii) the Defendants had made false or misleading statements to shareholders, and (iii) the Director Defendants had disseminated materially false or misleading proxy statements.

27. On April 14, 2017, Wells Fargo replied. Dkt. 116. The Director Defendants filed a joinder. Dkt. 117. In its reply, Wells Fargo advanced further arguments in support of its position that the Complaint be dismissed for failure to plead demand futility. Wells Fargo argued that certain events of which the Defendants were allegedly aware were not "red flags" under the law, and that Co-Lead Plaintiffs had otherwise failed to plead facts establishing bad faith on the part of the directors. Moreover, Wells Fargo trumpeted its April 10, 2017 Oversight Committee

1  Report as demonstrating Board action and knowledge contrary to the allegations in the

2  Complaint.

3          28.     On April 26, 2017, Co-Lead Plaintiffs moved the Court for leave to file a surreply

4  to respond to an argument Wells Fargo raised for the first time in its reply brief.  Dkt. 119.  Wells

5  Fargo filed an opposition to Co-Lead Plaintiffs' motion on April 28, 2017.  Dkt. 120.  On May 1,

6  2017, the Court denied Co-Lead Plaintiffs' motion for leave but held it would "not consider

7  [Wells Fargo]'s new argument" because it was first raised on reply, further reasoning that "even

8  if the Court were to consider the argument, it would be compelled to reject it, because it has

9  already been flatly rejected by the Delaware Supreme Court."  Dkt. 122 at 1.

10         29.     On May 4, 2017, following a hearing on Wells Fargo's Demand Futility Motion to

11  Dismiss, the Court granted in part and denied in part the motion, holding that pre-litigation

12  demand on the Board was excused and permitting Co-Lead Plaintiffs to pursue the surviving

13  claims asserted in the Action on the Company's behalf.  Dkt. 129 (the "Demand Futility Order").

14  Of particular note, with respect to Co-Lead Plaintiffs' core breach of fiduciary duty claims, the

15  Court concluded:

16         under both the standard for director oversight liability and the standard for director
           liability for breach of the duty of care when the company has adopted an
17         exculpatory provision, Plaintiffs must "alleg[e] particularized facts that show that a
           director *consciously* disregarded an obligation to be reasonably informed about the
18         business and its risks or *consciously* disregarded the duty to monitor and oversee
           the business."
19
           The extensive and detailed allegations in the complaint plausibly suggest that a
20         majority of the Director Defendants did precisely that.

21  *Id.* at 17 (quoting *In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d 106, 125 (Del. Ch.

22  2009)).[3]  The Court concluded that the Complaint "create[d] a reasonable doubt as to whether a

23  majority of the Director Defendants face a substantial likelihood of personal liability" and "that

24  demand is excused as futile."  *Id.* at 37.  The Court denied Wells Fargo's and Defendants'

25  [3] Wells Fargo's certificate of incorporation contains a provision, pursuant to 8 Del. C.
    § 102(b)(7), eliminating the monetary liability of directors for certain breaches of duty, such as
26  breaches of the duty of care.  Compl. ¶ 533.  However, the exculpatory provision cannot
    "eliminate or limit the liability of a director" for "any breach of the director's duty of loyalty to
27  the corporation or its stockholders," "acts or omissions not in good faith or which involve
    intentional misconduct or a knowing violation of law," or "any transaction from which the
28  director derived an improper personal benefit."  *Id.*

Demand Futility Motion to Dismiss on this basis as to all but one of Co-Lead Plaintiffs' claims. *Id.* The Court granted the motion only as to Co-Lead Plaintiffs' claim under Section 25403 of the California Corporations Code after concluding that no private right of action existed under California law. *Id.*

30. Following the Court's favorable Demand Futility Order, the Parties conferred and submitted a proposed schedule for briefing a second round of motions to dismiss pursuant to Rule 12(b)(6). The Court granted the stipulation on May 30, 2017. Dkt. 135.

### 4. Motions to Dismiss the Complaint on Pleading Sufficiency Grounds

31. On June 5, 2017, the Officer and Director Defendants filed a series of five substantively similar motions to dismiss the Complaint for failure to state a claim pursuant to Rule 12(b)(6), with Defendant Stumpf joining in some portions of those motions. *See* Dkts. 139 (Sloan), 140 (Tolstedt), 141 (Loughlin), 143 (Shrewsberry), 144 (Director Defendants), 145 (Stumpf joinder). In general, Defendants argued that (i) all claims were insufficiently pled, particularly with respect to fraud-related claims; (ii) the claim under Section 25402 of the California Corporations Code should be dismissed in part on claim preclusion grounds; and (iii) the claim for contribution and indemnification were unripe. Specifically, the Officer Defendants argued that the Complaint's allegations about them were not sufficient to establish liability over them and that the Complaint largely focused on the Director Defendants. The Director Defendants argued that the Complaint relied on "shotgun" pleading and failed to meet the heightened burden of Rule 9(b) and the Private Securities Litigation Reform Act of 1995.

32. On July 5, 2017, Co-Lead Plaintiffs filed a 70-page omnibus opposition to the second round of motions to dismiss. Dkt. 151. Therein, Co-Lead Plaintiffs explained why each of their claims was adequately pled and viable as a matter of law. For example, Co-Lead Plaintiffs identified numerous allegations in the Complaint that the Officer Defendants received information from executive management about the Improper Sales Practices, giving rise to the strong inferences of *scienter* required for their Section 10(b) Claim and the conscious disregard required for their breach of fiduciary duty claim. *See id.* at 26–46.

33.     On July 26, 2017, the Director Defendants and Defendants Sloan, Tolstedt, Loughlin, and Shrewsberry filed reply briefs in further support of their motions to dismiss.  Dkts. 153 (Shrewsberry), 154 (Director Defendants), 155 (Tolstedt), 156 (Loughlin), 157 (Sloan). These replies continued to argue that Co-Lead Plaintiffs were improperly relying on the group pleading doctrine and could not allege facts specific to each individual defendant.

34.     On October 4, 2017, after vacating the hearing on the matter, the Court issued a 49-page order that denied in large part Defendants' motions to dismiss, after finding that Co-Lead Plaintiffs had pled facts sufficient to sustain the vast majority of their claims.  Dkt. 174 (the "12(b)(6) Order").  The Court held that the Complaint "does not engage in shotgun pleading" and did not exclusively rely on the group pleading doctrine.  *Id.* at 18, 19.  The Court dismissed (i) the Section 10(b) Claim against Defendant Loughlin without prejudice, (ii) claims for indemnification and contribution without prejudice, and (iii) claims under Section 25402 California Corporations Code with prejudice.  While rejecting the argument that the Section 25402 claims were precluded by the non-final decision in a parallel state court action, the Court nevertheless dismissed them as barred under the internal affairs doctrine.  *Id.* at 41–44.  The Court sustained all other claims.  *See id.* at 49.

35.     Accordingly, as a result of the 12(b)(6) Order, Co-Lead Plaintiffs were permitted to proceed with nearly all of their original claims:  (i) the Section 10(b) Claim, (ii) a claim under Section 14(a) of the Exchange Act, (iii) a claim under Section 29(b) of the Exchange Act, (iv) a claim under Section 20A of the Exchange Act, (v) a claim for breach of fiduciary duty, (vi) unjust enrichment claims, (vii) corporate waste claims, and (viii) Delaware insider trading claims.  *See id.*  The same 20 Defendants named in the Complaint remained in the Action.

### 5.     Defendants' Answers

36.     Following the Court's 12(b)(6) Order, the Parties conferred and submitted a stipulation proposing to extend the deadline for Defendants to file their respective answers to the Complaint.  On November 13, 2017, the Court granted the Parties' stipulation and extended the deadline for answering the Complaint to January 8, 2018.  Dkt. 183.

37.     On January 8, 2018, Defendants filed separate answers to the Complaint.  *See*
Dkts. 187 (Stumpf), 188 (Tolstedt), 189 (Sloan), 190 (Loughlin), 191 (Shrewsberry), 192
(Director Defendants).

### 6.    Late-Filed Federal Court Derivative Actions

38.     Well after the Court consolidated the first nine related shareholder derivative
actions, appointed lead plaintiffs, and issued its Demand Futility Order and 12(b)(6) Order, a
second wave of three late-filed complaints came before this Court.  In each instance, the Court
resolved potential conflicts by ensuring that Co-Lead Plaintiffs would continue to represent the
Company's interests on behalf of all shareholders and to ensure resolution of all derivative claims
relating to the Improper Sales Practices.

### a.    The *Hannon II* Action

39.     On December 20, 2017, plaintiff George Hannon filed, in *Hannon v. Loughlin*, No.
3:17-cv-07236-JST (N.D. Cal.) ("*Hannon II*"), a shareholder derivative complaint that was nearly
identical to the one he filed a year earlier.  As noted above, the Court consolidated Mr. Hannon's
first related action into this Action on December 12, 2016.  *See* Dkt. 39.  Mr. Hannon's new
complaint added two California causes of action against American Express Company ("American
Express").  After the Court granted Co-Lead Plaintiffs' administrative motion to relate *Hannon II*,
*see* Dkt. 197, Co-Lead Plaintiffs moved to consolidate *Hannon II* with this Action on the grounds
that the legal and factual issues in *Hannon II* were overwhelmingly the same as those in this
Action, despite Mr. Hannon's claims against American Express.  Dkt. 204.

40.     After a hearing on Co-Lead Plaintiffs' motion to consolidate, on May 2, 2018, the
Court granted Co-Lead Counsel's motion and consolidated *Hannon II* with this Action after
concluding that "there is good reason to believe that [Mr. Hannon's] counsel's dominant purpose
in adding claims against American Express was simply to escape the Court's prior order of
consolidation."  Dkt. 219 at 2.

