# EXHIBIT A

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE WELLS FARGO & COMPANY SHAREHOLDER DERIVATIVE LITIGATION | Lead Case No. 3:16-cv-05541-JST |
| | **DECLARATION OF BRIAN T. FITZPATRICK IN SUPPORT OF CO-LEAD COUNSEL'S MOTION FOR AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT AWARDS TO CO-LEAD PLAINTIFFS** |
| This Document Relates to: | |
| ALL ACTIONS. | |

## I.      Background and qualifications

1.      I am a Professor of Law at Vanderbilt University in Nashville, Tennessee.  I joined the Vanderbilt law faculty in 2007, after serving as the John M. Olin Fellow at New York University School of Law in 2005 and 2006.  I graduated from the University of Notre Dame in 1997 and Harvard Law School in 2000.  After law school, I served as a law clerk to The Honorable Diarmuid O'Scannlain on the United States Court of Appeals for the Ninth Circuit and to The Honorable Antonin Scalia on the United States Supreme Court.  I also practiced law for several years in Washington, D.C., at Sidley Austin LLP.  My C.V. is attached as Exhibit 1.

2.      My teaching and research at Vanderbilt and New York University have focused on class action litigation.  I teach the Civil Procedure, Federal Courts, and Complex Litigation courses at Vanderbilt.  In addition, I have published a number of articles on class action litigation in such journals as the University of Pennsylvania Law Review, the Journal of Empirical Legal Studies, the Vanderbilt Law Review, the University of Arizona Law Review, and the NYU Journal of Law & Business.  My work has been cited by numerous courts, scholars, and popular media outlets, such as the New York Times, USA Today, and the Wall Street Journal.  I am also frequently invited to speak at symposia and other events about class action litigation, such as the ABA National Institutes on Class Actions in 2011, 2015, 2016, and 2017, and the ABA Annual Meeting in 2012.  Since 2010, I have also served on the Executive Committee of the Litigation Practice Group of the Federalist Society for Law & Public Policy Studies.  In 2015, I was elected to the membership of the American Law Institute.

3.      In December 2010, I published an article in the Journal of Empirical Legal Studies entitled *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. Empirical L. Stud. 811 (2010) (hereinafter "Empirical Study").  This article is still the most comprehensive examination of federal class and derivative settlements and attorneys' fees that has ever been published.  Unlike other studies, which have been confined to securities cases or have been based on samples of cases that were not intended to be representative of the whole (such as settlements approved in published opinions), my study attempted to examine *every* class and derivative settlement approved by a federal court over a two-year period, 2006-2007.  *See id*. at 812-13.  As

such, not only is my study an unbiased sample of settlements, but the number of settlements

included in my study is several times the number of settlements per year that has been identified

in any other empirical study: over this two-year period, I found 688 settlements, including 169

from the Ninth Circuit alone.  *See id*. at 817.  I presented the findings of my study at the

Conference on Empirical Legal Studies at the University of Southern California School of Law in

2009, the Meeting of the Midwestern Law and Economics Association at the University of Notre

Dame in 2009, and before the faculties of many law schools in 2009 and 2010.  This study has

been relied upon by a number of courts, scholars, and testifying experts.[1]  I will draw upon this

study in this declaration.

---

[1] *See*, *e.g.*, *Silverman v. Motorola Solutions, Inc.*, 739 F.3d 956, 958 (7th Cir. 2013) (relying on article to assess fees); *James v. China Grill Mgmt., Inc.*, 2019 WL 1915298, at *2 (S.D.N.Y. Apr. 30, 2019) (same); *Grice v. Pepsi Beverages Co.*, 363 F. Supp. 3d 401, 407 (S.D.N.Y. 2019) (same); *Alaska Elec. Pension Fund v. Bank of Am. Corp.*, 2018 WL 6250657, at *2 (S.D.N.Y. Nov. 29, 2018) (same); *Rodman v. Safeway Inc.*, 2018 WL 4030558, at *5 (N.D. Cal. Aug. 23, 2018) (same); *Little v. Washington Metro. Area Transit Auth.*, 313 F. Supp. 3d 27, 38 (D.D.C. 2018) (same); *Hillson v. Kelly Servs. Inc.*, 2017 WL 3446596, at *4 (E.D. Mich. Aug. 11, 2017) (same); *Good v. W. Virginia-Am. Water Co.*, 2017 WL 2884535, at *23, *27 (S.D.W. Va. July 6, 2017) (same); *McGreevy v. Life Alert Emergency Response, Inc.*, 258 F. Supp. 3d 380, 385 (S.D.N.Y. 2017) (same); *Brown v. Rita's Water Ice Franchise Co. LLC*, 2017 WL 1021025, at *9 (E.D. Pa. Mar. 16, 2017) (same); *In re Credit Default Swaps Antitrust Litig.*, 2016 WL 1629349, at *17 (S.D.N.Y. Apr. 24, 2016) (same); *Gehrich v. Chase Bank USA, N.A.*, 316 F.R.D. 215, 236 (N.D. Ill. 2016); *Ramah Navajo Chapter v. Jewell*, 167 F. Supp. 3d 1217, 1246 (D.N.M. 2016); *In re: Cathode Ray Tube (CRT) Antitrust Litig.*, 2016 WL 721680, at *42 (N.D. Cal. Jan. 28, 2016) (same); *In re Pool Products Distribution Mkt. Antitrust Litig.*, 2015 WL 4528880, at *19-20 (E.D. La. July 27, 2015) (same); *Craftwood Lumber Co. v. Interline Brands, Inc.*, 2015 WL 2147679, at *2-4 (N.D. Ill. May 6, 2015) (same); *Craftwood Lumber Co. v. Interline Brands, Inc.*, 2015 WL 1399367, at *3-5 (N.D. Ill. Mar. 23, 2015) (same); *In re Capital One Tel. Consumer Prot. Act Litig.*, 2015 WL 605203, at *12 (N.D. Ill. Feb. 12, 2015) (same); *In re Neurontin Marketing and Sales Practices Litigation*, 2014 WL 5810625, at *3 (D. Mass. Nov. 10, 2014) (same); *Tennille v. W. Union Co.*, 2014 WL 5394624, at *4 (D. Colo. Oct. 15, 2014) (same); *In re Colgate-Palmolive Co. ERISA Litig.*, 36 F.Supp.3d 344, 349-51 (S.D.N.Y. 2014) (same); *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, 991 F. Supp. 2d 437, 444-46 & n.8 (E.D.N.Y. 2014) (same); *In re Federal National Mortgage Association Securities, Derivative, and "ERISA" Litigation*, 4 F. Supp. 3d 94, 111-12 (D.D.C. 2013) (same); *In re Vioxx Products Liability Litigation*, 2013 WL 5295707, at *3-4 (E.D. La. Sep. 18, 2013) (same); *In re Black Farmers Discrimination Litigation*, 953 F. Supp. 2d 82, 98-99 (D.D.C. 2013) (same); *In re Southeastern Milk Antitrust Litigation*, 2013 WL 2155387, at *2 (E.D. Tenn. May 17, 2013) (same); *In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.*, 851 F. Supp. 2d 1040, 1081 (S.D. Tex. 2012) (same); *Pavlik v. FDIC*, 2011 WL 5184445, at *4 (N.D. Ill. Nov. 1, 2011) (same); *In re Black Farmers Discrimination Litig.*, 856 F. Supp. 2d 1, 40 (D.D.C. 2011) (same); *In re AT & T Mobility Wireless Data Servs. Sales Tax Litig.*, 792 F. Supp. 2d 1028, 1033 (N.D. Ill. 2011) (same); *In re MetLife Demutualization Litig.*, 689 F. Supp. 2d 297, 359 (E.D.N.Y. 2010) (same).

4.       In addition to my empirical works, I have also published many papers on how law-and-economics theory affects the incentives of attorneys and others in class action litigation.  *See, e.g.*, Brian T. Fitzpatrick, *The End of Objector Blackmail?*, 62 Vand. L. Rev. 1623 (2009); Brian T. Fitzpatrick, *Do Class Action Lawyers Make Too Little*, 158 U. Pa. L. Rev. 2043 (2010) (hereinafter "Class Action Lawyers").  The culmination of these papers will be a book published in October by the University of Chicago Press entitled The Conservative Case for Class Actions, where I argue that the so-called "private attorney general" is superior to the public attorney general in the enforcement of the rules that free markets need in order to operate effectively.  I will also draw upon this work in this declaration.

5.       I have been asked by Co-Lead Counsel to opine on whether the attorneys' fees and the lead plaintiffs' reimbursement awards they have requested here are reasonable.  In order to formulate my opinion, I reviewed a number of documents provided to me by Co-Lead Counsel; I have attached a list of these documents in Exhibit 2 (and describe there how I refer to them herein).  My compensation in this matter is $950 per hour, and is not contingent upon the outcome of this case.

6.       As I explain, based on my study of settlements across the country and in the Ninth Circuit in particular, I believe the requests here are within the range of reason.

