# EXHIBIT B

1
2
3
4
5
6
7
8              UNITED STATES DISTRICT COURT
9            NORTHERN DISTRICT OF CALIFORNIA
10

11   IN RE WELLS FARGO & COMPANY          Lead Case No. 3:16-cv-05541-JST
     SHAREHOLDER DERIVATIVE
12   LITIGATION                           **DECLARATION OF JEFFREY N.
                                          GORDON IN SUPPORT OF CO-LEAD
13                                        PLAINTIFFS' MOTION FOR FINAL
                                          APPROVAL OF SETTLEMENT**
14
15

16                          **INTRODUCTION**

17          1.      Wells Fargo & Company ("Wells Fargo" or the "Company") was one of the eight

18   recipients of the immediate drawdown of emergency funds at the outset of the Financial Crisis in

19   October 2008, receiving $25 billion from the Trouble Asset Relief Program, and thus popularly

20   regarded as having been "bailed out."  The Company subsequently has been designated a "Global

21   Systemically Important Bank," or "G-SIB," meaning a bank whose financial distress or failure

22   could threaten the stability of the world financial system.  There are eight such banks in the

23   United States.  The quality of the management and corporate governance of the Company is thus

24   a matter of national concern, drawing the attention of regulators, political actors, and the media.

25   In response to the matters raised in this litigation, regulators have pointedly signaled their

26   concerns with issues of management and corporate governance at the Company by, inter alia,

27   capping the Company's growth.

28

2.      The Settlement herein will deliver a substantial monetary recovery of $240 million from D&O Liability Insurance, credit for previous executive compensation reductions and forfeitures of $60 million (the "Clawbacks"), and credit for corporate governance reforms of $20 million (the "Reforms").  The Reforms resulted in significant part because of the persistence of the Co-Lead Plaintiffs in pushing them throughout the litigation.

3.      In my opinion, this is the rare case of shareholder derivative litigation in which the corporate governance reforms are more valuable to a company and its shareholders than even a substantial monetary recovery.  This is because a near-term recurrence of serious compliance problems at Wells Fargo could produce an existential crisis for the Company, in which the Company would face calls for a downsizing or break-up on grounds that the Company in present form was unmanageable.  Such authority in respect of a systemically important financial institution exists in the Dodd Frank Act, sec. 121, "Mitigation of Risks to Financial Stability."  This would be a financial calamity for Wells Fargo shareholders.

4.      In my opinion, the Reforms will meaningfully reduce the recurrence risk of a significant compliance failure.  For example, the Reforms will establish reporting requirements and a Board structure that will significantly heighten the liability risks for directors in the event of a significant compliance failure.  This in turn should evoke greater Board diligence in carrying out vigorous compliance oversight.

5.      The Settlement credits the Co-Lead Plaintiffs with $20 million in value creation for the Reforms.  In light of the manifest importance of these Reforms and the acknowledged persistence of Co-Lead Plaintiffs in pursuing these Reforms, I think $20 million is well within the range of value-creation-in-fact, perhaps even at the low end.

## **QUALIFICATIONS**

6.      I have been retained in this matter as an expert on corporate law and governance and directors' fiduciary duties.  My compensation in this matter is $800 per hour.  My compensation is not contingent upon the outcome of this case.

7.      I am the Richard Paul Richman Professor of Law at Columbia University Law School, Co-Director of the Millstein Center for Global Markets and Corporate Ownership, Co-

Director of the Richman Center for Business, Law, and Public Policy, and Co-Director of the Columbia Center for Law and Economic Studies.  I am also a Visiting Professor at the University of Oxford and a Fellow of the European Corporate Governance Institute.  I have been a law professor for 35 years, starting at NYU Law School in 1982 and moving to Columbia in 1988.  In the fall of 2002, I was the Bruce W. Nichols Visiting Professor of Law at Harvard Law School.  Most of my teaching and scholarship have been in the corporate and securities area, broadly defined.  I have become a specialist in corporate law (including the fiduciary duties of boards and directors), corporate governance, corporate finance, and mergers and acquisitions.  I have taught Corporations or Advanced Corporate Law: Mergers and Acquisitions on a yearly basis throughout my career.  I also regularly teach courses that focus on various aspects of corporate governance.  Since the financial crisis, I have created and taught courses on the regulation of financial institutions and have done scholarship in the area, focusing particularly on the special governance needs of systemically important financial firms.  Further professional background is provided by my curriculum vitae, attached as Exhibit 1 hereto.

8.      Of particular relevance to the opinions I express in this Declaration, I have written extensively on the board's role in corporate governance.  My article on the role of boards and independent directors in corporate governance, *The Rise of Independent Directors in the United States: 1950-2005*, 59 Stan. L. Rev. 1465 (2007), was selected by a vote of business law academics as one of the 10 best articles on business law published in the United States during 2007 and was awarded the European Corporate Governance Institute's prize for the best working paper in 2007 on company boards and their role in corporate governance.  Another much-discussed article directly addressed the responsibility of the Enron board in that company's collapse, *Governance Failures of the Enron Board and the New Information Order of Sarbanes-Oxley*, 35 U. Conn. L. Rev. 1125 (2003) (symposium issue).

9.      My article calling for board responsibility in reviewing and approving disclosures relating to executive compensation was cited by the Securities and Exchange Commission ("SEC") in connection with its own similar rule, *Executive Compensation:  If There is a Problem, What's the Remedy?  The Case for "Compensation Discussion and Analysis,"* 30 J. Corp. Law

675 (2005).  An article on the governance role of controlling shareholders, *Controlling*
*Controlling Shareholders*, 152 U. Penn. L. Rev. 785 (2003) (with Ronald J. Gilson), also selected
as a "top ten" article, has been cited and relied upon several times by the Delaware Chancery
Court.  Other articles addressing other corporate law issues have also been cited by the Delaware
Chancery Court.  I am the co-editor of the OXFORD HANDBOOK OF CORPORATE LAW AND
GOVERNANCE (2018), which provides an overview of the entire field.

10.     My most recent scholarship addresses the problem of assuring corporate
compliance with applicable law in light of the high-powered compensation incentives that are
now commonly received by officers and directors.  This concern is expressed in two co-authored
forthcoming articles:  *Taking Compliance Seriously* (forthcoming 2020 Yale J. on Regulation)
and *Board Compliance* (forthcoming 2020 Univ. of Minnesota L. Rev.).

11.     Other recent scholarship addresses specifically the governance problems of
financial firms, including a recent article that focuses on the particular responsibilities of the
board in risk oversight of systemically important financial firms, *Systemic Harms and*
*Shareholder Value* (with John Armour), 6 J. Legal Analysis 35 (2014).  I am also a co-author of
Principles of Financial Regulation (Oxford Univ. Press 2016), which includes a treatment of
corporate governance in financial firms.

12.     I also participate in the international dialogue about corporate governance and
sophisticated business transactions.  I have written a number of articles on international corporate
governance standards and have co-edited CONVERGENCE AND PERSISTENCE IN CORPORATE
GOVERNANCE (with Mark J. Roe) (2004).  My work has been translated into German, French, and
Chinese.  As previously noted, I am a Fellow of the European Corporate Governance Institute, a
leading interdisciplinary group of economists and lawyers.  I am also Vice-Chair of the Global
Corporate Governance Colloquium, an international consortium of 12 leading law schools and
business schools that meets annually to discuss corporate governance questions.

13.     On a number of occasions I have been retained by agencies of the United States
government (namely, the office of the U.S. Attorney for the Southern District of New York, the
office of the U.S. Attorney for the Eastern District of New York, the SEC, the Board of

1   Governors of the Federal Reserve System and the Internal Revenue Service) to serve as an expert

2   witness in pending criminal or civil litigation, involving various matters of corporate and

3   securities law, including but not limited to various questions of corporate governance, board

4   behavior, controlling shareholder responsibilities, corporate structure, and finance.  In all cases

5   where I was called upon to testify or submit an affidavit, and where the court permitted expert

6   testimony, I have been accepted as an expert.

7         14.     I have also submitted affidavits or reports as a corporate governance expert in

8   recent settlements of shareholder derivative suits in connection with stock option backdating,

9   disclosure issues, and alleged fiduciary duty issues.

10        15.     In preparing this Declaration, I have reviewed the litigation material identified in

11  Exhibit 2 attached hereto.

12                            **UNDERLYING LITIGATION**

13        16.     The underlying litigation is a shareholder derivative suit brought on behalf of

14  nominal defendant Wells Fargo against various officers, directors, and senior management arising

15  from so-called "Improper Sales Practices" that were widespread within Wells Fargo and that

16  victimized millions of Wells Fargo customers.  In particular, Plaintiffs' Consolidated Amended

17  Verified Stockholder Derivative Complaint (the "Complaint") alleged that over a several year

18  period, beginning in at least 2011, "Defendants knew or consciously disregarded that Wells Fargo

19  employees were illicitly creating millions of deposit and credit card accounts for their customers,

20  without their customers' knowledge or consent."  (Complaint, ¶ 1).

21        17.     The various defendants filed motions to dismiss, which were for the most part

22  denied by the Court on May 4, 2017 and October 4, 2017, holding particularly that the Complaint

23  had alleged sufficiently culpability by the defendant directors so as to deprive them of the

24  prerogative of controlling litigation on behalf of Wells Fargo.  Subsequent mediation efforts

25  eventually led to a settlement in December 2018.  On February 28, 2019, the Parties filed for

26  preliminary approval, and attached, as part of their settlement agreement, an exhibit ("Federal

27  Settlement Exhibit A") containing the Reforms adopted by Wells Fargo.[1]  Pursuant to Co-Lead

28  ────────────────────

[1] My understanding is that following Co-Lead Plaintiffs moving for preliminary approval in

Plaintiffs' motion, the District Court granted preliminary approval of the settlement proposal on May 14, 2019 (the "Preliminary Approval Order").

## THE VALUE OF REMEDIAL ACTIONS TAKEN BY WELLS FARGO

18.     One issue that was left open in the Preliminary Approval Order was "what value to assign to the remedial actions taken by Wells Fargo" (*id.* at 10), including (i) the Clawbacks, and (ii) the Reforms.

