Theodore H. Frank (SBN 196332)
HAMILTON LINCOLN LAW INSTITUTE
CENTER FOR CLASS ACTION FAIRNESS
1629 K Street NW, Suite 300
Washington, DC 20006
Voice: 703-203-3848
Email: ted.frank@hlli.org

*Attorneys for Objector John Cashman*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE WELLS FARGO & COMPANY SHAREHOLDER DERIVATIVE LITIGATION, | Case No. 3:16-cv-05541-JST |
| This Document Relates to: ALL ACTIONS | Judge: Hon. Jon S. Tigar<br>Courtroom: 9, 19th Floor<br>Date: August 1, 2019<br>Time: 2:00 P.M. |

# TABLE OF CONTENTS

TABLE OF CONTENTS ....................................................................................................................i

TABLE OF AUTHORITIES .............................................................................................................ii

INTRODUCTION ...........................................................................................................................1

I.      Objector Cashman is a shareholder and intends to appear through *pro bono* counsel............................3

II.     The district court has a fiduciary duty to the absent shareholders.................................3

III.    A percentage-of-recovery analysis does not support the requested fee.....................................4

       A.    Including the purported value of the injunctive relief in the denominator for purposes of calculating a fee award is legally improper. ...........................................................5

             1.    Clawbacks.........................................................................................................6

             2.    Corporate Governance Reforms .........................................................................8

       B.    Derivative counsel should be awarded no more than 17.9% of the $240 million recovery, which would return over $25 million to the absent shareholders. ...............................9

IV.    The Court should strike or disregard the Fitzpatrick Declaration (Dkt. 278-1). ...................13

V.     The lodestar crosscheck does not support derivative counsel's fee request because the lodestar is overstated by at least $5.58 million. ........................................................14

       A.    The lodestar is overstated by at least $5.58 million because contract and staff attorneys billed 27,142 hours at exorbitant rates. .......................................................15

       B.    Insufficient detail exists to evaluate the appropriateness of hours billed.................................18

       C.    Only a modest risk multiplier is appropriate here because plaintiffs counsel bore little risk of non-payment. ........................................................................................................19

             1.    The low risk of litigation is confirmed by the cavalcade of competing counsel who each hoped to prosecute the derivative action........................................19

             2.    The litigation had little risk to begin with, and most time was billed when the case had essentially zero risk. ...............................................................21

VI.    The Court should allocate the fee award among co-lead counsel and require disclosure of any side-agreements regarding fees...........................................................................23

CONCLUSION.................................................................................................................25

# TABLE OF AUTHORITIES

## **Cases**

*Alaska Elec. Pension Fund v. Bank of Am. Corp.*, No. 14-cv-7126,
    2018 U.S. Dist. LEXIS 202526 (S.D.N.Y. Nov. 29, 2018) ................................................... 11

*Alexander v. FedEx Ground Package Sys.*, No. 05-cv-00038,
    2016 WL 3351017 (N.D. Cal. June 15, 2016) ...................................................... 9, 10, 11, 14

*In re Anthem Inc. Data Breach Litig.*,
    2018 WL 3960068, 2018 U.S. Dist. LEXIS 140137 (N.D. Cal. Aug. 17, 2018) ............... 5, 16, 17

*Ark. Teacher Ret. Sys. v. State St. Bank*,
    2018 U.S. Dist. LEXIS 111409 (D. Mass. May 14, 2018) ...................................................... 16

*Banas v. Volcano Corp.*,
    47 F. Supp. 3d 957 (N.D. Cal. 2014) ...................................................................................... 16

*In re Beacon Assocs. Litig.*, No. 09 Civ. 777,
    2013 WL 2450960 (S.D.N.Y. May 9, 2013) ............................................................................ 17

*Bell Atl. Corp. v. Bolger*,
    2 F.3d 1304 (3d Cir. 1993) ....................................................................................................... 3

*In re Bluetooth Headset Products Liability Litigation*,
    654 F.3d 935 (9th Cir. 2011) .............................................................. 4, 5, 12, 14, 15, 21

*Blum v. Stenson*,
    465 U.S. 886 (1984) ................................................................................................................ 15

*In re Capital One TCPA Litig.*,
    80 F. Supp. 3d 781 (N.D. Ill. 2015) ........................................................................................ 12

*In re Cendant Corp. Prides Litig.*,
    243 F.3d 722 (3d Cir. 2001) ..................................................................................................... 7

*In re Charles Schwab Corp. Secs. Litig.*, No. C 08–01510 WHA,
    2011 WL 1481424 (N.D. Cal. Apr. 19, 2011) ........................................................................ 11

*In re Citigroup Inc. Bond Litig.*,
    988 F. Supp. 2d 371 (S.D.N.Y. 2013) ................................................................................. 9, 18

*In re Citigroup Inc Secs. Litig.*,
    2013 WL 4441511, 2013 U.S. Dist. LEXIS 117741 (S.D.N.Y. Aug. 19, 2013) ...................... 6

*City of Pontiac Gen. Emples. Ret. Sys. v. Lockheed Martin Corp.*,
    954 F. Supp. 2d 276 (S.D.N.Y. 2013) ..................................................................................... 17

*In re Continental Ill. Sec. Litig.*,
    962 F.2d 566 (7th Cir. 1992) .................................................................................................... 4

*Dennis v. Kellogg Co.*,
    697 F.3d 858 (9th Cir. 2012) .................................................................................................... 5

*Dial Corp. v. News Corp.*,
  317 F.R.D. 426 (S.D.N.Y. 2016)................................................................................ 11, 16

*In re Diet Drugs Prods. Liab. Litig.*,
  401 F.3d 143 (3d Cir. 2005)........................................................................................... 24

*In re First Fidelity Secs. Litig.*,
  750 F. Supp. 160 (D.N.J. 1990).......................................................................................9

*In re Foreign Exch. Benchmark Rates Antitrust Litig.*,
  2018 WL 5839691, 2018 U.S. Dist. LEXIS 191373 (S.D.N.Y. Nov. 8, 2018)............ 12

*G.A. Enterprises, Inc. v. Leisure Living Communities, Inc.*,
  517 F.2d 24 (1st Cir. 1975) .............................................................................................3

*In re Galena Biopharma Securities Litigation*, No. 14-cv-00367,
  2016 U.S. Dist. LEXIS 82693 (D. Or. Jun. 24, 2016)....................................................7

*Good v. W. Virginia-American Water Co.*,
  2017 WL 2884535, 2017 U.S. Dist. LEXIS 104242 (S.D. W. Va. July 6, 2017) ......... 11

*GPF Waikiki Galleria v. DFS Group*,
  2007 WL 3195089 (D. Haw. Oct. 30, 2007) ................................................................. 13

*Gutierrez v. Wells Fargo, NA*, No. C 07–05923 WHA,
  2015 WL 2438274, (N.D. Cal. May 21, 2015) .............................................................. 10

*Grice v. Pepsi Beverages Co.*,
  363 F. Supp. 3d 401407 (S.D.N.Y. 2019) ..................................................................... 11

*Heighley v. J.C. Penney Life Ins. Co.*,
  257 F. Supp. 2d 1241 (C.D. Cal. 2003) ......................................................................... 14

*In re High Sulfur Content*,
  517 F.3d 220 (5th Cir. 2008)..................................................................................... 23, 24

*In re High-Tech Employee Antitrust Litigation* ("*High-Tech*"), No. 11-CV-02509-LHK,
  2015 WL 5158730, 2015 U.S. Dist. LEXIS 118052 (N.D. Cal. Sept. 2, 2015) ...... 10, 12

*In re HP Secs. Litig*, No. 3:12-CV-05980-CRB,
  2015 U.S. Dist. LEXIS 193707 (N.D. Cal. Nov. 13, 2015) .......................................... 11

*In re Indymac Mortgage-Backed Secs. Litig.*,
  94 F. Supp. 3d 517 (S.D.N.Y. 2015).............................................................................. 11

*Intel Corp. v. Terabyte Int'l, Inc.*,
  6 F.3d 614 (9th Cir. 1993) .............................................................................................. 18

*In re Johnson & Johnson Derivative Litig.*, No. 11-2511(FLW),
  2013 WL 6163858 (D.N.J. Nov. 25, 2013)..................................................................... 20

*Kakani v. Oracle Corp.*, No C 06-06493 WHA,
  2007 WL 179377, 2007 U.S. Dist. LEXIS 47515 (N.D. Cal. Jun. 19, 2007)..................4

*Koby v. ARS Natl. Services, Inc.*,
   846 F.3d 1071 (9th Cir. 2017) ............................................................................. 7

*Laffitte v. Robert Half Int'l*,
   376 P.3d 672 (Cal. 2016) ............................................................................. 4, 25

*In re LendingClub Secs. Litig.*,
   2018 WL 4586669 (N.D. Cal. Sept. 24, 2018) ..................................................... 11, 23

*Lewis v. Silvertree Mohave Homeowners' Ass'n, Inc.*, No. C 16-03581 WHA,
   2017 WL 5495816 (N.D. Cal. Nov. 16, 2017) ....................................................... 15

*Lukov v. Schindler Elevator Corp.*,
   2012 WL 2428251 (N.D. Cal. June 26, 2012) ....................................................... 14

*In re MagSafe Apple Power Adapter Litig.*,
   571 F. App'x 560 (9th Cir. 2014) ...................................................................... 21

*In re Maxwell Techs., Inc.*,
   2015 WL 12791166, 2015 U.S. Dist. LEXIS 189165 (S.D. Cal. Jul. 13, 2015) ................. 7

*In re Mercury Interactive Corp. Sec. Litig.*,
   618 F.3d 988 (9th Cir. 2010) .......................................................................... 3, 20

*In re NASDAQ Market-Makers Antitrust Litig.*,
   187 F.R.D. 465 (S.D.N.Y. 1998) ........................................................................ 9

*Nationwide Transport Finance v. Cass Info. Sys.*,
   523 F.3d 1051 (9th Cir. 2008) .......................................................................... 13

*In re NCAA Athletic Grant-in-aid Cap Antitrust Litig.*, No. 4:14-md-2541-CW,
   2017 WL 6040065 (N.D. Cal. Dec. 6, 2017) ........................................................ 10

*New York State Teachers' Ret. Sys. v. GM Co.*,
   315 F.R.D. 226 (E.D. Mich. 2016) ..................................................................... 11

