Richard M. Heimann (063607)
*rheimann@lchb.com*
Katherine C. Lubin (259826)
*kbenson@lchb.com*
Michael K. Sheen (288284)
*msheen@lchb.com*
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
Facsimile:  (415) 956-1008

*Attorneys for Co-Lead Plaintiff Fire & Police Pension
Association of Colorado and Co-Lead Counsel*

Maya Saxena (*Pro hac vice*)
*msaxena@saxenawhite.com*
Joseph E. White, III (*Pro hac vice*)
*jwhite@saxenawhite.com*
Lester R. Hooker (241590)
*lhooker@saxenawhite.com*
SAXENA WHITE P.A.
150 East Palmetto Park Road, Suite 600
Boca Raton, FL 33432
Telephone:  (561) 394-3399
Facsimile:  (561) 394-3382

*Attorneys for Co-Lead Plaintiff The City of Birmingham
Retirement and Relief System and Co-Lead Counsel*

[Additional Counsel on Signature Page]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE WELLS FARGO & COMPANY SHAREHOLDER DERIVATIVE LITIGATION | Lead Case No. 3:16-cv-05541-JST<br><br>**REPLY IN FURTHER SUPPORT OF (I) CO-LEAD PLAINTIFFS' MOTION FOR FINAL APPROVAL OF THE SETTLEMENT AND (II) CO-LEAD COUNSEL'S MOTION FOR AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT AWARDS TO CO-LEAD PLAINTIFFS** |
| This Document Relates to:<br><br>ALL ACTIONS. | Date: August 1, 2019<br>Time: 2:00 PM<br>The Honorable Jon S. Tigar<br>Courtroom 9, 19th Floor |

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT.................................................................................................... 1

ARGUMENT ............................................................................................................................... 2

I.      THE LACK OF OBJECTIONS TO THE SETTLEMENT OR
        REIMBURSEMENT AWARDS TO CO-LEAD PLAINTIFFS SUPPORTS
        THEIR APPROVAL........................................................................................................... 2

II.     OBJECTORS MOUNT NO CREDIBLE CHALLENGE TO THE FEE REQUEST ....... 3

        A.      Objectors' Proposed Rule Limiting Fees in "Megafund" Cases Improperly
                Disregards the Parties' Agreement and Contravenes Ninth Circuit Law. .............. 3

        B.      Plaintiffs' Counsel's Lodestar, Including Rates and Hours for Staff and
                Contract Attorneys, Is Well Justified and Exhaustively Detailed.......................... 9

        C.      Objectors' Claim that Plaintiffs' Counsel Faced "Minimal Risk"
                Disregards Applicable Law and the Record........................................................ 13

        D.      The Record Supports Crediting Co-Lead Counsel for Helping Achieve the
                Reforms and Clawbacks, But the Fee Is Reasonable In Any Event. ................... 16

        E.      Co-Lead Counsel Should Allocate the Fee as They Deem Appropriate.............. 18

        F.      LeBendig's Challenge to the Fee Request Is Baseless......................................... 20

CONCLUSION........................................................................................................................... 20

# TABLE OF AUTHORITIES

**Page**

## Cases

*Andrews v. Lawrence Livermore Nat'l Sec., LLC*,
2012 WL 160117 (N.D. Cal. Jan. 18, 2012) ............................................................. 10

*Ark. Teacher Ret. Sys. v. State St. Bank & Tr. Co.*,
2018 U.S. Dist. LEXIS 111409 (D. Mass. May 14, 2018) ...................................... 12

*Banas v. Volcano Corp.*,
47 F. Supp. 3d 957 (N.D. Cal. 2014) ....................................................................... 11

*Bell Atl. Corp. v. Bolger*,
2 F.3d 1304 (3d Cir. 1993) ......................................................................................... 3

*Dial Corp. v. News Corp.*,
317 F.R.D. 426 (S.D.N.Y. 2016) ............................................................................. 11

*Dyer v. Wells Fargo Bank, N.A.*,
303 F.R.D. 326 (N.D. Cal. 2014) ........................................................................ 5, 13

*Eubank v. Pella Corp.*,
2019 WL 1227832 (N.D. Ill. Mar. 15, 2019) ............................................................ 6

*Fleming v. Kemper Nat'l Servs., Inc.*,
373 F. Supp. 2d 1000 (N.D. Cal. 2005) .................................................................... 10

*Hefler v. Wells Fargo & Co.*,
2018 WL 6619983 (N.D. Cal. Dec. 18, 2018) ................................................. *passim*

*In re Anthem, Inc. Data Breach Litig.*,
2018 WL 3960068 (N.D. Cal. Aug. 17, 2018) ..................................................... 9, 11

*In re Atmel Corp. Derivative Litig.*,
2010 WL 9525643 (N.D. Cal. Mar. 31, 2010) ............................................. 8, 17, 18

*In re Bank of N.Y. Mellon ADR FX Litig.*,
No. 16-cv-00212-JPO-JLC (S.D.N.Y. Apr. 29, 2019), Dkt. 154 ............................ 10

*In re Bank of N.Y. Mellon ADR FX Litig.*,
No. 16-cv-00212-JPO-JLC (S.D.N.Y. June 17, 2019), Dkt. 161 ........................... 11

*In re Bank of N.Y. Mellon Corp. Forex Transactions Litig.*,
No. 12-md-2335 (S.D.N.Y. Aug. 17, 2015), Dkt. 622-1 .......................................... 11

*In re Bank of N.Y. Mellon Corp. Forex Transactions Litig.*,
No. 12-md-2335 (S.D.N.Y. Oct. 7, 2015), Dkt. 642 ................................................ 11

*In re Bluetooth Headset Prods. Liab. Litig.*,
654 F.3d 935 (9th Cir. 2011) ...................................................................................... 5

*In re Caremark Int'l Inc. Derivative Litig.*,
698 A.2d 959 (Del. Ch. 1996) ................................................................................... 14

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
2016 WL 4126533 (N.D. Cal. Aug. 3, 2016) .................................................. 5, 6, 12

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
2017 WL 5969318 (N.D. Cal. Feb. 28, 2017) .......................................................... 19

*In re Cendant Corp. Litig.*,
264 F.3d 201 (3d Cir. 2001) ........................................................................................ 4

# TABLE OF AUTHORITIES
### (continued)

Page

*In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices & Prods. Liab. Litig.*,
No. 17-md-02777-EMC (N.D. Cal. July 3, 2017), Dkt. 181 .................................................. 10

*In re High Sulfur Content Gasoline Prods. Liab. Litig.*,
517 F.3d 220 (5th Cir. 2008)................................................................................................. 19

*In re LendingClub Sec. Litig.*,
2018 WL 4586669 (N.D. Cal. Sept. 24, 2018) ...................................................................... 19

*In re Lioderm Antitrust Litig.*,
2018 WL 4620695 (N.D. Cal. Sept. 20, 2018) ...................................................................... 10

*In re Omnivision Techs., Inc.*,
559 F. Supp. 2d 1036 (N.D. Cal. 2008) ................................................................................... 9

*In re Optical Disk Drive Prods. Antitrust Litig.*,
2016 WL 7364803 (N.D. Cal. Dec. 19, 2016) .................................................................. 4, 10

*In re Rambus Inc. Derivative Litig.*,
2009 WL 166689 (N.D. Cal. Jan. 20, 2009) ........................................................................... 4

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
2013 WL 1365900 (N.D. Cal. Apr. 3, 2013) ........................................................................... 5

*In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, and Prods. Liab. Litig.*,
2013 WL 12327929 (C.D. Cal. June 17, 2013) ....................................................................... 4

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices & Prods. Liab. Litig.*,
2017 WL 1352859 (N.D. Cal. Apr. 12, 2017) ......................................................................... 8

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices & Prods. Liab. Litig.*,
914 F.3d 623 (9th Cir. 2019)................................................................................................. 20

*In re Wash. Pub. Power Supply Sys. Sec. Litig.*,
19 F.3d 1291 (9th Cir. 1994)................................................................................................... 5

*Klein v. Gordon*,
2019 WL 1751839 (C.D. Cal. Feb. 12, 2019)....................................................................... 16

