Pages 1 - 51

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Jon S. Tigar, Judge

```
IN RE WELLS FARGO & COMPANY      )
SHAREHOLDER DERIVATIVE           )
LITIGATION.                      )
                                 )    NO. 16-05541 JST
                                 )
_____  )
```

San Francisco, California
Thursday, August 1, 2019

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:

        LIEFF, CABRASER, HEIMANN & BERNSTEIN LLP
        275 Battery Street - 29th Floor
        San Francisco, California  94111
  BY:  **RICHARD M. HEIMANN, ATTORNEY AT LAW**
       **KATHERINE C. LUBIN, ATTORNEY AT LAW**
       **MICHAEL K. SHEEN, ATTORNEY AT LAW**

        LIEFF, CABRASER, HEIMANN & BERNSTEIN LLP
        250 Hudson Street - 8th Floor
        New York, New York 10013
  BY:  **NICHOLAS DIAMAND, ATTORNEY AT LAW**

        SAXENA WHITE P.A.
        150 East Palmetto Park Road - Suite 600
        Boca Raton, Florida  33432
  BY:  **LESTER R. HOOKER, ATTORNEY AT LAW**
       **JOSEPH E. WHITE, III, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY:  Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
           Official Reporter

1   **APPEARANCES**:   (CONTINUED)

2   For Plaintiff Cathy LeBendig:
                    HIMMELSTEIN LAW NETWORK
3                   2000 Powell Street - Suite 1605
                    Emeryville, California  94608
4             BY:  **BARRY HIMMELSTEIN, ATTORNEY AT LAW**

5   For Delaware Plaintiffs and Connecticut Laborers Pension &
    Annuity Funds:
6                   HACH, ROSE, SCHIRRIPA & CHEVERIE LLP
                    112 Madison Avenue - 10th Floor
7                   New York, New York  10016
              BY:  **DANIEL B. REHNS, ATTORNEY AT LAW**
8
    For Massachusetts Laborers Pension Fund and Employees
9   Retirement System of the City of Providence:
                    BERMAN TABACCO
10                  44 Montgomery Street - Suite 650
                    San Francisco, California  94104
11            BY:  **NICOLE C. LAVALLEE, ATTORNEY AT LAW**

12  For Defendant Wells Fargo & Company:
                    SULLIVAN & CROMWELL
13                  1870 Embarcadero Road
                    Palo Alto, California  94303
14            BY:  **BRENDAN P. CULLEN, ATTORNEY AT LAW**
                   **SVERKER K. HÖGBERG, ATTORNEY AT LAW**
15
    For Defendant Independent Directors:
16                  SHEARMAN & STERLING LLP
                    535 Mission Street - 25th Floor
17                  San Francisco, California  94105
              BY:  **JOHN F. COVE, JR., ATTORNEY AT LAW**
18                 **STUART BASKIN, ATTORNEY AT LAW**
                   **JOHN GUELI, ATTORNEY AT LAW**
19
    For Defendant John R. Shrewsberry:
20                  RAMSEY & EHRLICH LLP
                    803 Hearst Avenue
21                  Berkeley, California 94710
              BY:  **ISMAIL RAMSEY, ATTORNEY AT LAW**
22
    For Defendant Timothy J. Sloan:
23                  CLARENCE, DYER & COHEN LLP
                    899 Ellis Street
24                  San Francisco, California  94109
              BY:  **JOSH A. COHEN, ATTORNEY AT LAW**
25                 **ADAM F. SHEARER, ATTORNEY AT LAW**

**APPEARANCES**:   (CONTINUED)

For Defendant John G. Stumpf:
                    GOODWIN PROCTER LLP
                    135 Commonwealth Drive
                    Menlo Park, California  94025
          BY:  **NICHOLAS A. REIDER, ATTORNEY AT LAW**

For Defendant Carrie L. Tolstedt:
                    SKAGGS FAUCETTE LLP
                    One Embarcadero Center - Suite 500
                    San Francisco, California  94111
          BY:  **JEFFREY E. FAUCETTE, ATTORNEY AT LAW**

For Objector John Cashman:
                    HAMILTON LINCOLN LAW INSTITUTE
                    1629 K Street, N.W. - Suite 300
                    Washington, D.C.  20006
          BY:  **THEODORE H. FRANK, ATTORNEY AT LAW**

For Objector Kevin Fisher:
                    RIDLEY, MCGREEVY & WINOCUR PC
                    303 16th Street - Suite 200
                    Denver, Colorado  80202
          BY:  **PATRICK L. RIDLEY, ATTORNEY AT LAW**
               **KRISTEN M. FROST, ATTORNEY AT LAW**

**Thursday - August 1, 2019**                                    **2:10 p.m.**

P R O C E E D I N G S

---oOo---

**THE CLERK:**  Your Honor, now calling civil matter
16-5541, regarding Wells Fargo & Company Shareholder Derivative
Litigation.

If counsel could please come forward and state their
appearances for the record.

**THE COURT:**  Actually, Madam Clerk, what we're going to
do is we're going to allow the docket just to reflect the
appearances of counsel.

So if you've not checked in with Ms. Lee, you should do
that at the conclusion of the hearing.  There are so many of
you, the sun would set by the time we'd taken all your
appearances, and I work better in daylight.  So let's do it
that way.

So let me start by us stating for the record the lawyers
who I think -- who I expect want an opportunity to make
argument to the Court today.

Madam Clerk -- oh, I see.  Mr. Heimann is over there.

Mr. Heimann, you're listed on my docket sheet as counsel
for Wells Fargo & Company.

**MR. HEIMANN:**  Maybe another day.

**THE COURT:**  Yeah.  But, anyway, I'm expecting that
Mr. Heimann will want to argue on behalf of the plaintiffs,

1   that either of Kristen Frost or Patrick Ridley will want to

2   make argument on behalf of Kevin Fisher, that Ted Frank would

3   like to make argument for John Cashman, that Barry

4   Himmelstein -- I apologize, Mr. Himmelstein.  You've appeared

5   in my court before, but I can't remember if it's Himmelstein or

6   Himmelstein.

7             **MR. HIMMELSTEIN:**  Stein.  Thank you, Your Honor.

8          **THE COURT:**  Thank you, Mr. Himmelstein.

9   -- Mr. Himmelstein would like to make argument on behalf

10  of Cathy LeBendig.

11    Is there anyone else who came to court expecting to argue

12  today?

13                  (No response.)

14       **THE COURT:**  Okay.  The order will be as follows:

15  Mr. Frank will argue.  You'll have 20 minutes.

16  Either Frost or Ridley will argue and have five minutes.

17  Mr. Himmelstein also five minutes.

18  And then, Mr. Heimann, you'll have 30 minutes in response.

19  And then the motion -- both motions will be under

20  submission.

21    Before we start the clock running and I start to hear from

22  counsel, there were so many issues that are presented in the

23  various objections and the papers and so forth, I thought it

24  might be helpful if I identified the ones that were more

25  prominent in my mind.

1    The issue of contract attorneys and staff attorneys is one

2    of those issues.  As you know, because you cited it back to me,

3    I said in the *CRT* case that the cases have not spoken with one

4    voice on this issue; and I recently -- and some of you may know

5    this too because I think word probably has gotten out -- issued

6    an order in a fairly new class action in which I told the

7    attorneys it was my intention to reimburse contract attorney's

8    fees at cost, and they filed a motion for reconsideration which

9    is currently pending.

10    And let me apologize in advance because my comments on

11    these subjects are not going to be very linear.  They just come

12    from the notes I made for today's hearing.

13    The actual money paid to the contract lawyers in this case

14    is not set out.  Specifically there's a footnote that says they

15    were billed at 40 to $50 an hour.  Also, Mr. Frank makes a

16    point that -- makes the contention that some billers are listed

17    as staff attorneys who were formerly contract attorneys and

18    that money is not broken out.  If that contention -- if his

19    contention is not correct, then Mr. Heimann should correct the

20    record.

