1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE WELLS FARGO & COMPANY
SHAREHOLDER DERIVATIVE
LITIGATION

This Document Relates To:

ALL ACTIONS

Lead Case No. 16-cv-05541-JST

**ORDER GRANTING MOTION FOR
FINAL APPROVAL AND MOTION
FOR ATTORNEY'S FEES**

Re: ECF Nos. 276, 277

Before the Court are Plaintiffs' motions for final approval of a derivative action settlement, ECF No. 276, and attorney's fees and expenses, ECF No. 277. The Court will grant the motion for final approval and grant the motion for attorney's fees in part.

I.     BACKGROUND

A.     Parties and Claims

This is a shareholder derivative action on behalf of nominal Defendant Wells Fargo & Co. against the company's officers, directors, and senior management ("Individual Defendants"). Consolidated Amended Verified Stockholder Derivative Complaint ("Compl."), ECF No. 83 ¶ 64. The substance of Plaintiffs' claims is set forth in greater detail in the Court's prior orders on Defendants' motions to dismiss. *See* ECF No. 129 at 1-9; ECF No. 174 at 2-4. In short, Plaintiffs allege that, "[f]rom at least January 1, 2011 to the present ('the Relevant Period'), Defendants knew or consciously disregarded that Wells Fargo employees were illicitly creating millions of deposit and credit card accounts for their customers, without those customers' knowledge or consent." Compl. ¶ 1. Plaintiffs seek to hold Individual Defendants accountable for these failures under various securities laws and common-law duties.

1

2

3

4

5

6

7

8

9

10

11

United States District Court
Northern District of California

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### B.     Procedural History

Based on the Improper Sales Practices[1] and the Defendants' alleged oversight failures, several entities filed shareholder derivative complaints in this district, which were then consolidated into a single action.  ECF Nos. 39, 70, 219.  The Court appointed the Fire & Police Pension Association of Colorado ("FPPA") and the City of Birmingham Retirement & Relief System ("Birmingham") as Co-Lead Plaintiffs and Lieff Cabraser Heimann & Bernstein and Saxena White as Co-Lead Counsel.  ECF No. 70.  Plaintiffs then filed a consolidated amended complaint on February 24, 2017.  ECF No. 83.

On March 17, 2017, Wells Fargo filed a motion to dismiss for failure to plead demand futility, in which the Individual Defendants joined.  ECF Nos. 99, 100, 101, 102, 107, 108, 110.  The Court largely denied the motion.  ECF No. 129.

Various Individual Defendants proceeded to file a series of motions to dismiss for failure to state a claim.  ECF Nos. 139, 140, 141, 143, 144, 145.  On October 4, 2017, the Court denied the motions in large part.  ECF No. 174.

After an initial unsuccessful round of three mediation sessions, the parties resumed intensive negotiations in September 2018.  ECF No. 270 at 16.  The parties engaged in four day-long sessions under the supervision of Judge Daniel Weinstein (Ret.) and Jed Melnick.  ECF No. 270-3 ¶ 7.  On December 12, 2018, the parties accepted Judge Weinstein's mediator's proposal, which forms the basis for the proposed settlement agreement.  *Id.* ¶ 12.

On February 28, 2019, Plaintiffs filed a motion for preliminary approval.  ECF No. 270.  The Court granted the motion on May 14, 2019, and directed notice to the shareholders.  Preliminary Approval Order, ECF No. 274.

Plaintiffs filed these motions for final approval and an award of attorney's fees and expenses on June 27, 2019.  ECF Nos. 276, 277.  Four objections were filed.  ECF Nos. 279, 281, 282, 284.  On July 25, 2019, Plaintiffs filed a reply responding to those objections.  ECF No. 287.  The Court held a final approval hearing on August 1, 2019.

---

[1] Consistent with Plaintiffs' motion and the parties' settlement agreement, the Court refers to Wells Fargo's illicit account creation as the "Improper Sales Practices."

1
2
3
4
5
6

United States District Court
Northern District of California

On October 24, 2019, the Court issued an order to show cause why the Court should not appoint an expert witness pursuant to Evidence Code section 706 to determine "the appropriate hourly rate the Court should assign to contract attorney services when calculating . . . Plaintiffs' counsel's lodestar" for purposes of Plaintiffs' attorney's fees motion ("Court Expert Order").  ECF No. 301 at 1.  The parties and an objector filed written responses to the OSC on November 8, 2019.  ECF Nos. 304, 305, 306.

**C.      Terms of the Settlement**

The proposed settlement agreement ("Settlement") resolves the claims Plaintiffs have asserted on behalf of Wells Fargo in this action.  Settlement, ECF No. 270-1 at 1-36.

Pursuant to the Settlement, the Individual Defendants' insurers will pay $240 million to Wells Fargo.  Settlement ¶ V(33).  The Settlement also identifies additional Wells Fargo reform actions the parties attribute in part to Plaintiffs' pursuit of this action.  First, after this suit was filed, Wells Fargo's board clawed back $122.5 million from certain Individual Defendants through "stock grant forfeitures, reduced compensation, and return of incentive compensation."  *Id.* ¶ V(1); *see also* ECF No. 270-1 at 47-48.  The parties agree among themselves, and argue to the Court, that Plaintiffs' suit was a "significant factor in the determination to undertake [these] actions, and that these remedial actions conferred a value to Wells Fargo of $60 million."  ECF No. 270-1 at 48.  Second, the Settlement points to "Corporate Governance Reforms," meaning "the corporate actions undertaken by Wells Fargo to address Improper Sales Practices including, but not limited to, amending certain corporate charters and bylaws, increasing oversight and monitoring of business units, leadership changes, the creation of positions, and the increased reporting from business units."  Settlement ¶ V(5); *see also* ECF No. 270-1 at 40-44.  The parties note that Plaintiffs proposed "certain of these corporate governance reforms" and "agree and acknowledge that these reforms have conferred significant benefits to Wells Fargo," of which $20 million can be attributed to Plaintiffs' efforts.  ECF No. 270-1 at 44.

In exchange for this consideration, Plaintiffs agree to release the following claims on behalf of themselves, Wells Fargo, and its shareholders:

[A]ny and all manner of claims, demands, rights, liabilities, losses,

3

United States District Court
Northern District of California

obligations, duties, damages, costs, debts, expenses, interest, penalties, sanctions, fees, attorneys' fees, actions, potential actions, causes of action, suits, agreements, judgments, decrees, matters, issues and controversies of any kind, nature or description whatsoever, whether known or unknown, disclosed or undisclosed, accrued or unaccrued, apparent or not apparent, foreseen or unforeseen, matured or not matured, suspected or unsuspected, liquidated or not liquidated, fixed or contingent, including Unknown Claims, whether based on state, local, foreign, federal, statutory, regulatory, common or other law or rule, brought or that could be brought derivatively or otherwise by or on behalf of Wells Fargo against any of the Released Parties, which now or hereafter are based upon, arise out of, relate in any way to, or involve, directly or indirectly, any of the actions, transactions, occurrences, statements, representations, misrepresentations, omissions, allegations, facts, practices, events, claims or any other matters, things or causes whatsoever, or any series thereof, that are, were, could have been, or in the future can or might be alleged, asserted, set forth, claimed, embraced, involved or referred to in the Derivative Action and relate to, directly or indirectly, the subject matter of the Derivative Action in any court, tribunal, forum or proceeding, including, without limitation, any and all claims by or on behalf of Wells Fargo which are based upon, arise out of, relate in any way to, or involve, directly or indirectly: (i) Improper Sales Practices; or (ii) any of the allegations in any complaint or amendment(s) thereto filed in (x) the Derivative Action or (y) any Action described above in Section II.C, with the exception, as described above, of the CPI Allegations in the *Connecticut Laborers* Action.

Settlement ¶ V(26).[2]  The "Released Parties" consist of the Individual Defendants, Wells Fargo, American Express, and various other "Related Parties."  *Id.* ¶¶ V(25), (27).  The Settlement does not, however, release (1) claims to enforce the agreement, (2) direct claims asserted on behalf of present or former Wells Fargo shareholders at issue in *Hefler v. Wells Fargo & Co.*, No. 16-cv-05479-JST (N.D. Cal.),[3] or (3) certain claims that "the Individual Defendants or Wells Fargo may have against any of the Insurers."  *Id.* ¶ V(26).

In addition, the parties separately negotiated Wells Fargo's payment of attorney's fees to Co-Lead Counsel.  *Id.* ¶ (V)(44).  Wells Fargo has agreed not to oppose Plaintiffs' request for attorney's fees and costs of up to $68 million.  *Id.*  Plaintiffs also intend to seek $25,000 incentive awards for each Co-Lead Plaintiff, to be paid from the fee award.  *Id.*

---

[2] As explained in the Settlement, the *Connecticut Laborers* Action includes additional allegations regarding Wells Fargo's implementation of certain collateral protection insurance ("CPI") programs.  Settlement ¶ II(5).

[3] The Court previously approved a Rule 23 class action settlement in the *Hefler* case.  *See Hefler*, ECF Nos. 252-255.  An objector has appealed the settlement.  *Id.*, ECF No. 260.