41.     On June 1, 2018, Mr. Hannon sought interlocutory review of the Court's
consolidation order.  *See* Dkt. 226; *Hannon v. Am. Express Co.*, No. 18-16115 (9th Cir.).  At the
appellate court's request, Mr. Hannon and Co-Lead Plaintiffs filed preliminary briefing, in July

and August 2018, on whether the court lacked jurisdiction over the appeal. *See Hannon II*, Dkts. 5, 7, 8.

42. On December 18, 2018, a three-judge motions panel declined to rule on whether the court had jurisdiction and ordered the parties to further brief the issue for the merits panel. *Hannon II*, Dkt. 9. The court then set a briefing schedule for the appeal, with Mr. Hannon's opening brief due on January 29, 2019. *Id.* After two requests for extensions, Mr. Hannon's deadline was extended to April 29, 2019. *See Hannon II*, Dkts. 10–13.

43. On April 29, 2019, the parties filed a stipulation of voluntary dismissal under Rule 42(b) of the Federal Rules of Appellate Procedure, *see Hannon II*, Dkt. 14, and on May 8, 2019, the court granted the stipulation and closed the case, *see Hannon II*, Dkt. 15. Mr. Hannon never filed a substantive merits brief addressing consolidation.

### b.    The *Feuer* Action

44. On May 16, 2018, plaintiff R.A. Feuer filed a shareholder derivative complaint captioned *Feuer v. Baker*, No. 3:18-cv-02866-JST (N.D. Cal.) (the "*Feuer* Action"). The *Feuer* complaint was broad in scope—it asserted claims relating to both the Improper Sales Practices and other unrelated misconduct, including the forced placement of collateral protection insurance. Unlike in this Action wherein Co-Lead Plaintiffs alleged that demand on the Board was futile, Mr. Feuer alleged that he made two pre-suit demands on the Board, but that both demands were wrongfully refused.

45. On June 13, 2018, on Co-Lead Plaintiffs' motion, Dkt. 228, the Court entered an order relating the *Feuer* Action to this Action. Dkt. 230.

46. Given the broad scope of the claims in the *Feuer* Action, Co-Lead Plaintiffs sought an agreement between the parties in both actions regarding the extent to which the claims in the *Feuer* Action overlapped with those asserted by Co-Lead Plaintiffs in this Action. On September 6, 2018, the parties, including Mr. Feuer, filed a stipulation and proposed order providing that (i) the *Feuer* complaint cannot be construed to assert claims based on the Improper Sales Practices, and (ii) Mr. Feuer cannot assert claims for any relief involving the Improper Sales Practices. Dkt. 251. On September 7, 2018, the Court granted the stipulation. Dkt. 252. The

*Feuer* Action remains before this Court, and two motions to dismiss Mr. Feuer's claims, which do not concern the Improper Sales Practices, are pending. *See Feuer* Action, Dkts. 54, 55.

### c.     The *Himstreet* Action

47.     On May 17, 2018, plaintiff Timothy Himstreet filed a derivative complaint relating to the Improper Sales Practices, in *Himstreet v. Sloan*, No. 3:18-cv-02922-JST (N.D. Cal.).

48.     On August 2, 2018, in response to a *sua sponte* judicial referral, the Court entered an order relating the *Himstreet* Action to this Action. Dkt. 243.

49.     On August 9, 2018, the Court granted a stipulation of the parties to the *Himstreet* Action to voluntarily dismiss that action without prejudice. *Himstreet*, Dkt. 29.

### 7.     Co-Lead Plaintiffs' Efforts to Stay or Dismiss Related State Court Derivative Actions

50.     Following issuance of the favorable Demand Futility Order and the 12(b)(6) Order, Co-Lead Plaintiffs sought to avoid unnecessary and duplicative efforts across the several related derivative actions pending nationwide, and to prevent inconsistent outcomes in those proceedings. Accordingly, Co-Lead Plaintiffs undertook a comprehensive nationwide effort to coordinate five related actions pending in California and Delaware state courts in order to preserve Wells Fargo's claims in this Action.

51.     As a result of Co-Lead Plaintiffs' efforts, every related state court derivative action was dismissed or stayed pending the resolution of this Action. These efforts, which spanned over fourteen months, required submission of at least thirteen briefs on behalf of Co-Lead Plaintiffs, as well as attendance (and argument) in at least seventeen hearings. A brief description of each action, including Co-Lead Plaintiffs' efforts, follows.

### a.     The California State Derivative Action

52.     Beginning on September 21, 2016, several plaintiffs filed shareholder derivative actions in the Superior Court of California, County of San Francisco (the "San Francisco Superior Court"), against certain defendants and Wells Fargo, as nominal defendant, alleging breach of fiduciary duty and various other claims related to Improper Sales Practices.

53. On November 22, 2016, the San Francisco Superior Court consolidated a number of related actions under the caption *In re Wells Fargo & Co. Derivative Litigation*, No. CGC 16-554407 (S.F. Super.) (the "California State Derivative Action"). Pursuant to an agreement of the parties, the court also appointed the law firm Cotchett, Pitre & McCarthy, LLP as lead counsel in the California State Derivative Action.[4]

54. On May 10, 2017, six days after this Court issued its Demand Futility Order, Judge Curtis E.A. Karnow of the San Francisco Superior Court sustained defendants' demurrers with leave to amend, for failure to sufficiently allege demand futility.[5]

55. On May 26, 2017, Co-Lead Plaintiffs moved to intervene in and stay the California State Derivative Action.[6] Among other reasons, Co-Lead Plaintiffs argued that their intervention was appropriate because they had an interest in the outcome of the California State Derivative Action as shareholders asserting claims that were substantially, if not entirely, encompassed in this Action. Moreover, Co-Lead Plaintiffs argued that disposition of the California State Derivative Action "may as a practical matter impair or impede" their ability to protect Wells Fargo's interests in this Action, particularly given this Court's Demand Futility Order.[7] Co-Lead Plaintiffs also asserted that their interests could not be adequately represented by the parties in the California State Derivative Action. On June 26, 2017, lead plaintiffs in the California State Derivative Action filed an opposition to Co-Lead Plaintiffs' motion to intervene and stay.[8] On June 30, 2017, Co-Lead Plaintiffs filed a reply.[9]

56. On July 10, 2017, Judge Karnow held a hearing on Co-Lead Plaintiffs' motion, and indicated his intention to grant Co-Lead Plaintiffs' motion, finding that "[Co-Lead Plaintiffs']

---

[4] Order re Joint Stipulation Relating & Consolidating Actions & re Defs.' Response to Compl. & Appointing Lead Counsel, California State Derivative Action (Nov. 22, 2016).

[5] Order Sustaining Dems. in Part with Leave to Amend & in Part without Leave to Amend & Setting Case Mgmt. Conf., California State Derivative Action (May 10, 2017).

[6] Mot. to Intervene & to Stay This Case in Favor of the Federal Derivative Action, California State Derivative Action (May 26, 2017).

[7] *Id.* at 9.

[8] Pls.' Opp'n to Federal Pls.' Mot. for Leave to Intervene & to Stay This Case in Favor of the Federal Derivative Action, California State Derivative Action (June 26, 2017).

[9] Reply in Further Support of Mot. for Leave to Intervene & to Stay This Case in Favor of the Federal Derivative Action, California State Derivative Action (June 30, 2017).

interests could be severely impacted by the proceedings in this court."[10]  And on July 28, 2017, the San Francisco Superior Court permitted intervention by Co-Lead Plaintiffs and entered a general stay of the California State Derivative Action, which would be revisited at a subsequent case management conference.[11]

57.     On October 13, 2017, the San Francisco Superior Court held a further case management conference in the California State Derivative Action to hear the parties' respective positions on continuing the stay of that case following this Court's 12(b)(6) Order.  On October 20, 2017, the San Francisco Superior Court issued an order finding that the California State Derivative Action "apparently has claims not currently in the federal case [*i.e.*, this Action], that is, certain insider trading matters, certain defendants, and certain time period for claims, are in the state but not the federal matter."[12]  Furthermore, the court's "tentative conclusion [was] that proceeding on parts of the state case is appropriate," and it asked the parties to "confer on an appropriate means to in effect sever the unique state claims and allow them to proceed here [*i.e.*, before the San Francisco Superior Court], and report the results to the [San Francisco Superior Court] in the next joint CMC statement." [13]

58.     The San Francisco Superior Court heard the parties' respective positions at the subsequent case management conference, held on November 30, 2017.  That same day, the San Francisco Superior Court entered a partial stay of that case, staying those portions of the claims that overlapped with claims asserted in this Action.[14]  Specifically, the court stayed the California State Derivative Action with limited exceptions: (i) the state plaintiffs' fourth cause of action for breach of fiduciary duty for insider selling and misappropriation of information, and (ii) other causes of action to the extent they accrued during the time period preceding the Relevant Period

---

[10] Order re Mot. for Leave to Intervene & for a Stay, California State Derivative Action (July 10, 2017).
[11] Order Granting Mot. for Leave to Intervene & for a Stay, California State Derivative Action (July 28, 2017).
[12] Case Mgmt. Order No. 3 at 1, California State Derivative Action (Oct. 20, 2017), at 1–2.
[13] *Id.* at 2.
[14] Case Mgmt. Order No. 4 & Order on Stay, California State Derivative Action (Nov. 30, 2017).

in this action (*i.e.*, alleged misconduct prior to 2011) and relate to damages incurred during the period prior to 2011.