## II.     Case background

7.       This is a shareholder derivative action on behalf of Wells Fargo & Co. ("Wells Fargo" or the "Company") against the Company's officers, directors, and senior management for knowing about or consciously disregarding infamous practices by bank employees in which they opened millions of new accounts for customers without their consent and allegedly in violation of federal and state laws.  The first constituent case in this consolidated action was filed in September 2016, and after engaging in two rounds of motions to dismiss, discovery, and many rounds of mediation, the parties have now reached a settlement.  On May 14, 2019, this court preliminarily approved the settlement.

8.       Under the settlement, the defendants will pay $240 million to Wells Fargo.  *See* Settlement Agreement ¶ V.B.33.  In addition, Wells Fargo has acknowledged that it undertook

certain corporate governance changes ("Reforms") and rescinded $122.5 million in compensation from the defendants ("Clawbacks") in "significant" part because of this lawsuit. *See id.* at Ex. A, pp. 4-8 & Ex. B, p. 4. Wells Fargo further acknowledges that the portion of the Reforms and Clawbacks attributable to this lawsuit conferred a value to the Company of $80 million. *See id.* In exchange for these benefits to Wells Fargo, the plaintiffs agree to release the defendants from, among other things, "any and all claims by or on behalf of Wells Fargo which are based upon, arise out of, relate in any way to, or involve, directly or indirectly" the "Improper Sales Practices" described above. *Id.* at ¶ V.B.26.

9.      Counsel for the plaintiffs have now moved the court for an award of fees of $68 million and reimbursement awards to the lead plaintiffs of $25,000 each. The fee request constitutes 28.33% of the cash called for by the settlement and 21.25% of the total value of the benefits counsel estimates it has conferred on Wells Fargo by this litigation. No matter which percentage is used, it is my opinion that the fee requested is reasonable. Moreover, the reimbursement awards are a miniscule percentage of the settlement and represent less than the value of the time (as measured by an estimated hourly rate) the plaintiffs spent on this litigation. In my opinion, they, too, are reasonable.

III.   **Assessment of the reasonableness of the request for attorneys' fees**

10.     Like successful counsel in class actions, successful counsel in derivative actions can be compensated only from the benefits they have conferred, pursuant to a theory of unjust enrichment: if the corporation did not pay counsel for the benefits they had conferred, then the corporation would be unjustly enriched. At one time, courts that awarded fees in such cases did so using the familiar lodestar approach. *See* Fitzpatrick, *Class Action Lawyers*, *supra*, at 2051. Under this approach, courts awarded counsel a fee equal to the number of hours they worked on the case (to the extent the hours were reasonable), multiplied by a reasonable hourly rate as well as by a discretionary multiplier that courts often based on the risk of non-recovery and other factors. *See id.* Over time, however, the lodestar approach fell out of favor, largely for two reasons. First, courts came to dislike the lodestar method because it was difficult to calculate the lodestar; courts had to review voluminous time records and the like. Second—and more

1    importantly—courts came to dislike the lodestar method because it did not align the interests of

2    counsel with the interests of their clients; to wit, counsel's recovery did not depend on how much

3    was recovered, but, rather, on how many hours could be spent on the case.  *See id.* at 2051-52.

4    According to my empirical study, the lodestar method is now used to award fees in only a small

5    percentage of class action and derivative cases, usually those involving fee-shifting statutes or

6    those where the relief is injunctive in nature and the value of the injunction cannot be reliably

7    calculated.  *See* Fitzpatrick, *Empirical Study*, *supra*, at 832 (finding the lodestar method used in

8    only 12% of settlements).  The other large-scale academic studies of fees agree.  *See, e.g.,*

9    Theodore Eisenberg et al., *Attorneys' Fees in Class Actions: 2009-2013*, 92 N.Y.U. L. Rev. 937,

10   945 (2017) (hereinafter "Eisenberg-Miller 2017") (finding the lodestar method used only 6.29%

11   of the time from 2009-2013, down from 13.6% from 1993-2002 and 9.6% from 2003-2008).

12            11.     The more widely utilized method of calculating attorneys' fees today is known as

13   the "percentage" method.  Under this approach, courts select a percentage that they believe is fair

14   to counsel, multiply the settlement amount by that percentage, and then award counsel the

15   resulting product.  The percentage approach became popular precisely because it corrected the

16   deficiencies of the lodestar method: it is less cumbersome to calculate, and, more importantly, it

17   aligns the interests of counsel with the interests of their clients because the greater the recovery,

18   the more counsel receives.  *See* Fitzpatrick, *Class Action Lawyers, supra,* at 2052.

19            12.     In the Ninth Circuit, district courts have the discretion to use either the lodestar

20   method or the percentage method.  *See, e.g., In re Washington Public Power Supply Sys.*

21   *Securities Litig.*, 19 F.3d 1291, 1295 (9th Cir. 1994) ("[D]istrict court has discretion to use either

22   method in common fund cases.").  In light of the well-recognized disadvantages of the lodestar

23   method and the well-recognized advantages of the percentage method, it is my opinion that courts

24   should generally use the percentage method whenever enough of the value of the settlement can

25   be reliably calculated.  It is my opinion that courts should use the lodestar method only where

26   enough value of the settlement cannot be reliably calculated (and the percentage method is

27   therefore not feasible) or a fee-shifting statute requiring the lodestar method is applicable.  This is

28   not just my opinion.  It is the consensus opinion of class action scholars.  *See* American Law

Institute, Principles of the Law of Aggregate Litigation § 3.13(b) (2010) ("[A] percentage-of-the-fund approach should be the method utilized in most common-fund cases.").  In this case, enough of the settlement can be reliably valued that the percentage method can be used.  Thus, in my opinion, the court should do so.

13.      Under the percentage method, courts must 1) calculate the value of the benefits conferred by the litigation and then 2) select a percentage of that value to award to counsel. When selecting the percentage, courts in the Ninth Circuit use 25% as the "'bench mark' percentage for the fee award," which "can then be adjusted upward or downward to account for any unusual circumstances involved in the case." *Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 272 (9th Cir. 1989).  In various cases, the Ninth Circuit has identified at least eight different factors that district courts can examine in deciding whether to increase or decrease an award from the benchmark:

a.      the results achieved by counsel, *see Six Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990); *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1048 (9th Cir. 2002);

b.      the length the case has transpired, *see Six Mexican Workers*, 904 F.2d at 1311; *Vizcaino*, 290 F.3d at 1050;

c.      the complexity of the case, *see Six Mexican Workers*, 904 F.2d at 1311; *In re Pacific Enters. Securities Litig.*, 47 F.3d 373, 379 (9th Cir. 1995);

d.      the risks the case involved, *see In re Pacific Enters. Securities Litig.*, 47 F.3d at 379; *Vizcaino*, 290 F.3d at 1048-49;

e.      the percentages awarded in other cases, *see Vizcaino*, 290 F.3d at 1050;

f.      any non-monetary benefits obtained by counsel, *see In re Pacific Enters. Securities Litig.*, 47 F.3d at 379; *Vizcaino*, 290 F.3d at 1049; *Staton v. Boeing Co.*, 327 F.3d 938, 946 (9th Cir. 2003);

g.      the percentages in standard contingency-fee agreements in similar individual cases, *see Vizcaino*, 290 F.3d at 1049; and

h.      counsel's lodestar, *see id.* at 1050-51.

14.     When calculating the value of the benefits, most courts include any benefits conferred by the litigation, whether cash relief, non-cash relief, attorneys' fees and expenses, or administrative expenses.  *See, e.g.*, *In re Heartland Payment Systems, Inc. Customer Data Sec. Breach Litigation*, 851 F. Supp. 2d 1040, 1080 (S.D. Tex. 2012) (Rosenthal, J.).  Although some of these things do not go directly to the class in a class action or to the corporation in a derivative suit, they facilitate compensation to the class or corporation, future savings to the class or corporation, or deter defendants from future misconduct by making defendants pay more when they cause harm.  Thus, in my opinion, it is appropriate to include them all in the denominator of the percentage method.  *See also* Principles of the Law of Aggregate Litigation, *supra*, § 3.13(b) ("[A] percentage of the fund approach should be the method utilized in most common-fund cases, with the percentage being based on both the monetary and nonmonetary value of the judgment or settlement.").

15.     It should be noted, however, that it is only possible to include non-cash benefits in the denominator if they can be reliably valued.  *See, e.g., Staton*, 327 F.3d at 974 ("[W]here the value to individual class members of benefits deriving from injunctive relief can be accurately ascertained . . . courts [may] include such relief as part of the value of a common fund for purposes of applying the percentage method . . . .").  What happens when the non-cash benefits cannot be reliably valued?  Should we ignore them under the percentage method?  No.  It is important to reward counsel in some way for pursuing even hard-to-value non-cash relief.  If courts reward counsel only for pursuing cash relief and not for pursuing other relief, then rational counsel will not spend their time and money pursing other relief—even when it may be as or more important than cash.  Such incentives are not good if we are interested in encouraging the best possible remedies from class and derivative litigation.  Thankfully, courts have found ways of compensating counsel for hard-to-value non-cash benefits: they either increase the percentage awarded to counsel from the cash benefits conferred by the litigation, *see, e.g., id.* ("The fact that counsel obtained injunctive relief in addition to monetary relief for their clients is . . . a relevant circumstance to consider in determining what percentage of the fund is reasonable as fees."), or award counsel a flat fee for the non-cash benefits in addition to a percentage of the cash benefits,

1    *see, e.g., Faught v. American Home Shield Corp.*, 668 F.3d 1233, 1243 (11th Cir. 2012)

2    (affirming fee award of $1.5 million plus 25% of cash recovery).