19.     The total value of the Clawbacks was $122.5 million.  Since actions to obtain Clawbacks were undertaken after Co-Lead Plaintiffs' initiation of this derivative litigation and such Clawbacks were substantially included in Co-Lead Plaintiffs' Prayer for Relief, Co-Lead Plaintiffs and Wells Fargo assigned $60 million of the Clawbacks to Co-Lead Plaintiffs' efforts. (Settlement Agreement, Ex. B, at 4).  The Parties also agreed that the Reforms have conferred significant value to Wells Fargo and have valued Co-Lead Plaintiffs' contribution at $20 million. (Federal Settlement Exhibit A, at 8).  This reflects both a belief that the Reforms have significant value to Wells Fargo shareholders and a determination that Co-Lead Plaintiffs' persistence in promoting corporate governance reforms throughout the litigation process, beginning with their Prayer for Relief in the Complaint and continuing throughout subsequent settlement negotiations and mediations, were material factors in advancing the Reforms.  The proposed Settlement describes with lengthy particularity Co-Lead Plaintiffs' continual efforts to include corporate governance reform measures as part of any settlement.  *Id.* at 2-4.  Thus the fact that Wells Fargo implemented certain of these Reforms prior to the execution of the settlement agreement does not negative Co-Lead Plaintiffs' significant role in achieving them.

20.     The question I have been asked to address is whether the Reforms are sufficiently valuable for Wells Fargo and its shareholders so that it would be reasonable to credit the Co-Lead Plaintiffs with $20 million in value creation, assuming their role in promoting these Reforms as acknowledged in Federal Settlement Exhibit A.  My view is that (i) Reforms that will avoid the

---

February 2019, other derivative suits have since sought to settle claims against Wells Fargo and include corporate governance reforms.  I have only been asked to assess the value of Co-Lead Plaintiffs' contribution to the Reforms identified in Exhibit A to the Federal Settlement, filed February 28, 2019.

1   risk of another major compliance failure at Wells Fargo are extraordinarily important and (ii) the

2   Reforms will meaningfully reduce this recurrence risk.  This may be the rare settlement of

3   derivative litigation in which the value of the governance reforms exceeds even a substantial out-

4   of-pocket recovery.  Thus in my opinion the $20 million attributed to Co-Lead Plaintiffs in the

5   proposed Settlement is well within the range of value-creation-in-fact, perhaps even at the low

6   end.

7                                      **THE REFORMS**

8   **I.      The Importance of the Reforms**

9          21.    The governance failures that led to the Improper Sales Practices resulted in a major

10  setback for Wells Fargo and its shareholders, with losses in the billions of the dollars.  The test of

11  the Reforms is whether they will substantially reduce the likelihood of a recurrence of serious

12  compliance issues as exemplified by the Improper Sales Practices.

13         22.    One way to meter the losses to Wells Fargo is to look at out-of-pocket costs: civil

14  and regulatory fines, payments, and penalties (here: $529 million, according to Co-Lead

15  Plaintiffs' estimate), to which could be added the related investigation and litigation costs (here:

16  $443 million).  This would produce out-of-pocket losses of approximately $1.1 billion.  An

17  additional element of loss comes from the lost income to Wells Fargo that has resulted from the

18  regulators' restrictions on Wells Fargo's growth and general lost business and reputational harm.

19  This was estimated by Co-Lead Plaintiffs at $1.4 to $2.4 billion over the period of the pendency

20  of the litigation.  Summing these figures would produce losses associated with the governance

21  failures of between $2.5 billion to $3.5 billion.

22         23.    From this perspective, Reforms that reduced even a small recurrence risk by a

23  meaningful amount would generate substantial value.  For example, assume a base-line

24  recurrence risk of 5 percent that is cut in half by the Reforms.  This would produce expected

25  value of approximately $60 million to $85 million.[2]

26

27  _____

28  [2] The calculation is this: The expected costs of a baseline recurrence (5%) is $125-
    $175 million [0.05 x $2.5 billion; 0.05 x $3.5 billion].  A 50% reduction in that risk generates
    value of approximately $60-$85 million.

24.     This effort at quantification understates the importance of the Reforms.  The Improper Sales Practices led to heightened scrutiny of Wells Fargo; other compliance issues came to light, which may have been treated more severely because of the Improper Sales Practices.  But the most important point is this:  If there is a recurrence of a major compliance failure, the threat to the Wells Fargo franchise could be existential.

25.     As stated in the Introduction, Well Fargo is a G-SIB.  It was "bailed out" in the Financial Crisis.  Its problems have high public salience because of the potential risks to financial stability in the United States that could arise from poor management.  Another major compliance failure at Wells Fargo arising from poor management will put regulators under pressure to take drastic action, including the forced disassembly of the Company, on the grounds that management is unable to safely manage the Company in its current form.  From a shareholder value point of view, this is likely to be calamitous.  As noted above, governance reforms that will avoid this risk are extraordinarily important and the Settlement has documented the importance of Co-Lead Plaintiffs' role in pushing them forward.  This may be the rare settlement of derivative litigation in which the value of the governance reforms exceeds even a substantial out-of-pocket recovery.

## II.     The Broad Sweep of the Reforms

26.     The Reforms fall into three distinct categories which should work in combination to effect broad-sweeping change in corporate governance at Wells Fargo.  The three categories are: first, meaningful sanctions for negligent failure in assuring that Wells Fargo conducts its business in accord with regulatory requirements and honest customer relationships (*see* Federal Settlement Exhibit A, at 5-6); second, a reworking of internal compliance monitoring, auditing, and reporting that should create a robust compliance culture and put senior management on notice of compliance problem areas as they arise (*id.* at 6-8); and third, structural changes at the Board level that will enhance the Board's focus, capacity, and diligence in compliance oversight.  *Id.* at 4, 8.

27.     *Meaningful sanctions*.  Although not formally designated as "Reforms," the Clawbacks transmit an important governance message: there will be significant financial penalties for failure to assure that the Company operates in a lawful way.  *Id.* at 6.  The usual pattern is a

compensation structure heavily biased in favor of risk-taking that may increase expected returns. This will produce incentives for senior managers to short change compliance.  The Clawbacks build in a downside that should materially affect employee behavior: serious compliance problems will lead to monetary sanctions for the responsible parties.  This effort to force employees to internalize the costs of compliance failures is an important governance step.

28.     The sanctions were not limited to compensation matters.  Senior officers were forced to resign and virtually all of the directors who served during the period of the Improper Sales Practices were replaced.  *Id.* at 5.  Apart from the loss of the $200,000-$300,000 in annual directors' fees, the displaced directors should face significant reputational sanctions that will reduce the likelihood of other board seats.[3]

29.     *Reworking of internal compliance monitoring, auditing, and reporting.*  Among the most important Reforms is the creation of a Conduct Management Office ("CMO") that centralizes various internal behaviors and compliance monitoring functions and then locates the Office outside the line businesses that are the subject of this monitoring.  Federal Settlement Exhibit A, at 7.  The CMO brings together the Offices of Sales Practices Oversight, Ethics Oversight, and Complaints Oversight, and Internal Investigations, and Bribery and Corruption Governance.  *Id.*  The CMO has a direct reporting line to the Risk Committee of the Board through the Chief Risk Officer.  *Id.*  Placing the compliance arm outside the line business operation is an important element in creating a credible compliance structure; otherwise compliance employees face pressure to be "team players."  A reporting line to the Board should augment the CMO's independence in fact.  The CMO also will have responsibility to focus on conduct management and sales practices issues, the domains that produced the Improper Sales Practices.  The Reforms include various other measures that should enhance the internal monitoring, auditing, and reporting functions.

30.     The cohort within the Company that has greatest responsibility for assuring compliance with legal standards and appropriate standards of customer treatment is of course

---

[3] *See, e.g.*, Eliezer Fich and Anil Shivdasani, *Financial Fraud, Director Reputation and Shareholder Wealth*, 86 J. Fin. Econ. 306 (2007).

senior management.  These internal-reporting Reforms should buttress the compliance culture and also put senior management on notice of compliance problems areas as they arise.

31.     *Structural Board Changes*.  The Reforms feature several important changes in board structure.  One notable change is the separation of the role of board "chair" (and "vice chair") from chief executive officer, against the usual pattern of combining the two positions.  *Id.* at 4-5.  This can have critical implication for the board's oversight capacity.  A "chair" will commonly have much greater control over the board's agenda than the "lead director" position that has evolved in the United States.  Practically this means that the chair will determine the "questions to be discussed" at the board meeting, the time to be devoted to particular questions, and the information flow to the board.

32.     There is division in the scholarly literature over whether separation of the CEO/Chair functions *on average* creates value for all companies, but there seems little doubt that for *some* companies this structural change will be beneficial.[4]  The case of Wells Fargo as revealed in this litigation is that such a separation may be a critical element in assuring that compliance failures are squarely and promptly addressed by the Board rather than allowed to fester and build.  The high-powered stock-based compensation incentives of a CEO may lead him/her to downplay compliance problems with strategies that generate outsize returns.  This appears to have been at work in the Wells Fargo Improper Sales Practices case.  By contrast, the reputation-focused perspective of a separate chair is likely to lead to a quicker focus on compliance questions as they emerge.

33.     A second notable structural change is the reshaping of several board committees that will result in much deeper board oversight of "compliance" as a distinct category of business

---

[4] *Compare, e.g.*,  Lawrence D. Brown & Marcus L. Caylor, *Corporate Governance and Firm Performance* (2004), available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=586423 (separation creates value) and Paula L. Rechner & Dan R. Dalton, *CEO Duality and Organization Performance: A Longitudinal Analysis*, 12 Strategic Mgmt. J 155 (1991) (separation enhances performance) *with* James A. Brickley, Jeffrey L. Coles & Gregg Jarrell, *Leadership Structure: Separating the CEO and Chairman of the Board*, 3 J. Corp. Fin. 189 (1997) (no effect from separation) and D. Rhoades, Paula Rechner, P. & C. Sundaramurthy, *A Meta-analysis of Board Leadership Structure and Financial Performance: Are "two heads better than one"*? 9 Corp. Gov: An Int'l Rev. 311 (2001) (benefits from separation are context specific).

1    issues and much deeper board oversight of business conduct and culture that is often the source of

2    compliance problems.  For example, the Risk Committee established a separate "Compliance"

3    subcommittee, which meets monthly to assess compliance risks, and the Risk Committee's

4    charter was amended to include oversight of the "risk" components of the company's culture.