*Nitsch v. DreamWorks Animation SKG Inc.*,
   2017 WL 2423161 (N.D. Cal. June 5, 2017) ........................................................ 10

*In re Oracle Secs. Litig.*,
   132 F.R.D. 538 (N.D. Cal. 1990) ....................................................................... 6

*Pearson v. NBTY, Inc.*,
   772 F.3d 778 (7th Cir. 2014) ........................................................................... 24

*Pa. Pub. Sch. Employees Ret. Sys. v. Bank of Am. Corp.*,
   318 F.R.D. 19 (S.D.N.Y. 2016) ........................................................................ 17

*Perdue v. Kenny A.*,
   559 U.S. 542 (2010) ..................................................................................... 19

*Piambino v. Bailey*,
   757 F.2d 1112 (11th Cir. 1985) ........................................................................ 4

*Pinal Creek Group v. Newmont Mining Corp.*,
    352 F. Supp. 2d 1037 (D. Ariz. 2005) ........................................................................ 13

*In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*,
    148 F.3d 283 (3d Cir. 1998) ........................................................................................7

*Rodman v. Safeway Inc.*,
    2018 WL 4030558, 2018 U.S. Dist. LEXIS 143867 (N.D. Cal. Aug. 22, 2018) ................ 5, 12-13

*SEC v. Kirkland,* No. 6:06-cv-183,
    2008 U.S. Dist. LEXIS 123308 (M.D. Fla. June 30, 2008) ............................................ 16

*Silverman v. Motorola Solutions, Inc.*,
    739 F.3d 956 (7th Cir. 2013) ...................................................................................... 20

*Snyder v. Ocwen Loan Servicing, LLC*,
    2019 WL 2103379, 2019 U.S. Dist. LEXIS 80926 (N.D. Ill. May 14, 2019) .................... 23

*Stathakos v. Columbia Sportswear*, No. 15-cv-04543,
    2018 WL 1710075 (N.D. Cal. Apr. 9, 2018) ................................................................ 13

*Staton v. Boeing Co.*,
    327 F.3d 938 (9th Cir. 2003) ..................................................................................... 5, 7

*Stobie Creek Invs. v. United States*,
    81 Fed. Cl. 358 (Ct. Fed. Cl. 2008), *aff'd* 608 F.3d 1366 (Fed. Cir. 2010) ..................... 13

*In re Telik, Inc. Sec. Litig.*,
    576 F. Supp. 2d 570 (S.D.N.Y. 2008) ........................................................................ 16

*United States ex rel. Palmer v. C&D Techs., Inc.*,
    2017 WL 1477123 (E.D. Pa. Apr. 25, 2017) ................................................................ 16

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*,
    2017 WL 1352859 (N.D. Cal. Apr. 12, 2017) .............................................................. 14

*In re Wash. Pub. Power Supply Sys. Sec. Litig.* ("*WPPSS*"),
    19 F.3d 1291 (9th Cir. 1994) .......................................................................3, 4, 14, 21

*Wininger v. SI Mgmt. L.P.*,
    301 F.3d 1115 (9th Cir. 2002) .............................................................................6, 7, 14

*Zucker v. Westinghouse Elec. Corp.*,
    265 F.3d 171 (3d Cir. 2001) .........................................................................................4

**Rules**

Advisory Committee Notes on 2003 Amendments to Rule 23 ..............................................4

Fed. R. Civ. Proc. 23(e)(3) ........................................................................................... 25

Fed. R. Evid. 701 ......................................................................................................... 13

Fed. R. Evid. 702 ................................................................................................... 13, 14

**Other Authorities**

Theodore Eisenberg & Geoffrey P. Miller,
*Attorney Fees and Expenses in Class Action Settlements: 1993–2008,*
7 J. EMPIRICAL LEGAL STUD. 248 (2010) ...................................................................... 9, 10

Theodore Eisenberg & Geoffrey P. Miller,
*Attorneys fees in Class Action Settlements: An Empirical Study,*
1 J. EMPIRICAL L. STUD. 27 (2004) ...................................................................... 11

Theodore Eisenberg, Geoffrey P. Miller & Roy Germano,
*Attorneys' Fees in Class Actions: 2009-2013,* 92 N.Y.U. L. Rev. 937 (2017) .................................... 10

Andrea Estes, *Critics hit law firms' bills after class-action lawsuits,*
BOSTON GLOBE (Dec. 17, 2017) ...................................................................... 3

Federal Judicial Center,
Manual for Complex Litigation—Fourth (2004) ...................................................................... 10

Brian Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards,*
7 J. EMPIRICAL L. STUD. 811 (2010) ...................................................................... 9, 14

Brian T. Fitzpatrick, *Do Class Action Lawyers Make Too Little?,*
158 U. PA. L. REV. 2043 (2010) ...................................................................... 14

Stuart Logan, et al., *Attorney Fee Awards in Common Fund Class Actions,*
24 Class Action Reports (March-April 2003) ...................................................................... 9

Catherine Rampell, *At Well-Paying Law Firms, a Low-Paid Corner,*
N.Y. TIMES (May 23, 2011) ...................................................................... 17

Vaughn R. Walker, & Ben Horwich, *The Ethical Imperative of a Lodestar Cross-Check: Judicial
Misgivings About Reasonable Fees in Common Fund Cases,*
18 GEO J. LEGAL ETHICS 1453 (2005) ...................................................................... 14

# INTRODUCTION

Co-lead counsel propose to pay themselves $68 million, or 28.33% of the $240 million settlement in this case, well above the 25% benchmark in this Circuit. The settlement is a megafund, and the proposed fees represent undue windfall for counsel—a 3.03 multiplier applied on top of surreal rates for contract and staff attorneys. Co-lead counsel admits that they paid contract attorneys $40 to $50/hour, but now counsel seeks up to $1257.45 per hour (3.03 times $415/hour) for this investment. Shareholder John Cashman objects.

This case was among many derivative actions filed over directors' failure to monitor employees' perverse incentives to create fake accounts; the Court should not conclude the litigation by blessing directors' unwillingness to monitor fake attorney billing rates.

Co-lead counsel offer various excuses for their fee request, but none of them withstand scrutiny. The common benefit, they claim, is actually $320 million due to corporate reforms and clawbacks of compensation from misbehaving executives, which the parties have agreed to be worth $80 million for no other reason than to secure a large attorney fee award. The $80 million fiction is belied by Wells Fargo's SEC disclosures, which list no other benefit from the settlement than the $240 million cash from insurers. There's good reason for this: the clawbacks plaintiffs claim credit for occurred before the motion to dismiss in this case was even resolved upon the recommendation of directors' Oversight Committee, which was established due to the September 2, 2016 settlements with three government agencies, which preceded and precipitated this litigation. There is simply no reason to assume that this suit—as opposed government regulators, stiff action by the Federal Reserve, and numerous other suits—cause the claimed clawbacks and corporate reforms. In fact, California derivative plaintiffs claim to be responsible for most or all of the same corporate reforms in their proposed settlement, which was filed on June 21, 2019. The value of the settlement is exactly what Wells Fargo told shareholders it was: $240 million, so the $68 million fee is clearly too high.

Plaintiffs also cite a string of abnormally large fee awards to support their request, but representative empirical surveys show that a fee award between 15 and 20% is typical of the settlement of this size. Here, Objector Cashman recommends a generous fee award of 17.9%, which results in over $25 million being retained by the company on behalf of shareholders. And the court would be justified lowering the fee award below 17.9%, because even that fee award provides a sizable multiplier on exaggerated billing for relatively low-risk litigation piggybacking on governmental investigations.

The unreasonableness of co-lead counsel's fee request is confirmed by the lodestar crosscheck. Properly counting the market rates of contract and staff attorneys. The rate actually paid by the market (and counsel) is $40-50/hour for contract attorneys, and perhaps $240/hour for full-time staff attorneys. Using these rates, the lodestar figure is exaggerated by at least $5.5 million, but the precise amount is unclear due to counsel's failure to submit daily billing records. This means the lodestar multiplier is actually about 4.04. Therefore, the requested $68 million fee constitutes a windfall—especially considering the relatively modest risk this case posed during most of its pendency.

While co-lead counsel claim that they bore unusual risks, the virtual gold rush of derivative litigation proves otherwise. Plaintiffs bore little risk because regulators repeatedly found Wells Fargo executives and directors culpable. The case was so attractive that attorneys fell over each other to file cumulative, pointless derivative litigation in numerous forums. Plaintiffs' attorneys did not do this because the claims were risky, but because the underlying litigation presented a historic opportunity to wring damages from a board that government regulators had found deficient. Co-lead counsel were among the first to file, but even late filers have found nuggets of gold—counsel has agreed to pay twelve other law firms out of their fee request, eight of which also stand to earn fees from the proposed California derivative settlement, and two of which assured the Delaware Chancery they had not received an compensation "directly or indirectly from any Defendant." Of course, the Court should exercise its authority to require co-lead counsel to disclose these side agreements, and the Court should fix an award to each firm notwithstanding any such agreement.

Finally, the risk multiplier is unwarranted because most time billed in the case occurred after the Federal Reserve served letters on the directors, when relatively little risk remained. Objector's proposed fee award of $42.96 million corresponds to a healthy 1.92 multiplier, and effectively compensates co-lead counsel with a 4.0 multiplier for work they performed early in the case before the motion to dismiss was resolved.

Of the requested $68 million attorneys' fee award, neither the percentage, nor the multiplier, nor the rates are fairly borne by shareholders. The Court should protect shareholders by awarding reasonable fees of no more than 17.9% or $42.96 million, which still provides co-lead counsel with a handsome multiplier, especially considering appropriate billing rates for contract and staff attorneys engaged in document review.

## I.     Objector Cashman is a shareholder and intends to appear through *pro bono* counsel.

Objector Cashman owns 700 shares of Wells Fargo Co New Com as of February 26, 2019. *See* Declaration of John Cashman, ¶ 3 & Ex. 1. Cashman therefore has standing to object.

Hamilton Lincoln Law Institute's Center for Class Action Fairness ("CCAF") represents Cashman *pro bono*, and CCAF attorney Theodore H. Frank intends to appear at the fairness hearing on his behalf. CCAF represents class members *pro bono* where class counsel employs unfair procedures to benefit themselves at the expense of the class. CCAF has recouped more than $200 million for class members by driving the settling parties to reach an improved bargain or by reducing outsized fee awards. Andrea Estes, *Critics hit law firms' bills after class-action lawsuits*, BOSTON GLOBE (Dec. 17, 2017) (more than $100 million at time). Cashman brings this objection through CCAF in good faith to protect the interests of the class. Cashman Decl. ¶ 5-6. His objection applies to all shareholders; he adopts any objections not inconsistent with this one.