*Perdue v. Kenny A.*,
559 U.S. 542 (2010) ................................................................................................................. 6

*Reiter v. Fairbank*,
2016 WL 6081823 (Del. Ch. Oct. 18, 2016)......................................................................... 15

*Rodman v. Safeway, Inc.*,
2018 WL 4030558 (N.D. Cal. Aug. 23, 2018)............................................................... 6, 7, 13

*Rose v. Bank of Am. Corp.*,
2014 WL 4273358 (N.D. Cal. Aug. 29, 2014)....................................................................... 10

*Snyder v. Ocwen Loan Servicing, LLC*,
2019 WL 2103379 (N.D. Ill. May 14, 2019) ........................................................................ 19

*Stathakos v. Columbia Sportswear Co.*,
2018 WL 1710075 (N.D. Cal. Apr. 9, 2018) ........................................................................... 8

*Van Gerwen v. Guar. Mut. Life Co.*,
214 F.3d 1045 (9th Cir. 2000)................................................................................................. 6

## TABLE OF AUTHORITIES
**(continued)**

**Page**

*Vizcaino v. Microsoft Corp.*,
   290 F.3d 1043 (9th Cir. 2002)...................................................................................... 4, 5

**Other Authorities**

Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee*
   *Awards*,
   7 J. EMPIRICAL LEGAL STUD. 811 (2010) ..................................................................... 7

*Newberg on Class Actions*
   § 15:23 (5th ed.) ......................................................................................................... 18

Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees in Class Action Settlements: An*
   *Empirical Study*,
   1 J. EMPIRICAL LEGAL STUD. 27 (2004) ....................................................................... 7

**PRELIMINARY STATEMENT**[1]

While no Wells Fargo shareholder objects to this historic Settlement or the proposed Reimbursement Awards for Co-Lead Plaintiffs, four individual investors—who collectively own less than 0.0002% of Wells Fargo's outstanding shares—challenge Co-Lead Counsel's fee request. Their objections are meritless.

Ted Frank, a professional objector with a well-documented animus toward plaintiff-attorney fees, envisions covetous plaintiffs' lawyers lined up for a "gravy train" to extract "nuggets of gold" from Wells Fargo. Frank Obj. 2, 20. But his colorful (mixed) metaphors cannot supplant the governing law and established facts, which amply support the requested fee. Frank's portrayal of this hard-fought, highly uncertain litigation—involving one of the most difficult theories in corporate law—as posing "minimal risk" (*id.* at 10) is pure fantasy. And his view that lower fees are mandated in "megafund" settlements has already been rejected by the Ninth Circuit. Frank's unavailing arguments are largely parroted by "serial meritless objectors" Steve Miller and John Pentz, *see Hefler v. Wells Fargo & Co.*, 2018 WL 6619983, at *16 n.19 (N.D. Cal. Dec. 18, 2018), as well as Kevin Fisher, who objects through a criminal defense lawyer with no discernable experience in derivative litigation.

Additionally, while Frank casts the rates billed for contract and staff attorneys as "surreal" or "fake" (Frank Obj. 1), the record demonstrates those lawyers performed high-level document review and analysis akin to junior associates—not "unskilled" (*id.* at 16) or "clerical" work (Miller Obj. 3)—and their rates reflect those prevailing in the relevant legal community. This Court approved similar staff attorney rates in *Hefler*, and other courts have approved these rates for some of these same staff and contract attorneys. The Court should also decline the Professional Objectors' invitation to become the first to *require*, in evaluating the reasonableness of a requested fee, that contract or staff attorneys be billed "at cost." But even applying at-cost

---

[1] Capitalized terms and abbreviations retain their meanings from the opening brief. The objections by professional objectors Steve Miller and John Pentz (Dkt. 279) as well as Theodore ("Ted") Frank (Dkt. 281) (collectively, "Professional Objectors") are referenced as "Miller Obj." and "Frank Obj.," and the objections by Cathy LeBendig (Dkt. 282) and Kevin Fisher (Dkt. 284) (together with the Professional Objectors, "Objectors") are referenced as "LeBendig Obj." and "Fisher Obj." Unless otherwise indicated, all emphasis has been added, and all internal citations and quotation marks have been omitted.

rates for contract attorneys, as well as assigning the lowest staff attorney rate billed in this case ($300, lower than in *Hefler*) to *all* staff attorney time, would result in a lodestar multiplier within the presumptively acceptable 1.0-4.0 range.

Indeed, while Frank purports to advocate a fee reflecting the "prevailing market rate" for counsel's services (Frank Obj. 15), he discounts that the fee was heavily negotiated by perhaps the most sophisticated market participant there is: Wells Fargo.  No absent class member recoveries are at issue in this derivative action, and Frank provides no credible reason why Wells Fargo would purposefully cheat *itself* out of money by agreeing to an excessive fee.

The Court should also reject Objectors' attempt to undermine the Parties' bargained-for agreement that the Clawbacks and Reforms add $80 million in value to this Settlement.  The facts memorialized in the Settlement Stipulation and recounted by the Mediator, moreover, demonstrate Co-Lead Counsel's efforts and the import of this derivative action constitute *a* proximate cause of those measures.  But even assessing the $68 million requested fee (which includes no reimbursement for costs) based solely on the $240 million cash recovery yields only a slight upward adjustment from the Ninth Circuit's 25% benchmark.  That is well justified in light of this extraordinary recovery, the risks Plaintiffs' Counsel faced in achieving it, their devotion of over 2 ½ years to pursuing Wells Fargo's claims on a contingency basis, and the reasonable 3.03 lodestar multiplier.

The Court can readily dispense with Objectors' remaining arguments.  Contending Co-Lead Counsel should be precluded from allocating the fee award, Frank once again resorts to supposition accompanied by inapposite caselaw and mischaracterizations of the record.  Finally, LeBendig's counsel provides no credible justification for compensation, and their passing challenge to Co-Lead Counsel's lodestar is baseless.  The fee request should be approved.

## **ARGUMENT**

### I.   THE LACK OF OBJECTIONS TO THE SETTLEMENT OR REIMBURSEMENT AWARDS TO CO-LEAD PLAINTIFFS SUPPORTS THEIR APPROVAL

Following an extensive Notice campaign, none of the holders of Wells Fargo's 4.5 billion outstanding shares—which include some of the world's largest institutional investors—objected

to the Settlement, raising "a strong presumption" that its terms are favorable.  *Hefler*, 2018 WL 6619983, at *9.  Nor do any shareholders object to granting a $25,000 Reimbursement Award to each Co-Lead Plaintiff, which should likewise be approved.

While recognizing this Court rarely approves plaintiff awards of more than $5,000, Co-Lead Counsel submit this case warrants an exception to the general rule.  Of particular significance, unlike class cases where such awards would detract from class members' recovery, here they will come from *Co-Lead Counsel's fee*.  Further, as recounted in their declarations, Co-Lead Plaintiffs devoted significant time to obtaining this exceptional result for Wells Fargo and were intimately involved in nearly every aspect of the case.  FPPA Decl. (Dkt. 278-4) ¶¶ 4-7; Birmingham Decl. (Dkt. 278-5) ¶¶ 4-7.  They have thus complied with the Court's directive to "provid[e] appropriate detail and documentation in connection with their motion for service awards."  Prelim. Approval Order ("PA Order") (Dkt. 274) 13.

## II.    OBJECTORS MOUNT NO CREDIBLE CHALLENGE TO THE FEE REQUEST

### A.    Objectors' Proposed Rule Limiting Fees in "Megafund" Cases Improperly Disregards the Parties' Agreement and Contravenes Ninth Circuit Law.

The Professional Objectors and Fisher ask the Court to reduce Plaintiffs' Counsel's fee because this is a "megafund" case.  Caselaw and common sense dictate otherwise.

As an initial matter, Objectors' challenges to the fee in this *derivative* action are fundamentally inapposite.  They recycle arguments regularly advanced in *class* actions, where absent class members' recoveries are directly impacted by class counsel's fee.  But because recoveries in derivative cases "belong to the corporation on whose behalf the suit was brought," *Bell Atl. Corp. v. Bolger*, 2 F.3d 1304, 1307 n.4 (3d Cir. 1993), any attorneys' fee comes directly and solely from *the corporation*.  That distinction is particularly significant here, as Co-Lead Counsel negotiated the fee with Wells Fargo.