21    But I wonder how are contract attorney fees different from

22    other expenses, such as expert fees or, for that matter,

23    airline tickets?  This is an out-of-pocket cost that law firms

24    pay and a client would be shocked, shocked, if you said, "Well,

25    I know the ticket, the plane ticket, was $800, but I'm going to

1    mark it up nine times to $7200," which is the markup that's

2    sought here, to be clear.  Nine times.

3        And even if one thinks that the airline ticket example is

4    hyperbole, I simply cannot imagine a client of a law firm

5    saying, "That's fine.  I'll pay nine times the rate that you're

6    actually paying these contract lawyers who are not employees of

7    your firm."  To which the response might be, "Well, but they

8    know that we don't -- that they are paying more than we

9    compensate our associate attorneys even accounting for

10   overhead."  To which I say, "That's a very different matter."

11       With regard to associate attorneys, there is overhead to

12   be paid, there are intangible costs, like retention and

13   recruitment.  A firm cannot be hiring and firing its associate

14   attorneys.  No associates would ever work there.  And clients

15   understand this because they themselves bear those exact same

16   intangible costs, and so they willingly pay whatever the

17   associate rate is.

18       There's no discussion of this issue in the cases that have

19   been cited to me and I'm not aware of any in the literature,

20   although I can't claim to have researched it exhaustively.

21   But, again, I would be surprised if a paying client at what we

22   typically call a defense firm would pay nine times the rate

23   being paid to a contract attorney if those attorneys were

24   independent contractors and were just hired on a project basis.

25       Judge Koh's *Anthem* case is interesting.  I found that case

 1  because I started to do my own independent research with regard

 2  to the motion for reconsideration that I identified to you a

 3  moment ago so I already had that case sitting on my desk.

 4      I am a great respecter of Judge Koh, who is one of the

 5  stronger judges in this district and I think we have a pretty

 6  strong district, but the analysis on this issue doesn't really

 7  go all the way to the end.  What she says is "This Court

 8  commends the practice of treating contract attorney work as a

 9  cost."  And then she explains why that's the most appropriate

10  treatment.

11      And then for whatever reason she decides not to award fees

12  at cost, and she says "Professor Rubenstein at Harvard has

13  canvassed the area and found that staff and contract attorney

14  time has been awarded at a rate as low as $240, so that's the

15  rate I'm going to use."

16      What follows from that?  Well, I've not discussed the case

17  with Judge Koh, nor would I for these purposes at least, but

18  one wonders what if Professor Rubenstein had found a lower

19  rate.  Presumably she would have used that one.  Or if the rate

20  that Professor Rubenstein had found was a higher rate, if it

21  was the lowest rate he found, presumably she would have used

22  that one.

23      My point is that rate is not tied to any of the

24  considerations that we normally attach to price setting.  The

25  economist in me says:  Why 240?

1          Now, I could use a little more clarity from Mr. Heimann

2    about what it takes to be a staff attorney in his law firm, and

3    I'll be asking him about that today; and probably I have a

4    feeling we'll get to a place where I'm not going to need

5    anything further to be filed on that particular point.  I think

6    I know what a staff attorney is.

7          And for staff attorneys, assuming that my understanding is

8    correct, I think maybe a rate like 240 might be right.  I have

9    to think about that.

10         But I think it's very, very unlikely -- I think what I

11   should say to plaintiffs' counsel is:  I see the shareholders

12   in this case just like I would any other class member.  So when

13   we talk about Wells Fargo is paying this and Wells Fargo is

14   paying that, that's not the way I see it.

15         And you have an uphill battle getting me to approve, as a

16   lodestar matter, $415 an hour when you have associate attorneys

17   who are billing out at less than that or even if you didn't

18   have associate attorneys who were billing out less than that.

19         I've been waiting, frankly, since *CRT* to get a case that

20   sent the ball right over the plate on this issue, and this is

21   that case.

22         At much less length I can just say the question of what

23   weight is to be given to clawbacks and corporate governance

24   reforms is on the table today.

25         I know Brian Fitzpatrick pretty well and I've relied on

 1  his work as you know.  I don't think he's a corporations

 2  lawyer.

 3      And I say the last category is the 5 percent being given

 4  to these Delaware lawyers.  That's a puzzle.  What standard

 5  governs Delaware counsel's entitlement for fees for work

 6  performed in a different action?

 7      Ordinarily where fees are awarded under the common fund or

 8  substantial benefit exception, counsel must show that they

 9  conferred some benefit on the class, which here would be the

10  shareholders.  What's the benefit?

11      Assuming there has to be a causal relationship, where in

12  the record is the contribution of Delaware counsel documented?

13      Assuming that it would be impossible as a legal matter for

14  me to award those fees directly to Delaware counsel for work

15  performed in a different action before a different judge, why

16  is it okay for me to do it as a pass-through?

17      If I sound less certain of myself than I am on the

18  question of contract fees, it's because the issue is totally

19  novel to me, and I could use at least some reassurance and

20  probably some explanation.

21      Anyway, I took a little longer than I wanted it to.

22      Mr. Frank.

23      **MR. FRANK:**  Thank you, Your Honor.  Ted Frank for

24  objector shareholder John Cashman.

25      Given that you've posed many questions to plaintiffs'

1    counsel, I'd like to reserve some time to rebut that.

2            **THE COURT:**  That request is denied.

3            **MR. FRANK:**  Thank you, Your Honor.

4        With respect to *CRT*, as I'm sure you're aware, that's a

5    completely different case than this one where that was

6    litigated for eight years and the Court ultimately awarded a

7    multiplier of less than two.

8        This obviously was litigated on much shorter terms, had

9    the advantage of federal investigations, a Federal Reserve

10   letter specifically criticizing the role of directors in this

11   case; and on top of that, 24 other actions of plaintiffs --

12           **THE COURT:**  Actually, you know what?  I'm going to

13   reverse course.  I'm going to allocate all of your time to

14   reply.

15           **MR. FRANK:**  Thank you.

16           **THE COURT:**  Because the questions that I asked really

17   were mostly directed at Mr. Heimann.  He knows what you're

18   going to say on these points.  Now I think he needs a chance to

19   explain some things to me.  Let me ask you to have a seat.

20       Mr. Heimann.

21           **MR. HEIMANN:**  I had intended -- good afternoon,

22   Your Honor.

23       I had intended to talk about all sorts of other things,

24   but I will talk about what Your Honor has asked about.

25           **THE COURT:**  Look, it's a marvelous result.

1    $240 million is a lot of money.  I mean, one of the problems

2    that we face here is that there's an anchoring effect; right?

3    So let's say instead of $68 million, you got $48 million.  You

4    would say, "Oh, my God.  You only gave them $48 million."

5    $48 million.  What if you don't get the credit for the

6    60 million and half of the clawbacks and the result was 240 or

7    260 million?  This is a huge amount of money.

8         Anyway, it was a great result.  Good work.  So I just

9    wanted to frame these other things.  I wouldn't say they're

10   marginal, but they're not at the core.

11        **MR. HEIMANN:**  All right.  But they're important and

12   not just for this case because Your Honor is out on a limb, to

13   say the least, in terms of what the courts have done with

14   respect to contract lawyers and staff attorneys.  I know this

15   because I am up to my eyeballs in this issue in another matter

16   where we have done enormous amounts of research and we've

17   actually had Professor Rubenstein from Harvard do additional

18   research for us.

19        We can't find and have found no case ever, ever, which has

20   distinguished between contract lawyers -- and by "contract

21   lawyers" I mean, as I think Your Honor means, lawyers hired

22   through an agency to do work for a law firm -- as distinguished

23   from lawyers who are employed by the law firm but who do

24   exactly the same work.  So let me start there.

25        In our law firm and in this case those contract lawyers

1   and the staff attorney lawyers did exactly the same work.

2   They --

3          THE COURT:  You made a lot more money on the contract

4   lawyers, didn't you?

5          MR. HEIMANN:  Did we?  No, we really didn't, and

6   that's because you have to take into account --

7          THE COURT:  You wouldn't even if I gave you a fee

8   award that you've asked for without modification?

9          MR. HEIMANN:  No.  One thinks that the only costs that

10  are involved when we have a contract lawyer is the hourly rate

11  that we pay the agency.  That's not true.  The contract lawyers

12  engage our expenses in many ways in the same way that the staff

13  attorneys do.