## II.      MOTION FOR FINAL APPROVAL

### A.      Legal Standard

Pursuant to Federal Rule of Civil Procedure 23.1, "[a] derivative action may be settled, voluntarily dismissed, or compromised only with the court's approval." Fed. R. Civ. P. 23.1(c). Rule 23, in turn, "governs a district court's analysis of the fairness of a settlement of a shareholder derivative action." *In re Hewlett-Packard Co. S'holder Derivative Litig.*, No. 12-cv-06003-CRB, 2015 WL 1153864, at *3 (N.D. Cal. Mar. 13, 2015); *see also In re Cadence Design Sys., Inc. Sec. Litig.*, No. 08-cv-4966 SC, 2011 WL 13156644, at *2 (N.D. Cal. Aug. 26, 2011) ("Within the Ninth Circuit, Rule 23's requirements for approval of class action settlements apply to proposed settlements of derivative actions." (citing *In re Pac. Enters. Sec. Litig.*, 47 F.3d 373, 377 (9th Cir. 1995))). Accordingly, "[c]ourts considering settlements of derivative actions have generally found '[c]ases involving dismissal or compromise under Rule 23(e) of nonderivative cases . . . relevant by analogy." *Lloyd v. Gupta*, No. 15-cv-04183-MEJ, 2016 WL 3951652, at *4 (N.D. Cal. July 22, 2016) (second and third alterations in original) (quoting 7C Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1839 (3d ed. 2007)). The Ninth Circuit maintains a "strong judicial policy" that favors the settlement of class actions. *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992).

Rule 23 requires courts to follow a two-step process in evaluating a class action or derivative action settlement. First, the parties must show "that the court will likely be able to . . . (i) approve the proposal under Rule 23(e)(2)." Fed. R. Civ. P. 23(e)(1)(B). In other words, a court must make a preliminary determination that the settlement "is fair, reasonable, and adequate" when considering the factors set out in Rule 23(e)(2). Fed. R. Civ. P. 23(e)(2). The court's task at the preliminary approval stage is to determine whether the settlement falls "within the range of possible approval." *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1080 (N.D. Cal. 2007) (citation omitted). "The initial decision to approve or reject a settlement proposal is committed to the sound discretion of the trial judge." *City of Seattle*, 955 F.2d at 1276 (citation omitted).

Second, if the court preliminarily approves a derivative action settlement, notice "must be given to shareholders or members in the manner that the court orders." Fed. R. Civ. P. 23.1(c).

United States District Court
Northern District of California

1    The court must then hold a hearing to make a final determination whether the settlement is "fair,

2    reasonable, and adequate." Fed. R. Civ. P. 23(e)(2).

3            The proposed settlement need not be ideal, but it must be fair and free of collusion,

4    consistent with counsel's fiduciary obligations to the class. *Hanlon v. Chrysler Corp.*, 150 F.3d

5    1011, 1027 (9th Cir. 1998) ("Settlement is the offspring of compromise; the question we address is

6    not whether the final product could be prettier, smarter or snazzier, but whether it is fair, adequate

7    and free from collusion.").  To assess a settlement proposal, courts must balance a number of

8    factors:

9            [T]he strength of the plaintiffs' case; the risk, expense, complexity,
         and likely duration of further litigation; the risk of maintaining class
10        action status throughout the trial; the amount offered in settlement;
         the extent of discovery completed and the stage of the proceedings;
11        the experience and views of counsel; the presence of a governmental
         participant; and the reaction of the class members to the proposed
12        settlement.

13   *Id.* at 1026 (citations omitted).[4]  The proposed settlement must be "taken as a whole, rather than

14   the individual component parts," in the examination for overall fairness.  *Id.*  Courts do not have

15   the ability to "delete, modify, or substitute certain provisions"; the settlement "must stand or fall in

16   its entirety." *Id.* (citation omitted).

17      **B.      Discussion**

18              **1.      Adequacy of Notice**

19           Rule 23.1(c) requires that notice of the Settlement "must be given to shareholders or

20   members in the manner that the court orders." Fed. R. Civ. P. 23.1(c).  In determining the

21   appropriate notice method, "the Court considers whether such notice would be sufficient to reach

22   the majority of interested stockholders." *Bushansky v. Armacost*, No. 12-cv-01597-JST, 2014 WL

23   2905143, at *6 (N.D. Cal. June 25, 2014).

24           The Court previously approved the parties' notice plan.  ECF No. 274 at 13-14.  With the

25   ────────────────────

26   [4] These factors are substantially similar to those articulated in the 2018 amendments to Rule 23(e),
     which were not intended "to displace any factor [developed under existing Circuit precedent], but
27   rather to focus the court and the lawyers on the core concerns of procedure and substance that
     should guide the decision whether to approve the proposal." *Hefler v. Wells Fargo & Co.*, No. 16-
28   cv-05479-JST, 2018 WL 6619983, at *4 (N.D. Cal. Dec. 18, 2018) (quoting Fed. R. Civ. P.
     23(e)(2) advisory committee's note to 2018 amendment).

United States District Court
Northern District of California

1  motion for final approval, counsel submitted a declaration and documentation demonstrating their

2  implementation of that plan.  ECF No. 278-3.  On May 20, 2019, Wells Fargo published the

3  approved Summary Notice in the *Wall Street Journal*, *New York Times*, *Los Angeles Times*, and

4  *Investor Business Daily*.  ECF No. 278-3 at 10-11, 13-14, 16-17, 19-20.  That same day, Wells

5  Fargo also published a Current Report on Form 8-K with the Securities and Exchange

6  Commission ("SEC") attaching a Long-Form Notice of the Settlement.  *Id.* ¶¶ 13-14.  Wells Fargo

7  also posted notice on a unique page within its website.  *Id.* ¶¶ 15-19.  These documents were

8  viewed 9,200 times.  *Id.* ¶ 20.  Wells Fargo further maintained a hotline number referenced in the

9  notices, which received 6 calls.  *Id.* ¶ 23.  Co-Lead Counsel also created their own dedicated

10  website for the Settlement, which received 403 unique views.  *Id.* ¶¶ 24-29.

11        The deadline for shareholders to submit objections to the Settlement or Co-Lead Counsel's

12  fees motion was July 11, 2019.  As noted above, the Court received four objections to the fees

13  motion, ECF Nos. 279, 281, 282, 284, but none to the Settlement itself.

14        Given these efforts, the Court concludes that the parties have satisfied Rule 23.1 and due

15  process.  *See Bushansky*, 2014 WL 2905143, at *6 (collecting cases).

16              **2.**       **Fairness, Adequacy, and Reasonableness**

17        With the exception of the reaction of shareholders, the Court analyzed the necessary

18  factors and found the Settlement to be fair, adequate, and reasonable when it granted preliminary

19  approval to the agreement.  ECF No. 274 at 6-13.

20        The Court finds no reason to alter this conclusion now that shareholders have been given

21  notice and an opportunity to be heard.  No shareholder objected to the Settlement.  "[T]he absence

22  of a large number of objections to a proposed class action settlement raises a strong presumption

23  that the terms of a proposed class settlement action are favorable to the class members."  *In re*

24  *Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1043 (N.D. Cal. 2008) (citation omitted); *see also*

25  *Churchill Vill., LLC v. Gen. Elec.*, 361 F.3d 566, 577 (9th Cir. 2004) (holding that approval of a

26  settlement that received 45 objections (0.05%) and 500 opt-outs (0.56%) out of 90,000 class

27  members was proper).  Courts reviewing settlements of shareholder derivative suits have applied

28  the same presumption.  *See, e.g., In re Ceradyne, Inc.*, No. SACV06919JVSPJWX, 2009 WL

1    10671494, at *5 (C.D. Cal. June 9, 2009) ("Plaintiffs' counsel believes that this settlement is an

2    excellent result for Ceradyne and its shareholders, and, given that only two Ceradyne shareholders

3    have objected out of 17,701 notified shareholders, the Court agrees." (citations omitted)).  That

4    presumption is further enhanced where "not one sophisticated institutional investor objected to the

5    Proposed Settlement."  *In re Facebook, Inc., IPO Sec. & Derivative Litig.*, No. MDL 12-2389,

6    2018 WL 6168013, at *9 (S.D.N.Y. Nov. 26, 2018); *see also In re Linerboard Antitrust Litig.*, 321

7    F. Supp. 2d 619, 629 (E.D. Pa. 2004).  This presumption merely buttresses the Court's prior

8    conclusions regarding the Settlement's fairness.

9         After reviewing all of the required factors, the Court continues to find the Settlement to be

10   fair, reasonable, and adequate.  Plaintiffs' motion for final approval is granted.

11   **III.    MOTION FOR ATTORNEY'S FEES AND EXPENSES**

12        **A.    Attorney's Fees**

13             **1.    Legal Standard**

14        "Under both Delaware and federal law, a court may grant fees and expenses to derivative

15   counsel when the derivative suit creates a common fund or confers a substantial corporate

16   benefit."  *In re Oracle Sec. Litig.*, 852 F. Supp. 1437, 1445 (N.D. Cal. 1994); *see also Mills v.*

17   *Elec. Auto-Lite Co.*, 396 U.S. 375, 396 (1970); *Lewis v. Anderson*, 692 F.2d 1267, 1270 (9th Cir.

18   1982).  "[W]here the litigation results in a 'common fund' that benefits the general class of

19   shareholders, courts may allocate a percentage of the total fund as the fee award," *In re Oracle*

20   *Sec. Litig.*, 852 F. Supp. at 1449, "in lieu of the often more time-consuming task of calculating the

21   lodestar," *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 942 (9th Cir. 2011).