59.     Pursuant to further scheduling, the parties in the California State Derivative Action briefed a second round of demurrers on plaintiffs' amended complaint.  On April 6, 2018, Co-Lead Plaintiffs filed a response regarding the demurrers, noting that "[t]o the extent the Court otherwise examines the broadly alleged breaches of duty of loyalty in the Amended Complaint, its ruling may implicate and potentially adversely impact findings already made in the Federal Action [*i.e.*, this Action]."[15]  Co-Lead Plaintiffs therefore asked that should the San Francisco Superior Court make an adverse determination as to demand futility, it explicitly limit such a determination to the non-stayed causes of action only.[16]

60.     The San Francisco Superior Court held a hearing on April 17, 2018.  On April 25, 2018, the court indicated it was inclined to sustain the demurrer finding that plaintiffs had again failed to plead demand futility as to the non-stayed causes of action.  The court also noted that "it may not be in the best interests of Wells Fargo . . . to proceed now with the claims remaining," and ordered further briefing as to whether it should impose a general stay of the case.[17]

61.     On May 9, 2018, Co-Lead Plaintiffs filed briefing in support of a general stay. Consistent with its prior motion, Co-Lead Plaintiffs argued (i) that neither Wells Fargo nor any other party to the state court proceedings would derive any benefit from continued litigation of non-overlapping claims, (ii) that allowing the state court plaintiffs to amend their pleadings again would result in additional wasted resources, and (iii) that the state court proceedings continued to pose an unintended but existential threat to the outcome of this Action.[18]  That same day, lead plaintiffs in the California State Derivative Action filed a supplemental brief proposing that the San Francisco Superior Court take one of two paths—*i.e.*, (i) lift the stay and allow the parties to

---

[15] Response by Federal Intervenors re Defs.' Demurrers at 4, California State Derivative Action (Apr. 6, 2018).

[16] *Id.*

[17] Order on Demurrer & Request for Further Briefing, *Wells Fargo Derivative Cases*, No. CJC-18-004966 (Apr. 25, 2018).

[18] Federal Intervenors' Supplemental Submission in Support of General Stay, *Wells Fargo Derivative Cases* (May 9, 2018).

move forward on all claims, or (ii) reconsider the existing demurrers by following this Court's Demand Futility Order and 12(b)(6) Order.[19]

62.     Also on May 9, 2018, Wells Fargo and defendants in the California State Derivative Action filed a supplemental brief, in which they indicated that, while they believed a dismissal of that action was most appropriate, they "remain[ed] amenable to a general stay of all claims in [the California State Derivative Action]."[20]

63.     On May 14, 2018, the San Francisco Superior Court agreed with Co-Lead Plaintiffs and entered a complete stay.  It concluded that "a full stay is best now to preserve the derivative claims" and stayed the California State Derivative Action in its entirety.[21]  On June 12, 2018, lead plaintiffs in the California State Derivative Action filed a writ petition with the California Court of Appeal on the stay order.  On June 21, 2018, the writ petition was summarily denied.

64.     On June 14, 2019, lead plaintiffs in the California State Derivative Action filed a renewed motion for preliminary approval of a proposed settlement.  That motion is pending before the San Francisco Superior Court.

**b.     The *Herron* Action**

65.     On January 30, 2018, after the partial stay had been entered in the California State Derivative Action, plaintiff Joan Herron filed a shareholder derivative action in San Mateo Superior Court, captioned *Herron v. Stumpf*, No. 18-civ-00466 (San Mateo Super.) (the "*Herron* Action"), against certain defendants and Wells Fargo, as nominal defendant, alleging breach of fiduciary duty, violation of Section 25402 of the California Corporations Code, and breach of the duty of loyalty related to Improper Sales Practices.  Unlike this Action and the California State Derivative Action, Ms. Herron alleged that she made a pre-suit demand on the Board and that the Board wrongfully refused her demand.

---

[19] Pls.' Supplemental Br. Pursuant to the Court's Apr. 25, 2018 Order, *Wells Fargo Derivative Cases* (May 9, 2018).

[20] Defs.' Supplemental Br. Concerning Implementation of the Court's Apr. 25, 2018 Order on Demurrer, *Wells Fargo Derivative Cases* (May 9, 2018).

[21] Order Imposing General Stay, *Wells Fargo Derivative Cases* (May 14, 2018).

66.     On February 23, 2018, the Chair of the Judicial Council of California issued an order authorizing the San Francisco Superior Court to determine whether the actions should be coordinated. On April 12, 2018, the San Francisco Superior Court granted the petition for coordination and coordinated the actions under the caption *Wells Fargo Derivative Cases*, No. CJC-18-004966 (S.F. Super.).

67.     For the same reasons they had sought to stay the California State Derivative Action, Co-Lead Plaintiffs sought to stay the *Herron* Action. On May 24, 2018, the San Francisco Superior Court entered an order granting a stipulation between Co-Lead Plaintiffs and the parties to the *Herron* Action to allow Co-Lead Plaintiffs to intervene in the *Herron* Action for the limited purpose of seeking a stay of that case.[22]

68.     On May 25, 2018, Co-Lead Plaintiffs filed a motion to stay the *Herron* Action. Co-Lead Plaintiffs argued that as with the California State Derivative Action, the *Herron* Action should be stayed in its entirety because (i) the *Herron* Action is duplicative of and less comprehensive than this Action, and (ii) proceeding in the *Herron* Action would waste party resources and potentially give rise to conflicting rulings.[23] On June 11, 2018, Ms. Herron filed an opposition to Co-Lead Plaintiffs' motion.[24] On June 22, 2018, Co-Lead Plaintiffs filed a reply.[25]

69.     On July 11, 2018, Judge Karnow heard argument on the motion to intervene and thereafter stayed the *Herron* Action in its entirety pending resolution of this Action.[26]

70.     On June 14, 2019, lead plaintiffs in the California State Derivative Action concurrently filed in the *Herron* Action a renewed motion for preliminary approval of a proposed settlement. That motion, as noted above, is pending before the San Francisco Superior Court.

---

[22] Stipulation & Order Granting Federal Pls.' Intervention for Purposes of Seeking a Stay of the *Herron* Action, *Wells Fargo Derivative Cases* (May 24, 2018).

[23] Mot. by Federal Intervenors to Stay the *Herron* Action in Favor of the Federal Derivative Action, *Wells Fargo Derivative Cases* (May 25, 2018).

[24] Pl. Herron's Opp'n to Mot. by Federal Intervenors to Stay *Herron* Action, *Wells Fargo Derivative Cases* (June 11, 2018).

[25] Federal Intervenors' Reply in further Support of Mot. to Stay the *Herron* Action in Favor of the Federal Derivative Action, *Wells Fargo Derivative Cases* (June 22, 2018).

[26] Order Granting Mot. to Stay *Herron* Action, *Wells Fargo Derivative Cases* (July 11, 2018).

### c. The *Gordon* Actions

71.     On September 29, 2016, plaintiff Natalie Gordon filed a shareholder derivative action in California state court (*Gordon v. Baker*, No. CGC 16-554578 (S.F. Super.)), alleging breach of fiduciary duty and various other claims related to Improper Sales Practices against certain defendants and Wells Fargo, as nominal defendant. That case was voluntarily dismissed without prejudice on February 10, 2017.

72.     On November 7, 2016, Ms. Gordon filed a second shareholder derivative action in Delaware Chancery Court (*Gordon v. Baker*, C.A. No. 12877-VCG (Del. Ch.)), again alleging breach of fiduciary duty and various other claims related to Improper Sales Practices, against certain defendants and Wells Fargo, as nominal defendant. That case was voluntarily dismissed without prejudice on or about July 10, 2017.

### d. The *Massachusetts Laborers* Action

73.     On May 17, 2017, certain shareholders brought suit in the Delaware Court of Chancery against certain defendants and Wells Fargo to compel the production of documents in connection with allegations related to Improper Sales Practices, in *Massachusetts Laborers' Pension Fund v. Wells Fargo & Co.*, C.A. No. 12997-VCG (Del. Ch.) (the "*Massachusetts Laborers* Action"). The parties in the *Massachusetts Laborers* Action subsequently agreed to stay the action, though certain plaintiffs in that case subsequently commenced the *Connecticut Laborers* Action, discussed below.

### e. The *Rosenfeld* Action

74.     On December 20, 2016, plaintiff Barry Rosenfeld filed a shareholder derivative action in Delaware Chancery Court, captioned *Rosenfeld v. Stumpf*, C.A. No. 2017-0383 (Del. Ch.) (the "*Rosenfeld* Action"), against certain defendants and Wells Fargo, as nominal defendant, alleging breach of fiduciary duty, waste of corporate assets, insider trading, contribution and indemnification, unjust enrichment, and aiding and abetting related to Improper Sales Practices.

75.     On January 12, 2018, Co-Lead Plaintiffs filed motions to intervene in and to stay the *Rosenfeld* Action.[27] In connection with moving to intervene in Delaware Chancery Court,

---

[27] Mot. to Intervene, *Rosenfeld* Action (Jan. 12, 2018); Mot. to Stay, *Rosenfeld* Action (Jan. 12,

*Footnote continued on next page*

Co-Lead Counsel retained the law firm of Prickett, Jones & Elliott, P.A. ("Prickett Jones"), a Delaware firm, to assist with the Delaware proceedings, including filing the motions to intervene and stay. In their motion to intervene, Co-Lead Plaintiffs argued, *inter alia*, that (i) the *Rosenfeld* Action was both duplicative of and narrower than this Action; (ii) disposition of the *Rosenfeld* Action might, as a practical matter, impair Co-Lead Plaintiffs' ability to protect their claims on behalf of the Company in this Action; and (iii) Co-Lead Plaintiffs' interests could not be adequately represented by the existing parties to the *Rosenfeld* Action.[28] In moving to stay the *Rosenfeld* Action, Co-Lead Plaintiffs argued that an unfavorable ruling in the *Rosenfeld* Action could generate conflicts with the proceedings in this Action, and that further litigation of the *Rosenfeld* Action was duplicative and offered no meaningful benefit to the Company. In addition, Co-Lead Plaintiffs argued that, notwithstanding that Mr. Rosenfeld had pled demand *refusal* instead of demand *futility*, Defendants might still seek to use a dismissal of the *Rosenfeld* Action as a basis to assert issue preclusion in this Action.[29]

76. On May 11, 2018, the Delaware Chancery Court granted a stipulation by the parties, including Co-Lead Plaintiffs and Mr. Rosenfeld, dismissing the *Rosenfeld* Action with prejudice only as to Mr. Rosenfeld.