3         16.     In this case, it is obviously easy to value the cash conferred by the litigation ($240

4    million) but harder to value the non-cash benefits.  Given this difficulty, in my opinion, it would

5    be simplest for the court to increase the percentage it awarded counsel of the cash to compensate

6    counsel for pursuing non-cash relief and not tie the percentage to a specific value for the non-cash

7    benefits.  But I also think the non-cash benefits can be valued reliably enough that the court could

8    also include them in the denominator and apply a fee percentage across the board.  In my opinion,

9    both approaches would be reasonable and I will discuss each of them in turn.  But the most

10   important point is this one: whatever approach the court uses, it is important to reward counsel in

11   *some* way for pursuing the non-cash relief.

12        Approach 1: Do Not Tie the Fee Percentage To A Specific Value For the Non-Cash Benefits

13        17.     Let me begin with the approach that would not tie the fee percentage to a specific

14   value for the non-cash benefits here and instead simply credit counsel for them in awarding a

15   percentage of the cash.  In that case, Co-Lead Counsel's $68 million fee request would come to

16   28.33% of the cash value of the settlement.  That would be a modest increase over the Ninth

17   Circuit's 25% benchmark, and, as I explain below, in my opinion, a reasonable one.

18        18.     Consider first factor (5): the awards in other cases.  According to my empirical

19   study, the most common percentages awarded by all federal courts in 2006 and 2007 using the

20   percentage method were 25%, 30%, and 33%, with nearly two-thirds of awards between 25% and

21   35%, and with a mean award of 25.4% and a median award of 25%.  *See* Fitzpatrick, *Empirical*

22   *Study, supra,* at 833-34, 838.  The numbers for the 111 settlements in the Ninth Circuit where the

23   percentage method was used were quite similar: the most common percentages were also 25%,

24   30%, and 33%, with the vast majority of awards also between 25% and 35%, and a mean of

25   23.9% and median of 25%.  My numbers agree with the other large-scale academic studies of

26   class action fee awards.  *See* Theodore Eisenberg & Geoffrey P. Miller, *Attorneys' Fees and*

27   *Expenses in Class Action Settlements: 1993-2008*, 7 J. Empirical L. Stud. 248, 260 (2010)

28   (hereinafter "Eisenberg-Miller 2010") (finding mean and median of 24% and 25% nationwide,

and 25% in Ninth Circuit); Eisenberg-Miller 2017, *supra*, at 951 (finding mean and median of 27% and 29% nationwide, and 26% and 25% in the Ninth Circuit). Although the request here (when measured as a percentage of the $240 million cash recovery alone) is above the means and medians within and outside the Ninth Circuit, it is only modestly so.

19.     Indeed, in order to see how modest the departure is here, I graphed the distribution of the Ninth Circuit's percentage awards from my study in Figure 1, below. The figure shows what fraction of settlements (y-axis) had fee awards within each five-point range of fee percentages (x-axis). Thus, for example, nearly half of all settlements (i.e., nearly .5 of all settlements) had fee awards that fell between 25% (inclusive) and 30%. As the Figure shows, a fee equal to 28.33% would be in the meatiest part of the Ninth Circuit's curve.



Figure 1: Percentage-method fee awards in the Ninth Circuit, 2006-2007

20.     It should be noted that the cash settlement here is unusually large. In my empirical study, only 23 settlements nationwide (less than 4%) exceeded $200 million. This is notable because my empirical study showed that settlement size had a statistically significant but inverse relationship with the fee percentages awarded by federal courts—*i.e.*, that some federal courts awarded lower percentages in cases where settlements were larger. *See* Fitzpatrick, *Empirical*

*Study, supra,* at 838, 842-44.  Thus, for example, the mean and median fee percentages awarded in the fourteen percentage settlements in my dataset between $100 and $250 million were only 17.9% and 16.9%, respectively.  *See id.* at 839.  This raises the question whether it would be unreasonable to award counsel 28.33% here.  As I explain below, I believe such an award would be reasonable even in light of this data.

21.     First, the Ninth Circuit does not require that fee percentages decline as settlement sizes increase.  In *Vizcaino*, the Ninth Circuit directly confronted the argument that a district court erred because it "fail[ed] to take into account that this is a megafund case to which it should have applied . . . the increase-decrease rule."  290 F.3d at 1047.  The Ninth Circuit rejected the argument, holding that it had "not adopt[ed] this . . . principle governing fee awards."  *Id.*  It is true that *Vizcaino* is several years old now, but the Ninth Circuit still has not adopted this rule.

22.     Second, although the Ninth Circuit does not require district courts to reduce fee percentages as settlement sizes increase, it does permit them to do so within their discretion.  *See Vizcaino*, 290 F.3d at 1050 & n.4 ("[I]t may be . . . appropriate to examine . . . the range of fee awards out of common funds of comparable size.").  In my opinion, the court should not exercise any such discretion here.  The practice among some district courts to decrease fee percentages as settlement sizes increase has been criticized by scholars and other courts, and, in my opinion, this court should not follow it.  In particular, courts and commentators have worried that lowering percentages as settlement sizes increase will blunt the incentives of plaintiffs' counsel to fight for the largest settlement, and, indeed, might incentivize them to settle cases earlier for smaller sums.  *See, e.g.*, *In re Cendant Corp. Litigation*, 264 F.3d 201, 284 n. 55 (3d Cir. 2001) ("Th[e] position [that the percentage of a recovery devoted to attorneys fees should decrease as the size of the overall settlement or recovery increases] . . . has been criticized by respected courts and commentators, who contend that such a fee scale often gives counsel an incentive to settle cases too early and too cheaply." (alteration in original)).  As one court has put it, "[b]y not rewarding Class Counsel for the additional work necessary to achieve a better outcome for the class, the sliding scale approach creates the perverse incentive for Class Counsel to settle too early for too little."  *Allapattah Servs. Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1213 (S.D. Fla. 2006).  *See*

*also In re Toyota Motor Corp. Unintended Acceleration Marketing, Sales Practices, and Products Liability Litigation*, No. 10-ml-02151, 2013 WL 12327929, at *34 n.16 (C.D. Cal. June 17, 2013) ("The Court also agrees with . . . other courts, e.g., *Allapattah Servs.*, 454 F. Supp. 2d at 1213, which have found that decreasing a fee percentage based only on the size of the fund would provide a perverse disincentive to counsel to maximize recovery for the class."); *In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330, 1367 (S.D. Fla. 2011) (quoting *Allapattah*).

23.     Consider the following example: if courts award attorneys 25% of settlements if they are under $100 million but only 20% of settlements if they are over $100 million, then rational attorneys will prefer to settle cases for $90 million (*i.e.*, a $22.5 million fee award) rather than $110 million (*i.e.*, a $22 million fee award)!  Such incentives are obviously not good for generating the most compensation and deterrence from our class and derivative action systems. Courts attuned to these perverse incentives sometimes slash fee percentages on a marginal basis rather than an absolute basis—e.g., award 25% of the first $100 million, but 20% thereafter. Although this has the virtue of not incentivizing counsel to settle for less in a given case, it does give them an incentive to redirect their efforts from bigger cases to smaller ones.  For example, if counsel believed that the court would award them only 20% once they hit $100 million but 25% before then, then counsel might redirect their time once they hit $100 million to smaller cases where they can still return 25% on their time.  Again, such incentives are not good for compensation or deterrence, at least in the biggest cases (i.e., the cases where defendants have caused people the most harm).  Although this settlement obviously will not be affected by the court's fee decision here, the court's decision will send a signal to lawyers in the future about how courts might compensate them and it could have an effect on future cases.  In my opinion, courts should not send signals that encourage lawyers to do anything other than recover the most they can from defendants.