5    Federal Settlement Exhibit A, at 7.  The Risk Committee will also have responsibility for

6    oversight of the new Conduct Management Office.  *Id.* at 8.  Another example: the Human

7    Resources Committee expanded its oversight responsibilities to include (i) appropriate training in

8    ethics and business conduct, including reporting and resolution of ethics issues and (ii) the

9    interaction of incentive compensation and risk management.  *Id.*  These questions were at the

10   heart of the Improper Sales Practices.

11         34.    A third notable structural change is the hard-wiring in board committee charters of

12   robust reporting requirements (including reporting in executive session) from various

13   compliance-facing offices and functions within Wells Fargo.  The Audit and Examination

14   Committee and the Risk Committee are the principal recipients of such regularly scheduled

15   reports.  *Id.* at 6-7.  The full board is to receive reporting on conduct and culture matters at least

16   twice yearly.  *Id.* at 7.

17         35.    The enhanced flow of compliance-related information to the Board and the more

18   robust board engagement with compliance oversight are important Reforms on at least two

19   dimensions.  First, it is reasonable to believe that the "sunlight" required about business practices

20   and conduct that may raise compliance issues will enhance compliance in fact.  Second, the

21   directors' self-interest will propel a more aggressive engagement with compliance problems as

22   they emerge.  The applicable director liability standard focuses on the directors' actions after they

23   have actual knowledge of compliance failures,[5] but gives the directors business judgment

24   discretion in devising a reporting system that might generate such "red flags."[6]  The Reforms far

25   exceed the "information and reporting systems" that otherwise would have been required to

26   satisfy the directors' compliance oversight responsibilities.[7]  In other words, the information flow

27
     ───────────────
     [5] *Graham v. Allis-Chalmers Mfg. Co.*, 188 A.2d 125, 130 (Del. 1963).
28   [6] *See In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959 (Del Ch. 1996).
     [7] *Id.* at 970.

1   generated by the Reforms will necessarily make directors more alert to compliance issues because

2   of the greater likelihood of personal liability for compliance oversight failures.  This is turn will

3   make "sunlight" a more effective internal deterrent because directors will be less willing to give

4   dubious practices a pass.

5         36.      Thus the interaction of the new reporting requirements required by the Reforms

6   and the specifically-designated Board Committee recipients will, through private ordering, create

7   an enhanced regime of director liability in the event of serious compliance failures.

8         37.      In short, the board structure changes enacted by the Reforms will enhance the

9   Board's focus, capacity, and diligence in compliance oversight and thus are likely to reduce the

10  recurrence risk of compliance failure.

11                                     **CONCLUSION**

12        38.      For these reasons, I believe that the Reforms will meaningfully reduce the chance

13  of a serious compliance failure at Wells Fargo.  The compliance failure reflected in the Improper

14  Sales Practices was enormously costly for Wells Fargo and its shareholders, reflected not only by

15  various out-of-pocket measures but also via shareholder value metrics.  The recurrence of a

16  serious compliance failure could have consequences for the Company and its shareholders that

17  are even more severe.  For this reason it is my opinion that the Reforms will deliver substantial

18  value for Wells Fargo and its shareholders and that Co-Lead Plaintiffs' efforts in promoting these

19  reforms have thus created substantial value for Wells Fargo and its shareholders.[8]  In my opinion

20  the $20 million attributed to Co-Lead Plaintiffs in the Proposed Settlement is well within the

21  range of value-creation-in-fact, perhaps even at the low end.

22

23

24

25

_____

26  [8] For the record I should state that I agree with the conclusion of Michael A. Santoro that "the
    Corporate Governance Reforms provide substantial value to Wells Fargo, and the $20 million
27  value ascribed to the Reforms in the Stipulation is eminently reasonable."  Declaration of Michael
    A. Santoro in Support of Approval of Derivative Settlement, at 3.  Although my emphasis has
28  been different in analyzing the Reforms, I find value in his overall approach and conclusions.

GORDON DECL. ISO MOTION FOR
FINAL APPROVAL OF SETTLEMENT
LEAD CASE NO. 3:16-CV-05541-JST

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 27th day of June, 2019, at New York, NY.

_____

Jeffrey N. Gordon

# EXHIBIT 1

**EXHIBIT 1**

**JEFFREY N. GORDON**

Columbia University Law School
435 West 116th St.
New York, N.Y. 10027
*jgordon@law.columbia.edu*
voice: 212-854-2316
fax: 212-854-7946

<u>ACADEMIC APPOINTMENTS</u>

Richard Paul Richman Professor of Law, Columbia University Law School, 2011-current

      Co-Director, Columbia Center for Law and Economic Studies, 1988- current

      Co-Director, Millstein Center for Global Markets and Corporate Ownership, 2012-current

      Co-Director, Richman Center for Business, Law and Public Policy, 2012-current

Visiting Professor, Faculty of Law, Oxford University, 2014-current

Fellow, European Corporate Governance Institute, 2004-current

Alfred W. Bressler Professor of Law, Columbia University Law School, 1998-2011

Exchange Faculty Member, Columbia-Oxford Alliance, spring 2010

Albert E. Cinelli Enterprise Professor of Law, Columbia University Law School, 2006-07

Bruce W. Nichols Visiting Professor of Law, Harvard Law School, fall 2002

Professor of Law, Columbia University, 1988-current

Professor of Law, New York University Law School, 1982-1988
(starting as assistant professor of law)

<u>COLUMBIA UNIVERSITY APPOINTMENTS</u>

Chair, Advisory Committee on Socially Responsible Investment, 2014-2017

<u>COURSES</u>

Mergers and Acquisitions; Financial Crises and Regulatory Responses; Regulation of Financial Institutions; Foundations of the Regulatory State; Corporations; Corporate Governance; Comparative Corporate Governance; Regulation of Institutional Investors; Corporate Law and Political Economy

<u>PUBLICATIONS</u>

<u>BOOKS</u>

CONVERGENCE AND PERSISTENCE IN CORPORATE GOVERNANCE, co-editor with Mark J. Roe (Cambridge Univ. Press 2004) (translated into Chinese)

PRINCIPLES OF FINANCIAL REGULATION, co-authored with John Armour, Dan Awrey, Paul Davies, Luca Enriques, Colin Mayer, and Jennifer Payne (Oxford Univ. Press 2016)

OXFORD HANDBOOK OF CORPORATE LAW AND GOVERNANCE, co-editor with W. Georg Ringe (Oxford Univ. Press 2018)

<u>ARTICLES</u>

[Many articles are posted at <u>http://ssrn.com/author=39401</u>]

Efficient Markets, Costly Information, and Securities Research, 60 N.Y.U. L. Rev. 761 (1985) (with Lewis A. Kornhauser).

The Puzzling Survival of the Constrained Prudent Man Rule, in B. Longstreth, MODERN INVESTMENT THEORY AND THE PRUDENT MAN RULE (Oxford Univ. Press 1986).

Takeover Defense Tactics: A Comment on Two Models, 96 Yale L.J. 295 (1986) (with Lewis A. Kornhauser).

The Puzzling Persistence of the Constrained Prudent Man Rule, 62 N.Y.U. L. Rev. 52 (1987) (revision and substantial elaboration of book chapter).

Ties That Bond: Dual Class Common Stock and the Problem of Shareholder Choice, 76 Calif. L. Rev. 1 (1988), condensed version reprinted in L. Bebchuk (ed.), CORPORATE LAW AND ECONOMIC ANALYSIS (Oxford Univ. Press 1990).

The Mandatory Structure of Corporate Law, 89 Colum. L. Rev. 1549 (1989).

Corporations, Markets, and Courts, 91 Colum. L. Rev. 1931 (1991) (analyzing *Paramount Communications, Inc. v. Time Inc.*).

Shareholder Initiative: A Social Choice and Game Theoretic Approach to Corporate Law, U. Cincinnati Law Review Corporate Law Symposium issue, 60 U. Cin. L. Rev. 347 (1991), reprinted in 1992 Corp. Practice Commentator 455.

Institutions as Relational Investors: A New Look at Cumulative Voting, 94 Colum. L. Rev. 124 (1994), reprinted in 1994-1995 Corp. Practice Commentator 455.

Employee Stock Ownership as a Transitional Device: The Case of the Airline Industry, in Darryl Jenkins, ed., HANDBOOK OF AIRLINE ECONOMICS (McGraw-Hill 1995).

Employees, Pensions, and the New Economic Order, 97 Colum. L. Rev. 1519 (1997).

"Just Say Never?" Poison Pills, Deadhand Pills, and Shareholder-Approved Bylaw Amendments," 19 Cardozo L. Rev. 511 (1997), reprinted in 1998 Corp. Practice Commentator 1 and 20 Bank & Corp. Gov. Reporter 702 (July 1998).

The Shaping Force of Corporate Law in the New Economic Order, 31 U. Rich. L. Rev.1473 (1997) (George Allen Chair lecture).

Employee Stock Ownership in Economic Transitions: The Case of United Air Lines, 10 J. Applied Corp. Fin. 59 (1998).

Employee Stock Ownership in Economic Transitions: The Case of United Air Lines, different versions published in 3 different conference volumes:

> EMPLOYEE REPRESENTATION IN THE EMERGING WORKPLACE: ALTERNATIVES/SUPPLEMENTS TO COLLECTIVE BARGAINING (Samuel Estreicher, ed.) (1998).

> CORPORATE GOVERNANCE: THE STATE OF THE ART AND EMERGING RESEARCH (Klaus Hopt, Mark Roe & Eddy Wymeersch, eds.) (1998).

EMPLOYEES' ROLE IN CORPORATE GOVERNANCE (Margaret Blair & Mark Roe, eds.) (Brookings Inst. 1999), translated into Chinese and published in the Aordo Investment Review, Vol. 4, 2006.

Deutsche Telekom, German Corporate Governance, and the Transition Costs of Capitalism, 1998 Colum. Bus. L. Rev. 185.

Individual Responsibility for the Investment of Retirement Savings: A Cautionary View, 64 Brklyn L. Rev. 1037 (1998).

Pathways to Corporate Convergence?  Two Steps on the Road to Shareholder Capitalism in Germany, 5 Colum. J. of European L. 219 (1999) (symposium issue), reprinted in 2000 Corporate Practice Commentator 107.