## II.    The district court has a fiduciary duty to the absent shareholders.

"One of the risks flowing from shareholders' difficulty in monitoring derivative litigation is that plaintiffs' counsel and the defendants will structure a settlement such that the plaintiffs' attorneys' fees are disproportionate to any relief obtained for the corporation." *Bell Atl. Corp. v. Bolger*, 2 F.3d 1304, 1310 (3d Cir. 1993). To guard against this danger, a district court must act as a "fiduciary" "with 'a jealous regard to the rights of those who are interested in the fund' in determining what a proper fee award is." *In re Mercury Interactive Corp. Sec. Litig.*, 618 F.3d 988, 994 (9th Cir. 2010) (quoting *In re Washington Pub. Power Supply Sys. Litig.,* 19 F.3d 1291, 1302 (9th Cir. 1994) ("*WPPSS*")).[1]

Cashman's objection invokes this special fiduciary role of this Court to protect the class from derivative counsel's excessive and unreasonable fee request. At the fee-setting stage, the relationship between counsel and their putative client and its shareholders turns directly and unmistakably adversarial because counsel's "interest in getting paid the most for its work representing the class [is] at odds with the class' interest in securing the largest possible recovery for its members." *Id.* Given this natural adversity, there can be no deference to counsel's recommendation.  Contrary to derivative counsel's assertion (Dkt. 277 at 12-13), the

---

[1] This and several cases discussed below involve Rule 23 class action suits. Such "cases interpreting Rule 23 may be effectively utilized in analyzing the requirements of 23.1." *G.A. Enterprises, Inc. v. Leisure Living Communities, Inc.*, 517 F.2d 24, 26 n.3 (1st Cir. 1975).

fact that Wells Fargo agreed to pay $68 million is not entitled to deference. Wells cannot risk jeopardizing the global peace that the underlying settlement would provide and the benefit arising from a cessation of litigation should not enter the equation when calculating reasonable fees. *Zucker v. Westinghouse Elec. Corp.*, 265 F.3d 171 (3d Cir. 2001). Nor can a mediator be relied on to guarantee that the fee request is reasonable; "[t]hey are masters in the art of what is negotiable." *Kakani v. Oracle Corp.*, No C 06-06493 WHA, 2007 WL 179377, 2007 U.S. Dist. LEXIS 47515, at *31 (N.D. Cal. Jun. 19, 2007). "Such a mediator has no fiduciary duty to anyone, much less those [absent shareholders] not at the table" who will ultimately be paying derivative counsel's fees. *Id.* Further, no individual shareholder has the financial incentive to object to an exorbitant fee request either; "[h]is gain from a reduction, even a large reduction, in the fees awarded the lawyers would be minuscule." *In re Continental Ill. Sec. Litig.*, 962 F.2d 566, 573 (7th Cir. 1992). The district court (and good-faith public-minded objectors) serve as the last line of defense against overreaching fee requests.

"Public confidence in the fairness of attorney compensation in class actions is vital to the proper enforcement of substantive law." *Laffitte v. Robert Half Int'l*, 376 P.3d 672, 688-92 (Cal. 2016) (Liu, J., concurring). Exorbitant fees erode public confidence in representational litigation. To prevent that erosion, it is "it is important that the courts should avoid awarding 'windfall fees' and that they should likewise avoid every appearance of having done so." *Piambino v. Bailey,* 757 F.2d 1112, 1144 (11th Cir. 1985); *see also WPPPS,* 19 F.3d at 1298 (differentiating "reasonable" from "windfall" fees in megafund cases). "Active judicial involvement in measuring fee awards is singularly important to the proper operation of the class action process." Advisory Committee Notes on 2003 Amendments to Rule 23.

### III. A percentage-of-recovery analysis does not support the requested fee.

Although attorneys' fees and costs may be awarded in a certified derivative action that creates a common fund or other substantial benefit for the corporation, "courts have an independent obligation to ensure that the award, like the settlement itself, is reasonable, even if the parties have already agreed to an amount." *In re Bluetooth Headset Products Liability Litigation*, 654 F.3d 935, 941 (9th Cir. 2011). In a typical case alleging economic injury, the benchmark for a reasonable award in the Ninth Circuit is 25% of the class benefit. *Id.* at 942. However, "to avoid routine windfalls where the recovered fund runs into the multi-millions, courts typically decrease the percentage of the fee as the size of the fund increases." *Rodman v. Safeway Inc.*, 2018 WL

4030558, 2018 U.S. Dist. LEXIS 143867, *10-11 (N.D. Cal. Aug. 22, 2018) (cleaned up); *see also Bluetooth*, 654 F.3d at 942 (suggesting downward departure from the benchmark to prevent counsel from obtaining "windfall profits" in "mega-fund" settlements).

By their calculation, derivative counsel request 21.25% of the $320 million "total settlement value" or, alternatively, 28.33% of the settlement's $240 million cash component. Fee Motion 3-4. For reasons discussed below, the $80 million value derivative counsel attributes to the clawbacks and corporate governance reforms cannot be included in the denominator for purposes of awarding a common-fund fee. Thus, the actual request is 28.33% of the $240 million settlement fund. While that percentage exceeds the benchmark in its own right, the request is in fact even more excessive because of the magnitude of the fund. When properly calculated, derivative counsel should be awarded no more than $42.96 million (17.9%).

## A.  Including the purported value of the injunctive relief in the denominator for purposes of calculating a fee award is legally improper.

Derivative counsel predicate their fee request on a "total settlement value" of $320 million, comprising a $240 million insurance-funded payment to the corporation and $80 million value ascribed to clawbacks and corporate governance reforms. Settlement § 2.F, Dkt. 270-1 at 9. Derivative counsel ask this Court to commit reversible error by attributing $80 million to the injunctive relief and including that value in the denominator for purpose of calculating their common fund fee award. "The issue of the valuation of…a settlement must be examined with great care to eliminate the possibility that it serves only the 'self-interests' of the attorneys and the parties, and not the class, by assigning a dollar number to the fund that is fictitious." *Dennis v. Kellogg Co.*, 697 F.3d 858, 868 (9th Cir. 2012). Because the value of injunctive relief is "easily manipulable by overreaching lawyers seeking to increase the value assigned to a common fund," "parties ordinarily may not include an estimated value of undifferentiated injunctive relief in the amount of an actual or putative common fund for purposes of determining an award of attorneys' fees." *Staton v. Boeing Co.*, 327 F.3d 938, 946, 974 (9th Cir. 2003). "[O]nly in the unusual instance where the value to individual class members of benefits deriving from injunctive relief can be accurately ascertained may courts include such relief as part of the value of a common fund for purposes of applying the percentage method of determining fees." *Id.* at 974; *see also In re Anthem Inc. Data Breach Litig.*, 2018 WL 3960068, 2018 U.S. Dist. LEXIS 140137, at *92-*93 (N.D. Cal. Aug. 17, 2018) (following *Staton*). As this Court once described, injunctive relief "'expert valued' at some fictitious

figure, together with arrangement to pay plaintiffs' lawyers their fees" is a "classic manifestation" of the collective action agency problem in class litigation. *In re Oracle Secs. Litig.*, 132 F.R.D. 538, 544 (N.D. Cal. 1990) (Walker, J.). At preliminary approval, this Court reserved the question of what value it should assign to the remedial actions taken by Wells Fargo, pending consideration of objector input. Prelim. Appr. Ord. 10. Derivative counsel is not entitled to common fund credit for either the clawbacks or the governance reforms.

### 1.     Clawbacks

The clawbacks cannot be credited to the common fund because derivative counsel is not causally responsible for that benefit; it is would be an abuse of discretion to award fees a percentage of that benefit. *Wininger v. SI Mgmt. L.P.*, 301 F.3d 1115, 1124 (9th Cir. 2002); *see also In re Oclaro Inc. Derivative Litig.*, 2014 WL 4684993, at *4 (N.D. Cal. Sept. 19, 2014) (reducing fee request by 40% where counsel attempted to "take[] credit for reforms that took place prior to settlement and that were not negotiated in connection with settlement."); *In re Citigroup Shareholder Derivative Litig.*, 2013 WL 4441511, 2013 U.S. Dist. LEXIS 117741, *20 (S.D.N.Y. Aug. 19, 2013), *aff'd sub. nom. Moskal v. Pandit*, 576 Fed. Appx. 33 (2d Cir. 2014) (no fees where "shareholder pressure, not the lawsuits at issue in this action, was the cause of Citigroup's policy changes").

Wells Fargo's account fraud scandal was exposed to public view on September 2, 2016, when three government entities (the Consumer Financial Protection Bureau, the Office of the Comptroller of the Currency, and the Los Angeles City Attorney) announced settlements with Wells totaling $185 million. These settlements required the independent directors of the Wells board to establish an oversight committee to investigate the improper sales practices. Only after those events, on September 29, 2016, was the first of the shareholder cases consolidated into this action filed. Dkt. 270-1 at 46. From late September 2016 through early April 2017, the board clawed back more than $180 million worth of compensation from certain Wells executives. *See* Declaration of Theodore H. Frank ("Frank Decl.") ¶¶ 7-10. $122.5 million of those forfeitures came after the filing of the derivative actions, but they were not attributable to them; they were "a result of the investigation" of the oversight committee. *Id* at ¶ 11. It is particularly ironic that derivative counsel now try to take credit for actions of the early-2017 board because they argued at the time that the board was irredeemably conflicted such that they could be excused from making a demand on the board. *See* Dkt. 83 ¶¶ 477-517.

1    Indeed, this Court's order partially denying defendants' motion to dismiss was not entered until May 4, 2017,

2    several weeks after the last of the clawbacks. *See* Dkt. 129.

3            "Allowing private counsel to receive fees based on the benefits created by public agencies would

4    undermine the equitable principles which underlie the concept of the common fund, and would create an

5    incentive for plaintiffs attorneys to 'minimize the costs of failure . . . by free riding on the monitoring efforts

6    of others.'" *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 336-37 (3d Cir. 1998); *see*

7    *also In re Cendant Corp. Prides Litig.*, 243 F.3d 722, 741 (3d Cir. 2001) (same).