Those negotiations commenced, moreover, only after the substantive terms of the Settlement were reached.  *See, e.g.*, Settlement Stip. (Dkt. 270-1) § V.H(44); Weinstein Decl. (Dkt. 270-3) ¶¶ 7-12.  Further, contrary to Frank's and Fisher's suggestion that Wells Fargo was motivated to pay an excessive fee to conclude the litigation, the Settlement "is expressly not

1   conditioned upon[] the approval of an application for attorneys' fees." Settlement Stip.

2   § V.A(11).  Indeed, that the agreed-upon fee may in part reflect Wells Fargo's desire to achieve

3   "global peace" (Frank Obj. 4) attests to the quality of Plaintiffs' Counsel's work resolving this

4   case and multiple related proceedings—for which they should be rightfully compensated.  The

5   facts, in short, demonstrate sophisticated market participants engaged at arm's length, with the

6   aid of highly experienced Mediators, to arrive at a reasonable result.  The Parties' agreement

7   should therefore be accorded substantial weight, regardless of this case's "megafund" status.  *See*

8   *In re Rambus Inc. Derivative Litig.*, 2009 WL 166689, at *4 (N.D. Cal. Jan. 20, 2009) (in

9   granting fee request, noting "the proposed fee award is the product of arm's-length negotiation

10  between counsel highly experience[d] in shareholder derivative actions and agreed upon only

11  after the other terms of the Settlement were negotiated").

12          Further, the Ninth Circuit expressly has "not adopt[ed]" a categorical rule that the

13  percentage of an award *must* "decrease[] as the amount of the fund increases."  *Vizcaino v.*

14  *Microsoft Corp.*, 290 F.3d 1043, 1047 (9th Cir. 2002).  Fund size is "*one* relevant circumstance

15  to which courts must refer."  *Id.* at 1047; *see also In re Optical Disk Drive Prods. Antitrust Litig.*,

16  2016 WL 7364803, at *12 (N.D. Cal. Dec. 19, 2016) (rejecting objectors' argument that because

17  the case involved a "megafund," it "require[ed] an automatic reduction in attorney fees," and

18  observing "there is no automatic rule in the Ninth Circuit which requires an automatic

19  percentage").  And while some courts have endorsed a sliding scale approach, it has also "been

20  criticized by respected courts and commentators, who contend that such a fee scale often gives

21  counsel an incentive to settle cases too early and too cheaply."  *In re Cendant Corp. Litig.*, 264

22  F.3d 201, 284 n.55 (3d Cir. 2001); *see also* Fitzpatrick Decl. (Dkt. 278-1) ¶¶ 22-23; Supp. Decl.

23  of Brian T. Fitzpatrick ("Fitzpatrick Supp. Decl.") ¶¶ 3-5 (rebutting Ted Frank's arguments on

24  this point); *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices & Prods.*

25  *Liab. Litig.*, 2013 WL 12327929, at *34 n.16 (C.D. Cal. June 17, 2013) ("agree[ing] with

26  Plaintiffs' expert [Professor Fitzpatrick] and other courts, which have found that decreasing a fee

27  percentage based only on the size of the fund would provide a perverse disincentive to counsel to

28  maximize recovery for the class").  Rather, the relevant question, in megafund and non-

megafund cases alike, is whether the proposed award "is proper and fair in light of the amount and quality of the work done by the attorneys." *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2013 WL 1365900, at *8 (N.D. Cal. Apr. 3, 2013) (awarding 28.6% of $1.08 billion fund and rejecting objectors' argument to "reduce the award or use a sliding scale model . . . to avoid a windfall for the attorneys").

In *In re Cathode Ray Tube (CRT) Antitrust Litigation*, where several objectors "urge[d] the Court either not to use a percentage-of-recovery method, or to reduce the award, because this [wa]s a megafund case," this Court explained "the best way to guard against a windfall is first to examine whether a given percentage represents too high a multiplier of counsel's lodestar." 2016 WL 4126533, at *6 (N.D. Cal. Aug. 3, 2016). The Court's analysis is consistent with the Ninth Circuit's instruction in *In re Bluetooth Headset Products Liability Litigation* (a case on which Frank relies) that "where awarding 25% of a 'megafund' would yield windfall profits for class counsel *in light of the hours spent on the case*, courts should adjust the benchmark percentage or employ the lodestar method instead." 654 F.3d 935, 942 (9th Cir. 2011). The court of appeals likewise admonished against categorical rules in *In re Washington Public Power Supply System Securities Litigation*, explaining "courts cannot rationally apply any particular percentage—whether 13.6 percent, 25 percent or any other number—in the abstract, without reference to all the circumstances of the case." 19 F.3d 1291, 1298 (9th Cir. 1994) ("*WPPSS*"). Accordingly, while Miller relies heavily on *WPPSS*, that decision actually makes clear there is nothing "inherently reasonable" about the *per se* megafund rule he espouses. *Id.*

Crosschecking the requested percentage fee against Plaintiffs' Counsel's lodestar demonstrates there is no windfall, as the resulting 3.03 multiplier resides well within the "presumptively acceptable range of 1.0-4.0" in this Circuit. *Dyer v. Wells Fargo Bank, N.A.*, 303 F.R.D. 326, 334 (N.D. Cal. 2014); *see also Vizcaino*, 290 F.3d at 1046, 1051 n.6 (approving 28% fee from $96.885 million fund, corresponding to 3.65 lodestar multiplier).[2] It is also *lower* than

---

[2] Ignoring *Vizcaino* and myriad other decisions approving multipliers over three, Miller claims the fee requested here "is clearly refuted by [*WPPSS*], where a 13.6% fee request was rejected because it resulted in an excessive lodestar multiplier of 3.1" Miller Obj. 3. But the Ninth Circuit in *WPPSS vacated* the district court's fee decision, holding, *inter alia*, the court "abused its discretion in denying a risk multiplier" in determining the fee. *WPPSS*, 19 F.3d at 1302.

*Footnote continued on next page*

1    the 3.22 multiplier the Court accepted in *Hefler*, *see* 2018 WL 6619983, at *14, which entailed

2    *less* risk than this derivative litigation.  *See infra* pp. 13-16.  Further, the lodestar is *understated*,

3    as it excludes time Co-Lead Counsel will devote in the coming months to securing the resolution

4    of the remaining state derivative actions, as well as time spent over the last two months (and

5    going forward) seeking final approval of this Settlement.  As in *CRT*, moreover, this Settlement

6    did not come about in "little time" or with "little effort."  2016 WL 4126533, at *6.  As the Court

7    is aware, it resulted from more than 2 ½ years of investigating the facts, drafting initial and

8    consolidated amended complaints, overcoming two motions to dismiss, reviewing more than 1.1

9    million pages of documents (with more to be reviewed had the parties not agreed to settle) in

10   anticipation of more than 40 depositions, and participating in a lengthy and hotly contested

11   mediation process.  *See* Supp. Joint Decl. (Dkt. 278) ¶¶ 24-35, 91-128, 135-52; Decl. of Hon.