14     We have to train the lawyers.  We have to supervise the

15  lawyers.  We have to provide them space to work, overhead.  All

16  of that is the same with respect to whether a contract lawyer

17  is being paid directly by an agency and we are paying the

18  agency or whether we're paying directly to the staff attorneys

19  from ourselves.

20     There may be a discrepancy, and I can give you --

21          THE COURT:  Wait a minute.  Are you telling me with a

22  straight face you don't make more money on contract lawyers?  I

23  just want to put a fine point on this and move on.

24          MR. HEIMANN:  Marginal.  Marginal.  Marginal.  Maybe

25  we're talking 10 to 20 percent, and I've got a declaration --

 1    we didn't submit it to you, but we submitted it in another

 2    case -- from Professor Rubenstein where he lays all of this

 3    out.  It is a marginal difference.

 4        But more to the point, Your Honor --

 5            THE COURT:  You wouldn't do it if it weren't more

 6    profitable.  I mean, this is a *res ipsa loquitur* situation.

 7            MR. HEIMANN:  No, that's not true.  That's not why we

 8    use contract lawyers.

 9            THE COURT:  Flexibility.

10            MR. HEIMANN:  Flexibility is one of the things, yes.

11    Timing is another.

12            THE COURT:  It's a form of profitability, though.

13            MR. HEIMANN:  It is marginally a form of

14    profitability, Your Honor.  I'm telling you, I'm talking from

15    the inside and you're looking from the outside in.

16        When we go to contract lawyers, we do it because we need

17    to under the circumstances.  So, for example, we get a case in

18    the door that requires us to up our number of lawyers who are

19    going to be doing document analysis and review and doing the

20    analysis that precedes taking depositions, and we don't have

21    the time to go out and vet ourselves lawyers to hire as staff

22    attorneys.

23        And so we go to an agency, an agency with which we have

24    had considerable experience in the past over the years because

25    we've been doing this for more than a decade now, and we can

1    rely on those folks to prevent -- to provide us with lawyers of

2    the quality and experience to do the work that we need done.

3         That's the primary reason we use contract attorneys and

4    has been for a long, long time; and it is not, I assure you, it

5    is not a question of profitability.  That does not figure into

6    our calculus as to why we use a contract lawyer rather than a

7    staff attorney.

8         Now, we didn't brief that or provide you with evidence of

9    that but if that's significant to you, we can because I can

10   show you on a business basis why we do that.

11        **THE COURT:**  What quality of briefing am I going to get

12   going the other way?

13        **MR. HEIMANN:**  I don't know.

14        **THE COURT:**  I mean, that's always -- none.

15        **MR. HEIMANN:**  Well, I mean, that's because they don't

16   know.

17        **THE COURT:**  That's my concern in proceedings like

18   this.  They're nonadversarial and with $68 million at stake,

19   people do a very good job.  I'm not saying I wouldn't benefit

20   from additional briefing.  I'm just saying a lot of additional

21   briefing from people of the caliber of Professor Rubenstein

22   only on one side of the issue I don't think is going to help

23   me.

24        **MR. HEIMANN:**  Well, all right, then.  Let me just try

25   to convince you orally of the point.

1      The notion -- again, I've made the point as best I can

2  this is not a matter of profit.  That's not why we do it.  In

3  fact, it's the furthest thing from our mind in terms of why we

4  staff a case with contract lawyers as opposed to staff

5  attorneys.  We always staff our cases if our staff attorneys

6  are available, if they're not working on something else, with

7  our staff attorneys first.  We only resort to contract

8  attorneys where we don't have sufficient staff attorneys to

9  cover the job that needs to be done.

10      **THE COURT:**  What's the difference between an associate

11  at your law firm and a staff attorney?

12      **MR. HEIMANN:**  Primarily the types of work that they

13  do.  So associates normally are not assigned to do document

14  review and analysis at least at the first or second level.

15  Now, I can explain what I mean by "first or second level" if

16  that --

17      **THE COURT:**  What's the difference in status within the

18  law firm?  Here's the --

19      **MR. HEIMANN:**  Staff attorneys -- here's the other

20  difference.  Staff attorneys are not on a partner track.

21      **THE COURT:**  There we go.  That's what I actually --

22  that's what I expected you to say.

23      **MR. HEIMANN:**  That is the principal distinction other

24  than -- as I say, I can't say we never use associate-level

25  personnel for document review and analysis.  I'm sure we do

1    particularly for the analytical part of it and the second- and

2    third-tier work that goes on with documents; but that is the

3    primary distinction and, of course, there's a difference in

4    pay, in compensation.

5              THE COURT:  Right.

6              MR. HEIMANN:  But now, now let me turn to what is the

7    basis under the law for which hourly rate should be assigned in

8    a situation like this.  Does it have to do with what we pay our

9    lawyers?  Is that a basis upon which to determine what their

10   worth is in the market?  The answer is absolutely not.  There's

11   no law to support that.  None.

12        And Your Honor's suggestion that no private person would

13   agree to pay you called it nine times our costs is just not

14   true.  There's no -- and there's no --

15             THE COURT:  Does your footnote say 40 to $50 an hour?

16             MR. HEIMANN:  Footnote say?

17             THE COURT:  You have a footnote on what you paid your

18   contract lawyers.  Does it say 40 to $50 an hour?

19             MR. HEIMANN:  I can't tell you off the top of my head,

20   but that's about what we pay.

21             THE COURT:  It does say that.

22             MR. HEIMANN:  Okay.

23             THE COURT:  And did you bill that time on your sheet

24   at 415 an hour?

25             MR. HEIMANN:  The lawyers -- if we're talking about

 1   staff attorneys, whose hourly average --

 2        **THE COURT:**  I don't mean to be arguing with you.  The

 3   reason I came to the number nine is it's actually slightly

 4   below the multiplier between what you paid your contract

 5   lawyers and what you billed them at on the materials you gave

 6   me.  I just wanted to make the point.  It's not a number I came

 7   up with.  It's just the number.

 8        **MR. HEIMANN:**  That's fine.  Of course, we're not being

 9   paid nine times.  That's not -- in a lodestar cross-check,

10   we're not being paid on the basis of lodestar.  All the

11   lodestar does is cross-check the reasonableness of the

12   percentage fee that Your Honor awards.  So we're not getting

13   paid nine times what we pay our contract lawyers or our staff

14   attorneys.  We're getting paid a percentage of what we recover.

15        **THE COURT:**  The question is whether a willing -- I

16   want to come back to the point you were making --

17        **MR. HEIMANN:**  Yeah.

18        **THE COURT:**  -- which is you were responding to

19   something I said about what a paying client would do.

20        **MR. HEIMANN:**  Yes.

21        **THE COURT:**  And you were telling me -- I think you

22   were winding up to tell me, "Judge, they would happily pay it."

23        **MR. HEIMANN:**  I don't know --

24        **THE COURT:**  And that number is nine times.

25        **MR. HEIMANN:**  All right.  Well, we do hourly work and

1    we have for sometime.  It's a small percentage of our work but

2    we do it.  And we have a set of hourly rates for all of our

3    lawyers, rack rates, whatever you want to call them, and those

4    rates are paid by those clients that we represent on an hourly

5    basis.  Schwab & Company, for example.  And we make no

6    distinction with respect to the lawyers who do perform the work

7    that our staff and contract lawyers do between those two in

8    terms of charging an hourly rate to our hourly clients, and

9    they pay those rates.

10        And, frankly, I have never experienced any instance where

11   a client in that situation questioned whether there was a

12   distinction or difference between staff and contract lawyers in

13   terms of what they should be paying them because the people

14   that we deal with at least are sophisticated in the legal field

15   and understand that lawyers who are doing that kind of work,

16   what the rates are, generally speaking, for those kinds of

17   lawyers and they don't make that distinction.

18        Now, let me also go to the law.  As I started out, the

19   law, the case authority, and this goes back more than 30 years

20   now, has never -- there's never been a single case, other than

21   Judge Koh, who was riffing off of something that I know about

22   that's going on in Massachusetts, there's never been a single

23   case where a court has made a distinction between contract

24   lawyers and staff attorneys in terms of whether they should be

25   included on the lodestar and at what rate.