22        For more than two decades, the Ninth Circuit has set the "benchmark for an attorneys' fee

23   award in a successful class action [at] twenty-five percent of the entire common fund."  *Williams*

24   *v. MGM-Pathe Commc'ns Co.*, 129 F.3d 1026, 1027 (9th Cir. 1997).  It has applied the same

25   standard in derivative settlements.  *In re Pac. Enters. Sec. Litig.*, 47 F.3d at 379.  Under this

26   approach, courts generally start with the 25 percent benchmark and adjust upward or downward

27   depending on:

28             [T]he extent to which class counsel "achieved exceptional results for

United States District Court
Northern District of California

the class," whether the case was risky for class counsel, whether
counsel's performance "generated benefits beyond the cash . . .
fund," the market rate for the particular field of law (in some
circumstances), the burdens class counsel experienced while
litigating the case (e.g., cost, duration, foregoing other work), and
whether the case was handled on a contingency basis.

*In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 954-55 (9th Cir. 2015) (quoting *Vizcaino*

*v. Microsoft Corp.*, 290 F.3d 1043, 1047-50 (9th Cir. 2002)).

Courts often also cross-check the amount of fees against the lodestar. "Calculation of the

lodestar, which measures the lawyers' investment of time in the litigation, provides a check on the

reasonableness of the percentage award." *Vizcaino*, 290 F.3d at 1050.[5]

### 2.    Discussion

Co-Lead Counsel move for an award of $68 million in attorney's fees and expenses, to be

paid by Wells Fargo.  ECF No. 277 at 7.  Because counsel's primary justification for the award is

a percentage of the fund approach, the Court first considers the common fund produced by the

Settlement.

### a.    Amount of Common Fund

As noted above, Co-Lead Counsel contend that the Settlement's value is $320 million:

$240 million in insurer-funded payments and $80 million in corporate governance reforms and

clawbacks.  *Id.*  Two objectors, John Cashman and Kevin Fisher, argue that the Court should not

consider the $80 million component as part of the common fund.  ECF No. 281 at 12-20; ECF No.

284 at 6-19.

The Ninth Circuit has cautioned that, "because the value of injunctive relief is difficult to

quantify, its value is also easily manipulable by overreaching lawyers seeking to increase the value

assigned to a common fund." *Staton v. Boeing Co.*, 327 F.3d 938, 974 (9th Cir. 2003).

---

[5] The Court notes that Plaintiffs' common-law claims arise under Delaware law, although their securities claims are federal.  No party or objector has advocated for the application of Delaware law to the fee award or "identified any significant difference between [Delaware] and federal law in applying the doctrine." *Lewis*, 692 F.2d at 1270; *cf. Americas Mining Corp. v. Theriault*, 51 A.3d 1213, 1260 (Del. 2012) ("A study of recent Delaware fee awards finds that the average amount of fees awarded when derivative and class actions settle for both monetary and therapeutic consideration is approximately 23% of the monetary benefit conferred; the median is 25%." (citation omitted)).  Under these circumstances, the Court need not reach the issue. *See Lewis,* 692 F.2d at 1270.

United States District Court
Northern District of California

Accordingly, "only in the unusual instance where the value to individual class members of benefits deriving from injunctive relief can be accurately ascertained may courts include such relief as part of the value of a common fund for purposes of applying the percentage method of determining fees." *Id.*  If the injunctive relief does not meet this standard, the Court instead takes into account "the value of the injunctive relief obtained as a 'relevant circumstance' in determining what percentage of the common fund class counsel should receive as attorneys' fees, rather than as part of the fund itself."  *Id.*

Here, the Court concludes that the value conferred to Wells Fargo's shareholders by the corporate governance reforms is not sufficiently quantifiable to be directly included in the common fund.  Co-Lead Counsel submitted two expert declarations attesting to the reforms' value.  Professor Michael Santoro opines that Wells Fargo's corporate governance reforms "provide significant value to the Company," ECF No. 270-4 ¶ 21, and represent "an appropriate and adequate remedy for the alleged corporate governance failures at Wells Fargo," *id.* ¶ 53.  But Santoro does not attempt to place a specific value on the reforms or describe a method for doing so, opining simply that "the $20 million value the settling parties ascribe to the Corporate Governance Reforms is eminently reasonable."  *Id.* ¶ 54.  Although Professor Santoro provides a narrative description of the benefits conferred by different reforms, he makes no attempt to quantify those benefits.  *See, e.g.*, *id.* ¶¶ 48-50.  The declaration is devoid of any intermediate calculations.

Professor Jeffrey Gordon starts from the estimated $2.5 to $3.5 billion in losses incurred by Wells Fargo as a result of the fallout from the Improper Sales Practices.  ECF No. 278-2 ¶ 22.  He then assumes that (1) there is a 5 percent risk of similar losses recurring absent the reforms and (2) the corporate governance reforms reduce this risk in half, to 2.5 percent.  *Id.* ¶ 23.  Using this methodology, he determines that the reforms confer an overall value of $60 to $85 million.  *Id.*  He opines that ascribing $20 million to the Settlement "is well within the range of value-creation-in-fact, perhaps even at the low end."  *Id.* ¶ 20.

These declarations demonstrate that this is not "the unusual instance where the value to individual class members of benefits deriving from injunctive relief can be accurately

ascertained." *Staton*, 327 F.3d at 974.  First, neither expert provides a reliable means of assigning a fixed value to the reforms themselves.  Professor Santoro does not attempt to quantify that value. Professor Gordon's methodology relies on (1) an estimated range of losses from the current scandals; (2) an assumed 5 percent risk of recurrence, with no evidence to support that assumption; and (3) an assumed 50 percent risk reduction resulting from the reforms, again without reference to any support.  The Court cannot simply adopt these variables.  Gordon also fails to quantify the likelihood that Wells Fargo would have adopted these measures in the absence of the lawsuit.  And in the end, Professor Gordon's method produces only a range, which varies by $25 million.  ECF No. 278-2 ¶ 23.  Second, both experts simply provide their opinion that the value the parties attribute to the Settlement is *within the range of reasonableness*.  ECF No. 270-4 ¶ 54; ECF No. 278-2 ¶ 20.  This is not the "degree of accuracy" *Staton* requires.  327 F.3d at 974.

Notably, Co-Lead Counsel fail to identify any case in which the court included similar injunctive relief as part of the common fund.  In *Klein v. Gordon*, the court found that the corporate governance reforms conferred a "substantial benefit," thereby establishing counsel's entitlement to fees, but then went on to apply the lodestar method to determine the amount of fees. No. 17-cv-00123-ABJ (PRX), 2019 WL 1751839, at *2-4 (C.D. Cal. Feb. 12, 2019); *see also In re Oclaro, Inc. Derivative Litig.*, No. 11-cv-3176 EMC, 2014 WL 4684993, at *4-5 (N.D. Cal. Sept. 19, 2014) (same).  In *In re Atmel Corp. Derivative Litigation*, the court likewise did not include the value of the corporate governance reforms in the common fund, but instead considered it as a factor justifying departure from the 25 percent benchmark.  No. 06-cv-4592 JF (HRL), 2010 WL 9525643, at *10-12 (N.D. Cal. Mar. 31, 2010).

Indeed, it appears that district courts applying *Staton* regularly find that the value of various injunctive or other non-monetary relief measures cannot be accurately ascertained.  In *Giroux v. Essex Property Trust, Inc.*, for example, the district court declined to consider as part of the common fund credit monitoring services provided to class members, noting a substantial difference between the retail price of those services and the price paid by defendants.  No. 16-cv-01722-HSG, 2019 WL 1207301, at *5 (N.D. Cal. Mar. 14, 2019), *amended on other grounds*, 2019 WL 2106587 (N.D. Cal. May 14, 2019).  Rather than assuming a value within that range, as

United States District Court
Northern District of California

the parties and their experts do here, the *Giroux* court applied the lodestar method. *Id.*; *see also Pan v. Qualcomm Inc.*, No. 16-cv-01885-JLS-DHB, 2017 WL 3252212, at *3, 12 (S.D. Cal. July 31, 2017) (programmatic relief including appointment of compliance officer, periodic reviews, and complaint resolution mechanisms); *Nigh v. Humphreys Pharmacal, Inc.*, No. 12-cv-2714-MMA (DHB), 2013 WL 5995382, at *2, 11 (S.D. Cal. Oct. 23, 2013) (drug labeling changes); *cf. In re Maxwell Techs., Inc., Derivative Litig.*, No. 13-cv-966 BEN (RBB), 2015 WL 12791166, at *4 (S.D. Cal. July 13, 2015) ("The parties appear to agree, and the Court finds, that the lodestar method is more appropriate here than the percentage of recovery method as a starting point because the relief obtained, corporate governance reforms, is 'not easily monetized.'" (citation and footnote omitted)).

Co-Lead Counsel's attempt to quantify the relevant portion of the Board's clawbacks is no more persuasive. As the objectors note, the Court cannot include in the common fund the value of measures that Wells Fargo would have taken even absent this litigation. *See Wininger v. SI Mgmt. L.P.*, 301 F.3d 1115, 1124 (9th Cir. 2002); *In re Oclaro*, 2014 WL 4684993, at *4 ("[W]here the corporation voluntarily undertakes a remedial act or change in corporate structure, which is not the proximate result of the action, plaintiffs are not entitled to attorneys' fees and expenses even though the act or change is significantly beneficial to the shareholders." (citation omitted)). Putting aside for the moment Objectors' concerns whether the clawbacks have any causal relation to this lawsuit, Co-Lead Counsel also provide no method for apportioning the percentage other than the parties' agreement. *See* ECF No. 270-1 at 48. The failure to overcome this apportionment issue precludes consideration of a percentage of the clawbacks as part of the common fund. *See In re Anthem, Inc. Data Breach Litig.*, No. 15-md-02617-LHK, 2018 WL 3960068, at *8 (N.D. Cal. Aug. 17, 2018), *appeal dismissed sub nom. In re Anthem, Inc., Customer Data Sec. Breach Litig.*, No. 18-16826, 2018 WL 7858371 (9th Cir. Oct. 17, 2018) (explaining that the court could not include remedial measures because, among other reasons, "it is difficult to isolate which portion of Anthem's increase in its cybersecurity spending is attributed solely to the instant lawsuit as opposed to money that Anthem would have spent anyway in the aftermath of the data breach at issue").