### f. The *Connecticut Laborers* Action

77. On May 17, 2017, plaintiff Connecticut Laborers Pension and Annuity Funds ("Connecticut Laborers") filed a shareholder derivative action in Delaware Chancery Court, captioned *Connecticut Laborers Pension & Annuity Funds v. Stumpf*, C.A. No. 2017-0380-SG (Del. Ch.) (the "*Connecticut Laborers* Action"), against certain defendants and Wells Fargo, as nominal defendant, alleging breach of fiduciary duty related to Improper Sales Practices. Connecticut Laborers filed an amended complaint on December 18, 2017.

78. In addition to claims relating to Improper Sales Practices, the amended complaint in the *Connecticut Laborers* Action also alleged that certain defendants violated their duties to the

*Footnote continued from previous page*
2018).
[28] Mot. to Intervene, *Rosenfeld* Action (Jan. 12, 2018).
[29] Mot. to Stay, *Rosenfeld* Action (Jan. 12, 2018).

1 Company concerning the provision of collateral protection insurance, overcharges to auto loan

2 customers for Guaranteed Asset Protection insurance, charges to customers related to mortgage

3 interest rates and so-called "rate-locks," violations of the Servicemembers Civil Relief Act, 50

4 U.S.C. App. § 3901 *et seq.*, and the fees charged to customers by the Company's foreign

5 exchange unit.

6       79.     While Co-Lead Plaintiffs' motions to intervene in and stay the *Rosenfeld Action*

7 were pending, *see* above, Co-Lead Plaintiffs, Mr. Rosenfeld, and Connecticut Laborers conferred

8 and agreed that, in order to conserve party and judicial resources and in light of the advanced

9 nature of this Action, the *Rosenfeld* Action should be voluntarily dismissed and the *Connecticut*

10 *Laborers* Action should be stayed.  On February 21, 2018, counsel for Connecticut Laborers sent

11 all parties proposed stipulations to that effect.  After considering the stipulations for several

12 weeks, defendants in the Delaware Chancery Court proceedings ultimately took the position that

13 they would not agree to either a stay of the *Connecticut Laborers* Action or a dismissal of the

14 *Rosenfeld* Action, and would actively oppose such relief.  Defendants' position contrasted with

15 their prior position in January 2018 when, pursuant to Court of Chancery Rules 23.1 and 12(b)(6),

16 they moved the court for an order to dismiss the *Connecticut Laborers* Action.[30]

17       80.     In light of the defendants' opposition to a proposed stay, Vice Chancellor

18 Glasscock held a telephonic conference in the *Connecticut Laborers* Action on March 16, 2018.

19 Attorneys from Prickett Jones joined Co-Lead Counsel on that telephonic conference.

20       81.     During that conference, defendants (who include Wells Fargo and all of the

21 Defendants in this Action, except Defendants Shrewsberry and Loughlin) reiterated their

22 opposition without providing justification for refusing to stipulate to a stay.  The parties stipulated

23 to Co-Lead Plaintiffs' intervention for the purpose of filing a motion to stay the *Connecticut*

24

---

25 [30] Def. John G. Stumpf's Mot. to Dismiss Pls.' Verified Am. Derivative Compl., *Connecticut Laborers* Action (Jan. 3, 2018); Wells Fargo & Co.'s Mot. to Dismiss Pls.' Verified Am.

26 Derivative Compl., *Connecticut Laborers* Action (Jan. 3, 2018). Def. Carrie Tolstedt's Mot. to Dismiss Verified Am. Derivative Compl., *Connecticut Laborers* Action (Jan. 3, 2018). Director

27 Defendants' Mot. to Dismiss Verified Am. Derivative Compl., *Connecticut Laborers* Action (Jan. 3, 2018). Def. Timothy J. Sloan's Mot. to Dismiss Verified Am. Derivative Compl., *Connecticut*

28 *Laborers* Action (Jan. 3, 2018).

*Laborers* Action. A hearing on Co-Lead Plaintiffs' and Connecticut Laborers' motions to stay was set for June 12, 2018 before Vice Chancellor Glasscock.

82. On April 6, 2018, Co-Lead Plaintiffs and Connecticut Laborers separately filed motions to stay the *Connecticut Laborers* Action.[31] Co-Lead Plaintiffs argued, *inter alia*, that an unfavorable ruling in the *Connecticut Laborers* Action could generate conflicts with the proceedings in this Action, and that further litigation of the *Connecticut Laborers* Action was duplicative and offered no meaningful benefit to the Company. Prickett Jones assisted Co-Lead Counsel in the filing of the motion to stay.

83. On May 10, 2018, defendants filed a brief in opposition to Co-Lead Plaintiffs' motion to stay the *Connecticut Laborers* Action. In their brief, defendants specifically requested that the Delaware Chancery Court issue a decision contrary to this Court's prior Demand Futility Order and 12(b)(6) Order, with the apparent intention of depriving this Court of jurisdiction over Co-Lead Plaintiffs' claims.[32] Defendants cited "ongoing confusion" and "diverging decisions" between this Action and the California State Derivative Action, though to the extent that argument had any merit at the outset (Co-Lead Plaintiffs maintained it did not), it was seriously undermined, or obviated entirely, just four days later when the San Francisco Superior Court stayed the California State Derivative Action *in its entirety* in deference to this Action. Defendants, though, sought from the Delaware Chancery Court a preclusive and final "*authoritative ruling* on the demand futility issue," plainly seeking to undue this Court's well-considered decision.[33] On May 17, 2018, Co-Lead Plaintiffs filed a notice in this Action, apprising this Court of the positions taken by Wells Fargo and the defendants in the *Connecticut Laborers* Action. Dkt. 223.

84. On May 17, 2018, Co-Lead Plaintiffs filed a reply in further support of their motion.[34] Principally, Co-Lead Plaintiffs explained that (i) the decisions issued by this Court and

[31] Federal Pls.' Mot. to Stay, *Connecticut Laborers* Action (Apr. 6, 2018); Mot. to Stay, *Connecticut Laborers* Action (Apr. 6, 2018).

[32] Defs.' Opp'n to Federal Plaintiffs' Mot. to Stay Delaware Proceedings, *Connecticut Laborers* Action (May 10, 2018).

[33] *Id.* at 6 (emphasis added).

[34] Reply Br. in Further Support of Mot. to Stay, *Connecticut Laborers* Action (May 17, 2018).

the San Francisco Superior Court were *not* conflicting because the San Francisco Superior Court had made no final rulings on demand futility in the California State Derivative Action; (ii) the San Francisco Superior Court stayed the entire California State Derivative Action specifically to *avoid* any potential future conflicts; and (iii) defendants offered no basis for questioning this Court's capacity to render prompt and complete justice.

85. On June 12, 2018, after a hearing on the matter, the Delaware Chancery Court stayed the *Connecticut Laborers* Action in its entirety pending resolution of this Action.[35] An attorney from Prickett Jones argued the motion on behalf of Co-Lead Plaintiffs.

86. Prickett Jones continues to act on behalf of Co-Lead Plaintiffs and Co-Lead Counsel in the Delaware proceedings.

**B.** **Negotiations Regarding Initial Discovery and Scheduling**

87. The Parties exchanged initial disclosures in this Action pursuant to Rule 26(f) on December 20, 2017.

88. On January 10, 2018, the Court held a case management conference, Dkt. 194, and on January 24, 2018, it issued a Scheduling Order setting forth significant case deadlines going forward. Notably, the Court scheduled (i) a document discovery cut-off (*i.e.*, substantial completion) date of September 14, 2018; (ii) an expert discovery deadline of May 10, 2019; (iii) an August 30, 2019 deadline for briefing of dispositive motions; and (iv) a trial date of December 2, 2019. Dkt. 199.

89. In addition, following the 12(b)(6) Order, the Parties began negotiating both a stipulated Protective Order and a stipulated ESI Protocol to govern discovery going forward. After several rounds of proposals, the Parties reached agreement and filed both stipulations and proposed orders on February 28, 2018. *See* Dkts. 205, 206.

90. On March 7, 2018, the Court granted the Parties' stipulated Protective Order and stipulated ESI Protocol. Dkts. 210, 211.

---

[35] Order to Stay Proceedings, *Connecticut Laborers* Action (July 11, 2018).

### C. Co-Lead Plaintiffs' Discovery Efforts

91. For over a year, Co-Lead Plaintiffs pursued discovery from Wells Fargo, Defendants, and several third-parties. The Parties agreed to and operated under an expedited case schedule providing for substantial completion of document production by September 14, 2018, less than nine months after the Court entered its Scheduling Order on January 24, 2018. *See* Dkt. 199**.**

92. In total, Co-Lead Plaintiffs served 204 document requests on Wells Fargo, Defendants, and certain third-parties. Co-Lead Plaintiffs received 727,679 documents from Defendants and seven third-parties, comprising 3,529,385 pages.