24.     Third, the fact that average and median fee percentages are lower in larger cases does not mean, of course, that courts do not award higher fee percentages when the facts and circumstances justify it, including some from this very district.  *See, e.g., In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2013 WL 1365900, at *7 (N.D. Cal. Apr. 3, 2013) (28.5% of $1.1 billion);

*see also Allapattah*, 454 F. Supp. 2d at 1218 (31.33% of $1.075 billion); *In re Urethane Antitrust Litig.*, 2016 WL 4060156, at *6 (D. Kan. July 29, 2016) (33.33% of $835 million); *In re Toyota Motor. Corp. Unintended Acceleration, supra* (26.4% of $757 million); *Dahl v. Bain Capital Partners*, *LLC*, No. 07-cv-12388 (D. Mass. Feb. 2, 2015) (33% of $590.5 million); *In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d 467, 516 (S.D.N.Y. 2009) (33% of $510 million); *In re Checking Account Overdraft Litigation*, 830 F. Supp. 2d 1330, 1358 (S.D. Fla. 2011) (30% of $410 million); *In re Vitamins Antitrust Litig.*, 2001 WL 34312839, at *10 (D.D.C. July 16, 2001) (34% of $365 million); *In re Takata Airbag Products Liab. Litig.*, No. 15-0259-MD (S.D. Fla. Nov. 1, 2017) (30% of $278.5 million); *In re Tricor Direct Purchaser Antitrust Litig.,* No. 05-340 (D. Del. 2009) (33% of $250 million); *In re Buspirone Antitrust Litig.*, No. 01-md-1413 (S.D.N.Y. Apr. 11, 2003) (33% of $220 million); *In re Linerboard Antitrust Litig.*, 2004 WL 1221350, at *1 (E.D. Pa. June 2, 2004) (30% of $202 million); *In re Relafen Antitrust Litig.*, No. 01-12239, at 8 (D. Mass. Apr. 9, 2004) (33% of $175 million); *In re Apollo Group Inc. Securities Litigation*, 2012 WL 1378677, at *9 (D. Ariz. April 20, 2012) (33% of $145 million); *In re Combustion Inc.*, 968 F. Supp. 1116, 1142 (W.D. La. 1997) (36% of $127 million); *In re Takata Airbag Prod. Liab. Litig.*, 2017 WL 5290875, at *4 (S.D. Fla. Nov. 1, 2017) (30% of $131 million); *Kurzweil v. Philip Morris Companies*, 1999 WL 1076105, at *1 (S.D.N.Y. Nov. 30, 1999) (30% of $123 million); *In re Ikon Office Solutions, Inc. Securities Litig.*, 194 F.R.D. 166, 197 (E.D. Pa. 2000) (30% of $111 million); *City of Greenville v. Syngenta Crop Protection*, 904 F. Supp. 2d 902, 908-09 (S.D. Ill. 2012) (33% of $105 million).

25.     Indeed, a 28.33% fee award would still be within two standard deviations of the 17.9% mean in the $100-250 million range in my study.  *See* Fitzpatrick, *Empirical Study, supra,* at 839 (reporting standard deviation of 5.2%).  Consistent with the courts cited above, scholars believe fee requests falling within this range can be reasonable when the facts and circumstances justify it: "Fee requests falling within one and two standard deviations above or below the mean should be viewed as potentially reasonable but in need of affirmative justification."  Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees in Class Action Settlements: An Empirical Study*, 1 J. Empirical L. Studies 27, 74 (2004) ("Eisenberg-Miller 2004").  As I explain below, in my

1    opinion, the facts and circumstances justify an above-average fee percentage in this case—

2    *especially* if the court is not going to add any of the value of the non-cash benefits to the

3    denominator from which the fee is calculated.

4         26.    Consider next factor (1): the results achieved by counsel.  The $240 million cash

5    recovery alone as measured by percentage of potential damages is much better than the typical

6    case.  According to counsel, that recovery is between 6.9% and 21.8% of potential damages,

7    depending on how optimistic we are about what those damages might have been.  Those

8    percentages are *many multiples* of the typical securities class settlement (which is the closest

9    analog to a derivative suit on which we have data).  *See, e.g.,*

10   *https://www.nera.com/content/dam/nera/publications/2019/PUB_Year_End_Trends_012819_Fin*

11   *al.pdf*, at 36 (finding that the median securities fraud class action between 2008 and 2017 settled

12   for between 1.3% and 2.6% of the most common measure of investor losses, depending on the

13   year).  Indeed, when compared to securities lawsuits pursuing the same magnitude of potential

14   damages, the recovery here looks even better: securities class actions recovered only 1.2% of

15   investor losses when the losses were between $1 and $5 billion.  *See id.* at 35.  In my opinion, this

16   factor therefore weighs in favor of an above-average fee award.

17        27.    Consider next factors (3) and (4): how the recovery here compares to the risks and

18   complexities counsel faced.  In my opinion, very well.  First, I am not an expert on corporate law,

19   but my research for this declaration suggests that it is very difficult to prove that directors and

20   officers either *knew about* or *consciously disregarded* the corporation's misconduct.  Second, I

21   believe counsel would have had considerable difficulty proving that all of the damages it pursued

22   were proximately caused by management's knowing or conscious disregard of misconduct as

23   opposed to any number of other market conditions.  Even more to the point: many of the out-of-

24   pocket losses pursued by counsel here arguably stemmed from conduct predating the improper

25   sales practices identified in the complaint.  Moreover, all these risks were compounded by two

26   complexities I do not see in many class actions.  First, according to my research, the claims of

27   officer-and-director liability here appear fairly novel.  Counsel did not have much in the way of a

28   roadmap to follow in this case.  Second, the improper practices here spawned a great deal of

litigation and counsel had to spend considerable time to consolidate it in one place or otherwise to protect against adverse rulings in those cases.  Not only did this magnify the complexity of this litigation, but, it should be noted, counsel's efforts in this regard conferred its own benefit on Wells Fargo by enabling it to get this era in its history behind it more expeditiously than it otherwise might have been able to.  Thus, in my opinion, these factors, too, weigh in favor of an above-average fee award.

28.     Consider next factor (6): the non-monetary benefits conferred by the litigation.  In my opinion, this litigation has conferred such benefits: the Clawbacks and Reforms.  I believe that any skepticism regarding the credit that should be accorded to derivative counsel for non-cash measures is unwarranted in this case.  Wells Fargo has conceded that these benefits were caused in "significant" part by this litigation.  This concession can only decrease Wells Fargo's take from this settlement by increasing plaintiffs' counsel's fee percentage.  Thus, unlike the class action situation where a defendant might be indifferent to what the fee percentage is and feel free to make all sorts of statements to facilitate settlement, I put more credence in Wells Fargo's concession in a derivative action as it comes with a substantial financial price.  As I noted above, one way to reward counsel for conferring these benefits is to boost the fee percentage from the cash value of the settlement.  In other words, this factor, too, weighs in favor of an above-average fee award.  *See also* Fitzpatrick, *Empirical Study, supra*, at 824 (finding that only 23% of settlements confer non-cash, non-coupon benefits).

29.     Consider next factor (2): the length this case has transpired.  By the time this settlement is granted final approval (if it is indeed granted final approval), it will have lasted almost three years.  This is the typical time-to-final-approval that I found in my empirical study.  *See* Fitzpatrick, *Empirical Study, supra*, at 820 (finding median time-to-final-approval just below three years and mean time just above three years).  As this length here is only typical, this is the one factor that does not weigh in favor of an above-average fee award.  It should be noted, however, that this is, frankly, not the most important of fee factors.  Why does longevity matter?  It does tell us how long counsel who work on contingency have to wait before receiving any payment for their work, but, even if three years is normal, it is still a long time to wait to be paid,

1    particularly when considering that counsel here have expended significant costs and expenses in

2    prosecuting the litigation, for which they are not seeking reimbursement.  The longevity of the

3    action also serves as a proxy for how deeply counsel have dug into the case; we want counsel to

4    know what a case is really worth before they settle it.  But there is no doubt here that we have

5    enough information about what this case is worth.  As I explained above, we have good

6    information about both the range of possible recoveries and how likely it is those recoveries

7    might have come to pass.  As such, in my opinion, I do not believe this factor should give the

8    court much pause.

9           30.     Consider next factor (7): the percentages in standard contingency-fee agreements

10   in similar individual cases.  First, it is well known that standard contingency-fee percentages in

11   individual litigation are *at least* 33%, which, of course, makes them greater than the award

12   requested here.  *See, e.g.*, Lester Brickman, *ABA Regulation of Contingency Fees:  Money Talks,*

13   *Ethics Walks*, 65 Fordham L. Rev. 247, 248 (1996) (noting that "standard contingency fees" are

14   "usually thirty-three percent to forty percent of gross recoveries" (emphasis omitted)); Herbert M.

15   Kritzer, *The Wages of Risk:  The Returns of Contingency Fee Legal Practice*, 47 DePaul L. Rev.

16   267, 286 (1998) (reporting the results of a survey of Wisconsin lawyers, which found that "[o]f

17   the cases with a [fee calculated as a] fixed percentage [of the recovery], a contingency fee of 33%

18   was by far the most common, accounting for 92% of those cases").  But these studies are largely

19   based on fee agreements with unsophisticated clients.  Because Wells Fargo is being forced to

20   pay the fees here, it is perhaps more probative to look at studies of what corporations pay law

21   firms when they hire them on contingency.  The best of these studies comes from patent

22   litigation.  *See* David L. Schwartz, *The Rise of Contingent Fee Representation in Patent*

23   *Litigation*, 64 Ala. L. Rev. 335 (2012).  Professor Schwartz reports that, "[o]f the agreements

24   using a flat fee reviewed for this Article, the mean rate was 38.6% of the recovery" and, "[o]f the

25   agreements reviewed for this Article that used graduated rates, the average percentage upon filing

26   was 28% and the average through appeal was 40.2%."  *Id*. at 360.  These numbers are all at or

27   above the percentage requested here.  Thus, in my opinion, this factor, too, supports counsel's

28   petition.