L'actionnariat salarié: l'analyze américaine appliquée à Air France [American Reflections on Employee Stock Ownership in Air France] in RAPPORT MORAL SUR L'ARGENT DANS LE MONDE (1999)  [The Report on Money and Morals Worldwide].

Poison Pills and the European Case, 54 U. Miami L. Rev. 839 (2000) (symposium issue).

New Merger Accounting Regime on the Way: Let's Hope It Works [Published as *Reviewing The New Merger Accounting Regime*], New York Law Journal, 7/19/2001, p.1.

What Enron Means for the Management and Control of the Modern Business Corporation: Some Initial Reflections, 69 U. Chi. L. Rev. 1233 (2002), *reprinted in* Thomas Clarke, ed. THEORIES OF CORPORATE GOVERNANCE (2004).

Das neue deutsche „Anti"-Übernahmegesetz aus amerikanischer Perspektive [An American Perspective on the New German Anti-takeover Law], 12 *Die Aktiengesellschaft* (December 2002).

Governance Failures of the Enron Board and the New Information Order of Sarbanes-Oxley, 35 U.Conn. L.Rev. 1125 (2003) (symposium issue).

The United Airline Bankruptcy and the Future of Employee Ownership, 7 Employee Rts & Employment  Pol. J. 227 (2003) (part of proceedings issue on "Employee Stock Ownership after Enron").

Convergence on Shareholder Capitalism: An Internationalist Perspective, in Curtis Milhaupt, ed., GLOBAL MARKETS, DOMESTIC INSTITUTIONS: CORPORATE LAW AND GOVERNANCE IN A NEW ERA OF CROSS-BORDER DEALS (2003).

Controlling Controlling Shareholders, 152 U. Penn. L. Rev. 785 (2003) (with Ronald J. Gilson) reprinted in 2004 Corporate Practice Commentator.

The International Relations Wedge in the Corporate Convergence Debate, in Jeffrey N. Gordon & Mark J. Roe, eds., CONVERGENCE AND PERSISTENCE IN CORPORATE GOVERNANCE (2004).

An American Perspective on Anti-Takeover Laws in the EU: A German Example, in Ferrarini, Hopt, Winter & Wymeersch Hopt, eds., REFORMING COMPANY LAW IN EUROPE (2004).

4

Executive Compensation:  If There is a Problem, What's the Remedy? The Case for "Compensation Discussion and Analysis," 30 J. Corp. Law 675 (2005).

A Remedy for the Executive Pay Problem: The Case for "Compensation Discussion and Analysis," 17 App. Corp. Fin. 24 (Fall 2005).

The Rise of Independent Directors in the United States, 1950-2005: Of Shareholder Value and Stock Market Prices, 59 Stan. L. Rev. 1465 (2007) (Recipient of Egon Zehnder prize, European Corporate Governance Institute), reprinted in 2008 Corporate Practice Commentator and THE HISTORY OF MODERN U.S. CORPORATE GOVERNANCE (Brian R. Cheffins, ed., 2011).

The "Prudent Retiree" Rule: What To Do When Retirement Security Is Impossible?, 11 Lewis & Clark L. Rev. 481 (2007) (symposium).

Proxy Contests in an Era of Increasing Shareholder Power:  Forget Issuer Proxy Access and Focus on E-Proxy, 61 Vand. L. Rev. 475 (2008) (symposium).

The Rise of Independent Directors in Italy: A Comparative Perspective, Rivista Delle Società, 2008 (conference volume celebrating 50th anniversary).

The Story of Unocal v. Mesa Petroleum: The Core of Takeover Law, in CORPORATE LAW STORIES (J. Mark Ramseyer, ed.) (2009).

"Say on Pay": Cautionary Notes on the UK Experience and the Case for Shareholder Opt-in, 46 Harv. J. on Legislation 323 (2009).

Confronting Financial Crisis: The Case for a Systemic Emergency Insurance Fund, 28 Yale J. Reg. 151 (2011) (with Christopher Muller).

Corporate Governance and Executive Compensation in Financial Firms: the Case for Convertible Equity-Based Pay, 2012 Colum. Bus. L. Rev. 834.

The Agency Costs of Agency Capitalism: Activist Investors and the Re-valuation of Governance Rights, 113 Colum. L. Rev. 863 (2013) (with Ronald Gilson), reprinted in 2013 Corporate Practice Commentator.

Money Market Funds Run Risk: Will Floating Net Asset Value Fix the Problem?  2014 Colum. Bus. L. Rev. 313 (with Christopher M. Gandia).

Agency Capitalism: Further Implications of Equity Intermediation), in RESEARCH HANDBOOK ON SHAREHOLDER POWER (Jennifer Hill & Randall Thomas, eds. (2015) (with Ronald Gilson).

Systemic Harms and Shareholder Value, 6 Journal of Legal Analysis 35 (2014) (with John Armour).

The Empty Call for Benefit-Cost Analysis in Financial Regulation, 43 Journal of Legal Studies S351 (2014).

Bank Resolution in the European Banking Union: An American Perspective on What It Would Take, 115 Colum. L. Rev. 1297 (2015) (with Georg Ringe).

Bank Resolution in Europe: The Unfinished Agenda of Structural Reform, in EUROPEAN BANKING UNION (Danny Busch & Guido Ferrarini, eds.) (2015), and revised for Second edition, 2019 (with Georg Ringe).

Convergence and Persistence in Corporate Law and Governance, in OXFORD HANDBOOK ON CORPORATE LAW AND GOVERNANCE (Jeffrey Gordon & W. Georg Ringe, eds.) (2018).

Is Corporate Governance a First Order Cause of the Current Malaise?, 6 J. British Academy (Supp, Iss. 1) ("Reforming Business for the 21st Century" ) (Dec. 2018).

China as a "National Strategic Buyer": Towards a Multilateral Regime for Cross-Border M&A 2019 Col. Business L. Rev. 192 (with Curtis Milhaupt).

Board 3.0: An Introduction, 74 The Business Lawyer 351 (2019) (with Ronald Gilson).

The Rise of Agency Capitalism and the Role of Shareholder Activists in Making It Work, 31  J. Applied Corp. Fin. 8 (2019) (with Ronald Gilson).

The Origins of Capital Markets Union in the U.S., in CAPITAL MARKET UNION AND BEYOND (Franklin Allen et al., eds.) (forthcoming 2019) (with Kathryn Judge).

"Dynamic Precaution" in Maintaining Financial Stability: the Importance of FSOC, in TEN YEARS AFTER THE FINANCIAL CRISIS (Sharyn O'Halloran et al., eds., forthcoming 2019).

Taking Compliance Seriously (forthcoming 2020, Yale Journal on Regulation) (with John Armour and Geeyoung Min).

Board Compliance (forthcoming 2020, Minnesota Law Review) (with John Armour, Brandon Garrett, and Geeyoung Min).

UNPUBLISHED WORKING PAPERS

Toward a Theory of Corporate Recapitalizations (with Lewis Kornhauser) (working paper, Jan. 1990).

Corporate Governance and the Transition Costs of Capitalism (working paper, March 1994).

An International Relations Perspective on Corporate Governance: German Shareholder Capitalism and the European Union: 1990-2000 (Columbia Center for Law and Economic Studies and European Corporate Governance Institute Working Paper) (2003), available at http://ssrn.com/abstract=374620.

Economic Nationalism and Corporate Governance: German Shareholder Capitalism in the European Union (working paper, October 2005).

Avoiding Eight-Alarm Fires in the Political Economy of Systemic Risk Management (with Christopher Muller) (Columbia Center for Law and Economic Studies and European Corporate Governance Institute Working Paper, Feb. 2010), available at http://ssrn.com/abstract=1553880.

The Micro, Macro and International Design of Financial Regulation, with Colin Mayer (Draft of April 2012), available at http://ssrn.com/abstract=2047436.


WORKS IN PROGRESS

The Contestable Claims of Shareholder Wealth Maximization: Evidence from the Airline Industry (working paper, 2009) (under revision) (Yair Listokin, co-author)

THE LAW AND FINANCE OF CORPORATE ACQUISITIONS (with Ronald Gilson, Bernard Black, and Charles Whitehead; 3d edition, expected completion 2019)

Activist Investors in an Era of Ownership Reconcentration: Solving the Agency Costs of Equity Intermediation (forthcoming 2020, Delaware Journal of Corporate Law) (2015 Pileggi Lecture)

Short-Changing Compliance (with John Armour and Geeyoung Min), available at https://ssrn.com/abstract=3244167


FOUNDATION GRANTS

Sloan Foundation, 2000-2006 (individual investigator grant in support of empirical project on shareholder wealth maximization)

7

British Academy (2018-2019) (Group project on The Future of the Corporation)

A<small>CADEMIC</small> P<small>RIZES</small>

Egon Zehnder prize, European Corporate Governance Institute, 2007 (for the best paper "on company boards and their role in corporate governance," awarded for *The Rise of Independent Directors in the United States, 1950-2005: Of Shareholder Value and Stock Market Prices*, 59 Stan. L. Rev. 1465 (2007)).

Designations by Corporate Practice Commentator as "top ten" article for the year:

> Shareholder Initiative: A Social Choice and Game Theoretic Approach to Corporate Law, U. Cincinnati Law Review Corporate Law Symposium issue, 60 U. Cin. L. Rev. 347 (1991)
>
> Institutions as Relational Investors: A New Look at Cumulative Voting, 94 Colum. L. Rev. 124 (1994)
>
> "Just Say Never?" Poison Pills, Deadhand Pills, and Shareholder-Approved Bylaw Amendments," 19 Cardozo L. Rev. 511 (1997)
>
> Pathways to Corporate Convergence?  Two Steps on the Road to Shareholder Capitalism in Germany, 5 Colum. J. of European L. 219 (1999)
>
> Controlling Controlling Shareholders, 152 U. Penn. L. Rev. 785 (2003) (with Ronald J. Gilson)
>
> The Rise of Independent Directors in the United States, 1950-2005: Of Shareholder Value and Stock Market Prices, 59 Stan. L. Rev. 1465 (2007)
>
> The Agency Costs of Agency Capitalism: Activist Investors and the Re-valuation of Governance Rights, 113 Colum. L. Rev. 863 (2013) (with Ronald Gilson).