8            Derivative counsel have not demonstrated that *any* "accurately ascertained" portion of the clawbacks'

9    value is attributable to this litigation, such that including $60 million in the common fund would satisfy the

10   requirements of *Staton* and *Wininger*. Wells' settlement representation that "**facts alleged** in the Derivative

11   Action were significant factors taken into account…in recommending appropriate remedial steps with respect

12   to compensation reductions and forfeitures" is entirely consistent with the view that the derivative suits

13   themselves had *no* causal connection to the committee's decisions at all. Dkt. 270-1 at 47. *See* Frank Decl. ¶ 13.

14   Rather, the record reveals that Wells had no shortage of independent reasons to forfeit executives'

15   compensation in the aftermath of the public scandal. *See generally Koby v. ARS Natl. Services, Inc.*, 846 F.3d 1071,

16   1079 (9th Cir. 2017) (holding that codifying injunctive relief business practices changes defendant already made

17   "presumably to avoid further litigation risk" has no real settlement value). While derivative counsel loudly

18   proclaim that during mediation they had proposed certain corporate reforms that Wells later adopted

19   (Dkt. 270-1 at 44), they are conspicuously silent on whether they pressed defendants to forfeit funds from

20   responsible executives. Almost certainly they did not, as the mediation sessions did not commence until August

21   2017, months after the money was recouped. Dkt. 270-1 at 9.

22           Even if, *arguendo*, the inception of litigation here increased the pressure on the oversight committee to

23   recommend such forfeitures, that benefit has nothing to do with the *settlement* of this action. Frank Decl. ¶ 14.

24   The "single fact" that the forfeiture occurred after the lawsuits were filed "is insufficient for the Court to

25   include the cancellation of…employment benefits in the calculation of the value attributable to the Derivative

26   Settlement." *In re Galena Biopharma Securities Litigation* is directly on point. No. 14-cv-00367, 2016 U.S. Dist.

27   LEXIS 82693, *30 (D. Or. Jun. 24, 2016).

28

### 2.     Corporate Governance Reforms

Derivative counsel attributes $20 million to a potpourri of corporate governance reforms. Dkt. 270-1 at 40. Similar to the clawbacks, these reforms were implemented by the board beginning in late 2016 and continuing through much of the litigation, and so they suffer the same problem of causal indeterminacy. Again, even if the settlement recitals were not "self-interested" "hearsay" (Preliminary Approval Order 10), it says little that "the facts alleged in the Derivative Action were significant factors taken into account by Wells Fargo in implementing the…reforms" (Dkt. 270-1 at 40) because the facts alleged were not unearthed in this lawsuit. Moreover, since February 2, 2018, Wells Fargo's asset size growth has been restricted by the Federal Reserve "until its governance and risk management sufficiently improves." Frank Decl., Ex. 1. That same order required Wells to replace four directors and committed the Wells board to take steps to improve its oversight and practices consistent with risk management objectives. Many of the other purported reforms appear to follow from Wells Fargo's September 2, 2016 settlements with regulators. *See* Frank Decl. ¶ 13. Most of the same reforms are also claimed by plaintiffs as a benefit from a recently-proposed California derivative settlement, *In re Wells Fargo & Co. Auto Ins. Derivative Litig.*, No. CGC 17-561118 (S.F. Super.) ("California CPI Settlement"). Frank Decl. ¶ 15 & Ex. 3, at 13-15. Derivative counsel provides no evidence that they are even partially responsible for the reforms as opposed to three regulators and other plaintiffs.

Wells Fargo itself described the material terms of the settlement to its shareholders as: "insurance carriers will pay the Company approximately $240 million for alleged damage to the Company, and the Company will pay plaintiffs' attorneys' fees." *Id.* ¶ 16 (quoting SEC filing). Governance reforms are notably absent from the description.

Even if such prophylactic governance reforms were generated by the settlement of this action itself, precedent bars their inclusion in the common fund because their value cannot be accurately ascertained. *See In re Maxwell Techs., Inc.*, 2015 WL 12791166, 2015 U.S. Dist. LEXIS 189165 (S.D. Cal. Jul. 13, 2015) (applying lodestar approach without multiplier because corporate governance reforms are "not easily monetized") (quoting *Bluetooth*, 654 F.3d at 941). By negative implication, derivative counsel have admitted that, unlike the value of the clawbacks, the value of the reforms is not "readily quantifiable." Fee Motion 13. The declarations of Jeffrey N. Gordon and Michael A. Santoro do not demonstrate otherwise. Frank Decl. ¶¶ 18-20.

1    Derivative counsel have not borne their burden to show that either the value of the executive clawbacks

2    or the purported value of corporate governance reforms should be imputed to the settlement common fund.

3    **B.     Derivative counsel should be awarded no more than 17.9% of the $240 million recovery,**
4    **which would return over $25 million to the absent shareholders.**

5        Derivative counsel seek 28.33% of the $240 insurer-paid fund that the settlement creates. Because of

6    economies of scale, a reasonable fee award should utilize sliding scale percentage to prevent a windfall for

7    plaintiffs' attorneys at the expense of the class. *See, e.g., Alexander v. FedEx Ground Package Sys.,* No. 05-cv-00038,

8    2016 WL 3351017 (N.D. Cal. Jun. 15, 2016). "It is generally not 150 times more difficult to prepare, try and

9    settle a $150 million case than it is to try a $1 million case." *In re NASDAQ Market-Makers Antitrust Litig.,* 187

10   F.R.D. 465, 486 (S.D.N.Y. 1998). "There is considerable merit to reducing the percentage as the size of the

11   fund increases. In many instances the increase is merely a factor of the size of the class and has no direct

12   relationship to the efforts of counsel." *Id.* at 486 (quoting *In re First Fidelity Secs. Litig.,* 750 F. Supp. 160, 164

13   n.1 (D.N.J. 1990)). Thus, "[i]n cases with exceptionally large common funds, courts often account for these

14   economies of scale by awarding fees in the lower range." *In re Citigroup Inc. Bond Litig.,* 988 F. Supp. 2d 371,

15   374 (S.D.N.Y. 2013) (cleaned up). "The existence of a scaling effect—the fee percent decreases as class

16   recovery increases—is central to justifying aggregate litigation such as class actions. Plaintiffs' ability to

17   aggregate into classes that reduce the percentage of recovery devoted to fees should be a hallmark of a well-

18   functioning class action system." Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees and Expenses in Class*

19   *Action Settlements: 1993–2008*, 7 J. EMPIRICAL LEGAL STUD. 248, 263 (2010).

20       Empirical research shows that in class actions "fee percentages tended to drift lower at a fairly slow

21   pace until a settlement size of $100 million was reached, at which point the fee percentages plunged well below

22   20 percent." Brian Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards,* 7 J. EMPIRICAL

23   L. STUD. 811, 838 (2010). In class actions in which the settlement equaled $100 to $250 million, the median

24   fee award was 16.9% and the mean was 17.9%. *Id.* at 839. Other surveys support this analysis. *E.g.,* Logan,

25   Stuart, et al., *Attorney Fee Awards in Common Fund Class Actions*, 24 Class Action Reports (March-April 2003)

26   (empirical survey showed average recovery of 15.1% where recovery exceeded $100 million); Eisenberg &

27   Miller, 7 J. EMPIRICAL LEGAL STUD. at 265 tbl.7 (mean percentage fee in 68 class action settlements with

28

1    recovery above $175.5 million was 12% and median award was 10.2% with standard deviation of 7.9%).[2] A

2    reasonable award for derivative counsel in this case is no more than 17.9%, or about $43 million. Such an

3    award would appropriately compensate derivative counsel for the sizable $240 million fund that the settlement

4    created, while still recognizing that this case was relatively expedited and prompted by enforcement

5    proceedings that snowballed into a public spectacle.

6         Percentage awards in megafund cases are "substantially less than the 25% benchmark applicable to

7    typical class settlements in this Circuit." *Alexander*, 2016 WL 3351017, at *2-3 (awarding 16.4% of common

8    fund). For example, in *In re High-Tech Employee Antitrust Litigation* ("*High-Tech*"), this Court rejected a 19.5% fee

9    request and instead awarded 9.8% of a $415 million settlement because empirical research showed a 10.2%

10   median for megafund cases over $175 million. No. 11-CV-02509-LHK, 2015 WL 5158730, at *13 (N.D. Cal.

11   Sept. 2, 2015) (citing Eisenberg & Miller, 7 J. EMPIRICAL LEGAL STUD. at 265 tbl.7). And following *High-Tech*,

12   in *Nitsch v. DreamWorks Animation SKG Inc.*, this Court awarded 11% of $150 million settlement in order to

13   avoid "windfall profits" to class counsel where class counsel "achieved economies of scale." 2017 WL 2423161,

14   at *12 (N.D. Cal. June 5, 2017).

15        The fact that *High-Tech* and *Nitsch* were antitrust cases only underscores why the requested 28%

16   percentage here is so excessive. An antitrust case is "arguably the most complex action to prosecute." *In re*

17   *NCAA Athletic Grant-in-aid Cap Antitrust Litig.*, No. 4:14-md-2541-CW, 2017 WL 6040065, at *3 (N.D. Cal.

18   Dec. 6, 2017) (cleaned up). By contrast, this case involved much less risk as demonstrated by the sheer number

19   of derivative complaints brought in federal and state court regarding this matter. *See* Dkt.  270-1 at 2-7

20   (cataloging nearly 25 actions). That so many firms were lining up to bring this case reflects the minimal risk

21   involved. *See* section V.B.1, *infra*. Had there been competitive bidding for the lead counsel role, there is no

22   reason to believe that the best fee bid would have exceeded 18% of a fund this large.