12   Daniel Weinstein (Ret.) in Support of Final Approval and Attorneys' Fees ("Weinstein Final

13   Approval/Fee Decl.") ¶¶ 4-7. And while "the two-plus year lifespan of this litigation is not as

14   lengthy as some other cases," Plaintiffs' Counsel "bore a heavy financial burden in expending

15   significant resources"—more than $22.4 million in attorney and support staff time—"on a

16   contingency basis."  *Hefler*, 2018 WL 6619983, at *13.[3]

17        The Professional Objectors also overstate the significance of data provided by certain

18   empirical studies analyzing fee awards (*see, e.g.*, Frank Obj. 9-12), which this Court has

19   instructed "does not replace the 25 percent benchmark" but rather "is simply an important

20   additional data point in the determination of an appropriate award."  *Rodman*, 2018 WL 4030558,

21   at *5.  In any event, Professor Brian Fitzpatrick—a leading authority on attorneys' fees who

22   *Footnote continued from previous page*
     Additionally, in characterizing lodestar multipliers as "rare and exceptional," Frank and Fisher

23   rely on decisions addressing federal fee-shifting statutes, which have no bearing here.  *See* Frank
     Obj. 19 (citing *Perdue v. Kenny A.*, 559 U.S. 542, 546 (2010)); Fisher Obj. 30 (citing *Van*

24   *Gerwen v. Guar. Mut. Life Co.*, 214 F.3d 1045, 1045 (9th Cir. 2000)).  And notwithstanding his
     attempt to invent a general presumption against lodestar multipliers, Frank has no compunction

25   advocating a large multiplier for himself.  *See Eubank v. Pella Corp.*, 2019 WL 1227832, at *9
     (N.D. Ill. Mar. 15, 2019) (noting "[t]he $3 million fee award that Frank requests on the objectors'

26   behalf reflects a lodestar multiplier of *9.3* for Frank").
     [3] Contrary to Frank's suggestion (*see* Frank Obj. 13), a modest upward adjustment of the 25%

27   benchmark does not require that Plaintiffs' Counsel "litigate this case to a successful judgment"
     or "assume six years of substantial risk," as in *Rodman v. Safeway, Inc.*, 2018 WL 4030558

28   (N.D. Cal. Aug. 23, 2018).

authored one of those studies, which this Court has cited with approval[4]—observes "a 28.33%

fee award would still be within two standard deviations of the 17.9% mean in the $100-250

million range in [his] study." Fitzpatrick Decl. (Dkt. 278-1) ¶ 25 (citing Brian T. Fitzpatrick, *An*

*Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. EMPIRICAL LEGAL STUD.

811, 839 (2010) ("Fitzpatrick Study")).[5]  Fee requests within two standard deviations above the

mean "should be viewed as potentially reasonable but in need of affirmative justification." *Id.*

(quoting Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees in Class Action Settlements:*

*An Empirical Study*, 1 J. EMPIRICAL LEGAL STUD. 27, 74 (2004)).  The facts here, as Professor

Fitzpatrick's own analysis concludes, amply justify the requested fee.  *See, e.g.*, Fee Mot. (Dkt.

277) 12; Fitzpatrick Decl. ¶¶ 40-45.

Contrasting with the legally infirm *per se* rule Objectors propose, Professor Fitzpatrick's

assessment of this case under each of the Ninth Circuit's factors confirms a $68 million fee is

appropriate, even based on the Settlement's $240 million cash alone.  Fitzpatrick Decl. ¶¶ 17-34.

In addition to analyzing the empirical data regarding typical awards in securities class cases (i.e.,

"factor (5)")—which do not weigh against the fee proposed here, *id.* ¶¶ 18-25—Professor

Fitzpatrick carefully analyzes six considerations favoring an upward adjustment of the 25%

benchmark: <u>factor (1)</u> – the superior result Plaintiffs' Counsel achieved, measured against typical

recoveries in securities class cases, *id.* ¶ 26; <u>factors (3) and (4)</u> – the significant risks in

attempting to prove Wells Fargo Board members knew about or consciously disregarded the

Improper Sales Practices, *id.* ¶ 27; <u>factor (6)</u> – the Clawbacks and Reforms, for which the record

supports according credit to Co-Lead Counsel's efforts, *id.* ¶ 28; <u>factor (7)</u> – the percentages in

standard contingency-fee agreements in individual cases, which suggest a fee of 28% or above is

---

[4] *See Rodman*, 2018 WL 4030558, at *5 (observing that while Fitzpatrick's study "is older and accounts for fewer years" than a 2017 study by Theodore Eisenberg and Geoffrey Miller, "it examines many more cases"); *see also* Fitzpatrick Supp. Decl. ¶ 6 (explaining Eisenberg and Miller "do not break down their data as finely as I do").

[5] Characterizing the requested fee as "presumptively unreasonable" under a study by Professors Eisenberg and Miller, Frank contends 28.33% "is slightly more than two standard deviations above the mean" in the Fitzpatrick Study, which is 28.3% if one adds 17.9% and 10.4% (i.e., two times the 5.2 standard deviation).  Frank Obj. 11 & n.4.  Three hundredths of a percent is a slim reed on which to hang an objection, but in any event, because the figures in the Fitzpatrick Study are rounded to the nearest tenth of a percent, Frank is wrong to declare 28.33% is necessarily more than two standard deviations above the mean.  *See* Fitzpatrick Supp. Decl. ¶ 7 n.1.

1    appropriate, *id.* ¶ 30; and <u>factor (8)</u> – Plaintiffs' Counsel's lodestar, which shows they "are

2    receiving a very typical return on their investment of time in a case of this size," *id.* ¶ 34.[6]

3           Frank mischaracterizes Professor Fitzpatrick's opinions as "inadmissible legal

4    conclusions and other legal arguments."  Frank Obj. 13.  But there is nothing impermissibly

5    "legal" about analyzing whether the *factual* considerations set forth by the Ninth Circuit warrant

6    the requested fee.  Indeed, Professor Fitzpatrick has offered similar opinions in numerous cases,

7    which to Co-Lead Counsel's knowledge have never been stricken.[7]  And the only decision Frank

8    cites that even addresses expert opinions regarding reasonable fees is inapposite.  In *Stathakos v.*

9    *Columbia Sportswear Co.*, defendants' expert, who "claim[ed] to have conducted a line-by-line

10   review of plaintiffs' lodestar and aver[red] that the hours contained therein [we]re unreasonable,"

11   included in his declaration "improper legal opinions" that "either interpret[ed] or merely quot[ed]

12   case law, the American Bar Association Code of Professional Responsibility, the State Bar of

13   California Professional Code, and the U.S. Attorney Offices' Attorney Fee Matrix."  2018 WL

14   1710075, at *5 & n.6 (N.D. Cal. Apr. 9, 2018).  Professor Fitzpatrick, by contrast, cites caselaw

15   to present the context within which to evaluate the relevant facts.  Fitzpatrick Decl. ¶¶ 21-24.

16          Fisher criticizes Co-Lead Counsel and Professor Fitzpatrick for "fail[ing] to review the

17   attorneys' fees awarded in derivative settlements between $100 million and $250 million."

18   Fisher Obj. 26.  But courts deem it appropriate to compare derivative and similarly sized class

19   settlements.  *See, e.g.*, PA Order 10-11 & n.7 (citing *In re Atmel Corp. Derivative Litig.*, 2010

20   WL 9525643, at *12 (N.D. Cal. Mar. 31, 2010)).  Fisher's preferred comparison, moreover,

21   *supports* the requested fee, because (1) the cash recovery to Wells Fargo exceeds each of those

22   "comparable" settlements by over $90 million—which Fisher acknowledges is "'the most critical

23   factor in granting a fee award,'" Fisher Obj. 20 (quoting *In re Omnivision Techs., Inc.*, 559 F.

---

24   [6] While <u>factor (2)</u>—"the length this case has transpired"—reflects "the typical time-to-final
     approval" in the Fitzpatrick Study, three years "is still a long time to wait be paid, particularly

25   when considering that counsel here have expended significant costs and expenses in prosecuting
     the litigation, for which they are not seeking reimbursement."  *Id.* ¶ 29.  Further, given the benefit

26   to Wells Fargo of moving past the fake-account scandal, Plaintiffs' Counsel's expediency in
     achieving this Settlement should weigh *in their favor*.

27   [7] In *In re Volkswagen "Clean Diesel" Marketing, Sales Practices & Products Liability Litigation*,
     which Frank cites, the court *rejected* Volkswagen's attempt to exclude Professor Fitzpatrick's

28   opinions as "improper expert testimony."  2017 WL 1352859, at *3 n.3 (N.D. Cal. Apr. 12, 2017).

Supp. 2d 1036, 1046 (N.D. Cal. 2008)); (2) all but one of those cases involved self-interested transactions or acquisitions, not these far more difficult *Caremark* "failure to monitor" claims; (3) the 18.9% average fee award in those cases *exceeds* the mean fee (17.9%) recorded in the Fitzpatrick Study for securities class settlements of $100-250 million; and (4) in each of the cases Fisher cites, the court awarded counsel the fee they sought (*see* Fisher Obj. 27-29).