1          In fact, the one -- I can -- the case, the *Citicorp* [sic]

2     case, this goes back about five or six years, Judge Stern,

3     specifically identified in the opinion that he wrote about

4     this, that he understood that the lawyers that he was dealing

5     with were contract lawyers as distinguished from staff

6     attorneys, and he was concerned about the hourly rate but not

7     that they should be charged at cost.  He rejected -- that was

8     Mr. Frank's argument to Judge Stern.  He rejected that out of

9     hand as absurd really, and he said the real question is:  How

10    much on a market basis should these lawyers be billed to for

11    purposes of the lodestar?

12         And Judge Stern handled that by coming, I would say with

13    very little empirical data to support it, with a rate of

14    something like 200 or 220 -- I've forgotten exactly what it

15    was -- and then found that, of course, it didn't make any

16    difference.

17         We're going to argue that here I suppose at some point

18    because when you -- even if you reduce the rates to whatever

19    rate you want to reduce it to, it turns out the lodestar

20    multiplier doesn't move beyond what is still reasonable.

21         But I want to emphasize once again, I can't emphasize this

22    enough, the lawyers who are contract lawyers who work for us

23    and the staff attorneys do the same work, the same --

24         **THE COURT:**  Well, let me actually say, because you

25    reminded me of something else, which is not in my notes but

1   it's in my head, and that is, you know, Professor Fitzpatrick

2   says in his declaration that whatever percentage you're asking

3   for -- I actually forgot what that is; I know the total number,

4   but anyway -- that that's reasonable because it's only so many

5   standard deviations away from the mean of the data that's

6   reflected in his study.  His study itself, the data would

7   suggest a lower percentage.

8        So it's possible that it wouldn't matter, and one of the

9   things that I share with Judge Koh is I think lodestars are

10  useful almost always only as a cross-check.  I think really you

11  ought to make it about percentage because it just makes more

12  sense from an incentive standpoint, but I can't exclude the

13  possibility that it might make a difference.

14       MR. HEIMANN:  No, and we could calculate it, I mean,

15  once you come up with where you come out.

16       But there's one other aspect of this I think is important.

17  As I said, no court has ever made this distinction that you're

18  suggesting to make and no court has ever ruled, that I'm aware

19  of, and we've looked very hard, that contract attorneys should

20  be billed as a cost rather than --

21       THE COURT:  No one has ever said it had to be done.

22  Judge Koh said it was better.  So the word matters.  You're

23  going like this (indicating), but the word matters.

24       MR. HEIMANN:  Well --

25       THE COURT:  "Should" means "should."  No one ever said

1    it's required.

2         **MR. HEIMANN:**  Okay.

3         **THE COURT:**  I'll give you that.

4         **MR. HEIMANN:**  All right.  And Judge Koh is the only

5    judge I've ever heard of who said it should.

6         There are two cases I think from New York, the Southern

7    District, where it was actually done voluntarily under

8    circumstances which are explained why it was done voluntarily

9    where the judge said, "Thanks very much.  It avoids me having

10   to decide what a fair hourly rate is."

11        But neither of those courts said that it was even

12   something that should be done, let alone something that had to

13   be done.

14        But let me come to the point.  Judge Koh said this -- what

15   was it? -- about a year ago I think her case came down.

16        **THE COURT:**  It's a 2018 order.  I don't have the exact

17   date.

18        **MR. HEIMANN:**  It's about halfway through our work on

19   this case.

20        So how fair is it for Your Honor after the fact, after

21   we've done all the work, to now say we should -- that our fee

22   should suffer because you want to change the rules on us and

23   treat the contract lawyers as an expense rather than included

24   in the lodestar?

25        **THE COURT:**  If I think the rule should be -- if I

1   think that should be the rule, how could I ever do it, then,

2   without issuing an advisory opinion?  Doesn't it have to be in

3   someone's case?  What am I to do with that argument?

4          **MR. HEIMANN:**  I would say this:  I think you've

5   already shot the bullet across the bow with your order in the

6   *Bail Bonds* case, and from now on we will take that into account

7   not only with you but with other judges in the

8   Northern District because we know that Your Honor's views have

9   some influence among other judges.

10         But at least we're forwarned and can do what we think is

11  appropriate to deal with that if there's anything that we can

12  do -- if we can deal with it.  We may not be able to deal with

13  it.  As I said before, we -- the reason we use contract

14  attorneys is not because we want to use contract attorneys,

15  it's because we're put into a situation where that is what we

16  need to do in order to get the work done on a particular case

17  because we don't have the staff personnel available to do that

18  work.

19         **THE COURT:**  Mr. Heimann, I'm told you've got about

20  five minutes.

21         **MR. HEIMANN:**  One other thing --

22         **THE COURT:**  Madam Clerk, out of 30, really?

23         **THE CLERK:**  Oh, I'm sorry, Your Honor.  I thought his

24  was 20.

25         **THE COURT:**  He's got 30.

1        **THE CLERK:**  My apologies.

2        **THE COURT:**  You've got 15.

3        **MR. HEIMANN:**  All right.  One other thing I wanted to

4    mention, if I didn't get it out, in terms of the status of

5    staff versus contract attorneys, they are identical in terms of

6    their educational qualifications, the schools they went to, the

7    degrees they hold, their years of experience.

8        So the distinction here, if there is a distinction to be

9    made, is whether they're strictly getting paid directly or

10   getting paid indirectly and the marginal difference in terms of

11   what Your Honor is focusing on in terms of the costs.

12       But I want to come back and emphasize one other thing.

13   Your Honor says no client would be willing to pay that.  I

14   don't believe Your Honor has empirical data to support that.

15   We don't I know.

16       **THE COURT:**  I don't have empirical data to support it.

17   There's a profound lack of empirical data all the way around on

18   these questions, frankly.

19       **MR. HEIMANN:**  You know, we could live and I think the

20   plaintiffs' bar generally could live with any rule that you

21   wanted to come up with about it, but we just need to know what

22   it is going in so we are able to deal with it in a way that

23   makes sense.

24       **THE COURT:**  I promise you won't lose money on this

25   case, Mr. Heimann.

1          **MR. HEIMANN:**  I appreciate that, Your Honor.

2      All right.  If I have -- if you have any other questions

3   about that, I'll do my best to answer them, but I want to get

4   down to this Delaware counsel thing; but I wasn't quite sure

5   about what your question was about, if there was one, about

6   Mr. Fitzpatrick's qualifications -- or Professor Fitzpatrick's

7   qualification to speak to --

8          **THE COURT:**  I don't have any questions about that.

9          **MR. HEIMANN:**  All right.  Let me go to Delaware

10  counsel because the facts here are very straightforward but

11  important, and I don't know on a legal basis how it affects

12  what Your Honor's questions are but at least you need to know

13  clearly what the facts are.

14         **THE COURT:**  What work did they do on this case?

15  That's my first question.  I think it's none; right?

16         **MR. HEIMANN:**  Specifically on this case I would say

17  none, although I think one --

18         **THE COURT:**  Then why am I paying them?  Why am I being

19  asked to pay them?

20         **MR. HEIMANN:**  That's what I want to explain, at least

21  on a factual basis.

22      Much like Mr. Cotchett had a derivative action, competing

23  derivative action, on file here in the Superior Court in

24  San Francisco which was posing a threat to our litigation

25  because Judge Karnow had at least initially a very different

1   view about the key first issue in a derivative case, demand

2   futility --

3            THE COURT:  Yes, I remember.

4            MR. HEIMANN:  -- you remember very well, we knew under

5   the law that if Judge Karnow had ultimately ruled against

6   Mr. Cotchett on that issue, we were in dire straits on a

7   *res judicata* basis, that our case would be dismissible because

8   if that order came down before your order became final, and it

9   would have because your order doesn't become final until it

10  goes to appeal under the federal system, so that ruling by

11  Judge Karnow dismissing Mr. Cotchett's case on demand futility

12  grounds could have killed our case.