The Court therefore concludes that the Settlement has produced a $240 million common fund. The Court will consider the asserted value of the additional relief as a factor in its benchmark analysis.

### b.    Benchmark Analysis

Co-Lead Counsel request $68 million, or 28.33 percent of the $240 million common fund. Objectors raise three main arguments. First, as alluded to above, Objectors Cashman and Fisher dispute whether counsel's efforts are causally related to the Board's clawbacks or corporate governance reforms, and so urge the Court not to base its analysis on those putative additional benefits. ECF No. 281 at 13-15; ECF No. 284 at 6-13. Second, Objectors Cashman and Fisher argue that the risk factor does not support Co-Lead Counsel's request because the action was not risky in light of regulatory and other investigations. ECF No. 281 at 26-30; ECF No. 284 at 22-26. Third, Objectors Edward Cochran, Cashman, and Fisher contend that the standard 25 percent benchmark should not apply, given the size of the common fund. ECF No. 279 at 1-3; ECF No. 281 at 16-20; ECF No. 284 at 26-30. The Court integrates these objections into its own independent analysis of the requisite factors.

### i.    Results Achieved

The first and "most critical factor [in determining an attorneys' fee] is the degree of success obtained." *Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983). The $240 million common fund represents a 6.9 to 9.6 percent recovery on the estimated $2.5 to $3.5 billion in losses suffered by Wells Fargo.[6] As Plaintiffs point out by rough analogy,[7] their low-end recovery estimate exceeds "recoveries achieved in . . . securities fraud class actions of similar size (over $1 billion in estimated damages), which settled for median recoveries of 2.5 percent between 2008 and 2016, and 3 percent in 2017." *Hefler*, 2018 WL 6619983, at *8 (citing Cornerstone Research,

---

[6] Because no objector has challenged Plaintiffs' calculation, the Court continues to conclude that this range "represents a reasonable estimate of the value of Plaintiffs' claims." ECF No. 274 at 10.

[7] At least one other court in this district has found the comparison useful. *See In re Atmel*, 2010 WL 9525643, at *12 (comparing company's "net cash recovery" to securities class action settlements).

Securities Class Action Settlements, 2017 Review and Analysis, at 8 (2018)); *see also* Cornerstone

Research, Securities Class Action Settlements, 2018 Review and Analysis, at 6 (2019) (noting

average 2 percent recovery for 2018).   Moreover, as noted above, no shareholder objected to the

adequacy of the Settlement amount.   The Court agrees that this represents an excellent result for

the shareholders. [8]

Co-Lead Counsel also contend that they "generated benefits beyond the cash settlement

fund," *Vizcaino*, 290 F.3d at 1049, in the form of corporate governance reforms and clawbacks.

As discussed above, counsel have not provided the Court with a methodology for quantifying the

precise benefits that were conferred.   Still, such benefits are "a 'relevant circumstance' in

determining what percentage of the common fund class counsel should receive."   *Staton*, 327 F.3d

at 974 (quoting *Vizcaino*, 290 F.3d at 1049)); *see also Willner v. Manpower Inc.*, No. 11-cv-

02846-JST, 2015 WL 3863625, at *6-7 (N.D. Cal. June 22, 2015).

Having said that, however, the Court gives these additional actions minimal weight.   While

the clawbacks are undeniably valuable to Wells Fargo, there are legitimate concerns that "the

institution and settlement of" this case did not "proximately cause[]" $60 million in clawbacks.   *In

re Oclaro*, 2014 WL 4684993, at *4.   As Objectors Cashman and Fisher note, at the time the first

of these consolidated actions were filed, three government entities had already reached settlements

---

[8] As the Court has previously observed:

> Of course, to some extent, counsel's success provides its own
> reward: the larger the total recovery, the larger counsel's fee award
> will be, all else being equal. For example, even if the Court were to
> award the benchmark of 25 percent in every case, counsel who
> achieved twice as large a recovery for the class would receive twice
> as large a fee. For the same reasons, lack of success provides its own
> penalty. Nonetheless, the law appropriately provides for some
> upward adjustment where the results achieved are significantly
> better than the norm.

*Rodman v. Safeway Inc.*, No. 11-cv-03003-JST, 2018 WL 4030558, at *3 n.3 (N.D. Cal. Aug. 23,
2018).   Applying that logic here, had Plaintiffs' counsel achieved the 3-percent-of-losses
settlement that was the median in 2017, the settlement amount would have been approximately
$90 million, 25 percent of which would have been $22.5 million.   Twenty-five percent of $240
million is $60 million.   In other words, even if the Court were simply to apply the Ninth Circuit's
25 percent benchmark, Plaintiffs' counsel would be $37.5 million better off than if they had
negotiated a median settlement.   At 22 percent, *see infra*, they are $33 million better off.

14

requiring Wells Fargo to establish an oversight committee, which clawed back the compensation in question while this case was still in its early stages.  ECF No. 281-3 ¶¶ 9-11; *see also* ECF No. 284-2 at 29 (Investigative Committee April 10, 2017 Report).  And Objectors correctly note that the parties' stipulation that the "*facts alleged* in the Derivative Action were significant factors" in these decisions, ECF No. 270-1 at 47 (emphasis added), says nothing about whether Co-Lead Counsel's prosecution of this action played any part.  Rather than meet these objections head on, Co-Lead Counsel asserts that the parties' and the mediator's valuation is nonetheless entitled to "substantial deference."  ECF No. 287 at 21.  This conclusory response ignores Co-Lead Counsel's burden to rule out other potential causes, *see In re Oracle Sec. Litig.*, 852 F. Supp. at 1447, and is not convincing.

None of which is to ignore or disparage the importance of changes to the corporate governance rules.  Professor Santoro cogently explains why these changes, in many instances long overdue, will benefit shareholders by reducing the likelihood of future misconduct.  The question, however, is not whether the reforms are valuable, but whether the benefits are quantifiable and clearly attributable to Co-Lead Counsel's efforts.  As highlighted above, there are substantial difficulties in determining the value of the corporate governance reforms.  These claimed benefits also raise some of the same causation concerns as the clawbacks.  The Court therefore gives these additional benefits little weight.

### ii.      Risk and Burdens on Class Counsel

The risk that Co-Lead Counsel took in litigation on a contingency basis – a risk they have borne for more than three years – also weighs in favor of a substantial attorney's fee award.  *See Willner*, 2015 WL 3863625, at *6.  Objectors identify some ways in which they contend that the risk was mitigated, but their criticisms are for the most part unpersuasive.

First, Cashman and Fisher both argue that the government settlements, journalist investigations, and Congressional hearings preceding the lawsuit alleviated the normal risk associated with derivative actions.  ECF No. 281 at 28; ECF No. 284 at 24-26.  Cashman further posits that post-filing events, such as the April 2017 Oversight Committee report and a February 2018 Federal Reserve letter, further decreased that risk.  They argue that the various investigations

United States District Court
Northern District of California

1    "[n]ot only . . . uncover[ed] the illegal activities and provide[d] highly-detailed factual

2    information, they also established, for the purposes of the Derivative Action, Board-level

3    knowledge and culpability.  Consequently, these investigations disclosed virtually every fact

4    needed for Plaintiffs' Counsel to draft a compelling complaint."  ECF No. 284 at 23.  Former CEO

5    John Stumpf's testimony before Congress, they argue, "established Board knowledge and demand

6    futility."  *Id.* at 26.

7         While the significant number of government investigations and settlements undoubtedly

8    made Plaintiffs' task easier, they still faced a great deal of risk.  For example, while demand

9    futility may have been established to Objectors' – and this Court's – satisfaction, the state court in

10   a parallel proceeding found that similar allegations "[did] not allow [the court] to infer that

11   directors knew of the illegal sales practices or promoted or encouraged them knowing that they

12   were illegal and/or for the purpose of obtaining personal benefit," and granted a motion to dismiss.

13   *See* ECF No. 139-1, Order, *In re Wells Fargo & Co. Derivative Litig.*, No. CGC-16-554407 (S.F.

14   Super. Ct. May 10, 2017) (Order Sustaining Demurrers in Part With Leave to Amend and In Part

15   Without Leave to Amend).  It was hardly a foregone conclusion that Plaintiffs would obtain a

16   different result in this Court.

17        There is also an enormous difference between surviving a motion to dismiss and prevailing

18   at trial.  It would not have been enough to show that Wells Fargo had engaged in widespread

19   misconduct.  To persuade a jury, Plaintiffs would have had to prove that the individual directors

20   (i) had actual or constructive knowledge of Wells Fargo's misconduct, and (ii) failed to act in the

21   face of a known duty to act, thereby demonstrating conscious disregard for their responsibilities.