93. As of December 12, 2018, when the Parties accepted the Mediators' proposal, Plaintiffs' Counsel had reviewed over 1.1 million pages of documents produced in this Action, as well as tens of thousands of pages of documents from other civil and regulatory proceedings, public reports, press coverage, and congressional testimony related to the Improper Sales Practices. Plaintiffs' Counsel ceased document review and analysis, and all other discovery work, following the Parties' acceptance of the Mediator's proposal.

94. Co-Lead Plaintiffs also retained several experts, consultants, and investigatory firms to obtain additional information and to perform an evaluation of their claims as the Action progressed. This work covered a wide range of topics, including corporate governance, regulatory matters, insurance coverage, and damages.

95. Co-Lead Counsel's discovery efforts provided Co-Lead Plaintiffs with a thorough understanding of the strengths and weaknesses of their claims, and assisted Co-Lead Counsel in considering and evaluating whether the proposed Settlement was fair, reasonable, and adequate.

96. A detailed summary of Co-Lead Counsel's discovery efforts follows.

#### 1. Discovery from Wells Fargo

97. Formal document discovery in the Action commenced on November 3, 2017, when Co-Lead Plaintiffs served Wells Fargo with their first set of document requests. Broadly speaking, these document requests—comprising 63 individual requests—sought information concerning (i) the scope of the Improper Sales Practices; (ii) investigations and litigations relating

to the Improper Sales Practices; (iii) the Company's internal investigations; (iv) Defendants' contemporary awareness of the Improper Sales Practices; (v) statements made to investors, financial analysts, and the SEC; (vi) employee complaints and litigation regarding the Improper Sales Practices; (vii) the termination of over 5,300 Wells Fargo employees in connection with the Improper Sales Practices; (viii) the Board's authorization of repurchases of Wells Fargo stock; (ix) Wells Fargo's Sales Integrity Task Force; (x) the Company's corporate structure; (xi) the Company's policies, including those relating to employment practices, its Code of Ethics and Business Conduct, corporate governance, internal controls, risk management, and internal auditing; (xii) Defendants' transactions in Wells Fargo securities; (xiii) reelection, compensation, and terminations or other departures of Board members; (xiv) the Company's remedial efforts with respect to the Improper Sales Practices; and (xv) potential damages.

98. On December 15, 2017, Wells Fargo served its responses and objections to Co-Lead Plaintiffs' first set of document requests.

99. Co-Lead Counsel and Wells Fargo met and conferred, beginning on January 11, 2018 and for a period of several months, to address the Parties' disagreements regarding the scope of discovery and proposed search terms to be applied to identify responsive documents. As of July 2, 2018, Co-Lead Plaintiffs and Wells Fargo had agreed upon a comprehensive preliminary search protocol (including more than 50 custodians and hundreds of search terms), subject to potential further meet-and-confer discussions based on information produced in discovery. *See* Dkt. 234. Pursuant to that preliminary agreement, Wells Fargo would produce responsive documents dated through October 2016. Wells Fargo continued to maintain objections to producing documents post-dating October 2016.

100. On March 12, 2018, Co-Lead Plaintiffs served Wells Fargo with their second set of document requests. This second set of five individual document requests sought information concerning the Federal Reserve Board's investigation into the Improper Sales Practices, and the Order to Cease and Desist Issued Upon Consent Pursuant to the Federal Deposit Insurance Act, as Amended, *In the Matter of Wells Fargo & Company San Francisco, California*, Docket No. 18-

007-B-HC, dated February 2, 2018, issued by the Federal Reserve Board (the "Federal Reserve Consent Order").

101.    On April 11, 2018, Wells Fargo served Co-Lead Plaintiffs with its responses and objections to their second set of document requests.

102.    By July 9, 2018, Wells Fargo had produced approximately 135,000 pages of documents in response to Co-Lead Plaintiffs' document requests. *See* Dkt. 234 at 8. By August 7, 2018, Wells Fargo had produced approximately 255,000 pages of documents. *See* Dkt. 244 at 2.

103.    Wells Fargo informed Co-Lead Plaintiffs that it substantially completed its production of documents as of September 14, 2018.

104.    As described in the Parties' October 9, 2018 joint case management statement, Wells Fargo to that point had produced over 164,000 documents, consisting of more than 688,000 pages. Wells Fargo further indicated that it had completed its production of documents identified through application of the preliminary search protocol. *See* Dkt. 255 at 5–6. However, the Parties anticipated additional document production, and stipulated to a modified case schedule, whereby the document discovery cut-off date would be extended until January 11, 2019. *See id.* at 11.

105.    At a subsequent case management conference on October 17, 2018, the Court adopted the Parties' stipulated request and extended the document discovery cutoff date to January 11, 2019. Dkt. 260.

106.    After a further meet and confer, Wells Fargo agreed to produce to Co-Lead Plaintiffs an additional set of more than 520,000 responsive documents, comprising over 2.5 million pages, which Wells Fargo completed in four document productions in November 2018.

## 2.    Discovery from Defendants

107.    On May 9, 2018, Co-Lead Plaintiffs served the Officer Defendants and the Director Defendants with separate sets of document requests. The document requests to the Officer Defendants and Director Defendants each consisted of 68 substantially similar requests, and, broadly speaking, sought information similar to that sought from Wells Fargo. On June 8,

2018, the Director Defendants served Co-Lead Plaintiffs with a single set of their responses and objections, and each of the Officer Defendants separately served his or her responses and objections.

### a. Director Defendants

108. On June 21, 2018, and July 19, 2018, Co-Lead Plaintiffs and the Director Defendants met and conferred regarding the Director Defendants' response to Co-Lead Plaintiffs' document requests. Recognizing the substantial overlap among the document requests, Co-Lead Plaintiffs modified the preliminary search protocol with Wells Fargo as a starting point for negotiations with the Director Defendants.

109. Following the meet-and-confer process, the Director Defendants made four productions. In addition, by agreement with Wells Fargo, the Company produced additional documents relating to the Director Defendants.

110. Following the October 17, 2018 case management conference, Co-Lead Plaintiffs and the Director Defendants exchanged letters and held a telephonic meet-and-confer on November 1, 2018. The Director Defendants made additional productions of documents on November 12 and November 30, 2018.

### b. Officer Defendants

111. On July 6, 2018, Co-Lead Plaintiffs sent substantially similar letters to each of the Officer Defendants seeking additional information with regard to their responses and objections to the document requests. Specifically, Co-Lead Plaintiffs requested, *inter alia*, that the Officer Defendants confirm that they (i) were continuing to preserve all relevant documents, and (ii) had conducted certain searches for information through the present day. Co-Lead Plaintiffs also requested that the Officer Defendants provide additional information about the manner in which they searched for responsive information. The letters requested dates to set up meet-and-confer calls to discuss these issues and the Officer Defendants' objections and responses.

112. Co-Lead Plaintiffs and the Officer Defendants subsequently engaged in a meet-and-confer process, after which the Officer Defendants made one production in addition to documents of theirs that, by agreement, Wells Fargo produced.

### 3. Discovery from Third-Parties

113. Co-Lead Plaintiffs served subpoenas to seven third-parties, which collectively produced 4,458 pages of documents.

114. ***American Express***. On July 24, 2018, Co-Lead Plaintiffs served a subpoena on American Express, containing 12 separate requests for information relating to, *inter alia*, (i) the Improper Sales Practices; and (ii) the agreement, announced on August 7, 2013, whereby Wells Fargo would issue new credit cards provided by American Express. The parties met and conferred on August 1, 2018. On August 22, 2018, American Express served its written responses and objections. On October 25, 2018, American Express made a production in response to Co-Lead Plaintiffs' subpoena.

115. ***PwC***. On July 24, 2018, Co-Lead Plaintiffs served a subpoena on PricewaterhouseCoopers ("PwC"), containing 14 separate requests for information relating to its retention by Wells Fargo in connection with regulatory investigations and litigations relating to the Improper Sales Practices. On August 7, 2018, PwC served its responses and objections, largely refusing to produce documents on grounds of relevance and privilege. On September 24, 2018, Co-Lead Plaintiffs served a written response by letter, and the parties agreed to meet and confer the following week. On November 21, 2018, Co-Lead Plaintiffs sent a second letter to PwC requesting production of PwC's retention agreement with Wells Fargo.

116. ***McKinsey***. On August 6, 2018, Co-Lead Plaintiffs served a subpoena on McKinsey & Company, Inc. ("McKinsey"), containing 12 separate requests for information relating to its retention by Wells Fargo's Board to aid its evaluation of the Company's risk management capabilities. The parties met and conferred on August 17, 2018, and McKinsey served its written responses and objections on August 24, 2018. Counsel for McKinsey represented that McKinsey would issue a preservation memorandum for relevant materials, and begin a process for collecting responsive documents. On November 21, 2018, Co-Lead Plaintiffs corresponded with McKinsey regarding the progress of McKinsey's document collection.

117. ***Accenture***. On August 9, 2018, Co-Lead Plaintiffs served a subpoena on Accenture LLP ("Accenture"), containing 16 separate requests for information relating to its

retention by Wells Fargo to assist in an independent review of the Company's approach to sales practices. On August 30, 2018, Accenture served its written responses and objections, refusing to produce any documents largely on grounds of privilege. On November 21, 2018, Co-Lead Plaintiffs sent Accenture a letter requesting production of Accenture's retention agreements with Wells Fargo or its counsel.

118. ***FTI***. On August 6, 2018, Co-Lead Plaintiffs served a subpoena on FTI Consulting, Inc. ("FTI"), containing 17 separate requests for information relating to its retention by counsel to Wells Fargo's Board in its preparation of the Oversight Committee Report. On August 20, 2018, FTI served its written responses and objections, refusing to produce any documents largely on grounds of privilege. On November 21, 2018, Co-Lead Plaintiffs sent FTI a letter requesting production of FTI's retention agreements with Wells Fargo or its counsel.