31.     Finally, consider factor (8): counsel's lodestar.  This factor—known as the "lodestar crosscheck"—is not a required one in the Ninth Circuit.  *See*, *e.g.*, *Yamada v. Nobel Biocare Holding AG*, 825 F.3d 536, 547 (9th Cir. 2016) ("[A] cross-check is entirely discretionary . . . .").  Moreover, only a minority of courts nationwide perform it with the percentage method.  *See* Fitzpatrick, *supra*, at 833 (finding that only 49% of courts consider lodestar when awarding fees with the percentage method); *Eisenberg-Miller 2017*, *supra*, at 945 (finding percent method with lodestar crosscheck used 38% of the time versus 54% for percent method without lodestar crosscheck).  In my opinion, the majority approach is the better one.  Entertaining the lodestar crosscheck does not create good incentives for lawyers.  In particular, the lodestar crosscheck reintroduces the very same undesirable consequences of the lodestar method that the percentage method was designed to correct in the first place.  For example, if counsel believe that courts will cap the percentage awarded at some multiple of their lodestar, then they will have precisely the same incentives they would if courts used the lodestar method alone: to be inefficient, perform unnecessary projects, delay results, and overbill and overstaff work in order to run up their lodestar.  The lodestar crosscheck also caps the amount of compensation counsel can receive from a settlement, thereby misaligning their incentives from those of their clients and blunting their incentive to achieve the largest possible award.  *See* Fitzpatrick, *Class Action Lawyers*, *supra*, at 2065-66.

32.     Consider the following example.  Suppose counsel had incurred a lodestar of $1 million in a case.  If counsel believed that a court would not award them a 25% fee if it exceeded twice their lodestar, then they would be *rationally indifferent* between settling the case for $8 million and $80 million (or any number higher than $8 million).  Either way they will get the same $2 million fee.  Or suppose counsel believed that the greatest settlement value they could negotiate from the defendant in this example was $16 million.  In order to reap the maximum 25% fee with the lodestar crosscheck, they would have to generate an additional $1 million in lodestar before agreeing to the settlement; this would give them incentive to *drag the case out* before settling.  Neither indifference as to settlement amount nor incentive to delay settlement is

1  in the interests of class members, of corporations represented in derivative actions, or of a society

2  interested in optimal compensation of injuries and optimal deterrence of wrongdoing.

3  33.  We must ask ourselves: is there any offsetting benefit to the lodestar crosscheck

4  that might outweigh the negative influence it will have on counsel's incentives?  I have yet to find

5  such a benefit.  The most frequently cited purpose of the lodestar crosscheck is to prevent

6  plaintiffs' counsel from reaping a "windfall," which I understand to be the notion that counsel

7  should not be paid "too much" over the amount at which they ordinarily bill for their time.  It may

8  very well seem inappropriate in some people's minds for this to occur, but I have never

9  understood why.  Class action lawyers are like many other workers in our economy who earn

10  their living by earning commissions rather than salaries.  Does anyone ask investment bankers

11  how many hours they worked after a deal closed and then attempt to adjust their compensation so

12  they don't earn too much over the value of their time?  Does anyone ask this of real estate agents?

13  Other salespeople who work on commissions?  When lawyers have individual clients and work

14  on contingency, is it customary for the client to ask to see the lawyer's time sheets after the case

15  is over and enter into a discussion of whether the contingency rate should be adjusted because the

16  lawyer earned too much?  As far as I know, the answer to all of these questions is "no."  I

17  therefore do not believe things should suddenly be different for class action and derivative

18  lawyers.  If these lawyers do a good job, there is nothing untoward about paying them their

19  commission, similar to commissions received by other workers.  As such, it is my opinion that

20  considering counsel's lodestar with the percentage method does a lot of harm in exchange for

21  little to no benefit.  I am always heartened when courts to which I submit declarations agree with

22  this sentiment.  *See, e.g.*, *Lloyd v. Navy Fed. Credit Union*, 2019 WL 2269958, at *13 (S.D. Cal.

23  May 28, 2019) (approving 25% fee award even though "[t]he Court is aware that a lodestar cross-

24  check would likely result in a multiplier of around 10.96").

25  34.  Nonetheless, because the Ninth Circuit and this court sometimes apply the lodestar

26  crosscheck in evaluating the reasonableness of requested percentage fees, I should note that the

27  lodestar here does not change my opinion that the fee request is reasonable.  Plaintiffs' counsel

28  have reported a lodestar of approximately $22.4 million, which would result in a lodestar

multiplier of approximately 3.03 if the court grants their fee request.  It is true that this multiplier would be above average in run-of-the-mill cases.  *See* Fitzpatrick, *Empirical Study, supra*, at 834 (finding mean and median lodestar multipliers in cases using the percentage method with the lodestar crosscheck were 1.65 and 1.34, respectively); *Eisenberg-Miller 2010*, *supra*, at 273 (finding mean multiplier of 1.81 for cases between 1993 and 2008); *Eisenberg-Miller 2017*, *supra*, at 965 (finding mean multiplier of 1.48 for cases between 2009 and 2013).  But it is in line with multipliers in large settlements like this one.  The best published study on this is Ted Eisenberg and Geoff Miller's 2010 article, which showed that the average multiplier in settlements above $175.5 million was 3.18 and the median was 2.60.  *See Eisenberg-Miller 2010*, *supra*, at 274.  Similarly, although I did not publish this finding, of the 7 settlements between $100 and $250 million in my study where courts used the percentage method and the multipliers could be ascertained, the average multiplier was 3.47 and the median was 2.20.  In other words, counsel are receiving a very typical return on their investment of time in a case of this size, and, as such, there is no reason, in my opinion, to believe counsel are reaping some sort of "windfall" here.

<u>Approach 2: Value the Non-Cash Benefits</u>

35.     Let me turn now to the approach that would value the non-cash benefits and give counsel a percentage of them along with a percentage of the cash.  The hardest question here is what value to place on these benefits.  This requires the court to assess both how much the Clawbacks and Reforms benefited Wells Fargo and how much of those benefits are attributable to counsel's efforts rather than market and regulatory factors.  In my opinion, the $80 million figure ascribed by Wells Fargo and the mediators does not strike me as an unreasonable estimate.  First, as I noted above, Wells Fargo has stipulated to this number even though doing so will reduce its take from the settlement by boosting counsel's fee award.  For this reason, I think the stipulation cannot be disregarded lightly.  Second, $80 million is likely to capture only a small fraction of the benefits the Clawbacks and Reforms will confer on Wells Fargo.  To begin with, we know the Clawbacks alone will save Wells Fargo $122.5 million.  Moreover, to the extent the Reforms improve Well Fargo's fortunes, as one of plaintiffs' other experts, Professor Jeffrey Gordon, has

opined in favor of, it would not take much improvement to confer tens of millions of dollars of value on the Company.  If the Reforms are as valuable as they appear to be, this strikes me as a very conservative estimate even discounting for how much of these benefits is attributable to factors other than the efforts of plaintiffs' counsel in this case.

36.     If the court accepts $80 million as a reasonable estimate of the value of the non-cash benefits conferred by the settlement, that pushes the total value of the benefits conferred here to $320 million.  In that case, counsel's $68 million fee request would come to 21.25% of the whole.  This would be below the Ninth Circuit's 25% benchmark and everything I said above with regard to a 28.33% fee request would apply with even greater force to a 21.25% fee request, with two modifications.

37.     First, a $320 million settlement is no longer within the $100-250 million range of my study but within the $250-500 million range.  But that only *improves* the reasonableness of the fee request.  The average (17.8%) and median (19.5%) fee percentages I reported in the $250-500 million range were almost identical to those I reported in the $100-250 million range, but now counsel's fee request is only slightly above the average and median and well within *one* standard deviation (7.9%) rather than two.  *See* Fitzpatrick, *Empirical Study*, at 839.  Moreover, for the five settlements in my $250-500 million range where the courts used the percentage method and the lodestar multipliers could be ascertained, the average and median multipliers were 3.34 and 3.33, respectively—higher than the multiplier sought here.

38.     Second, counsel would no longer be entitled to a boost of its fee percentage for conferring non-cash benefits because those benefits would now be included in the denominator from which the fee percentage is calculated.  Thus, factor (6) would become neutral rather a reason to award an above-average fee request.  But in light of the other factors, changing that one factor does not change my opinion, *especially* given that the fee percentage would now be below the Ninth Circuit's benchmark and well within one standard deviation of the average even in large settlements.

39.     For all these reasons, I believe the fee award requested here is within the range of reasonable awards.

**IV.**     **Assessment of the reasonableness of the reimbursement awards**

40.     Counsel requests reimbursement awards of $25,000 each to the two lead plaintiffs. According to the leading empirical studies, such payments would be right in line with the typical payments in securities cases (as I noted above, the closest analog to a derivative case) and below the typical payments as a percentage of a settlement.  Moreover, the payments would not fully reimburse the plaintiffs for the time their in-house counsels spent on this matter.  In my opinion, these awards would be perfectly reasonable.