S<small>ELECTED</small> A<small>CADEMIC</small> C<small>ONFERENCES AND</small> S<small>EMINARS</small>

1980-1989

Conference on Commercial Banks and the Securities Industry—Is the Glass-Steagall Act an Anachronism in the 1980's?  (Salomon Brothers Center for the Study of Financial Institutions Nov. 1984) ("Conflicts of Interest: The Need for a Broader View").

Univ. of Pennsylvania Law and Economics Institute (February1985) (draft of "Efficient Markets" paper).

Conference on Modern Investment Theory and the Prudent Man Rule (Salomon Brothers Center for the Study of Financial Institutions November 1986)  ("Points of Restraint and Conflict in the Application of the Prudent Man Rule to Contemporary Investment Problems").

Conference on the Economics of Corporate and Capital Markets Law (Harvard Law School Nov. 1986) (draft of "Dual Class Common Stock" paper).

Harvard Law School Law and Economics Workshop (April 1988) (early draft of "Mandatory Structure of Corporate Law" paper).

Conference on Contractual Freedom in Corporate Law (Columbia Univ. Law School Dec. 1988) (organizer of conference; also presented revised draft of "Mandatory Structure" paper; symposium based on conference was published as November 1989 issue of Columbia Law Review).

Univ. of Michigan Law and Economics Workshop (February 1989) (further revised draft of "Mandatory Structure" paper).

Univ. of Chicago Law and Economics Workshop (April 1989) (same).

Tel Aviv Univ. Conference on Legal Theory (May 1989) (draft of "Duties and Markets" paper).

American Association of Law Schools Annual Meeting, Section on Business Associations (January 1990) (draft of "Toward a Theory of Corporate Recapitalizations") (with Lewis A. Kornhauser).

1990-1999

Georgetown Univ. Law and Economics Workshop (October 1990) (draft of "Corporations, Markets, and Courts").

Univ. of Cincinnati Corporate Law Symposium (March 1991) (draft of "Shareholder Initiative" paper).

Conference on "The Future of Corporate Governance," (Columbia Univ. Law School, May 1991) (organizer of conference, also presented comments on "Are There Limits for the Institution as Shareholder?").

Conference on "Relational Investing," (Columbia Institutional Investor Project, May 1993) (draft of "Cumulative Voting Paper").

"Delaware Goes to the Movies -- Recent Legal Developments in Mergers and Acquisitions" (Columbia Law and Economics Center, March 1994) (conference organizer and presenter).

Univ. of Toronto Law and Economics Workshop (March 1994) ("Corporate Governance and the Transition Costs of Capitalism" working paper).

Univ. of Pennsylvania Law and Economics Institute (April 1995) (draft of "Employee Stock Ownership as a Transitional Device").

Boston Univ. Law School Faculty Workshop (November 1995) (draft of "Employee Stock Ownership as a Transitional Device").

Conference on "Employees in Corporate Governance"  (Columbia Law School Sloan Project, November 1996) (draft of "Employee Stock Ownership in Economic Transitions: The Case of United Air Lines").

Conference on "Cross Border Views of Corporate Governance"  (Columbia Law School Sloan Project/L'Ecole Polytechnique Federale, March 1997) (draft of "Deutsche Telekom, German Corporate Governance, and the Transition Costs of Capitalism").

Conference on Comparative Corporate Governance (Max Planck Institute/Columbia Law School Sloan Project) (May 1997) (draft of Employee Ownership/United Air Lines paper).

Conference on New Trends in Labor Law (NYU Law School) (May 1997) (draft of Employee Ownership/United Air Lines paper).

Conference on Warren Buffet  (Cardozo Law School, October 1997) ("'Just Say Never?' Poison Pills, Deadhand Pills, and Shareholder-Approved Bylaw Amendments").

Conference on "Is Corporate Law Converging? (Columbia Law School Sloan Project, December 1997) (co-organizer).

Allen Chair Lecture, T.C. Williams Law School, Univ. Of Richmond (April 1997) ("The Shaping Force of Corporate Law in the New Economic Order").

Conference on Comparative Corporate Law (University of Frankfurt/Columbia Law School, May 1998) (draft of "Two Steps on the Road to Shareholder Capitalism in Germany").

Univ. of Michigan Law and Economics Workshop (December 1998) (draft of "Two Steps on the Road to Shareholder Capitalism in Germany").

10

Bressler Chair Inaugural Lecture, Columbia Univ. Law School (December 1998) ( "Corporate Law in the New Political Economy").

Univ. of San Diego Law School Political Economy Workship (November 1999) (draft of "The Contestable Claims of Shareholder Wealth Maximization: Evidence from the Airline Industry").

2000-2009

Univ. of Southern California Law and Economics Workshop (February 2000) (draft of "The Contestable Claims of Shareholder Wealth Maximization: Evidence from the Airline Industry").

Columbia-NYU Law and Economics Workshop (November 2000) (same).

University of Virginia Law and Economics Workshop (February 2001) (same).

Vanderbilt Univ. Law and Economics Workshop (February 2001) (same).

University of Pennsylvania Law and Economics Workshop (March 2001) (same).

University of California at Berkeley Law and Economics Workshop (April 2001) (same).

Conference on "Corporations as Producers and Distributors of Rents" (Georgetown-Sloan Project on Business Institutions, October 2001) (Shareholder wealth maximization paper).

Conference on "Global Markets, Domestic Institutions" (Columbia & Center for International Political Economy, October 2001, April 2002) ("Corporate Governance and Transnational Integration: The Evolution of German Shareholder Capitalism in the 1990s").

Univ. of Chicago Conference on "Management and Control of the Modern Business Corporation" (February 2002) ("What Enron Means for the Management and Control of the Modern Business Corporation: Some Initial Reflections").

Boston Univ. Law and Economics Workshop (April 2002) (German shareholder capitalism paper).

German Investor Relations Conference (April 2002) (Frankfurt) ("The Intended And Unintended Consequences of Germany's New Antitakeover Law") (keynote speech).

Annual meeting of American Law and Economics Association (May 2002) (refereed selection process) (Shareholder wealth maximization paper, German shareholder capitalism paper).

Harvard Law School Faculy Workshop (November 2002) ("An International Relations Perspective on Corporate Governance: German Shareholder Capitalism and the European Union:1990-2000").

Univ. of Connecticut Conference on "Crisis in Confidence: Corporate Governance and Professional Ethics Post-Enron" (November 2002) ("Governance Failures of the Enron Board and the New Information Order of Sarbanes-Oxley").

American Ass'n of Law Schools Annual Meeting, section on Pensions and Employment Benefits (January 2003) ("Has Employee Ownership failed at United Airlines?").

Columbia Law School Faculty Workshop (January 2003) ("Economic Nationalism and Corporate Governance: German Shareholder Capitalism and the European Union, 1990-2000").

Univ. of Pennsylvania Symposium on Corporate Control Transactions (February 2003) ("Controlling Controlling Shareholders: New Limits On the Operate, Sale of Control and Freeze-Out Alternatives").

Cornell Law School Conference on "Enron and the Future of U.S. Corporate Law and Policy" (February 2003) (Blame Delaware?: The Delaware Law Roots of the Corporate Governance Crisis).

Univ. of Toronto Law and Economics Workshop (March 2003) ("Economic Nationalism and Corporate Governance: German Shareholder Capitalism and the European Union, 1990-2000").

Univ. of Pennsylvania Law School Roundtable on "Mergers of Equals" (April 2003).

Yale Law School Roundtable on "Recent Legally Induced Changes in Corporate Governance: Necessity and Effectiveness" (May 2003).

Conference on "A Modern Regulatory Framework for Company and Takeover Law in Europe – The Corporate Governance and Takeover Recommendations of the High Level Group of Company Law Experts to the European Commission".   (Syracuse, Sicily, May 2003) ("An American Perspective on Anti-Takeover Laws in the EU: A German Example").

Annual meeting of American Law and Economics Association (September 2003) (refereed selection process) (Comparative US/European Anti-Takeover Laws paper)

Fordham Law School Corporate Law Conference (November 2003) ("Boards").

Korea Development Institute Conference on Corporate Governance and Capital Markets in Korea (December 2003) (Seoul, Korea) ("Boards: How a Korean Comparison Clarifies Understanding")

Univ. California Berkeley Law and Economics Workshop (April 2004) ("The Mechanisms of Board Independence").

12

Columbia Law School Conference on Law, Finance, and Political Economy (April 2004) (co-organizer, with Katharina Pistor).

Columbia Law School Conference on Executive Compensation (October 2004) (co-organizer) ("Executive Compensation: Puzzles, Questions and the Search for the Appropriate Remedy").

Harvard Law School Conference on EU Corporate Law-Making (October 2004) ("Economic Nationalism and Corporate Governance: German Shareholder Capitalism in the European Union").

Stanford Law and Economics Workshop (April 2005) ("Boards").

Yale Law School Conference on Reassessing Director Elections (October 2005) ("Rethinking Cumulative Voting").

Washington Univ. Law School Conference on Corporate Governance (September 2005) ("Executive Compensation: The Case for 'Compensation Discussion and Analysis'").

Georgetown Law School Conference on Corporate Governance (October 2005) ("The Rise of Independent Directors").

Columbia Law School Faculty Workshop (February 2006) ("The Rise of Independent Directors").

University of Lisbon Faculty of Law Securities Law Institute (March 2006) ("The Case of Strengthening the Role of Independent Directors in Portuguese Corporate Governance").

Columbia Law School Conference on the Law and Economics of Contracts (April 2006) (co-organizer).

York Univ. Business School, Toronto (April 2006) ("Executive Compensation"; "Rise of Independent Directors").

Lewis and Clark Law School Conference on "Baby-Boomer" Retirement  (September 2006) ("Is Retirement Security Possible?"

Columbia Law School Conference on "The Structure of the Corporation" (Nov. 2006) (organizer and paper presenter).

Rivisti Delle Societa 50th Anniversary Celebration (Nov. 2006) ("What Accounts for the Rise of Independent Directors in the United States?").

AALS Section on Business Law (January 2007) ("Stock Market Prices and Independent Directors," paper selected in refereed process).

Columbia Law School conference on Hedge Funds (February 2007) ("The Effect of Informative Stock Prices on the Role of the Board").

Univ. of Virginia Law and Finance conference ("Stock Market Prices and Independent Directors").

American Law and Economic Association Annual Meeting (area organizer) (May 2007).

Stanford-Yale Junior Faculty Forum (area organizer and commentator) (May 2007).