23        Other judges in this District also award lower percentages in megafund cases. *See Gutierrez v. Wells Fargo,*

24   *NA*, No. C 07–05923 WHA, 2015 WL 2438274, at *5 (N.D. Cal. May 21, 2015) (rejecting 25% of $203 million;

25

26        [2] *See also* Theodore Eisenberg, Geoffrey P. Miller & Roy Germano, *Attorneys' Fees in Class Actions: 2009-
     2013*, 92 N.Y.U. L. Rev. 937, 947 (2017) (noting that mean and median for cases over $100 million ranged
27   from 16.6% to 25.5%, but that variation was likely due to significantly smaller number of cases in data set);
     Federal Judicial Center, Manual for Complex Litigation—Fourth 188–89 (2004) (noting survey where "class
28   actions with recoveries exceeding $100 million found fee percentages ranging from 4.1% to 17.92%")

awarding only 9% in action alleging unfair banking practices) (Alsup, J.); *Alexander*, 2016 WL 3351017, at *2-3 (22% of a $226 million megafund settlement over wage-and-hour claims is "well above the typical range"; awarding instead 16.4%, "consistent with the higher end of awards in megafund cases") (Chen, J.); *In re Charles Schwab Corp. Secs. Litig.*, No. C 08–01510 WHA, 2011 WL 1481424, at *8 (N.D. Cal. Apr. 19, 2011) (awarding attorneys' fees of 9.25% where fund equaled $235 million) (Alsup, J.).[3]

Nevertheless, derivative counsel argue that this Court should depart *upward* from the 25% benchmark. Fee Motion 19-20. Although they claim that their fee request is within two standard deviations of the mean of Fitzpatrick's study, it's actually slightly more than two standard deviations above the mean.[4] Under Eisenberg and Miller's view that would make the request "presumptively unreasonable." *Attorneys fees in Class Action Settlements: An Empirical Study*, 1 J. EMPIRICAL L. STUD. 27, 74 (2004). Derivative counsel cite a list of eight outlying megafund settlements, all but one outside this Circuit, where courts awarded above-benchmark fees. *Id.* at 19 n.11. But "isolated string cites to cases in which class counsel received a higher percentage of the settlement are not particularly meaningful." *Alaska Elec. Pension Fund v. Bank of Am. Corp.*, No. 14-cv-7126, 2018 U.S. Dist. LEXIS 202526, at *14 (S.D.N.Y. Nov. 29, 2018). It is as easy to cite an equally lengthy list of cases on the other side, counseling a much lower award. The better approach is not cherry-picking but looking at the "empirical studies cited above, which together survey hundreds of cases, paint a far more comprehensive picture of the average percentage awarded to counsel in common fund settlements, thereby minimizing any potential sampling biases." *Grice v. Pepsi Beverages Co.*, 363 F. Supp. 3d 401, 407 (S.D.N.Y. 2019).

Derivative counsel and their expert Fitzpatrick observe that Fitzpatrick's 2010 survey found a mean and median of 17.9% and 16.9% respectively for funds between $100 and $250 million, and also that

---

[3] *See also In re LendingClub Secs. Litig.*, 2018 WL 4586669 (N.D. Cal. Sept. 24, 2018) (awarding 13.1% of $125 million); *New York State Teachers' Ret. Sys. v. GM Co.*, 315 F.R.D. 226 (E.D. Mich. 2016) (awarding 7% of $300 million); *Dial Corp. v. News Corp.*, 317 F.R.D. 426, 437 (S.D.N.Y. 2016) (refusing to award 30% of $244 million; instead awarding 20% of fund); *In re HP Secs. Litig*, No. 3:12-CV-05980-CRB, 2015 U.S. Dist. LEXIS 193707 (N.D. Cal. Nov. 13, 2015) (awarding 11% of $100 million settlement based upon a fee grid which varied based upon the amount recovered and the point during the litigation at which the settlement was achieved); *In re Indymac Mortgage-Backed Secs. Litig.*, 94 F. Supp. 3d 517, 523-25 (S.D.N.Y. 2015) (cataloging authorities and reducing 13% fee request to 8.2% of $346 million); *Good v. W. Virginia-American Water Co.*, 2017 U.S. Dist. LEXIS 104242, 2017 WL 2884535 (S.D. W. Va. July 6, 2017) (criticizing a megafund fee request of 30% and denying preliminary approval).

[4] 17.9% mean + 2 * (5.2 standard deviation) = 28.3% and the fee request is 28.33%.

1  Eisenberg/Miller/Germano's 2017 survey found an average of 22.3% for funds over $67.5 million. Fee Motion

2  19-20; Dkt. 278-1 at 14. But "given that the 22.3% figure comprises *all* cases with recoveries above $67.5

3  million, it does not necessarily reflect a reasonable baseline fee for this case." *In re Foreign Exch. Benchmark Rates*

4  *Antitrust Litig.*, 2018 WL 5839691, 2018 U.S. Dist. LEXIS 191373, at *18 (S.D.N.Y. Nov. 8, 2018) (awarding

5  13% of a $2.3 billion settlement).  Both derivative counsel and Fitzpatrick conspicuously decline to mention

6  Eisenberg's 2010 findings of a 12% mean and 10.2% median for funds over $175.5 million. Previously this

7  district has found Eisenberg's 2010 survey "more persuasive than the Fitzpatrick study for at least two

8  reasons." *In re High-Tech Emple. Antitrust Litig.*, 2015 WL 5158730, 2015 U.S. Dist. LEXIS 118052, at *50.

9  Eisenberg's 2010 survey spanned sixteen years and accordingly had a much larger sample size than Fitzpatrick's

10 study which spanned just two years. *Id.*

11      Fitzpatrick, whose declaration should be stricken or disregarded for the reasons discussed in section IV

12 below, encourages the Court to abandon the whole enterprise of reducing fee percentages to avoid windfalls

13 in megafund class actions. Dkt. 278-1 at 12-13; *contra Bluetooth*, 654 F.3d at 942; *WPPSS*, 19 F.3d at 1298. He

14 reasons that if courts simply drop the percentage at a given threshold (say $100 million) then rational class

15 counsel acting in their own self-interest would prefer to settle at $90 million rather than $100 million. Dkt.

16 278-1 at 13.  But as Fitzpatrick notes immediately thereafter, this problem is addressed by using a marginal

17 sliding scale like that regularly employed in the Seventh Circuit. *See, e.g., In re Capital One TCPA Litig.*, 80 F.

18 Supp. 3d 781, 804 (N.D. Ill. 2015). Fitzpatrick fears that that approach will lead attorneys to redirecting efforts

19 away from big cases "once they hit $100 million." Dkt. 278-1 at 13. But cases don't develop in such a linear

20 fashion. There's no alarm that goes off informing class counsel they've "hit $100 million" and can stop work

21 now. And even if counsel could guess when the supposed threshold was reached, in large cases, where the

22 competition among counsel is fierce, class counsel would not jeopardize their own position at the helm of the

23 class action by attempting to skimp on resources. Fitzpatrick provides no good reason to ignore the consensus

24 of authorities supporting a sliding scale, including the Ninth Circuit itself.

25      Derivative counsel suggests that this Court's decision in *Rodman v. Safeway* can justify the 28.33% fee

26 request here. Fee Motion 20. But *Rodman* is only notable as a foil to the fee request here. In *Rodman* this Court

27 awarded 28% of a $42 million *judgment* when "class counsel obtained an exceptional result for the class: a

28 judgment representing 100 percent of damages plus interest[,]…faced significant risks by engaging in

substantial motion practice, extensive discovery and hard-fought litigation surrounding essentially every conceivable issue [, and]… carried a heavy financial burden in representing the class on a contingency basis for more than six years." 2018 WL 4030558, 2018 U.S. Dist. LEXIS 143867, at *9. Not only is the size of the fund more than five times greater than that of *Rodman*, class counsel did not litigate this case to successful judgment, nor did they assume six years of substantial risk.

Derivative counsel's fee should not exceed $42.96 million (17.9% of the $240 recovery), which would increase relief to the corporation and its shareholders by over $25.04 million.

## IV.   The Court should strike or disregard the Fitzpatrick Declaration (Dkt. 278-1).

Cashman asks the Court to strike or, in the alternative, to disregard the Fitzpatrick Declaration because it contains inadmissible legal conclusions and other legal arguments regarding the calculation of attorneys' fees and reimbursement awards. Testimony regarding matters of law is inadmissible under either Rule 701 or 702 because "[r]esolving doubtful questions of law is the distinct and exclusive province of the trial judge." *Nationwide Transport Finance v. Cass Info. Sys.*, 523 F.3d 1051, 1058 (9th Cir. 2008) (cleaned up). It is well established that "that expert testimony by lawyers, law professors, and others concerning legal issues is improper." *Pinal Creek Group v. Newmont Mining Corp.*, 352 F. Supp. 2d 1037, 1043 (D. Ariz. 2005); *accord Stathakos v. Columbia Sportswear*, No. 15-cv-04543, 2018 WL 1710075, at *5 n.6 (N.D. Cal. Apr. 9, 2018) (striking paragraphs of a declaration contained "improper legal opinions" on the topic of reasonable fees). Such legal opinions invade this Court's province as the "sole arbiter of the law." *GPF Waikiki Galleria v. DFS Group*, 2007 WL 3195089, at *5 (D. Haw. Oct. 30, 2007). "[T]he court is well equipped to instruct itself on the law." *Stobie Creek Invs. v. United States*, 81 Fed. Cl. 358, 361 (Ct. Fed. Cl. 2008), *aff'd* 608 F.3d 1366 (Fed. Cir. 2010).

Here, the Fitzpatrick Declaration seeks to usurp the Court's role by telling the Court which Ninth Circuit legal factors to evaluate in considering whether to deviate from the benchmark, the available methodologies it should apply in awarding fees, and eventually concluding that "this fee request is within the range of reason" under his review of the law. *E.g.*, Fitzpatrick Decl. ¶¶ 9, 17-34, 39. The Fitzpatrick Declaration predominantly analyzes case law not facts. Derivative counsel may argue that the declaration presents factual "empirical data," but the declaration consists of little more than discussion of Fitzpatrick's interpretation of the case law and improper legal opinion dressed up as statistics, but derived exclusively from case law and legal

surveys. Citations to case law remain legal argument when the case law is averaged, and this is especially true when the averages are stretched into dubious legal conclusions. "Expert testimony" which simply surveys the law ought to be excluded under Rule 702. *See Lukov v. Schindler Elevator Corp.*, 2012 WL 2428251, at *2 (N.D. Cal. June 26, 2012) (excluding expert opinion based on "survey of state laws"); *Heighley v. J.C. Penney Life Ins. Co.*, 257 F. Supp. 2d 1241, 1260 & n.23 (C.D. Cal. 2003) (striking "interpretations of case law").