Fisher also contends the fee should be lower than the 20% this Court approved in *Hefler* because Wells Fargo stands to receive between 6.9% and 21.8% of its potential damages, and class plaintiffs' expert estimated the settlement amount represented 15% to 137% of the potential class recovery. While even on their face these percentages indicate the $240 million cash component potentially reflects (at 21.8%) a *greater* percentage recovery than the class settlement, the more-relevant point is that even Co-Lead Plaintiffs' "low-end" recovery estimate "exceeds 'recoveries achieved in . . . securities fraud class actions of similar size (over $1 billion in estimated damages), which settled for median recoveries of 2.5 percent between 2008 and 2016, and 3 percent in 2017.'" PA Order 10-11 (ellipsis in original) (quoting *Hefler*, 2018 WL 6619983, at *8); *see also Omnivision*, 559 F. Supp. 2d at 1046 ("a total award of approximately 9% of the possible damages . . . weigh[ed] in favor of granting the requested 28% fee").

### B. Plaintiffs' Counsel's Lodestar, Including Rates and Hours for Staff and Contract Attorneys, Is Well Justified and Exhaustively Detailed.

Frank and Miller challenge Plaintiffs' Counsel's use of staff and contract attorneys, and Frank further claims Plaintiffs' Counsel provide insufficient detail to support their lodestar. They are wrong in both respects.

*First*, these Professional Objectors advocate billing contract attorneys (and, Miller proposes, staff attorneys) at cost—a "hardline position" even their primary authority (*Anthem*) acknowledges *no* court has adopted. *See In re Anthem, Inc. Data Breach Litig.*, 2018 WL 3960068, at *18 (N.D. Cal. Aug. 17, 2018) (objector "identifie[d] no case" so holding). Frank and Miller also speculate staff attorneys, which Frank contends should be billed at $240 per hour, are "systematically overbilled by co-lead counsel," and deride their contributions as "unskilled document review" or "largely clerical work." Frank Obj. 16, 17; Miller Obj. 3. But

the *facts* are that these staff and contract attorneys—who have impressive professional and

educational backgrounds—performed high-level review and analysis, including specifically for

deposition preparation, akin to junior-level associates.  *See, e.g.*, Fee Mot.  22.; Lieff Cabraser

Decl. (Dkt. 278-7) Exs. 2, 3; Saxena White Decl. (Dkt. 278-8) Exs. 2, 3.  As "[t]he determination

of the reasonable fee is not made by reference to rates actually charged, but by reference to the

prevailing market rate in the community for similar services of lawyers of reasonably

comparable skill, experience and reputation," *Fleming v. Kemper Nat'l Servs., Inc.*, 373 F. Supp.

2d 1000, 1007 (N.D. Cal. 2005), the $295 to $420 hourly rates billed for these attorneys are well

justified.  *See also, e.g.*, *In re Lioderm Antitrust Litig.*, 2018 WL 4620695, at *2 (N.D. Cal. Sept.

20, 2018) (approving fee request including contract attorney time at market rates); *Andrews v.*

*Lawrence Livermore Nat'l Sec., LLC*, 2012 WL 160117, at *2 (N.D. Cal. Jan. 18, 2012)

(rejecting argument that "for purposes of determining reasonable hourly rates, an attorney's

status as a contract attorney, as opposed to his or her employment as an associate, is a proper

substitute for evaluating an attorney's actual experience or skills").[8]

Relying on a self-styled "best practice" contrived from their own supposition and scant

dicta (Frank Obj. 16), the Professional Objectors ignore that courts regularly approve rates for

staff and contract attorneys similar to those requested here.  *See, e.g.*, *Optical Disk Drive*, 2016

WL 7364803, at *8 (approving rates of $300-$350 for staff and contract attorneys); *Rose v. Bank*

*of Am. Corp.*, 2014 WL 4273358, at *7 (N.D. Cal. Aug. 29, 2014) (approving $325 rate for

attorney "who held the titles of both Law Clerk and Contract Attorney").  Indeed, courts have

approved these rates for similar work performed by some of the same staff and contract

attorneys.  *See, e.g.*, *Fiat Chrysler*, *supra* n.8; *In re Bank of N.Y. Mellon ADR FX Litig.*, No. 16-

cv-00212-JPO-JLC (S.D.N.Y.) (Oetken, J.), Dkt. 154 (reporting $415 rate for Lieff Cabraser

---

[8] Frank's assertion, without authority, that "rates claimed for staff attorneys—up to $415/hour—actually exceed the costs these firms could credibly bill for junior associates doing the same work" (Frank Obj. 17) does not reflect actual practice. *See, e.g.*, *In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices & Prods. Liab. Litig.*, No. 17-md-02777-EMC (N.D. Cal. July 3, 2017) (Chen, J.) ("*Fiat Chrysler*"), Dkt. 181, at 9 (permitting use of "junior associates, contract, and staff attorneys" for document review, and providing that "[l]awyers who perform initial document analysis and coding will be billed at an hourly rate consistent with the market rate for junior associates"); Dkt. 538-1, Ex. A (reporting $415 rates for Lieff Cabraser staff and contract attorneys, including several who worked on this case); Dkt. 561 (approving fee).

1   staff attorneys, including several who worked on this case) & Dkt. 161 (approving fee); *In re*

2   *Bank of N.Y. Mellon Corp. Forex Transactions Litig.*, No. 12-md-2335 (S.D.N.Y.) (Kaplan, J.),

3   Dkt. 622-1 (reporting rates of $375-$425 for contract attorneys, including several who worked

4   on this case (having since been hired as staff attorneys)) & Dkt. 642, at 17 (Court: "I accept the

5   lodestar. I accept as fair, reasonable and accurate everything that went into it."). Further, in

6   rejecting an objector's argument in *Hefler* "that fees should be reduced because 'the great bulk of

7   the time in the case' was billed by staff attorneys rather than senior partners," the Court observed

8   that "[b]ecause the staff attorneys have lower billing rates, . . . this results in a lower lodestar,

9   which factors into the Court's cross-check." 2018 WL 6619983, at *15. The Court accordingly

10  approved staff attorney rates of $340 to $395. *Id.* & Dkt. 240-5. The use of staff and contract

11  attorneys for discovery work here likewise reflects a judicious allocation of resources that

12  benefited Wells Fargo (and its shareholders), as assigning associates with correspondingly higher

13  rates to those tasks might have generated unnecessary lodestar.

14          Even in *Anthem*, on which the Professional Objectors lean heavily, Judge Koh rejected a

15  proposed "categorical rule that contract and staff attorneys must be billed at cost." 2018 WL

16  3960068, at *18. In the cases the *Anthem* objector cited—on which Frank also relies—"counsel

17  had billed the contract attorneys as expenses (rather than as part of the lodestar), and the courts

18  approved those expenses *without requiring that approach*." *Id.* (distinguishing *Dial Corp. v.*

19  *News Corp.*, 317 F.R.D. 426, 438 (S.D.N.Y. 2016); *Banas v. Volcano Corp.*, 47 F. Supp. 3d 957,

20  980 (N.D. Cal. 2014)). While the court in *Anthem* "commend[ed] the practice of treating

21  contract attorney work as a cost," it applied a $240 rate for staff and contract attorneys, "the low

22  end of the range that [plaintiffs' counsel's expert] Professor [William] Rubenstein has identified

23  as having been approved in federal class actions," adding that for future cases the court "is

24  willing to receive documentation justifying a lower or higher rate." *Id.* at *18, *20. While the

25  rates billed for staff and contract attorneys here are appropriate, even applying a $240 rate as in

26  *Anthem* would result in a 3.57 multiplier (with a lodestar of $19,069,917.50), within the "typical"

27  range for common fund cases. *Hefler*, 2018 WL 6619983, at *14.