13           THE COURT:  Right.

14           MR. HEIMANN:  Same thing in Delaware.  There was a

15  case -- actually several cases in Delaware asserting the same

16  claims that we were asserting here.  Now, here's a curious

17  difference.  I want to make this point.

18       In the case of Mr. Cotchett's lawsuit, the defendants and

19  the bank opposed the pursuit of that case.  They sought to stay

20  that case --

21           THE COURT:  Yes.

22           MR. HEIMANN:  -- alongside of us.

23           THE COURT:  Let me cut to the chase because I don't

24  want you to use more time on this than you have to.

25           MR. HEIMANN:  All right.

1          **THE COURT:**  It looks to me like you want this Court to

2    allocate 5 percent of the fee recovery here to some other

3    lawyers because they agreed to stop litigating somewhere else.

4          **MR. HEIMANN:**  That's essentially --

5          **THE COURT:**  Because if they had continued to litigate,

6    then that might have produced a result that made it difficult

7    or impossible to prevail here, and I don't understand why

8    that's a good idea.

9          So some other judge might have ruled differently.  Maybe

10   that judge knows more than I do.  Maybe I was wrong.  This is

11   just -- this is how courts work.  There are competing things

12   happening around the country.  Why am I paying money for that?

13   Those people didn't help you.

14         **MR. HEIMANN:**  We're not asking you to pay money,

15   Your Honor.  That's our burden.  What we did -- what we did,

16   although I'm not sure technically we were required to, was

17   disclose to you what our obligations were and are to the

18   lawyers in Delaware so that no one could ever say we had hidden

19   from you the fact that some portion of the award that

20   Your Honor will make to us was going to go to compensate

21   somebody else.

22         **THE COURT:**  Well, for the record, my gut instinct

23   tells me on a pop-quiz basis that you do have an obligation to

24   disclose it, and I would like the transcript just to state that

25   I have that feeling.  This is shareholder money, and I think

1  that lawyers should justify a fee request based on a lodestar

2  and hours and their actual expenses and everything else.

3      And you and I both know that 5 percent of $68 million is a

4  very big number, and the idea that there's someone who thinks

5  they don't need to disclose that to the judge would trouble me.

6  So, yes, I'm glad you disclosed it.

7          **MR. HEIMANN:**  Well, but I've got to push back a little

8  bit.  Actually, the rules don't require it.  Now, again, I've

9  gone through this.  The rules don't require it, but we

10  thought --

11          **THE COURT:**  Mr. Heimann, today is your day to win some

12  fights that are important to you and you do not help yourself

13  by pushing back on that collateral issue of whether it needs to

14  be disclosed here because you already have.

15          **MR. HEIMANN:**  We have and we did it for the very

16  specific reason that we didn't want to ever be -- anybody to

17  second-guess whether or not we were required to do it; and even

18  if we weren't required to do it, we thought it was appropriate

19  and necessary so that Your Honor was fully informed.  That is

20  the fact.

21          **THE COURT:**  You may have some other points you wanted

22  to make.

23          **MR. HEIMANN:**  I did.  I wanted to -- despite the fact

24  that the briefing on the fee issue is extensive and

25  comprehensive, I wanted to make two points about the fee

1   request.

2        The first has to do with the fact that the first and

3   foremost element or factor in determining a fair and reasonable

4   fee here is the results obtained, and I know Your Honor has

5   made reference to that already but I just want to emphasize

6   that what you're dealing with is the second-largest derivative

7   recovery ever, the largest derivative recovery funded by

8   insurance and, perhaps most importantly, the largest Caremark

9   claim -- the largest recovery in a Caremark claim ever, and I

10  think that bears noting.

11       I won't go through the percentages of what the 240 or the

12  320, whichever one you want to use --

13       **THE COURT:**  Do you want to push back on what Mr. Frank

14  calls his causal indeterminacy point?

15       **MR. HEIMANN:**  I'm not even sure what that means.  I

16  don't understand.  Is he saying that -- is it his point that we

17  were at no risk in this case?  It was a lay down?

18       **THE COURT:**  No.  He uses that vocabulary in connection

19  with your valuation of the clawback and corporate governance

20  reforms.

21       **MR. HEIMANN:**  All right.  We don't dispute the notion

22  that the bank's actions with respect to both the clawbacks and

23  corporate reforms or corporate governance changes were the

24  product of what -- were causally connected with several

25  different possible causes, actual causes.

 1          What we're saying is that --

 2          THE COURT:  Do you think that the clawbacks became

 3   50 percent more likely because of things that you did --

 4   actually did in the lawsuit?

 5          MR. HEIMANN:  That's impossible to say.

 6          THE COURT:  Someone did say it.

 7          MR. HEIMANN:  No.

 8          THE COURT:  They said it on your behalf.  You paid

 9   them to say it.

10          MR. HEIMANN:  Well, all right.  I don't think they

11   said -- I don't think they said that in terms quantifying it

12   that way.  I think what they said was that under the

13   circumstances, it was probable that our actions had some causal

14   impact on the decisions by the bank and the bank said that it

15   did.  That was part of the settlement.  It was the bank -- it

16   was the bank who signed on to -- well, that's a bad way of

17   putting it.

18          We weren't the ones who proposed that aspect of the

19   settlement.  It came from a different source.  Okay?

20          THE COURT:  It came from Danny Weinstein, didn't it?

21          MR. HEIMANN:  No, actually, it didn't.  It didn't, not

22   in --

23          THE COURT:  I shouldn't say -- I mean Judge Weinstein.

24          MR. HEIMANN:  Judge Weinstein.  It didn't.  Do you

25   want to know who it came from?

1          **THE COURT:**  I do.

2          **MR. HEIMANN:**  The insurance carriers.  It was their

3     idea and they pressed it very hard, and the bank agreed with

4     the carriers' position that there was a causal relationship

5     between the pursuit of the case, the derivative case against

6     the bank, and at least, to some extent, the corporate

7     governance reforms that the Board of Directors were willing to

8     make and did make during the course of the pendency of the

9     lawsuit.

10         Now, is that the strongest argument in favor of a fee

11    award here?  Of course not.  But is it entitled to some weight?

12    I can only look to Professor Fitzpatrick's declaration in

13    respect to that and why he thinks it's important both from a

14    prophylactic point of view and in terms of what actually

15    happened in this case.

16         Now, I think -- I just wanted to finish up on the Delaware

17    aspect of this, if I may.  As I was saying, the bank and the

18    defendants supported the staying of the Cotchett lawsuit; but

19    when it came to the Delaware lawsuit, they flip-flopped.  At

20    whose request?  The carriers.  The carriers thought that was a

21    shot to kill this case.

22         So they went in front of the Delaware court and argued

23    against our motion to stay, and it was in those circumstances

24    that we reached an agreement with Delaware counsel so that they

25    would voluntarily support a motion to stay; and, in fact, the

1  order of the Delaware court finally did stay the action, and I

2  think one or more of the actions were dismissed voluntarily as

3  a part of that entire thing.

4      So the benefit that we saw as plaintiffs in this case for

5  this case was the elimination of a very dangerous potential for

6  an order in that court that would have undermined our efforts

7  here.

8      Now, I don't --

9      **THE COURT:**  Now you really have five minutes.  I got

10  it right this time.

11      Let me just say what my concern is, and this is going to

12  be sort of half formed.  But I can imagine a circumstance in

13  which a class action lawsuit is filed and the claims are poorly

14  supported by the law.  And more than one class action is filed

15  around the country, and most sensible judges reading the law

16  fairly would come to the conclusion that the case was not --

17  the claims were not good.  And, in fact -- but there's one

18  jurisdiction where the case seems to have some momentum, and

19  the lawyers run around and just pay off the people in the other

20  jurisdictions.

21      That's not good for the development of the law and it

22  doesn't lead to a just result.  And so if I'm to find that

23  these payments are good -- this is the part where the question

24  is half formed -- why shouldn't I be worried about that?

25      **MR. HEIMANN:**  I don't think this is the first occasion

1   where that's happened.  I think the hypothetical that

2   Your Honor has articulated is a reality, has been a reality

3   from time to time.