22   *Rosenbloom v. Pyott*, 765 F.3d 1137, 1151 (9th Cir. 2014); *Stone v. Ritter*, 911 A.2d 362, 368-69

23   (Del. 2006).  This theory – often called a "*Caremark* claim" – has been called "possibly the most

24   difficult theory in corporation law upon which a plaintiff might hope to win a judgment."  *In re*

25   *Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959, 967 (Del. Ch. 1996).  To prove their claim

26   under Section 10(b) of the Securities Exchange Act of 1934, Plaintiffs would have had to prove,

27   among other things, materiality, scienter, and loss causation.  *In re Wells Fargo & Co. S'holder*

28   *Derivative Litig.*, 282 F. Supp. 3d 1074, 1089-90 (N.D. Cal. 2017).  At the motion to dismiss

United States District Court
Northern District of California

stage, the Court was required to accept Plaintiffs' allegations as true; at trial, they would have been hotly contested.  Objectors' argument that Co-Lead Counsel had virtually won their case by the time it was filed is simply not persuasive.

Cashman also complains that the number of hours Co-Lead Counsel generated increased as the case progressed, even as the risk to them allegedly declined.  ECF No. 281 at 25-26, 28-30.  He states, for example, that "the vast majority of lodestar – about 90% – was billed *after* this Court denied defendants' motion to dismiss, and most lodestar, over 72%, was billed on or after February 2018, when the case presented little risk to plaintiffs."  ECF No. 281 at 29 (emphasis in original).  He complains particularly about the amount of document review occurring in the fall of 2019.

First, it should surprise no one that much work was performed after the motion to dismiss was denied.  That stage of a case is often when discovery begins in earnest, and in securities cases there is usually a lot of discovery.[9]  Nor is the Court surprised that work continued while settlement discussions were ongoing.  Among other deadlines, the fact discovery cut-off was set to occur on January 25, 2019; expert disclosures were due January 30, 2019, and the deadline to file dispositive motions was June 3, 2019.  Defendants reported in their October 9, 2018 joint case management statement, ECF No. 255, that they were engaged in multiple discovery and scheduling disputes and preparing for more than 40 depositions.  The parties' final mediation session did not occur until December 4, 2018, and the mediator's proposal was not accepted until December 12, 2018.  ECF No. 287 at 21.  Until the settlement was approved or the Court vacated the scheduling order, Co-Lead Counsel were required to meet the preexisting case deadlines,

---

[9] Objector Fisher acknowledges that the riskier part of the case actually began after the motions to dismiss were decided:

> The risky part of the case would have then been the work required after motions to dismiss where the plaintiffs' allegations do not have to be taken as true and construed in the light most favorable to him. Taking adversarial depositions, pre-trial motion practice, proving up the claims and refuting the defenses, summary judgment briefing, expert reports and discovery, Daubert motions, proving damages, trial, and overcoming negative rulings and appeals.

ECF No. 284 at 26.

1    including by performing a great deal of document review.  No smart lawyer stops working on a

2    case simply because it looks like it might settle.  The objection that too many hours were spent too

3    late in the case is not persuasive.

4           Finally, Cashman urges the Court to infer from the number of similar derivative suits that

5    this action carried little risk.  ECF No. 281 at 26-28.  Co-Lead Counsel do not respond to this

6    argument, but the Court finds it unconvincing nonetheless.  Cashman cites a single, unpublished

7    district court case in support.  *In re Johnson & Johnson Derivative Litig.*, No. CIV.A. 10-2033

8    FLW, 2013 WL 6163858 (D.N.J. Nov. 25, 2013).  *Johnson & Johnson* does suggest that lower

9    attorney's fees should be awarded when multiple lawyers "seek[] to be first in the door in filing

10   lawsuit on behalf of shareholders," *id.* at *11 (sic), but cites no authority for that proposition.

11          This Court does not adopt *Johnson & Johnson's* reasoning.  In the Court's experience, a

12   more likely explanation for the appearance of many putative plaintiffs' counsel has more to do

13   with the size of the potential recovery than anything else – and when the potential recovery is

14   large, more lawyers typically seek to participate.  A casual glance at the dockets in this district

15   lends support to this hypothesis.  *See, e.g., In re: Volkswagen "Clean Diesel" Mktg., Sales*

16   *Practices, & Prods. Liab. Litig.*, Case No. 3:15-md-02672-CRB (N.D. Cal), ECF Nos. 598, 599,

17   608, 613, 622, 624, 630, 633, 639, 641, 657, 658, 663, 666, 671, 682; *In re Facebook, Inc.,*

18   *Consumer Privacy User Profile Litig.*, 18-md-2843-VC (N.D. Cal.), ECF Nos. 16-23, 25-28, 31,

19   33-52, 62-65, 83, 84, 87, 102.

20          In short, the Court overrules these objections and finds that the risk taken by counsel in this

21   contingency litigation weighs in favor of a substantial award.

22                              **iii.      Comparison to Similar Cases**

23          In setting a fee, district courts are instructed to "examine lawyers' reasonable expectations,

24   which are based on the circumstances of the case and the range of fee awards out of common

25   funds of comparable size."  *Vizcaino*, 290 F.3d at 1050*; see also In re Nat'l Collegiate Athletic*

26   *Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*, No. 4:14-md-2541-CW, 2017 WL 6040065, at *5

27   (N.D. Cal. Dec. 6, 2017) (awarding a fee percentage in part because it was "consistent with, and

28   within the range of, fee awards out of common funds of comparable size"); *Craft v. County of San*

United States District Court
Northern District of California

18

United States District Court
Northern District of California

*Bernardino*, 624 F. Supp. 2d 1113, 1127 (C.D. Cal. 2008) ("In awarding percentages of the class fund, courts frequently take into account the size of the fund."). Thus, it makes sense to examine historical data regarding the size of fee awards in comparable litigation.

Objectors Cochran, Cashman, and Fisher argue that, given fee awards in similarly large "megafund" settlements, the Court should award a fee below the 25 percent benchmark. ECF No. 279 at 5 (17.5 percent); ECF No. 281 at 12 (17.9 percent); ECF No. 284 at 34 (20 percent).

The Court has previously discussed the effect of settlement size on the appropriate percentage of fees to award. *See Rodman*, 2018 WL 4030558, at *4-5). Examining the same empirical studies over which Co-Lead Counsel and the objectors now argue, the Court concluded that their "data supports the principle that larger common funds weigh against an upward adjustment of [the] 25 percent [benchmark]." *Id.* at *5 (citing Theodore Eisenberg, Geoffrey Miller, & Roy Germano, Attorneys' Fees in Class Actions: 2009-2013, 92 N.Y.U. L. Rev. 937 (2017) and Brian T. Fitzpatrick, An Empirical Study of Class Action Settlements and Their Fee Awards, 7 J. Empirical Legal Stud. 811 (2010)). Applying this principle to a $42 million judgment, the Court reasoned that the studies' "data does not replace the 25 percent benchmark, nor does it negate the positive factors assessed above. It is simply an important additional data point in the determination of an appropriate award. And it weighs in favor of a slight downward adjustment from the Ninth Circuit's 25 percent benchmark." *Id.* Accordingly, the Court awarded 28 percent of the common fund rather than the 35 percent requested. *Id.* at *2, 6.

As Cashman points out, the positive factors in *Rodman* were extraordinarily strong. There, counsel had litigated the case to judgment, obtaining "100 percent of damages plus interest." *Id.* at *3. Counsel had also litigated the case on a contingency basis through "more than six years of pre-trial, appellate, and post-judgment litigation." *Id.* at *1. The *Rodman* judgment of approximately $42 million fell in a lower range at which, according to the empirical studies, the mean fee percentage was 22.3 or 24 percent, depending on the study. *Id.* at *5. Here, by contrast, the $240 million common fund falls within a range where courts have awarded a mean fee percentage of 18.4 or 22.3 percent. *Id.*

Bearing the foregoing considerations in mind, the Court finds that the "megafund" nature

19

1    of the Settlement argues in favor of a slight downward adjustment to the Ninth Circuit's 25

2    percent benchmark, but that the award should be toward the upper end of the range for awards of

3    this size.  Accordingly, the Court sets the fee at 22 percent of the Settlement, or $52,800,000.

4                                    **c.    Lodestar Cross-Check**

5            To confirm an award's reasonableness through a lodestar cross-check, a court takes "the

6    number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate."

7    *Hensley*, 461 U.S. at 433.  "[T]he determination of fees 'should not result in a second major

8    litigation'" and "trial courts need not, and indeed should not, become green-eyeshade

9    accountants."  *Fox v. Vice*, 563 U.S. 826, 838 (2011) (quoting *Hensley*, 461 U.S. at 437).  Rather,

10   the Court seeks to "do rough justice, not to achieve auditing perfection."  *Id.* at 838.

11           A district court must "exclude from this initial fee calculation hours that were not

12   'reasonably expended.'"  *Hensley*, 461 U.S. at 434 (citation omitted).  Additionally, the reasonable

13   hourly rate must be based on the "experience, skill, and reputation of the attorney requesting fees"

14   as well as "the rate prevailing in the community for similar work performed by attorneys of

15   comparable skill, experience, and reputation."  *Chalmers v. City of Los Angeles*, 796 F.2d 1205,

16   1210-11 (9th Cir. 1986), *amended on other grounds*, 808 F.2d 1373 (9th Cir. 1987).  The relevant

17   community is typically the forum – here, San Francisco.  *See Schwarz v. Sec'y of Health &*

18   *Human Servs.*, 73 F.3d 895, 906-07 (9th Cir. 1995) (citations omitted).  To inform and assist the

19   Court in making this assessment, "the burden is on the fee applicant to produce satisfactory

20   evidence . . . that the requested rates are in line with those prevailing in the community. . . ."  *Blum*

21   *v. Stenson*, 465 U.S. 886, 895 n.11 (1984).  Regardless whether the court uses the lodestar or

22   percentage approach, the main inquiry is whether the fee award is "reasonable in relation to what

23   the plaintiffs recovered."  *Powers v. Eichen*, 229 F.3d 1249, 1258 (9th Cir. 2000).