119. ***F.W. Cook***. On August 6, 2018, Co-Lead Plaintiffs served a subpoena on Frederick W. Cook & Co., Inc. ("F.W. Cook"), containing six separate requests for information relating to its retention by Wells Fargo regarding executive compensation practices. The parties met and conferred several times regarding Co-Lead Plaintiffs' requests—on September 27, 2018, October 5, 2018, and November 6, 2018. In these discussions, counsel for F.W. Cook agreed to review and produce any responsive non-privileged documents. On November 30, 2018, F.W. Cook served its written responses and objections, and on December 6, 2018, it produced 60 documents.

120. ***Mercer***. On September 8, 2018, Co-Lead Plaintiffs served a subpoena on Mercer Consulting Group, Inc. ("Mercer"), containing 15 separate requests for information relating to its retention by Wells Fargo regarding the Company's compensation program. On September 26, 2018, Mercer served its written responses and objections, and on October 24, 2018, it produced documents totaling 325 pages.

### 4. The Federal Reserve

121. On June 20, 2018, Co-Lead Plaintiffs made a formal written request to the Federal Reserve for access to confidential supervisory information in accordance with 12 C.F.R. § 261.22. Specifically, Co-Lead Plaintiffs sought access to information regarding the Federal

Reserve's investigation into Wells Fargo and the Improper Sales Practices, as well as its eventual February 2, 2018 Consent Order. Co-Lead Plaintiffs identified specific document requests they had served in this Action, which Wells Fargo and Defendants refused to produce, relying on the bank examination privilege. On October 23, 2018, counsel for the Federal Reserve served a written response, requesting additional information with respect to Co-Lead Plaintiffs' request.

### D. Co-Lead Plaintiffs' Review and Synthesis of Document Discovery

122. In the course of discovery, Co-Lead Plaintiffs reviewed and analyzed over 332,000 documents produced by Wells Fargo, the Defendants, and third-parties, totaling more than 1.1 million pages. This review and analysis consisted of both an attorney-directed manual review of individual documents and, later, the use of technology-assisted review ("TAR") software, to identify documents most likely to be relevant to the central issues in the Action.

123. As Wells Fargo made its first productions of documents, beginning in May 2018, Co-Lead Counsel took steps to maximize the efficiency of its review and analysis. Given the volume of documents, Co-Lead Counsel ran searches of key terms through the document productions in order to prioritize review of documents more likely to be responsive to Co-Lead Plaintiffs' requests. Co-Lead Counsel also prepared a comprehensive document review manual for use in training and guiding attorneys in their review and analysis. This manual contained, among other things, background information about the Action, an explanation of key issues and witnesses, and instructions for document coding. Co-Lead Counsel also developed a set of quick-reference resources to aid attorneys in their review and analysis, including a "cast of characters" directory, a list of acronyms and terms, and a document of frequently asked questions regarding the case and key issues. As document review and analysis continued, Co-Lead Counsel refined the manual to account for newly produced information and to narrow the focus on particular issues in preparation for anticipated depositions.

124. Starting in July 2018, Co-Lead Counsel commenced a first-level review of documents produced in this Action. This process required attorneys to carefully review each document, one-by-one, to assess its relevance to the core issues in the Action, and to input summary notes regarding documents of interest. This process also required attorneys to perform

targeted searches to identify similarly relevant documents, and to share that information with the larger team. During this phase, and throughout the remainder of discovery, attorneys on the document review and analysis team met weekly by telephone for, during which attorneys discussed key documents and collaborated on best practices. The document review and analysis was conducted by attorneys at Lieff Cabraser, Saxena White, Robbins Arroyo LLP and Glancy Prongay & Murray LLP. The weekly meetings were led by associates and partners from Lieff Cabraser and Saxena White, and actively attended by lawyers at all four law firms who, among other things, presented on documents they had reviewed and analyzed.

125. In performing initial review and analysis of documents, attorneys identified "hot" and "highly relevant" documents, which were deemed particularly relevant to the key issues in the Action. These selected documents were further subjected to a second-level review by a team of experienced attorneys, who then synthesized the information and provided specific feedback to the review and analysis team. The second-level review resulted in a refined set of key documents that were confirmed to be "hot" or "highly relevant" (*i.e.*, the "seed set") with respect to the issues in the case.

126. In order to further conserve resources and maximize efficiency, Co-Lead Counsel configured their document database for TAR in the Continuous Active Learning ("CAL") mode. In the TAR-CAL mode, the computer learns from the content of the seed set and is trained to identify more of the same types of documents from additional unreviewed documents as they are produced. The computer identifies and feeds new proposed hot or highly relevant documents to a team of attorneys on a priority basis for further review. These attorneys review and either affirm or correct the computer's proposed coding. The computer automatically "digests" the decisions made by the attorneys and recalibrates its learning process on a continuous basis, hence the term "Continuous Active Learning." Through this iterative process between attorneys and artificial intelligence, Co-Lead Counsel identified key hot and highly relevant documents quickly and on a priority basis. A total of 109,401 documents produced were subjected to TAR-CAL and, in a few months, Co-Lead Counsel identified 12,780 of these documents as hot or highly relevant. These hot or highly relevant documents were then analyzed for deposition preparation.

127. Overall, including documents run through the TAR-CAL process, Co-Lead Counsel reviewed and analyzed over 332,000 documents produced by Wells Fargo and the Defendants.

128. Co-Lead Counsel also began a comprehensive process of preparing for the depositions of over 40 anticipated fact witnesses, including the 20 named Defendants. This deposition preparation process required attorneys to, among other things, (i) conduct independent research on each of the anticipated witnesses, (ii) review and synthesize information contained in hot and highly relevant documents, (iii) identify key documents for use in depositions, and (iv) draft detailed outlines with respect to key deposition topics. Attorneys were organized by fact witness into two- or three-person teams. After review and analysis of the pertinent information, these attorney teams presented their summaries, outlines, and key documents for further discussion with managing attorneys on the case. Based on feedback from the managing attorneys, these attorney teams would then further refine their work product and identify additional areas of inquiry as well as additional documents for use at deposition.

### E. <u>Notable Discovery Disputes</u>

129. In addition to disputes over the completeness of Wells Fargo's and the Defendants' document productions (*see supra* at ¶¶ 96-110), the Parties engaged on issues regarding the applicable time period for discovery as well as depositions and case scheduling, as detailed below.

### 1. **Applicable Time Period for Discovery**

130. Over the course of discovery, Wells Fargo and the Defendants refused to produce documents relevant to events and developments post-dating the Company's September 2016 disclosures relating to the Improper Sales Practices. In general, Wells Fargo agreed to produce only documents dated through October 2016, and the Director Defendants agreed to produce only documents dated through September 2016.

131. The Parties met and conferred on multiple occasions. Among other things, the Parties discussed, on September 25 and 28, 2018, a proposal to run searches for the following limited categories of documents post-dating October 2016: (i) post-September 2016 termination

of executives and officers; (ii) corporate governance changes and Board composition; (iii) internal investigations of sales practices by Wells Fargo's Oversight Committee and the resulting April 2017 Oversight Committee Report; (iv) the investigation by the Federal Reserve Board and the resulting February 2018 Federal Reserve Order; and (v) remedial actions and damages incurred by Wells Fargo. The issue was ultimately briefed in a submission to the Court shortly before the Settlement was reached.

### 2. Depositions and Case Scheduling

132. Co-Lead Plaintiffs informed the Court that they projected taking at least 40 fact witness depositions. *See, e.g*., Dkts. 234 at 8, 244 at 6-7, 255. Wells Fargo and Defendants took the position that such a large number of depositions would be extremely difficult to complete within the timeframe provided under the Court's Scheduling Order (Dkt. 199). The Parties continued to dispute the propriety of and the amount of time required for Co-Lead Plaintiffs' anticipated depositions, as reflected in their October 9, 2018 joint case management statement. *See* Dkt. 255 at 12–13, 17.

133. Under the Court's Scheduling Order, the Parties were required to simultaneously exchange opening and rebuttal expert reports. In the Parties' October 9, 2018 joint case management statement, Defendants proposed an alternative schedule under which Co-Lead Plaintiffs would be required to first serve their expert reports, followed by Defendants' expert reports, and precluding Co-Lead Plaintiffs from rebuttal altogether. *See* Dkt. 255 at 11–12, 14–15, 17.

134. Both of the disagreements described above had ramifications for the Action going forward, as reflected in the Parties' divergent proposed case schedules. *See id.* at 11–12. However, at its October 17, 2018 case management conference, before definitively deciding these matters, the Court (i) adopted the Parties stipulated request to continue the document discovery cutoff date to January 11, 2019, and (ii) scheduled a further case management conference for January 23, 2019. Dkt. 260. In light of the settlement-in-principle reached on December 12, 2018, the Parties did not propose a revised case schedule.

### III. SETTLEMENT DISCUSSIONS, MEDIATION, AND NEGOTIATION OF SETTLEMENT DOCUMENTS

135.     In a total of seven in-person mediation sessions that commenced in August 2017 and took place in San Francisco and New York City, the Parties and certain insurance companies that issued directors and officers liability insurance ("Insurers"), engaged in vigorous negotiations regarding a potential resolution of the Action.  At the end of the last full-day mediation session, on December 4, 2018, these efforts culminated in a Mediators' proposal, which the Parties and the Insurers accepted on December 12, 2018.