41.     Let me begin with the empirical studies.  The best study is Theodore Eisenberg & Geoffrey Miller, *Incentive Awards to Class Action Plaintiffs: An Empirical Study*, 53 UCLA L. Rev. 1303 (2006) ("Eisenberg-Miller Incentive Awards").  They found that, in cases where "service payments" were awarded between 1993 and 2002,[2] the average of *all* awards in a given case was over $128,000 and the median was over $18,000.  *See id*. at 1334.  The average of *each* award in a given case was almost $16,000 and the median was over $4000.  *See id*.  It should be noted, however, that these numbers include many different types of cases, including consumer cases where awards are very small.  In securities cases (again, the closest analog to this case), the average for *all* awards was over $25,000 and the average for *each* award was over $16,000, with the medians at almost $12,000 and $3000, respectively.  *See id*.  All of these numbers are in 2002 dollars, and, to convert them to 2019 dollars, they would need to be multiplied by 142%.  This conversion would put the awards requested here ($25,000 each, $50,000 in total) right in line with the averages found in securities cases.[3]  As such, as a first cut, there is little reason to worry the awards here would be too generous.

42.     The Eisenberg-Miller study also reported service payments as a percentage of the amount of the settlement.  The average percentage for all service payments was 0.16% and the

---

[2] Service payments are awarded less frequently in securities cases than other types of cases because there is some debate whether the Private Securities Litigation Reform Act of 1995 permits such payments.  *See* William Rubenstein, 5 Newberg on Class Actions § 17:19 (5th ed.).

[3] Bill Rubenstein's study covering 2006-2011 is largely consistent with the Eisenberg-Miller study: he found slightly lower means and medians in 2002 dollars, but he did not break out his findings by case category, so we do not know what his securities numbers were.  *See* William Rubenstein, 5 Newberg on Class Actions § 17:8 (5th ed.).

median was 0.024%.  *See Eisenberg-Miller Incentive Awards, supra,* at 1339.  The average and median percentages for service payments in securities cases were both 0.024%.  By contrast, the total service payments here would comprise only 0.021% of the $240 million cash component of this settlement.  This suggests that there is even less reason to worry the reimbursement awards here would be too generous.

43.  Finally, the concern with service payments is usually that they confer such "windfalls" on lead plaintiffs that they will support a settlement regardless of how bad it might be—i.e., they make so much money from the service payments, they don't care what their take (or here, Wells Fargo's take) is from the settlement.  But it is clear from the declarations of the lead plaintiffs that they will reap no "windfall" from the reimbursement awards here: the time they spent participating in this litigation will not be fully reimbursed by these payments.

44.  Nor will the reimbursement awards decrease Wells Fargo's recovery, as the awards will be paid from Co-Lead Counsel's attorneys' fees.

45.  For all these reasons, in my opinion, the requested reimbursement awards would be reasonable.


Executed on this 27th day of June, 2019, at New York, NY.



By:  */s/ Brian T. Fitzpatrick*
Brian T. Fitzpatrick

# EXHIBIT 1

# BRIAN T. FITZPATRICK

Vanderbilt University Law School
131 21st Avenue South
Nashville, TN 37203
(615) 322-4032
brian.fitzpatrick@law.vanderbilt.edu

## ACADEMIC APPOINTMENTS

**VANDERBILT UNIVERSITY LAW SCHOOL**, *Professor*, 2012 to present
- *FedEx Research Professor*, 2014-2015; *Associate Professor*, 2010-2012; *Assistant Professor*, 2007-2010
- Classes: Civil Procedure, Complex Litigation, Federal Courts, Comparative Class Actions
- Hall-Hartman Outstanding Professor Award, 2008-2009
- Vanderbilt's Association of American Law Schools Teacher of the Year, 2009

**HARVARD LAW SCHOOL**, *Visiting Professor*, Fall 2018
- Classes: Civil Procedure, Litigation Finance

**FORDHAM LAW SCHOOL**, *Visiting Professor*, Fall 2010
- Classes: Civil Procedure

## EDUCATION

**HARVARD LAW SCHOOL**, J.D., *magna cum laude*, 2000
- Fay Diploma (for graduating first in the class)
- Sears Prize, 1999 (for highest grades in the second year)
- *Harvard Law Review*, Articles Committee, 1999-2000; Editor, 1998-1999
- *Harvard Journal of Law & Public Policy*, Senior Editor, 1999-2000; Editor, 1998-1999
- Research Assistant, David Shapiro, 1999; Steven Shavell, 1999

**UNIVERSITY OF NOTRE DAME**, B.S., Chemical Engineering, *summa cum laude*, 1997
- First runner-up to Valedictorian (GPA: 3.97/4.0)
- Steiner Prize, 1997 (for overall achievement in the College of Engineering)

## CLERKSHIPS

**HON. ANTONIN SCALIA**, Supreme Court of the United States, 2001-2002

**HON. DIARMUID O'SCANNLAIN**, U.S. Court of Appeals for the Ninth Circuit, 2000-2001

## EXPERIENCE

**NEW YORK UNIVERSITY SCHOOL OF LAW**, Feb. 2006 to June 2007
*John M. Olin Fellow*

**HON. JOHN CORNYN**, United States Senate, July 2005 to Jan. 2006
*Special Counsel for Supreme Court Nominations*

**SIDLEY AUSTIN LLP**, Washington, DC, 2002 to 2005
*Litigation Associate*

## BOOKS

THE CONSERVATIVE CASE FOR CLASS ACTIONS (University of Chicago Press, forthcoming 2019)

## ACADEMIC ARTICLES

*Can the Class Action be Made Business Friendly?*, 24 N.Z. BUS. L. & Q. 169 (2018)

*Can and Should the New Third-Party Litigation Financing Come to Class Actions?*, 19 THEORETICAL INQUIRIES IN LAW 109 (2018)

*Scalia in the Casebooks*, 84 U. CHI. L. REV. 2231 (2017)

*The Ideological Consequences of Judicial Selection*, 70 VAND. L. REV. 1729 (2017)

*Judicial Selection and Ideology*, 42 OKLAHOMA CITY UNIV. L. REV. 53 (2017)

*Justice Scalia and Class Actions: A Loving Critique,* 92 NOTRE DAME L. REV. 1977 (2017)

*A Tribute to Justice Scalia: Why Bad Cases Make Bad Methodology,* 69 VAND. L. REV. 991 (2016)

*The Hidden Question in* Fisher, 10 NYU J. L. & LIBERTY 168 (2016)

*An Empirical Look at Compensation in Consumer Class Actions,* 11 NYU J. L. & BUS. 767 (2015) (with Robert Gilbert)

*The End of Class Actions?*, 57 ARIZ. L. REV. 161 (2015)

*The Constitutionality of Federal Jurisdiction-Stripping Legislation and the History of State Judicial Selection and Tenure*, 98 VA. L. REV. 839 (2012)

Twombly *and* Iqbal *Reconsidered*, 87 NOTRE DAME L. REV. 1621 (2012)

*An Empirical Study of Class Action Settlements and their Fee Awards*, 7 J. EMPIRICAL L. STUD. 811 (2010) (selected for the 2009 Conference on Empirical Legal Studies)

*Do Class Action Lawyers Make Too Little?*, 158 U. PA. L. REV. 2043 (2010)

*Originalism and Summary Judgment*, 71 OHIO ST. L.J. 919 (2010)

*The End of Objector Blackmail?*, 62 VAND. L. REV. 1623 (2009) (selected for the 2009 Stanford-Yale Junior Faculty Forum)

*The Politics of Merit Selection*, 74 MISSOURI L. REV. 675 (2009)

*Errors, Omissions, and the Tennessee Plan*, 39 U. MEMPHIS L. REV. 85 (2008)

*Election by Appointment: The Tennessee Plan Reconsidered*, 75 TENN. L. REV. 473 (2008)

*Can Michigan Universities Use Proxies for Race After the Ban on Racial Preferences?*, 13 MICH. J. RACE & LAW 277 (2007)


## BOOK CHAPTERS

*Do Class Actions Deter Wrongdoing?* in THE CLASS ACTION EFFECT (Catherine Piché, ed., Éditions Yvon Blais, Montreal, 2018)

*Judicial Selection in Illinois* in AN ILLINOIS CONSTITUTION FOR THE TWENTY-FIRST CENTURY (Joseph E. Tabor, ed., Illinois Policy Institute, 2017)

*Civil Procedure in the Roberts Court* in BUSINESS AND THE ROBERTS COURT (Jonathan Adler, ed., Oxford University Press, 2016)

*Is the Future of Affirmative Action Race Neutral?* in A NATION OF WIDENING OPPORTUNITIES: THE CIVIL RIGHTS ACT AT 50 (Ellen Katz & Samuel Bagenstos, eds., Michigan University Press, 2016)


## ACADEMIC PRESENTATIONS

*The Indian Securities Fraud Class Action: Is Class Arbitration the Answer?*, Ninth Annual Emerging Markets Finance Conference, Mumbai, India (Dec. 14, 2018)