Yale School of Organization and Management conference on "Short-Termism" (June 2007).

Columbia Law School conference marking the 75th Anniversary of the Publication of Adolph A. Berle's and Gardiner Means' *The Modern Corporation and Private Property* (co-organizer, co-author of "The Berle-Means Corporation of the 21st Century").

Vanderbilt Law School workshop (February 2008) ("Issuer Proxy Access and E-Proxy Alternatives").

Fordham Law School workshop (February 2008) ("Berle-Means Corporation of the 21st Century").

American Law and Economic Association Annual Meeting (program co-chair) (May 2008).

Univ. of Pennsylvania Corporate Law and Economics Workshop (November 2008) ("Berle-Means Corporation of the 21st Century").

Georgetown Univ. Law School Faculty Workshop (Nov. 2008) ("Berle-Means Corporation of the 21st Century").

Cambridge Univ. Center for Corporate and Commercial Law, Conference on Ownership and Control (January 2008) ("Berle-Means Corporation of the 21st Century").

Vanderbilt Law School, Conference on the Future of Federal Regulation of Financial Markets, Shareholder Litigation and Corporate Governance (March 2009) ("Cautionary Lessons from the Financial Crisis about Executive Compensation and Corporate Governance").

IMBEC & St. Gallen Univ. (Sz) Foundation for Law and Economics, Conference on Capital Market Regulation and International Standards in Brazil, the US, the EU and Switzerland (Sao Paulo, April 2009) (Current Developments on the US Mergers Landscape).

Transatlantic Corporate Governance Dialogue (under the auspices of the SEC and the EU) (Washington, DC September 2009) (The Government as Owner/Investor in the United States).

NYU Law School Conference on Executive Compensation (October 2009) ("'Say on Pay' in Executive Compensation").

George Washington Univ. Law School, Conference on Regulatory Response to the Financial Crisis (October 2009) ("An International Perspective on Regulatory Initiatives for Executive Compensation").

Univ. of Virginia Law School workshop (November 2009) ("Avoiding Eight-Alarm Fires in the Political Economy of Systemic Risk Management").

Harvard Law School workshop (November 2009) ("Avoiding Eight-Alarm Fires in the Political Economy of Systemic Risk Management").

<u>2010-2014</u>

AALS Annual Meeting, Section on Business Associations (January 2010) ("Corporate Governance Reform in Financial Firms").

AALS Annual Meeting, Section on Financial Institutions (January 2010) ("Avoiding Eight-Alarm Fires in the Political Economy of Systemic Risk Management") (refereed selection).

Columbia Law School Faculty Workshop (February 2010) ("Avoiding Eight-Alarm Fires in the Political Economy of Systemic Risk Management").

Vanderbilt Conference on Executive Compensation (February 2010) (Comment on "The European Response to Bankers' Pay").

Co-organizer, Columbia Law School Conference on The Financial Crisis: Can We Prevent a Recurrence? (March 2010).

Univ. of Connecticut Conference on Regulating Risk (April 2010) ("Confronting Financial Crisis: the Case for a Systemic Emergency Insurance Fund").

Univ. of Delaware Roundtable on the Government as Shareholder (April 2010) ("Government and Governance").

Univ. of Oxford Law Faculty Workshop (May 2010) ("Confronting Financial Crisis").

Columbia-Univ. of Tokyo Symposium on Mergers and Acquisitions and the Law (June 2010) ("Legal and Structural Barriers to M&A around the World: An Empirical Assessment").

Vanderbilt Conference on Shareholder Litigation (October 2010) (Comment on "Is Delaware Losing Its Cases?").

15

Univ. of Pennsylvania Law School Faculty Workshop (October 2010) ("Confronting Financial Crisis").

Transatlantic Corporate Governance Dialogue (under the auspices of the SEC and the EU) (Brussels, October 2010) ("Resolution of Failing Financial Firms: Alternative Approaches").

Conference on Empirical Legal Studies (November, 2010) (Comment on "Corporate Financial and Investment Policies in the Presence of a Blockholder on the Board").

Columbia Law School Faculty Workshop (November 2010) ("Executive Compensation and Corporate Governance in Financial Firms").

Brooklyn Law School Symposium on Comparative Approaches to Systemic Risk and Resolution (February 2011) ("Resolution of Financial Firms – Why Dodd-Frank Falls Short")

Columbia-Oxford Pre-Conference on "Corporate Governance After the Financial Crisis" (to prepare for large conference at Oxford in January 2012) (March 2011) (pre-conference co-organizer and discussion co-leader for session on "Are Banks Different?")

Yale Roundtable on Financial Regulation (April 2011) (presenter in session on "'Too Big to Fail and the New Resolution Authority")

European Univ. Inst./Hague Inst. for Int'ntl'zn of Law Conference on "Banking and Finance (April 2011) ("Corporate Governance and Executive Compensation in Financial Firms")

American Law and Economics Annual Meeting (May 2011) ("Corporate Governance and Executive Compensation in Financial Firms: The Case for Convertible Equity-Based Pay")

Columbia Conference on the Delaware Chancery Court (November 2011) ("The Delaware Roots of Executive Compensation Excesses")

Transatlantic Corporate Governance Dialogue (December 2011) (co-organizer; "What is 'Appropriate' Shareholder Engagement – Framing the Issues?")

Federalist Society (December 2011) (The Affirmative Case for the Consumer Financial Protection Bureau)

CLS-Oxford Conference on Corporate Governance After the Financial Crisis (January 2012) (co-organizer; co-author of three presented papers, with John Armour, Ronald Gilson, Colin Mayer)

Pace Law School Faculty Workshop ("Capital Markets, Efficient Risk Bearing and Corporate Governance: The Agency Costs of Agency Capitalism," with Ronald Gilson) (February 2012)

16

Univ of Texas Law School Conference on Financial Regulation (February 2012) (commentator; presented work-in-progress on Money Market Mutual Funds)

Univ. of Colorado Law School Faculty Workshop (February 2012) ("Capital Markets, Efficient Risk Bearing and Corporate Governance: The Agency Costs of Agency Capitalism," with Ronald Gilson)

Notre Dame Law School Faculty Workshop (April 2012) ("Capital Markets, Efficient Risk Bearing and Corporate Governance: The Agency Costs of Agency Capitalism," with Ronald Gilson)

ETH-NYU Conference on Banking Regulation (April 2012) ("The Micro, Macro and International Design of Financial Regulation," with Colin Mayer)

CLS Project on Investment, Ownership and Control in the Modern Firm (May 2012) (co-organizer) ("The Agency Costs of Agency Capitalism: Activist Investors and the Re-valuation of Governance Rights," with Ronald Gilson)

CLS-Ono Conference (June 2012, Tel Aviv)  ("The Agency Costs of Agency Capitalism: Activist Investors and the Re-valuation of Governance Rights," with Ronald Gilson)

American Enterprise Institute (June 2012, Washington),  Money Market Reform (panelist)

Conference on Empirical Legal Studies (November 2012) ("Money Market Funds Run Risk: Will Floating Net Asset Value Fix the Problem?" (with Christopher M. Gandia).

Transatlantic Corporate Governance Dialogue (December 2012, Brussels) ("The Corporate Governance of Banks and Other Systemically Important Financial Institutions") (also co-organizer of conference, on theme of "Corporate Governance and Banking Union in Transatlantic Perspective").

Harvard Law and Economics Workshop (January 2013, Cambridge)  ("Systemic Harms and the Limits of Shareholder Value" (with John Armour).

Columbia Law School Faculty Workshop (January 2013) ("Systemic Harms and the Limits of Shareholder Value" (with John Armour).

Oxford Conference on Eurozone Banking Union (April 2013, Oxford) ("Banking Union Resolution Without Deposit Insurance: An American Perspective on What It Would Take" (with Georg Ringe))

17

Columbia Law School/Millstein Center for Global Markets and Corporate Ownership Conference on "Changes in Ownership: Beyond the Berle-Means Paradigm" (April 2013) (co-organizer) ("Dual Class Common Stock: From 'Banker-Control' to Protection of Entrepreneurial Vision")

American Law and Economics Ass'n 2013 Annual Meeting ( May 2013) ("Systemic Harms and the Limits of Shareholder Value" (with John Armour)); ("Money Market Funds Run Risk: Will Floating Net Asset Value Fix the Problem?" (with Christopher M. Gandia))

ETH-NYU Conference on Banking Regulation (June 2013, Zurich) ("Banking Union Resolution Without Deposit Insurance: An American Perspective on What It Would Take" (with Georg Ringe))

Toulouse Institute for Advanced Study Conference on Law and Economics ( June 2013, Toulouse) ("Agent-Focused Strategies in the Control of Systemic Risk: Resolving the Bank Corporate Governance Paradox") (with Patrick Bolton)

Fordham Law School Faculty Workshop (Oct 2013) ("Systemic Harms and the Limits of Shareholder Value" (with John Armour)

Univ. Pennsylvania-Wharton joint Faculty Workshop (Oct. 2013, Philadelphia) ("Money Market Funds Run Risk: Will Floating Net Asset Value Fix the Problem?" (with Christopher M. Gandia))

Global Justice Forum, Columbia Law School (Oct. 2013) ("FIRREA as a Tool in Redressing Sub-Prime Fraud").

Univ. Chicago Conference on Benefit-Cost Analysis for Financial Regulation (Oct. 2013, Chicago) ("The Empty Promise of Benefit-Cost Analysis in Financial Regulation").