To the extent the Court considers the declaration, Fitzpatrick's opinion entails a deterrence-based class-members-don't-matter approach that would hold it appropriate to pay the attorneys 100% of the fund. Indeed, he has taken that exact position in his writings. Brian T. Fitzpatrick, *Do Class Action Lawyers Make Too Little?*, 158 U. PA. L. REV. 2043, 2047 (2010). It is little wonder that he is willing to endorse a contingency fee that pays attorneys over $3000/hour with a blended average rate of $1405 for all timekeepers—despite the fact that his own empirical work shows that a 16-17% fee is more typical in a settlement of this magnitude—and to excuse those characteristics that favor a downward adjustment, such as length of litigation and double-digit lodestar multiplier. See Fitzpatrick, 7 J. EMPIRICAL L. STUD. at 836, 839. This Court should join others in refusing to follow Fitzpatrick's opinion and apply its own discretion to award a more reasonable fee than the windfall requested by counsel. *E.g., In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*, 2017 WL 1352859, at *3 (N.D. Cal. Apr. 12, 2017).

## V. The lodestar crosscheck does not support derivative counsel's fee request because the lodestar is overstated by at least $5.58 million.

The lodestar cross-check should "confirm that a percentage of recovery amount does not award counsel an exorbitant hourly rate." *Bluetooth*, 654 F.3d at 945. "[I]n megafund cases, the lodestar cross-check assumes particular importance." *Alexander*, 2016 WL 3351017, at *2; *see also WPPSS*, 19 F.3d at 1298 (describing how percentage-based awards become particularly arbitrary in a megafund context). The crosscheck helps uncover the "disparity between the percentage-based award and the fees the lodestar method would support." *Wininger*, 301 F.3d at 1124 n.8 (9th Cir. 2002). "[C]ourts making common fund fee awards are ethically bound to perform a lodestar cross-check." Vaughn R. Walker & Ben Horwich, *The Ethical Imperative of a Lodestar Cross-Check: Judicial Misgivings About Reasonable Fees in Common Fund Cases*, 18 GEO J. LEGAL ETHICS 1453, 1454 (2005).

Here, the lodestar crosscheck confirms the excessiveness of plaintiffs' fee request. The lodestar here is overstated by millions of dollars because the document review was performed by contract and staff attorneys

that charged exorbitant billing rates. When appropriate rates are given to contract attorneys, the requested lodestar multiplier is actually 4.04. The true multiplier is likely higher because lodestar must be based on "hours *reasonably* expended" (*Bluetooth*, 654 F.3d at 944 (emphasis in original)), and the claimed hours appear to include needless post-settlement document review. The extent of overstatement cannot be determined due to the insufficient billing summaries submitted by derivative counsel. Even if the excessive rates and hours could be credited in full, the 3.03 lodestar multiplier is enormously inflated given the low amount of risk in this case. Plaintiffs' firms, including derivative counsel, spent significant time jockeying with each other for position because they knew the settlement would likely be lucrative given the government findings against the board. And the fee request for this settlement bears it out—co-lead counsel has agreed to pay even wildly unsuccessful plaintiffs' counsel from its award. The court should consider this arrangement as evidence of the low risk of litigation and as a sign that the requested $68 million fee represents a windfall to plaintiffs' counsel. Also, this Court should exercise its authority to apportion fees among counsel.

## A. The lodestar is overstated by at least $5.58 million because contract and staff attorneys billed 27,142 hours at exorbitant rates.

The lodestar materially overstates the value of counsel's services. Lodestar is calculated by multiplying the "number of hours reasonably expended on the litigation by a reasonable hourly rate." *Lewis v. Silvertree Mohave Homeowners' Ass'n, Inc.*, No. C 16-03581 WHA, 2017 WL 5495816, at *3 (N.D. Cal. Nov. 16, 2017). "The reasonableness of an hourly rate should be determined based on the rates prevailing in the community for 'lawyers of reasonably comparable skill, experience and reputation.'" *Id.* (quoting *Blum v. Stenson*, 465 U.S. 886, n.11 (1984)). Plaintiffs billed both contract and staff attorneys at hourly rates exorbitantly higher than market rates. Reducing the hourly rates for this work to the prevailing market rate would reduce the purported lodestar by perhaps $5.58 million.

| Biller Type | Hours | Claimed[5] |
|---|---|---|
| Contract Atty | 10,411.5 | $3,232,672 |
| Staff Attorney | 16,731.4 | $6,613,116 |

**Table 1**

A large chunk of the claimed lodestar in this case—$9,868,641 or 44.6%—derives from contract and staff attorney time. "As a general matter, contract attorneys are 'attorneys who are not permanent employees

---

[5] This table understates the number of contract attorney hours and overstates the number of staff attorney hours because some billers are listed as staff attorneys who were formerly contract attorneys. Fee Motion at 23 n.13. Counsel has not provided data to more accurately allocate the time between biller types.

of the law firm, are hired largely from outside staffing agencies, are not listed on counsel's law firm website or resume, are paid by the hour, and are hired on a temporary basis to complete specific projects related to a particular action,' whereas staff attorneys are 'non-partnership-track attorneys working on an hourly basis.'" *In re Anthem, Inc. Data Breach Litig.*, 2018 U.S. Dist. LEXIS 140137, at *124. Contract attorneys are generally hired to do relatively unskilled document review work that discerning paying clients refuse to pay a premium for and certainly cannot charge rates of up to $415/hour, which is what derivative counsel request from their client. "To permit marked-up rates and then add a multiplier on contract attorneys is an unfair burden on class funds." *Ark. Teacher Ret. Sys. v. State St. Bank*, 2018 U.S. Dist. LEXIS 111409, *248 (D. Mass. May 14, 2018).

The best measure of the market rate is to review what *paying clients* are willing to pay. *See In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 589 (S.D.N.Y. 2008) ("Perhaps the best indicator of the 'market rate' in the New York area for plaintiffs' counsel in securities class actions is to examine the rates charged by New York firms that defend class actions on a regular basis."). In today's legal market, clients refuse to tolerate law firms treating gigantic document review projects as a profit center, or in other words "a trough where herds of lawyers try to muscle their way to the front to quench their thirst without explanation and with no appreciation of moderation." *United States ex rel. Palmer v. C&D Techs., Inc.*, 2017 WL 1477123, at *6 (E.D. Pa. Apr. 25, 2017). A reasonable market rate that a *paying client* would pay for contract attorneys after the financial crisis and the glut in unemployed attorneys able to do the fungible work would be between *actual cost* and $75/hour. Even a decade ago, paying clients were not paying more than $125/hour for document review. *E.g., SEC v. Kirkland*, No. 6:06-cv-183, 2008 U.S. Dist. LEXIS 123308, at *5 (M.D. Fla. June 30, 2008). Contract attorneys should be credited at their actual market cost, which is the rate derivative counsel actual paid for their services. The best practice is to bill the contract attorneys at cost. In *Dial Corp. v. News Corp.*, the district court commended class counsel for treating contract attorney work as an expense, charging the 25,000 hours at $39/hour with no mark-up applied. 317 F.R.D. 426, 430 n.2 & 438 (S.D.N.Y. 2016); *see also Banas v. Volcano Corp.*, 47 F. Supp. 3d 957, 980 (N.D. Cal. 2014) (awarding contract attorney time as "costs" at billing rate of $47 to $59 per hour).

Plaintiffs' counsel seeks between $295 and $415/hour for contract attorney time, which they admit is much higher than the "$40-$50 hourly rates Plaintiffs' Counsel actually paid for them." Fee Motion at 23 n.13. Counsel further admits that counting all attorneys at this rate would reduce the lodestar by $3,408,783. *Id.* "[T]here is absolutely no excuse for paying these temporary, low-overhead employees $40 or $50 an hour and

then marking up their pay ten times for billing purposes." *In re Beacon Assocs. Litig.*, No. 09 Civ. 777, 2013 WL 2450960, at *18 (S.D.N.Y. May 9, 2013); *Pa. Pub. Sch. Employees Ret. Sys. v. Bank of Am. Corp.*, 318 F.R.D. 19, 26 (S.D.N.Y. 2016) (holding that charging the class $362/hr for temporary attorney work "is unreasonable and warrants a reduction in the attorneys' fees"). Thus, the lodestar is exaggerated by $3,408,783 due to contract attorney markup.

Staff attorneys are also systematically overbilled by co-lead counsel. As used by big law firms retained by sophisticated clients, staff attorneys are used to save clients' money on routine work such as document review. Paid about half the salary of partnership-track associates, staff attorneys are typically billed at the rates of junior associates—or even lower. *See* Catherine Rampell, *At Well-Paying Law Firms, a Low-Paid Corner*, N.Y. TIMES (May 23, 2011) (describing emergence of staff attorneys, describing their work, and noting entry level salaries that are only 30-40% as much as associates at the same firms), available online at: http://www.nytimes.com/2011/05/24/business/24lawyers.html. As employed by co-lead counsel in this case, staff attorneys represent a cynical profit center. Rates claimed for staff attorneys—up to $415/hour— actually exceed the costs these firms could credibly bill for junior associates doing the same work. Yet the salary for these attorneys is much lower than the salary for junior associates. Judge Koh appointed a special master to review time submitted by some of some of the same staff attorneys billed in this case and found that nearly all of them were compensated on hourly terms and "paid by the firms at hourly rates from $25.00 to $65.00, with the clear majority in the $40.00 range." *Anthem*, 2018 U.S. Dist. LEXIS 140137, at *125. While law firms are entitled to markup their full-time employees, the rates awarded must bear some resemblance to actual market rates. Staff attorney rates in this case simply do not. Even if the review of documents was assigned to associates, many courts refuse to permit full lodestar rates to be charged, given that large-scale document review can be performed more economically by other professionals. *E.g., City of Pontiac Gen. Emples. Ret. Sys.*, 954 F. Supp. 2d 276, 280 (S.D.N.Y. 2013) ("a sophisticated client, knowing these contract attorneys cost plaintiff's counsel considerably less than what the firm's associates cost (in terms of both salaries and benefits) would have negotiated a substantial discount in the hourly rates charged the client for these services").

Using appropriate staff attorney rates, the lodestar is overstated at least by another $2 million. In *Anthem*, Judge Koh reckoned the value of staff attorney time—including some of the same individuals claimed in this case—at $240/hour. 2018 U.S. Dist. LEXIS 140137, at *133. Because derivative counsel does not report

the precise breakdown of time billed by timekeepers when they were contract attorneys versus staff attorneys, the exact overbilling of staff attorneys is impossible to calculate precisely on this record. But assuming 14,000 of the 16,731.4 hours attributed to staff attorneys were billed while those timekeepers were staff attorneys (as opposed when they were contract attorneys), adjusting their rates to $240/hour would result in about an additional $2.173 million of overbilling. Altogether then, billing for contract and staff attorneys is about $5.58 million too high. Therefore, $16.8 million is a more accurate lodestar estimate, and the requested $68 million fee award represents an excessive 4.04 lodestar multiplier windfall for low-risk litigation.