28

Frank also cites the special master's recommendation in *Arkansas Teacher Retirement System v. State Street Bank & Trust Co.* (which is subject to pending objections to the district judge) that contract attorneys be treated as a cost, while ignoring that the special master approved of staff attorney rates of $335 to $515.  2018 U.S. Dist. LEXIS 111409, at *232, *238 (D. Mass. May 14, 2018).  As in *State Street*, staff attorneys did more than "first-level document review" in this case, including "digest[ing] complex information" and preparing "witness memoranda for deposition"—the "same kind of work done by associates at large firms." *Id.* at *233.  The lodestar should appropriately reflect those efforts.  Further, the *State Street* special master's attempt to distinguish contract from staff attorneys contradicts his prior observation that "similar work justifies similar rates." *Id.* at *239.  The staff and contract attorneys here did substantively *identical* work; there is no basis to treat the former akin to associates while relegating the latter to a firm expense in determining a reasonable fee.  This Court should not be the first to do so.

Ultimately, the Court "need not weigh in on this conflict, . . . because even if the Court were to reduce the Plaintiffs' lodestar to reflect the contract attorneys' lower billing rates" (*CRT*, 2016 WL 4126533, at *9) *and* apply a discounted rate of $300 for all staff attorneys (i.e., the lowest rate billed for any staff attorney on the case), the resulting multiplier would be 3.90 (with a lodestar of $17,455,289).  That remains within the presumptively reasonable range.[9]

*Second*, Frank "suspects" this case suffers from "excessive" billing, but claims it is "impossible to estimate the overstatement" because Plaintiffs' Counsel do not provide enough "detail."  Frank Obj. 18.  The five firms whose lodestar is included for crosscheck purposes have submitted nearly *150 pages* of documentation detailing (1) the work and hours each timekeeper contributed, including (a) the hours each timekeeper devoted to particular categories of work during each month, (b) the portion of total lodestar devoted to particular categories of work

---

[9] For this analysis, Co-Lead Counsel apply (i) $35 per hour—the lowest rate paid for any contract attorney at any time during this litigation—to *all* contract attorney time (including for time billed by contract attorneys who became staff attorneys during the pendency of this litigation), even though Co-Lead Counsel paid more for a substantial portion of contract attorney time in this case; and (ii) $300 per hour—the lowest rate billed for any staff attorney at any time during this litigation—to *all* staff attorney time, even though most staff attorney time was billed at a higher rate.  In their opening brief (Fee Mot. 23 n.13), Co-Lead Counsel provided an alternative lodestar figure applying a varying $40-$50 hourly rate for all contract attorneys.

during each month, and (c) the hours and lodestar each timekeeper devoted to particular

categories of work for the entirety of the case; and (2) describing each timekeeper's role in the

case and his or her professional and educational history.  Lieff Cabraser Decl. & Exs. 1-6;

Saxena White Decl. & Exs. 1-6; Glancy Decl. (Dkt. 278-9) & Exs. 1-6; Robbins Arroyo Decl.

(Dkt. 278-10) & Exs. 1-6; Prickett Jones Decl. (Dkt. 278-11) & Exs. 1-6.  The Court has

approved precisely these types of submissions in other cases.  *See, e.g.*, *Hefler*, 2018 WL

6619983, at *14; *Rodman*, 2018 WL 4030558, at *7.  Frank thus provides no credible basis for

requiring daily time records.  *See, e.g.*, *Rodman*, 2018 WL 4030558, at *7 (rejecting objector's

argument for "actual billing records"); *Dyer*, 303 F.R.D. at 333-34 (same).

He nonetheless contends that without those records, the Court "is unable to confirm that

plaintiffs ceased document review after settlement [in principle] was reached" on December 12,

2018, given that the lodestar contains time through June 2019, including 2,405.70 hours for

document review in December 2018.  Frank Obj. 18.  Plaintiffs' Counsel attest that no work was

devoted to discovery after December 12—2 ½ months before the Parties finalized the Settlement

Stipulation—and the hours billed to discovery during the first two weeks of December were

spread over 28 timekeepers, for an average of 86 hours.  That time is reasonable, as the Parties

were actively litigating the case under an aggressive schedule.  *See infra* pp. 15-16.  Frank

retrospectively assumes settlement was "especially likely and imminent" (Frank Obj. 19); the

reality was far different, as Judge Weinstein (Ret.)—who (along with his colleague Jed Melnick)

conducted the mediations that led to the Settlement—attests.  Weinstein Final Approval/Fee Decl.

¶¶ 7-8.  In any event, there is no rule demanding that counsel cease discovery or other litigation-

related work upon reaching a settlement in principle, before a formal agreement is finalized.  In

*Hefler*, for example, confirmatory discovery *after* the parties reached an agreement in principle

accounted for the vast majority of the lodestar.  *See Hefler*, Dkt. 239, at 21 & Ex. 5.

**C.**     **Objectors' Claim that Plaintiffs' Counsel Faced "Minimal Risk" Disregards Applicable Law and the Record.**

Frank's and Fisher's supposition that this case involved little risk is belied by the law,

facts, and procedural history.  Perhaps their most-blatant delusion—that Co-Lead Counsel faced

no risk at the pleading stage and "demand futility was essentially admitted" (Fisher Obj. 22)—is refuted by the *dismissal* of the California State Derivative Action, with the court concluding plaintiffs' allegations "d[id] not allow [it] to infer that directors knew of the illegal sales practices or promoted or encouraged them knowing that they were illegal and/or for the purpose of obtaining personal benefit." May 10, 2017 Demurrer Order 7. Co-Lead Counsel's successful efforts to stay the California case prevented the state court from dismissing it entirely, which would have endangered this Court's favorable ruling as to Co-Lead Plaintiffs' complaint. Far from "self-interest[ed]" (Fisher Obj. 4 n.4), those efforts protected *Wells Fargo's* interests, which could otherwise have been irreparably impaired.

Nor did the risks to recovery dissipate after the pleading stage. The Delaware Actions posed an existential threat of issue or claim preclusion until June 2018, when, again due to Co-Lead Counsel's efforts—and over Defendants' strategic objections—those cases were stayed or otherwise resolved. Additionally, as this Court recognized in preliminarily approving the Settlement, "significant obstacles remain to proving [Co-Lead Plaintiffs'] case and prevailing at trial." PA Order 8. Foremost was the standard for proving "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment," *In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959, 967 (Del. Ch. 1996), which Co-Lead Counsel would have faced (without the benefit of pleading-stage inferences) at summary judgment and trial. *See, e.g.*, Weinstein Final Approval/Fee Decl. ¶¶ 5-8. Among the numerous arguments advanced during the mediation process, including with the aid of a former Delaware Vice Chancellor, Defendants pointed to Board-level initiatives throughout the Relevant Period to address the Improper Sales Practices. *Id.* at 6. Given the high standard for *Caremark* claims, Defendants might have successfully persuaded a jury they had satisfied their fiduciary obligations and the blame lay instead with rogue lower-level employees. Indeed, Co-Lead Counsel have found no *Caremark* case where similar oversight claims against independent directors were successfully litigated through trial, and Objectors likewise cite none. These risks compounded the already significant challenges to prevailing on Co-Lead Plaintiffs' federal securities claims.

1    The Court can readily dispense with Objectors' suggestion that the regulatory actions,

2   which "concerned Wells Fargo's underlying fraudulent consumer practices," virtually ensured

3   Defendants' liability here.  *Hefler*, 2018 WL 6619983, at *15.  Those proceedings "did not

4   reduce the costs or risks of litigating this securities [derivative] case or help establish elements of

5   the securities claims such as materiality, scienter, or loss causation," *id.*, or the critical *Caremark*

6   claims.  Indeed, neither the Federal Reserve nor any other government entity has imposed

7   sanctions, levied charges, or instituted civil or criminal actions against any Wells Fargo

8   executives in their individual capacity, much less found *the outside directors* acted in bad faith.

9   *See Reiter v. Fairbank*, 2016 WL 6081823, at *1, *13-14 (Del. Ch. Oct. 18, 2016) (plaintiff

10   "failed to plead with particularity that a majority of a ten-member board," which included "nine

11   outside directors," acted "in such an egregious manner" to "sustain a finding" of bad faith).  And

12   the Oversight Report, on which Objectors rely, purported to *exculpate* the Board—including

13   criticizing certain executives for failing to adequately alert directors to sales practices issues—

14   potentially arming Defendants with additional arguments against demand futility.