4           **THE COURT:**  Yeah.

5           **MR. HEIMANN:**  And I don't know that there's any

6   impropriety in that regard.  I can understand why Your Honor --

7   or the judiciary would be concerned about that.

8           **THE COURT:**  Lots of things that happen in the law that

9   I don't like, but I'm not asked to bless them.

10          **MR. HEIMANN:**  Well, fair enough, Your Honor.

11      With my last couple of minutes I wanted to go to the

12  second major point I wanted to highlight about the fairness of

13  the $68 million proposed fee, and that is it was negotiated.

14  Now, I know Your Honor knows this, but I want to make sure

15  Your Honor appreciates fully the circumstances here.

16      I don't need to tell you how sophisticated Wells Fargo

17  Bank is dealing with lawyers' fees and how sophisticated their

18  lawyers are who negotiated the lawyers' fees in this case.

19  They knew in detail what the factors -- how the factors

20  measured up against what we had done as plaintiffs in this case

21  to warrant that fee.

22      But perhaps the most important thing that I want to get

23  across --

24          **THE COURT:**  Were Mr. Cullen and his firm negotiating

25  that issue for Wells Fargo?

1              **MR. HEIMANN:**  They were involved in the negotiations,

2    yes, sir.

3              **THE COURT:**  Your wording was slightly different than

4    mine.  Were they the principal negotiators for Wells Fargo in

5    this fee question?

6              **MR. HEIMANN:**  As to my negotiations, they were.

7              **THE COURT:**  Okay.

8              **MR. HEIMANN:**  But as you know, Judge Weinstein

9    participated to some extent in those negotiations as well.

10             **THE COURT:**  No, that's okay.  You've answered the

11   question.

12             **MR. HEIMANN:**  All right.

13        As you know from the papers, the award of an attorneys'

14   fee in this case, whether large or small or not at all, is not

15   a condition of the settlement.  So if Your Honor decides to

16   stiff us, we still have a settlement.

17        That was the case when the fee was negotiated.  In other

18   words, the bank's agreement with us was that they agreed to pay

19   a reasonable fee.  They didn't agree to negotiate a fee.  They

20   didn't agree that they were required to negotiate.  They could

21   have not negotiated or negotiated.  It was up to them, but that

22   didn't imperil the settlement.  They had the settlement.

23        So they were unrestrained -- unconstrained when they

24   negotiated the fee with us by what was going to happen with the

25   settlement.  It was going to be a settlement regardless.  So

1    there was no limitation, if you will, or constraint on the bank

2    to negotiate a fee that they thought was anything other than

3    reasonable when they engaged in the negotiations and came to an

4    agreement at the number that we're seeking here.

5         It seems to me while it's true under Ninth Circuit

6    precedent, even though it's an old one in the case of *Vizcaino*,

7    it's not conclusive even under these circumstances where you

8    have highly sophisticated parties -- now I'm talking about the

9    bank, not us -- highly sophisticated parties negotiating a

10   reasonable fee, but it certainly is entitled at a minimum to

11   great weight in Your Honor's determination about whether or not

12   the fee that we're requesting is reasonable or not.

13        **THE COURT:**  Right on time.

14        Mr. Heimann, I've enjoyed your advocacy every time you've

15   been at the podium.  This is probably the first time when

16   things have gotten a little fricative and you know what?  I

17   still enjoyed it so thank you.

18        **MR. HEIMANN:**  I did as well, Your Honor.

19        **THE COURT:**  Thank you.

20        All right.  Mr. Frank.

21        **MR. FRANK:**  Thank you, Your Honor.

22        We did submit substantial empirical evidence in the

23   *Citigroup* case and also the association of corporate counsel

24   submitted *amicus* in that case with empirical data.

25        **THE COURT:**  Yeah.  I just want to interrupt for one

 1    second to say, in light of what you've heard me say to

 2    Mr. Heimann, you might conclude you don't actually need the

 3    whole 20 minutes.  You can still use it if you want, but you

 4    might conclude based on some things I've said that I've done a

 5    thorough job of reading what you submitted in paper.

 6         **MR. FRANK:**  Excellent.  I won't repeat what we've

 7    submitted in papers, but if you're looking for empirical

 8    evidence of what the market rates are for attorneys who do the

 9    document review that the contract attorneys do here, ask

10    Wells Fargo.  Why should Wells Fargo's shareholders pay more

11    than what Wells Fargo pays the big law firms that do this?

12         I'm confident that it's in the two-digit range, confident

13    enough that --

14         **THE COURT:**  You mean, the hourly -- that the hourly

15    rate paid is in the two-digit range?

16         **MR. FRANK:**  Yes.

17         I want to correct one thing Your Honor said.  Footnote 9

18    of their reply brief said that the contract attorneys were paid

19    $35 an hour.  The 40- to $50-an-hour rate was our estimate.

20         But one thing I do want to rebut that Mr. Heimann said is

21    that the staff attorneys are treated like the regular

22    attorneys.  Generally from what staff attorneys have told me

23    after publicity from the *Citibank* case, that's not the case.

24    They're kept on a separate floor often.  They don't have their

25    own offices.  They're judged by the number of clicks on the

1    computer that they have.

2           **THE COURT:**  Are you talking about your personal

3    experience with the contract lawyers who work at Lieff,

4    Cabraser & Heimann?

5           **MR. FRANK:**  With other firms so not necessarily Lieff,

6    but it would surprise me if they were given their own offices

7    rather than being kept in a bullpen, that they weren't having

8    the sort of oversight that other contract attorneys have, but

9    we can leave that separately.

10          Whether they're a profit center, something that I can say

11   with respect to Lieff Cabraser, because we know this from the

12   *State Street* case where there was a lot of evidence taken, and

13   that's still under consideration by Judge Wolf, is that where

14   there are separate firms involved in the litigation, they

15   negotiated amongst themselves the share of the contract

16   attorneys they would get to hire for the case.

17          They very clearly viewed it as a profit center because it

18   was a subject of negotiation who gets to have the -- who gets

19   to take credit for the contract attorneys, who gets to hire the

20   contract attorneys.

21          With respect to the causal factor and the fact that the

22   insurance company proposed the idea that Lieff Cabraser could

23   take credit for $60 million of the clawbacks, I think that sort

24   of proves our point actually because that's a zero cost for the

25   insurance company and a very easy way for them to settle the

1     case.

2            **THE COURT:**  Excuse me, Mr. Frank.  I'm worried based

3     on something you said that the audience might think that I

4     didn't read the papers very carefully.  The 40- to $50-an-hour

5     figure is contained in the motion for attorneys' fees on

6     page 23 at Footnote 13.

7            **MR. FRANK:**  Then I apologize then.  That's where that

8     came from, and they said 35 in the reply brief.  And I

9     apologize for the error, and I apologize for suggesting you got

10    something wrong because you're very clearly a very careful

11    judge, and I'm very impressed by it.

12           **THE COURT:**  I don't want to look thin skinned.

13           **MR. FRANK:**  Huh?

14           **THE COURT:**  I don't want to look thin skinned either.

15    But, anyway, go ahead.

16           **MR. FRANK:**  The insurance company is trying to get out

17    of this case as cheaply as possible and if it can do it at

18    shareholder expense by saying "Why don't you take credit for

19    something that costs us nothing, it is no skin off of our nose

20    and will allow you to get out of this settlement for less money

21    from us but more money from you," they have every incentive to

22    agree to that.

23         And Wells Fargo, of course, has every incentive to agree

24    to that because they want global peace; and if they can't come

25    to an agreement on the attorneys' fees and that's going to get

 1   litigated, the whole settlement might fall through.

 2       So --

 3           THE COURT:  Well, Mr. Heimann says that we've already

 4   agreed on the number and so "litigated" just means that either

 5   a fee application is submitted with the bank's support or a fee

 6   application is submitted without the bank's support.  The issue

 7   isn't being litigated.  That's why we're here today.  That's

 8   what he would say.  Why is that wrong?