24           Here, Co-Lead Counsel claim 48,367.65 hours, at hourly rates ranging from $560 to

25   $1,075 for partners or "of counsel" attorneys, $250 to $660 for associates, $365 to $420 for staff

26   or project attorneys, and from $295 to $415 for contract or discovery attorneys (i.e., "attorneys

27   who are not full-time firm employees but rather hired through an outside agency").  *Id.* at 26-28.

28   Based on these figures, they calculate a lodestar of $22,426,479.50, which would render a

United States District Court
Northern District of California

1    multiplier of 3.03 on their requested award.  *Id.* at 25-26.  Objectors primarily take issue with the

2    hourly rates of staff and contract attorneys.

3                                    **i.    Contract attorneys**

4           A substantial number of the hours comprising Co-Lead Counsel's lodestar were expended

5    by contract attorneys.[10]  In their motion for attorney's fees, Co-Lead Counsel do not provide the

6    actual hourly rate paid for the time of any particular contract attorney, but state generally that they

7    were compensated at a rate somewhere between $35 and $50 per hour.  *Compare* ECF No. 277 at

8    28 n.13 (using a figure of $40-$50 per hour); ECF No. 287 at 17 n.9 (using a figure of $35 per

9    hour).  The mark-up contained in nominal hourly rates of $295-$415 is, to say the least, "striking."

10   *In re Anthem, Inc. Data Breach Litig.*, 2018 WL 3960068, at *19 (contract attorneys paid between

11   $25.00 and $65.00 per hour billed at rates ranging from $185.00 to $495.00 per hour, with most

12   over $350.00).

13          The Court cannot determine how to include contract attorneys' time in the lodestar until

14   the Court determines what the "market rate" for those services is.  Surprisingly, there is very little

15   authority on that question.[11]  As the Court observed in a different case:

16              The courts have not spoken with one voice concerning the proper
17              treatment of contract attorney costs in the calculation of a lodestar.
                Many courts hold that contract attorneys' hours should be billed at
18              market rates and included in the lodestar without regard to the wage
                actually paid to the contract attorney.  *See, e.g., Charlebois v. Angels*
19              *Baseball LP*, 993 F. Supp. 2d 1109, 1124 (C.D. Cal. 2012); *In re*
                *Tyco Int'l, Ltd. Multidistrict Litig.*, 535 F. Supp. 2d 249, 272
20              (D.N.H. 2007).  In the view of these courts, "[t]he lodestar
                calculation is intended not to reflect the costs incurred by the firm,
21              but to approximate how much the firm would bill a paying client."
                *Tyco Int'l*, 535 F. Supp. 2d at 272.  Accordingly, "it is not
22              objectionable *per se* . . . to apply a multiplier to a lodestar that
                includes work performed by contract attorneys, even though the
23              profit margin for the firms employing them was greater than the
                profit margin the firms would have had for work done by full-time
24              employees."  *Carlson v. Xerox Corp.*, 596 F. Supp. 2d 400, 410 (D.
                Conn. 2009), *aff'd*, 355 Fed. Appx. 523 (2d Cir. 2009).  Not
25              surprisingly, this is the position taken by Class Counsel.  *See* IPP
                Resp. at 35 ("[I]f the contract lawyer is billed as just another lawyer
26              whose work makes up the fee for the matter, the firm may bill the

27   _____
     [10] Objections to the rates of staff, rather than contract, attorneys are overruled.

28   [11] For clarity, the Court repeats here some of the analysis contained in the Court Expert Order.

                                            21

United States District Court
Northern District of California

client any reasonable rate for the services just as it does for one of its associates.") (quoting Legal Ethics, Law. Deskbk. Prof. Resp. § 1.5-4(e) (2015-2016 ed.)).

Some courts, by contrast, are unwilling to calculate a lodestar at higher associate market rates when contract attorneys themselves billed at much lower rates. *See, e.g., City of Pontiac Gen. Employees' Ret. Sys. v. Lockheed Martin Corp.*, 954 F. Supp. 2d 276, 280 (S.D.N.Y. 2013). The reasoning of these courts is that some tasks in document-intensive litigation can and should be performed by "low-cost, low-overhead" contract attorneys, "and there is absolutely no excuse for paying those temporary, low-overhead employees $40 or $50 an hour and then marking up their pay ten times for billing purposes." *In re Citigroup Inc. Sec. Litig.*, 965 F. Supp. 2d 369, 395-96 (S.D.N.Y. 2013). Also, "a sophisticated client, knowing these contract attorneys cost plaintiff's counsel considerably less than what the firm's associate attorneys cost (in terms of both salaries and benefits) would have negotiated a substantial discount in the hourly rates charged the client for these services." *City of Pontiac*, 954 F. Supp. 2d 276.

*In re: Cathode Ray Tube (CRT) Antitrust Litig.*, MDL No. 1917, No. C-07-5944 JST, 2016 WL 4126533, at *8 (N.D. Cal. Aug. 3, 2016), *dismissed sub nom. In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. 16-16368, 2017 WL 3468376 (9th Cir. Mar. 2, 2017). While this Court found it unnecessary to reach the question in *CRT*, *see id.*, it believes the question is more squarely presented here.

There are several potential approaches to answering this question. One approach, and the one suggested by Co-Lead Counsel, is to calculate all contract attorney fees at a notional "market rate" determined by Co-Lead Counsel based on each attorney's background and experience and the type of work performed on the case. *See, e.g., In re Tyco Int'l, Ltd. Multidistrict Litig.*, 535 F. Supp. 2d 249, 272 (D.N.H. 2007) ("It is therefore appropriate to bill a contract attorney's time at market rates and count these time charges toward the lodestar."). This is the approach taken by many district courts, although the "market rate" is artificial in the sense that the rate has never been paid – or at least, there is no evidence that it has ever been paid – by a willing client. Another approach is to allow the actual cost of the contract attorneys to Co-Lead Counsel only as a cost item and not to include it in their lodestar. This approach has been taken by some district courts, *see, e.g., Dial Corp. v. News Corp.*, 317 F.R.D. 426, 438 (S.D.N.Y. 2016), but only at the suggestion of counsel. The practice of billing contract attorney's fees as a cost has much to recommend it – it "reap[s] cost savings for the clients[]" and "promotes judicial efficiency by

22

1    avoiding a judicial determination of fees," *In re Anthem, Inc. Data Breach Litig.*, 2018 WL

2    3960068, at *18 – but no court has required it.  A third approach is to include in the lodestar the

3    hourly rate actually paid to contract attorneys, increasing that rate by a certain amount to account

4    for overhead.  *See, e.g., In re Petrobras Sec. Litig.*, 317 F. Supp. 3d 858, 875-76 (S.D.N.Y. 2018),

5    *appeal dismissed sub nom.* No. 18-2120, 2018 WL 7108171 (2d Cir. Sept. 13, 2018), and *aff'd,*

6    No. 18-2120, 2019 WL 4127327 (2d Cir. Aug. 30, 2019).  This approach too has something to

7    recommend it, although without good evidence concerning overhead rates it also is speculative.  A

8    fourth approach is to start with the nominal "market" rates suggested by Co-Lead Counsel and

9    reduce that rate to a different nominal rate to account for the lawyers' status as contract attorneys.

10    *In re Anthem, Inc. Data Breach Litig.*, 2018 WL 3960068, at *20.  This kind of adjustment, while

11    reducing the size of Co-Lead Counsel's mark-up, is inherently speculative and still does not

12    attempt to identify an actual market rate for the services provided by contract attorneys.

13            In light of the deficiencies in all of these approaches, the Court previously issued an order

14    to show cause why it should not appoint an expert to determine a true market rate for contract

15    attorneys.  ECF No. 301.  The goal of that order was to "determin[e] what actual clients typically

16    pay for contract attorney services when a law firm utilizes those contract attorneys' services on

17    behalf of that paying client."  *Id.* at 6.  The Court believed "[t]hat rate, rather than a notional rate

18    determined by Plaintiffs' counsel, [was] more likely to be the 'market rate' for those services,

19    because '[a]n actual price, agreed to by a willing buyer and a willing seller, is the most accurate

20    gauge of the value the market places on a good.'  *Id.* (quoting *Keener v. Exxon Co., USA*, 32 F.3d

21    127, 132 (4th Cir. 1994)).  Accordingly, the Court ordered the parties to show cause

22                    why an expert witness should not be appointed pursuant to Federal
                    Rule of Evidence 706 to provide an opinion regarding the market
23                    rate for contract attorney services, and specifically to answer the
                    following question:  When law firms utilize contract attorneys to
24                    assist in complex litigation on behalf of clients who pay those firms'
                    fees on a current basis, i.e., not on contingency: (1) do those firms
25                    commonly charge a premium or multiplier in addition to the contract
                    attorneys' fees when billing those fees to the client; and (2) if so,
26                    what is the percentage premium or multiplier, if any, most
                    commonly charged by those firms?