136.     The Settlement is the product of arm's-length negotiations among experienced and well-informed counsel, and were conducted in the utmost good faith.[36]

### A. Mediations with Judge Layn R. Phillips (Ret.)

137.     After the Court issued its Demand Futility Order, the Parties agreed to begin exploring the possibility of resolving the Action.  To that end, the Parties engaged retired federal Judge Layn R. Phillips and Ms. Michelle Yoshida, both of Phillips ADR, to facilitate a series of settlement negotiations.

138.     On August 7, 2017, the Parties met in San Francisco, California, for their first mediation session with Judge Phillips.

139.     In preparation for that mediation, Judge Phillips requested, and the Parties exchanged, detailed mediation briefs on July 24, 2017.  Co-Lead Plaintiffs submitted a 25-page mediation brief, detailing the relevant facts and presenting a preliminary analysis of the damages suffered by the Company as a result of the Improper Sales Practices.  Wells Fargo and the Director Defendants each submitted briefs rebutting Co-Lead Plaintiffs' claims and contesting damages to the Company from the Improper Sales Practices.  In addition, after reviewing Co-Lead Plaintiffs' submission, Judge Phillips sought additional information regarding Co-Lead Plaintiffs' claims and their positions with respect to a potential settlement.  Co-Lead Plaintiffs prepared a response, which they shared with Judge Phillips at the mediation.

---

[36] The Parties' mediation sessions are discussed below for the purpose of describing key events in this Action, and do not constitute a waiver of any privilege (including the mediation privilege), doctrine, law, or rule protecting information from disclosure.

140.     The Parties negotiated, through Judge Phillips, on August 7, 2017.  Specifically, Co-Lead Plaintiffs shared their positions and conveyed to Judge Phillips their understanding of the strengths and weaknesses of the claims and defenses in this Action, as well as potential sources of recovery.  The Parties agreed to schedule a subsequent mediation.

141.     Following the first mediation and in advance of the second mediation, and at the request of Judge Phillips, Co-Lead Plaintiffs prepared proposals regarding corporate governance reforms and the forfeiture of compensation from certain Defendants.

142.     On August 28, 2017, the Parties and the Insurers (comprising approximately fifteen distinct entities) met for a second mediation session in New York City.  At this mediation, the Parties prepared and gave presentations on key issues affecting the Action, including with respect to the claims and defenses asserted, proposed corporate governance reforms, and the damages sought.

143.     On October 5, 2017, one day after the Court issued its 12(b)(6) Order, the Parties and the Insurers met for a third mediation session in New York City.  In advance of that mediation, Judge Phillips requested, and the Parties submitted, detailed responses regarding some of the key arguments that each side had advanced during negotiations to that point.  After a full day of negotiations, the Parties' positions remained significantly far apart.  Accordingly, the Parties concluded their negotiations with no resolution in hand.

**B.     Mediations with Judge Daniel Weinstein (Ret.) and Jed Melnick, Esq.**

144.     With no settlement in sight, discovery progressed and Co-Lead Plaintiffs successfully stayed the parallel California State Derivative Action and the *Connecticut Laborers* Action.

145.     Then, in mid-June 2018, the Parties revisited mediation.  The Parties engaged retired Judge Daniel Weinstein (Ret.) and Jed Melnick, Esq., both of JAMS Mediation, Arbitration and ADR Services, to facilitate the renewed settlement negotiations.

146.     In advance of the first mediation session with Judge Weinstein and Mr. Melnick, and, at their request, on August 15, 2018, Co-Lead Plaintiffs provided to the mediators a detailed analysis of the categories of damages recoverable in this Action.

147.    On September 12, 2018, the Parties exchanged mediation briefs regarding liability and damages.  Co-Lead Plaintiffs submitted a comprehensive brief, covering their key positions regarding liability, information that had been uncovered during discovery, and an updated estimate of potential damages incurred by Wells Fargo.  The Director Defendants and the Officer Defendants separately submitted responsive briefs on those topics.  In addition, the Insurers submitted written reports from two experts regarding damages, consistent with the arguments advanced by the Officer Defendants.

148.    On September 20, 2018, the Parties and the Insurers met for their fourth mediation session, in New York City.  At the mediators' suggestion, this mediation session was structured as an "information sharing" session.  To that end, the Parties, the Insurers, and their counsel jointly met to present and defend, their respective positions.

149.    Following that mediation session, the Parties and the Insurers exchanged briefs on October 9, 2018, responding to points raised in the briefing exchanged on September 12 and at the September 20 mediation.  Co-Lead Plaintiffs supplemented their arguments about liability with documents produced in discovery and specifically challenged, with applicable legal authority, the Officer Defendants' and Insurers' arguments with respect to purported limitations on calculable damages in this Action.  The Officer Defendants and Director Defendants each submitted a reply brief.

150.    On October 15 and October 16, 2018, the Parties and the Insurers convened in San Francisco, California, for their fifth and sixth mediation sessions, respectively.  At these mediation sessions, the Parties and the Insurers continued their negotiations in earnest, including presenting settlement demands and offers through the mediators.  By the end of the second day, the Parties were unable to reach resolution.  However, given the progress made in these sessions, the Parties agreed to schedule an additional mediation session to allow for further information sharing and discussion.

151.    On December 4, 2018, the Parties and the Insurers met in New York City for their seventh and final mediation session.  After a full day of negotiations, including exchanges of offers and demands, Judge Weinstein and Mr. Melnick presented the Mediators' proposal,

consisting of the following principal terms:  (i) a monetary payment of $240 million to be paid by the Insurers to Wells Fargo; (ii) acknowledgement from Wells Fargo that facts alleged in the Action were a significant factor in causing certain corporate governance changes undertaken by Wells Fargo during the pendency of this Action (the "Corporate Governance Reforms"); and (iii) acknowledgement from Wells Fargo that facts alleged in this Action were a significant factor in causing certain remedial steps with respect to compensation reductions and forfeitures undertaken by Wells Fargo during the pendency of this Action (the "Clawbacks").  The Parties would further agree, as part of the Mediators' proposal, that the Corporate Governance Reforms and the Clawbacks have a combined value to Wells Fargo of $80 million, for a total settlement value to Wells Fargo of $320 million, not including Co-Lead Counsel's fee award.  Additionally, in response to the Insurers' insistence that certain derivative actions and claims not based on the Improper Sales Practices (as defined in the Stipulation, the "CPI Derivative Actions") be resolved at the same time, the Mediators' proposal also required the contemporaneous (but unconnected) resolution of the CPI Derivative Actions.

152.    On December 12, 2018, the Parties and the Insurers accepted the Mediators' proposal.

153.    On January 16, 2019, the Parties submitted a joint case management statement and notice of settlement informing the Court that they had "recently reached an agreement in principle to settle this action," and proposing a briefing schedule for preliminary approval.  Dkt. 266 at 2. On January 21, 2019, the Court issued an Order re Notice of Settlement and Scheduling Order that adopted the Parties' proposed briefing schedule, set a preliminary approval hearing for March 21, 2019, and vacated all previous deadlines in the case.  Dkt. 267.  On February 13, 2019, the Court entered a stipulation modifying the Parties' briefing schedule and set a preliminary approval hearing for April 4, 2019.  Dkt. 269.

C.    **The Settlement Agreement and Preliminary Approval**

154.    After accepting the Mediators' proposal, the Parties and the Insurers engaged in extensive negotiations over approximately two months regarding the material terms of the Stipulation and various supporting documents, including those describing the Corporate

Governance Reforms and Clawbacks, proposed notices to shareholders, and proposed orders for the Court. Co-Lead Plaintiffs also worked with Wells Fargo to design and implement a notice plan consistent with Ninth Circuit authority.

155. On February 26, 2019, the Parties executed the Stipulation. *See* Dkt. 270-1.

156. On February 28, 2019, Co-Lead Plaintiffs filed their motion for preliminary approval of the Settlement. Dkt. 270.

157. On March 20, 2019, the Court issued an order requesting supplemental briefing regarding the value of the claims being released. Dkt. 271. The Court also vacated the previously scheduling hearing for April 4, 2019. *Id.* In response, on April 2, 2019, Co-Lead Plaintiffs filed a supplemental brief addressing the estimated amount of potential damages in this Action. Dkt. 272.

158. On May 14, 2019, the Court entered an order granting preliminary approval of the Settlement and scheduling a final fairness hearing on the Settlement and related matters for August 1, 2019, at 2:00 p.m. Dkt. 274.

159. Following the Court's order granting preliminary approval, Co-Lead Counsel and counsel for Wells Fargo implemented an extensive notice program directed to shareholders. A detailed description of these efforts is provided in the Declaration of Sean A. Petterson, submitted concurrently herewith.

## IV. THE RISKS OF CONTINUED LITIGATION

160. At the time the Parties agreed to the Mediators' proposal on December 12, 2018, Co-Lead Plaintiffs had a sufficient understanding of the strengths and weaknesses of the claims and defenses in this Action. Having reviewed voluminous documents produced in discovery, Co-Lead Plaintiffs had also identified key information and evidence that would be central to their ability to succeed at trial.

161. Despite Co-Lead Plaintiffs' confidence in the strengths of their claims, significant risks remained in continuing to litigate this Action through trial and a near-certain appeal. Co-Lead Plaintiffs and Co-Lead Counsel carefully considered these risks before ultimately agreeing to the Mediators' proposal.

162. Some of the most significant risks facing Co-Lead Plaintiffs and Wells Fargo in continuing to litigate this Action are discussed below.

**A.  Procedural Risks**

163. Despite Co-Lead Plaintiffs' early successes in overcoming Wells Fargo's and Defendants' motions to dismiss, significant and costly procedural hurdles remained.