*MDL: Uniform Rules v. Best Practices*, Miami Law Class Action & Complex Litigation Forum, University of Miami Law School, Miami, Florida (December 7, 2018) (panelist)

*Third Party Finance of Attorneys in Traditional and Complex Litigation*, George Washington Law School, Washington, D.C. (November 2, 2018) (panelist)

*MDL at 50 - The 50th Anniversary of Multidistrict Litigation*, New York University Law School, New York, New York (October 10, 2018) (panelist)

*The Discovery Tax*, Law & Economics Seminar, Harvard Law School, Cambridge, Massachusetts (September 11, 2018)

*Empirical Research on Class Actions,* Civil Justice Research Initiative, University of California at Berkeley, Berkeley, California (Apr. 9, 2018)

*A Political Future for Class Actions in the United States?*, The Future of Class Actions Symposium, University of Auckland Law School, Auckland, New Zealand (Mar. 15, 2018)

*The Indian Class Actions: How Effective Will They Be?*, Eighth Annual Emerging Markets Finance Conference, Mumbai, India (Dec. 19, 2017)

*Hot Topics in Class Action and MDL Litigation,* University of Miami School of Law, Miami, Florida (Dec. 8, 2017) (panelist)

*Critical Issues in Complex Litigation*, Contemporary Issues in Complex Litigation, Northwestern Law School (Nov. 29, 2017) (panelist)

*The Conservative Case for Class Actions*, Consumer Class Action Symposium, National Consumer Law Center, Washington, DC (Nov. 19, 2017)

*The Conservative Case for Class Actions—A Monumental Debate*, ABA National Institute on Class Actions, Washington, DC (Oct. 26, 2017) (panelist)

*One-Way Fee Shifting after Summary Judgment*, 2017 Meeting of the Midwestern Law and Economics Association, Marquette Law School, Milwaukee, WI (Oct. 20, 2017)

*The Conservative Case for Class Actions*, Pepperdine Law School Malibu, CA (Oct. 17, 2017)

*One-Way Fee Shifting after Summary Judgment*, Vanderbilt Law Review Symposium on The Future of Discovery, Vanderbilt Law School, Nashville, TN (Oct. 13, 2017)

*The Constitution Revision Commission and Florida's Judiciary*, 2017 Annual Florida Bar Convention, Boca Raton, FL (June 22, 2017)

*Class Actions After* Spokeo v. Robins*: Supreme Court Jurisprudence, Article III Standing, and Practical Implications for the Bench and Practitioners*, Northern District of California Judicial Conference, Napa, CA (Apr. 29, 2017) (panelist)

*The Ironic History of Rule 23*, Conference on Secrecy, Institute for Law & Economic Policy, Naples, FL (Apr. 21, 2017)

*Justice Scalia and Class Actions: A Loving Critique*, University of Notre Dame Law School, South Bend, Indiana (Feb. 3, 2017)

*Should Third-Party Litigation Financing Be Permitted in Class Actions?*, Fifty Years of Class Actions—A Global Perspective, Tel Aviv University, Tel Aviv, Israel (Jan. 4, 2017)

*Hot Topics in Class Action and MDL Litigation,* University of Miami School of Law, Miami, Florida (Dec. 2, 2016) (panelist)

*The Ideological Consequences of Judicial Selection,* William J. Brennan Lecture, Oklahoma City University School of Law, Oklahoma, City, Oklahoma (Nov. 10, 2016)

*After Fifty Years, What's Class Action's Future,* ABA National Institute on Class Actions, Las Vegas, Nevada (Oct. 20, 2016) (panelist)

*Where Will Justice Scalia Rank Among the Most Influential Justices*, State University of New York at Stony Brook, Long Island, New York (Sep. 17, 2016)

*The Ironic History of Rule 23,* University of Washington Law School, Seattle, WA (July 14, 2016)

4

*A Respected Judiciary—Balancing Independence and Accountability*, 2016 Annual Florida Bar Convention, Orlando, FL (June 16, 2016) (panelist)

*What Will and Should Happen to Affirmative Action After Fisher v. Texas*, American Association of Law Schools Annual Meeting, New York, NY (January 7, 2016) (panelist)

*Litigation Funding: The Basics and Beyond,* NYU Center on Civil Justice, NYU Law School, New York, NY (Nov. 20, 2015) (panelist)

*Do Class Actions Offer Meaningful Compensation to Class Members, or Do They Simply Rip Off Consumers Twice?,* ABA National Institute on Class Actions, New Orleans, LA (Oct. 22, 2015) (panelist)

*Arbitration and the End of Class Actions?,* Quinnipiac-Yale Dispute Resolution Workshop, Yale Law School, New Haven, CT (Sep. 8, 2015) (panelist)

*The Next Steps for Discovery Reform: Requester Pays*, Lawyers for Civil Justice Membership Meeting, Washington, DC (May 5, 2015)

*Private Attorney General: Good or Bad?*, 17th Annual Federalist Society Faculty Conference, Washington, DC (Jan. 3, 2015)

*Liberty, Judicial Independence, and Judicial Power*, Liberty Fund Conference, Santa Fe, NM (Nov. 13-16, 2014) (participant)

*The Economics of Objecting for All the Right Reasons,* 14th Annual Consumer Class Action Symposium, Tampa, FL (Nov. 9, 2014)

*Compensation in Consumer Class Actions: Data and Reform*, Conference on The Future of Class Action Litigation: A View from the Consumer Class, NYU Law School, New York, NY (Nov. 7, 2014)

*The Future of Federal Class Actions: Can the Promise of Rule 23 Still Be Achieved?*, Northern District of California Judicial Conference, Napa, CA (Apr. 13, 2014) (panelist)

*The End of Class Actions?*, Conference on Business Litigation and Regulatory Agency Review in the Era of Roberts Court, Institute for Law & Economic Policy, Boca Raton, FL (Apr. 4, 2014)

*Should Third-Party Litigation Financing Come to Class Actions?*, University of Missouri School of Law, Columbia, MO (Mar. 7, 2014)

*Should Third-Party Litigation Financing Come to Class Actions?*, George Mason Law School, Arlington, VA (Mar. 6, 2014)

*Should Third-Party Litigation Financing Come to Class Actions?*, Roundtable for Third-Party Funding Scholars, Washington & Lee University School of Law, Lexington, VA (Nov. 7-8, 2013)

*Is the Future of Affirmative Action Race Neutral?*, Conference on A Nation of Widening Opportunities: The Civil Rights Act at 50, University of Michigan Law School, Ann Arbor, MI (Oct. 11, 2013)

*The Mass Tort Bankruptcy: A Pre-History*, The Public Life of the Private Law: A Conference in Honor of Richard A. Nagareda, Vanderbilt Law School, Nashville, TN (Sep. 28, 2013) (panelist)

*Rights & Obligations in Alternative Litigation Financing and Fee Awards in Securities Class Actions*, Conference on the Economics of Aggregate Litigation, Institute for Law & Economic Policy, Naples, FL (Apr. 12, 2013) (panelist)

*The End of Class Actions?*, Symposium on Class Action Reform, University of Michigan Law School, Ann Arbor, MI (Mar. 16, 2013)

*Toward a More Lawyer-Centric Class Action?,* Symposium on Lawyering for Groups, Stein Center for Law & Ethics, Fordham Law School, New York, NY (Nov. 30, 2012)

*The Problem: AT & T as It Is Unfolding*, Conference on *AT & T Mobility v. Concepcion*, Cardozo Law School, New York, NY (Apr. 26, 2012) (panelist)

*Standing under the Statements and Accounts Clause,* Conference on Representation without Accountability, Fordham Law School Corporate Law Center, New York, NY (Jan. 23, 2012)

*The End of Class Actions?*, Washington University Law School, St. Louis, MO (Dec. 9, 2011)

*Book Preview Roundtable: Accelerating Democracy: Matching Social Governance to Technological Change*, Searle Center on Law, Regulation, and Economic Growth, Northwestern University School of Law, Chicago, IL (Sep. 15-16, 2011) (participant)

*Is Summary Judgment Unconstitutional?  Some Thoughts About Originalism*, Stanford Law School, Palo Alto, CA (Mar. 3, 2011)

*The Constitutionality of Federal Jurisdiction-Stripping Legislation and the History of State Judicial Selection and Tenure*, Northwestern Law School, Chicago, IL (Feb. 25, 2011)

*The New Politics of Iowa Judicial Retention Elections: Examining the 2010 Campaign and Vote,* University of Iowa Law School, Iowa City, IA (Feb. 3, 2011) (panelist)

*The Constitutionality of Federal Jurisdiction-Stripping Legislation and the History of State Judicial Selection and Tenure*, Washington University Law School, St. Louis, MO (Oct. 1, 2010)

Twombly *and* Iqbal *Reconsidered,* Symposium on Business Law and Regulation in the Roberts Court, Case Western Reserve Law School, Cleveland, OH (Sep. 17, 2010)

*Do Class Action Lawyers Make Too Little?*, Institute for Law & Economic Policy, Providenciales, Turks & Caicos (Apr. 23, 2010)

*Originalism and Summary Judgment*, Georgetown Law School, Washington, DC (Apr. 5, 2010)