Transatlantic Corporate Governance Dialogue (Dec. 2013, Washington) (Co-organizer)

Univ. of Europe at Rome Conference on Corporate Governance (Dec. 2013, Rome)  ("Activist Investors in an Era of Ownership Reconcentration: Solving the Agency Costs of Equity Intermediation")

NYU-ETH Conference on Banking Regulation (May 2014) ("Agent-Focused Strategies in the Control of Systemic Risk: Resolving the Bank Corporate Governance Paradox") (with Patrick Bolton)

Copenhagen Business School Conference on Ownership, Regulation and Creative Destruction (June 2014, Copenhagen) ("Cost-Benefit Analysis in Financial Regulation")

European Banking Union Conference (June 2014, Amsterdam) ("A US Perspective on Resolution in the European Banking Union")

18

European Summer Symposium in Economic Theory (July 2014, Gerzensee, Sz) ("Bank Resolution," with Patrick Bolton)

World Bank, Law, Justice & Development Symposium  (October 2014, Washington) ("Resolution in the European Banking Union: An Unfinished Agenda")

Columbia Center on European Legal Studies; Richman Center on Business, Law and Public Policy -- A Global Agenda for Financial Stability: Have We Tamed the Too-Big-To-Fail Financial Institution (November 2014) (Co-organizer and Co-Moderator)

Columbia Center for Corporate Governance Conference on Current Issues in Securities Regulation (November 2014) ("Pessimism from SEC Money Market Fund Reform")

2015

Co-organizer, Richman Center Conference on Inversions in M&A: Implications for Tax Planning, Tax Policy, and Corporate Governance  (February 2015) (Discussant – "A Social Responsibility Perspective")

Keynote Speaker, CEPR-IMFS conference on Global Banking and Bank Resolution (March 2015, Frankfurt) ("The Necessary Structural Reform for Successful Bank Resolution in the EU")

Vanderbilt Law and Business Conference (March 2015, Nashville)  "Money Market Funds Reform Shortfalls as Predicting Regulatory Failure in Addressing Newly Emerging Systemic Risk")

NYU Law School Conference on Conference on Corporate Crime and Financial Misdealing (April 2015) (Discussant on "Modeling Compliance")

LSE-Oxford Law and Finance Conference (May 2015, London) (Discussant on Tax Inversions and Corporate Governance)

Global Corporate Governance Colloquium (June 2015, Stanford) (Discussant on Boards of Directors)

Univ. Toronto-Rotman/ ICPM Conference on Long-Horizon Investing (June 2015, Toronto) ("Activist Shareholders as Potentiating Institutional Voice")

Widener Univ/Delaware Law School – Pileggi Lecture (October 2015, Wilmington) ("Shareholder Activism: the Triumph of Delaware's Board-Centric Model and the New Role for Boards of Directors")

19

Columbia Center on Corporate Governance Conference on M&A and Hedge Fund Activism (November 2015) (Dialogue with Chief Justice Strine, Del Sup Ct.)

Richman Center Conference on Reviving Economic Growth (November 2015) ("After the Financial Crisis: the Need for Dynamic Precaution")

Goethe Univ./House of Finance, Frankfurt, Conference on Finance between Liquidity and Insolvency (December 2015, Frankfurt)  (Discussant on Bank Resolution)

2016

Columbia Law School Roundtable on Financial Regulation (March 2016) (Co-organizer) (co-sponsored by Richman Center and Law and Economics Center)

Goethe Univ/Institute of Law & Finance Conference on Shareholder and Hedge Activism (April 2016, Frankfurt) (Experience of Activism in US, governance and empirics)

Paris Law and Finance Seminar (May 2016, Paris) (co-sponsored by ESCP Paris and ETH Zurich with ENA and CNMA) ("Empty Call of Cost Benefit Analysis in Financial Regulation')

Oxford-LSE Law and Finance Conference (May 2016, Oxford) (Discussant)

Global Corporate Governance Colloquium (June 2016, Stockholm) (Discussant)

Columbia-Ono Conference (June 2016, Tel Aviv) (Implications of Hedge Fund Activism for Boards)

Conference on the New Pedagogy of Financial Regulation (Oct. 2016) (lead organizer and presenter)

U Penn Institute for Law and Economics Roundtable (Dec. 2016) ("Medium Form Mergers: Fiduciary Duties and Appraisal")

2017

CLS-Oxford-ECGI Conference on Capital Markets Union for the EU (January 2017) (Discussant)

U Delaware Weinberg Corporate Governance Center Conference (March 2017) (Discussant, new directions for corporate boards)

Wharton Conference on Financial Regulation and Rule of Law (April 2017) (Discussant)

NYU LS Corporate Governance Conference (April 2017) ("Activist Pills and the Costs of Governance Adaptation")

Global Corporate Governance Colloquium (Univ of Tokyo) (June 2017) (Discussant)

ETH-Goethe-NYU Law and Banking Conference (June 2017) (Discussant on "Say on Pay" in Germany)

Columbia SIPA/Imperial College Conference on The Future of Global Finance (October 2017) ("First Some History")

Shanghai Univ. of Finance and Economics Conference on The Corporation in a Changing World (October 2017) ("Convergence and Persistence in Corporate Law and Governance")

Emory Law School Faculty Colloquium (November 2017) ("Boards 3.0")

Columbia SIPA Conference on "Ten Years After the Financial Crisis" (December 2017) ("FSOC's Off-Ramp for the Systemically Important Financial Firm")

2018

Imperial College-Goethe Conference on Capital Market Union for the EU (January 2018) ("The Origins of Capital Market Union in the US")

SEC-NYU Stern School Dialogue on Shareholder Engagement (January 2018) ("Reflections on Long Termism (and Short-Termism) for the Long Run")

Wharton Financial Regulation Conference (April 2018) ("The Origins of Capital Market Union in the US")

Columbia Law School-Oxford Law and Finance Program "Book Launch" for the Oxford Handbook on Corporate Law and Governance (May 2018) (commentator) (organizer)

Global Corporate Governance Colloquium (June 2018) ("Is Corporate Governance First Order in Economic Outcomes?")

ETH-NYU-SAFE Law and Banking Conference (June 2018) ("The Origins of Capital Market Union in the US")

UCLA Conference on Boards (September 2018) ("Board 3.0")

Berkeley Conference on Sustainability (October 2018) ("Is Corporate Governance a First Order Cause of the Current Malaise?"

21

Conference on Empirical Legal Studies (October 2018) ("Compliance Committees") (refereed submission)

2019

AALS Conference, Financial Regulation Section (invited speaker) (January 2019) ("Dynamic Precaution in Financial Regulation")

Millstein Center Conference on "Corporate Governance Counter-narratives (March 2019) (organizer and speaker) ("Corporate Governance's Limited Role in the Current Malaise")

Bocconi Conference on Institutional Investors and Corporate Governance (March 2019) ("Convergence and Persistence in Corporate Governance: Implications from the Rise of International Institutional Ownership in Open Capital Markets")

NYU Labor Center Conference on The German Model of Co-determination (April 2019) ("Challenges for Co-determination in the American Setting")

Wharton Financial Regulation Conference (April 2019) (discussant)

American Law and Economics Association (May 2019) ("Board Compliance") (refereed submission)

CONSOB (Italy) Conference on Stewardship (June 2019) ("Stewardship by Institutional Investors: What Possible? What Is Desirable?")

Labex ReFi-NYU-SAFE Law and Banking/Finance Conference (June 2019) (discussant)


SELECTED PRACTITIONER PRESENTATIONS

Univ. of Miami Mergers & Acquisition Institute (February 2000).

Fried, Frank, Harris, Shriver & Jacobsen (April 2001).

On-Line Moderator, Law.com seminars on mergers and acquisitions (spring 2001).

Columbia Law School London CLE program (June 2001).

Cleary Gottlieb Steen & Hamilton CLE program (November 2004).

ALI-ABA CLE program (December 2004).

NY Society of Securities Analysts (February 2007).

Brazilian Institute on Business Law (February 2007).

Conference Board annual conference on Executive Compensation (June 2007).

Baruch College seminar series on Corporate Governance (June 2007).

Institutional Investor Education Foundation conference on Institutional Activism (December 2008).

NYU Center for Labor & Employment Law, conference on New Initiatives in Regulating Executive Compensation (October 2009).

TIAA-CREF and National Association of Corporate Directors (NY Chapter) conference on "Say on Pay" (October 2009).

NY State Bar Ass'n-Canadian Bar Ass'n Joint Meeting, Panel on US-Canada Approaches to M&A (March 2012)

NYSE Board-Shareholder Forum (June 2013)

Institute for Law and Economic Policy (April 2014) (discussion of benefit-cost analysis in SEC and other financial regulation)

Responsible Investor Conference on Long-term, Sustainable Capitalism (December 2014) (discussion of shareholder activism)

CLS Post-Election CLE (Nov. 2016) ("What to Expect After the Election: Financial Regulation")

NYC Bar Association Committee on Futures and Derivatives Regulation (Dec. 2016) ("What to Expect After the Election: Financial Regulation")

NYS Bar Association Committee on Securities Regulation (March 2017) (Dual Class Common Stock)

ALI Conference on Law and Corporate Finance (April 2017) (M&A auction practice as applied in bankruptcy)

SELECTED SHORT PRACTITIONER-ORIENTED ARTICLES

Reviewing The New Merger Accounting Regime, New York Law Journal, 7/19/2001, p.1.

23

<u>Published Commentary</u>

"Why Investors Should Worry About Money Funds," Wall. St. J., June 4, 2011, p. C7.

"How To Save Bank Resolution in the European Banking Union" (with Georg Ringe), VoxEU April 30, 2014, available at http://www.voxeu.org/article/saving-bank-resolution-eurozone. Translated and published in Danish (Børsen, 5/9/2014) and German (Franfurter Allgemeine Zeitung, 7/9/2014).

"Bank Resolution in Europe: The Unfinished Agenda of Structural Reform" (with Georg Ringe),VoxEU, 1/28/2015, available at http://www.voxeu.org/article/restructure-eu-banks-facilitate-resolution.

"Stock Market Gyrations a Reminder Wall Street Banks Need Regulation," The Hill, March 2, 2018, available at http://thehill.com/opinion/finance/376439-stock-market-gyrations-a-reminder-wall-street-banks-need-regulation, *discussed at* Congressional Record S1621 (March 12, 2018).

<u>Blog Posts</u>

Forget Issuer Proxy Access and Focus on E-Proxy, (February 4, 2008), available at http://blogs.law.harvard.edu/corpgov/2008/02/04/forget-issuer-proxy-access-and-focus-on-e-proxy/.

The Corporate and Securities Professors' Brief in Bebchuk vs. Electronic Arts, (September 11, 2008), available at http://blogs.law.harvard.edu/corpgov/2008/09/11/the-corporate-and-securities-professors%E2%80%99-brief-in-bebchuk-vs-electronic-arts/.

*Electronic Arts* Before the Second Circuit: The *Amici Curiae* Brief of 60 Corporate and Securities Law Professors, (February 24, 2009), available at http://blogs.law.harvard.edu/corpgov/2009/02/24/electronic-arts-before-the-second-circuit-the-amici-curiae-brief-of-60-corporate-and-securities-law-professors/.