### B.     Insufficient detail exists to evaluate the appropriateness of hours billed.

As discussed below in Section I.C.2, the Objector suspects that some of the billing in this case was excessive and should not be counted for the purposes of counsel's cross-check, but it is impossible to estimate the overstatement because plaintiffs' counsel have failed to provide sufficient detail in their billing summaries. The lodestar "serves little purpose as a cross-check if it is accepted at face value." *Citigroup Secs. Litig.*, 965 F. Supp. 2d at 389. *See generally* N.D. Cal. Procedural Guidance for Class Action Settlements, available at http://cand.uscourts.gov/ClassActionSettlementGuidance ("All requests for approval of attorneys' fees awards must include detailed lodestar information, even if the requested amount is based on a percentage of the settlement fund."). Lack of detailed billing submissions in their fee papers, however, make it impossible to precisely identify the duplication and inefficiencies. *See Intel Corp. v. Terabyte Int'l, Inc.*, 6 F.3d 614, 623 (9th Cir. 1993) (time records should demonstrate "whether the time devoted to particular tasks was reasonable and whether there was improper overlapping of hours").

For example, without detailed submissions, the Court lacks critical information regarding the timing of the work performed. Here, the lodestar includes work performed through June 2019 including 2405.7 hours devoted to document review in the month of December 2018. But the agreement in principle was reached on December 12, 2018 after a mediation session on December 4. Dkt. 278 at 34. Without detailed daily billing information, the Court is unable to confirm that plaintiffs ceased document review after settlement was reached. In *Citigroup Secs. Litig.*, the district court struck $7.5 million of lodestar where class counsel had brought on twenty additional contract attorneys to perform document review *after* the parties had reached the settlement agreement in principle. 965 F. Supp. 2d 369, 392 (S.D.N.Y. 2013).   The district court recognized that class

counsel was attempting to "inflate the lodestar." *Id.* Instead of providing sufficient lodestar detail, class counsel employs a "just trust us" approach, which is unacceptable in class action proceedings. *Dennis*, 697 F.3d at 869. It "is essential" to allow "class members an opportunity to thoroughly examine counsel's fee motion, inquire into the bases for various charges and ensure that they are adequately documented and supported." *Mercury Interactive*, 618 F.3d at 994.

### C.  Only a modest risk multiplier is appropriate here because plaintiffs counsel bore little risk of non-payment.

In *Perdue v. Kenny A.*, the Supreme Court established a "strong presumption that the lodestar is sufficient" without an enhancement multiplier. 559 U.S. 542, 546 (2010). A lodestar enhancement is justified only in "rare and exceptional" circumstances where "specific evidence" demonstrates that a lodestar alone "would not have been adequate to attract competent counsel." *Id.* at 554.

No such showing has been made here, and available evidence suggests the case posed relatively little risk. This is apparent from even a cursory glance at the number of duplicative derivative suits filed against Wells Fargo's palpably negligent board.

Plaintiffs' law firms didn't fear non-payment. They feared missing out.

Moreover, the vast majority of hours were billed when the case was nearly settled and risk negligible. Only 10% of the lodestar claimed by co-counsel accrued before this Court denied defendants' motion to dismiss. In contrast, nearly 40% of the lodestar was billed after September 2018, when promising mediations would have suggested settlement to be especially likely and imminent. Applying generous risk multipliers to each stage of the case results in a risk-adjusted lodestar of $42.96 million, or a 1.92 multiplier overall—even without reducing excessive contract attorney rates.

### 1.  The low risk of litigation is confirmed by the cavalcade of competing counsel who each hoped to prosecute the derivative action.

The low risk of this suit is confirmed by the parade of other plaintiffs and counsel who filed largely duplicative complaints in numerous forums in an effort to win a piece of the inevitable settlement. Frank Decl. ¶ 22. Numerous other suits were filed in federal court and the state courts of California and Delaware— including several of the original eight federal plaintiffs, stubbornly trying to score on the action. *Id.* ¶ 23. "Nor is an enhancement necessary to compensate counsel for the contingent nature of this case. … that conclusion

1   is bolstered by the number of attorneys seeking to be first in the door in filing lawsuit on behalf of shareholders,

2   and the intense level of competition litigating who would become lead counsel. … from counsel's perspective,

3   this was a 'promising' case, holding the prospect of a large fee recovery from solvent defendants." *In re Johnson*

4   *& Johnson Derivative Litig.*, No. 11-2511(FLW), 2013 WL 6163858, at *11 (D.N.J. Nov. 25, 2013); *contrast*

5   *Silverman v. Motorola Solutions, Inc.*, 739 F.3d 956, 958 (7th Cir. 2013) (affirming risk enhancement when "no

6   other law firm was willing to serve as lead counsel" at the case's inception).

7          The gravy train is so heavy that co-lead counsel has agreed to pay law firms that brought other cases

8   even where they provided no common benefit, who represent plaintiffs who lack any colorable claims. This is

9   illustrated vividly by Dkt. 278-12, which contains purported lodestar figures for *twelve* law firms that brought

10  three of the Delaware actions listed above. Plaintiffs have agreed to "allocate 5% of the awarded fee" to these

11  firms. Fee Motion at 5 n.4. Yet eight of these firms can also collect from the proposed settlement in No. CGC

12  16-554407 (S.F. Super.), where they "have been unable to agree upon an appropriate amount of attorneys' fees

13  and expenses…[and shall submit a fee request] not exceed $3,500,000 in fees and expenses." Even profoundly

14  unsuccessful derivative plaintiffs are poised to win attorneys' fees in this way. For example, see the discussion

15  concerning Faruqi & Faruqi LLP and Weisslaw LLP in Section VI, *infra*. In spite of filing a late complaint that

16  went nowhere and was dismissed with prejudice over a year ago—even these two firms stand to get paid for

17  their pointless work! The underlying claims were so manifestly valuable and low-risk that even tardy counsel

18  could—and did—successfully negotiate fees from Wells Fargo's treasury. Indeed, Wells Fargo has effective

19  agreed to pay both sides: counsel here and the Delaware counsel who sparred against intervention in those

20  actions. This outcome might please the insurers, who may pay less overall by ensuring potentially querulous

21  attorneys are paid off—but Objector fails to see how these payments benefit Wells Fargo or its shareholders.

22          Plaintiffs' expert Fitzpatrick offers legally incorrect justification for the hefty risk multiplier requested

23  here. He suggests risk was "compounded" by "fairly novel" claims and the fact that lead plaintiffs had to

24  "spend considerable time to consolidate it in one place." Dkt. 278-1 at 14-15. But the fact that a claim is

25  difficult or time-consuming is already reflected in the hours consumed. A multiplier "may not be awarded

26  based on a factor that is subsumed in the lodestar calculation"—either in the number of hours or hourly rate.

27  *Kenny A.*, 559 U.S. at 553. Thus, "the novelty and complexity of a case generally may not be used as a ground

28  for an enhancement because these factors presumably are fully reflected in the number of billable hours

recorded by counsel." *Id.* (cleaned up); *accord Bluetooth*, 654 F.3d at 942 n.7. Similarly, a multiplier based on outstanding results requires some "exceptional success" beyond the "expectancy of excellent or extraordinary results" already baked into pricey hourly rates. *WPPSS*, 19 F.3d at 1304.

Co-lead counsel is mistaken that they are entitled to a risk multiplier and an upward deviation of this circuit's 25% benchmark. Multipliers are not granted as a matter of course. *E.g. In re MagSafe Apple Power Adapter Litig.*, 571 F. App'x 560, 564 (9th Cir. 2014) (remanding where a 1.5 multiplier was applied without an explanation of why it was "necessary to adequately compensate class counsel"). On this record, little rebuts the "strong presumption" lodestar alone provides sufficient compensation, let alone a multiplier over 3 or 4.

### 2. The litigation had little risk to begin with, and most time was billed when the case had essentially zero risk.

From the outset, derivative litigation against Wells Fargo's board was an attractive prospect, which numerous plaintiffs' firms coveted. The extraordinary facts of the case made it intrinsically valuable. When this suit was filed September 29, 2016 Wells Fargo had *already* entered into settlements with three government agencies and had *already* acted to claw back compensation from two of its executives. Derivative counsel was hardly alone in recognizing the value of the case; by the time of filing, two derivative actions had already been filed in California state court, the first suits of many. Fully eight federal derivative actions would be consolidated before this Court on December 12, 2016. Dkt. 39. All of these plaintiffs filed suit *before* establishing futility because the potential rewards of becoming lead counsel in consolidated derivative litigation were so high.

Risk continued to decline as the Oversight Committee issued its report on April 10, 2017 assigning fault to numerous Wells Fargo executives. The report also summarized clawbacks from several former employees and structural reforms like separating the roles of Chairman and CEO, which plaintiffs implausibly take credit for. Litigation risk dropped further after the Court substantially denied defendants' motion to dismiss on May 4, 2017. Risk declined further on February 2, 2018 as the Board of Governors of Federal Reserve ("Fed") acted to enforce the 2016 CFPB and OCC settlements with Wells Fargo, serving letters on the board that it still "must take further steps to ensure that senior management establishes and maintains an effective risk management structure." The Fed also sent a letter to defendant Stephen Sanger, which assigned specific blame to directors:

> You were made aware of sales practices and other compliance issues while you
> were lead independent director.  However, you did not appear to initiate any

serious investigation or inquiry into the sales practices problems or put a proposal to do so to the WFC board.  In addition, you did not appear to lead the independent directors in pressing firm management for more information and action, even after you were aware of the seriousness of the problems.  This lack of inquiry and lack of demand for additional information are not consistent with the duties and responsibilities of the Lead Director . . .

Frank Decl. Ex. 2 (Fed letter to Stephen Sanger, Feb. 2, 2018).