15    Co-Lead Counsel also confronted imposing obstacles to establishing Wells Fargo

16   suffered damages proximately caused by Defendants' breaches of duty or securities violations.

17   Notably, only $186.5 million of the $1.1 billion out-of-pocket damages Co-Lead Plaintiffs would

18   seek at trial is attributable to regulatory fines and penalties.  *See* Dkt. 272, at 2 n.2.  The

19   remainder relates to investigations and associated litigation costs, as well as remediation

20   measures largely consisting of marketing efforts, with only $6.1 million in consumer refunds.  *Id.*

21   at n.3.  Defendants would argue those damages stemmed from unrelated alleged misconduct or

22   constituted unrecoverable "business" expenses.  As to the $1.4-2.4 billion in lost-business

23   damages, Defendants could point to the Company's *increasing* profits even after the Improper

24   Sales Practices were disclosed.  They would contend any damages would have been incurred

25   regardless of their actions during the Relevant Period or were entirely offset by gains from cross-

26   selling practices generally.  Objectors account for none of those risks.

27    Finally, Frank suggests any risk essentially disappeared after the Parties engaged in a

28   series of unsuccessful mediations.  But in fact the prospects for settlement remained highly

uncertain until the last mediation session, in early December 2018.  During the mediation process Co-Lead Plaintiffs rejected several offers to settle for an inferior recovery, and instead continued to press Wells Fargo's claims.  Further, belying Frank's supposition that settlement was "especially likely and imminent" after September 2018 (Frank Obj. 19), Co-Lead Plaintiffs and Defendants reported in their October 9, 2018 joint case management statement (Dkt. 255) that they were engaged in multiple discovery and scheduling disputes and preparing for more than 40 depositions.  Indeed, the Parties were still intensely negotiating a potential settlement even during the final mediation session on December 4, 2018, which ended with a Mediator's proposal that was not accepted until December 12, 2018.  Objectors' unfounded assumptions regarding this litigation's purportedly low risk simply do not withstand scrutiny.

### D.   The Record Supports Crediting Co-Lead Counsel for Helping Achieve the Reforms and Clawbacks, But the Fee Is Reasonable In Any Event.

While Frank and Fisher attempt to surmise the provenance of every dollar clawed back by Wells Fargo as well as the Reforms it implemented, the primary question for this fee request is whether Co-Lead Counsel—and the derivative case they pursued for more than two years— deserve enough credit for those measures to justify a 3% upward adjustment to the 25% fee benchmark.  *See, e.g.*, Fitzpatrick Decl. ¶ 28.  The record shows the answer is yes.

The Parties, as well as the Mediators, acknowledge "facts alleged *in the Derivative Action*" played a "significant" role in Wells Fargo's decision to adopt the Reforms and Clawbacks, and Wells Fargo itself acknowledges this case contributed $80 million worth of those measures.  *See, e.g.*, Settlement Stip. § II.F; Weinstein Decl. ¶ 12 ("The mediator's proposal placed a combined value of $80 million on the [Reforms] and Clawbacks.").  As these Settlement terms are indisputably not the product of collusion, the Parties' agreement should be accorded substantial deference.  *See, e.g.*, *Klein v. Gordon*, 2019 WL 1751839, at *2 (C.D. Cal. Feb. 12, 2019) (noting with approval "the settlement agreement . . . acknowledges that [the] derivative action contributed, at least in part, to the initial corporate reforms adopted by Opus which are aimed at preventing future misconduct").  This is particularly true given that Wells Fargo's attribution of credit to Co-Lead Counsel "can only decrease Wells Fargo's take from this

settlement," thus exacting "a substantial financial price."  Fitzpatrick Decl. ¶ 28.  Additionally, as illustrated in the following chart (and supported by Exhibit A to the Settlement Stipulation), Co-Lead Counsel expressly negotiated a number of the Reforms, which reflect the relief requested in their Complaint:

| Compl. Prayer | Pls.' Mediation Requests | Reforms Implemented |
|---|---|---|
| Strengthen Board oversight of Community Banking sales practices | Create Retail Customer Protection Committee to oversee retail sales practices and customer relationships | Created Conduct Management Office focused on conduct management and sales practice issues, which reports to Risk Committee and Board; created Compliance Oversight Subcommittee of Human Resources Committee |
| Strengthen corporate disclosure controls | Establish Ombudsman Program, run by Office of Ethics Oversight & Integrity<br><br>Mandate that risk committees lead internal investigations | Designated senior audit manager in Internal Audit Group for sales practices matters; created Heads of Stakeholder Relations and Regulatory Relations; enhanced controls and customer feedback mechanisms to ensure account activity authorization |
| Improve Wells Fargo culture, particularly in Community Banking | Reconfigure internal audit process as retail practices audit<br><br>Implement quarterly reporting to Audit & Examination Committee and other risk committees | Board training, evaluation and reporting of internal assessment and strengthening of Company culture; transferred employee ethics oversight to Human Resources Committee |
| Strengthen Board supervision of operations | Authorize Board Chairman or Vice Chairman to initiate internal investigations | Expanded Audit & Examination Committee's oversight to legal and regulatory compliance; appointed new Board members to Risk, Human Resources, and Governance & Nominating Committees; required that Chairman and Vice Chairman be independent, non-employee directors |
| Revise Board composition | Withdraw nomination of five Board directors | Nine directors departed, seven new directors appointed; separated Board Chairman and CEO positions |

Against those record facts, Objectors' assertion that neither Co-Lead Counsel's efforts nor the threat of significant liability from this derivative action played *any* role in Wells Fargo's decisions to implement the Reforms or claw back executive compensation during the litigation's pendency is unavailing.  *See, e.g.*, *Atmel*, 2010 WL 9525643, at *11 (according counsel credit where reforms "were all adopted after the federal derivative actions were filed" and Atmel represented "that the filing of the actions and later settlement negotiations were material factors in the implementation of the measures").  Further, contrary to Objectors' suggestion, Co-Lead

1    Counsel do not dispute that the results of Wells Fargo's internal investigation or the regulatory

2    actions *also* contributed to the Reforms and Clawbacks.  Indeed, the Parties' attribution to this

3    Settlement of less than half of the Clawbacks' total value answers Objectors' concerns regarding

4    funds that may have been clawed back regardless of this case.

5         Additionally, that attributing $20 million to Plaintiffs' Counsel for the Reforms reflects

6    an "estimate" (Fisher Obj. 17) does not preclude considering it in assessing the fee.  *See Atmel*,

7    2010 WL 9525643, at *11 (rejecting objector's argument that "Plaintiffs' failure to quantify the

8    value of the remedial measures is 'fatal'" to considering them as part of the fee request).  If it

9    did, lawyers would virtually never be entitled to credit for pursuing corporate governance

10   measures, and "rational counsel w[ould] not spend their time and money pursuing [non-cash]

11   relief—even when it may be as or more important than cash."  Fitzpatrick Decl. ¶ 15.  Corporate

12   governance expert Professor Jeffrey Gordon concludes, moreover, the Reforms' value may

13   "exceed[] even a substantial out-of-pocket recovery" (Gordon Decl. (Dkt. 278-2) ¶ 20), and

14   Professor Michael Santoro notes the "substantial impact" the Reforms could have on Wells

15   Fargo's "current economic performance and long-term sustainability" (Santoro Decl. (Dkt. 270-

16   4) ¶¶ 53-54).  The $20 million figure assigned to the Reforms thus may significantly *undervalue*

17   them.  Finally, even if the Court determines the value of the Reforms and Clawbacks is lower

18   than the Parties have agreed, or concludes Co-Lead Counsel deserve no credit for them, the other

19   factors supporting a 28.33% fee from the $240 million cash recovery would render it reasonable.

20   *See, e.g.*, *Rodman*, 2018 WL 4030558, at *6 (approving a 28% fee where "the exceptionally

21   strong result obtained, the risk undertaken by counsel litigating on contingency, the complexity

22   of the legal issues, and the duration of the litigation all weigh[ed] in favor of an upward

23   adjustment," and "the size of the common fund weigh[ed] in favor of a downward adjustment").