 9           MR. FRANK:  Well, it's not entitled to deference and

10   that's *Bluetooth*, that's *Dennis v. Kellogg*.  The Court has an

11   independent obligation, as we cited in our briefs, to look at

12   the fee application.

13       I've already addressed *CRT*.

14       I've addressed -- it sounds like the Court isn't going to

15   consider the Fitzpatrick declaration, but we do object to --

16           THE COURT:  Oh, no, I'll consider it.

17           MR. FRANK:  All right.  Well --

18           THE COURT:  It's just that I think that

19   Professor Fitzpatrick did us all such a large service by

20   publishing his studies in law reviews that just contain the

21   data and it has an effect, the nature of which it's still

22   uncertain of, when he monetizes that work by serving as an

23   expert witness.  That's all.

24       I don't have anything more to say about that.  I don't

25   think -- I think that your point that he is probably

1    unqualified in the area of corporations law sufficiently to

2    render some of the opinions that he gives in his declaration is

3    well taken, but I am going to consider his declaration and I

4    have tremendous respect for Professor Fitzpatrick.

5            **MR. FRANK:**  As do I, but we do object to the

6    supplemental expert report submitted with the reply brief.

7    That's a violation of *Mercury Securities* and Rule 23(h) as

8    Judge Koh found in the *Anthem* case where Lieff tried to submit

9    a reply brief with a Fitzpatrick declaration.

10           In their reply brief they suggested that the settlement

11   remained unlikely after October 2018.  As the Court recalls, in

12   the October 17th hearing on the proposed schedule, the parties

13   punted on just about every issue saying "We'll resolve this in

14   a January hearing if necessary."

15           It seems pretty clear at the time that they were very

16   close to settlement or understood they were very close to

17   settlement.  At a minimum, they knew that Wells Fargo would not

18   want to litigate this case with billions of dollars at stake

19   where --

20           **THE COURT:**  That one's a little tougher for me, I have

21   to say, you know.  I was never at a plaintiffs' firm when I

22   went on the bench, which was several years ago now.  I was at a

23   defense firm in town what was then called Keker & Van Nest.  I

24   don't remember ever telling anybody to stop working on a case

25   until there was wet blue ink on a settlement agreement.  I just

1  don't remember that.

2      I mean, I remember actually the reverse, and that is, if

3  you were at the partner level, you began to get worried that if

4  people knew that a settlement had been reached in principle,

5  they might relax a little bit when that would be sort of a bad

6  idea.  Do you want to push back on that?

7      **MR. FRANK:**  Well, it's difficult for us to push back

8  on that because they didn't submit the lodestar data that is

9  normally required by the Northern District rules, and they

10  don't -- they never addressed that argument from our objection

11  that the Northern District rules require them to do that.

12      But certainly in the *Citigroup* case we found that there

13  was a date where there is a mediation session and then the

14  partners stopped working on the case, and suddenly a bunch of

15  contract attorneys were hired and they started churning.

16  Whether that happened here, I have no idea.  We don't have the

17  data so I can't make the accusation.

18      What I can note is that the average hourly rate dropped

19  over time and whether that was because some people stopped

20  working and other people worked more upon the knowledge that

21  the case was close to complete, I don't know; but certainly by

22  December everything was pretty much resolved.

23      I'm happy to answer any questions the Court might have.

24      **THE COURT:**  I don't have any.  As I hope you

25  appreciated from my discussion with Mr. Heimann, I found parts

1   of your objection very helpful.

2          **MR. FRANK:**  Thank you, Your Honor.

3          **THE COURT:**  Thank you.

4          **MR. FRANK:**  And I apologize for any parts you didn't

5   find helpful.

6          **THE COURT:**  Kristen Frost or Patrick Ridley.

7          **MR. RIDLEY:**  Thank you, Your Honor.  I'm Patrick

8   Ridley on behalf of objector Kevin Fisher.

9          I'd like to address a couple points in my few minutes

10  before the Court.  One is the clawback and corporate reform

11  issue and then just the amount of attorneys' fees that

12  Mr. Fisher believes is appropriate.

13         In terms of the corporate reforms, it's our view that the

14  settlement language indicates that Wells Fargo acknowledges

15  that facts alleged in the complaint contributed to corporate --

16  the corporate reforms, but nowhere is there a statement that

17  plaintiffs' attorneys' efforts in connection with developing

18  corporate returns -- corporate reforms or their work with

19  Wells Fargo contributed to those corporate reforms.

20         And in plaintiffs' counsel's papers, nowhere do we see any

21  evidence of actually the effort put forth to effectuate the

22  corporate reforms.

23         And so --

24         **THE COURT:**  Well, the easiest -- I mean, I don't know

25  the easiest.  The best evidence would be something from

1    Wells Fargo that says "I'm in a position of authority and I

2    authorized these changes because of this lawsuit."  But we

3    don't have that.

4         **MR. RIDLEY:**  We don't have that.

5         **THE COURT:**  Right.

6         **MR. RIDLEY:**  There's no evidence to that, and paying

7    $60 million in the absence of any evidence for attorneys' fees

8    on that score doesn't make a lot of sense to me.

9         **THE COURT:**  What do you think the number should be?

10        **MR. RIDLEY:**  I don't think there -- I think the number

11   should be 240 million, Your Honor, for the derivative --

12        **THE COURT:**  No.  What do you think the fee should be?

13   That's what you came here to tell me.

14        **MR. RIDLEY:**  48 million.

15        **THE COURT:**  Hmm.

16        **MR. RIDLEY:**  I think it should be based upon

17   $240 million settlement at 20 percent.  Why 20 percent?  I

18   think we --

19        **THE COURT:**  Brian Fitzpatrick.  That's the answer to

20   that.

21        **MR. RIDLEY:**  Right.

22        **THE COURT:**  It is.  Because of the size of the

23   settlement.

24        **MR. RIDLEY:**  Yeah.  And --

25        **THE COURT:**  I think that's your best argument.  You

 1 | may have a different one, but I think that's your best
 2 | argument.
 3 |         **MR. RIDLEY:**  I'm sorry.  I may have misheard you.
 4 | Could you say it again?
 5 |         **THE COURT:**  Brian Fitzpatrick, the person that I was
 6 | talking about with Mr. --
 7 |         **MR. RIDLEY:**  Right.  Right.
 8 |         **THE COURT:**  Never mind.  I'm sorry.  Go ahead.  I'm
 9 | interrupting you.
10 |         **MR. RIDLEY:**  Absolutely.  No, that was one of my
11 | points.  I just misunderstood you.
12 |     It's also the 20 percent that you agreed to in the
13 | shareholders case based upon a $480 million settlement, which
14 | was an extraordinary settlement.  20 percent attorneys' fees is
15 | what you thought was appropriate.
16 |     It's based upon the seven cases that we've put before the
17 | Court that we believe are the best comparables because they're
18 | all derivative cases.  They're all between 100 and $250,000;
19 | and if you average those seven awards of attorneys' fees out,
20 | it ends up at 18.9 percent.  18.9 percent, 20 percent, both of
21 | those are reasonable awards for attorneys' fees.
22 |     I talked for a moment about the claw -- the corporate
23 | reforms and the clawbacks together are $80 million.  There is
24 | no evidence that we found that suggests that the clawbacks were
25 | a result of work that plaintiffs' counsel did.

1          Those clawbacks appear to have all been accomplished

2     through government efforts and litigation in regulatory matters

3     prior to plaintiffs' counsel being in a position where they

4     could have effectuated, you know, clawbacks.  I think they're

5     seeking 50 percent of credit for the clawbacks, but it's a

6     large number.  And to award them $80 million for the clawbacks

7     and corporate reforms, in our view, it is excessive.

8          We're asking simply that the Court award 48 million in

9     attorneys' fees, which is fair and reasonable and, as the Court

10    said at the beginning of this proceeding, it's a lot of money.

11              **THE COURT:**  Thank you.

12              **MR. RIDLEY:**  Thank you.

13              **THE COURT:**  Mr. Himmelstein.

14              **MR. HIMMELSTEIN:**  Did I hear Your Honor say five

15    minutes?

16              **THE COURT:**  You did.