27

28

United States District Court
Northern District of California

United States District Court
Northern District of California

1  *Id.* at 7.  The Court proposed that Dr. Daniel Acland, a Ph.D. economist at the University of

2  California at Berkeley, be appointed to this role.  *Id.*  The order provided, however, that the parties

3  could "propose another expert or experts for the Court's consideration."  *Id.*  The Court's order

4  also stated that, if a court expert were appointed, he or she would be subject to deposition and

5  cross-examination, and the parties would remain free to call their own expert witnesses on the

6  subject.  *Id.*

7  In response to the Court Expert Order, Defendants requested that the Court approve the

8  parties' settlement without resolving the question of attorney's fees, but did not oppose the

9  appointment of a court expert.  ECF No. 304.  Objector Cashman opposed the appointment of an

10  expert, suggesting instead that the Court "[s]imply ask counsel for Wells Fargo, Sullivan &

11  Cromwell, what they charge defendant Wells Fargo for contract attorneys" and use the answer in

12  determining an appropriate rate here.  ECF No. 305 at 2.  He noted that "the burden is on the fee

13  applicant to produce satisfactory evidence . . . that the requested rates are in line with prevailing

14  market rates," *id.* at 4 (quoting *In re Citigroup Inc. Sec. Litig.*, 965 F. Supp. 2d at 396), and argued

15  that the fact "[t]hat the Court is considering retaining an expert to determine what market rates are

16  demonstrates that class counsel has not met their burden," *id.*

17  Co-Lead Counsel objected to the Court's proposal on several grounds.  ECF No. 306.

18  First, they disputed that data concerning "'what actual clients typically pay for contract attorney

19  services when a law firm utilizes those contract attorneys' services on behalf of that paying client'

20  . . . is accessible in reliable form."  *Id.* (quoting Court Expert Order at 6).  Second, they argued that

21  "even if market rate data for contract attorneys used by defense firms in complex litigation were

22  available, it would not provide relevant information on the rates prevailing for work performed by

23  contract attorneys for *plaintiffs'* firms in complex litigation, which entails substantive document

24  coding, issue identification, and deposition preparation analysis absent from defense-side contract

25  attorney work."  *Id.* at 5 (emphasis in original).  Third, they offer that "Lieff Cabraser's own

26  experience as counsel for large clients in non-contingency representations, albeit limited, supports

27  the reasonableness of the rates charged for contract attorneys for the work they performed in this

28  case."  *Id.*  They cited four examples in the last 17 years in which Lieff Cabraser represented

24

1    clients on an hourly paid fee basis and "charged clients for the services of contract or hourly

2    attorneys and [was] paid at rates comparable to those [requested] here." *Id.* at 14.  Lastly, Co-

3    Lead Counsel took issue with Dr. Acland's qualifications and "request[ed] that the Court hold a

4    hearing to allow the parties to assess" them.  *Id.* at 5.  Notably, Co-Lead Counsel did not propose

5    their own expert or an alternative method of determining a market rate for contract attorneys

6    beyond the walls of their own firm.  On those questions, they simply punted.

7         None of these criticisms is convincing.  Regarding the accessibility of the necessary data,

8    the Court cannot conclude that the data to determine an appropriate market rate for contract

9    attorneys is unavailable until some attempt has been made to *obtain* that data; one can't know if

10   something is possible if one hasn't tried.  Second, if that data turns out not to sufficiently account

11   for the special roles, if any, played by plaintiff-side contract attorneys, Plaintiffs can provide their

12   own data.  Third, four instances of billing over 17 years does not establish a "market rate" because

13   the sample size is too small.  As Lieff Cabraser knows from other litigation in which it has been

14   counsel of record, it is not possible to draw meaningful conclusions from such a small sample size

15   because the data is not statistically significant.  *See, e.g., Chen-Oster v. Goldman, Sachs & Co.*,

16   325 F.R.D. 55, 69 (S.D.N.Y. 2018) (affirming exclusion of statistical studies because "sample size

17   of only 2 pairs . . . could not be statistically significant"); *In re Optical Disk Drive Antitrust Litig.*,

18   No. 3:10-MD-2143 RS, 2016 WL 467444, at *7 (N.D. Cal. Feb. 8, 2016) (Lieff Cabraser arguing

19   on behalf of plaintiffs that "reducing sample size too far undermines the statistical reliability of

20   any results") (emphasis omitted); *Ellis v. Costco Wholesale Corp.*, 285 F.R.D. 492, 522-23 & n.25

21   (N.D. Cal. 2012) (relatively small sample size likely not to yield statistically significant results).

22   As for the sufficiency of Dr. Acland's qualifications, Co-Lead Counsel could have proposed their

23   own expert, but they did not.  Instead, they proposed only an open-ended process of discovery

24   concerning the Court's proposed expert.  Combined with Co-Lead Counsel's failure to nominate

25   their own expert, their proposed process of responding to the Court's order seems designed less to

26   ensure that the most helpful data is gathered, and more to bolster their position that the task is

27   impossible.

28         The Court does not agree that the data is unavailable or inaccessible.  Nor is the Court

United States District Court
Northern District of California

persuaded by the rates charged by Lieff Cabraser on a few occasions over the last 17 years.

Instead, the Court concludes simply that Co-Lead Counsel have not met their burden of

"produc[ing] satisfactory evidence . . . that the requested rates [for contract attorneys] are in line

with those prevailing in the community." *Blum*, 465 U.S. at 895 n.11. The Court will therefore

incorporate contract attorneys' time[12] into the lodestar at the $42.50 per hour average they were

actually paid, for a total of $445,538,[13] and reduce the lodestar by $2,808,659.

### ii.    Billing detail

Cashman also faults Co-Lead Counsel for "fail[ing] to provide sufficient detail in their

billing summaries" to permit scrutiny as to whether their hours were excessive. ECF No. 281 at

25. Plaintiffs did not provide contemporaneous records of individual entries, but instead provided

summaries of the work performed by each timekeeper, including (1) the hours each timekeeper

devoted to particular categories of work during each month; (2) the portion of total lodestar

devoted to particular categories of work during each month, and (3) the hours and lodestar each

timekeeper devoted to particular categories of work for the entirety of the case.

The Court agrees with Co-Lead Counsel that contemporaneous time records are not always

required. "California courts have . . . approved fee awards based on declarations describing the

hours worked on various tasks, without providing underlying time records of the hours worked

and the type of work performed." *Ridgeway v. Wal-Mart Stores Inc.*, 269 F. Supp. 3d 975, 987

(N.D. Cal. 2017) (citing *Lunada Biomedical v. Nunez*, 230 Cal. App. 4th 459, 487-88 (2014)); *see*

*also City of Colton v. Singletary*, 206 Cal. App. 4th 751, 785 (2012); *Chavez v. Netflix, Inc.*, 162

Cal. App. 4th 43, 64 (2008). The same is true in the Ninth Circuit. *See Fischer v. SJB-P.D. Inc.*,

214 F.3d 1115, 1121 (9th Cir. 2000). And this district's local rules require only that the motion

---

[12] Based on the timekeeper biographies submitted by the Saxena White firm, ECF No. 278-8 at 19, the Court concludes that "discovery attorneys" are contract attorneys. The Court reaches the same conclusion regarding the "project attorneys" utilized by Robbins Arroyo. ECF No. 278-10 at 8, 10.

[13] Plaintiffs' response to the Court Expert Order states that "the actual amount of contract attorney lodestar in this case is $3,232,672.50." ECF No. 306 at 4. The total lodestar attributed to contract attorneys in the bills submitted by counsel totals $3,254,197.50. See ECF Nos. 278-7 at 7, 44-45, 54, 278-8 at 7-8, 48-51; 278-10 at 8. The Court has used the latter figure.

United States District Court
Northern District of California

United States District Court
Northern District of California

1  include "[a] statement of the services rendered by each person for whose services fees are claimed

2  together with a summary of the time spent by each person, and a statement describing the manner

3  in which time records were maintained," while providing the Court with discretion to require

4  additional documentation.  Civil L.R. 54-5(b)(2).

5         Nonetheless, Cashman's criticisms have some force.  The level of specificity at which

6  Plaintiffs' counsel have documented their time makes it difficult or impossible for objectors to

7  raise certain challenges that courts have found justified partial reductions in other cases.  For

8  instance, this Court has previously reduced fees for "entries related to clerical tasks that are not

9  compensable or, at the very least, should not be billed at an attorney's hourly rate."  *Boconvi v.*

10  *Velocity Express, LLC*, No. 17-cv-02623-JST, 2018 WL 2248988, at *3 (N.D. Cal. May 17, 2018);

11  *see also Hydros Bottle LLC v. Stephen Gould Corp.*, No. 16-cv-04077-JST, 2017 WL 3453350, at

12  *7 (N.D. Cal. Aug. 10, 2017) (denying fees for hours that "appear to all be administrative and/or

13  clerical in nature, such as calendaring deadlines and filing and serving documents").

14         This Court has also found reductions appropriate where "entries such as 'reviewed email,'

15  'SJ motion,' and 'review documents' d[id] not provide enough detail about the work performed to

16  allow the Court to determine whether the claimed hours are reasonable."  *Boconvi*, 2018 WL

17  2248988, at *4.  Relatedly, where entries did provide such detail, the Court has sometimes noted

18  that the allocation of work on a particular motion was unreasonable.  *See Stewart v. Applied*

19  *Materials, Inc.*, No. 15-cv-02632-JST, 2017 WL 3670711, at *10 (N.D. Cal. Aug. 25, 2017)

20  ("While the Court would expect [the most senior attorneys] to review and edit the Motion before

21  filing, basic research and drafting tasks should have been left to a more junior lawyer.").

22  Additionally, "[t]he Ninth Circuit has approved of reductions in fees for unnecessary and

23  duplicative intra-office conferences."  *Hernandez v. Grullense*, No. 12-cv-03257-WHO, 2014 WL

24  1724356, at *10 (N.D. Cal. Apr. 30, 2014) (citing *Welch v. Metro. Life Ins. Co.*, 480 F.3d 942, 949

25  (9th Cir. 2007)).  Courts within this district have also been "critical of the practice of billing for

26  multiple .1 hour entries separately where they could be consolidated."  *Id.* at  *9.