164. Co-Lead Plaintiffs faced some uncertainty in proceeding through the discovery process. For example, prior to agreeing to the Mediators' proposal, there were active disputes between the Parties about the scope of discovery and the extent to which Co-Lead Plaintiffs could obtain and admit at trial meaningful evidence related to their claims. The resolution of these disputes, potentially through rulings by the Court, may have significantly affected the strength of Co-Lead Plaintiffs' position.

165. In addition, Co-Lead Plaintiffs reasonably expected that they would need to oppose summary judgment and *Daubert* motions before going to trial. For instance, in addition to questions affecting liability and damages, Defendants signaled their intent to seek summary judgment on the question of demand futility, an issue for which there is little authority at the summary judgment stage.

166. And even assuming the Court ultimately agreed with Co-Lead Plaintiffs that genuine issues of material fact existed with respect to each of the claims, merely reaching trial would have imposed significant costs on Wells Fargo and subjected it to continued public scrutiny.

167. Furthermore, Defendants would undoubtedly appeal any favorable verdict, further elongating the litigation process.

168. In short, continued litigation would have (i) taken at least another year, excluding any appellate process; (ii) subjected Wells Fargo to the disruption and uncertainty inherent in a trial on the issues; and (iii) deprived the Company of an opportunity to move past the scandal. In particular, a likely appeal and collateral litigation with the Insurers could possibly place in jeopardy the primary source of recovery: the underlying D&O insurance policies.

### B.     Risks of Establishing Liability

169.     Assuming Co-Lead Plaintiffs survived summary judgment, they faced additional risk in being able to prove liability at trial.  For example, in order to establish the core breach of fiduciary duty claim at trial, Co-Lead Plaintiffs would bear the burden of proving that Defendants (i) had actual or constructive knowledge of the misconduct, and (ii) failed to act in the face of a known duty to act, thereby demonstrating conscious disregard for their responsibilities.  While Co-Lead Counsel believed significant evidence existed to support a finding of liability, Defendants indicated that they would have presented countervailing evidence of the Board's remedial efforts following the September 2016 disclosure of the Improper Sales Practices, including the expansion of internal controls and management-level efforts to prevent future sales practice violations, such as: (i) establishing working groups, as well as engaging third-party consultants, to identify, analyze, and rectify sales practices violations; (i) conducting town hall meetings with employees to encourage the reporting of sales-related misconduct; and (i) encouraging reporting of the progress of sales practice remediation initiatives.  While Co-Lead Plaintiffs would have argued those actions were illusory and inadequate based on facts developed in discovery, there was a significant risk the jury would find the evidence failed to demonstrate Defendants' knowledge or conscious disregard of wrongdoing.

170.     Indeed, Co-Lead Counsel is unaware of any instance in which a *Caremark* breach of fiduciary duty claim has been successfully tried in a shareholder derivative action.

### C.     Risks Related to Damages

171.     Even if liability could be established, Co-Lead Plaintiffs faced risks in establishing and recovering damages.

172.     Co-Lead Plaintiffs would have sought approximately $1.1 billion in out-of-pocket damages, consisting of $529 million in civil and regulatory fines, penalties, and payments; $443 million in investigation and litigation costs; and $138 million in remediation efforts.  Dkt. 272 at 1.  Co-Lead Plaintiffs would have also sought between $1.4 billion and $2.4 billion in lost actual or potential income.  *Id.*at 2.

173. In response, Defendants would have disputed the existence and the extent of recoverable damages that flowed from any alleged misconduct. For example, Defendants would have challenged whether any of the damages asserted were proximately caused by Defendants' alleged misconduct, as opposed to the misconduct of others. Defendants would have also argued that most if not all of the payments by the Company in connection with the Improper Sales Practices scandal were part of its ongoing course of business operations, not cognizable derivative damages. Moreover, Defendants would have disputed whether any actual damages incurred would need to be offset by the benefits that Defendants' decisions conferred on the Company.

174. In addition, Defendants would have disputed that Wells Fargo suffered any harm in the form of lost income, given the Company's substantial profits even after the revelation of the Improper Sales Practices. For example, even if Wells Fargo did suffer lost income, Defendants would contend any lost income was attributable to other causes, such as general market effects, the conduct of employees independent of any wrongdoing by Defendants, or unrelated issues that the Company was experiencing at the time.

175. Separately, it was far from certain that a jury finding liability would have also imposed monetary damages in excess of the $240 million in cash consideration secured by the Settlement. For example, the Officer Defendants would have argued that several of them were required to forfeit or reduce their compensation to the Company in the wake of revelations of the Improper Sales Practices, in an amount totaling over $180 million. A jury could very well have found that an especially large monetary judgment against the Defendants would be inappropriate in light of these substantial compensation actions.

176. Thus, even if Co-Lead Plaintiffs succeeded through trial and appeal, they faced the real risk that the Company could have obtained a recovery that was significantly inferior to the one offered through the Settlement—or no recovery at all.

## V. CO-LEAD PLAINTIFFS' EFFORTS ON BEHALF OF WELLS FARGO

177. Based on our collective experience in complex commercial litigation and derivative actions, it is our professional opinion that Co-Lead Plaintiffs willingly, constructively, and effectively contributed to the prosecution of the claims on behalf of Wells Fargo.

178. Each Co-Lead Plaintiff participated in the lead plaintiff application process; participated in discussions with Co-Lead Counsel concerning significant developments in the litigation; reviewed and conferred with Co-Lead Counsel on Rule 26(a) initial disclosures; reviewed and commented on significant pleadings and briefs; attended hearings; conferred with Co-Lead Counsel regarding discovery efforts; attended mediation sessions; consulted with Co-Lead Counsel concerning settlement negotiations as they progressed; and evaluated, approved, and recommended the approval of the proposed Settlement to the Co-Lead Plaintiffs' respective boards.

179. A more detailed description of each Co-Lead Plaintiff's efforts is provided in the Declaration of Kevin B. Lindahl, Esq., and the Declaration of James Love, Esq., submitted concurrently herewith.

180. Given the substantial efforts described above and in their respective declarations, each Co-Lead Plaintiff spent significant time contributing to the litigation and resolution of this Action. In light of this commitment of time and effort, including the cost to Co-Lead Plaintiffs of the time their representatives devoted to this Action that would have otherwise been devoted to other work on behalf of those institutions, we believe Ninth Circuit and Northern District authorities support awarding each Co-Lead Plaintiff $25,000, to be paid from Co-Lead Counsel's fee award.

**VI.     <u>SUPPORTING DOCUMENTS</u>**

181. In further support of (i) Co-Lead Plaintiffs' motion for final approval of the proposed Settlement, and (ii) Co-Lead Counsel's motion for an award of attorney's fees and for reimbursement awards, we attach the following documents and declarations.

182. Attached hereto as <u>Exhibit A</u> is a true and correct copy of the Declaration of Brian T. Fitzpatrick in Support of Co-Lead Counsel's Motion for Award of Attorneys' Fees and Reimbursement Awards to Co-Lead Plaintiffs.

183. Attached hereto as <u>Exhibit B</u> is a true and correct copy of the Declaration of Jeffrey N. Gordon in Support of Co-Lead Plaintiffs' Motion for Final Approval of Settlement.

184. Attached hereto as <u>Exhibit C</u> is a true and correct copy of the Declaration of Sean A. Petterson Regarding Settlement Notice.

185. Attached hereto as <u>Exhibit D</u> is a true and correct copy of the Declaration of Kevin B. Lindahl, Esq. in Support of Reimbursement Award to Co-Lead Plaintiff Fire & Police Pension Association of Colorado.

186. Attached hereto as <u>Exhibit E</u> is a true and correct copy of the Declaration of James D. Love, Esq. in Support of Reimbursement Award to Co-Lead Plaintiff The City of Birmingham Retirement and Relief System.

187. Attached hereto as <u>Exhibit F</u> is a true and correct Summary of Plaintiffs' Counsel's Lodestar.

188. Attached hereto as <u>Exhibit G</u> is a true and correct copy of the Declaration of Richard M. Heimann in Support of Co-Lead Counsel's Motion for Award of Attorneys' Fees and Reimbursement Awards to Co-Lead Plaintiffs.

189. Attached hereto as <u>Exhibit H</u> is a true and correct copy of the Declaration of Joseph E. White, III in Support of Co-Lead Counsel's Motion for Award of Attorneys' Fees and Reimbursement Awards to Co-Lead Plaintiffs.

190. Attached hereto as <u>Exhibit I</u> is a true and correct copy of the Declaration of Daniella Quitt in Support of Co-Lead Counsel's Motion for Award of Attorneys' Fees Filed on Behalf of Glancy Prongay & Murray LLP.

191. Attached hereto as <u>Exhibit J</u> is a true and correct copy of the Declaration of Shane P. Sanders in Support of Co-Lead Counsel's Motion for Award of Attorneys' Fees Filed on Behalf of Robbins Arroyo LLP.

192. Attached hereto as <u>Exhibit K</u> is a true and correct copy of the Declaration of Bruce E. Jameson in Support of Co-Lead Counsel's Motion for Award of Attorneys' Fees Filed on Behalf of Prickett, Jones & Elliott, P.A.

193. Attached hereto as <u>Exhibit L</u> is a true and correct copy of the Declaration of Daniel B. Rehns of Hach Rose Schirripa & Cheverie LLP in Support of Co-Lead Counsel's Motion for Award of Attorneys' Fees.

1   We declare under penalty of perjury under the laws of the United States of America that

2   the foregoing is true and correct.

3       Executed on this 27th day of June, 2019, at San Francisco, California and Boca Raton,

4   Florida.

5

6

7   By: */s/ Richard M. Heimann*                    By: */s/  Joseph E. White, III*
            Richard M. Heimann                              Joseph E. White, III

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28