*Theorizing Fee Awards in Class Action Litigation*, Washington University Law School, St. Louis, MO (Dec. 11, 2009)

6

*An Empirical Study of Class Action Settlements and their Fee Awards*, 2009 Conference on Empirical Legal Studies, University of Southern California Law School, Los Angeles, CA (Nov. 20, 2009)

*Originalism and Summary Judgment*, Symposium on Originalism and the Jury, Ohio State Law School, Columbus, OH (Nov. 17, 2009)

*An Empirical Study of Class Action Settlements and their Fee Awards*, 2009 Meeting of the Midwestern Law and Economics Association, University of Notre Dame Law School, South Bend, IN (Oct. 10, 2009)

*The End of Objector Blackmail?*, Stanford-Yale Junior Faculty Forum, Stanford Law School, Palo Alto, CA (May 29, 2009)

*An Empirical Study of Class Action Settlements and their Fee Awards*, University of Minnesota School of Law, Minneapolis, MN (Mar. 12, 2009)

*The Politics of Merit Selection*, Symposium on State Judicial Selection and Retention Systems, University of Missouri Law School, Columbia, MO (Feb. 27, 2009)

*The End of Objector Blackmail?*, Searle Center Research Symposium on the Empirical Studies of Civil Liability, Northwestern University School of Law, Chicago, IL (Oct. 9, 2008)

*Alternatives To Affirmative Action After The Michigan Civil Rights Initiative*, University of Michigan School of Law, Ann Arbor, MI (Apr. 3, 2007) (panelist)

## OTHER PUBLICATIONS

*9th Circuit Split: What's the math say?*, DAILY JOURNAL (Mar. 21, 2017)

*Former clerk on Justice Antonin Scalia and his impact on the Supreme Court*, THE CONVERSATION (Feb. 24, 2016)

*Lessons from Tennessee Supreme Court Retention Election*, THE TENNESSEAN (Aug. 20, 2014)

*Public Needs Voice in Judicial Process*, THE TENNESSEAN (June 28, 2013)

*Did the Supreme Court Just Kill the Class Action?*, THE QUARTERLY JOURNAL (April 2012)

*Let General Assembly Confirm Judicial Selections*, CHATTANOOGA TIMES FREE PRESS (Feb. 19, 2012)

*"Tennessee Plan" Needs Revisions*, THE TENNESSEAN (Feb. 3, 2012)

*How Does Your State Select Its Judges?*, INSIDE ALEC 9 (March 2011) (with Stephen Ware)

*On the Merits of Merit Selection*, THE ADVOCATE 67 (Winter 2010)

*Supreme Court Case Could End Class Action Suits,* SAN FRANCISCO CHRONICLE (Nov. 7, 2010)

*Kagan is an Intellect Capable of Serving Court*, THE TENNESSEAN (Jun. 13, 2010)

*Confirmation "Kabuki" Does No Justice*, POLITICO (July 20, 2009)

*Selection by Governor may be Best Judicial Option*, THE TENNESSEAN (Apr. 27, 2009)

*Verdict on Tennessee Plan May Require a Jury*, THE MEMPHIS COMMERCIAL APPEAL (Apr. 16, 2008)

*Tennessee's Plan to Appoint Judges Takes Power Away from the Public*, THE TENNESSEAN (Mar. 14, 2008)

*Process of Picking Judges Broken*, CHATTANOOGA TIMES FREE PRESS (Feb. 27, 2008)

*Disorder in the Court*, LOS ANGELES TIMES (Jul. 11, 2007)

*Scalia's Mistake*, NATIONAL LAW JOURNAL (Apr. 24, 2006)

*GM Backs Its Bottom Line*, DETROIT FREE PRESS (Mar. 19, 2003)

*Good for GM, Bad for Racial Fairness*, LOS ANGELES TIMES (Mar. 18, 2003)

*10 Percent Fraud*, WASHINGTON TIMES (Nov. 15, 2002)

## OTHER PRESENTATIONS

*Does the Way We Choose our Judges Affect Case Outcomes?*, American Legislative Exchange Council 2018 Annual Meeting, New Orleans, Louisiana (August 10, 2018) (panelist)

*Oversight of the Structure of the Federal Courts*, Subcommittee on Oversight, Agency Action, Federal Rights and Federal Courts, United States Senate, Washington, D.C. (July 31, 2018)

*Where Will Justice Scalia Rank Among the Most Influential Justices*, The Leo Bearman, Sr. American Inn of Court, Memphis, TN (Mar. 21, 2017)

*Bringing Justice Closer to the People: Examining Ideas for Restructuring the 9th Circuit*, Subcommittee on Courts, Intellectual Property, and the Internet, United States House of Representatives, Washington, D.C. (Mar. 16, 2017)

*Supreme Court Review 2016: Current Issues and Cases Update*, Nashville Bar Association, Nashville, TN (Sep. 15, 2016) (panelist)

*A Respected Judiciary—Balancing Independence and Accountability*, Florida Bar Annual Convention, Orlando, FL (June 16, 2016) (panelist)

*Future Amendments in the Pipeline: Rule 23*, Tennessee Bar Association, Nashville, TN (Dec. 2, 2015)

*The New Business of Law: Attorney Outsourcing, Legal Service Companies, and Commercial Litigation Funding*, Tennessee Bar Association, Nashville, TN (Nov. 12, 2014)

*Hedge Funds + Lawsuits = A Good Idea?*, Vanderbilt University Alumni Association, Washington, DC (Sep. 3, 2014)

*Judicial Selection in Historical and National Perspective*, Committee on the Judiciary, Kansas Senate (Jan. 16, 2013)

*The Practice that Never Sleeps: What's Happened to, and What's Next for, Class Actions*, ABA Annual Meeting, Chicago, IL (Aug. 3, 2012) (panelist)

*Life as a Supreme Court Law Clerk and Views on the Health Care Debate*, Exchange Club, Nashville, TN (Apr. 3, 2012)

*The Tennessee Judicial Selection Process—Shaping Our Future*, Tennessee Bar Association Leadership Law Retreat, Dickson, TN (Feb. 3, 2012) (panelist)

*Reexamining the Class Action Practice*, ABA National Institute on Class Actions, New York, NY (Oct. 14, 2011) (panelist)

*Judicial Selection in Kansas*, Committee on the Judiciary, Kansas House of Representatives (Feb. 16, 2011)

*Judicial Selection and the Tennessee Constitution*, Civil Practice and Procedure Subcommittee, Tennessee House of Representatives (Mar. 24, 2009)

*What Would Happen if the Judicial Selection and Evaluation Commissions Sunset?*, Civil Practice and Procedure Subcommittee, Tennessee House of Representatives (Feb. 24, 2009)

*Judicial Selection in Tennessee*, Chattanooga Bar Association, Chattanooga, TN (Feb. 27, 2008) (panelist)

*Ethical Implications of Tennessee's Judicial Selection Process*, Tennessee Bar Association, Nashville, TN (Dec. 12, 2007)

## PROFESSIONAL ASSOCIATIONS

Member, American Law Institute
Referee, Journal of Law, Economics and Organization
Referee, Journal of Empirical Legal Studies

Reviewer, Oxford University Press
Reviewer, Supreme Court Economic Review
Member, American Bar Association
Member, Tennessee Advisory Committee to the U.S. Commission on Civil Rights
Board of Directors, Tennessee Stonewall Bar Association
American Swiss Foundation Young Leaders' Conference, 2012
Bar Admission, District of Columbia

## COMMUNITY ACTIVITIES

Board of Directors, Nashville Ballet, 2011-2017; Nashville Talking Library for the Blind, 2008-2009

# EXHIBIT 2

Documents reviewed:

- Order Granting in Part and Denying in Part Motion to Dismiss (document 129, filed 5/4/17)

- Order Granting in Part and Denying in Part Motions to Dismiss (document 174, filed 10/4/17)

- Co-Lead Plaintiffs' Notice of Motion and Motion for Preliminary Approval of Settlement, and Memorandum of Points of Authorities in Support Thereof (document 270, filed 2/28/19), as well as the exhibits thereto, including the Stipulation and Agreement of Compromise, Settlement and Release ("Settlement Agreement")

- Order Requesting Supplemental Briefing (document 271, filed 3/20/19)

- Supplemental Brief in Support of Plaintiffs' Motion for Preliminary Approval of Settlement (document 272, filed 4/2/19)

- Director and Officer Defendants' Statement in Response to Court's Order Requesting Supplemental Briefing (draft, never filed)

- Order Granting Preliminary Approval of Derivative Action Settlement (document 274, filed 5/14/19)

- Declaration of Kevin B. Lindahl, Esq., in Support of Reimbursement Award to Co-Lead Plaintiff Fire & Police Pension Association of Colorado (filed herewith)

- Declaration of James D. Love, Esq., in Support of Reimbursement Award to Co-Lead Plaintiff The City of Birmingham Retirement and Relief System (filed herewith)

- Declaration of Jeffrey N. Gordon in Support of Co-Lead Plaintiffs' Motion for Final Approval of Settlement (draft)