Proposed Money Market Reforms Fail to Address Key Issues, (September 17, 2009), available at http://blogs.law.harvard.edu/corpgov/2009/09/17/proposed-money-market-reforms-fail-to-address-key-issues/.

Dodd-Frank's Dangers and the Case for a Systemic Emergency Insurance Fund, (August 28, 2010), available at http://blogs.law.harvard.edu/corpgov/2010/08/28/dodd-frank%E2%80%99s-dangers-and-the-case-for-a-systemic-emergency-insurance-fund/.

*Janus Capital Group v. First Derivative Traders*: Only the Supreme Court can "Make" a Tree, (June 29, 2011), available at http://blogs.law.harvard.edu/corpgov/2011/06/29/janus-capital-group-v-first-derivative-traders-only-the-supreme-court-can-%E2%80%9Cmake%E2%80%9D-

a-tree/.

Wachtell Lipton's Critique of Harvard Law School, (April 3, 2012), available at
http://blogs.law.harvard.edu/corpgov/2012/04/03/wachtell-liptons-critique-of-harvard-law-school/.

JPMC, Dimon, Hedging, and Volcker, (June 14, 2012), available at
http://blogs.law.harvard.edu/corpgov/2012/06/14/jpmc-dimon-hedging-and-volcker/.

The SEC Punts (Again) on Financial Stability Reform, (September 4, 2012), available at
http://blogs.law.harvard.edu/corpgov/2012/09/04/the-sec-punts-again-on-financial-stability-reform/.

Money Market Fund Reform: Endorsement of the Minimum Balance at Risk Proposal, (March 4, 2013), available at http://clsbluesky.law.columbia.edu/2013/03/04/money-market-fund-reform-endorsement-of-the-minimum-balance-at-risk-proposal/.

Activist Investors and the Revaluation of Governance Rights, (with Ronald J. Gilson) (May 6, 2013), available at http://clsbluesky.law.columbia.edu/2013/05/06/activist-investors-and-the-revaluation-of-governance-rights/.

Proposals to "Reform" the Section 13D Rules: Getting it Precisely Backwards, (with Ronald J. Gilson) (August 7, 2013), available at http://clsbluesky.law.columbia.edu/2013/08/07/proposals-to-reform-the-section-13d-rules-getting-it-precisely-backwards/.

How to Save Bank Resolution in the European Banking Union, (with Wolf-Georg Ringe) (April 24, 2014), available at http://clsbluesky.law.columbia.edu/2014/04/24/how-to-save-bank-resolution-in-the-european-banking-union/.

The Sotheby's Poison Pill Case: The Plate Tectonics of Delaware Corporate Governance (with Ronald J. Gilson) (May 15, 2014), available at http://clsbluesky.law.columbia.edu/2014/05/15/the-sothebys-poison-pill-case-the-plate-tectonics-of-delaware-corporate-governance/.

The FSOC's Off-Ramp for the Systemically Important Financial Firm (May 10, 2017), available at http://clsbluesky.law.columbia.edu/2017/05/10/the-fsocs-off-ramp-for-the-systemically-important-financial-firm/.

Financial Scholars Oppose Eliminating "Orderly Liquidation Authority" As Crisis-Avoidance Restructuring Backstop (with Mark Roe) (May 26, 2017), available at https://corpgov.law.harvard.edu/2017/05/26/financial-scholars-oppose-eliminating-orderly-liquidation-authority-as-crisis-avoidance-restructuring-backstop/.

Appraisal Appraisal: Dell v. Magnetar (with Eric Talley) (Dec. 19, 2017), available at http://clsbluesky.law.columbia.edu/2017/12/19/appraisal-apprisal-dell-v-magnetar/.

Short-Changing Compliance (with John Armour and Geeyoung Min) (Setp. 27, 2018), available at https://corpgov.law.harvard.edu/2018/09/27/short-changing-compliance/.

Dual Class Common Stock: An Issue of Public and Private Law (Jan. 1, 2019), available at http://clsbluesky.law.columbia.edu/2019/01/02/dual-class-common-stock-an-issue-of-public-and-private-law/.

Board 3.0: An Introduction (with Ronald Gilson) (March 26, 2019), available at https://corpgov.law.harvard.edu/2019/03/26/board-3-0-an-introduction/

GOVERNMENT TESTIMONY

Securities Exchange Commission, Hearings on Dual Class Common Stock, December 1986.

Senate Committee on Banking, Housing, and Urban Affairs, Hearings on Money Market Funds, June, 2012 (invited written submission).

US Treasury Roundtable on FSOC Designation, July 2017 (invited written submission and participation)

LETTERS TO CONGRESSIONAL LEADERS

Financial Scholars Oppose Eliminating "Orderly Liquidation Authority" As Crisis-Avoidance Restructuring Backstop (with Mark Roe) (May 23, 2017) (signed by 120 law professors and economists), available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2979546.

SEC COMMENT LETTERS

Comment Letter filed on SEC Money Market Fund Proposal, September 2009.

Comment filed on SEC Money Market Fund Proposal, August 2011.

Comment filed on Federal Stability Oversight Council Money Market Fund Reform Proposals, February 2013.

Comment filed on SEC Money Market Fund Proposal, November 2013.

OTHER PROFESSIONAL ACTIVITIES

Chair, Columbia Univ. Advisory Committee on Socially Responsible Investing (2014-17)

Member, American Law Institute.

Advisor to ALI Restatement of Corporate Governance, 2019-

Advisor to ALI Restatement (Third) of Trusts: Prudent Investor Rule

Vice-Chair, Global Corporate Governance Colloquium, 2018-2020

Director, American Law and Economics Association, 2008-2011.

Member, Securities Law Committee, Association of the Bar of the City of New York, 2001-04.

Member, Columbia Univ. Advisory Committee on Socially Responsible Investing, 2002- 2004 (Chair, Spring 2004).

Member, Corporate Law Committee, Association of the Bar of the City of New York, 1986-89.

Secretary, Ad Hoc Committee on Corporate Takeover Legislation, Association of the Bar of the City of New York, 1988-90.

Chair, Section on Business Associations, American Association of Law Schools, 1989.

Chair, Section on Law and Economics, American Association of Law Schools, 2000.

Program Co-Chair, American Law and Economics Association 2008 Annual Meeting, 2008.


PRIOR EMPLOYMENT

1982-1988, Assistant Professor through Professor of Law, New York University.

l979-1981, attorney in U.S. Treasury Department, Washington, D.C. Attorney-advisor in office of Assistant General Counsel (Domestic Finance); Special Assistant to the General Counsel. Exceptional Service Award, Dep't of Energy.  Major project areas: Chrysler, synfuels, and NYC loan guarantee programs; drafting of financial institutions deregulation legislation; oversight of CFTC regulation of financial futures trading.

1976-l979, associate at Cleary, Gottlieb, Steen & Hamilton, New York, New York.  Corporate and securities litigation and negotiation; general appellate practice.

27

l975-l976, law clerk to the Hon. William E. Doyle, U.S. Court of Appeals, 10th Cir., Denver, Co.

Summer, l974, summer associate at Wilmer, Cutler & Pickering, Washington, D.C.

Summer l973 and 1971-1972, newspaper reporter, Rocky Mountain News, Denver, Co.

EDUCATION

Harvard Law School, Cambridge, Mass., J.D. magna cum laude l975.
Senior articles editor, Harvard Civil Rights-Civil Liberties Law Review (Vol. 10).
Tutor in Law, Adams House in Harvard College.

Yale University, New Haven, Conn., B.A. magna cum laude l97l.
Phi Beta Kappa; Managing Board, Yale Daily NEWS; John Spangler Nicholas Prize

PERSONAL

Born in Richmond, Va.

Bar Admissions: New York, November, l977; District of Columbia, January 1981

Member, NYC Bar Ass'n; Am. Bar Ass'n; Am. Law & Econ. Ass'n, Society of Empirical Legal Studies

Listed in Who's Who in America

06/19

28

<u>**Jeffrey N. Gordon – Prior Matters**</u>

Here is a list of matters in which I have previously testified at trial, a bench hearing, or through deposition or submitted an expert report, 2014-2019

<u>Herald Fund SPC v. HSBC Securities Services</u> (Luxembourg) SA (Luxembourg courts, 2017, 2018) (US securities market structure; fiduciary obligations of broker-dealers) (expert affidavit)

<u>Public School Teachers' Pension and Retirement Fund of Chicago v. Guthart et al</u> [Intuitive Surgical] (CA Superior Court, 2017) (corporate law and governance, directors' fiduciary duties) (expert affidavit)

<u>In re Chinese-Manufactured Drywall Products</u> Litigation (federal district court, 2015-16) (corporate law and governance; corporate finance) (expert affidavit, deposition)

<u>In re Walgreen Co. Derivative Litigation</u> (federal district court, 2014) (corporate law and governance; directors' fiduciary duties) (expert affidavit)

# EXHIBIT 2

**EXHIBIT 2**


<u>**MATERIALS REVIEWED IN CONNECTION WITH DECLARATION**</u>
<u>**OF JEFFREY N. GORDON**</u>


I reviewed the following filings and documents in connection with the preparation of the Declaration I submitted in <u>In re Wells Fargo & Company Shareholder Derivative Litigation</u>:


<u>Filings in the litigation:</u>

1.      Plaintiffs' Consolidated Amended Verified Stockholder Derivative Complaint, filed 2/24/17.

2.       Order Granting in Part and Denying in Part Motions to Dismiss, 10/4/17

3.      Stipulation and Agreement of Compromise, Settlement and Release, filed, 2/28/2019, including all exhibits

4.      Co-Lead Plaintiffs' Notice of Motion and Motion for Preliminary Approval of Settlement, filed 2/28/19

5.      Declaration of Michael A. Santoro in Support of Approval of Derivative Settlement, 2/27/2019

6.      Supplemental Brief in Support of Plaintiffs' Motion for Preliminary Approval of Settlement, filed 4/2/19

7.      Order Granting Preliminary Approval of Derivative Action Settlement, 5/14/19

<u>Other Materials</u>

8.      SEC filings for Wells Fargo & Co: Annual Reports, Form 10-K, Form 14A, for 2016, 2017, 2018

9.      Stock return data for Wells Fargo & Co. and various financial industry indices and ETFs, accessed through Bloomberg and Yahoo! Finance