Examining the hours submitted by co-lead counsel, the vast majority of lodestar—about 90%—was billed *after* this Court denied defendants' motion to dismiss, and most lodestar, over 72%, was billed on or after February 2018, when the case presented little risk to plaintiffs. The numbers strongly

| Date Range | Hours | Lodestar |
|---|---|---|
| Sep '16–Apr '17 | 3,833.35 | $2,289,371 |
| May '17–Jan '18 | 6,420.6 | $3,888,793 |
| Feb '18–Sep '18 | 16,892.3 | $7,412,253 |
| Oct '18–Jun '19 | 21,221.5 | $8,833,574 |

Table 2

suggest that counsel engaged in needless billing in an effort to rationalize their $68 million fee request, because a 3.03 multiplier (albeit padded with contract and staff attorneys) sounds much more reasonable than the 5.3 multiplier that would have resulted if billing after September 2018 was curtailed. Consider document review. In November 2018, co-lead counsel billed 4612.8 hours on document review—more in that month than any other month in the case. This frenetic pace of document review occurred even though the October 15-16 mediation session made substantial "progress" such that an additional mediation was scheduled in early December 2018, where an agreement-in-principle was reached. Dkt. 278 at 36. Even then, 2405.7 hours were billed for discovery in December 2018, an astonishing amount of work in a case on the cusp of settlement where zero depositions were ever taken.

Even if this late work was directed faithfully for the sole benefit of the corporation, hours billed in 2018-19 were undoubtably less risky than hours billed before the motion to dismiss was decided. Assuming for the sake of argument that plaintiffs had only a 25% chance of prevailing over

| Date Range | Multiplier | Risk Adj. |
|---|---|---|
| Sep '16–Apr '17 | 4 | $9,157,487 |
| May '17–Jan '18 | 3.03 | $11,783,042 |
| Feb '18–Sep '18 | 1.66 | $12,304,341 |
| Oct '18–Jun '19 | 1.1 | $9,716,932 |
| Table 3 | **Sum:** | $42,961,802 |

dismissal, then those early hours might merit a 4.0 lodestar multiplier to compensate counsel for the risk of failure. (Of course, the odds of surviving a motion to dismiss were substantially higher than 25%.) And if the case were still extremely risky—less than one third chance of success—through January 2018, then the 3.03 multiplier would be appropriate for those hours. And then imagining the risk dropped to 40% after the Federal

1   Reserve enforcement action and dropped to about a 9% chance of failure after September 2018 when there

2   was a promising mediation, then the lodestar multipliers shown in the table would be appropriate and yield an

3   overall fee award of $42.96 million (1.92 multiplier overall). These risk estimates are generous and also vastly

4   overcompensate co-lead counsel for contract and staff attorneys time.

5   Objector has grounded his suggested fee award with the generous lodestar crosscheck shown in

6   Table 3. In contrast co-lead counsel's suggested fee award compensates them with a wildly excessive effective

7   4.04 multiplier, which is even more excessive given that most hours were billed when only modest risk

8   remained in the suit. The Court would be well justified to award less than 17.9%.

9   **VI.   The Court should allocate the fee award among co-lead counsel and require disclosure of**

10      **any side-agreements regarding fees.**

11   The fee application seeks a lump sum, with no indication of how the fee award will actually be split

12   among plaintiffs' counsel (except that 5% will go to Delaware Derivative Counsel). Fee Application at 5 n.4.

13   The Settlement here purports to give co-lead counsel the responsibility of allocating fees to plaintiffs' counsel.

14   Settlement, Dkt. 270-1 ¶ 47. But this Court should allocate the fee award: "the district court has an independent

15   duty under Federal Rule of Civil Procedure 23 to the class and the public to ensure that attorneys' fees are

16   reasonable and divided up fairly among plaintiffs' counsel." *In re High Sulfur Content Gasoline Prods. Liab. Litig.*,

17   517 F.3d 220, 227 (5th Cir. 2008); *In re LendingClub Secs. Litig.*, 2018 WL 4586669 (N.D. Cal. Mar. 16, 2018)

18   (ordering that "class members must be clearly informed about how two groups of attorneys in the federal and

19   state litigations would split the requested fee award"); *Snyder v. Ocwen Loan Servicing, LLC*, 2019 WL 2103379,

20   2019 U.S. Dist. LEXIS 80926, at *37-*38 (N.D. Ill. May 14, 2019) ("the Court has 'an independent duty under

21   Federal Rule of Civil Procedure 23 to the class and the public to ensure that attorneys' fees are reasonable  and

22   divided up fairly among plaintiffs' counsel."); Newberg on Class Actions § 15:23 (5th ed.) ("[I]t is axiomatic

23   that the court has the ultimate authority to determine how the aggregate fee is to be allocated among counsel.").

24   The Court "must not … delegate that duty to the parties." *High Sulfur*, 517 F.3d at 228 (cleaned up).

25   The appellants in *High Sulfur* complained that the district court had sealed the fee allocation list, such that they

26   could not compare their fee awards to those of other attorneys. The Fifth Circuit agreed: "One cannot compare

27   apples to oranges without knowing what the oranges are." *Id.* at 232. That court further held that it was

28   impermissible for the district court to defer to the allocation proposed by the attorneys themselves. "[O]ur

precedents do not permit courts simply to defer to a fee allocation proposed by a select committee of attorneys, in no small part, because 'counsel have inherent conflicts.' As Judge Ambro noted, 'They make recommendations on their own fees and thus have a financial interest in the outcome. How much deference is due the fox who recommends how to divvy up the chickens?'" *Id.* at 234-35 (quoting *In re Diet Drugs Prods. Liab. Litig.*, 401 F.3d 143, 173 (3d Cir. 2005)).

While counsel may present a suggested allocation to the shareholders and the Court, it is not permissible for the parties to divide up the spoils *ex post*, outside the view of the shareholders and the Court, purely according to the whim of co-lead counsel. Court oversight of the fee division is especially necessary here for three reasons. First, the Court should determine allocation of the fee award to protect shareholders from undisclosed side agreements among plaintiffs' counsel. If one of the plaintiffs' law firms negotiated a side-deal with lead class counsel to accept less than its proportionate share of lodestar (or to a smaller multiplier than is being requested from the Court), the premium should redound to the benefit of the shareholders, rather than the law firm that has secretly extracted a return greater than would be approved by the Court. *Cf. Pearson v. NBTY, Inc.*, 772 F.3d 778, 786 (7th Cir. 2014).

That is precisely what happened here. While the Fee Application provides the Delaware Derivative Counsel's lodestars (Dkt. 278-12), Co-Lead Counsel argues that those lodestars are not being submitted "for purposes of calculating the lodestar for this fee application." Fee Application at 5 n.4. But it makes no sense to exclude those lodestars from the fee application when co-lead counsel intends to pay Delaware Derivative Counsel 5% of the fee award. *Id.* Regardless of how they structure their Fee Application, the reality is that Delaware Derivative Counsel would receive $3.4 million for their $5.2 million lodestar (0.65 multiplier). The fact that these law firms would accept less than their lodestar suggests the existence of side agreements among these firms that should be disclosed to the Court who will determine whether any windfall should redound to the shareholders' benefit.

Second, the Court should allocate the fee award among the law firms to ensure that firms are not being paid twice for the same work. Eight law firms that are seeking compensation here are also seeking compensation in a California derivative case: *In re Wells Fargo & Co. Auto Ins. Deriv. Litig.*, No. CGC-17-561118 (Sup. Ct. Cal.) attached as Frank Decl. Ex. 3. Two of those firms, Berman Tabacco and Berger & Montague, were counsel in *Mass. Laborers' Pension Fund v. Wells Fargo & Co.*, C.A. No. 12997-VCG (Del. Ch.). See Dkt.

278-12 at 1. But the Settlement here releases all of the claims from the *Mass. Laborers'* settlement, Dkt. 270-1 at 5, 15-16, and the California CPI Settlement excludes the *Mass. Laborers'* claims. Thus, it is unclear why Berman Tabacco and Berger & Montague should be paid in both Settlements. Six other firms are seeking fees for work performed in other litigation, raising the likelihood of double-dipping. Frank Decl. ¶ 24.

Third, this Court should allocate the fees to ensure that two of the law firms (Faruqi & Faruqi, LLP and WeissLaw LLP) are estopped from receiving fees in this Settlement based on representations made to the Court of Chancery of the State of Delaware in *Rosenfeld v. Stumpf*, C.A. No. 2017-0383 (Del. Ch.). When dismissing the *Rosenfeld* action, the parties represented to the Court that "No compensation in any form has passed directly or indirectly from any Defendant to any Plaintiff or Plaintiffs' attorneys and no promise to give any such compensation has been made." *Rosenfeld* Action, Stipulation and Order of Dismissal at 3 (attached as Frank Decl. Ex. 4). But, co-lead counsel expressly stated in their fee motion that "as part of the Settlement, Co-Lead Counsel have agreed to allocate 5% of the awarded fee" to the Delaware Derivative Counsel. Fee Application, Dkt. 277 at 5 n.4. Thus, there seems to have been an agreement regarding compensation for those two law firms; if so, it would be contrary to the parties' representations in *Rosenfeld*.

"Public confidence in the fairness of attorney compensation in class actions is vital to the proper enforcement of substantive law." *Laffitte*, 376 P.3d at 688-92 (Liu, J., concurring). As an initial matter, class counsel should produce all agreements concerning the distribution of attorneys' fees. See Rule 23(e)(3) (requiring identification of "any agreement made in connection" with class action settlement). Further, the Court should award each of the firms individual sums rather than allocating a lump sum to class counsel, and enjoin them from redistribution.

## CONCLUSION

The Court should deny fee approval until derivative counsel discloses detailed billing and the division of the fee award amongst counsel. Once disclosed, the Court should assign awards to each law firm, such that the total fee award does not provide a windfall to any firm. Objector suggests a reasonable fee would be no more than $42.96 million, or 17.9% of the gross fund, and the Court should consider awarding less than that.

Dated: July 11, 2019                    Respectfully submitted,

                                        /s/ Theodore H. Frank
                                        Theodore H. Frank (SBN 196332)
                                        HAMILTON LINCOLN LAW INSTITUTE
                                        CENTER FOR CLASS ACTION FAIRNESS
                                        1629 K Street NW, Suite 300
                                        Washington, DC 20006
                                        Voice: 703-203-3848
                                        Email: ted.frank@hlli.org

                                        Attorneys for Objector John Cashman

1

2                               PROOF OF SERVICE

3          I hereby certify that on this day I electronically filed the foregoing Objection using the CM/ECF filing

4    system thus effectuating service of such filing on all ECF registered attorneys in this case.

5          DATED this 11th day of July, 2019.

6                                                        /s/ Theodore H. Frank
                                                         Theodore H. Frank
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28