24        **E.      Co-Lead Counsel Should Allocate the Fee as They Deem Appropriate.**

25        In exercising their "'ultimate authority to determine how the aggregate fee is to be

26   allocated among counsel,'" Frank Obj. 23 (quoting *Newberg on Class Actions* § 15:23 (5th ed.)),

27   courts often recognize "lead counsel are better suited than a trial court to decide the relative

28

1    contributions of each firm and attorney." *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 2017

2    WL 5969318, at *1 (N.D. Cal. Feb. 28, 2017).  So too, here.

3    Frank relies on decisions addressing disputes among counsel or other extraordinary

4    circumstances.  In *In re High Sulfur Content Gasoline Products Liability Litigation*, the Fifth

5    Circuit criticized the district court's approval of a fee for "more than six dozen plaintiffs'

6    lawyers" where the allocation was proposed "in an ex parte hearing and apparently without

7    benefit of supporting data," and the court "seal[ed] the individual awards; prevent[ed] all counsel

8    from communicating with anyone about the awards; require[d] releases from counsel who

9    accepted payment; and limit[ed] its own scope of review of objections to the allocation."

10   517 F.3d 220, 223-24 (5th Cir. 2008).  The court of appeals notably distinguished the situation

11   where, as here, "all attorneys . . . come to an agreement about dividing up fees."  *Id.* at 234.  And

12   in *In re LendingClub Securities Litigation*, counsel disclosed—similar to Plaintiffs' Counsel

13   here—they "agreed to allocate 18 percent of the 13.1 total percent requested (or 2.36 percent of

14   the total recovery) to co-lead counsel in the state action and the balance to federal lead counsel."

15   2018 WL 4586669, at *2 (N.D. Cal. Sept. 24, 2018).[10]  Those cases do not assist Frank.

16   Frank suggests plaintiffs' counsel in the *Rosenfeld* Action falsely represented they did not

17   receive compensation, or a "promise" of compensation, from "any Defendant" in exchange for

18   dismissing the case.  Frank Obj. 25; Dkt. 281-7 at 4.  But those counsel have in fact received

19   nothing from any Defendant, and their compensation here will come solely from *Co-Lead*

20   *Counsel's fee*.  Further, that compensation is appropriate given the benefit Delaware Derivative

21   Counsel provided to Wells Fargo by dismissing or staying those cases.  Had those cases

22   proceeded, the threat of claim or issue preclusion would have persisted, jeopardizing this Court's

23   favorable rulings and impeding Co-Lead Plaintiffs' efforts to achieve this extraordinary

24   recovery.[11]

25   ─────────────────

26   [10] *See also Snyder v. Ocwen Loan Servicing, LLC*, 2019 WL 2103379, at *14, *15 (N.D. Ill.
     May 14, 2019) (cited at Frank Obj. 23) (assessing reasonableness of proposed fee distribution
     where one of the class counsel engaged in "troubling" conduct, including possibly "encourag[ing]

27   opt-outs," which "created an unacceptable risk to the plaintiff class's settlement negotiations").
     [11] Frank further posits, without evidence, Delaware Derivative Counsel could be double-paid to

28   the extent they also receive a fee in connection with the settlement of the CPI Derivative Actions.

*Footnote continued on next page*

1

### F.     LeBendig's Challenge to the Fee Request Is Baseless.

2      Notwithstanding their attempt to smear Lieff Cabraser through unfounded accusations

3  and misleading references to other cases, LeBendig's counsel fail to demonstrate they

4  "contributed to the creation of [the] common fund or otherwise benefited [Wells Fargo]"—the

5  only relevant issue.  *In re Volkswagen "Clean Diesel" Mktg., Sales Practices & Prods. Liab.*

6  *Litig.*, 914 F.3d 623, 641 (9th Cir. 2019).  Instead, they falsely claim Lieff Cabraser "deliberately

7  concealed [its] intention" to "deny [them] any fees," violating its "stated willingness to

8  coordinate and work with plaintiffs' counsel in the related actions."  LeBendig Obj. 3, 6.  The

9  record shows otherwise.

10      Co-Lead Counsel, exercising their discretion, determined LeBendig's assistance was

11  unnecessary given the case's posture at that time.  *See, e.g.*, Dkt. 219 (*Hannon* Consol. Order).

12  LeBendig's counsel nonetheless speculate Co-Lead Counsel could have "short-circuit[ed]

13  discovery" by further engaging with her, and accuse Lieff Cabraser of unnecessarily churning

14  lodestar by litigating and attempting to resolve this case.  LeBendig Obj. 7.  That self-serving

15  conjecture finds no support in the record, with which the Court is well familiar.[12]  Their passing

16  assertion that Lieff Cabraser is entitled to recoup no more than its lodestar and costs should be

17  rejected.  Co-Lead Counsel accordingly submit LeBendig's lawyers have not demonstrated they

18  are entitled to a fee.  If the Court determines otherwise, Co-Lead Counsel are prepared to pay the

19  requested fee out of their share of the total award.

20                                          **CONCLUSION**

21      The Court should (1) grant final approval of the Settlement; and (2) grant Co-Lead

22  Counsel's request for $68 million in fees, and permit them to pay $50,000 of that amount for

23  Reimbursement Awards to Co-Lead Plaintiffs.

24

25  _____

*Footnote continued from previous page*

26  But those counsel attest that none of the time they submitted here—which in any event is not included in the lodestar for this case—was devoted to CPI litigation.  *See* Rehns Decl. ¶¶ 33-36.

27  [12] LeBendig's counsel offer only information about what she purportedly *would have* provided; none of that information was included in her complaint, for which her counsel now seek a fee.

28  *See* No. 16-cv-06262-JST (N.D. Cal.), Dkt. 1.

1    Dated:  July 25, 2019                     **LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**

2

3                                 By: */s/ Richard M. Heimann*
Richard M. Heimann (063607)

4                                 *rheimann@lchb.com*
Katherine C. Lubin (259826)

5                                 *kbenson@lchb.com*
Michael K. Sheen (288284)

6                                 *msheen@lchb.com*
275 Battery Street, 29th Floor

7                                 San Francisco, CA 94111-3339
Telephone: (415) 956-1000

8                                 Facsimile: (415) 956-1008

9                                 Steven E. Fineman (140335)
*sfineman@lchb.com*

10                                Daniel P. Chiplock (*Pro hac vice*)
*dchiplock@lchb.com*

11                                Nicholas Diamand (*Pro hac vice*)
*ndiamand@lchb.com*

12                                Michael J. Miarmi (*Pro hac vice*)
*mmiarmi@lchb.com*

13                                Sean A. Petterson (*Pro hac vice*)
*spetterson@lchb.com*

14                                250 Hudson Street, 8th Floor
New York, NY 10013-1413

15                                Telephone: (212) 355-9500
Facsimile: (212) 355-9592

16                                *Attorneys for Co-Lead Plaintiff Fire & Police Pension Association of Colorado and Co-Lead Counsel*

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**SAXENA WHITE P.A.**

Maya Saxena (*Pro hac vice*)
*msaxena@saxenawhite.com*
Joseph E. White, III (*Pro hac vice*)
*jwhite@saxenawhite.com*
Lester R. Hooker (241590)
*lhooker@saxenawhite.com*
Adam D. Warden (*Pro hac vice*)
*awarden@saxenawhite.com*
Dianne M. Pitre (286199)
*dpitre@saxenawhite.com*
150 East Palmetto Park Road, Suite 600
Boca Raton, FL 33432
Telephone: (561) 394-3399
Facsimile: (561) 394-3382

Steven B. Singer (*Pro hac vice*)
*ssinger@saxenawhite.com*
Kyla Grant (*Pro hac vice*)
*kgrant@saxenawhite.com*
Sara DiLeo (*Pro hac vice*)
*sdileo@saxenawhite.com*
10 Bank Street, 8th Floor
White Plains, NY 10606
Telephone: (914) 437-8551
Facsimile: (888) 631-3611

*Attorneys for Co-Lead Plaintiff The City of
Birmingham and Co-Lead Counsel*

REPLY ISO (I) FINAL SETTLEMENT APPROVAL AND
(II) FEES AND REIMBURSEMENT AWARDS
LEAD CASE NO. 3:16-CV-05541-JST