17              **MR. HIMMELSTEIN:**  Okay.  If you don't mind, I'm going

18    to start a timer.

19          I found co-lead counsel's reply brief less than

20    satisfying, at least with respect to my client, Ms. LeBendig,

21    who's here in the courtroom today, third row back, one over,

22    and who's a party to these proceedings, not merely an objector.

23    She filed her complaint before Lieff Cabraser filed theirs.

24          Since I have so little time, I'm going to cut out all the

25    fluff.  Let's go to the points they made in their reply.  Quote

1   (reading):

2          "Co-lead counsel exercising their discretion

3      determined LeBendig's assistance was unnecessary given the

4      case's posture at that time."

5      In support of that argument, they cite Document 219, a

6   May 2018 order consolidating the Hannon action raising claims

7   against American Express.  For the life of me, I can't figure

8   out what that has to do with the substance of our opposition.

9      I would refer the Court instead to page 17 of their final

10  approval motion where they say that after over two years of

11  litigation, one of the primary obstacles to recovery remains

12  that, quote (reading):

13         "In 2014 the board received reports from management

14      indicating that sales practices issues were being

15      scrutinized and that they were decreasing," unquote.

16     That was because of what Ms. LeBendig stated in her

17  declaration, quote (reading):

18         "In 2014 Wells Fargo doubled the number of new

19      accounts that it would allow to be missing a signature;

20      i.e., without declaring an exception from one out of seven

21      to two out of seven," unquote.

22     A 100 percent increase in the detection threshold.  Is it

23  any wonder the reports made it look like the practice was

24  decreasing?  Because unless it was increasing by more than

25  100 percent, that's what it would have looked like.

1           Did co-lead counsel know this?  Obviously not or they

2      would not have highlighted this in their motion for final

3      approval.

4           I see plenty of details about Wells Fargo's defenses at

5      pages 16 to 7 -- 16 to 17 in their reply.  I see nothing in

6      over 48,000 of hours spent, $22 million of lodestar, about what

7      they actually discovered.  Do they know now what my client knew

8      before they ever filed their case?  As far as I can tell, no.

9           What else did they say?  It's simply not credible or

10     believable that Lieff Cabraser saw no benefit in having a

11     Wells Fargo insider on the team.  If that's how they really saw

12     it, they were incompetent and they're not that.

13          Next, the co-lead counsel argue that, quote (reading):

14               "LeBendig's counsel offered only information about

15          what she purportedly would have provided.  None of that

16          information was included in her complaint for which her

17          counsel now seek a fee," unquote.

18          That's page 20, Note 12, of the reply.  Well, I certainly

19     tried over and over.

20               **THE COURT:**  Mr. Himmelstein --

21               **MR. HIMMELSTEIN:**  Yes, Your Honor.

22               **THE COURT:**  -- you and I are so close to each other --

23               **MR. HIMMELSTEIN:**  I think I'll lower my voice.

24               **THE COURT:**  -- that you don't need to raise your

25     voice.

1      **MR. HIMMELSTEIN:**  I'm sorry.  It's the time constraint

2  is making me a little nervous here.  Might I have a couple

3  extra minutes if I go a little over?

4      **THE COURT:**  No.  You actually used some of your time

5  complaining about how little time you have.  Go.

6      **MR. HIMMELSTEIN:**  I apologize, Your Honor.

7      Okay.  They say we only offered -- (reading)

8          "None of the information was included in her complaint

9          for which counsel now seek a fee," unquote.

10     I put it in the first e-mail I sent them the day after she

11  was appointed -- they were appointed co-lead counsel that she

12  was an employee of Wells Fargo until January 7th, 2017, less

13  than a week before they were appointed; and for that reason, we

14  confined our complaint information in the public record so she

15  wouldn't get in trouble, but now we were offering them all of

16  that stuff and they clearly did not want it and you have to ask

17  why.

18     Okay.  There's only a couple reasons I can think.  They

19  didn't want to short-circuit discovery.  Ms. LeBendig could

20  have walked them through stuff they ended up sorting through

21  themselves.  I looked at the amount of discovery done.

22  52 percent of the hours were spent on discovery.  It was

23  18,000 -- 9,854 hours of LCHB's 8000 hours.  Could they have

24  done it more efficiently?  Yes.

25     Now, how did they get their position?  Your Honor's order

1  says because they promised, because of the widespread vocal

2  recognition, including from Ms. LeBendig, of their inclusive

3  approach to working with other plaintiffs and co-counsel and it

4  would be critical.

5       The ink was not dry on Your Honor's order before they

6  started to subvert it by saying to co-lead counsel with

7  valuable information, "Nah.  We don't need you."

8       So what -- there's several possible outcomes here.  I

9  understand it's a huge settlement and --

10          **THE COURT:**  Mr. Himmelstein, your time has elapsed.

11 Thank you.

12          **MR. HIMMELSTEIN:**  Thank you, Your Honor.

13          **THE COURT:**  Mr. Heimann, it seems only fair to give

14 you three or four minutes if you want to bat cleanup.  It's

15 your application after all.

16          **MR. HEIMANN:**  Despite what Mr. Frank surmises about

17 how we deal with our staff and our contract attorneys --

18          **THE COURT:**  You don't have to address that.

19          **MR. HEIMANN:**  All right.

20      I do have -- I don't know if Your Honor is interested in

21 this, but I'll tell you what I have and you can tell me whether

22 you want to hear it.

23      We did a calculation behind my back about what the

24 lodestar multiplier would turn out to be if we did what

25 Your Honor has suggested you might want us to do, which is to

1  treat all contract attorney time as an expense and none of it

2  as lodestar.

3         THE COURT:  I thought you did that in Footnote 13 on

4  page 23 of your brief.

5         MR. HEIMANN:  Not quite, and I think we made -- I'm --

6  I don't have that memorized, but I think what we did in that

7  footnote was to reduce the hourly rate for the contract

8  attorneys to $35 an hour.

9         THE COURT:  Well, 40 to 50 but, anyway.

10        MR. HEIMANN:  All right.  But what Your Honor is

11 suggesting is even more extreme than that.  What Your Honor is

12 suggesting is that we reduce the rate to zero.

13        THE COURT:  No, I'm not suggesting that.

14        MR. HEIMANN:  Oh, I thought you were.  I thought you

15 said you were.

16        THE COURT:  No, no, no.  Are you kidding me?

17        MR. HEIMANN:  No, I'm not kidding you.

18        THE COURT:  I have never said that you're not to be

19 paid anything for a contract attorney, did I?

20        MR. HEIMANN:  No.  What I thought you said, and this

21 is what the argument has been, is that we would not include any

22 of our contract time in the lodestar.

23        THE COURT:  Oh, I see.

24        MR. HEIMANN:  Instead, we would expense it at whatever

25 the hourly rate was that we paid those lawyers.

1          **THE COURT:**  No.  You would include it in the lodestar

2    at what you actually paid for it.

3          **MR. HEIMANN:**  All right.

4          **THE COURT:**  So I think you have addressed that in the

5    footnote.

6          **MR. HEIMANN:**  We have, Your Honor.

7          **THE COURT:**  That's the question.  That's the question.

8       No.  I simply asked you from a fairness standpoint why it

9    was any different from the expenses because you weren't -- I

10   mean, anyway.  We'll just go back over the discussion we

11   already had.

12         **MR. HEIMANN:**  All right.

13         **THE COURT:**  But I think I've got the revision there.

14         **MR. HEIMANN:**  All right.  Very good.

15      Unless Your Honor has further questions, we would submit.

16         **THE COURT:**  I don't.  I have other cases I need to

17   call now.

18         **MR. HEIMANN:**  Yes, Your Honor.

19         **THE COURT:**  Thank you all so much.  The motion is

20   now -- both of these motions are now under submission.

21              (Proceedings adjourned at 3:15 p.m.)

22                      ---oOo---

23

24

25

1

2

3                            **CERTIFICATE OF REPORTER**

4          I certify that the foregoing is a correct transcript

5     from the record of proceedings in the above-entitled matter.

6

7     DATE:   Friday, August 2, 2019

8

9

10

11     _____

12          Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
                    U.S. Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25