27         Co-Lead Counsel's approach thus deprives Objectors and the Court of the ability to

28  identify excessive hours in categories like the ones just identified. At the same time, the Court is

United States District Court
Northern District of California

mindful that "the determination of fees 'should not result in a second major litigation.'" *Fox*, 563 U.S. at 838 (quoting *Hensley*, 461 U.S. at 437)). Moreover, "when trimming the fee application, the district court 'should defer to the winning lawyer's professional judgment as to how much time [s]he was required to spend on the case; after all, [s]he won, and might not have, had [s]he been more of a slacker.'" *Elise Dragu v. Motion Picture Indus. Health Plan for Active Participants*, 159 F. Supp. 3d 1121, 1128 (N.D. Cal. 2016) (quoting *Moreno*, 534 F.3d at 1112). Based on the scope, complexity, and contentious nature of this case, the Court does not find the time claimed in Plaintiffs' counsel's categories to be unreasonable. While concerns about generalized billing have sometimes prompted the Court to reduce a lodestar across the board, *see, e.g., Bernstein v. Virgin America, Inc.*, No. 15-cv-02277, ECF No. 402 at 8 (N.D. Cal. Jan. 21, 2020), the Court declines to do so here.

Accordingly, the Court reduces the lodestar by $2,808,659 to reflect the lack of evidence concerning an appropriate market rate for contract attorneys, but does not otherwise decrease it, resulting in a total lodestar of $19,617,820.50. On an award of $52,800,000, the multiplier is 2.7, which is within the range other courts have found reasonable. *See, e.g., Vizcaino*, 290 F.3d at 1051 n.6 (in a majority of cases where the common fund was $50-200 million, the multiplier was in the 1.5-3.0 range); *In re Cendant Corp. Prides Litig.*, 243 F.3d 722, 742 (3d Cir. 2001) (indicating that lodestar multiplier of 1.35 to 2.99 is common in megafunds over $100 million).

### d.      Reaction of the Shareholders

As with the Settlement itself, the lack of objections from institutional investors "who presumably had the means, the motive, and the sophistication to raise objections" weighs in favor of approval of the fee request. *In re Bisys Sec. Litig.*, No. 04 CIV. 3840(JSR), 2007 WL 2049726, at *1 (S.D.N.Y. July 16, 2007).

### e.      LeBendig

Plaintiff Cathy Lebendig objects to Co-Lead Counsel's attorney's fees application on the grounds that it is "bloated" and does not award fees to her lawyers, Barry Himmelstein of Himmelstein Law Network and Alexander Stern of Stern Legal Services. ECF No. 282. On their behalf, she asks for an award of $33,565 in fees and $400 in costs. *Id.* at 8-9.

United States District Court
Northern District of California

1    On November 9, 2016, LeBendig moved the Court to appoint the firms of Wolf

2    Haldenstein Adler Freeman & Herz LLP ("Wolf Haldenstein") and Harwood Feffer LLP

3    (Harwood Feffer") to serve as Lead Derivative Plaintiffs' Counsel in the consolidated actions.

4    ECF No. 29.  Later, however, she withdrew that application as well as any opposition to the

5    appointment of Lieff Cabraser Heimann & Bernstein LLP and Saxena White P.A. as Co-Lead

6    Plaintiffs' Counsel.  ECF No. 43.  From that time until the filing of her objection, there is no

7    record of her having participated in the litigation.

8    Much of the objection and request for fees is based on work Himmelstein says he

9    performed in an earlier, unrelated case, *Gutierrez v. Wells Fargo Bank*, No. C 07-05923 WHA

10   (N.D. Cal.).  That case was prosecuted by the Lieff Cabraser firm when Himmelstein was still a

11   partner of that firm; Himmelstein wishes the Court to understand that he personally was

12   responsible for Lieff Cabraser's success in that case.  *See* ECF No. 282 at 5 n.1.[14]

13   The Court overrules LeBendig's objection to Co-Lead Counsel's fee request, which

14   besides describing that request as "bloated," *id.* at 9, makes no specific complaint about it.  That

15   leaves Lebendig's request for an award of fees to her lawyers.

16   Federal Rule of Civil Procedure 23 permits a court to "award reasonable attorney's fees

17   and nontaxable costs that are authorized by law or by the parties' agreement."  Fed. R. Civ. P.

18   23(h).  Wells Fargo did not agree to pay LeBendig's lawyer's fees as part of the settlement.  The

19   only other legal ground that might conceivably be available to Lebendig is that she or her counsel

20   "created a common fund for recovery or extended a substantial benefit to a class."  *In re*

21   *Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*, 914 F.3d 623, 641 (9th

22   Cir. 2019) (quoting *In re Bluetooth*, 654 F.3d at 941).  However, neither she nor her lawyers

---

[14] "From the time LCHB associated into the case until commencement of trial, Himmelstein singlehandedly conducted all of the remaining discovery, and single-handedly briefed and argued all of the remaining pre-trial motions except for Wells Fargo's motion for reconsideration of the court's order rejecting its defense of federal preemption, including plaintiffs' motion to exclude the testimony of Wells Fargo's experts, and the opposition to Wells Fargo's motion for summary judgment or to decertify the class.  At trial, Himmelstein presented the testimony of plaintiffs' damages expert, and cross-examined Wells Fargo's damages expert.  Richard Heimann, who had virtually no involvement with any of the pre-trial briefing, was the only other LCHB attorney to question witnesses at trial."  *Id.*

1    identify any legal work they did for the class' benefit.  Instead, they state that Lebendig had

2    factual information that could have "short-circuited" the discovery process.  That assertion is

3    speculative, and in any event does not change the fact that Himmelstein did not perform any

4    services that benefitted the class.  Accordingly, the Court must deny this fee request.  *Vizcaino*,

5    290 F.3d at 1051 (objectors were not entitled to fees because they did not increase the settlement

6    fund or otherwise substantially benefit the class).

7         **B.**    **Incentive Awards**

8         Co-Lead Counsel request incentive awards of $25,000 each for co-lead plaintiffs FPPA

9    and Birmingham.

10        "Incentive awards are payments to class representatives for their service to the class in

11   bringing the lawsuit."  *Radcliffe v. Experian Info. Solutions, Inc.*, 715 F.3d 1157, 1163 (9th Cir.

12   2013).  "It is well-established in this circuit that named plaintiffs in a class action are eligible for

13   reasonable incentive payments, also known as service awards."  *Wren v. RGIS Inventory

14   Specialists*, No. 06-cv-05778 JCS, 2011 WL 1230826, at *31 (N.D. Cal. Apr. 1, 2011),

15   *supplemented*, No. 06-cv-05778 JCS, 2011 WL 1838562 (N.D. Cal. May 13, 2011).  An incentive

16   award of $5,000 is presumptively reasonable, and an award of $25,000 or even $10,000 is

17   considered "quite high."  *See Dyer v. Wells Fargo Bank, N.A.*, 303 F.R.D. 326, 335 (N.D. Cal.

18   2014) (citing *Harris v. Vector Mktg. Corp.*, No. 08-cv-5198 EMC, 2012 WL 381202, at *7 (N.D.

19   Cal. Feb. 6, 2012)).  Nonetheless, a higher award may be appropriate where class representatives

20   expend significant time and effort on the litigation and face the risk of retaliation or other personal

21   risks; where the class overall has greatly benefitted from the class representatives' efforts; and

22   where the incentive awards represent an insignificant percentage of the overall recovery.  *Wren*,

23   2011 WL 1230826, at *32.

24        Several factors weigh in favor of a higher award here.  First, FPPA and Birmingham's

25   contribution and effort were substantially greater than the average lead plaintiff's.  Counsel

26   represent that "FPPA's and Birmingham's representatives closely participated in every aspect of

27   this case, collectively devoting more than 400 hours of time they otherwise would have spent on

28   other work for those institutions."  ECF No. 277 at 29.  Second, Co-Lead Counsel propose to

United States District Court
Northern District of California

30

1   deduct the award from counsel's fees rather than the settlement fund. "An incentive payment to

2   come from the attorneys' fees awarded to plaintiff's counsel need not be subject to intensive

3   scrutiny, as the interests of the corporation, the public, and the defendants are not directly

4   affected." *In re OSI Sys., Inc. Derivative Litig.*, No. CV142910MWFMRWX, 2017 WL 5642304,

5   at *5 (C.D. Cal. May 2, 2017) (quoting *Cendant*, 232 F. Supp. 2d 327, 344 (D.N.J. 2002)).

6   Finally, although the Court gives this factor only modest weight, larger awards are more common

7   in "megafund" cases. *See In re High-Tech Employee Antitrust Litig.*, No. 11-CV-02509-LHK,

8   2015 WL 5158730, at *18 (N.D. Cal. Sept. 2, 2015) (collecting cases).

9           Taking these factors into account, the Court concludes that the requested incentive awards

10  are justified and reasonable in this case.

11                                          **CONCLUSION**

12          For the foregoing reasons, Plaintiffs' motion for final approval of the derivative settlement

13  is granted; the motion for attorney's fees and costs is granted in part and denied in part; and the

14  motion for incentive awards is granted. Any remaining objections to the settlement are overruled.

15          **IT IS SO ORDERED.**

16  Dated:  April 7, 2020

17                                          _____

18                                                  JON S. TIGAR
                                             United States District Judge

19

20

21

22

23

24

25

26

27

28

*United States District Court*
*Northern District of California*